**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **BLAINE SHAW, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 19-1343-KHV |
| | ) | |
| **HERMAN JONES, in his official capacity** | ) | |
| **as Superintendent of the Kansas** | ) | |
| **Highway Patrol, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

On January 30, 2020, Blaine Shaw, Samuel Shaw and Joshua Bosire, on behalf of themselves and others similarly situated, filed an amended complaint against Kansas Highway Patrol ("KHP") Superintendent Herman Jones, and KHP troopers Doug Schulte and Brandon McMillan,[1] alleging that based on their travel origins and destinations, defendants subjected them to prolonged detentions and vehicle searches. First Amended Complaint – Class Action (Doc. #7). Pursuant to 42 U.S.C. § 1983, plaintiffs sue defendants for violating their rights under Article IV and the Fourth and Fourteenth Amendments to the United States Constitution, and they seek compensatory, punitive, declaratory and injunctive relief. This matter is before the Court on the Motion To Dismiss Defendant Herman Jones (Doc. #14) filed February 28, 2020. For the reasons stated below, the Court overrules the motion.

---

[1] Plaintiffs sue Jones in his official capacity as KHP Superintendent, and sue Schulte and McMillan in their individual capacities.

**Factual Background**

Highly summarized, plaintiffs' amended complaint alleges the following:

**I.     KHP's Practice Of Targeting Out-Of-State Travelers**

In 2014, Colorado legalized the recreational cultivation, sale and possession of marijuana, which Kansas law enforcement quickly characterized as a threat to the health and safety of Kansas residents. In 2016, to determine the impact that Colorado-sourced marijuana was having on Kansas, Kansas Attorney General Derek Schmidt issued a survey to law enforcement agencies. In response, KHP reported a significant increase in seizures of marijuana which originated in Colorado. KHP suspected that in 2015, 69 per cent of all marijuana that it seized came from Colorado.

As a result, KHP increased its scrutiny of drivers who were traveling to and from Colorado. For individuals who made these trips, defense attorneys reported an uptick in stops and prolonged detentions by KHP, which was particularly true for out-of-state drivers. KHP's stop and forfeiture data show that it disproportionately stops out-of-state drivers and subjects them to civil asset forfeiture proceedings. Specifically, in 2017, drivers who had out-of-state license plates constituted 93 per cent of KHP stops. In 2018 and 2019, out-of-state motorists who were driving through Kansas on I-70 constituted 96 per cent of KHP civil forfeitures. KHP has also declared that out-of-state drivers who are traveling to and from Colorado are proper targets for suspicion. In a 2017 article in the Topeka Capital Journal, KHP Lieutenant Randy Moon noted that "it's not an unreasonable expectation" for his troopers to assume that drivers who have out-of-state license plates and are traveling to or from Colorado are trafficking marijuana.

### A.     Prolonged Detentions

When KHP troopers suspect that a driver on I-70 is traveling to or from Colorado, they employ a maneuver called the "Kansas Two Step," in which they detain the driver after the initial purpose of the traffic stop has ended and ask questions about his or her travel plans. KHP does so without the driver's consent or a reasonable suspicion of criminal activity. KHP training materials include instructions on the Kansas Two Step, which the Kansas Court of Appeals has described as follows:

> After telling [the driver] to have a safe trip, [the trooper] turned his body, took two steps toward his patrol vehicle, turned back around, and, through the Escalade's still open passenger window, asked [the driver] if he would answer a few more questions. This maneuver is known as the "Kansas Two Step" and is taught to all Kansas Highway Patrol officers as a way to break off an initial traffic detention and attempt to reengage the driver in what would then be a consensual encounter.

State v. Gonzalez, 455 P.3d 419, 423 (Kan. Ct. App. 2019). To conduct this maneuver, KHP troopers block the detained vehicle from safely re-entering traffic while questioning the occupants about their travel plans and whether the vehicle contains anything illegal.

### B.     Canine Drug Searches

If KHP troopers apply the Kansas Two Step but cannot elicit consent to search, they have canines search the vehicle for drugs based solely on their belief that the driver is traveling to or from Colorado. KHP has maintained this practice since 2011, and it typically goes as follows: (1) the trooper issues the driver a ticket or warning for a driving infraction, or tells the driver that he or she will receive one; (2) without breaking contact with the vehicle, the trooper asks the driver to answer "a quick question" or "a few more questions;" (3) the trooper asks about the driver's travel plans (if not already established during the initial stop); (4) if the driver declines to answer or provides travel details which indicate that he or she is traveling to or from Colorado, the trooper asks the driver if he or she is transporting anything illegal; (5) if the driver denies transporting

anything illegal, the trooper requests consent to search the vehicle; and (6) if the driver declines to consent, the trooper detains the driver and has a canine search the vehicle.

In 2016, the Tenth Circuit held that even when combined with other factors, a driver's status as a Colorado resident does not give KHP troopers reasonable suspicion to subject the driver to prolonged detention and a vehicle search. Vasquez v. Lewis, 834 F.3d 1132, 1137 (10th Cir. 2016). In Vasquez, KHP troopers had used the driver's Colorado residency as partial justification to detain him for a canine drug search. The Tenth Circuit concluded that factors such as state residency and other indicia of interstate travel are "so broad as to be indicative of almost nothing." Id. (citations omitted). Specifically, because 25 states permit marijuana use for medical purposes, the troopers' reasoning "would justify the search and seizure of the citizens of more than half of the states in our country." Id. The Tenth Circuit reasoned that it "cannot think of a scenario in which a combination of otherwise innocent factors becomes suspicious because the individual is from one of the aforementioned twenty-five states or the District of Columbia." Id. at 1138. It concluded that "it is time to abandon the pretense that state citizenship is a permissible basis upon which to justify the detention and search of out-of-state motorists, and time to stop the practice of detention of motorists for nothing more than an out-of-state license plate." Id.

### C. KHP Training

Despite the Tenth Circuit ruling in Vasquez, KHP still instructs its troopers that when combined with other innocuous factors, a driver's travel origin or destination grants reasonable suspicion to search the vehicle. KHP does not train its troopers that using these factors to search vehicles violates the Fourth Amendment to the United States Constitution, and it does not include Vasquez in its training curriculum.

As Superintendent of KHP, Herman Jones is the chief officer of the statewide police force. Accordingly, Jones has the statutory authority to direct the conduct of KHP troopers, and he is responsible for training, guiding and directing KHP troopers. Jones therefore has the authority to stop the Kansas Two Step and canine searches that are based on driver travel origins or destinations.

## II.   Detentions Of Blaine And Samuel Shaw

Blaine Shaw and his brother Samuel Shaw reside in Oklahoma City, Oklahoma, and are members of the Osage Nation Native American tribe. The Shaws have family and friends who live in Durango and Colorado Springs, Colorado, and they maintain contact with members of the Osage community in a suburb north of Denver. Several times a year, Blaine drives through Kansas to Colorado on I-70 to visit family and friends, and he plans to continue doing so in the future. Samuel also travels through Kansas on I-70 once a year to visit family and friends in Aurora and Durango. Samuel often accompanies Blaine when he travels to Colorado, and he plans to continue doing so for the foreseeable future.

On December 20, 2017, Blaine was driving to Denver with Samuel in their father's 2010 Chrysler, which has Osage Nation license plates. As they travelled westbound in Ellis County, Kansas, KHP trooper Doug Schulte pulled them over. Schulte told Blaine that he had stopped him for driving 91 miles per hour in a 75 mile per hour zone, and he twice noted Blaine's Oklahoma residence. Schulte wrote Blaine a ticket for speeding, explained how he could pay the ticket and told him to have a safe trip.

Seconds later, before returning to his patrol car, Schulte re-engaged Blaine, asking whether he could ask Blaine a few questions. Schulte asked Blaine where he was traveling. When Blaine said that they were going to Denver, Schulte immediately asked whether Blaine had anything in

the car that he was not supposed to have, such as weapons, narcotics or cash.  Blaine stated that he did not have any of those items.  Schulte then asked Blaine if he could search the vehicle.  Blaine refused, and Schulte instructed Blaine and Samuel to wait while he returned to his patrol car.  Five minutes later, Schulte returned and told Blaine and Samuel that he was detaining them for a canine drug search because Blaine had refused to consent to a search.  Schulte detained Blaine and Samuel for 19 minutes before the canine unit arrived.

When the canine unit arrived, the dog circled the car and alerted to the back seat.  The troopers searched the vehicle for 33 minutes, while Blaine and Samuel waited outside, and discovered medication for which Blaine had a prescription.  Schulte directed Blaine to follow him to the station so that he could make copies of Blaine's medical paperwork.  Blaine complied.  Schulte released Blaine and Samuel from detention after approximately one and a half hours.  During the search, Schulte broke the zippers on two of Blaine's bags.

Following his detention, Blaine suffered significant anxiety, and for the next 14 months, he ceased his job as an Uber driver because he feared that local police would detain him like KHP had.  Similarly, Samuel has become fearful of police and his detention reminded him of a traumatic experience that he had with police as a teenager.

### III.    Detention Of Joshua Bosire

Bosire resides in Wichita, Kansas.  Twice each month, he travels on I-70 to Denver, Colorado to see his four-year-old daughter.  During the winter, he uses a rental car because his vehicle is not equipped for snow or bad weather.  His rental cars usually have out-of-state license plates.

On February 10, 2019, after visiting his daughter in Colorado, Bosire was returning to Wichita in a rented Nissan Altima with Missouri license plates.  While eastbound on I-70 in Ellis

County, Kansas, KHP troopers Schulte and Brandon McMillan stopped and detained him. McMillan asked for Bosire's driver's license, and said that he had stopped Bosire for exceeding the speed limit by six miles per hour. McMillan asked Bosire where he was coming from, to which Bosire responded that he was traveling from the west. McMillan asked him to clarify whether he was traveling from Colorado, but Bosire declined to provide more detail or state the purpose of his trip.

McMillan left Bosire's car to speak with Schulte. Twice, he told Schulte that he did not smell drugs in the car and that he did not believe that he could hold Bosire for a canine search. Schulte encouraged McMillan to try to get Bosire's consent to search the car. McMillan returned to Bosire's car and told him that he was going to give him a warning for speeding, but said that because Bosire had refused to clarify his travel plans, he was suspicious that Bosire was transporting something illegal. McMillan asked Bosire for consent to search his car. Bosire refused, so McMillan called a canine unit.

McMillan and Schulte detained Bosire for 36 minutes before the canine unit arrived. They forced Bosire to exit the car, undergo a pat down search and stand in a cold February night while the dog circled the car. The dog did not alert, so McMillan and Schulte released Bosire from detention.

As a result of the detention, Bosire suffered extreme anxiety and developed a fear of driving alone at night. Based on the stress from the detention, he missed the next several days of work and for the next two months, he refrained from visiting his daughter because he feared that KHP would again detain him at night. Since his detention, Bosire has changed his travel schedule to ensure that he does not have to drive on I-70 at night. He has elected to stay in hotels rather than drive after sundown.

At Bosire's request, KHP performed an internal investigation of his stop. On August 9, 2019, KHP published findings which stated that "after considering everything we had access to, and comparing what we know with what occurred during [Bosire's] traffic contact, we have determined some of [Bosire's] concerns had merit." First Amended Complaint – Class Action (Doc. #7) at ¶ 77. KHP's findings concluded that the length of time Bosire was detained was "unnecessary given the suspicions . . . articulated" by McMillan. Id.

## IV.   Lawsuit

On January 30, 2020, Blaine and Samuel Shaw and Bosire, on behalf of themselves and others similarly situated,[2] filed an amended complaint against Jones, Schulte and McMillan.[3] First Amended Complaint – Class Action (Doc. #7). Pursuant to 42 U.S.C. § 1983, each plaintiff brings several constitutional claims, and they seek various forms of relief. As to Jones, plaintiffs bring the following claims:

- Count 1: Class action claim that Jones violated their Fourth Amendment rights by maintaining a practice of detaining drivers using innocent indicia of travel, and training KHP troopers to do so.

- Count 2: Class action claim that Jones violated their rights to travel under the Privileges and Immunities Clauses of Article IV, Section 2 and the Fourteenth Amendment by creating and enforcing a policy to target vehicles with out-of-state license plates.[4]

---

[2]   Pursuant to Fed. R. Civ. P. 23, plaintiffs seek to bring their claims on behalf of themselves and on behalf of a particular class of individuals. Because the specifics of plaintiffs' class claims are not pertinent to the present motion, the Court does not detail them here.

[3]   As the Court explained above, plaintiffs sue Jones in his official capacity, and sue Schulte and McMillan in their individual capacities.

[4]   In the heading of Count 2, plaintiffs also purport to bring their privileges and immunities claims under the Fourth Amendment. The Court construes these claims as limited to Article IV and the Fourteenth Amendment.

Id. at 23–36.  Plaintiffs seek declaratory and injunctive relief, plus attorneys' fees, costs and any further relief that the Court deems just and equitable.  Plaintiffs do not seek damages from Jones under either count.  See Plaintiffs' Memorandum In Opposition To Defendant Jones's Motion To Dismiss (Doc. #17) filed March 20, 2020 at 8 ("three named Plaintiffs seek damages for themselves from two individual troopers and injunctive and declaratory relief for themselves and the class against Defendant Jones in his capacity as the Superintendent of the KHP").

## Legal Standards

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible – and not merely conceivable – on its face.  Id. at 679-80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  To determine whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense.  Iqbal, 556 U.S. at 679.  Plaintiffs make a facially plausible claim when they plead factual content from which the Court can reasonably infer that defendants are liable for the misconduct alleged.  Id. at 678.  However, plaintiffs must show more than a sheer possibility that defendants have acted unlawfully – it is not enough to plead facts that are "merely consistent with" defendants' liability.  Id. (quoting Twombly, 550 U.S. at 557).  Where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not "shown" – that the pleaders are entitled to relief.  Id. at 679.  The degree of specificity necessary to establish plausibility and fair notice depends on context; what constitutes fair notice under Fed. R. Civ. P. 8(a)(2) depends on the type of case.  Robbins v. Okla., 519 F.3d 1242, 1248 (10th Cir. 2008).

The Court need not accept as true those allegations which state only legal conclusions. See Iqbal, 556 U.S. at 678; Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). Rather, plaintiffs bear the burden of framing their complaint with enough factual matter to suggest that they are entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements. Twombly, 550 U.S. at 556. A pleading that offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand. Iqbal, 556 U.S. at 678.

## Analysis

As the Court explained above, plaintiffs assert two claims against Jones: (1) violation of their Fourth Amendment rights to be free from unreasonable searches and seizures; and (2) violation of their rights to travel under the Privileges and Immunities Clause of Article IV, Section 2 and the Fourteenth Amendment. Under these theories, plaintiffs seek declaratory and injunctive relief, and not damages. Jones asserts that plaintiffs lack standing to pursue these claims.

Federal courts are not "free-wheeling enforcers of the Constitution and laws" — Article III of the United States Constitution limits their jurisdiction to cases and controversies. Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1087 (10th Cir. 2006). Accordingly, to maintain suit in federal court, plaintiffs must establish that (1) they suffered an "injury in fact" that is concrete, particularized and actual or imminent, (2) the injury is "fairly traceable to the challenged action" and (3) it is "likely that the injury will be redressed by the relief requested." Colorado Cross Disability Coal. v. Abercrombie & Fitch Co., 765 F.3d 1205, 1211 (10th Cir. 2014). Accordingly, plaintiffs who seek prospective relief — such as a declaratory or injunctive order to prevent future injury — must show a real and immediate threat of future harm. City of Los Angeles v. Lyons,

461 U.S. 95, 109 (1983); Redmond v. Crowther, 882 F.3d 927, 942 (10th Cir. 2018) (plaintiff who seeks injunctive relief based on threat of future harm must show threat is "real and immediate, not conjectural or hypothetical"); Am. Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. RE-1, 859 F.3d 1243, 1250 (10th Cir. 2017) (to seek prospective relief, plaintiff must suffer continuing injury or be under real and immediate threat of future injury). Although not dispositive, past exposure to wrongful conduct "bears on whether there is a real and immediate threat of repeated injury." Tandy v. City of Wichita, 380 F.3d 1277, 1289 (10th Cir. 2004).

Jones asserts that plaintiffs do not have standing to seek injunctive relief against the KHP practice of detaining and searching vehicles based on the driver's travel origin or destination. Relying heavily on Lyons, Jones argues that even though KHP allegedly subjected plaintiffs to this unconstitutional practice in the past, plaintiffs' allegations do not establish a real and immediate threat that it will do so in the future. See Lyons, 461 U.S. at 106 (to have standing, plaintiff must allege that he would have future encounter with police). Specifically, Jones argues that plaintiffs cannot plausibly allege that they will have future encounters with KHP troopers because such encounters will depend on plaintiffs breaking the law, i.e. KHP will stop them for committing a traffic violation. To show that this unlikely, Jones points out that KHP has not stopped plaintiffs since the traffic stops at issue (on December 20, 2017 and February 10, 2019, respectively) even though they have since continued to travel to and from Colorado on I-70.[5]

---

[5] The fact that KHP has not stopped plaintiffs since February 10, 2019, tells us nothing. It does not prove that plaintiffs did or did not break the law. All it proves is that KHP has not stopped them for traffic violations since that date. It is not implausible that plaintiffs will violate traffic laws in the future or that defendants will detain them for doing so.

This argument is without merit. Plaintiffs allege that based on innocuous indicia of travel, KHP troopers stop and subject drivers to prolonged detention.[6] When the Kansas Two Step fails to procure the driver's consent to search the vehicle, the troopers still conduct a canine search. In 2016, the Tenth Circuit directed KHP to "abandon the pretense that state citizenship is a permissible basis upon which to justify the detention and search of out-of-state motorists, and . . . to stop the practice of detention of motorists for nothing more than an out-of-state license plate." Vasquez, 834 F.3d at 1137.

Allegedly disregarding this order, KHP has continued to explicitly train its troopers to target out-of-state drivers. In a 2017 article in the Topeka Capital Journal, KHP Lieutenant Randy Moon (who apparently disagrees with the Tenth Circuit) vowed that "it's not an unreasonable expectation" for his troopers to assume that drivers who have out-of-state plates and are traveling to or from Colorado are trafficking marijuana. To date, KHP's advanced training curriculum does not mention Vasquez. According to plaintiffs' allegations, KHP troopers have continued to

---

[6] Jones asserts that plaintiffs' amended complaint does not contain any allegations that KHP has a practice of *stopping* vehicles based on indicia of travel — only that it has a practice of subjecting already-stopped drivers to prolonged detentions and vehicle searches.

Although plaintiffs' claims are not based on unlawful stops (i.e., they do not allege that KHP troopers illegally stopped *them*), the amended complaint does contain several allegations that KHP troopers target out-of-state drivers for vehicle stops. See First Amended Complaint – Class Action (Doc. #7) at ¶ 31 ("Defense attorneys reported an uptick in clients with Colorado travel plans being targeted by KHP troopers for stops, prolonged questioning, and detentions"), ¶ 33 ("KHP stop and forfeiture data demonstrates out-of-state drivers are disproportionately stopped by KHP troopers"), ¶ 34 (in 2017, drivers with out-of-state plates made up 93% of KHP stops), and ¶ 62 ("KHP's unlawful stop and detention practices are pervasive and widespread").

Even if plaintiffs do not claim that out-of-state license plates were the reason for their stops, allegations that KHP maintains a "pervasive and widespread" practice of stopping out-of-state drivers are relevant to whether plaintiffs will have future encounters with KHP troopers. In other words, if KHP troopers consistently stop vehicles with out-of-state license plates, this increases the likelihood that they will stop plaintiffs on future trips and subject them to the challenged detentions and searches.

consistently apply their training: in 2017, drivers who had out-of-state license plates constituted 93 per cent of KHP's stops.[7]

Here, plaintiffs allege that several times a year, they drive through Kansas on I-70 on their way to and from Colorado. Specifically, Bosire takes I-70 twice a month to see his daughter in Denver, Colorado, and the Shaws travel several times a year to visit family and friends in various cities throughout Colorado. In December of 2017 and February of 2019, just as they consistently do with other out-of-state drivers, KHP troopers allegedly applied their training to plaintiffs: based on nothing except their out-of-state license plates and statements that they were traveling to or from Colorado, KHP troopers subjected them to canine searches and prolonged detentions which ranged from approximately 36 to 90 minutes. Despite these experiences, plaintiffs allege that they will maintain their travel schedule and continue to drive through Kansas to see family and friends in Colorado.

Plaintiffs allege a real and immediate threat that based on innocuous indicia of interstate travel, KHP will stop them for traffic violations (real or pretextual) and subject them to prolonged detentions and vehicle searches. Plaintiffs allege that despite explicit directives from the Tenth Circuit, KHP continues to train its troopers to target and enforce an unconstitutional practice

---

[7] Jones asserts that this particular allegation is "nonsense to anyone who has lived in Kansas for even a limited time." Reply In Support Of Motion To Dismiss (Doc. #24) at 4 n.2. Jones argues that the transcript which plaintiffs cite in support shows that this statistic was referencing the percentage of out-of-state vehicles that involved "significant seizures" of drugs or cash — not total stops. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1105 (10th Cir. 2017) (although Court accepts all well-pleaded allegations as true, content of attached exhibit controls if conflict exists between it and allegations).

The exhibit states, "In 2017 vehicles with Kansas license pla[tes] accounted for just 7 percent of stops by the Highway Patrol. Neighboring Missouri tied Colorado for the top of the out-of-state list – along with vehicles licensed out of California." Nothing surrounding this statement proves that it means something other than what it explicitly says. Accordingly, for purposes of his motion to dismiss, Jones has not established that it contradicts plaintiffs' allegation.

against interstate travelers, and that the troopers consistently apply this training. Accordingly, as plaintiffs travel across Kansas with out-of-state license plates, complying with Kansas traffic laws (or not), they face a realistic threat that KHP troopers will target them for prolonged detentions and drug searches. See Tandy, 380 F.3d at 1284 (plaintiff had standing to challenge bus system which frequently malfunctioned because he had used bus service "for many years" and had asserted intent do so several times per year in future); In re Motor Fuel Temperature Sales Practices Litig., No. 06-2582-KHV, 2012 WL 1672994, at *7 (D. Kan. May 14, 2012) (plaintiff had standing to seek injunctive relief against allegedly unlawful fuel practice because he intended to use defendant's station "many times" that year); Smith v. City of Chicago, 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015) (plaintiffs alleged "ongoing constitutional violations pursuant to an unconstitutional policy or practice" and that officers repeatedly subjected them to unconstitutional stops and frisks, "which leads to the reasonable inference of the likelihood that [the police department's] officers will unlawfully stop and frisk Plaintiffs in the future").

This conclusion is consistent with Lyons, which did not establish the categorical bar that Jones proposes. From Lyons, Jones discerns a black and white rule: if the alleged wrongful conduct involves any kind of interaction with law enforcement, plaintiffs' allegations are de facto too speculative because such allegations assume that plaintiffs will violate the law. See Memorandum In Support Of Motion To Dismiss Defendant Herman Jones (Doc. #15) filed February 28, 2020 at 5 ("standing for prospective injunctive relief will not flow" if injury contingent on violating law).

Lyons did not establish such a bright line rule. Instead, it represents a straightforward application of the requirement that to have standing to seek injunctive relief, a plaintiff must show a real and immediate threat of future harm. Lyons, 461 U.S. at 102 (injury or threat of injury must

be both "real and immediate," not conjectural or hypothetical), at 111 (plaintiff lacks standing absent sufficient likelihood that he will again be wronged in similar way); see Collins v. Daniels, 916 F.3d 1302, 1315 (10th Cir.), cert. denied, 140 S. Ct. 203, (2019), reh'g denied, 140 S. Ct. 567 (2019) (quoting Lyons for the same). In Lyons, the Supreme Court held that the plaintiff's allegations did not satisfy this standard, and he therefore did not have standing to seek to enjoin a police force from applying a particular chokehold. Specifically, the plaintiff had not shown a "real and immediate threat that he would again be stopped for a traffic violation, or for any other offense," by an officer who would apply the chokehold. Lyons, 461 U.S. at 105. The Supreme Court explained that to do so, the plaintiff would have had to plausibly allege that he would have another encounter with police, and "either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner."[8] Id. at 106 (emphasis in original).

As the Court explained above, plaintiffs have established a real and immediate threat of future harm. They plausibly allege that they frequently drive through Kansas with out-of-state plates on their way to and from Colorado, and that KHP troopers will do what they are trained to do: target them for stops, prolonged detentions and drug searches. Unlike in Lyons, plaintiffs have

---

[8] To support his bright line rule, Jones also relies on O'Shea v. Littleton, 414 U.S. 488 (1974), in which the Supreme Court held that the plaintiffs lacked standing to enjoin certain discriminatory enforcement of the criminal law, such as harsher sentences. As in Lyons, the Supreme Court in O'Shea merely applied the "real and immediate threat" test to the plaintiffs' claims – it did not establish the categorical bar which Jones proposes. O'Shea, 414 U.S. at 494 (threat of injury must be both real and immediate, not conjectural or hypothetical), 496 (question is whether threat to plaintiffs is "sufficiently real and immediate to show an existing controversy").

As the Court explained above, plaintiffs' allegations are far less speculative than those in Lyons and O'Shea. Id. (plaintiffs' standing depended on several layers of speculation, including *if* they violated law, *if* they were charged, *if* they were tried and *if* trial proceedings occurred in front of defendant).

plausibly alleged that (1) they will have another encounter with KHP troopers and (2) KHP not only authorizes this practice, it expressly instructs its troopers (presumably all troopers) to apply it. See Uroza v. Salt Lake Cty., No. 11-713-DAK, 2014 WL 4457300, at *5 (D. Utah Sept. 10, 2014) (after Lyons, "several federal courts have held that the victim of an established government policy can sue to enjoin that policy even [if] he would not again be subject to it unless arrested once more"); Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 345 (2d Cir. 1998) (in contrast to Lyons, "the challenged interrogation methods in this case are officially endorsed policies," and therefore "there is a likelihood of recurring injury"); Maneely v. City of Newburgh, 208 F.R.D. 69, 73 (S.D.N.Y. 2002) (following Lyons, "the Second Circuit has held that a plaintiff may have standing to seek injunctive relief against a police department if the alleged improper actions were conducted pursuant to a uniform practice or official policy"); Creedle v. Miami-Dade Cty., 349 F. Supp. 3d 1276, 1290 (S.D. Fla. 2018) (unlike in Lyons, plaintiff is not challenging a "sporadic, random practice of government officers gone rogue, but an established, blanket County policy").

Jones cites no authority that would negate plaintiffs' standing merely because a future encounter with KHP troopers might follow a traffic infraction. Indeed, if Jones' categorical bar was correct — that "standing for prospective injunctive relief will not flow" if an injury is contingent on violating the law — it is difficult to imagine how any plaintiff could ever enjoin unconstitutional conduct which occurs after a police encounter.[9] See Memorandum In Support Of

---

[9] Jones concludes his motion with a bizarre shot across the bow to any court — presumably this Court, in particular — which might be inclined to grant relief to plaintiffs: "However interesting the issues to personal rights advocates, public officials and most importantly courts cannot become their mice to play with. The Shaws and Bosire have their civil rights damage claims. That is enough." Memorandum In Support Of Motion To Dismiss Defendant Herman Jones (Doc. #15) at 8 n.2. At several points, Jones suggests that plaintiffs' lawyers — not plaintiffs — are the only ones who actually care about this case. Reply In Support Of Motion To Dismiss
(continued…)

Motion To Dismiss Defendant Herman Jones (Doc. #15) at 5.  The Court will not be the first to adopt such a drastic, blanket rule.

**IT IS THEREFORE ORDERED** that Jones' Motion To Dismiss Defendant Herman Jones (Doc. #14) filed February 28, 2020 is **OVERRULED**.

Dated this 1st day of May, 2020 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

---

[9](…continued)
(Doc. #24) at 14 (comparing plaintiffs' lawyers to Justice Marshall's dissent in Lyons: "public interest lawyers are not the only ones who are frustrated that potentially unconstitutional policies cannot be challenged for lack of standing").

Nothing about plaintiffs' allegations is "academic."  Future pleadings must omit such unprofessional and irrelevant arguments about plaintiffs, their counsel and the Court itself.