19-1343   Shaw, et al v. Schulte, et al   09.03.21        1

1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS
2

3    BLAINE FRANKLIN SHAW, SAMUEL
     JAMES SHAW, JOSHUA BOSIRE,
4    individually and on behalf of
     a class,
5
         Plaintiffs,
6
     v.                              Case No. 19-1343-KHV-GEB
7
     DOUG SCHULTE, Master Trooper,
8    in his individual capacity;
     HERMAN JONES, in his official
9    capacity as the
     Superintendent of the Kansas
10   Highway Patrol; BRANDON
     McMILLAN, Technical Trooper,
11   in his individual capacity,

12      Defendants.
     .....................          .....................
13
     MARK ERICH;
14   SHAWNA MALONEY,
     individually and as the
15   mother and natural guardian
     of minors D.M. and M.M.,
16
        Consolidated Plaintiffs,
17
     v.                              Case No. 20-1067-KHV-GEB
18
     HERMAN JONES, in his official
19   capacity as the
     Superintendent of the Kansas
20   Highway Patrol,                 Kansas City, Kansas
                                     Date:   09/03/2021
21      Consolidated Defendant.
                                     (Pages 1-48)
22   .....................

23
                 TRANSCRIPT OF MOTION HEARING
24
          BEFORE THE HONORABLE KATHRYN H. VRATIL
25        SENIOR UNITED STATES DISTRICT COURT JUDGE

```
 1    APPEARANCES:

 2    For the Plaintiffs:

 3    Mr. Joshua M. Pierson          Ms. Madison A. Perry
      Ms. Sharon Brett               Spencer Fane, LLP
 4    ACLU Foundation of Kansas      1100 Walnut Street
      6701 West 64th Street          Suite 1400
 5    Suite 210                      Kansas City, Missouri 64106
      Overland Park, Kansas 66202
 6
      For the Consolidated Plaintiffs:
 7
      (Appeared not)
 8
      For the Defendants/Consolidated Defendant:
 9
      Mr. Arthur S. Chalmers
10    Office of Attorney General
      120 Southwest 10th Avenue
11    Topeka, Kansas 66612

12

13

14

15

16

17

18

19

20

21

22

23

24
      _____
             Proceedings recorded by machine shorthand,
25       transcript produced by computer-aided transcription.
```

```
 1              (1:10 p.m., proceedings commenced).

 2          THE COURT:  Good afternoon.

 3          MR. PIERSON:  Good afternoon.

 4          THE COURT:  The court calls Shaw versus Jones and

 5   Erich versus Jones, Case Nos. 19-1343 and 20-1067.

 6          Will counsel state their appearances, please.

 7          MR. PIERSON:  Your Honor, I'm Josh Pierson for the

 8   plaintiffs.

 9          MS. BRETT:  Sharon Brett for the plaintiffs.

10          MS. PERRY:  Madison Perry for the plaintiffs, Your

11   Honor.  And I will also state that the three of us represent

12   the plaintiffs in the Blaine Shaw case.  We do not represent

13   the plaintiffs in the Erich case, since you called both of

14   them.

15          THE COURT:  Okay.  And I'm sorry, what did you say

16   your name is?

17          MS. PERRY:  Madison Perry.

18          THE COURT:  Okay.  Thank you.

19          MR. CHALMERS:  For the defendants, Your Honor, Arthur

20   Chalmers.

21          THE COURT:  Thank you.

22          And so is Mr. Erich represented by counsel here this

23   afternoon?

24          MS. PERRY:  He's not here this afternoon, Your Honor.

25   I believe the magistrate judge sent an order to show cause for
```

1   him to respond, and I don't believe his counsel has done so.

2          THE COURT:  Okay.  So, I'm sorry, I was not aware that

3   there was an issue with that attorney.  Does anybody know

4   what's going on?

5          MR. CHALMERS:  Your Honor, the short answer is no.

6   The plaintiff wanted to join and actually consolidated with

7   this case.  And then after that it's as if the plaintiff and

8   the plaintiff's attorney have lost interest.  They have not

9   attended hearings, they've not responded to discovery.  And

10  that led Judge Birzer to issue a show cause order, to ask them

11  whether they -- why they shouldn't be dismissed for failure to

12  prosecute, which I think she would be referring to you if she

13  doesn't hear a response.  But no one seems to know.  And there

14  have been efforts both by my office as well as plaintiffs'

15  office to reach out to them.

16         Now, the good news is that claim has nothing to do

17  with the issues in these motions.  They deal with two of the

18  three defendants and then obviously the three plaintiffs.

19         THE COURT:  Okay.  Well, we have a number of motions

20  to take up.  But, Mr. Chalmers, I have a few questions for you

21  before we take them up directly.

22         So I just want to clarify for the record sort of how

23  the parties are aligned here.  I think we all understand that

24  under the doctrine of qualified immunity the purpose is to

25  protect individual law enforcement officers and other municipal

1    employees from personal liability for mistakes that are not

2    clearly in violation of the constitutional law and to relieve

3    them of even the burdens of going forward with suit.

4           How do those theories apply in this case, because

5    you -- you work for the State of Kansas.  Right?

6           MR. CHALMERS:  Yeah, I'm with the Attorney General's

7    Office, Your Honor.

8           THE COURT:  Okay.  And so in this case the defendants

9    aren't -- they're not personally retaining lawyers to represent

10   them.  Right?

11          MR. CHALMERS:  Through the Tort Claims Act, our office

12   has been hired basically to represent them in this lawsuit in

13   their personal capacities.

14          THE COURT:  And so is that something that typically

15   happens in these civil rights cases?

16          MR. CHALMERS:  Well, the civil rights cases against

17   the state are unique in that you've got qualified -- or, excuse

18   me, you've got Eleventh Amendment immunity as to the state and

19   so you don't have the respondeat or the Monell question that

20   might arise otherwise.  So, yeah, it is kind of typical.

21          In this case a judgment was made and after advice, so

22   forth, that we'd be able to represent both the two individual

23   defendants who have been sued in their individual capacity as

24   well as the colonel, who's been sued in his official capacity

25   of the -- the colonel obviously is Defendant Jones for the

1    Kansas Highway Patrol, Your Honor.  So I guess it is typical.

2              THE COURT:  So, I mean, that's basically the policy,

3    that the Attorney General will represent individual law

4    enforcement officers who are sued in their personal capacities?

5              MR. CHALMERS:  If a request is posted under the Tort

6    Claims Act, then the -- as to the state, then, yeah, typically

7    the Attorney General will represent them or will retain counsel

8    to represent them.

9              THE COURT:  Okay.  So it's sort of a fiction to say

10   that the individual defendants have to personally assume the

11   cost of defense?

12             MR. CHALMERS:  That is true.

13             THE COURT:  Okay.  And what about liability?

14             MR. CHALMERS:  It's the -- well, the liability under

15   the Tort Claims Act, with some exceptions, is the liability of

16   the state.  The Tort Claims Act would say -- there's a separate

17   section that deals with civil rights suits, which say that it

18   will pay if the officers are liable.  There are -- without

19   getting into nuances of some exceptions dealing with when

20   there's immunity and so forth, which kind of contemplates

21   qualified immunity as an exception to the payment under the

22   act.

23             But beyond that, there are some exceptions that

24   couldn't be present here that would say in some instances the

25   officers wouldn't be entitled to reimbursement from the Tort

1  Claims Act.  That's for actual damages.  Punitive damages are
2  not covered under the Tort Claims Act.
3       THE COURT:  But does the State of Kansas usually end
4  up paying those indirectly by the terms of settlements and so
5  forth?
6       MR. CHALMERS:  Well, I think that the State of Kansas,
7  when it has resolved lawsuits against its officials that
8  include claims for punitive damages, tries to settle the whole
9  case.  So yeah.  But I -- no, I don't know that there is any
10  policy that the state has to pay punitive damages.  I think the
11  Tort Claims Act, with maybe some restrictions, allows the state
12  to do it if it chooses to do so.  But I can't answer your
13  question to say that they have.
14       THE COURT:  And here, because Herman Jones is sued in
15  his official capacity, his liability would only accrue if there
16  is an underlying violation by the individual officers.
17  Correct?
18       MR. CHALMERS:  Well, the claim against Colonel Jones
19  is for alleged policy and practice as it relates to, I view,
20  certain types of traffic stops which these two were involved
21  in, but it is for -- only for prospective injunctive relief.
22  And one could find in this instance that these plaintiffs are
23  unable to recover.  But I think under what the court has held
24  on the issue of standing, it's still conceptually possible for
25  the case to go forward against Jones on the policy and practice

1    aspect, which is a current and prospective thing.

2         So I guess the answer is - and I think plaintiffs

3    would agree with this - is that no, these two individual claims

4    don't control whether or not there is liability to the state

5    with respect to the policy and practice claims they've alleged.

6         THE COURT:  So help me understand that, because if

7    there was no constitutional right that the individual officers

8    violated, what would be the causation between whatever the

9    Superintendent Jones did and the damages to plaintiffs?

10        MR. CHALMERS:  Well, I think that the argument that

11   plaintiff will make is that their clients possessed standing

12   because there is, they allege, a widespread policy and practice

13   of unconstitutional conduct on how traffic stops are conducted

14   such that there's an imminent likelihood that they will be

15   subjected to it again.

16        That is a claim that is not controlled by whether or

17   not their particular stops were unconstitutional or whether the

18   officers have qualified immunity for liability for those stops.

19        I think in the usual case it would be -- well, if you

20   had a straight-up Monell case, if you had one where we don't

21   have an Eleventh Amendment issue, in that setting -- in that

22   usual setting, you would have no liability by the city or

23   municipality absent an underlying constitutional violation.

24   That's true.

25        But I think the issue here is whether or not these

1    plaintiffs have standing to present these claims on the basis

2    of a policy and practice that they've alleged if they can prove

3    it and prove that they fall within that orbit of risk I guess

4    under the policy and practice.

5           THE COURT:  Okay.  I'm not really talking about

6    standing, I'm really trying to think about liability and

7    damages.

8           So, Mr. Pierson, can you help me understand how you

9    could hold Superintendent Jones liable if there's no underlying

10   violation by the individual officers?

11          MR. PIERSON:  Yes, Your Honor.  So I think we largely

12   agree with the defense -- with what the defense has just said.

13   The claims against the individual officers are individual

14   claims for damages based on the events of these stops.  The

15   claims against Superintendent Jones are for injunctive relief

16   only, equitable relief for a policy and practice of the Kansas

17   Highway Patrol of unconstitutionally targeting out-of-state

18   drivers for prolonged detentions as well as prolonging

19   detentions without reasonable suspicion in violation of the

20   Fourth Amendment.

21          So the claims against Superintendent Jones are for

22   prospective relief only and do not depend on the success of the

23   individual claims that are the subject of defendant's motions

24   for summary judgment.  I think the two are related.  It might

25   be possible that the evidence in the individual claims would be

1    relevant to the policy and practice claim but certainly not

2    necessary for their success -- for the success of the policy

3    and practice claim.

4        THE COURT:  So even if plaintiffs were not unlawfully

5    stopped and their detentions were not unlawfully prolonged,

6    they could still get injunctive relief from -- on the official

7    capacity claims?

8        MR. PIERSON:  Yes, Your Honor.  Yes.

9        THE COURT:  Okay.  All right.  I think I understand.

10       So basically on each of these cases we have the

11   pending motions for leave to file a reply out of time, and

12   there are the underlying issues of excusable neglect with

13   regard to that.  I also want to address how you think the

14   result would be any different if I considered the reply,

15   because the proposed replies -- I've looked at them and I don't

16   really see anything new or anything that would've changed my

17   outcome.

18       So why don't we start with that, Mr. Chalmers.  And

19   just for the record, you repeat in pretty much every filing

20   that you think I only overruled your motions for summary

21   judgment on the issue of qualified immunity because you didn't

22   file a reply.  Where did you get that idea?

23       MR. CHALMERS:  If I worded it that way, it was

24   imprecise.  What I would've tried to do is that if that was why

25   you overruled it, then -- as opposed that you did.  I, frankly,

1    put those together rather quickly and it's possible I -- I

2    apologize if my language was less than clear.

3         THE COURT:  Okay.  Well, your language is very clear

4    and --

5         MR. CHALMERS:  Well, my meaning I guess was not well

6    conveyed then.  I apologize.

7         THE COURT:  Okay.  Well, let's talk about whether you

8    should be allowed to file replies, briefs out of time.  And if

9    -- well, before we go there, let's talk about why you think it

10   makes a difference if you filed the reply briefs.

11        MR. CHALMERS:  Thank you, Your Honor.

12        THE COURT:  Because, I mean, just for the record, I

13   did not overrule your motions because you didn't file a reply

14   brief.  The case was fully briefed, it was fully at issue, you

15   didn't file a reply brief.  And I don't know what I'm supposed

16   to do at that point, other than rule on what I have in front of

17   me.

18        MR. CHALMERS:  And I appreciate that explanation, Your

19   Honor.

20        I can best probably answer your question by telling

21   you my thinking as to why I filed these combined motions.  At

22   the outset, the Tenth Circuit has said that the issue of -- or

23   the question of whether there is reasonable suspicion or

24   probable cause is a question for the court, unlike in a

25   negligence case where a jury might decide what's reasonable.

1        And so they said that when it gets time to instruct a

2   jury, the preferred route is to give a special instruction

3   identifying those questions of historical fact that need to be

4   resolved and then the court, with that information, will make

5   the final decision.

6        The court chose, as the court had every right to, not

7   to issue an opinion that made findings of fact in particular or

8   conclusions of law.  That made it, in my view, difficult to

9   figure out what -- if it goes to a trial before a jury what

10  those special instructions might be and, frankly, a little bit

11  difficult on how to prepare for trial itself.  And so my first

12  thought was maybe I should ask for some sort of reconsideration

13  to see if the court is willing to give that sort of direction,

14  which you have every right to choose not to give.

15       Secondly, the Tenth Circuit says in those cases where

16  the courts have said -- or have decided they do not wish to

17  make findings on the denial of a motion for summary judgment

18  and it comes before them on whether there is qualified immunity

19  on interlocutory appeal, they said, we will go ahead and do

20  what the trial court would do, which is we'll review the

21  record, see what the facts are, and see if there are things in

22  controversy and where they are.  Taking those facts in a light

23  most favorable to the plaintiff in this instance, we'll go

24  ahead and decide the underlying legal issues.

25       So my thought was the Tenth Circuit would also look

1   favorably on having those sorts of findings.  They might find

2   that helpful.

3           I thought if I was going to go ahead and ask for that

4   sort of adjustment to the court's order, I might also ask

5   whether or not the court could conclude that the ruling, if

6   premised on some of the arguments that had been made by

7   plaintiff, was clearly erroneous.

8           Now, there are different pathways I think for the

9   court to have reached your decision.  If you reached them on

10  some of the pathways that are offered by the plaintiffs, I

11  would respectfully submit it is not supported by the law and

12  it's clearly erroneous.  So I went ahead and filed that motion.

13          Now, I understand the motion to reconsider and have it

14  favored, I would be -- I don't know, maybe it was a handful of

15  times I've seen that courts will reconsider and make their --

16  change their minds.  Certainly in a case like that, that seems

17  -- like this, that seems likely.  But I felt if I was making

18  that motion, I might as well make it.  So that's what I did.

19          Now, at the same time, the reply that I filed --

20  because I think you asked another question or at least implicit

21  in your question is, you've made your ruling, what difference

22  does it make now to file a reply out of time?  Maybe that's

23  kind of my phrasing on it.

24          Well, the difference to me is I would like to have a

25  complete summary judgment record for the purpose of the

1    interlocutory appeal which I would expect, given your comments,

2    will probably go forward.

3              THE COURT:  But I mean, why?  I didn't have the

4    benefit of the quote-unquote complete record.  So why should

5    the Tenth Circuit be reviewing what I did on the basis of a

6    different record?

7              MR. CHALMERS:  Well, I think it -- that's a point that

8    makes sense except that a motion to deny -- or rather a denial

9    of a motion for summary judgment is a provisional sort of

10   decision.  What I mean by that, it's going to come up again.

11             I would anticipate, given your comments, that if I

12   were to file a motion to say I want to renew my motion for

13   summary judgment on the idea maybe that the reason it was

14   denied was because discovery wasn't complete, which was one of

15   the arguments that was advanced by plaintiff, it would be

16   denied.  But that always could come up.  But if it doesn't come

17   up in another motion for summary judgment, it comes up during

18   the course of trial in a motion for judgment.

19             And so unlike when summary judgment is entered or some

20   of the other instances where there's finality, here there's not

21   a finality.  And it seems to me it's only fair and just to have

22   all the facts for the appellate court to look at it on summary

23   judgment that might be important to its decision.  And that is

24   this -- the other reason I was thinking it was important in my

25   -- really my selfish reasons for filing a motion to file out of

1   time, because I recognized if you had made your decision, then

2   filing the reply that you weren't going to consider wasn't

3   going to advance anything.  But I did need, I felt, to get a

4   couple of exhibits, Exhibit 8 and Exhibit 9, into the summary

5   judgment record.  So that was my thought process.

6           I can address if you'd like why at least in this

7   instance a motion to reconsider makes sense, and I can be very

8   short.  I won't address why you would want to alter your

9   opinion because it's clear error, I respect what the court has

10  told me on that point.

11          THE COURT:  So remind me what Exhibits 8 and 9 are.

12          MR. CHALMERS:  I'm sorry?

13          THE COURT:  Remind me again what Exhibits 8 and 9 are.

14          MR. CHALMERS:  Exhibit 8 is an excerpt of testimony

15  from Mr. Bosire, it's testimony concerning when he was in the

16  Love's convenience store.

17          Exhibit 9 is a video.  The plaintiffs had in their

18  response talked about the convenience store video and that they

19  had shown a portion of it to one of the witnesses.  And in that

20  video that they -- the portion they showed, it did not -- it

21  showed the troopers but didn't show people around the entrance

22  or exit to the convenience store.

23          And so the video itself shows the troopers -- one

24  trooper leaving, a group of people coming in, the two trooper

25  defendants then walking towards the door to leave.  One trooper

1    defendant, Mr. McMillan, actually turning and looking at Mr.

2    Bosire, who had just walked in on the video in the excerpt that

3    wasn't shown during the deposition.

4         So it was there to show that there was proximity

5    between Mr. Bosire and these two troopers, which confirms their

6    testimony that they felt he may be associated with the smell of

7    marijuana that they experienced at the convenience store, Your

8    Honor.

9         THE COURT:  So, I mean, we can talk in more detail

10   about the specific cases, but to me the description of that is

11   inconsistent with Paragraphs 16 and 17 -- I mean, 17 of Brandon

12   McMillan's affidavit.

13        I mean, and, frankly, I'll say this about both cases,

14   the reason that I overruled your motion was not because

15   discovery was incomplete, it was because the genuine issues of

16   material fact on the record prevented me from finding that you

17   were entitled to judgment as a matter of law on the issue of

18   qualified immunity.  And as much as anything, that's because of

19   these affidavits, which are full of contradictions and gaps and

20   internal inconsistencies which, frankly, I think make them sort

21   of ridiculous in some respects.

22        So I mean, for example, with Officer McMillan's, he

23   doesn't even -- nothing in his affidavit even places defendant

24   within the Love's convenience store ever.  And his name doesn't

25   come up until he and Trooper Schulte leave the store.  They

1    smell the odor of marijuana coming from people around or who

2    had been around the entrance.  It doesn't say anything about

3    plaintiff or the man in the hoodie.

4              So they go stand outside the convenience store and he

5    notices a black man and a white man in a hoodie standing and

6    talking by the car.  He never places them inside the car, he

7    never says anything about why -- what happened in the

8    convenience store is even relevant, and he never smells

9    marijuana on either plaintiff or the man in the hoodie.

10             So, I mean, I don't understand even what the whole

11   purpose of Paragraph 17 is.  Why is -- why are we talking about

12   this quote-unquote group of people inside the convenience store

13   and the fact that they smelled marijuana when there's no

14   connection to plaintiff?

15             MR. CHALMERS:  I think the testimony was in their

16   affidavit that they thought he might be associated with the

17   smell.

18             THE COURT:  Yeah.  So that's a great -- that's a great

19   point.  So they smell marijuana, they're outside the

20   convenience store, they apparently are scanning the parking lot

21   and they see a black guy in a car that's newer and in better

22   condition than maybe they think he should be driving and they

23   see him talking to a guy in a hoodie, so therefore they decide

24   that he must be the source?

25             MR. CHALMERS:  I think the testimony is that they

1    smelled the marijuana in the convenience store.

2          THE COURT:  It says, "While exiting the store, I

3    smelled the odor of marijuana seemingly coming from people

4    around or who had been around the entrance of the store."

5          MR. CHALMERS:  Yeah.

6          THE COURT:  And there's no reference to plaintiff

7    being part of that group.

8          MR. CHALMERS:  It's true there's no reference.  I

9    think that the area you're talking about is in the foyer, is

10   the exit.

11         The video which -- of the Love's shop shows

12   people coming in -- shows Mr. Bosire coming in, shows people

13   milling around, shows the troopers leaving, shows McMillan

14   turning and seeing Mr. Bosire there.  Now, he probably was no

15   closer to Mr. Bosire than I am to your law clerks, so he would

16   have been several feet away.

17         THE COURT:  Okay.  That's not in the record.

18         MR. CHALMERS:  No, that part isn't.

19         THE COURT:  And so --

20         MR. CHALMERS:  The video is, if the court accepts it.

21   That's the point.

22         THE COURT:  So but my point is, the video that you now

23   want to introduce is inconsistent with your client's affidavit.

24   And so that doesn't necessarily support your request for

25   summary judgment, it just introduces another genuine issue of

1    material fact.

2         MR. CHALMERS:  Yeah, I don't know that I can agree

3    that the video is inconsistent in that the affidavit is

4    intending to convey that -- when they smelled it.  It was when

5    they were in the store exiting and it was people coming in and

6    around.  But it is clear that they do not provide testimony

7    that they smelled it on Mr. Bosire.  Rather, the two of them

8    felt that he might've been the source of the marijuana.

9         THE COURT:  And why would he might -- why is that

10   maybe -- why would he maybe be the source?  It doesn't say in

11   the affidavit that he was near the convenience store entrance

12   or inside.  The only thing we know is that he's a black man

13   talking to a white man in a hoodie, and they look at him and

14   go, "I believe that one or both could've been the people

15   associated with the marijuana."

16        MR. CHALMERS:  Well, I think that they saw him by a

17   rental car and they saw the rental car with the --

18        THE COURT:  They didn't know it was a rental car.

19        MR. CHALMERS:  I'm sorry?

20        THE COURT:  They didn't know it was a rental car at

21   that time.

22        MR. CHALMERS:  They thought it was a rental car from

23   its appearance.

24        THE COURT:  And what is the appearance of a rental car

25   that's different from the appearance of another --

1          MR. CHALMERS:  A later model car, sometimes you can

2     see some markings on it.  I have to look back, see what the

3     officer said were the things that gave that impression.

4          THE COURT:  Okay.  Well, it doesn't say anything in

5     the affidavit.  It says its apparent age, appearance and

6     Missouri license plate.

7          MR. CHALMERS:  They also have the camera in it was a

8     concern to them; they thought that odd.  And they were saying

9     here's somebody that had been in the proximity of where we

10    smelled the odor, now he's out by a rental car that has a

11    camera on it.  There are two guys.  By that itself was that

12    suspicious?  Obviously not or they would've probably taken

13    actions there.

14         But that was part of their thought process, which is

15    verified subsequently when they are trying to locate the second

16    driver after they stopped Mr. Bosire, trying to find the Dodge

17    that they thought was associated with it, where they thought

18    that might be a caravan.

19         THE COURT:  So, I mean, frankly, I think this whole

20    thing about the silver Dodge Charger is one of the most

21    ludicrous parts of the whole affidavit.  So they see a Dodge

22    Charger which, quote, appeared to be a rental vehicle.  What's

23    the basis for that?  They have some superpower ability to

24    detect rental vehicles from a distance?

25         MR. CHALMERS:  I think that they would say that in

1   their profession that they've been around enough vehicles that

2   stop that are rental vehicles, that they can identify them as

3   probably being rental vehicles.

4        I know that when Mr. McMillan left, he ran the tags

5   for the -- for Mr. Bosire's rental and confirmed that it was a

6   rental.  But I don't know that it takes superpower, Your Honor,

7   I think several of us can say that looks like a rental.  It may

8   not be right, but we can probably make an educated guess.  And

9   particularly with their experience, they're probably going to

10  do better than we can.

11       THE COURT:  And so the thing that raises their

12  suspicion is that there's two rental cars at the same

13  convenience store at the same time.  Well, actually, the Dodge

14  Charger wasn't even at the convenience store, it was just on a

15  street that was north of the convenience store and it looked

16  like it was getting on I-70 entrance ramps.

17       MR. CHALMERS:  I think it was exiting from the

18  convenience store.

19       THE COURT:  It says that it was heading toward I-70's

20  east and west -- so he's driving away, away from the plaintiff.

21       MR. CHALMERS:  Yes.

22       THE COURT:  And he's not even in the parking lot and

23  we don't even know why it might appear to be a rental car.

24       MR. CHALMERS:  My recollection of the record is that

25  they observed it in the parking lot and felt it was a rental

1    car.  And then when McMillan - in the part you're referencing -

2    would say as he's leaving, which would've been about the same

3    time he expected Mr. Bosire to leave, although it was a little

4    before, he saw the Dodge Charger leave.  And again, they felt

5    maybe these were the two folks that they saw at the convenience

6    store talking together.

7         THE COURT:  So that again makes no sense to me,

8    because -- so he's standing here watching Mr. Bosire and the

9    white man with the hoodie.  And all of a sudden the white man

10   with the hoodie is driving in a silver Dodge Charger which is

11   going west on a street north of the convenience store and

12   headed toward I-70.  And he has no explanation.  Did the man in

13   the hoodie like levitate into this other car?  How would he

14   have gotten into there and how could he be driving it?  I mean,

15   this -- it doesn't even hang together as a story.

16        MR. CHALMERS:  I don't -- there's nothing in the

17   record or an explanation that I'm aware of as to how the

18   officer -- or the timeline from when the officer saw the two

19   talking and from when the Dodge left to be able to say that the

20   driver was in there, but I -- excuse me, obviously that was the

21   impression of the two troopers given their immediate -- or

22   conduct afterwards to try to connect the two.

23        THE COURT:  Yeah, well, I mean, you can say that was

24   their impression.  But it sort of defies common sense to see

25   how a reasonable officer could have that impression that the

1   man in the hoodie is standing by the pumps talking to plaintiff

2   one minute and literally seconds later he's in a Dodge Charger

3   about to get on I-70, and the officers have no explanation for

4   how he got from the pump into the car.

5           MR. CHALMERS:  I'm not sure that they don't have an

6   explanation, I know it's not in the record.  And I don't

7   remember it being seconds, Your Honor.  I don't remember that

8   being in the record either.

9           THE COURT:  I mean, it can't be very long because he

10  sees that the -- he learns that -- he thinks the Altima that

11  plaintiff is driving is a rental car, and he gets in the car to

12  drive out of the convenience store parking lot because he wants

13  to head on down the highway so that he can try and catch

14  plaintiff in a traffic infraction, and he gets lucky and he

15  does it.  So he wants to be ahead of the plaintiff out there on

16  the highway waiting for him.

17          And before he even gets out of the parking lot of the

18  convenience store, he sees this silver Dodge Charger.  So, I

19  mean, I don't know how long that takes, but it's probably not

20  very long.  Maybe a minute.

21          MR. CHALMERS:  There's no answer for that in the

22  record, other than the officers connected the two vehicles

23  given their proximity.

24          THE COURT:  Okay.  Well, so here's my point:  Saying

25  that they connect the two vehicles, I don't think there's an

1    inference of truth-telling that can arise from that because it

2    makes no sense.

3         These are seasoned law enforcement officers - and I'm

4    required to give plaintiff the benefit of the doubt, all

5    favorable inferences - and the only thing that I see these

6    people reacting to is the fact that you have a black man in his

7    30s driving a new vehicle in good condition, which they think

8    is suspicious enough to run a record check on the license

9    plate.  And the guy -- the white guy he's talking to is wearing

10   a hoodie.

11        And granted, there was marijuana that they smelled,

12   and I'll assume that they're telling the truth about that.  But

13   what does that have to do with these gentlemen?

14        MR. CHALMERS:  Their affidavits try to describe I

15   think, Your Honor, why they felt that they were connected.  I

16   have to say I suppose in their defense that there's no

17   indication whatsoever of the fact that you had a black man -- a

18   black young man by a late model vehicle was a factor in the

19   stop or a factor in anything else they did.

20        THE COURT:  Of course, you're -- I mean, I'm not

21   expecting that you will admit that.  I'm saying if I give

22   plaintiff the benefit of all the inferences that plaintiff

23   could argue, that's what -- that's what you could find, because

24   there's nothing in here that would connect the plaintiff to any

25   marijuana at all except that he happened to be at a convenience

1   store where there was the smell of marijuana.

2        MR. CHALMERS:  I'm not here to argue with Your Honor.

3        THE COURT:  Okay.  Well, I mean, so my point is, what

4   is in your reply brief that you think could change my mind?

5   Because the video won't change my mind because it only creates

6   more issues of fact.

7        MR. CHALMERS:  Well, I suppose -- if we just used this

8   last dialogue as an example, Your Honor, the subjective

9   intentions of the officers, unless we have an entirely

10  different type of lawsuit -- the idea that, well, this is a

11  young black man and that's why we pulled him over, because it's

12  a late model vehicle, aren't relevant to the reasonable

13  suspicion analysis at all.  It's what a officer in his position

14  with his training would have understood to have been the facts

15  that lead to the reasonable suspicion.  So that might be

16  pertinent.

17        THE COURT:  So but, I mean, to me I agree we're

18  looking at the objective standard of a reasonable officer, but

19  I'm trying explain -- trying figure out why a reasonable

20  officer would associate plaintiff with marijuana based solely

21  on the fact that he's talking to a guy in a hoodie in the

22  parking lot and is driving a newer car and he has a camera

23  mounted, which I thought the officer thought it was a radar

24  speeding detector at some point.

25        MR. CHALMERS:  Now, I think initially he felt that the

1   camera in front was a radar detector and the one in the back he

2   saw was a -- appeared to be a surveillance camera.

3          THE COURT:  Uh-huh.

4          MR. CHALMERS:  The connection I think that they make

5   is based on the fact that he was - that is Mr. Bosire - was in

6   the convenience store in the area when they -- about the same

7   time when they smelled an odor of marijuana.

8          Now, obviously it didn't come from Mr. Bosire or it

9   went away, but it was -- he was one of probably other folks

10  that were within that -- within that convenience store.

11         THE COURT:  That's not what the affidavit says but

12  okay.  That's why I think the video would just introduce

13  further factual issues.

14         MR. CHALMERS:  I think the video would respond to what

15  you're talking about, Your Honor.  And in that sense, it seems

16  even more important if what we are trying to do is present to

17  the Tenth Circuit or make a presentation on summary judgment on

18  whether qualified immunity should be given.  I think we should

19  do it on all the facts that we can present in the record.

20         THE COURT:  Well, I mean, let's talk about some of the

21  other issues.  So in Paragraph 21 he says he felt quote-unquote

22  that the Dodge Charger could be associated with the white man

23  at the gas pump and therefore caravanning.  Again, I don't even

24  know how that would be possible if the Dodge Charger is never

25  placed in the same vicinity as the white man, and I don't know

1    how he would have gotten into the Dodge Charger or what his

2    quote-unquote association with that car would be.

3         And then he makes this statement to Officer Schulte

4    that the white man at the convenience store is no longer in

5    plaintiff's car, which is also complete nonsense, because in

6    Paragraph 21 he seems to suggest that the white man was in the

7    Dodge Charger and was caravanning, but now he's saying that the

8    white man was in plaintiff's car and he's no longer in

9    plaintiff's car because maybe he tele-transported himself to

10   the Dodge Charger which has now disappeared.  I mean, help me

11   make some sense of this.

12        MR. CHALMERS:  I think his explanation -- well, I

13   think his explanation for that is that he thought you had two

14   guys associated with potentially the smell of marijuana in a

15   car that was a rental car, which has some significance to the

16   highway patrol, with a camera on it that seemed odd.  And that

17   when he pulled them over, it wouldn't have surprised him if you

18   had just two guys in the car, but that he also felt the

19   possibility that that guy that I guess he can't account for,

20   the man with the hoodie, ultimately ended up being -- the

21   reason he can't account for him is he -- ultimately being in

22   the Dodge Charger.

23        THE COURT:  I'm sorry, say that again.

24        MR. CHALMERS:  He ultimately ended up being in the

25   Dodge Charger.

1          THE COURT:  He did?

2          MR. CHALMERS:  Well, I think that's what he felt.  I

3    don't think -- I don't know that he was.  I don't know.

4    Probably not, but I --

5          THE COURT:  I know.  We don't even know if this Dodge

6    Charger exists.  Right?

7          MR. CHALMERS:  Well, you've got officers saying that

8    it did under oath and you've got the radio communications and

9    the traffic about a Dodge Charger that are made contemporaneous

10   when they're looking for it.  It would be hard to conclude that

11   it didn't exist.  But the --

12         THE COURT:  But, I mean, so why didn't the officer see

13   it when he hightailed it out on I-70 to get ahead of plaintiff

14   so he could stake a speed trap?

15         MR. CHALMERS:  It's not in the record as to why he

16   didn't see it.  I think I know, given the way it's situated, it

17   might've been difficult to -- to drive down the street and to

18   get onto it to see, but it's not in the record.

19         THE COURT:  All right.  Go ahead.

20         MR. CHALMERS:  I'm not sure what you were asking me to

21   respond to at this point.

22         THE COURT:  Okay.  So this statement that the guy with

23   the white hoodie is not any longer in plaintiff's car.

24         MR. CHALMERS:  Oh, well, of course from the officers'

25   standpoint this is a fluid situation.  So you look at what do

1    you have in front of you and then you will add or subtract to

2    what you may have if you think something is suspicious to begin

3    with.

4          And his testimony was that he thought that you had the

5    possibility of caravanning going on, but he also felt that

6    these two guys were in the car together and then he only found

7    one.  And that's why he went ahead and told his partner --

8    well, his -- the other trooper out there, look, the other guy

9    must be in the Dodge Charger.

10         That's the -- that is the assumption or the thought

11   process he went through connecting them at the time.  And there

12   really isn't any doubt that he did that.  Now, Your Honor

13   addresses whether it's reasonable or not for him to have made

14   that conclusion, but obviously that's a conclusion that he and

15   Trooper Schulte drew.

16         THE COURT:  Well, I think you probably have enough of

17   the flavor of why I think you're not entitled to qualified

18   immunity -- qualified immunity.  Right?

19         MR. CHALMERS:  I understand what you're coming from on

20   your comments, Your Honor.

21         THE COURT:  I mean, I think that the affidavit that

22   you submitted is inherently self-contradictory.  It doesn't

23   give a sufficient explanation for why a reasonable officer

24   faced with these facts would take the actions he did.  And I --

25   since the Tenth Circuit will review this de novo, you know, I

 1    don't really see any point in belaboring this in terms of

 2    written findings and so forth.

 3         MR. CHALMERS:  Okay, I respect that.  I understand

 4    that you don't have to.  I think it would be helpful for the

 5    reasons I've articulated, but if -- I'm not going to insist

 6    that you do on -- something you're not supposed to do, assuming

 7    I even have the ability to do that.

 8         THE COURT:  And so, again, Exhibits 8 and 9 -- so I

 9    told you why I don't think the video would be helpful in moving

10    the needle on your request for summary judgment.  What is it

11    about Exhibit 8 that you think would be helpful to your case?

12         MR. CHALMERS:  Exhibit 8 is -- my recollection is a

13    excerpt of Mr. Bosire's deposition in which he basically says

14    that he was -- puts himself walking into the -- to the

15    convenience store right before the two troopers left.  What he

16    said is that there are three.  There were two having lunch

17    together, a third came in.  The third left first.  Mr. Bosire

18    said he had kind of a conversation, opened the door with him,

19    walked in.

20         The video shows Mr. Bosire walking in and then you see

21    the two troopers, the two trooper defendants walking out.  One

22    looking at Mr. Bosire.  And then you see within less than a

23    minute Mr. Bosire turn around and walking back out where the

24    testimony was the officers had been standing outside.

25         THE COURT:  And so, again, they're right there in his

1    immediate proximity and not smelling any marijuana on him.

2         MR. CHALMERS:  I don't know -- they smelled the odor

3    of marijuana and they associated it potentially being from him,

4    but they did not smell it on him.  They didn't say, look, I

5    smelled it on Mr. Bosire at the time.  They couldn't tell.

6    There were a collection of people there when they smelled the

7    odor of marijuana.

8         THE COURT:  So, again, I mean, I think that's a

9    genuine issue of material fact, whether a reasonable officer

10   would have associated plaintiff with the marijuana odor based

11   on that encounter and/or based on his observations at the pump.

12        But I've been talking enough, let me hear from

13   plaintiff.

14        MR. CHALMERS:  Okay.

15        MR. PIERSON:  Thank you, Your Honor.  I'm happy to

16   answer any questions.  I think the discussion here demonstrates

17   the issues with defendants' motions for summary judgment.

18   These are exactly the kind of unsubstantiated hunches that

19   aren't sufficient to form reasonable suspicion.

20        You are correct to point out all of the

21   inconsistencies and, in fact, changes in testimony that Trooper

22   McMillan made about when and how he smelled marijuana for the

23   first time.  The only other point I would point out is that he

24   actually does pull over Mr. Bosire at some point and then

25   confirms there is no smell of marijuana.

1          THE COURT:  Right.

2          MR. PIERSON:  You know, further raising a question of

3     fact and an issue of fact about when and how he first

4     encountered this marijuana smell, if he did.

5          THE COURT:  And, you know, it seems to me that the

6     stop should've been terminated immediately after the officer

7     returned the license and insurance papers and so forth to

8     plaintiff.  But I think it's also pretty telling that the

9     officer doesn't decide to do a K-9 search until he's confronted

10    with a man who seems to understand his constitutional rights

11    and refuses to consent to a search.

12         So, I mean, have you all tried any jury trials since

13    George Floyd?

14         MR. CHALMERS:  I have not.

15         MR. PIERSON:  Neither have I, Your Honor.

16         THE COURT:  Well, I had -- I was down in the District

17    of New Mexico and trying a case down there, which is not

18    exactly a hotbed of liberalism.  And if that was any

19    indication, I think you all will be very, very surprised to see

20    how juries have changed in the last two or three years,

21    especially with issues related to race.

22         And I was -- I have never actually seen anything like

23    this because it was a large jury pool, it was a criminal case,

24    and the jury panel was comprised of folks of all different

25    ages, races, ethnicities and so forth.  But they volunteered so

1    much information about things such as -- well, about George

2    Floyd and other Black Lives Matter topics.  They used the

3    verbiage and lingo of white fragility, implicit bias, white

4    privilege, how do we eliminate -- they had a conversation in

5    the courtroom among themselves about how do we eliminate

6    implicit bias from our decisions when we're judging people of

7    different races than ourselves.

8           And so it was actually such an important and sensitive

9    conversations that -- conversation that I wish I had been able

10   to record it or, you know, somehow preserve it to share with

11   people who think that America is all, you know, going down the

12   tubes because we're so divided and unable to agree on things.

13          Anyway, I don't know that I have much else to say on

14   Mr. Bosire, but I have similar thoughts with regard to the

15   Shaws, including -- so I'll go to his affidavit.

16          First of all, I don't think there's anything in the

17   record which would substantiate -- I mean, well, let me say

18   this.  Officer Schulte's affidavit seems to put a lot of

19   importance on the fact -- so apparently he was clocking the

20   drivers -- clocking the minivan by, like, a radar gun in the

21   back or something?  How does that work?

22          MR. CHALMERS:  He's got two radar detectors, as I

23   understand it, one facing forward and one back.  And the Shaw

24   vehicle came up and he clocked them with the camera that's

25   facing towards the back, Your Honor.

1        THE COURT:  Okay.  And he -- I really question the

2    claim that it is suspicious that the minivan didn't immediately

3    pull over when the officer is driving in front of you and not

4    behind you.  I don't know one person in a thousand that would

5    think they're supposed to stop.  I mean, it may be the law, but

6    that is -- that is not how traffic works.

7        Because under that interpretation of the law, anybody

8    on a highway going, like, any direction before or ahead of an

9    officer with lights would be engaged in suspicious potentially

10   criminal activity if they failed to immediately pull over.  And

11   I think we all know that's not how people understand the law.

12       MR. CHALMERS:  The facts are that he clocked them and

13   then during the time that the minivan was passing the trooper's

14   vehicle, he turns on his lights and sirens and then the minivan

15   continues on for approximately a mile before pulling over, Your

16   Honor.

17       THE COURT:  So, I mean, how -- I guess I don't

18   understand how that is suspicious.  He said that the minivan

19   changed lanes, so the minivan is in the left lane, and it

20   slowed down and it didn't stop for a minute-and-a-half.

21       MR. CHALMERS:  The Tenth Circuit cases have said that

22   a failure to timely pull over of a lot shorter duration can

23   support a suspicion that the driver could be doing anything

24   from -- in this instance perhaps trying to get their story

25   straight to hiding contraband to thinking about fleeing.

1    THE COURT:  But what -- I'm sorry, what is timely?  So

2    he can't -- he can't pull over to the right of the road because

3    the police officer is there.

4    MR. CHALMERS:  Yeah, I think that the duration -- he

5    pulled over pretty much quickly in front of him.  The video, of

6    course, which is in the record, shows what it shows.  But he's

7    in the left lane passing, the lights come on, he comes over.

8    There's traffic in front of him; he slows down because of that

9    traffic and then continues to go on well after it would have

10   been apparent to anyone that they were obligated to pull over

11   under the law.  And the officer found that to be suspicious

12   under the circumstances.

13   THE COURT:  So how long would be not suspicious?

14   MR. CHALMERS:  I don't know the answer to that, Your

15   Honor.  I know that the Tenth Circuit has accepted that as

16   evidence of being suspicious at a lot shorter period than the

17   mile-and-a-half which was involved here or the minute -- or

18   whatever the time period was, I guess it would be about a

19   minute-and-a-half.

20   THE COURT:  But, I mean, my point is there's no, like,

21   bright line rule that's -- it's really a judgment call.  It's

22   just sort of like quintessential -- quintessential --

23   MR. CHALMERS:  I think it is a judgment call.  And

24   that's the point, that that judgment call -- the courts defer

25   to the training and experience of law enforcement officers in

 1   the totality of the circumstances and we would not leave to a

 2   jury to decide whether that was a reasonable judgment call or

 3   not.

 4           THE COURT:  Unless the facts are disputed.

 5           MR. CHALMERS:  I'm sorry.  And the mask probably makes

 6   it hard to hear.  What I said, that -- or meant to say is that

 7   the -- it could be a judgment call; that under the law the

 8   courts defer to the experience and training of law enforcement,

 9   to their judgment as to what is suspicious; that the issue is

10   not presented to a jury for a jury to decide whether this is a

11   reasonable suspicion or not.  That is -- that is not a jury

12   question.

13           THE COURT:  So what about this lived-in appearance?  I

14   mean, this is sort of a label that the officer slaps on the van

15   and I don't -- I don't know what that means.  To me if a

16   vehicle is lived in, there has to be room for people to live

17   there.  So they would have to sleep there probably, eat there,

18   and so you'd see things like maybe pillows and blankets and

19   food and stuff like that.

20           MR. CHALMERS:  Yeah, the description I think was it

21   was full up to the brim with stuff.  There was a cot there for

22   sleeping.  As they took things out of the vehicle, you can see

23   the whole collection there.  Maybe you and I would assign a

24   different term, lived-in appearance, but that's what they were

25   doing.

1        The testimony is they went to Colorado in the winter.

2   They either parked in a parking lot and, quote, camped there or

3   they were camped at a camping place and they were living in

4   that vehicle.

5        The importance was that it had a look from the

6   training of this officer of people traveling - and I'm not sure

7   this is the correct phrase - traveling hard; that is to say,

8   they were traveling without the intention of many stops or

9   places to visit.  They were -- they appeared to be like people

10  who wanted to go get their drugs and return or deliver their

11  drugs and return.  So that's the importance of the lived-in

12  look, whether we use that label or not.

13       THE COURT:  So, I mean, how does that look different

14  from a family of four that takes a road trip to California to

15  go to Disneyland on summer vacation?

16       MR. CHALMERS:  Well, I think it probably would, but it

17  -- I mean, any of these things in isolation can be innocent.

18  It's in the totality of the circumstances that the lived-in

19  look becomes more important based on the officers' training.

20       THE COURT:  Well, I know, because they train them to

21  look for a lived-in look.  That's one of the criteria that they

22  teach them so that's why it's in his affidavit.

23       So, again, what is -- how does this lived-in

24  appearance look different to a reasonable officer than the

25  appearance of a family taking a road trip to Disney World?

1          MR. CHALMERS:  Disney World, you'd have multiple

2    people, kids.  Here you didn't.  Here you had a cot, you had

3    coolers, you had things that made it appear that -- they had

4    lots of things in the vehicle for whatever reason and they were

5    traveling hard.

6          THE COURT:  Luggage, coolers, a cot, blankets and

7    other items.  That's exactly what I had in my car when I drove

8    to Montana this summer with my grandchildren.

9          MR. CHALMERS:  I'm guessing you had your grandchildren

10   in probably not quite the same configuration they did, I don't

11   know.

12          I mean, the Supreme Court has said you can take a

13   series of things that in isolation appear to be innocent but in

14   a totality of the circumstances can create that reasonable

15   suspicion of criminal conduct.  They said it would have to be

16   more than a hunch but certainly not 50 percent, and you don't

17   measure it by whether you found something, although in this

18   case I think they did find a marijuana smell.

19          THE COURT:  But so far in this case the reasonable

20   suspicion is based on the fact that the car didn't immediately

21   pull over and it had a lot of stuff in it.  Right?

22          MR. CHALMERS:  But the stuff in it was packed in a way

23   that gave a lived-in appearance or traveling hard appearance,

24   if you'd want to use that phrase as opposed to "lived in."

25          THE COURT:  Well, I mean, I guess the photos -- remind

1   me, do we have photos of the lived-in appearance before it was

2   taken apart?

3        MR. CHALMERS:  I think we have a video, Your Honor,

4   that would show it being taken apart.  So at the very beginning

5   of that, yes, and then returned.

6        THE COURT:  And when he says that he found out that

7   the driver had a 2009 record of felony intent to distribute

8   narcotics, what does that mean?

9        MR. CHALMERS:  Well, by itself the Tenth Circuit has

10  said that's not a factor.  But when you combine it with other

11  things, the Tenth Circuit can -- say it can be a kind of

12  controlling factor.  The inference I guess is, whether we like

13  it or not, that if someone has been engaged in a criminal past

14  with the sale of drugs, then that might imply or give a

15  reasonable suspicion that they're continuing to do it.

16       THE COURT:  But so then at this point we have the fact

17  that he didn't pull over immediately, the fact that his car was

18  packed all the way to the front seats with gear, and he has

19  this quote-unquote record of felony intent to distribute.  Is

20  that a conviction, an arrest?  What is a record?

21       MR. CHALMERS:  Well, in this instance I think they

22  report an arrest.  He went through diversion, Your Honor.

23       THE COURT:  And did the -- but we don't know what the

24  officer knew other than what it says right there.

25       MR. CHALMERS:  The only thing the officer gets is what

1    that says.  And I think the officer's understanding is that --

2    well, I don't know what the officer's understanding is.  I want

3    to say that the officer knows that that means an arrest, but it

4    may not be true, I don't know.

5              THE COURT:  I mean, would they say conviction if it

6    were a conviction?

7              MR. CHALMERS:  No.

8              THE COURT:  Okay.  And here again, you know, it looks

9    like the reason why he called the drug dog is basically because

10   the plaintiff refused to consent to a search.  Right?

11             MR. CHALMERS:  No.

12             THE COURT:  Okay.  What am I missing?

13             MR. CHALMERS:  He called the drug dog on the basis of

14   his reasonable suspicion.  He asked for consent and it was not

15   obtained.  The two --

16             THE COURT:  Right, but -- okay.  So the basis for his

17   suspicion is he didn't pull over; he has a past criminal

18   history; the highly doubtful one, that he was traveling on I-70

19   which goes to Colorado; the fact that his father is the owner

20   of the vehicle.  Like, I think this is sort of a laugher

21   myself, that he -- he thinks that it shows reasonable suspicion

22   to think somebody is using drugs if they get the family

23   minivan.

24             MR. CHALMERS:  The non-owned vehicle is something that

25   officers have learned in their training is used by people to

1   transport drugs.  And I think he'd say it doesn't make any

2   difference whether it's owned by a family member or not, it's

3   that it's not owned that is critical.  By itself no big deal.

4   The fact that it's the father's vehicle, by itself no big deal.

5   And he did confirm that it was at least somebody with the same

6   last name as Mr. Shaw, so there's no doubt there.  But it's in

7   the totality that makes a difference.

8           THE COURT:  Well, yeah, plaintiff said it was his

9   father's car.

10          MR. CHALMERS:  Yeah.

11          THE COURT:  And it wasn't stolen and there was no

12  reason to think that he -- that the driver didn't have

13  permission to use it.  I mean, I'm just surprised that you can

14  stand here with a straight face and tell me that taking the

15  family minivan to Colorado is -- supports a reasonable

16  suspicion that you're involved in drugs.

17          MR. CHALMERS:  By itself it sure doesn't.

18          THE COURT:  He says, "I also found a suspicion --

19  suspicious that the driver claimed to be a criminal justice

20  major at his age and that he would refuse a search if he were a

21  criminal justice major."

22          MR. CHALMERS:  That is not a ground that we rely on.

23  I think that is something that is a little bit of a red herring

24  that was thrown in by the plaintiffs.

25          THE COURT:  Well, it's in Paragraph 20 of your

1   affidavit.

2          MR. CHALMERS:  I think that -- I've got a footnote

3   that explains we don't rely on that and explains that there are

4   things that can be voiced by law enforcement that -- on their

5   kind of a subjective basis and their thinking that -- even if

6   they don't attach anything to reasonable suspicion, do not

7   alter whether there's reasonable suspicion on other grounds.

8          THE COURT:  Okay.  But, I mean, I don't think -- when

9   you've got your client saying what he thinks is suspicious, I

10  don't think you get to pick and choose which ones you think the

11  court should consider.

12         I mean, frankly, again, I think that this almost

13  doesn't pass the smell test, that he says, "I found it

14  suspicion that he claimed -- suspicious that B. Shaw claimed to

15  be a criminal justice major at his age" -- I have no idea what

16  that meant, means -- "that he would refuse a search if he were

17  a criminal justice major."  Again, I don't -- I don't see any

18  plausible support for that in the affidavit.

19         And then he makes this statement, "My experience is

20  that people with a criminal justice degree have no reluctance

21  about a law enforcement search of their vehicle."  I don't know

22  what that means either.  Or why he would think that it's --

23  well, I don't understand why he doesn't believe that the driver

24  was a criminal justice major "at his age," but it doesn't seem

25  to me to be -- it doesn't seem to me that a reasonable officer

1    would believe that if you have a criminal justice degree you

2    should have no reluctance to allow a search.  And if you don't

3    consent to a search, that's an indication that you're involved

4    in criminal activity.

5            MR. CHALMERS:  That's not a ground we rely on.

6            THE COURT:  Okay.  I'm just saying --

7            MR. CHALMERS:  But I agree with you, it's not a basis

8    for reasonable suspicion, Your Honor.

9            THE COURT:  But it throws -- I assume you wrote this

10   affidavit.  Right?

11           MR. CHALMERS:  I wouldn't say I wrote it, no, but I

12   assisted in the writing of it.

13           THE COURT:  Okay.  Well, who wrote it then?

14           MR. CHALMERS:  Well, it's the officer's affidavit,

15   Your Honor.

16           THE COURT:  I realize it's that, but I've never seen

17   officers that write their own affidavits without the lawyers

18   participating.

19           MR. CHALMERS:  I assisted in it.  I can't tell you the

20   particular spot --

21           THE COURT:  Okay.  Well --

22           MR. CHALMERS:  -- or pick that language or where it

23   came from.  It might've been from his report.

24           THE COURT:  I'm just saying when you put stuff like

25   that in an affidavit as a grounds for suspicion, that just sort

1    of reeks of nonsense.  It doesn't really rehabilitate your case

2    that much to say, well, as the lawyer I'm not relying on that,

3    because it discredits the other bases for the alleged

4    reasonable suspicion.  And it puts us back in the category of

5    -- you know, the declaration of Officer Schulte doesn't really

6    in my opinion have a coherent, objectively reasonable narrative

7    that defeats the inferences in favor of plaintiff on the issue

8    of qualified immunity.

9          Is there anything in your reply brief that you think

10   should change that outcome if you were allowed to file it?

11         MR. CHALMERS:  Well, the reply brief sets forth the

12   law that -- the one that might be pertinent here I guess is --

13   to the discussion we just talked about, which is that what an

14   officer subjectively thinks is a basis for reasonable suspicion

15   or probable cause; what the officer articulates as a basis or

16   doesn't articulate as an officer as probable cause in the test.

17   The test is what - based on the historical facts - is

18   reasonable suspicion.

19         And that's probably why the Tenth Circuit has had no

20   problem where they find -- what they find -- items that they

21   say, look, this doesn't amount to reasonable suspicion.  It's

22   been articulated by the officer, but we don't care, we'll move

23   on to those other items and see whether or not that amounts to

24   reasonable suspicion or not.  That might be one item.

25         But I think that the reply brief as to Shaws, I don't

1    -- there are no new exhibits.  The record cited is already in

2    there so it doesn't have the Bosire sort of context, but it

3    does collect the law that I think is pertinent.  Both the

4    Bosire and the Shaw reply briefs maybe stressed - although I

5    think it was in the opening brief - the requirement when you're

6    talking about whether there is a clearly-established law for

7    factually similar cases from the Tenth Circuit or the Supreme

8    Court which aren't being provided.

9         My position is that that requires probably in a

10   reasonable suspicion context, consent context where you're

11   looking at the totality of the circumstances, that requires a

12   case that's if not on all fours, it's pretty darn close, that

13   says that this conduct is unconstitutional so as to notify

14   every officer that it would've been a violation if they did it.

15        THE COURT:  So on your appeal I don't think anything

16   we do here will limit your ability to cite whatever authority

17   you think is appropriate.  So if it's just a question of legal

18   citations to additional authority, I honestly don't think that

19   you are prejudiced if I deny your motion for leave to file a

20   reply in each of these cases.

21        I mean, it's a close question whether you should be

22   allowed to file these out of time anyway.  I don't think that

23   your mistake in the filing -- in calendaring the filing

24   deadline was excusable neglect.  But on the other hand, there's

25   not any great amount of prejudice other than the fact that now

1    you're filing an interlocutory appeal over the issue.  Maybe

2    you would have done that anyway, so I don't know about that.

3    The length of the delay is not much.  The reason for the delay

4    was entirely within your control and was not excusable.  I have

5    no reason to think you acted in bad faith.

6          But because the replies that you want to file really

7    add nothing of consequence that I think would impact the

8    outcome here, I'm going to deny leave to file the reply and the

9    exhibits.  Also, I think you filed your replies without leave

10   of court, so I think they both need to be stricken.

11         Again, the only succinct way to reiterate the reason

12   for both rulings was strictly on the basis that genuine issues

13   of material fact precluded the court from concluding as a

14   matter of law that the individual officers were entitled to

15   qualified immunity.  And in making that finding I was giving

16   plaintiffs the benefit of all favorable inferences, and that's

17   what they're entitled to.

18         So is there anything else we need to take up before

19   you can all notify the Tenth Circuit that you're ready to

20   re-group in that court?

21         MR. CHALMERS:  Your Honor, I appreciate your time and

22   you looking at these motions.  I don't know that I've ever

23   asked a judge to reconsider and I wasn't very optimistic.  I

24   want you to know there's no disrespect, I explained my

25   justifications for it.  But I don't have any more to add.

1        THE COURT:  Okay.  I mean, as a practical matter, and

2   I don't mean this personally -- I don't take this personally

3   and I hope you don't take my comments personally either.  But,

4   you know, this is a case where qualified immunity isn't really

5   serving any purpose, even if I grant it, because the individual

6   officers aren't paying for their own defense.  They're not

7   subject to any financial hardship or expense because you're

8   representing them, so...

9        And I could spend -- I could spend a lot of time

10  writing on this and it wouldn't make any difference in the end

11  because the Tenth Circuit will conduct de novo review and so --

12  I mean, it honestly makes me -- what do I want to say -- it

13  bemuses me when lawyers think that they know better than I do

14  what's the best use of judicial resources, you know, my time,

15  my law clerks'.  I don't see that the benefits of me writing on

16  this are going to pay off in any way down the road at the time

17  of trial in either of the respects that you mentioned.

18       So if and when we go to trial -- I know it's a long

19  ways off and the record may look a lot different when we get to

20  that point, so I think we'll just leave it where it is.

21       All right.  Anything else for plaintiffs?

22       MR. PIERSON:  No, Your Honor.  Thank you for your

23  time.

24       THE COURT:  Okay.  Thank you all.  Be safe.  And good

25  luck with your discovery; it looks like you're having some

1    problems.  So take care and we'll be in touch.  Court's in

2    recess.

3              (2:32 p.m., proceedings concluded).

4

5                                  *  *  *

6

7

8                    C E R T I F I C A T E

9         I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   September 10, 2021.

13

14                         /s/ Kelli Stewart _____
15                         KELLI STEWART, CSR, RPR, CRR, RMR
                           United States Court Reporter
16

17

18

19

20

21

22

23

24

25