Exhibit 11

*BLAINE FRANKLIN SHAW, et al. vs.*

*HERMAN JONES, et al.*

---

*DEPOSITION OF RANDY MOON*

*July 28, 2021*

---



METROPOLITAN
COURT REPORTERS
COURT REPORTING + LEGAL VIDEO

mcr@metropolitanreporters.com
www.metropolitanreporters.com
913.317.8800   800.748.7511

OUT-OF-TOWN DEPOSITIONS?
WE'VE GOT YOU COVERED!



WWW.DEPOSPAN.COM

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 3

```
1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF KANSAS
3
4    BLAINE FRANKLIN SHAW, et al.,
5                   Plaintiffs,
6    vs.                              No. 6:19-cv-01343
7    HERMAN JONES, in his official
8    capacity as the Superintendent
9    of the Kansas Highway Patrol,
10   et al.,
11                  Defendants.
12
13
14
15        VIDEOTAPED DEPOSITION OF RANDY MOON, a
16   Witness, taken on behalf of the Plaintiffs before
17   Nissa M. Sharp, CSR No. 1365, CCR No. 528, pursuant
18   to Notice on the 28th of July, 2021, at the offices
19   of Spencer Fane, LLP, 6201 College Boulevard, Suite
20   500, Overland Park, Kansas.
21
22
23
24
25
```

Page 2

```
1                      APPEARANCES
2
3    APPEARING FOR THE PLAINTIFFS:
4         Ms. Leslie A. Greathouse
              Spencer Fane Britt & Browne LLP
5             1000 Walnut Street
              Suite 1400
6             Kansas City, Missouri  64106-2140
              (816) 474-8100
7             lgreathouse@spencerfane.com
8
9    APPEARING FOR THE DEFENDANTS:
10        Mr. Arthur Chalmers
              State of Kansas
11            Office of Attorney General
              120 SW 10th Avenue, 2nd Floor
12            Topeka, Kansas  66612-1597
              (785) 368-6244
13            art.chalmers@ag.ks.gov
14
15   VIDEOGRAPHER:
16        Mr. Patrick Robinson
              Metropolitan Court Reporters
17            11880 College Boulevard
              Suite 405
18            Overland Park, Kansas 66210
              (913) 317-8800
19            Jeremy@metropolitanreporters.com
20
     ALSO PRESENT:
21
              Josh Pierson, ACLU
22
23   APPEARING VIA MOBILE VIDEOCONFERENCE:
24        Cedar Hobbs, ACLU
              Chloe Ketchmark
25            Tate Schneider
```

Page 3

```
1                         INDEX
2
3    WITNESS:                              PAGE:
4      RANDY MOON
5        Examination By Ms. Greathouse      4
6        Examination By Mr. Chalmers      184
7        Examination By Ms. Greathouse    199
8
9                       EXHIBITS
10   EXHIBIT                               PAGE
      NUMBER    DESCRIPTION              IDENTIFIED
11
       71     Organizational Chart -       39
12             OAG017625
13     72     3/4/17 "The Topeka          93
               Capital-Journal"Article
14
       73     Excerpt from Plaintiffs'    197
15             First Amended Complaint
16
17   NOTE:  Original Moon Exhibits 71 through 73 were
       attached to the original transcript.
18
19
20
21
22
23
24
25
```

Page 4

```
1         (Deposition commenced at 10:06 AM.)
2         VIDEOGRAPHER:  Good morning, my name
3    is Patrick Robinson with Metropolitan Court
4    Reporters.  Today is July 28th.  We will go on the
5    record at 10:06 AM.
6         We are here to take the video recorded
7    deposition of Randy Moon in Case No. 619-CV-01343.
8         Would counsel please state their name
9    and affiliation for the record, please?
10        MS. GREATHOUSE:  My name is Leslie
11   Greathouse, and with me is Josh Pierson, and we are
12   here for the plaintiffs.
13        MR. CHALMERS:  Arthur Chalmers for the
14   defendants with the Kansas Attorney General's Office.
15        VIDEOGRAPHER:  Nissa Sharp is our
16   court reporter today.
17        Would you please swear the witness?
18             RANDY MOON,
19   being first duly sworn, testified under oath as
20   follows:
21             EXAMINATION
22   BY MS. GREATHOUSE:
23        Q.    Could you please state your name for
24   the record?
25        A.    Sure, my name is Randy Moon.
```

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

---

Page 5

1    Q.   Okay.  And, Mr. Moon, what is your
2  current address?
3    A.   I live at 34A Lakeshore Drive in
4  Marion, Kansas.
5    Q.   Have you ever had your deposition
6  taken before?
7    A.   Yes.
8    Q.   All right.  On approximately how many
9  occasions have you had your deposition taken?
10   A.   Six.
11   Q.   All right.  And were those depositions
12  all in relation to law enforcement activities?
13   A.   Yes.
14   Q.   Okay.  So, none of them were personal
15  depositions that had to do with you outside of your
16  law enforcement work; is that correct?
17   A.   That's correct.
18   Q.   Okay.  So then you're fairly familiar
19  with giving testimony, but I want to go through a few
20  of the rules just to make sure that you and I have
21  the same understanding of what we're going to do
22  today.  All right?
23   A.   Of course.
24   Q.   So, you're doing a great job so far
25  with the one speaking at a time.  I need to make sure

---

Page 6

1  that I get my whole question out and on the record
2  before you start your answer, even if you know where
3  I'm going, so that we have a complete record.  You
4  understand that?
5    A.   Yes.
6    Q.   We also need to make sure that we have
7  verbal answers at all times, so using words like
8  "yes" and "no" instead of "uh-huh" or "huh-uh," which
9  are very hard for a court reporter to get.
10        Do you understand that?
11   A.   Yes.
12   Q.   So there may be some times where I
13  will say something like "was that a yes" just because
14  I'm trying to make sure that the record is clear.
15  All right?
16   A.   Yes.
17   Q.   If you don't understand one of my
18  questions, and there's a good chance that at some
19  point today I will ask an unclear question, will you
20  let me know that you do not understand my question?
21   A.   Of course.
22   Q.   Okay.  If you would like to take a
23  break at some point, you are welcome to ask for that.
24  The only thing that we ask is that you complete the
25  answer to a question that is pending before we take

---

Page 7

1  the break.  Do you understand that?
2    A.   Yes.
3    Q.   All right.  Now, counsel for the
4  Kansas Highway Patrol may object at some point to
5  some of my questions.  Those are merely for the
6  record so the judge can rule on them later if
7  necessary.  But if he objects, you can let him get
8  the objection out and on the record, and then you can
9  still answer.  All right?
10   A.   Yes.
11   Q.   Do you have any questions about those
12  rules before we move on?
13   A.   No.
14   Q.   All right.  Have you done any
15  preparation for the deposition today?
16   A.   Yes.  I printed off the "Topeka
17  Capital News" article that I was quoted in that was
18  used in at least one of your briefs.
19   Q.   Okay.  And so you read that article;
20  is that correct?
21   A.   Yes.
22   Q.   Okay.  And how did you determine that
23  that article was quoted in something we filed with
24  the court?
25   A.   Because I had went online and did just

---

Page 8

1  a little bit, just very little bit of research on
2  your case against the defendants.
3    Q.   All right.  So, when you researched
4  the Shaw versus Jones lawsuit, you were able to see
5  that you had been quoted; is that correct?
6    A.   Yes.
7    Q.   All right.  Have you done anything
8  else in preparation for the deposition today?
9    A.   No.
10   Q.   Have you talked to anyone about the
11  deposition today?
12   A.   No.
13   Q.   All right.  I'm just going to get some
14  sort of background information on you, so that's
15  where we'll start.
16        What was your birthday, birth date?
17   A.   I was born on January 11th, 1963.
18   Q.   Okay, and let's talk about your formal
19  education.  So you graduated from high school --
20   A.   Yes.
21   Q.   -- I think in Pratt, Pratt High
22  School; is that correct?
23   A.   That's correct.
24   Q.   Okay.  And what year did you graduate?
25   A.   1981.

---

MCR

11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN
COURT REPORTING • LEGAL VIDEO
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                        July 28, 2021

Page 9

1    Q.    All right.  And did you go to college
2  after that?
3    A.    Two years of college.
4    Q.    Okay.  And where did you go?
5    A.    Barton County Community College.
6    Q.    Okay.  That's here in Kansas; is that
7  correct?
8    A.    Yes.  Out near Great Bend.
9    Q.    All right.  And what did you study
10  there?
11    A.    Administration of justice.
12    Q.    Okay.  Did you get a degree?
13    A.    Yes.
14    Q.    All right.  Have you had any other,
15  you know, formal education other than the high school
16  and then the 2-year degree from college?
17    A.    Yes.  I, during the course of my
18  employment, I attended a executive leadership
19  training course that is hosted by the Federal Bureau
20  of Investigation.  Most of the course work during
21  that 3-month training is at least a Bachelor's
22  level, some of it Master's, and some of it higher.
23    Q.    Okay.  We'll talk a little bit more
24  about what that program covered later in the
25  deposition.

Page 10

1          When did you go to that executive
2  leadership program?
3    A.    In the fall of 2010.
4    Q.    Okay.  And then is there any other
5  formal education, other than the three we have
6  listed?
7    A.    No.
8    Q.    All right.  Now, after you graduated
9  from community college, what was your first job?
10    A.    My first job was United States Marine
11  Corps.
12    Q.    All right.  Did you spend some time as
13  a patrolman in the Pratt Police Department before you
14  went into the Marines?
15    A.    No.  I went into the Marine Corps
16  first.  And then once I was honorably discharged,
17  then I went back home to Pratt and went to work for
18  the police department there in my hometown.
19    Q.    All right.  So which years -- well,
20  when did you join the Marine Corps?
21    A.    1981.
22    Q.    Okay.
23    A.    And I served through 1987.  However,
24  my active duty years were from 1981 to 1984, and then
25  the last 3 years were Reserve.

Page 11

1    Q.    Okay.  I forgot to ask, when did you
2  actually go to the Barton County Community College?
3    A.    I actually attended not only Barton
4  County, but Cowley County, working on that degree
5  which was actually through Barton County.  So that
6  would have been in about the first 4 years of
7  employment with the Kansas Highway Patrol, so 1986 to
8  roughly 1989-ish.
9    Q.    All right.  So it was Marine Corps,
10  then community college; is that right?
11    A.    Yeah.  Yes.
12    Q.    I made an assumption that it was the
13  other way, but thank you for --
14    A.    No.  I was not ready after high school
15  for college.
16    Q.    Okay.  So, what were your assignments,
17  let's start with active duty, while you were in the
18  Marines?
19    A.    Well, I, interestingly enough, I was
20  assigned very, very early in my Marine Corps career
21  to infantry duty.  However, I never really spent a
22  day in the infantry because I was selected very early
23  to go to a specialized field in the Marine Corps.
24  And I didn't really know exactly what that was until
25  a few months down the road that I spent about a year

Page 12

1  at the Marine barracks in Washington D.C. while
2  awaited a security clearance which then took me to
3  the presidential retreat at Camp David, Maryland.
4  And then I served a couple of years at Camp David
5  during the Reagan administration.
6    Q.    Okay.  So, were you at Camp David
7  from, like, 1982 to '84?
8    A.    Yes.
9    Q.    And, I mean, I can make some guesses
10  about what your job looked like that, but just tell
11  me just briefly what your job duties were when you
12  were on that detail.
13    A.    Sure.  It was primarily ensuring that
14  the facility was secure when the president was there
15  and when he was not.
16    Q.    All right.  And then when you went to
17  the Reserves starting in, well, either '84 or '85,
18  what were you doing then?
19    A.    Nothing.
20    Q.    Okay.  Were you just doing the regular
21  drills that you have to do the weekends or?
22    A.    It actually ended up being inactive
23  reserve, so I didn't even have to attend drills.
24    Q.    Okay.  So after you left the
25  presidential detail in 1984, you came back to Kansas

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 13

1 to Pratt; is that correct?
2    A.    Yes.
3    Q.    All right.  And then that's when you
4 started -- well, what did you start doing when you
5 got back to Pratt after -- well, in '84?
6    A.    I was hired by the police department
7 in Pratt as a police officer.
8    Q.    Okay.  And how long were you with the
9 Pratt Police Department?
10    A.    For 2 years.
11    Q.    And you said you were just a police
12 officer, was that your role the whole time you were
13 there?
14    A.    Yes.
15    Q.    And give us a brief description of
16 what that entailed.
17    A.    General enforcement of local and state
18 laws.
19    Q.    All right.  Now, in mid 1986 is when
20 you began your career with the Kansas Highway Patrol;
21 is that correct?
22    A.    Yes.
23    Q.    So, you went to the academy; is that
24 correct?
25    A.    Yes.

Page 14

1    Q.    And did you do that in the summer of
2 '86?
3    A.    Yes.
4    Q.    And how long was the academy at that
5 point in time?
6    A.    It was -- excuse me -- it was about
7 14 weeks.
8    Q.    And then what was your first duty
9 station after you graduated from the academy?
10    A.    I was assigned to Sumner County, and
11 so I worked in an area that entailed primarily Sumner
12 County, but also Cowley County and Butler County.
13    Q.    And, at that point, were you at a
14 trooper rank?
15    A.    I was a trooper and doing what I would
16 characterize as road, road traffic enforcement.  I
17 worked doing general trooper duties.  I was not in a
18 specialized assignment.
19    Q.    Okay.  And how long were you at that
20 first duty station?
21    A.    Until 1990, and then I transferred to
22 Wichita in the same capacity for one year.  And then
23 I transferred to Kingman County.  And I was there for
24 2 years, I believe, and then transferred back to
25 Sumner County.  And then in 1995, I believe I was

Page 15

1 promoted to sergeant and assigned to the governor's
2 protective services unit in Topeka.
3    Q.    All right.  So, is it fair to say then
4 from 1986 until 1995, you were doing road
5 enforcement, traffic enforcement work, as a trooper
6 with the KHP?
7    A.    That is fair.
8    Q.    Okay.  And then I saw somewhere in a
9 case view publication that you were assigned to the
10 governor's security detail in February of '96.  Does
11 that sound about right?
12    A.    That's correct.  From the time I
13 received the information and then moved and
14 everything, it would have been, yes, right after the
15 first of the year in '96.
16    Q.    Okay.  So tell us about what your job
17 entailed on the governor's security detail.
18    A.    The Protective Services Unit that
19 serve really all the governors across the nation is
20 comparatively to what the Secret Service does for the
21 president.  Much smaller scale of course and
22 certainly not the budget, nor the manpower.
23        But it's primarily to ensure that the
24 governor, the first lady and family, and anybody else
25 that the governor determines that he would like to

Page 16

1 have protective services afforded, it's to ensure
2 that they are safe in doing their job and when they
3 are not doing their job.  And we also provided
4 transportation services, both ground and air.
5        And so that's a fairly general -- I
6 mean, I could go on and on, but from a large
7 overview, I suppose, that's...
8    Q.    So that assignment was largely about
9 -- was protective as opposed to policing; is that
10 accurate?
11    A.    That is accurate.  We really did no
12 policing and our primarily focus was in, you know,
13 protective, being protective of the governor, much,
14 again, much like the Secret Service is for the
15 president.
16    Q.    Okay.  And how long were you on the
17 governor's detail?
18    A.    About 4-1/2 years.
19    Q.    Okay.  So does that take us to is it
20 '99 or 2000?
21    A.    2000.
22    Q.    All right.
23    A.    2000, actually, in about '98 or '99 I
24 was promoted to lieutenant within that rank, that
25 unit.  And then in 2000, I transferred out and went

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 17

1  to Hutchinson, Kansas, as a first line supervisor of
2  field troopers. And field, meaning troopers who are
3  doing basic trooper responsibility, traffic
4  enforcement, criminal enforcement and traffic
5  investigations, accident investigations.
6      Q.    Okay. So, before we go on to that job
7  in Hutchinson, you mentioned that you were promoted
8  to lieutenant?
9      A.    Yes.
10     Q.    And did your duties change at all when
11  you were promoted to lieutenant?
12     A.    Not while I was in the governors unit,
13  no.
14     Q.    Okay. Did being promoted to
15  lieutenant have another impact on your career at KHP?
16          I mean, the way you answered that
17  question it sounded -- you said it didn't have an
18  impact while you were at the governors detail.
19     A.    Uh-huh.
20     Q.    Was there some other significance to
21  that inside the KHP?
22     A.    Well, yes, I mean, in order to elevate
23  one's career, you know, one must take promotions in
24  order to move up. So, certainly, going from sergeant
25  to lieutenant and lieutenant to captain and so forth,

Page 18

1  one must take one step before the other.
2      Q.    Right. So becoming a lieutenant meant
3  that you were now eligible to do those jobs like
4  being a first line supervisor; is that correct?
5      A.    Yes. Yes.
6      Q.    Because would you have to be a
7  lieutenant before you could take those kinds of jobs?
8      A.    No. Interestingly enough, during that
9  time, a sergeant initially was a first line
10  supervisor in the Highway Patrol back in the '80s.
11         And then somewhere around 1995-ish or
12  maybe a little later, I don't really remember, I want
13  to say somewhere between 96-98, the superintendent at
14  that time decided to eliminate the position of
15  sergeant and he created a second lieutenants
16  position. We already had a lieutenants position, so
17  he created a second lieutenants position, which
18  didn't last very long, and then was just morphed into
19  a lieutenants position.
20         So there was some, some amount of
21  reallocation going on during those years. And just
22  about anybody who was a sergeant was reallocated to
23  second lieutenant and then shortly after made a
24  lieutenant.
25     Q.    Okay. You didn't go through that

Page 19

1  second lieutenant step, though; is that correct?
2      A.    Yes. Yes. I did.
3      Q.    You did?
4      A.    Yes.
5      Q.    Okay. So were you originally a second
6  lieutenant while you were on the governors detail?
7      A.    Yes. And, I'm sorry, I should have
8  been a little bit more specific about that, it just
9  having been through it all, we just blended it
10  together so quickly that that second lieutenant rank
11  was here and gone in just about no time.
12     Q.    So, when did you make full lieutenant?
13     A.    Oh, gosh, that happened, again,
14  probably 2000, maybe, 2001.
15     Q.    So about the time you went to Hutch?
16     A.    Yes.
17     A.    Hutchinson, sorry.
18     A.    Right during that time frame.
19     Q.    All right. So when -- Hutchinson is
20  Troop F; is that right?
21     A.    Yes.
22     Q.    And so were you supervising everyone
23  in Troop F or a particular section of Troop F?
24     A.    I had, originally, I had Rice County
25  to the north, Reno County, Harper County to the south

Page 20

1  and Kingman County. Those were the counties I
2  originally had.
3          At one point for the period of about a
4  year, maybe year and a half, I ended up taking
5  counties a little bit further west, Barton County and
6  Pratt County and Stafford and Barber County. So, you
7  know, I supervised anywhere from four to eight
8  counties of troopers during those years.
9      Q.    How many, approximately, how many
10  troopers -- well, let me back up.
11         How long did you stay as a first line
12  supervisor in Troop F?
13     A.    I stayed until -- the end of 2005 I
14  was promoted to captain and took an assignment as a
15  captain shortly after 2006 rolled over.
16     Q.    All right.
17     A.    So, about, about, 6 years.
18     Q.    Approximately, how many troopers would
19  you have been supervising at any, you know, given
20  time in that 6-year period?
21     A.    Yeah. Back in those days, typically
22  we had a ratio of one supervisor to about 12
23  troopers. So, for the most part, it was one to 12,
24  except for that period of time when it was about, you
25  know, about one to 20.

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
METROPOLITAN
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 21

1    Q.    And you indicated that those troopers
2  were generally in traffic enforcement, criminal
3  investigation and those kinds of areas?
4    A.    Yes.
5    Q.    Is that correct?
6    A.    So none of them were specialized.
7    Q.    Okay.  Did you have any Interdiction
8  troopers that you were supervising?
9    A.    No.
10    Q.    All right.  Now, tell us as a line
11  supervisor what your job entailed.
12    A.    Sure.  Generally speaking, No. 1 was
13  the welfare of the troopers.  Making sure that they
14  had the equipment and the things that they needed to
15  do their job.
16         It also entailed, of course, things
17  that you might think of in terms of supervision,
18  performance reviews of those personnel, mild
19  disciplinary, a lot of, a lot of, report reviewing.
20  I mean, in a nutshell.  I could, again, go on, but.
21    Q.    Okay.
22    A.    In a nutshell.
23    Q.    So, give me a general understanding of
24  what a performance review or the performance review
25  aspect of your job was in that 2000 to 2006 time

Page 22

1  frame.
2    A.    Sure.  Typically, we would meet, the
3  supervisor, would meet with an employee at the
4  beginning of a review, set some number of
5  expectations through the course of that coming year.
6         And then during the course of that
7  year, a supervisor would meet, sometimes get in and
8  ride shifts with that employee to be able to see how
9  they performed and how they worked.  Because, as you
10  may know, our troopers work really independently
11  without a lot of oversight.  So that would occur two
12  or three times a year, these meetings.
13         And then at the time of the review,
14  then I would sit down and pen out my thoughts on the
15  review form that the State of Kansas provided back in
16  those days.  And then I would sit down and meet with
17  the employee and we would discuss that.
18         At some point, the review would
19  eventually go on up to a lieutenant and a
20  captain and make its way to the headquarters to the
21  Human Resources division.
22    Q.    Right.  Well, at that point, you would
23  have been the lieutenant reviewing them, right?
24    A.    Yes.
25    Q.    And so then they would -- okay.

Page 23

1    A.    Yes.
2    Q.    Now what -- you said that you would
3  set out, sort of, performance criteria at the
4  beginning of the review period that you wanted the
5  trooper to achieve for that review period; is that
6  correct?
7    A.    Uh-huh.
8    Q.    What kind of criteria, generally,
9  would that be?
10    A.    Well, we would maybe have a
11  criteria -- you know, we of course able to look at
12  the statistics of any particular trooper to see how
13  well they were performing in certain areas of
14  enforcement.  And given that we were constrained in
15  not being able to set quotas because of our agreement
16  with the Kansas State Troopers Association, you know,
17  we set goals instead.
18         Which might be, you know, I might had
19  a trooper who was expected to give public safety
20  programs, maybe to schools or to civic groups.  And,
21  you know, if that trooper had not done any of those,
22  then I might say, okay, in this coming year, you
23  know, I would like to see you perform some of those.
24  And it could be the same thing with accident
25  investigation or really any number of things.

Page 24

1         And, again, without really talking
2  about the actual numbers, you know, I generally would
3  just tell them, you know, this area needs to improve,
4  I need to see improvement in this through this coming
5  year, so.  So, yeah.
6    Q.    So by "improvement," you know, like
7  let's just say you used the example of giving an
8  educational course.
9    A.    Uh-huh.
10    Q.    By "improvement," you would expect
11  them to do more of them numerically; is that correct?
12    A.    Yes.
13    Q.    And would you attend them and see
14  whether they were substantively accurate?
15    A.    Not generally.  But I have, you know,
16  in the course of my career as a first line
17  supervisor, I would do that.
18    Q.    And so would other criteria or goals
19  that you were setting out in these reviews include
20  things like the number of traffic stops?
21    A.    Yes, it could.  I mean, you know, I
22  had a trooper one time who received a large number of
23  citizen complaints based on his conduct.  So one of
24  his goals, for example, was that he needed to change
25  his approach and reduce the number of citizen

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

MCR
METROPOLITAN
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 25

1  complaints based on the manner in which he spoke to
2  citizens.
3          And so, you know, it wasn't always, it
4  wasn't always a numerical-based goal, it might be
5  something else like that.
6      Q.    So, but there would be a numerical
7  goal combined with other criteria; is that fair?
8      A.    Well, yes, I would think that's a fair
9  statement.  Again, without setting any type of quota,
10  by saying, well, you need to have 10 of these or, you
11  know, my expectation was if a trooper did none one
12  year and did one the next year, that was improvement.
13      Q.    Okay.  So, how would you evaluate a
14  trooper's interaction with the public, other than
15  through receiving complaints?
16      A.    Well, back in those days, and as
17  today, unless things have changed in the last couple
18  years, the Highway Patrol had in-car videos.  So, a
19  supervisor was able to review those videos, and, you
20  know, generally speaking, we didn't do that all the
21  time because we would spend all of our time just
22  reviewing video.
23          But, you know, from time to time,
24  particularly if I had a trooper who I felt that
25  either was underperforming, or in the case of the one

Page 26

1  trooper that I'm talking about that seemed to have an
2  unusually high number of complaints, then I would
3  look at his videos to see how he was interacting with
4  the public to try to help him understand what was
5  generating those complaints.
6      Q.    All right.  So, how often, you know,
7  let's -- well, let me back up.
8          Was the review period for the troopers
9  a year?
10      A.    Twelve months, correct.
11      Q.    All right.  So how many times in a
12  year would you review a stop video for a trooper?
13      A.    For one particular trooper?
14      Q.    Yes.
15      A.    Oh, it really varied, it varied from
16  zero to multiple times.
17      Q.    And what were the factors that went in
18  to you deciding whether you were going to review
19  those videos none of the time or multiple times?
20      A.    Well, oftentimes, performance was a
21  great indicator.  If a trooper appeared to be
22  underperforming in the duties that a trooper's
23  expected to do, I might look at a video to see what
24  is this trooper doing with their time through the
25  course of an 8-hour day.

Page 27

1          Now, sometimes there were explanations
2  because, for example, in the area that I worked, I
3  had one trooper who really was very, very proficient,
4  just very good at going to the schools and doing
5  educational type of training.  He wasn't so good in
6  some other areas.
7          And so as a supervisor, you know, it
8  was necessary to balance some of that.  So it wasn't
9  always necessarily that a trooper that was higher in
10  that area that was maybe lower in another area was
11  what we would consider underperforming.  It just
12  depended on what they were doing.
13          And so the reviewing of the videos and
14  just, you know, the daily contact with the troopers
15  would give me some sense of, you know, what these men
16  and women were doing during the course of their day.
17      Q.    So, correct me if I'm wrong, but it
18  sounds like you're saying there were sort of
19  categories of performance or underperformance that
20  you were looking at; is that correct?
21      A.    Yes.
22      Q.    Okay.  So we've talked about one of
23  those being community education?
24      A.    Uh-huh.
25      Q.    Is that correct?

Page 28

1      A.    Uh-huh.
2      Q.    And a number of those would be traffic
3  stops; is that correct?
4      A.    Yes.  We looked at -- we looked
5  at -- and, again, I don't have -- things have changed
6  over the decades, but back in those days, you know,
7  we looked at the statistics of a trooper to see how
8  many speed citations the trooper was issuing, so
9  warnings, how many inspections of vehicles that they
10  were doing, safety inspections.  We looked at how
11  many times that they were giving aid to motorists, we
12  called those service rendered.  Safety programs.  I
13  mean, there was just a whole myriad of categories.
14          But then there was a whole list of
15  elements of time, how were they spending their time.
16  So, if they weren't doing traffic enforcement, what
17  were they doing with their time.  Were they -- were
18  they doing accident investigation, were they
19  completing reports which took them away from their
20  traffic enforcement duties.
21          As you may know, an arrest today takes
22  some amount of time for a police officer or a trooper
23  to complete all of the reports that are required.
24      Q.    You said that today it takes time for
25  a trooper to complete all the reports required for an

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 29

1  arrest.
2      A.   Uh-huh.
3      Q.   Did it not take time for troopers to
4  write those reports between 2000 and 2006?
5      A.   Sure, it did.  I would say in my
6  opinion that it takes a whole lot more time these
7  days than it did back in those days.  A lot of things
8  have changed over the years, a lot more information
9  is required by the courts and the district attorneys
10  and sometimes laws change and case law occurs and it
11  just requires different, different types of reports,
12  more reports, more information.
13      Q.   All right.  And through the years from
14  the time that you were a first line supervisor
15  through the time that you left the KHP, did you keep
16  track of or generally understand how the report
17  writing requirements were changing through time?
18      A.   Yes.  We went from an old manual
19  typewriter and carbon forms to, during those times,
20  from there to computerized forms and computers in the
21  course of 15 years.
22      Q.   So, in 2000 to 2006, when you joined
23  as a first line or when you began being a first line
24  supervisor, were the troopers still using
25  typewriters?

Page 30

1      A.   In 2000?
2      Q.   Yes.
3      A.   At that point, there were still a lot
4  of word processors.  Because we went from typewriters
5  to word processors to computers.  So in the late '90s
6  through the early 2000s, we were transitioning over
7  to computers.
8      Q.   All right.  So, you became a first
9  line supervisor pretty much right in the middle of
10  that; is that fair?
11      A.   Well, 1996, because a sergeant was a
12  first line supervisor back in those days.
13      Q.   Let me clarify.
14      A.   You're talking about when I became a
15  supervisor of troopers in 2000?
16      Q.   I'll rephrase my question.
17           So, when you became a supervisor, a
18  first line supervisor of field units in 2000, that
19  was right in the middle of that change from computers
20  -- or excuse me -- from typewriters to word
21  processors to computers; is that fair?
22      A.   Yes.
23      Q.   All right.  So, when you arrived in
24  Hutchinson in 2000, do you recall where the troopers
25  were in that, sort of, continuum of technology for

Page 31

1  report writing?
2      A.   No.  Because it depended on the area
3  of the state.  The Patrol was rolling out the
4  computers in some fashion, maybe from west to east or
5  east to west, and I don't really remember.  At some
6  point during those years, we were fully computerized.
7      Q.   So, are you saying that by the time
8  you left the job as a first line supervisor of field
9  units, the systems were fully computerized?
10      A.   Yes.
11      Q.   All right.  And after -- well, let me
12  ask this, do you remember what computer systems were
13  being used in the time that you were in Hutchinson?
14      A.   Can you be more specific?  I don't
15  understand whether you're asking me a make of
16  computer or software or.
17      Q.   Well, why don't you tell me how a
18  trooper that you would have supervised in the time
19  that you were in Hutchinson when they first were
20  using computers, how would they write a report?
21      A.   Not very easily.  We -- back in those
22  days when they were developing this movement to
23  computers, the thought was that the computer -- or
24  the troopers would fill out information on the
25  computer in forms, and then those forms would be

Page 32

1  uploaded to a central server in Salina.
2           That didn't work so well.  After a
3  number of years, they figured out that that bogged
4  the system down terribly.
5           But back in those days that's what
6  they would do.  They would take typical Kansas
7  standard offense and arrest reports or DUI forms,
8  some, some forms weren't computerized, so there were
9  still some manual filling out, but that's what they
10  did.
11      Q.   All right.  So when they were using a
12  computer, where was that computer physically located?
13      A.   In their respective office.
14      Q.   All right.  So, initially, there
15  wasn't any computing in the field?  They had to go
16  back to an office and fill out their reports on a
17  computer on their desk inside of a KHP office; is
18  that correct?
19      A.   That's correct.  Mobile data units
20  were not available in the early days.
21      Q.   Right.  So when did mobile data units
22  become available, in your memory?
23      A.   I think they were starting to surface
24  by 2006 to 2008, in that time frame.
25      Q.   And so when you say a mobile data

MCR
METROPOLITAN
COURT REPORTING • LEGAL VIDEO
11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 33

1  unit, can you describe for me what you mean?
2      A.    A -- excuse me -- a laptop that was a
3  heavy duty laptop that could either be plugged in to
4  a port back in an office or could be used as a
5  stand-alone.
6      Q.    So, could be used as a stand-alone,
7  that would just be sort of a laptop that the officer
8  could or the trooper could take to their vehicle; is
9  that correct?
10     A.    Yes.  The vehicles had a computer
11 stand in them that, I'm not an IT professional, but
12 hooked in to components that made them work.
13     Q.    All right.  So, would, in your memory
14 when those units were first installed in the
15 vehicles, did those computers communicate directly to
16 the KHP system?  Or did there have to be, like, a
17 download when the trooper brought the car back to the
18 office?
19     A.    They communicated directly with our
20 systems.
21     Q.    So they were sort of using cellular
22 systems?
23     A.    Originally, we used like a
24 radiofrequency that wasn't as robust as cellular,
25 and, at some point, we switched over to cellular.

Page 34

1      Q.    Probably about the time they got
2  cellular towers all the way across Kansas; is that
3  right?
4      A.    Yes.
5      Q.    Yeah, all right.
6            Did you, during the time that you were
7  a first line supervisor for field units, do any
8  traffic work yourself?
9      A.    I did some.  My job was about
10 80 percent administrative and about 20 percent
11 enforcement as a first line supervisor.
12     Q.    So, when you were doing the 20 percent
13 of enforcement, what kinds of activities were you
14 doing during those years that you were in Hutchinson?
15     A.    The same kind of work that I did as a
16 road trooper, as a field trooper.  Traffic
17 enforcement, accident investigation, safety programs,
18 enforcement of criminal laws.
19     Q.    All right.  And then in 2006, you said
20 you were promoted to captain; is that correct?
21     A.    Yes.
22     Q.    And you had a change in duty station
23 at that time; is that correct?
24     A.    I did.
25     Q.    And what did you begin to do then in

Page 35

1  2006?
2      A.    I had two, two sections in the patrol
3  that I oversaw as a captain.  The first was in
4  Salina, Kansas, I oversaw our Communications Center
5  and the 70-some employees that worked there.
6            And then I oversaw a unit in Topeka
7  that we called our Criminal Justice Information
8  Services Unit, and there were, oh, a dozen or so
9  employees there.  So, I worked really between Salina
10 and Topeka those two units.
11     Q.    All right.  Before we go into those
12 two units, at some point were you doing work with the
13 US Marshals Office?
14     A.    I did a little bit of off-duty time
15 for just a short period back late '80s, maybe early
16 '90s, somewhere in that time frame.  I did some
17 off-duty work to assist the US Marshals Office out of
18 Wichita mostly with transportation of prisoners.
19     Q.    I saw a couple of different articles
20 that mention some -- well, there was one that talked
21 about a narcotics search and warrant execution in the
22 2005 time frame.  Does that sound familiar to you?
23     A.    I don't recall the particular
24 circumstance you're referring to.
25     Q.    So, is it fair to say that narcotics

Page 36

1  search and, searches, and warrant executions was not
2  a regular part of your job at any point in your
3  career with the Kansas Highway Patrol?
4      A.    We typically did not execute warrants
5  on behalf of another agency, unless we were
6  specifically requested, which did not happen very
7  much.  And execution of search warrants didn't happen
8  a whole lot in my individual career, but it certainly
9  does happen in some troopers' careers somewhat more
10 frequently.
11     Q.    You mentioned doing some off-duty work
12 you said in the late '80s and the early '90s; is that
13 right?
14     A.    Yeah, that time frame.  It wasn't very
15 long.  It wasn't 6 months maybe at the most.
16     Q.    Okay.  And which agency were you doing
17 the off-duty work with?
18     A.    The US Marshals Service.
19     Q.    I also saw another article mentioning
20 you with the US Marshal Service on a child
21 pornographer who had ended up over in the Branson,
22 Missouri, area.  Do you have a recollection of that?
23     A.    No.  I think you must be talking about
24 somebody all together with different with the same
25 name because I did not do anything like that.

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 37

1    Q.    Okay.  Are you aware of another Randy
2  Moon in law enforcement in the, sort of, Kansas, the
3  eastern Kansas, western Missouri area?
4    A.    No, I'm not.
5    Q.    Okay.  Okay, so when you were
6  transferred to I think you said it was -- well, I
7  don't actually think you said.
8        So when you received that next
9  promotion or the new assignment over Communications
10  and the CJIS, where were you located?
11    A.    I started out officing in Salina and
12  so for about -- from about 2006 to 2010, my office
13  was primarily in Salina, but I maintained an office
14  in Topeka, as well, and traveled to the office in
15  Topeka as I needed.
16        In 2010, because over those years I
17  was spending much more time with the CJIS unit in
18  Topeka in my duties as the CJIS systems officer for
19  the State of Kansas, necessitated that I really
20  needed to be in Topeka because of the amount of
21  meetings and responsibilities that I had associated
22  with that unit.  So I moved to Topeka in 2010 and
23  stayed as the captain of the Communications Center in
24  Salina, but I just switched locations.
25    Q.    And how long were you in this job

Page 38

1  covering the Communications Center and CJIS?
2    A.    Until my promotion in early 2015 to
3  the assistant superintendents position.
4    Q.    All right.  Now, the troop that you
5  were supervising from 2006 to 2015 is Troop M; is
6  that right?
7    A.    Yes.
8    Q.    All right.  And, as the captain in
9  Troop M, were you sort of the senior officer in that
10  particular troop?
11    A.    Yes.
12    Q.    All right.  And that is true for all
13  of the years, from '06 to '15; is that correct?
14    A.    Yes.  I had, at that -- during those
15  years, I had a lieutenant, a uniformed lieutenant,
16  that reported to me that worked in the Communications
17  Unit.  And I had a uniformed lieutenant who worked
18  for me in the CJIS unit.
19        Both the Communications Unit and the
20  CJIS unit are primarily civilian employees.  So about
21  65 or so of the dispatch personnel that we had were
22  all civilian employees and they were managed by first
23  line civilian employees in the Dispatch Center who
24  were then also managed or overseen by the lieutenant
25  who reported to me.

Page 39

1        MS. GREATHOUSE:  All right.  I think
2  we're -- let's go ahead -- we're just under about an
3  hour, I've got some exhibits that I'm going to start
4  to mark now, so this would be a good time to take a
5  break so we can get those marked and then we'll
6  resume.
7        VIDEOGRAPHER:  The time is 11:01 AM.
8  We're taking a short break.  Going off the record.
9        (Recess.)
10        (Moon Exhibit 71 was marked for
11  identification.)
12        VIDEOGRAPHER:  The time is 11:16 AM.
13  We are back on the record.
14  BY MS. GREATHOUSE:
15    Q.    Mr. Moon, I have given you what we
16  have marked as Deposition Exhibit 71.  For the
17  record, it is Bates No. OAG017625.  Have you seen a
18  document like this before?
19    A.    Yes.
20    Q.    Okay.  So this is an organizational
21  chart for the way Troop M is set up inside the KHP;
22  is that accurate?
23    A.    Yes.  It looks like it's a fairly
24  present organizational chart.
25    Q.    Right.  This is not the organizational

Page 40

1  chart that existed when you were in charge, when you
2  were the sergeant of Troop M; is that correct?
3    A.    Yes.
4    Q.    Right.  Okay.  But does it generally
5  show the same thing that you just described about how
6  Troop M was organized when you were there?
7    A.    Yes.
8    Q.    All right.  So, it shows that the
9  troop commander, which would have been you at the
10  time you were there; is that correct?
11    A.    Yes.
12    Q.    And then it shows the two lieutenants,
13  one over Communications and one over CJIS, correct?
14    A.    Yes.
15    Q.    And those were what you referred to as
16  the uniformed lieutenants, right?
17    A.    Yes.
18    Q.    So, if you look at this, sort of,
19  chart, at what point do the people in Troop M become
20  civilians?
21        Or which ones are civilians versus
22  which ones are uniformed?
23        Is there a level in the organizational
24  chart where that happens?
25    A.    There are only three sworn positions,

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 41

1  that of the captain and those two lieutenants.
2      Q.    Okay.
3      A.    There was a time in the Patrol's
4  history when the communications specialists wore
5  uniforms and may well have been sworn, but those days
6  are long passed.
7      Q.    All right.  So, can you give us
8  generally a description of what your duties were when
9  you were the captain of Troop M?
10     A.    Sure.  Since they're two units, I'll
11  talk about each respectively.
12         The Communications Unit, I oversaw the
13  operation of that unit.  So it was my job as the
14  commander to ensure that our employees were providing
15  a good service to our troopers, as well as to the
16  public.
17         There's a bit of a technical piece
18  associated with that position dealing with the radio
19  communications and telecommunications equipment.  So
20  I, one of the responsibilities I had, was working
21  very closely with K-DOT, who actually owned the radio
22  communications system in the state of Kansas.
23         And I worked very closely with K-DOT
24  officials in ensuring that that system was robust and
25  operational at all times and that it met the needs of

Page 42

1  the Kansas Highway Patrol.  And that would include
2  anything from the type of radios, the number of
3  radios that our troopers had, all the way to having
4  meetings and discussions with them concerning
5  upgrades to that entire system and how that might
6  impact the Highway Patrol.
7         I did not supervise the employees
8  daily.  That would have been the lieutenant's
9  position.  But I was certainly in direct
10  communication, direct contact with the lieutenant on
11  what was occurring within the Communications Center
12  and the daily operational status, so to speak.
13         And so, generally speaking, I just
14  oversaw that entire operation, everything from the
15  welfare of the people to the equipment.
16         As it relates to the CJIS unit --
17     Q.    Can we -- let's just stop with
18  Communications, I'll ask a few questions and then
19  we'll go onto CJIS.
20     A.    Sure.
21     Q.    All right?
22         So with regard Communications, I just
23  want to clarify that when you're talking about
24  radios, you're talking about the system, the radio
25  system, that is in the troopers' vehicles or attached

Page 43

1  to their uniforms; is that correct?
2      A.    Yes.  And the system that makes our
3  central communications system operate, it's an 800
4  megahertz trunked radio system that has a series of
5  76 to 80, I'm not sure how many towers there are
6  anymore, that are generally all linked together that
7  allow the troopers to be able to talk across the
8  state to each other.
9      Q.    And then they also not only talk to
10  each other, but they talk to people who are working
11  in the Communications portion of Troop M; is that
12  correct?
13     A.    That's correct.
14     Q.    And so would it be fair to say that,
15  like, dispatch is part of Troop M?
16     A.    Yes.  That Communications Center that
17  I'm talking about is our dispatch.  It is the 911 of
18  the Highway Patrol, minus the 911 part.
19     Q.    Right.  Okay.
20         And so the Communications group is
21  primarily sitting in an office building in Salina; is
22  that correct?
23     A.    Yes.  The Troop C, and I don't know
24  that the Troop M headquarters anymore, but at one
25  time it was.  But the Troop C building that houses

Page 44

1  the field headquarters for the troopers located in
2  the north central part of the state, in that
3  particular building in the basement portion
4  underground is where the Communications Center is
5  located.
6      Q.    All right.  And is it located
7  underground for purposes of making sure that it's
8  safe during, let's say, weather events?
9      A.    That's an interesting story.  I guess
10  the short answer is yes.  But they're underground
11  because there was an afterthought, because during the
12  renovation of that building back in the days when it
13  was Marymount, the area which was above ground that
14  they were going to put the Communications Unit was
15  not large enough.  So, it's my understanding that as
16  an afterthought, they ended up going down to the
17  basement that had more room.
18     Q.    Got it.  Okay.
19         So the people that are working in that
20  Communications Center, describe for me the equipment
21  that would have been sitting in front of a dispatcher
22  in the time that you were there from 2006 to 2015, if
23  you know.
24     A.    Sure.  They have a couple of computer
25  screens and a computer and they have a radio system.

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 45

1  In fact, these days that is all linked together.  And
2  then they would have telephone numbers and then they
3  would have other types of telephonic hotlines, I
4  guess, is maybe the easiest way to call them.
5          Highway Patrol Communications Center
6  takes care of the State of Kansas, the school safety
7  hotline.  It takes care of the I think it's a drunk
8  driving hotline.  Seems like there might be another,
9  but I've forgotten.
10      Q.   All right.  Now you said these days
11  those systems are all linked together.
12      A.   Uh-huh.
13      Q.   When you say "these days," when are
14  you talking about?
15      A.   Meaning from the time that I was the
16  commander to present.
17      Q.   All right.  So from 2006 until you
18  left the Patrol which was in -- well, strike that.
19  Let's just get that date set.
20      You resigned from the Patrol in April
21  of '19; is that correct?  Or is it '20 --
22      A.   I retired from the --
23      Q.   -- you retired?
24      A.   -- the Patrol in June of 2019.
25      Q.   All right.  So when you're saying

Page 46

1  "these days those systems are all linked together,"
2  the phrase "these days" is a reference to 2006 to
3  2019; is that fair?
4      A.   Yes.
5      Q.   All right.  Now, I have heard the
6  phrase "computer-assisted dispatch."  Are you
7  familiar that phrase?
8      A.   Yes.
9      Q.   Tell me what your understanding of a
10  computer-assisted dispatch system is.
11      A.   The computer-assisted dispatch, or CAD
12  in short, is a logging system that enables
13  dispatchers to more effectively do their job, in so
14  much as when calls come in, they are logged in to
15  this system.  Oftentimes, the dispatchers are
16  required to categorize the calls in the system.  And
17  it also enables the dispatchers to correctly assign
18  the calls based on what troopers are available and
19  where they are located in proximity to a situation.
20      Q.   All right.  And the CAD is actually an
21  incident-based reporting system, correct?
22      A.   It is an incident-based system, yes.
23      Q.   And by -- is your understanding of
24  "incident based" means it's sort of per contact with
25  the public or a particular incident that requires a

Page 47

1  law enforcement officer?
2      A.   Generally speaking, yes.
3      Q.   Okay.  Is there another way you would
4  define "incident-based reporting"?
5      A.   Well, when I hear the term
6  "incident-based reporting," I think of the
7  responsibility by the Kansas Bureau of Investigation
8  who collects incident-based information from law
9  enforcement agencies across the country.  But,
10  generally speaking, in the way that you've defined
11  "incident-based reporting," I think that would fairly
12  summarize the computer-aided dispatch system.
13      Q.   And is the computer aided -- or is the
14  CAD system the primary data system that the
15  communication group of Troop M are using?
16      A.   Yes.
17      Q.   Okay.  Are there other data systems
18  that that communications system uses that you're
19  aware of?
20      A.   I don't believe so.
21      Q.   Okay.  And do you have an
22  understanding of where the CAD data is stored at the
23  KHP?
24      A.   During my time as the commander, it
25  was stored in Salina at that complex.

Page 48

1      Q.   Okay.  So there were servers at that
2  complex in Salina where the CAD data was stored; is
3  that correct?
4      A.   Yes.
5      Q.   And do you know whether that CAD data
6  was -- well, strike that.
7      Are you familiar with the phrase
8  "Record Management System"?
9      A.   Yes.
10      Q.   And are you aware that the KHP had a
11  Records Management System, or RMS, in the time
12  between 2006 and 2019?
13      A.   Yes.
14      Q.   Do you know whether the CAD data was
15  cross-recorded or saved in the KHP's record
16  management system between 2006 and 2019?
17      A.   I don't know that I can speak
18  precisely to your question.  The systems are tied
19  together.  I don't know the intricacies today because
20  I've been away from the Patrol.
21      During the time that I was the
22  commander out there, there was a lot of work going
23  into tying those systems together, because at one
24  time they weren't tied together.  So that was going
25  on when I was the captain.  But I really can't speak,

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 49

1  you know, to after that time.
2         I know eventually there was some
3  linkage of them, I just don't know what data
4  specifically that the RMS pulls or is fed from the
5  CAD.
6     Q.    So, is it fair to say that by the time
7  you left Troop M in 2000 -- was it '14 or '15?
8     A.    '15.
9     Q.    Okay.  So between the time that you
10 were at Troop M from 2006 to 2015, is it correct to
11 say that implementation of communication between CAD
12 and RMS was not yet complete when you left?
13    A.    I'm sorry, I just don't recall exactly
14 when that was completed.
15    Q.    Is it fair to say that you know that
16 that communication link was completed at some time
17 while you were still with the KHP?
18    A.    Yes.
19    Q.    What troop inside of the KHP manages
20 the RMS?
21    A.    The IT section, Internet Technology
22 section.
23    Q.    Does that have a -- is that section
24 given a troop number that you know of?
25    A.    No, they're just called IT.  They work

Page 50

1  out of our headquarters in Topeka.
2     Q.    What is your understanding of,
3  generally, what the KHP's RMS holds?  What data does
4  it hold?
5     A.    Well, again, I'm limited on my
6  knowledge because I'm not in IT.  I have no IT
7  background.
8         It is a Records Management System.
9  So, it's my understanding that it holds, among other
10 things which I may not know exactly what those other
11 things are, it holds the Kansas incident-based
12 record -- incident-based arrest records.  It holds
13 accident investigation records.  It holds drunk
14 driving investigation records.  Offense, that may not
15 be an arrest, records.
16        Yes, I think I'll stop at that because
17 I don't know exactly for certain what other records
18 it holds.
19    Q.    And, to be clear, when I asked that
20 question, I asked your knowledge of it.  And so I
21 know that what I'm getting from you is your knowledge
22 of these systems --
23    A.    Sure.
24    Q.    -- not official --
25    A.    Well, it certainly holds other records

Page 51

1  for certain, I know that.  I think it holds pursuits
2  and other aspects of the Patrol, I just don't know
3  all of them.
4     Q.    Did any aspect of the communications
5  group of Troop M have responsibility for data input
6  into the RMS between 2016 and 2019 to your knowledge?
7     A.    No.  They did their entries into CAD,
8  and I don't remember specifically whether it was
9  pushed or pulled into the RMS, but it is fed to the
10 RMS.
11    Q.    As part of your role as the captain of
12 Troop M, were you also chair of a regional group that
13 oversaw, the sort of, the radio thing that you
14 mentioned, the 800 megahertz system?
15    A.    I wasn't the chair of the 800
16 megahertz.  I was a chair for a frequency band that
17 was in the 700 megahertz.  I was the chair of that
18 because the Patrol at that time managed the public
19 safety 700 megahertz bands which really were not
20 utilized during that time.
21    Q.    Okay.  So when you say the 700 public
22 safety band, what do you mean by that?
23    A.    Well, there are other uses of the 700
24 frequency, or really any frequency, whether it's 800,
25 high band, low band, there are commercial uses, there

Page 52

1  are personal uses.  And so what the Highway Patrol
2  managed was just the public safety use of the 700
3  megahertz.
4     Q.    All right.  And when you say "public
5  safety," what does that term include, to your
6  knowledge?
7     A.    Police, fire, EMS, first responders.
8     Q.    Okay.  Let's switch over now and talk
9  about the CJIS unit.  What were -- well, first of
10 all, why don't you describe what the CJIS unit does?
11    A.    Sure.  CJIS stands for Criminal
12 Justice Information Services.  So when we're talking
13 about Criminal Justice Information Services, we're
14 talking about the type of services that law
15 enforcement, whether it's the Highway Patrol or
16 whether it's police or sheriff's departments across
17 the state and across the country, utilize.
18        For example, the National Crime
19 Information Center, NCIC, that is a system that the
20 CJIS unit managed.  They trained on it, they trained
21 other agencies on it, they trained our dispatchers
22 and our personnel on the use of that system.
23        The various Kansas systems that are
24 primarily housed at the Kansas Bureau of
25 Investigation, for example, I think it's changed now,

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                            July 28, 2021

Page 53

1  I think NCIC holds misdemeanor warrants.  But at one
2  time, the KBI managed a system where all warrants
3  that didn't constitute a felony went into their
4  system.  And, again, this CJIS unit trained on the
5  use of that system.
6             There are other systems and files that
7  are associated with NCIC that this unit would train
8  agencies on the use of.  And then more, maybe a
9  little bit more relevant, or equally as relevant I
10 should say, to the training aspect, this unit did
11 auditing of those systems.  Meaning auditing of the
12 use or misuse of those systems, not just within the
13 KHP, but throughout all of law enforcement in the
14 state of Kansas.
15            So they were broken into two separate
16 sections.  There was a section that trained and
17 instructed and audited on the data side, meaning the
18 use or misuse of the data that comes from these
19 systems.
20            And then there was a technical
21 security audit team that would go to agencies and
22 audit the connections between their systems and these
23 systems to ensure that those connections were meeting
24 all the appropriate safeguards and protocols,
25 firewalls and virus protection and a whole host of

Page 54

1  other technical things that were often -- would often
2  make my head swim, but.
3             So those units did training in all
4  those various things and did auditing of police
5  agencies in the use of those.
6             And, as the commander over that unit,
7  similarly to the Communications unit, I, of course,
8  was responsible for ensuring that they were doing
9  what they were supposed to go doing, in terms of
10 their services.
11            I had a rather unique role, because
12 there was only one of them in the entire state and
13 that I served as the FBI's what they called the State
14 CJIS systems officer.  And that is the person in each
15 state that the FBI designates as the individual who
16 helps enforce the use of the federal systems, like
17 NCIC, there are others, AFIS and a whole host of
18 files, I don't know how many they're up to now, 17,
19 19.
20            That individual also participated in
21 meetings at the national level with both the peer
22 CSOs from across the country, as well as the FBI CJIS
23 unit, in helping form a policy for the use of these
24 systems on behalf of the director of the FBI.
25        Q.    All right.  You just used the used the

Page 55

1  acronym "CSO," can you tell me what you meant by
2  that?
3        A.    That is the CJIS systems officer.  I'm
4  sorry, it's been a couple years and it's actually
5  been longer than that since I've been away from that
6  unit.  CJIS systems officer.
7        Q.    Okay.  So, were you saying that you
8  were the CJIS systems officer for the State of
9  Kansas?
10       A.    Yes.
11       Q.    Okay.  I'm just trying to make sure
12 that that was the same thing --
13       A.    Yes.
14       Q.    -- that you were describing.  All
15 right.
16       A.    The captain who oversees Troop M
17 automatically inherits that role.  It's typically a
18 role that's assigned to the superintendent, but,
19 through delegation, because he would have absolutely
20 no time to manage that, he assigns that to the Troop
21 M commander.
22       Q.    Another question here, if you would
23 look back at Exhibit 71.  When I look at the CJIS
24 portion of that organizational chart, do you see that
25 there are people who are referred to as an

Page 56

1  "auditor/trainer," and then people who are referred
2  to as a "tech," which I assume means technical
3  auditor/trainer; is that correct?
4        A.    That's correct.
5        Q.    And so was that that distinction that
6  you were talking about in job roles?
7        A.    Yes.  If you look up above, you'll see
8  that there is a title "data quality supervisor" and
9  "technical audit supervisor," and that sort of was
10 the distinction between those two rows of people.
11            One side of them dealt with what we
12 termed as the "data quality," the use of the data.
13 The other side dealt with the technical issues
14 surrounding the connections into these systems.
15            Does that make sense?
16       Q.    Yes.  So the technical side was how
17 the systems communicate with each other through
18 technology; is that correct?
19       A.    That's correct.
20       Q.    And the data quality side was making
21 sure that the information that Kansas law enforcement
22 was putting into the system was accurately recorded?
23       A.    Correct.
24       Q.    Is that correct?
25       A.    And accurately used -- or I'm sorry --

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                           July 28, 2021

Page 57

1  appropriately used.
2      Q.    When you say "appropriately used,"
3  what do you mean?
4      A.    These auditors had the ability to look
5  into the systems to see how transactions were ran.
6  "Transaction" meaning if somebody were going to check
7  to see if I was a wanted person, well, there's a
8  trail that follows that.  Because in order to find
9  that out, they're going to utilize the National Crime
10  Information Center, which is a piece of hardware that
11  the FBI maintains for the benefit of all law
12  enforcement across the country and the world in fact.
13          So this unit was sort of the -- they
14  sort of policed the police in the state of Kansas on
15  the use of NCIC and all the various files that are
16  attached to NCIC, and there's, I don't know, 17 or 19
17  of them.
18          So they have the ability to go in and
19  see who was making the queries and why.  And meaning
20  why in so much as what information they provided as
21  to why they were seeking that information.
22      Q.    So to take it to sort of a basic
23  level, would it be fair to say that an inappropriate
24  use might be an officer making a query for a personal
25  reason as opposed to a law enforcement reason?

Page 58

1      A.    Yes.
2      Q.    Okay.  Are there other misuses besides
3  the one that I could see as a lay person?
4      A.    That's probably the most prevalent one
5  is personal use.  I have to put my thinking cap on
6  here and kind of think back to those days, because
7  the personal use was on of the most prevalent ones.
8          Sometimes that information might --
9  again, it's still sort of a personal use if it's
10  being provided to somebody outside of law
11  enforcement.  But obviously there are rules
12  associated, policies, even laws associated with the
13  use of criminal justice incident data.
14          And so they go to agencies, look into
15  their files, so to speak, to see whether or not the
16  use of that data or how they were putting information
17  in to the system met the requirements of those rules.
18      Q.    All right.  As part of Troop M, were
19  you also working with something called "N-DEx"?
20      A.    Yes.
21      Q.    Can you describe what N-DEx is?
22      A.    N-DEx is a system, it stands for the
23  National Data Exchange.  It's basically a ginormous
24  warehousing of criminal justice data.  It came about
25  after the attacks on America in 9/11, and Congress

Page 59

1  mandated that the FBI build this system.  Because
2  following 9/11 and some of the congressional
3  inquiries, there were findings that agencies,
4  including many federal agencies, didn't talk well to
5  each other.  They didn't share information to each
6  other.  They operated in individual silos as it came
7  to sharing data or sharing information.
8          So one of the takeaways was that the
9  FBI was tasked with building this system that would
10  eventually allow all of law enforcement across the
11  country to be able to share information, meaning
12  criminal arrest information, offense information.
13  Not really intelligence information.  It wasn't
14  really intended to be an intelligence device,
15  although I can see some ways in which it could be
16  utilized for that, but.
17          So, as my role of the CJIS systems
18  officer, I ended up, through my association with the
19  FBI CJIS unit, having a bit of a hand in the
20  implementation of N-DEx through input on things that
21  were important to law enforcement, as well as being
22  the first police agency in the nation that was
23  willing to actually teach other police agencies on
24  how to use that, along with our agency utilizing it
25  also.

Page 60

1      Q.    When you say "it," are you referring
2  to N-DEx --
3      A.    N-DEx.
4      Q.    -- or CJIS?
5      A.    N-DEx, I'm sorry.  We're speaking of
6  index.
7          MS. GREATHOUSE:  Shoot, I thought I
8  had that silenced.  I apologize.
9  BY MS. GREATHOUSE:
10      Q.    Now you said that N-DEx came about as
11  a result of 9/11, correct?
12      A.    Yes.
13      Q.    You were, I think in 2012, appointed
14  to an FBI, like, advisory board; is that correct?
15      A.    Yes.
16      Q.    Was that related to this project?  Or
17  was it something different?
18      A.    It was all connected.  The FBI CJIS
19  Advisory Board is a group, there is a representative
20  from every state that serves on this advisory board
21  and it's advisory to the FBI directory on CJIS
22  systems and use of CJIS systems and the needs of law
23  enforcement.
24          And the CJIS systems officers all, by
25  nature of being a CSO, belong to working groups that

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 61

1 met a couple of times a year to discuss these policy
2 issues.  Well, they, the working groups, reported to
3 the Advisory Policy Board.  So I went at some point
4 from being not just a working board member, but also
5 serving on the higher oversight board, the Advisory
6 Policy Board.
7     Q.    Okay.  And so what was the role that
8 you had at that upper level with the information
9 services Advisory Policy Board?
10     A.    So the Advisory Policy Board would
11 essentially approve or disapprove policy regarding
12 NCIC and the use of the NCIC systems that was
13 formulated by the respective working groups.
14         And there was a working group from
15 every region of the company that represented both a
16 CSO from every state and a local, what they called a
17 local authority, meaning a police official, generally
18 a chief or a sheriff, who represented all of the
19 local agencies in that state.
20         Those two individuals would go and
21 join with peer colleagues from all over the country
22 and would meet with the FBI semi annually to discuss
23 policy issues governing the use of NCIC or other
24 systems, like N-DEx, that the FBI was either
25 developing or had developed.

Page 62

1         Those working groups would revise or
2 develop new policy, then that would go to the
3 advisory working -- or the Advisory Board for
4 consideration by the board.  And if the board
5 approved any number of usually more than 100
6 different changes, then it would go to the FBI
7 director for either approval and implementation, or
8 it would get kicked back all the way down and would
9 be worked on in the future.
10     Q.    Okay.  So, these policies that were
11 being sort of created through this board, did they
12 cover the categories of data that should be input
13 into the system?
14     A.    Yes.
15     Q.    Okay.  So, like, what kinds of
16 categories of data were added in making these
17 policies?
18     A.    Everything -- and I'm going to just
19 broadly summarize -- but everything from wanted
20 persons and warrants and stolen articles, stolen
21 vehicles.  It's a very, very, very broad list, but
22 items such as that.
23     Q.    So, the information that was input
24 into this system was not incident based?
25     A.    Yes.

Page 63

1     Q.    It was incident based?
2     A.    Yes.  There was also -- it's rather
3 complex because it's not just NCIC, that's one piece
4 of it.  There's the incident-based reporting piece.
5 There's the fingerprint, what they now call AFIS,
6 automatic fingerprint, something, something.  Then
7 there was N-DEx and there were numerous systems.
8         And so the working groups and the
9 Advisory Policy Board created or revised policy for
10 all of those, not just NCIC.
11     Q.    For purposes of the record, you and I
12 have both used the phrase "N-DEx" today, correct?
13     A.    Uh-huh.  Yes.
14     Q.    And that is actually capital N hyphen
15 capital D-E-X; is that correct?
16     A.    Yes.
17     Q.    It's not the word "index"?
18     A.    No.
19     Q.    It sounds like the word "index," but
20 it's actually N-DEx.
21     A.    Yes.
22     Q.    Correct?  Okay.
23         I wanted to make sure the reporter got
24 that because that's going to make a difference in how
25 she records what you and I are saying, and I just

Page 64

1 realized that as we were going along.
2         Okay.  So you said there is an
3 incident-based reporting piece of the NCIC; is that
4 correct?  Or --
5     A.    It's actually stand-alone.  The
6 Kansas -- in our state, the Kansas Bureau of
7 Investigation manages what they call "KIBRS," which
8 is the Kansas Incident Based Reporting System.
9         The FBI houses a system called "NIBRS"
10 which is the National Based Incident Reporting
11 System.  And I guess for terms for making it
12 simplified, the goal was for the State's
13 incident-based reporting systems to feed to the
14 federal system, so, again, information sharing.
15         That was easier said than done
16 because, as you can imagine, the different platforms
17 across the country and then some states didn't
18 collect the same kinds of data, so that was yet
19 another one of the things that were worked on is
20 trying to create universal platforms and a way in
21 which criminal justice users could access other
22 criminal justice agencies' data provided they had the
23 right to do so.
24     Q.    Now, you mentioned KIBRS and I'm
25 guessing that that is K-B-R-S?

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
METROPOLITAN
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 65

1      A.    K-I-B-R-S.  Kansas Incident Based
2  Reporting System.  That is managed in Kansas by the
3  KBI.  However, since only -- there can only be one
4  CJIS systems officer in Kansas, even though KBI
5  managed it, the CSO is responsible for it.  So in a
6  bifurcated system like that, I would work hand in
7  hand with the Bureau's, KBI's, KIBRS folks, the
8  people in that unit, specifically their head.  So
9  that when I'd go to these meetings, I would be able
10  to appropriately represent the things that they felt
11  were needed.
12           A lot of states, the state police
13  manages the entire system.  But Kansas is one of a
14  very small handful of states that still has,
15  primarily because of political reasons, a bifurcated
16  system.
17           We have in our state of course the
18  governor who has an executive branch and an attorney
19  general who has that branch.  And because of that,
20  there is not a state police in Kansas, therefore, we
21  don't have -- we don't have those systems housed, I
22  say "we," meaning the Patrol.  So, the Patrol managed
23  NCIC primarily, the KBI managed the incident based
24  reporting systems and the fingerprint systems.
25      Q.    So, did the KHP's incident based

Page 66

1  reporting system communicate with the KBI's incident
2  based reporting system?
3      A.    Yes.
4      Q.    Okay.  And what kind of data was
5  communicated from the KHP to the KBI that was
6  incident based?
7      A.    Pretty much what the KBI told us that
8  they wanted, which is really primarily standard
9  offense and arrest data.  That's primarily what the
10  Kansas Incident Based Reporting System collects.
11      Q.    Okay.  I want to make sure I
12  understand this.  So let's just imagine we have an
13  incident, we'll call it an arrest, so we have an
14  arrest.
15      A.    Uh-huh.
16      Q.    On that arrest, what pieces of data
17  are collected and then sent over to the KBI?
18      A.    I will do my best to summarize.  I
19  will not hit every data element because there are so
20  many and certainly the KBI or one of our CJIS folks
21  would be better suited to tell you.
22           But, in summary, certainly a victim's
23  information would be counted in those reports.  A
24  suspect's information, if there was one and that was
25  known, would be reported.

Page 67

1      Q.    Well, I had asked you about an arrest.
2  So if we had an arrest, we would have a suspect,
3  right?
4      A.    Yes, I'm sorry.  I fell asleep on you
5  for a minute.
6      Q.    That's all right.
7      A.    Yes.  In the case of an arrest, then
8  if there is a victim, then a victim's information.  A
9  defendant or a suspect's information.  An officer's
10  information.  The location of where the incident or
11  the arrest allegedly occurred.  What the arrest was,
12  what the violation is alleged to have occurred.
13  Personal data on the suspect or the defendant.  I'm
14  certainly missing some data, but.
15      Q.    But that's to the best of your
16  recollection --
17      A.    Yes.
18      Q.    -- you've given -- to the best of your
19  recollection, you have given me the categories that
20  you can recall as you sit here today?
21      A.    Yes, a summary of the categories.
22      Q.    All right.  Okay, we're probably going
23  to come back and talk a little bit more about that.
24  But let's keep moving because I want to get -- make
25  sure I understand all the systems that Troop M was

Page 68

1  responsible for.
2           So did Troop M -- or was Troop M
3  responsible for the license plate reader, or LPR
4  system, in Kansas?
5      A.    No.  That database is housed with the
6  Kansas Bureau of Investigation.
7      Q.    To your knowledge, could the KHP
8  access that LPR information from the KBI?
9           MS. GREATHOUSE:  This is alphabet
10  soup.
11      A.    Maybe.
12  BY MS. GREATHOUSE:
13      Q.    Did Troop M have any responsibility
14  for a Uniformed Criminal Reporting Program?
15      A.    No.  That is another program that the
16  Kansas Bureau of Investigation manages.
17      Q.    Now we've talked about a couple of
18  different programs here that the KBI is in charge of,
19  but that would have to be communicated to the
20  national system through the national criminal -- the
21  NCIC; is that correct?
22      A.    Not technically speaking.
23      Q.    Okay.
24      A.    NCIC is a stand-alone system.  NIBRS
25  the, National Incident Based System, is stand-alone.

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 69

1  AFIS, the fingerprint system and whatever else it
2  collects these days, is a stand-alone system.  UCR
3  and NIBRS are very similar.
4       Q.    All right.  But as the CJIS systems
5  officer for Kansas, did you have responsibility for
6  the communication of that data that's held by KBI to
7  the national systems?
8       A.    The short answer is yes.  Meaning that
9  if there was problems in the reporting of that, then
10  the FBI would alert me.
11            From a more realistic standpoint, the
12  KBI was really responsible, in as much as if there
13  was a problem, I'd be notified and I would simply
14  contact the KBI, my contact there, and say, hey,
15  what's going on, and, you know, they would take care
16  of it.
17       Q.    So the KBI had its own way to directly
18  communicate to national systems; is that correct?
19       A.    Yes.
20       Q.    The KBI's data did not have to flow
21  through the KHP systems; is that correct?
22       A.    Not anything was non-NCIC, correct.
23       Q.    So KBI data that related to the NCIC
24  did come through the Kansas Highway Patrol's systems;
25  is that correct?

Page 70

1       A.    Again, technically, no, because the
2  item that they call -- they call it "the switch,"
3  which is really nothing more than a connection to,
4  from and to, was actually housed at KBI.  It's very
5  complicated in Kansas because of the bifurcated
6  system.  KBI holds most of the repositories in Kansas
7  for data, not NCIC though.
8            So even though the KHP's responsible
9  for NCIC because a long time ago decisions were made
10  that KBI was going to maintain these repositories and
11  these connections, that even that NCIC connection is
12  there.
13            So, yes, technically, the KBI is able
14  to communicate directly with the FBI outside of the
15  CSO.  But from a policy standpoint, because the FBI
16  doesn't want to go to every local or state entity
17  across the country to deal with these matters, they
18  appoint one individual, and that one would have been
19  the CSO.
20       Q.    So when you say -- you used the word
21  "switch," and the switch is literally a piece of
22  hardware that connects the KBI's systems to national
23  systems; is that correct?
24       A.    That is correct.
25       Q.    And so there was this physical switch

Page 71

1  at the KBI and then there's also a physical switch so
2  the Kansas Highway Patrol can communicate to national
3  systems; is that correct?
4       A.    Yes.  We go through, the KHP and any
5  police agencies connection to NCIC, is through the
6  one connection through KBI.
7       Q.    Okay.
8       A.    There's not separate connections.
9       Q.    So there's only --
10       A.    There is a back-up.  There is a
11  back-up connection that actually is housed at the KHP
12  in Salina.  So if NCIC fails at the connection, the
13  KBI fails, the redundancy switches over to this other
14  switch in Salina.
15       Q.    Okay.  So, other than a back-up,
16  there's only one switch to national reporting systems
17  for the state of Kansas?
18       A.    Yes.
19       Q.    All right.  Was Troop M responsible at
20  all for the Interstate Identification Index, which I
21  think has another acronym that you use; is that
22  correct?
23       A.    Well, yes.  You know, the FBI loves
24  their acronyms.  The Interstate Identification Index
25  stands for III.  What III is is the criminal,

Page 72

1  criminal history records of individuals who have been
2  arrested.  And, again, Kansas makes everything
3  complicated when it comes to criminal justice
4  systems because, you know, we're different from state
5  police agencies who house -- one entity houses it
6  all.
7            So the KHP, because III is a part of
8  NCIC, trains on it, audits on it.  But, again the KBI
9  has a integral piece of III as well because of that
10  connection to the FBI.
11       Q.    All right.
12       A.    I'm trying to make it as hard as I
13  possibly can for you, counsel.
14       Q.    I appreciate it.  I'm hoping I'm
15  tracking you.
16            Okay.  Other than what we have already
17  talked about, were there any other information
18  sharing tools that the Kansas -- well, that you were
19  overseeing when you were the captain of Troop M?
20       A.    No.
21       Q.    That you can think of.
22       A.    No.
23            MS. GREATHOUSE:  Okay, let's go off
24  the record for a minute please.
25            VIDEOGRAPHER:  The time is 12:16 PM,

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 73

1   taking a short break.  Going off the record.
2           (Recess.)
3           VIDEOGRAPHER:  The time is 12:23 PM.
4   We are back on the record.
5   BY MS. GREATHOUSE:
6       Q.    When we were talking about your, sort
7   of, formal education, you mentioned an FBI program
8   that you went to; is that correct?
9       A.    Yes.
10      Q.    And did that program have anything to
11  do with the kinds of information systems we've been
12  discussing?  Or did it cover different categories?
13      A.    It covered other things.
14      Q.    Okay.  So what were the kinds of
15  things that were addressed in your FBI training
16  program?
17      A.    Sure.  The program we're talking about
18  is referred to as the FBI National Leadership Or
19  National Executive Training.  And it's a 3-month long
20  training course that attendees are selected to go
21  spend their 3 months at Quantico, Virginia, and,
22  essentially, are in a college-like atmosphere.  And
23  they have a very large cafeteria-style curriculum of
24  courses that are tailored as you so deem that
25  you -- or better spoken I guess -- as you desire.

Page 74

1           So they have a catalog of different
2   kinds of courses, and an individual who's going to
3   attend then selects the courses that they attend.
4   Now there are a few mandatory courses that the FBI
5   requires that are leadership based.
6           But, essentially, the academy is all
7   about learning to be a police administrator, how to
8   eventually become a chief of police or sheriff or a
9   superintendent of a highway patrol and/or just a
10  leader in a police agency.
11          So it encompasses a large number of
12  courses, everything from leadership to communications
13  to media to criminal investigation techniques.  Oh,
14  goodness, physical fitness, wow, there are a lot.
15  And the school is attended by not only students from
16  US police agencies, but national police agencies.  So
17  it's really an international, international training
18  opportunity.
19      Q.    Is this a program that you had to
20  apply to be accepted to?
21      A.    Yes.
22      Q.    Okay.  And do you know whether there
23  have been other -- in the time that you were with the
24  Kansas Highway Patrol, were you aware of other
25  individuals with the Patrol that went to this

Page 75

1   academy?
2       A.    Yes.  Over the course of my career,
3   I'm not exactly sure just how many of our personnel
4   have attended the FBI's academy.  But from the time
5   that I attended, I was aware of a group of eight
6   individuals within the patrol who had attended that
7   academy.
8           It's very difficult to get into
9   because when you think of 40,000 police agencies
10  across the country and, you know, literally millions
11  of officers and a lot who apply every year, it's
12  difficult to get into.
13      Q.    Well, it sounds like maybe the Patrol
14  was sending about one person a year, if you went in
15  2010 and were with the Patrol until '19, that about
16  one a year.  Does that sound accurate?
17      A.    Our goal was to send one a year.  The
18  eight or so that I speak of encompassed employees
19  that attended some number of years before me and
20  years after me.
21          So, in that time, which is a fairly
22  significant, maybe 15-year period, we're only talking
23  about maybe six or eight employees.  But our goal was
24  to send one a year, just we didn't always succeed in
25  reaching that goal because of the volume, the shear

Page 76

1   volume of candidates that applied from across the
2   world.
3       Q.    You listed the kinds of courses that
4   were available at the academy, do you recall what
5   courses you took at the academy?
6       A.    No, not specifically.  I mean, I can
7   name a few.  I took some leadership courses.  I took
8   an internet security course.  I took a speech writing
9   course.  And there were others, I just simply don't
10  remember.  That's been over 10 years ago.
11      Q.    Do you remember taking any courses
12  that had to do with the media?
13      A.    No.
14      Q.    Did you take any courses that had to
15  do with criminal investigation or field work?
16      A.    Yes.
17      Q.    Was there a particular area in
18  investigation or field work that you took at the KBI
19  that you recall?
20      A.    At the FBI?
21      Q.    FBI.
22      A.    I remember specifically taking a
23  course on interrogation.
24      Q.    Did you take any courses that had to
25  do with reporting?  By which I mean internal reports,

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 77

1  police reports.
2      A.    I don't remember.
3      Q.    Okay.  So on the timeline I think
4  we've now come up to 2015 when you were appointed
5  lieutenant colonel of the KHP; is that correct?
6      A.    Yes.
7      Q.    And when you received that job, it was
8  because you were selected to take that job by the new
9  superintendent of the Highway Patrol; is that
10  correct?
11      A.    Yes.
12      Q.    Was that a job that you applied for?
13      A.    No.
14      Q.    So you just -- it's like one of those
15  things where you just get a phone call one day and
16  they say, hey, will you be the assistant
17  superintendent?
18      A.    That's kind of how it happened.
19      Q.    Okay.  Can you tell me what your
20  duties were as the assistant superintendent?
21      A.    Sure, I'll generalize them.  The
22  assistant superintendent of the Kansas Highway Patrol
23  is very much one might think of a vice-president of a
24  company or a COO of a company, in so much as the
25  assistant superintendent is the No. 2 person.

Page 78

1          So, the assistant superintendent
2  oversees all operations of the agency, whether those
3  are operations by uniformed personnel or by civilian
4  personnel.
5          There were shy of 1,000 employees, I
6  want to say 900-ish, so the lieutenant colonel, the
7  assistant superintendent, oversees, not directly, but
8  oversees everything that goes on in the Patrol.  The
9  assistant superintendent ensure that the directives
10  that are set out by the superintendent are carried
11  out throughout the agency.
12          The assistant superintendent is
13  involved in all matters regarding policy.  The
14  assistant superintendent is involved in all matters
15  concerning hiring and disciplinary.  The assistant
16  superintendent reviews internal affairs cases.
17          The assistant superintendent spends a
18  great deal of time overseeing all expenditures of an
19  approximately $90 million budget.
20          The assistant superintendent is really
21  also there to ensure that the personnel of the
22  highway practical, all the men and women, that their
23  welfare is taken care of.  And there are many, many,
24  many other duties, but I hope that gives some
25  understanding.

Page 79

1      Q.    It does.
2          So, since you came to the assistant
3  superintendent role from Troop M, did the, sort of,
4  communications and reporting and all of that stay
5  something that you were paying a lot of attention to
6  as the assistant superintendent?
7      A.    Not directly.  I mean, quite frankly,
8  through delegation, we had majors and captains and
9  others who took care of those things directly.  So if
10  it needed to reach my level, obviously I was made
11  aware of things, but, you know, any particular
12  changes that might have occurred that really weren't
13  worthy of reaching that level, I might not have known
14  about.
15      Q.    Okay.  So, when you went from the
16  captain of Troop M to the lieutenant colonel of the
17  Patrol, you sort of jumped over, sort of, several
18  ranks; is that correct?
19      A.    I jumped over the rank of major.
20  There were four majors that were employed.  And when
21  Colonel Bruce was selected to become the
22  superintendent, and I'm sort of speaking for him, but
23  I think he felt that I was a better fit as it related
24  to him and the Patrol in whole than the personnel
25  that one might think would ordinarily ascend to that

Page 80

1  position.
2          So, yes, I ended up going from a
3  captain to a lieutenant colonel and skipping the rank
4  of major.
5      Q.    You said that there were four majors
6  in the KHP, at least at the time in 2015 when you
7  became lieutenant colonel; is that right?
8      A.    Yes.
9      Q.    Were those majors assigned to
10  particular, let's say, topics or job duties in the
11  KHP?
12      A.    Region, yes.  The majors were
13  typically, as it related to our personnel, our field
14  personnel were assigned regionally.  So we had a
15  major who covered the entire western region of the
16  state which would have encompassed two troop
17  commands.  So everything in the entire western part
18  of the state, that major took care of those
19  operations.
20          Then we had a major that was assigned
21  to the central portion of the state.  So basically
22  from the Oklahoma line to Nebraska within certain
23  boundaries.
24          And then, likewise, an eastern major.
25          And then we had a major who took care

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 81

1 of some of the specialized or some of the support
2 type of operations.  Because, as you can imagine with
3 an organization like the Patrol, there are many
4 moving parts.  And so it's not, I think what some
5 people might think of, just all troopers.  There are
6 as many civilian employees as there are troopers, and
7 a lot of different sections within the Patrol that
8 are just civilians.
9    Q.    When you were the captain of Troop M,
10 did you report to one of the majors?
11    A.    Yes.
12    Q.    Okay.  Which major did you report to?
13 And I'm talking about position, not name.
14    A.    Well, I reported to a couple because
15 they changed, retired, promoted and so forth.  So, at
16 one point, I reported to a gentleman by the name of
17 John Gant who is retired now.  And then I reported to
18 Major Bruce, at the time, before he became the
19 superintendent.
20    Q.    And so, I'm sorry, I don't think my
21 question was clear.  I wasn't wondering about their
22 names.  I was wondering, you told me there was a
23 western, a central --
24    A.    Oh, I'm sorry.
25    Q.    -- an eastern and a specialized,

Page 82

1 right?
2    A.    Yes.
3    Q.    Okay.  Which one of those sort of
4 categories did you report to?
5    A.    It was the support.
6    Q.    Okay.
7    A.    Support.
8    Q.    And so, at some point, you were
9 reporting to Major, at that point, Major Bruce when
10 he was the major of the Patrol over support, the
11 specialized and support part of the KHP; is that
12 correct?
13    A.    Yes.
14    Q.    Okay.  So, when Major Bruce was named
15 the superintendent, there had to have also been
16 somebody who was named to the position of the support
17 major position; is that correct?
18    A.    Well, Colonel Bruce and I actually
19 promoted a captain into that major's position after
20 we assumed our positions.
21    Q.    Okay.  But I guess what I was asking,
22 inartfully, is that when Major Bruce was promoted,
23 that spot that had been your supervisor was empty; is
24 that correct?
25    A.    Yes.

Page 83

1    Q.    Okay.  So in your role as -- well, let
2 me ask, would you have referred to your role as
3 lieutenant colonel?  Or would you normally call it
4 assistant superintendent?
5    A.    Both.
6    Q.    Okay.
7    A.    I think from day to day, I was
8 referred to as a lieutenant colonel.  But I suppose
9 the more formal title was that of the assistant
10 superintendent, so.
11    Q.    Okay, so those terms are
12 interchangeable as we use them?
13    A.    They're interchangeable, for sure.
14    Q.    So when you were the lieutenant
15 colonel of the Patrol, did you act as its
16 spokesperson?
17    A.    No, only when the superintendent
18 designated me to or he was not available.  So, for
19 the most part, obviously the superintendent is the
20 spokespersons for all things Highway Patrol.
21 However, from a realistic standpoint, an agency our
22 size, he simply cannot address all the matters, so we
23 have, or the Patrol has, public relations officers or
24 personnel and they are geographically who speak to
25 issues geographically.

Page 84

1         If it is an issue of politics or
2 policy, that is likely going to be a discussion that
3 comes to the level of my -- the role I had or the
4 current superintendent's role.  And then it could be
5 delivered by one of those positions or it could be
6 delivered by a public relations officer.
7    Q.    So, if you were giving an interview to
8 the press when you were the lieutenant colonel, you
9 would have communicated in advance with the
10 superintendent about that issue?
11    A.    Of course.
12    Q.    And would you also have worked with
13 one of the, you know, the information specialists or
14 the --
15    A.    The public relations specialist.
16    Q.    All right.  So yes?
17    A.    Yes.
18    Q.    Is that a, yes, you would have?
19    A.    Yes.
20    Q.    All right, sorry my question was bad
21 there.
22         So, earlier we talked about the
23 article that you had looked at that was cited in some
24 of our court filings.  Do you recall that?
25    A.    Yes.

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
METROPOLITAN
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 85

1     Q.    So, when you gave that interview, you
2   were giving that in your capacity as the lieutenant
3   colonel of the KHP, correct?
4     A.    Yes.
5     Q.    And did you communicate with the
6   colonel about that issue before you gave the
7   interview?
8     A.    I communicated with the superintendent
9   regarding the request by the woman who came from the
10  "Topeka Capital Journal" to visit with us.  So he was
11  aware that myself, one of our legal counsel, our
12  criminal interdiction commander, that we were going
13  to have that interview.  He was aware of that.
14         He was aware of what it centered
15  around.  He probably did not know until after the
16  interview what each of us individually said.  In
17  other words, we didn't meet, my recollection is, we
18  did not meet beforehand to powwow and discuss what we
19  were going to say.
20    Q.    Before that interview, did the
21  reporter give you the topic that she was going to ask
22  questions about?
23    A.    No.
24    Q.    Okay.  So, you said that there was an
25  interdiction supervisor who was also interviewed at

Page 86

1   this same time; is that correct?
2     A.    Yes.
3     Q.    Do you recall who that was?
4     A.    Yes, his name was Captain, I assume
5   it's still captain, Brent Hogelin, H-O-G-E-L-I-N I
6   believe.
7     Q.    Okay.  And was he the captain that
8   oversaw the Interdiction Unit of the Kansas Highway
9   Patrol?
10    A.    Yes.
11    Q.    Just for purposes of making sure that
12  you and I have the same understanding of what
13  interdiction is, will you tell me what you mean, what
14  you understand "interdiction" to mean?
15    A.    Sure.  As far as the Kansas Highway
16  Patrol is concerned, and probably generally accepted,
17  criminal interdiction, and in our case we have a team
18  of troopers who are specially trained, meaning that
19  they've gone above and beyond just normal training
20  and they look for criminal activity, specific
21  criminal activity.  And really, I mean, realistically
22  all criminal activity.  But they certainly focus on
23  things like human trafficking, narcotics trafficking,
24  weapons trafficking or anything illegal connected
25  with weapons.  Yeah.

Page 87

1     Q.    And is it fair to say that the
2   majority of the interdiction that happens with the
3   Kansas Highway Patrol involves travelers on the
4   highways of Kansas?
5     A.    Yes.
6     Q.    Do you -- I mean, would you say --
7   well, strike that.
8          Do you have any knowledge about what
9   percentage of interdiction efforts occur in traffic
10  as opposed to other kinds of interdiction efforts?
11    A.    I don't know statistically speaking
12  and when you're -- are you speaking -- I guess I
13  should clarify.  So you're asking me do I have
14  knowledge as to any interdiction efforts other than
15  motorized traffic?
16    Q.    I'll re-ask my question.
17         Do you have a general understanding
18  of, you know, what percentage of interdiction efforts
19  in the Kansas Highway Patrol are happening via
20  traffic stops on the highways or freeways in Kansas?
21    A.    I think the majority of the
22  interdiction effort is traffic related, just by
23  nature of the Patrol's duties.
24    Q.    All right.  So when the reporter came
25  to the KHP, did she indicate that she wanted to talk

Page 88

1   to somebody in Interdiction?  Do you know?
2     A.    I don't think so.  I think we assumed.
3   I think she had made a number of requests in the
4   preceding weeks.  And I think given those requests,
5   we had some idea that she might want to be talking
6   about the Vasquez case, about license plates, about
7   Interdiction efforts.
8     Q.    Now, when you say she'd made a number
9   of requests in the preceding weeks or months, you're
10  referring to Kansas Open Record Act requests that she
11  made to the Patrol?
12    A.    Yes.
13    Q.    You said you also worked with legal
14  counsel related to that interview, correct?
15    A.    Yes.
16    Q.    Can you tell me the name of the person
17  you worked with?
18    A.    Yes.  Her name is Sarah Washburn and
19  she served in a couple of different capacities for
20  the Patrol.  One was she was counsel in our asset
21  forfeiture and she also taught criminal law.
22    Q.    When you say she taught criminal law,
23  where did she teach criminal law?
24    A.    At the Kansas Highway Patrol training
25  center in Salina.

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 89

1        MS. GREATHOUSE:  Just going to pause
2   for a second, I need to grab a water.  Finished my
3   coffee and now my voice is going.
4        A.    She taught other things also.
5   BY MS. GREATHOUSE:
6        Q.    So, this particular interview you gave
7   was in 2017; is that right?
8        A.    Yes.
9        Q.    And, at that time, was it the Kansas
10  Highway Patrol's position that it was not
11  unreasonable when a trooper was conducting a stop for
12  that trooper to consider that people coming from
13  Colorado, or I suppose any other state where
14  marijuana was legal, that the trooper could consider
15  that in determining whether or not they needed to
16  conduct a search or wanted to conduct a search of a
17  vehicle that had been stopped?
18       A.    I think our troopers considered many
19  facets as it related to searches.  Residency may or
20  may not have been one of those facets.
21       Q.    But if in the interview, and we can
22  look at it here in a minute, you indicated that it
23  was something for the troopers to appropriately
24  consider, that would have been the position of the
25  KHP; is that correct?

Page 90

1        MR. CHALMERS:  Let me pose an
2   objection before you answer.
3        That's not an accurate
4   characterization of the interview, and so I object to
5   the form.
6   BY MS. GREATHOUSE:
7        Q.    I will restate.  I will restate my
8   question.
9        Any statement you gave in that
10  interview would have been the position of the KHP as
11  regards stops or searches by the KHP; is that
12  correct?
13       A.    I believe so.
14       Q.    In 2017, would you say that asset
15  seizures in Kansas had become a political issue for
16  the Patrol?
17       A.    I think so.
18       Q.    Can you describe what you mean when
19  you say it was a political issue for the Patrol?
20       A.    Asset seizures?
21       Q.    Yes.
22       A.    There had been, over the years, the
23  Patrol was requested by the legislature to explain
24  what the Patrol did specifically with asset
25  forfeiture moneys.  There had been some attempts by

Page 91

1   the legislature and consideration given to taking
2   asset forfeiture on the state level, the proceeds
3   from the Patrol and routing them into other areas of
4   government.  That, of course, becomes political.
5        The -- and it's not just in Kansas, it
6   was not just in Kansas at that time that state
7   legislatures across the country were looking at asset
8   forfeiture.  So that's what I meant by that
9   statement.
10       Q.    So, before the issue became one that
11  the Kansas legislature was looking at, if there were
12  seizures by the Patrol, those moneys actually came to
13  the Patrol for operations; is that correct?
14       A.    They generally are used for things
15  like equipment and training, not operations.
16       Q.    Okay.  So you might buy a new airplane
17  or something like that; is that correct?
18       A.    Yes.
19       Q.    All right.  And then after the
20  legislatures became interested in those sums of
21  money, the issue was whether or not those funds would
22  be pulled into general state operations instead of
23  just for use by the KHP; is that correct?
24       A.    Yes.
25       Q.    Okay.  And so was it -- as I just

Page 92

1   described it, is that sort of the political issue
2   that the KHP was dealing with in 2017 about seizures?
3        A.    Yes, I think so.
4        Q.    Okay.  Now, do you recall the actual
5   interview with the reporter in 2017 that resulted in
6   the article?
7        A.    Well, I printed the article to refresh
8   my memory, and so I have read the article.  And, I
9   mean, obviously at the time I received the subpoena,
10  I didn't remember everything about that interview.
11  And I've read the article and refreshed my memory,
12  so, you know, I'm more familiar with it today than I
13  was a few weeks ago.
14       Q.    So when you read that article, did it
15  sort of take you back and help you remember the
16  actual conversation you had with the reporter?
17       A.    Yes.  To some extent.
18       Q.    Okay.  Well, first of all, did you
19  bring documents with you today?
20       A.    Yes.  I brought the article itself.
21       Q.    Okay.  So, is that what's in the
22  folder in front of you?
23       A.    Yes.
24       Q.    Do you mind if I take a look at which
25  version of it?  Because there's different versions

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

**Page 93**

1 available on the internet.
2     A.    No.
3     Q.    Okay.  Got it.
4           Let's go ahead and mark that copy as
5 Exhibit 72.
6           (Moon Exhibit 72 was marked for
7 identification.)
8 BY MS. GREATHOUSE:
9     Q.    Okay.  You now have Exhibit 72 in
10 front of you.
11           MS. GREATHOUSE:  Art, I do have a copy
12 of that version.  You have it in front of you too,
13 never mind.
14           MR. CHALMERS:  Probably, yeah.
15 BY MS. GREATHOUSE:
16     Q.    This article is entitled, "KHP says
17 out-of-state license plates not a factor in stops;
18 agency can't provide records substantiating claim."
19 Is that correct?
20     A.    Yes.
21     Q.    And the article was published in March
22 of 2017; is that correct?
23     A.    Yes.
24     Q.    Now I am also going to show you, and
25 I'm not going to mark it, but for the record it is

**Page 94**

1 marked as P000128 to 136 in the documents produced in
2 this case.
3           Can you look at that and tell me
4 whether you believe those are different printouts of
5 the same article?
6     A.    Without reading every single word and
7 just looking at it summarily, it appears to be the
8 same.
9     Q.    Thank you.  On the Exhibit 72 in front
10 of you, would you please turn to I think what will be
11 the fifth page?
12     A.    Yes.
13     Q.    On that page, do you see where your
14 name starts, at least on my copy it's about
15 two-thirds of the way down?
16     A.    Yes.
17     Q.    And there appear to be two paragraphs
18 there that refer to you, correct?
19     A.    Yes.
20     Q.    Could you please read the second
21 paragraph that contains the quote from you?
22     A.    Yes.  "'We're right next to a state
23 where it's legal.  We cannot ask our troopers to
24 ignore that fact,' Moon said.  'It's not an
25 unreasonable explanation -- expectation to think that

**Page 95**

1 people are going to come across the country to go to
2 that state to purchase marijuana, and then leave that
3 state and go back to where they came from, and once
4 they do that, they are committing violations of the
5 law."
6     Q.    Thank you.  In the first sentence of
7 that, you used the word or the phrase "where it's
8 legal," do you see that?
9     A.    Yes.
10     Q.    And by "it," you're actually referring
11 to marijuana; is that correct?
12     A.    Yes.  We are talking about marijuana
13 and, more specifically, THC since marijuana is not
14 the only thing that contains THC and it's not the
15 only thing that is sold in the states that have
16 legalized marijuana.
17     Q.    Right.  So, "it" refers to marijuana
18 or one of its components, THC, correct?
19     A.    Yes.  Yes.
20     Q.    And talking about states where it's
21 legal, at that point in 2017, this was really a
22 discussion about Colorado; is that correct?
23     A.    Well, I think this was a discussion
24 about Colorado specifically, but there were more than
25 just Colorado that had legalized marijuana at that

**Page 96**

1 time.
2     Q.    The major issue for Kansas at this
3 point in time with movement of marijuana or other THC
4 products across Kansas was largely coming from
5 Colorado; is that fair?
6           MR. CHALMERS:  Object to form.
7           THE WITNESS:  I'm sorry, I didn't
8 hear.  What, Counsel?
9           MS. GREATHOUSE:  Did you get his
10 objection on the record?  Okay, go ahead.
11     A.    So could you restate your question?
12           MS. GREATHOUSE:  Will you read it back
13 for me please?
14           (Whereupon, the requested portion of
15 the record was read by the reporter as follows:
16     Q.    The major issue for Kansas at this
17 point in time with movement of marijuana or other THC
18 products across Kansas was largely coming from
19 Colorado; is that fair?)
20           MR. CHALMERS:  Same objection.
21     A.    It is my understanding at that
22 particular time most of our marijuana and edible
23 seizures were coming out of Colorado.
24 BY MS. GREATHOUSE:
25     Q.    And in the paragraph before this

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 97

1 article, you had specifically indicated that the
2 political issue that was created in Kansas was, in
3 part, created by the fact that Colorado had legalized
4 recreational marijuana; is that correct?
5      A.    Well, the actual -- the language in
6 the -- that I've been attributed to here said "in
7 such states as Colorado," so that would have been
8 inclusive of Colorado and Washington and California
9 and Oregon and the however many number of states
10 where marijuana was legal in 2017.
11     Q.    Right.  But we're talking about
12 western states in the United States where people
13 might be driving it, marijuana or THC-containing
14 products, across Kansas; is that fair?
15     A.    Sure.
16     Q.    Okay.  So is it accurate to say that
17 in that article the KHP's position was that because
18 drivers might have purchased marijuana or other
19 THC-containing products in Colorado or another
20 western state and then be bringing it illegally
21 through Kansas, it was okay to focus on out-of-state
22 vehicles?
23          MR. CHALMERS:  Object to the form of
24 the question.  Misstates what the article says.
25     A.    I don't think that's a proper

Page 98

1 characterization.
2 BY MS. GREATHOUSE:
3      Q.    Okay.  How would you give it a proper
4 characterization?
5      A.    I think the Patrol's position, first
6 of all, this is, I guess, a bit my opinion, our
7 troopers have no interest in personal use marijuana.
8          Our troopers, the Patrol's troopers
9 were primarily interested in the trafficking of
10 significant amounts of marijuana or edibles or
11 anything containing THC.
12          When I say "significant" I'm not
13 talking about an ounce of marijuana, which is legal
14 in some states to purchase and possess.  I'm talking
15 about 100 pounds of marijuana, so.
16          But regardless of where it came from,
17 the Patrol had great interest in stopping the
18 trafficking of that level of narcotics.
19     Q.    Is it accurate to say that 1 pound of
20 marijuana is at a felony level in Kansas?
21     A.    Well, and it, at least at that time,
22 it also fit into the characteristics of a significant
23 amount of marijuana.
24     Q.    But in the article, you were
25 specifically referencing states where there had been

Page 99

1 marijuana legalization; is that correct?
2      A.    I'm not sure I understand your
3 question.
4      Q.    In the first paragraph where you are
5 quoted on Page 5 of Exhibit 72, you are referencing
6 marijuana legalization in such states as Colorado; is
7 that correct?
8      A.    Yes.
9      Q.    So is or did, in your understanding,
10 marijuana legalization in states such as Colorado
11 result in hundreds of pounds of marijuana being moved
12 across Kansas?
13     A.    Yes.
14     Q.    Okay.  So, describe for me how
15 legalization in one state was causing that to move
16 across Kansas?
17     A.    Because we knew from previous stops,
18 from interview with -- interviews with defendants
19 sometimes who would cooperate and sometimes who would
20 just voluntarily provide the information or provide
21 the information in an interview, we knew that people
22 were coming from one state across the nation or other
23 states or any number of states to Colorado to
24 purchase marijuana or any of the associated edibles
25 and so forth, and then taking them back to wherever

Page 100

1 it is they came from.  We knew that.
2          So, as I stated in the article, it
3 wasn't unreasonable for our troopers to understand
4 that because we knew that was going on.
5      Q.    So what the concern was is that
6 somebody from, let's say the eastern part of the
7 United States, was going to drive to, let's use
8 Colorado as an example where there is recreational
9 use of marijuana and THC products, and buy 100 pounds
10 of recreational-use marijuana and bring it back
11 across Kansas to the eastern part of the United
12 States?
13     A.    Happens every day.  Maybe not 100
14 pounds, but multiple pounds every single day.
15     Q.    Do you know how many ounces of
16 marijuana you can buy a day for recreational use in
17 Colorado?
18     A.    I believe it's one ounce.
19     Q.    Okay.  Was it the KHP's position that
20 a traveler was more likely to be violating the law if
21 they were traveling from a drug source state like
22 Colorado?
23     A.    No.  I wouldn't say that.
24     Q.    I have one more question back when we
25 were talking about Troop M that I realized I did not



BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 101

1  ask, and the time that you were over or supervising
2  Troop M.
3        Did the CJIS side of Troop M have
4  anything to do with collecting data from the mobile
5  data computers that were in troopers' vehicles and
6  storing it?
7    A.   No.
8    Q.   Did CJIS have anything to do with
9  training regarding the mobile data computers?
10   A.   Yes.
11   Q.   And so would that be training that
12 they would give inside the KHP?
13   A.   Yes.
14   Q.   And was it training that the Patrol
15 also offered to other law enforcement agencies across
16 Kansas?
17   A.   Yes.
18   Q.   So, when the CJIS trainers were
19 training KHP troopers on use of the mobile data
20 computers in troopers' cars, are you aware of what
21 that training entailed?
22   A.   Yes.
23   Q.   Okay.  Can you describe it to me
24 please?
25   A.   Well, as we talked about earlier, one

Page 102

1  of the forms of and probably the most prevalent was
2  the use of NCIC.  One of the other important aspects
3  that they trained on for the troopers was how to run
4  queries for such things like a driver's license
5  check, a registration check, a wanted persons check,
6  a stolen vehicle check.
7        So, that really is probably the large
8  amount or the largest amount of training that the
9  CJIS people gave our troopers was how to run these
10 queries to hit these databases and get the
11 information that they wanted.
12       Before the mobile units, they
13 typically would call a dispatcher and asked that,
14 asked for that information.  So, in those days, our
15 auditors were actually teaching these troopers on how
16 to get the information themselves from the same
17 sources.  And also on the rules of the use of them,
18 use of those databases.
19   Q.   So the CJIS training was focused on
20 running queries as opposed to inputting data by the
21 troopers; is that correct?
22   A.   Yes.
23   Q.   Would CJIS have been involved in
24 training troopers on input into the systems?
25   A.   I don't believe so.

Page 103

1    Q.   Okay.
2    A.   Well, which system?
3    Q.   Okay, well, which systems would CJIS
4  trainers have been teaching about?
5    A.   Primarily NCIC and then the Kansas,
6  the Kansas files, like driver's license and
7  registration.  So troopers would not have the ability
8  to input in those systems.
9        And, typically, the only kinds of
10 information that's input, for example, in NCIC would
11 be, and the Patrol does not do, is somebody steals
12 your car, so you go to the police department, say,
13 hey, somebody stole my car.
14       So the dispatcher or the police
15 official is going to get all the information
16 pertinent to that vehicle, what the make and model
17 and what the vehicle identification number is, maybe
18 what the license plate number is.
19       And then a dispatcher will then in
20 turn enter all that information into the system,
21 NCIC, so that anyone across the nation who queried
22 that tag or that ID number would received the
23 information that it was stolen.
24       Our troopers did not have the ability
25 to do that.  In fact, nor did our dispatchers.  We

Page 104

1  were not an inputting agency in that way because we
2  didn't, you know, we weren't a police department, so
3  to speak.
4    Q.   So, the kind of data that would be
5  input through the CJIS supervised, sort of, systems,
6  did not have anything to do with specific incidents
7  and -- strike that.
8        We'll use an example.  Let's say we
9  have a drunk driver on the highway who's pulled over
10 and they are arrested.
11       During the course of that stop, a
12 trooper might make inquiries through the NCIC; is
13 that correct?
14   A.   Yes.
15   Q.   And the trooper also would be
16 preparing arrest or providing or inputting arrest
17 documentation data into the KHP's systems; is that
18 correct?
19   A.   He would be preparing the data that
20 would later be uploaded to the system.  It wasn't
21 uploaded instantaneously.
22       So he would, yes, he would query
23 certain records, driver's license, wanted,
24 registration, use that to prepare the paperwork that
25 might be required in a DUI arrest.  And then fill out

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

MCR
METROPOLITAN
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                              July 28, 2021

Page 105

1  what paperwork he could on scene, complete that
2  paperwork later, then it would be uploaded into the
3  Records Management System.
4     Q.   Okay.  You've just used the word
5  "paperwork" a lot, correct?
6     A.   Uh-huh.  Yes.
7     Q.   Is that actually something they're
8  writing on paper?  Or is it like something that
9  they're typing into their computer?
10     A.   Well, it could be both.  But as it
11  relates to computerized forms, the Highway Patrol had
12  a certain number of required forms, whether it be
13  required by the KBI or K-DOT or maybe even the
14  courts, that they could have in a computer in digital
15  format so that the trooper could complete that
16  information in a digital manner.  Whereas, some
17  information might still need to be handwritten.  And
18  I don't know today.
19           At one time, for example, you may be
20  familiar with the implied consent paperwork, the
21  advisories and the forms provided to defendants, that
22  was not something generated in digital format from
23  Patrol's computers.
24     Q.   So that was, the implied consent, was
25  actually paper?

Page 106

1     A.   Yes.
2     Q.   Is that what you're saying?
3     A.   Yes.
4     Q.   Are you aware of any other paper
5  reports that they would have been filling out in the
6  field related to an arrest?
7     A.   Probably not anymore.  I think most of
8  it is digitized.
9     Q.   All right.  And if paper had been
10  used, was it then taken back to the KHP office and
11  digitized or scanned and uploaded?
12     A.   There was a, yes, there was a means
13  for a trooper to be able to scan additional paperwork
14  that perhaps was handwritten so that it could become
15  part of the Records Management System record for that
16  incident.
17     Q.   All right.  So, what kinds of data
18  would a trooper input through their computer during
19  an arrest out in the field?
20     A.   Well, they would -- and, again, I'm
21  speculating here a little bit.
22     Q.   Well, I don't actually want to you
23  speculate, but I do want you to give me your
24  understanding of -- strike that.
25           Let me ask it, let's start a different

Page 107

1  question here.
2           If there was, let's say, an arrest
3  record or an arrest report that was created in the
4  field by a trooper, would that be uploaded through a
5  system that you supervised through Troop M?
6     A.   No.
7     Q.   Okay.  What system would that be
8  uploaded through?
9     A.   The arrest reports would have been
10  uploaded into the Highway Patrol's Record Management
11  System and then it interfaced to the KBI's Incident
12  Based Reporting System.
13     Q.   Okay.  The KHP does from time to time
14  send out communications to the people in the KHP when
15  there are changes in the law that impact the KHP; is
16  that correct?
17     A.   No, not really.  Not so much -- there
18  was a day and time that that -- that they could have.
19  But it didn't happen very often even back then.
20  Today, most of the changes in the law come
21  electronically to the troopers.
22     Q.   Okay.
23     A.   Or, if I may finish, or they learn
24  about in like in-service training.
25     Q.   So, let's say in 2016 when you were

Page 108

1  the lieutenant colonel, would, to your knowledge, if
2  there was a change in the law, would that be
3  disseminated to troopers electronically?
4     A.   A change in the law, Kansas law or any
5  law?
6     Q.   I'll rephrase the question.
7           In 2016 when you were the lieutenant
8  colonel, if there was a change in the law that
9  impacted the activities of the Kansas Highway Patrol,
10  would that be communicated to the troopers
11  electronically?
12     A.   The troops would have received
13  electronic information as it pertained to Kansas
14  statutes.  Anything really besides that would be
15  something that they would learn about at in-service
16  training, which occurs once a year.
17     Q.   So, earlier you mentioned the Vasquez
18  case.
19     A.   Yes.
20     Q.   So, when the Vasquez case was decided
21  by the 10th Circuit, that would have only been
22  communicated to the troopers at the next in-service
23  training; is that what you're saying?
24     A.   Primarily.
25     Q.   Okay.  Was there a secondary or a

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

METROPOLITAN
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 109

1  tertiary way?
2      A.    Well, I mean, sure, I mean, the
3  troopers could learn about it themselves independent
4  of KHP training.  And certainly some who had the
5  initiative, who had that interest in that type of law
6  or in that type of -- those type of activities might
7  themselves know about that because that particular
8  case was, you know, fairly publicized.  So, they
9  could gain some knowledge that way.
10          But in terms of perhaps teaching the
11  more legalistic pieces of that or the more technical
12  pieces, they would learn that at in-service.
13      Q.    So other than something that they
14  might have done personally, was the only way that the
15  KHP was communicating a change of law, like the
16  Vasquez case, to the troopers, that would happen at
17  the in-service training?
18          MR. CHALMERS:  Lack of foundation.
19  I'm sorry.
20  BY MS. GREATHOUSE:
21      Q.    Correct?
22          MR. CHALMERS:  Lack of foundation.
23      A.    I just could simply answer that by
24  telling you that the primary means in which they
25  would learn about that would be in-service.  That's

Page 110

1  not to say that they might not learn about it in
2  other ways.
3  BY MS. GREATHOUSE:
4      Q.    All right.  When did you learn about
5  the Vasquez case?
6      A.    I'm sure it was shortly after the 10th
7  Circuit gave the opinion.
8      Q.    So you don't recall having known about
9  the lawsuit that Peter Vasquez had brought against
10  the KHP before the 10th Circuit's decision; is that
11  correct?
12      A.    I was familiar with the lawsuit being
13  in the position that I was in.
14      Q.    So the Vasquez lawsuit was something
15  that you were involved in as the lieutenant colonel;
16  is that what you're saying?
17      A.    I was briefed on it by our legal
18  counsel.
19      Q.    And then you were told about the
20  decision when it came down; is that correct?
21      A.    Yes.
22      Q.    Do you recall whether there was any
23  internal policies of the KHP that were changed when
24  that decision came down?
25      A.    I'm not aware of any.

Page 111

1      Q.    Okay.  Do you recall ever meeting with
2  the superintendent to talk about Vasquez?
3      A.    I don't remember a specific day or
4  meeting.  I know that the superintendent and I and
5  legal counsel and the command staff would have
6  been -- would have had conversation at one of our
7  weekly or monthly command staff meetings because
8  legal staff would have informed all of the command
9  staff, the majors, the colonels, concerning that
10  situation and how it might or might not impact any
11  legal proceedings and/or perhaps the necessity to
12  change, make any policy or training changes.
13      Q.    Now you have said that there were no
14  policy changes as a result of Vasquez; is that
15  correct?
16      A.    Correct.
17      Q.    Are you aware of training changes that
18  were made as a result of Vasquez?
19      A.    I am not personally aware, so I can
20  neither say that there were or there were not.
21      Q.    But it's fair to say that you were not
22  involved in any decision to change the troopers'
23  training because of Vasquez; is that correct?
24      A.    That would not have been my purview.
25  That would have been the purview of our training

Page 112

1  commander and our legal staff.
2      Q.    Do you recall any discussion with the
3  colonel where a decision was made about what to do
4  after Vasquez came down?
5      A.    Relating to what?
6      Q.    You indicated that there were command
7  staff meetings weekly, correct?
8      A.    Yes.
9      Q.    And that you believe Vasquez, after
10  the Vasquez decision came down in 2016, that it was
11  discussed at at least one command staff meeting; is
12  that accurate?
13      A.    Yes.
14      Q.    When that discussion was happening,
15  was it just a debrief on what the decision was?
16      A.    Yes.  And I believe that legal counsel
17  advised us that KHP Legal would be discussing with
18  the Attorney General's Office our desire for that to
19  be appealed.
20      Q.    All right.  And do you understand that
21  the case -- that there was a writ filed with the
22  United States Supreme Court that was eventually not
23  accepted?
24      A.    Yes.
25      Q.    All right.  So, and you understand

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 113

1  that at the point that the United States Supreme
2  Court did not accept an appeal of the case, that
3  Vasquez became the law that applied in the state of
4  Kansas; is that correct?
5       A.    I don't -- I guess I'm not familiar
6  with what law that the 10th Circuit imposed.  Perhaps
7  you could enlighten me, Counsel.
8       Q.    Okay.  So are you aware that when the
9  10th Circuit made a decision that the Vasquez stop
10 and search violated the United States Constitution,
11 that decision applied to all future stops that
12 happened in the state of Kansas?
13      A.    Yes, I understand that.  It's also my
14 understanding that the Vasquez case centered around,
15 heavily upon, a license plate issue.
16      Q.    Do you know whether it was license
17 plate or state of residency?
18      A.    Well, both.
19      Q.    And so you then do understand that
20 when the Vasquez opinion was finalized, that troopers
21 in the Patrol had to follow the dictates of the
22 Vasquez decision; is that correct?
23      A.    You're working under the preface that
24 the troopers in the Patrol did something wrong,
25 correct?

Page 114

1       Q.    Well, the Vasquez decision determined
2  that the troopers did something wrong; is that
3  correct?
4       A.    Yes.
5       Q.    Right.  So, the Vasquez decision had
6  to be followed by the Patrol's troopers to make sure
7  that they didn't do the same thing that the troopers
8  did in the Vasquez stop and search; is that correct?
9       A.    I think generally speaking that's
10 correct.
11      Q.    And so when the command staff was
12 looking at the Vasquez decision, is it fair to say
13 that it was determined that no changes needed to be
14 made to the way the Patrol was handling stops and
15 searches?
16      A.    Counsel, I don't know if there were
17 changes made in the training protocol or not.
18      Q.    I think I asked a slightly different
19 question.
20           MS. GREATHOUSE:  Would you read back
21 my question?
22           (Whereupon, the requested portion of
23 the record was read by the reporter as follows:
24      Q.    And so when the command staff was
25 looking at the Vasquez decision, is it fair to say

Page 115

1  that it was determined that no changes needed to be
2  made to the way the Patrol was handling stops and
3  searches?)
4           MR. CHALMERS:  It's been asked and
5  answered.
6       A.    We made no policy changes.  There may
7  have been training protocol that was changed.
8  BY MS. GREATHOUSE:
9       Q.    But, as you sit here today, you don't
10 know if training protocol changed after Vasquez was
11 decided; is that correct?
12           MR. CHALMERS:  Asked and answered.
13      A.    I don't know.
14 BY MS. GREATHOUSE:
15      Q.    Who was the commander or the
16 supervisor over training in 2016 and '17?
17      A.    It was either Captain Jimmie Atkinson
18 or Captain Allan -- I can't think of Allan's last
19 name right now.
20      Q.    Let me ask it this way --
21      A.    We made a change some time during that
22 period of time.
23      Q.    Let me ask it this way.  It would have
24 been the captain over which troop that was --
25      A.    J. J.  It would have been the

Page 116

1  training --
2       Q.    I'm going to re-ask the question
3  because you and I got on top of each other and I just
4  want to make sure that we got the record right.
5       A.    Okay.
6       Q.    So, sorry to stop you, but.
7           Is it fair to say that the captain of
8  Troop J would have been in charge -- strike that.
9           Is it fair to say that whoever was the
10 captain of Troop J in 2016 or 2017 when Vasquez was
11 decided would have been the person in charge of
12 training of the troopers?
13      A.    Yes.
14      Q.    When you became the lieutenant colonel
15 in 2015, did you have to take any additional
16 training?
17      A.    No.
18      Q.    And after the point in time that you
19 went into the more administrative side of the KHP
20 when you were the captain of Troop M in 2016, did you
21 continue to do your annual in-service training?
22      A.    Yes.
23      Q.    Okay.  So what kinds of classes, as an
24 example, would you take when you went to in-service?
25      A.    Classes on legal issues.  Classes on

**MCR**
METROPOLITAN
COURT REPORTING • LEGAL VIDEO
11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

Page 117

1  things such as racial sensitivity. First aid
2  classes. Defensive tactics classes. Use of
3  equipment classes. Firearms training. I think I
4  already said equipment training, so I mean.
5      Q.    Do you ever recall being trained on
6  the Vasquez case?
7      A.    No.
8          MS. GREATHOUSE: Let's go ahead and
9  take a little break at this point. We're getting
10 close.
11         VIDEOGRAPHER: The time is -- excuse
12 me -- the time is 1:42 PM. We're taking a break.
13 Going off the record.
14         (Recess.)
15         VIDEOGRAPHER: The time is 2:04 PM.
16 We are back on the record.
17 BY MS. GREATHOUSE:
18     Q.    I had another question that I wanted
19 to follow up on Exhibit 72, which is in front of you,
20 which is the article.
21         We talked about the fact that you had
22 been interviewed for it, correct?
23     A.    Yes.
24     Q.    And we talked through two paragraphs
25 in that article that had to do -- or that attributed

Page 118

1  statements to you; is that correct?
2      A.    Yes.
3      Q.    Did you say the things that are in
4  that article and that are attributed to you?
5      A.    Yes.
6      Q.    Okay. Just some sort of general
7  information with regard to your understanding of how
8  things operated at the KHP between 2006 and 2019.
9          Where, in your knowledge, did the KHP
10 keep incident reports, store incident reports?
11     A.    The Records Management System.
12     Q.    And would you understand the phrase
13 "incident report" to be different from the phrase
14 "case report"?
15     A.    No. I think they're synonymous.
16     Q.    Did KHP store any form of, like,
17 booking data?
18     A.    Not that I'm aware of.
19     Q.    Do you know whether the KHP stored any
20 kind of incarceration data?
21     A.    No.
22     Q.    Did the KHP store any parole or
23 probation information?
24     A.    No.
25     Q.    Where did the KHP store information

Page 119

1  about arrests?
2      A.    In the Records Management System.
3      Q.    Where did the KHP store data related
4  to tickets?
5      A.    In the e-Citation database.
6      Q.    Where is -- well, strike that.
7          Which troop oversees the e-Citation
8  system?
9      A.    The IT Department.
10     Q.    And how would a trooper input
11 something into the e-Citation system?
12     A.    It's all done electronically. All he
13 has to do is submit, fill out the citation and hit
14 Submit and then it travels electronically to the
15 various destinations, the database, you know, the
16 courts.
17     Q.    And so when you say he fills out the
18 information, you're talking about electronically
19 filling it out; is that correct?
20     A.    Yes.
21     Q.    Something that's done on the trooper's
22 computer in the car?
23     A.    Yes.
24     Q.    Are they actually carrying a full
25 computer at the point that you left in 2019?

Page 120

1      A.    Yes, a full, full laptop.
2      Q.    So they were using like a portable
3  voice, like a phone or a tablet, to do any of their
4  reporting; is that correct? And I'm asking as of
5  2019 when you left.
6      A.    No on the phones. The tablets I think
7  were being experimented at, with, looked at. So some
8  troopers could have had tablets.
9      Q.    Where did the KHP store information
10 about searches resulting in seizures?
11     A.    I believe that our Troop N, which is
12 our Criminal Interdiction Unit, kept track of
13 seizures. That's not to say they might not have been
14 kept track elsewhere, but I'm confident that Troop N
15 kept track of seizures.
16     Q.    Are you aware of any other place that
17 the KHP stored data on searches resulting in
18 seizures?
19     A.    No.
20     Q.    Where does the KHP store data on
21 searches that do not result in seizures?
22     A.    I don't know if that data is kept,
23 Counsel.
24     Q.    Do you know that it's not kept?
25     A.    No.

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                        July 28, 2021

Page 121

1    Q.    So, you don't know one way or the
2  other whether the KHP keeps track of data on searches
3  that don't result in seizures?
4    A.    That's correct.
5    Q.    Would you agree that a good
6  recordkeeping system is an essential part of a law
7  enforcement organization?
8    A.    Yes.
9    Q.    And so with the KHP, those systems
10 would be the RMS and the CAD that feeds into the RMS;
11 is that right?
12   A.    Yes.
13   Q.    Are you aware of any other
14 recordkeeping systems that store law enforcement
15 data?
16   A.    Well, we talked about the e-Citation
17 database.  But as far as the Patrol, the Records
18 Management System is the official repository.
19 However, some troopers may keep files or notes
20 locally.  But as far as official copies of things,
21 that would be the Records Management System.
22   Q.    Are you --
23   A.    I guess I should back up.  Our
24 Internal Affairs unit has a database also that is a
25 database of investigations relating to complaints of

Page 122

1  misconduct.
2    Q.    Okay.  So I'm going to rephrase my
3  question to try to incorporate those things that you
4  just said.
5         Is it fair to say that the
6  recordkeeping system, systems, of the KHP, as regards
7  its interactions with the public, are comprised of
8  the CAD, the RMS and the e-Citation system?
9    A.    As far as I know.
10   Q.    When you were the lieutenant colonel
11 of the KHP, were you involved in any conversations
12 regarding updates to the RMS?
13   A.    Yes.  In so much as the IT head, who
14 was part of our command staff, would make us aware of
15 when changes were going to occur, and sometimes he
16 would inform us of what those changes were, not
17 always.
18   Q.    Did the command staff, while you were
19 part of it, ever discuss the types of data that
20 should be kept in the RMS?
21   A.    I think we had some discussions over
22 those years of, not only the types of data, but that
23 there ought to be other types of data that we should
24 capture and other systems that we should look at.
25         But, as you may know with government,

Page 123

1  you are limited budgetarily to your priorities, so
2  sometimes those things didn't become a priority.
3    Q.    Okay.
4    A.    There's a lot of different things we
5  would have liked to have had, you know, technology
6  wise, but the budget just wouldn't allow it.
7    Q.    In the time that you were in the
8  command, were there things -- strike that.
9         In the time that you were part of the
10 command at the KHP, were there updates to the system,
11 the RMS, that you specifically recall discussing that
12 you could not do because of budget?
13   A.    Not specifically.
14   Q.    Do you recall generally the kinds of
15 updates that the command discussed while you were
16 part of it regarding RMS updates?
17   A.    I think that we had discussions about
18 wanting to be able to capture more kinds of data, but
19 we were not able to do so with the particular RMS we
20 had.
21   Q.    What kinds of data do you remember
22 discussing that you couldn't capture in your
23 current -- in the then current RMS?
24   A.    I really don't recall exactly what all
25 those data or data fields were that we wanted.

Page 124

1    Q.    Do you know what RMS you were using
2  when you were in the command structure of the KHP?
3    A.    I did know, but I don't remember now.
4    Q.    Does the name "Global" mean anything
5  to you with regard to the RMS?
6    A.    Yes.  That is the vendor that we
7  utilized.
8    Q.    Okay.
9    A.    Thank you for refreshing my memory.
10   Q.    I don't remember the whole name, I
11 just remember it has "Global."
12         When you were in the command
13 structure, was the KHP pleased with the services that
14 you were getting from Global?
15   A.    I think so generally.  But I'll
16 preface that, that that would be a better question
17 asked of our IT head.
18   Q.    Do you recall what other kinds of
19 systems that the command structure was discussing as
20 a need of the KHP when you were part of it?
21   A.    No.  I don't.
22   Q.    When you were part of the command
23 structure, did you discuss why the KHP keeps their
24 data in the way they do?
25   A.    I don't remember.

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 125

1    Q.    While you were part of the KHP
2  command, do you recall discussions about needing to
3  keep new or additional types of data?
4    A.    I think we had those kinds of
5  conversations.  I just don't remember the kinds of
6  data that we felt like that we wanted that the RMS
7  couldn't capture.
8    Q.    Do you recall any discussions about
9  whether or not you should be tracking data on stops
10 that didn't result in a ticket or an arrest?
11   A.    Perhaps.  I do remember conversations
12 about tracking traffic stops.
13   Q.    Is it accurate to say in the time that
14 you were in the command structure at the KHP that
15 there was no way or no source of data to track stops
16 by troopers that didn't result in a ticket or arrest?
17   A.    I think that's a fair statement.
18   Q.    Tell me about the conversations you
19 recall having about the issue of needing to store
20 additional data.
21   A.    Well, you might recall some number of
22 years back there was a lot of publicity surrounding
23 racial profiling, and there was in fact even some
24 legislative interest in trying to garner data
25 surrounding stops concerning people of color or

Page 126

1  minorities.  And we certainly didn't have that
2  capability.
3         Would that be helpful, sure it would.
4  It would certainly be helpful to be able to account
5  for every time an officer drew his weapon.  It would
6  be helpful to know every time a search or seizure was
7  done, well, a search, whether anything that was
8  seized or not.  I mean, there's lots of things I
9  think we would have liked to have had.
10   Q.    Did the KHP have any position on when
11 troopers could make a decision in the field about
12 whether to make an arrest when drugs were found or
13 just get rid of the drugs so that the person who was
14 stopped didn't have them anymore?
15   A.    Yes.  I think they were forwarded a
16 pretty wide area of latitude concerning that very
17 issue because the Criminal Interdiction Unit, for
18 example, were tasked with, you know, primarily trying
19 to, as it related to narcotics, focus on significant
20 seizures.  So, they really had no interest in a high
21 school or college age or even adult with a joint or a
22 very small amount of personal use, unless, unless
23 there were other issues, criminal or other narcotics
24 factors.
25         But just on a general traffic stop

Page 127

1  where a joint or small, you know, something small
2  like that is found, that really is not where we
3  wanted them focusing their time and energy.
4         So, I think it's probably fair to say
5  that there have been some number of occasions over
6  the years where troopers aided the individuals in
7  dumping those contents in the ditch.
8    Q.    Okay.  So, you mentioned that it would
9  be okay if they were dumping a joint in the ditch; is
10 that right?
11   A.    Yes.  And I can --
12   Q.    How about --
13   A.    I can attest to back in the days when
14 I was a road trooper having done that myself.
15   Q.    How about a pound of marijuana?
16   A.    I think when you're starting to get to
17 those kinds of qualities, the dynamics change.
18   Q.    Okay.  And --
19   A.    So I don't know that the same amount
20 of latitude for personal use would be given for the
21 kinds of weights that would lend itself to
22 distribution.
23   Q.    And you said earlier that a pound was
24 a significant seizure; is that correct?
25   A.    I believe under, and again I'm working

Page 128

1  under data from a couple years back, I believe a
2  pound was considered significant.
3    Q.    I'll rephrase the question.
4         At the time that you were part of the
5  KHP, was it your understanding that a pound of
6  marijuana was a significant seizure?
7    A.    I think our reporter might have
8  actually reported that.
9         Yes.  One pound of marijuana.
10   Q.    Are you aware of any official position
11 in the KHP about getting rid of or dumping a
12 significant seizure amount in the ditch?
13   A.    No, I am not.
14   Q.    Okay.  You said you thought that the
15 dynamics changed at the point that it became a
16 significant seizure; is that correct?
17   A.    Yes.
18         MR. CHALMERS:  Asked and answered.
19 BY MS. GREATHOUSE:
20   Q.    What did you mean by that?
21   A.    Well, first of all, we're talking
22 about going from a misdemeanor to a felony.
23 Secondly, the higher the number, the more probability
24 that we were talking about a distribution case.
25   Q.    Any other factors that you think are

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 129

1 involved there?
2     A.    Yes.  Our agency policy, we -- I'll
3 stop with that.  Because I'm not entirely sure about
4 the agency policy from...
5     Q.    Where would agency policies like that
6 be located?
7     A.    Within the KHP policy manual.
8     Q.    Okay.  Is the KHP policy manual
9 something that's publicly available?
10     A.    It wasn't at the time I retired.  The
11 other place it could be is if Troop N has a policy
12 manual pertaining to those troopers and their work.
13     Q.    So, as you're sitting here today, do
14 you recall when you were part of the KHP whether or
15 not the KHP policy manual contained any information
16 or any policy on when a trooper could get rid of a
17 certain amount of drugs in a stop rather than make an
18 arrest?
19     A.    Not specifically in that language.
20 However, as I mentioned earlier, troopers are given
21 some amount of latitude.
22     Q.    So what kind of language do you think
23 that the agency policy manual would use in that
24 regard?
25     A.    Counsel, I can't remember.

Page 130

1     Q.    Okay.
2     A.    I mean.  The Patrol's policy manual is
3 that thick (indicating).
4     Q.    In any of your work with the KHP, were
5 you ever involved in data retrieval from KHP's
6 various systems?
7     A.    No.
8     Q.    In your role in the command structure,
9 did you ever have to work with the IT Department to
10 gather statistics on various law enforcement
11 activities?
12     A.    The answer to that is yes.  And I'd
13 like to go back to the previous question, as I think
14 about that as my role as a commander over Troop N,
15 there were times when the -- we might have had a
16 request from the command staff to retrieve some CAD
17 data.
18         Now while I myself did not do that, we
19 had employees that knew where to go into the CAD to
20 get that data to supply it to the command staff.
21         So, to be more accurate to your
22 previous question, I suppose that would be, yes,
23 there were times.
24     Q.    Okay.  So, specifically with regard to
25 those kinds of requests for CAD data, do you recall

Page 131

1 what those requests would have been?
2     A.    No.  Could have been any number of
3 reasons.
4     Q.    Do you recall the kinds of data that
5 they were asking for?
6     A.    No.  I mean, it could have been -- it
7 could have been the location of a trooper at a
8 certain time, where a vehicle was towed.  It's hard
9 to say.
10     Q.    But you are not aware of how such
11 queries would be made in the CAD system; is that
12 right?
13     A.    No.  I wouldn't know how first -- I
14 wouldn't even begin to know how they do that.
15     Q.    And did you know whether or not the
16 people that could make those kinds of queries would
17 only do it for specific stops?  Or a broad section of
18 data about covering multiple?
19         MR. CHALMERS:  Lack of foundation.
20     A.    It would depend on what was requested
21 as to what the individual whose job was to do that
22 would go look for.
23 BY MS. GREATHOUSE:
24     Q.    I think I probably asked a bad
25 question, so I will try again.

Page 132

1         Do you know whether or not the folks
2 inside of Troop N -- M could retrieve are broad
3 swathes of data through a query or whether they could
4 only do it on an incident-by-incident basis?
5     A.    Incident by incident.
6     Q.    Do you know why they couldn't query
7 for a broad swathe of data?
8         MR. CHALMERS:  Lack of foundation.
9         MS. GREATHOUSE:  I asked him if he
10 knew why.
11     A.    Well, let me back up, Counsel.  I'm
12 not -- I'm not sure I'm speaking accurately here.  It
13 is responsible, I just simply don't remember.  It is
14 possible that they could have, if there was a request
15 for traffic stops involving a white vehicle or a
16 let's say a black male, I think it might have been
17 possible for those to have been queried, but I just
18 don't remember.  I really don't.
19         I just don't remember whether it was
20 incident by incident or whether they could on certain
21 fields go in and pull everything in the last
22 6 months.
23 BY MS. GREATHOUSE:
24     Q.    Did the CAD system record anything
25 with regard to K-9 sniffs in your recollection?

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                            July 28, 2021

Page 133

1    A.    I don't know if there was a specific
2 data field for that.  There could have been and if
3 there wasn't and the trooper was telling the
4 dispatcher that was what they were doing, they could
5 have went into like a miscellaneous section and
6 indicated that.  I just don't remember if that was a
7 field or not.
8    Q.    So in the CAD system, it sounds like
9 there was a free form space where the dispatcher
10 could type in information; is that correct?
11    A.    Yes.
12    Q.    So, the CAD system wasn't just
13 checking boxes?
14    A.    Correct.
15    Q.    How about when the troopers are
16 sending in information, let's say, via an arrest
17 record?  Did that system have a free form section
18 where the trooper could fill in information?
19          MR. CHALMERS:  Lack of foundation.
20 The question is too broad to solicit an accurate
21 answer.
22          MS. GREATHOUSE:  You can just state
23 your objection.
24          MR. CHALMERS:  I did.  I objected to
25 the form.

Page 134

1          MS. GREATHOUSE:  Well, you don't need
2 to do a speaking objection.
3          MR. CHALMERS:  I stated what it was
4 and I explained what the form problem was, which I'm
5 obligated to do by rule, Counsel.
6    A.    Not to my knowledge.
7 BY MS. GREATHOUSE:
8    Q.    How, in your knowledge, would a KHP
9 trooper record their probable cause that they might
10 be formulating in an interaction with the public?
11    A.    On an arrest report.
12    Q.    And --
13    A.    In the Narrative section.  There was a
14 form, I believe it was numbered HP 133 and it
15 was -- it allowed a trooper to write in some detail
16 details of the incident that might go along with the
17 arrest or offense report.  So that would be one
18 place.
19    Q.    Okay.  So that was a free form section
20 where the trooper could just fill in information as
21 opposed to check boxes or give little discrete bits
22 of information, like a name?
23          MR. CHALMERS:  Lack of foundation.
24 BY MS. GREATHOUSE:
25    Q.    Is that correct?

Page 135

1    A.    The HP 133, I believe they called it
2 an investigative or something like that, had some
3 data fields at the top that generally was populated
4 by other forms.
5          So if we captured it here, then it
6 shared it in the same fields.  And then there was an
7 area for the trooper to be able to type and list out
8 the details or his notes or anything that he felt
9 might have been important or pertinent.
10    Q.    Okay.  So that's a document that a
11 trooper would fill out after they've determined
12 they're going to make an arrest, right?
13    A.    Yes.
14    Q.    And would it in fact have been filled
15 out after the arrest was made?
16    A.    Generally speaking.
17    Q.    If the trooper was not yet certain
18 that they were going to make an arrest, was there any
19 way that you knew of that a KHP trooper could record
20 information as they are building a potential case?
21    A.    Yes.
22    Q.    And what would that be?
23    A.    Most of the troopers have a video
24 recorder in their car with a mic.  They could speak
25 into the microphone that they're seeing or observing

Page 136

1 certain things that would help them in their
2 reasonable suspicion, and that camera system could
3 then record that information.
4    Q.    Did the KHP train troopers to do what
5 you have just described in your knowledge?
6    A.    I'm not certain that that particular
7 training was made available.  I think it was
8 something the troopers just learned.  For example,
9 when I worked traffic enforcement and I was following
10 a vehicle that I suspected might have contained an
11 impaired driver, I myself spoke in to the microphone
12 to indicate what the driver was doing because it
13 aided me later in remembering and taking that
14 information down into the official reports that were
15 necessary.
16          So I don't know that there's any
17 training, per se, but I think troopers just figure
18 that out.
19    Q.    Okay.  So other than use the voice
20 recording systems that the troopers have, are you
21 aware of any other system that KHP had for a trooper
22 to record reasonable suspicion as they were gathering
23 it?
24    A.    I am not.
25    Q.    Part of the reason that the KHP would

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                               July 28, 2021

Page 137

1 want to take those steps to record probable cause is
2 to make sure that the troopers are doing what they're
3 supposed to do; is that right?
4            MR. CHALMERS:  Object to the form.  I
5 think you also maybe misspoke.  Did you mean probable
6 cause or reasonable suspicion?
7            MS. GREATHOUSE:  I'll rephrase the
8 question.
9 BY MS. GREATHOUSE:
10     Q.    Part of the reason that the KHP wants
11 troopers to be able to store or record reasonable
12 suspicion as they are building it is to make sure
13 that the troopers are doing what they're supposed to
14 do; is that correct?
15            MR. CHALMERS:  Object to the form.
16     A.    I'm not sure your question, Counsel,
17 that the KHP wanted them to record their probable
18 cause or reasonable suspicion.  I don't know that
19 that's an accurate question.
20 BY MS. GREATHOUSE:
21     Q.    Did the KHP not want their troopers to
22 record reasonable suspicion?
23     A.    I don't know that the KHP either
24 wanted or didn't want.
25     Q.    Is there an advantage to not recording

Page 138

1 reasonable suspicion as it is being built by a
2 trooper?
3     A.    I don't think there's advantage.  I
4 just think that, you know, I go back to a time where
5 there were no video recorders, so what the trooper
6 said mattered.
7            So, I mean, and not all of the
8 troopers even today have video cameras.  So, I mean,
9 it's certainly an advantage because later on it could
10 be utilized, as we know, in a court of law to verify
11 the voracity of what the trooper is saying happened.
12            But the lack of that doesn't
13 necessarily invalidate the trooper's voracity either.
14     Q.    It doesn't invalidate the trooper's
15 voracity when it comes to an arrest, correct?
16     A.    Yes.  I think that's a fair statement,
17 although I'm not exactly sure I understand the
18 statement or the question.
19     Q.    Is it fair to say that the KHP has an
20 interest in making sure that its troopers'
21 interactions with the public are legal?
22     A.    Yes.
23     Q.    How does the KHP check on that when it
24 comes to troopers building a reasonable suspicion
25 during a stop?

Page 139

1     A.    Well, I think one way that the KHP is
2 able to determine whether the troopers are doing what
3 they're supposed to do is the use of the video
4 camera.  As it pertains to reasonable suspicion,
5 building that, the video camera may capture that, it
6 may not.
7     Q.    Well, the video camera certainly would
8 not capture anything that's going on in the trooper's
9 head; is that correct?
10     A.    That's correct.
11     Q.    And so and a video camera on its own
12 wouldn't record what a trooper is saying unless the
13 voice module is activated; is that correct?
14     A.    That's correct.  But it still records
15 what they're doing.
16     Q.    Well, you can't see what a trooper's
17 doing if they're still in their car, right?
18     A.    Actually, these days, today, I believe
19 the KHP cars have an internal camera.
20     Q.    Did the KHP's cars have an internal
21 camera while you were still at the KHP?
22     A.    I think so.
23     Q.    Do you think that was in all vehicles
24 or just part of them?
25     A.    It was certainly in part of them.

Page 140

1 Whether it was in all of them, I can't say.
2     Q.    So, was it the KHP's position when you
3 were part of it that between video and audio
4 recording of interactions with the public by a
5 trooper, those forms of recording would be enough to
6 review reasonable suspicion?
7     A.    Not necessarily.
8     Q.    Okay.  So how else was the KHP when
9 you were part of it going to review whether troopers
10 were appropriately building reasonable suspicion
11 during a stop?
12     A.    Well, part of it would be to confirm
13 from the trooper himself.  I suppose one could
14 confirm from a defendant their version of the events
15 as well, if we're looking to try to independently
16 determine whether or not a trooper had a reasonable
17 suspicion.
18     Q.    And all of those kinds of reviews
19 would have to be done on an incident-by-incident
20 basis; is that correct?
21     A.    Yes.
22     Q.    There's no tool that the KHP uses to
23 make sure that on a broader base the troopers are
24 appropriately building reasonable suspicion?
25            MR. CHALMERS:  Object to the form.

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 141

1     A.    Just training.  The troopers are
2  trained.  And outside of training, I guess not.  I
3  mean.
4  BY MS. GREATHOUSE:
5     Q.    Outside of training from what you've
6  said here today during the time that you were at the
7  KHP, the only way the KHP could check to see whether
8  troopers were appropriately building a reasonable
9  suspicion case during a stop would be to sit through
10  what could be hours of video or weeks of video to
11  determine whether a particular trooper was
12  appropriately doing it; is that correct?
13         MR. CHALMERS:  Object to form.
14     A.    Well, I also -- I mean, that's one
15  way.  Another way, as I mentioned earlier, is that
16  there are times that supervisors may accompany a
17  trooper who's doing their day-to-day work, and that
18  would be another way to determine whether or not a
19  trooper's doing what they're trained to do properly.
20  BY MS. GREATHOUSE:
21     Q.    That's just one day, though, right?
22     A.    Yes.
23     Q.    You got no -- the KHP had absolutely
24  no way to look at a particular trooper over the
25  course of a period of time, whether it be a month or

Page 142

1  a 12-month review period, and determine if that
2  trooper was appropriately building reasonable
3  suspicion cases against individuals who they had
4  stopped?
5         MR. CHALMERS:  Object to form.  It's
6  not only leading, it's also argumentative.
7     A.    I think the answer to that is no.
8  BY MS. GREATHOUSE:
9     Q.    No, the KHP didn't have a way to do
10  that kind of review, correct?
11     A.    Well --
12         MR. CHALMERS:  Same objection.
13     A.    Well, the KHP through its Internal
14  Affairs division, if we -- if we had reason to
15  believe that a trooper, whether it's reasonable
16  suspicion or something else, was not doing what they
17  were supposed to be doing, that would be a function
18  of Internal Affairs to look into that and try to
19  determine whether that is the case or not.
20         And I don't know all the methods that
21  Internal Affairs could use, but certainly looking
22  very thoroughly at arrest reports and talking with
23  the trooper and anybody else involved in the case to
24  try to gather, or cases, to gather an understanding
25  of whether this trooper has a problem with

Page 143

1  understanding the elements of reasonable suspicion.
2         But we have no mechanical system, so
3  to speak.
4  BY MS. GREATHOUSE:
5     Q.    When you've mentioned Internal
6  Affairs, when Internal Affairs is actually reviewing
7  a situation, is that incident based?  Or can it be
8  more broadly about a trooper not building a
9  reasonable suspicion case on a stop, on stops?
10     A.    Yes, it could be.
11     Q.    Okay.  Are you, in the time that you
12  were in the KHP, were you ever aware of a trooper
13  being investigated by Internal Affairs -- and I'm not
14  asking for a name -- because they weren't building a
15  reasonable suspicion case on their stops?  By which I
16  mean plural, not singular, incidents where complaints
17  came in.
18     A.    I don't remember, Counsel.
19     Q.    It's fair to say that through the
20  training that the KHP gives to its troopers during
21  the time that you were part of the command structure
22  was to make sure that troopers were appropriately
23  building reasonable suspicion when they were
24  conducting stops; is that fair?
25     A.    Yes.  In fact, I believe those types

Page 144

1  of courses were taught by Ms. Washburn.
2     Q.    And one of the goals that the KHP
3  would have in having its troopers build a proper
4  reasonable suspicion case is because they want the
5  arrests to stand up in court; is that fair?
6     A.    Of course.
7     Q.    And is another part of that because
8  the KHP doesn't want its troopers to violate the
9  rights of the public?
10     A.    Yes.  That's correct.  We have no
11  vested interest in doing things wrong or violating
12  Constitutional rights.
13     Q.    In a situation, like let's say this
14  lawsuit, is there a way that the KHP could, that
15  you're aware of, show that its troopers were
16  statistically building their reasonable suspicion
17  case for stops that didn't result in arrests?
18         MR. CHALMERS:  Object to form.  And
19  also lack of foundation.
20     A.    I'm not aware of any way.
21  BY MS. GREATHOUSE:
22     Q.    Back to we were talking a little bit
23  about seizures and the political aspects of seizures,
24  do you recall that?
25     A.    Yes.

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                              July 28, 2021

Page 145

1      Q.    Is my understanding correct that a
2   certain size of a seizure stays at the state level,
3   the proceeds of that seizure, and then when it gets
4   larger, those proceeds go to federal law enforcement?
5      A.    Generally speaking.
6      Q.    Is there a dollar figure at which that
7   happens?  Or is it at a sort of charge level that
8   that happens, in your knowledge?
9      A.    I don't know that I can say exactly
10  what that threshold is.
11     Q.    Okay.  So if you don't know what the
12  threshold is, is it a dollar amount?
13     A.    I don't know that.
14     Q.    Okay.  So you don't even -- you don't
15  know --
16     A.    I mean you're talking about cash
17  seizures, correct, at this point?
18     Q.    I'll rephrase the question.
19         Do you know whether a seizure becomes
20  state or federal because of the value of what is
21  seized?
22     A.    I think that can be a factor.  I don't
23  know that that's the only factor.
24     Q.    What other factors would come into
25  play in whether that's a state seizure or a federal

Page 146

1   seizure?
2      A.    Well, again, I'm not sure I'm the best
3   qualified to answer this question, but.  I think
4   other factors could be ongoing investigations by
5   other agencies, for example, the federal government.
6   I mean, that's one that immediately comes to mind.
7      Q.    At some point in time, the Kansas
8   legislature actually asked the KBI to keep a database
9   of KHP's seizures; is that correct?
10     A.    Of all law enforcement seizures.
11     Q.    Were you part of the KHP when that law
12  was passed?
13     A.    Yes.
14     Q.    Do you recall approximately when that
15  happened?
16     A.    Some time between 2017 and 2019.
17     Q.    So that was passed while you were part
18  of the command structure, right?
19     A.    Yes.
20     Q.    And so what steps did the KHP take in
21  order to comply with that new requirement?
22     A.    We assigned members of the agency,
23  meaning our IT Department, our Legal, our perhaps
24  Captain Hogelin from our Troop N to work with the KBI
25  in developing both the data fields and any technical

Page 147

1   assistance regarding the actual building of that
2   database.  And I'm sure there was discussions about
3   interface, how's the data going to get from us to you
4   and so forth.
5      Q.    So, where inside of the KHP's systems
6   was that data extracted from?
7      A.    Well, I believe that there were -- I
8   believe that there were electronic forms built in
9   order for that information to be provided to the new
10  database.  I'm not sure that I remembered that that
11  was complete by the time I left the Patrol.  I think
12  that was still being worked on.
13     Q.    Were you part of the supervision of
14  that project?
15     A.    I don't know that I would say I was
16  part of the direct supervision.  I was aware.  I
17  would say our IT head was primarily the individual
18  overseeing the KHP's assistance in developing the
19  appropriate forms and interfaces, and while I think
20  our legal counsel also was involved in ensuring all
21  the legalities were met with the required information
22  and so forth.
23     Q.    You said you thought there was a form
24  that had to be filled out.  Do you recall that?
25     A.    Well, I think, in order for -- I mean,

Page 148

1   yes, I do remember it.  In order for the data to go
2   to the KBI, it had to have been captured somehow, and
3   it would not have been, in 2018, it wouldn't have
4   been captured pen and pencil.  So, I'm fairly
5   confident that it would have been some kind of
6   electronic means of providing the data to the KBI.
7      Q.    Is it fair to say that you don't know
8   whether that was done by a data extraction from the
9   RMS versus a separate form that had to be filled out
10  by the trooper involved in the seizure?
11     A.    Yeah, I don't know.
12     Q.    Would you agree with the statement
13  that, generally, troopers collect little data when
14  they're just performing a stop?
15     A.    Not really.
16     Q.    Okay.  So what kind of data are they
17  collecting on a stop?
18     A.    Well, as we talked about earlier,
19  let's just use a citation for example, they're
20  collecting all the personal identifiable information
21  on an individual in that stop, name --
22     Q.    I want to clarify here.  We're talking
23  about a stop.  I haven't said anything about a
24  citation or a ticket yet.  So let's back up.
25     A.    Okay.

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                           July 28, 2021

Page 149

1     Q.     We're going to first just start with a
2   stop and nothing else.
3     A.     Okay.
4     Q.     So would you agree with me that the
5   troopers collect little data if there's only a stop?
6     A.     It depends on what the stop is for.
7     Q.     Okay.  So explain to me what you mean
8   by that.
9     A.     If our troopers come across a motorist
10  that has a flat tire, they fill out a form that
11  captures the motorist's name, the vehicle
12  information, the license plate.  So there's data
13  collected in something just as simple as changing a
14  tire.  I mean, that's one example.
15    Q.     Okay.  If a trooper stops a driver --
16  and this again is based on your experience with the
17  KHP -- because they have drifted a little bit over a
18  line.
19    A.     Uh-huh.
20    Q.     And they just give the person that's
21  stopped a verbal warning.  Do they collect any data?
22    A.     Well, they may.  They may collect the
23  information concerning the motorist, who they are,
24  where they live, their physical characteristics.  The
25  Dispatch Center would certainly capture the

Page 150

1   information concerning the stop and the information
2   conveyed to them from the trooper, which might
3   include license plate information, so there's some
4   data collected.
5     Q.     Okay.  But would you agree that if
6   it's only a verbal warning, there's not a lot of data
7   that is collected?
8           MR. CHALMERS:  It's an incomplete
9   hypothetical.  It's been asked and answered.
10    A.     I'm just not sure I agree with that
11  based on a couple of the examples that we talked
12  about.
13          The troopers will normally, even with
14  a verbal warning, collect driver's license
15  information and registration information.  They'll
16  check for warrants.  And, again, that information
17  then goes into the CAD system even on a warning.
18  BY MS. GREATHOUSE:
19    Q.     You mentioned that when they're
20  collecting data on a change of a tire, they fill out
21  a report on that; is that correct?
22    A.     They complete electronically a form,
23  and I can't remember the number of it, it's called a
24  "Service Rendered."  And it is again for the purposes
25  of the patrol.  It's a form used to help the Patrol

Page 151

1   know what our troopers are doing.  And, you know,
2   interestingly enough, sometimes complaints are made
3   about things, and those, you know, those types of
4   forms help us to determine where our trooper was and
5   what he was doing at any given time.
6     Q.     Where are those Service Rendered forms
7   or data stored?
8     A.     Should be stored in the RMS.
9     Q.     Is anything stored in the RMS if, to
10  your knowledge when you were part of the KHP, if
11  there is only a verbal warning on a stop?
12    A.     Let me make sure I'm understanding
13  you, Counsel.  So do you mean that a trooper stops a
14  vehicle, doesn't call it in, doesn't get any
15  identifying information on the individual or any
16  vehicle information and just tells the person to slow
17  down and on their way?
18    Q.     Let me rephrase my question.
19          If a trooper makes a stop and they
20  call the information through CAD, as they normally
21  do when they make a stop, if they only give a verbal
22  warning, is it correct that the trooper would not
23  fill out any additional information directly into the
24  RMS?
25    A.     They fill out, rather than a citation

Page 152

1   form, they fill out a warning form.  They do actually
2   fill out a what looks like a citation, except it is a
3   warning.
4     Q.     Are the troopers required to give a
5   written warning?
6     A.     There's supposed to.
7     Q.     Is there actually a policy in the KHP
8   that when you give a warning, it should be in
9   writing?
10    A.     I think so.  But I will tell you that
11  I am guilty of not filling out warning forms in my
12  past.  So does it happen, sure.
13    Q.     What would be the reasons that a
14  trooper would decide not to fill out a warning form?
15          MR. CHALMERS:  Lack of foundation.
16  BY MS. GREATHOUSE:
17    Q.     In your understanding.
18    A.     Well, in my case it was --
19          MR. CHALMERS:  Still he's speculating.
20  I object to the form.
21    A.     In my case it was probably laziness, I
22  just didn't want to fill it out.  Didn't want to take
23  the time to do it.
24  BY MS. GREATHOUSE:
25    Q.     We were talking about, sort of, volume

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 153

1  of data that a trooper would take on a stop where
2  there is a warning.  Would you agree or disagree that
3  a trooper would record more data if they issued a
4  citation?
5      A.    No.  The data is the same on a
6  citation as it is a warning.
7      Q.    Okay.  Would they collect more
8  information if they're actually going to conduct a
9  search?
10     A.    I don't know about that.
11     Q.    In your understanding of the KHP,
12  would they collect more data if they were making an
13  arrest?
14     A.    Yes.
15     Q.    And would they collect more data than
16  a stop or a citation if they were making a seizure?
17     A.    No.  I don't think necessarily more.
18     Q.    In your time at the KHP, did the KHP
19  use its records to track disproportionate impacts of
20  stops across the public?
21     A.    Did we track that?  Did the Patrol
22  track that?
23     Q.    I'll re-ask the question.
24         In your time at the KHP, did the
25  Patrol use records to track disproportionate impacts?

Page 154

1         MR. CHALMERS:  Object to form.  It's
2  vague.
3      A.    Not that I'm aware of.
4  BY MS. GREATHOUSE:
5      Q.    In your time at the KHP, did the
6  Patrol use records to track disproportionate impacts
7  of searches?
8         MR. CHALMERS:  Same objection.  It's
9  vague.
10     A.    Not that I'm aware of.
11  BY MS. GREATHOUSE:
12     Q.    Do you understand the phrase
13  "disproportionate impact" as it relates to law
14  enforcement activities?
15     A.    Yes.
16     Q.    Can you tell me what your
17  understanding of that is?
18     A.    For example, in this case, the idea
19  that in a certain period of time the Patrol has
20  stopped more out-of-state motorists than in-state
21  motorists can be construed as being disproportionate
22  in the statement, in and of itself, not necessarily
23  factoring in other things.
24     Q.    In your time at the KHP, did the
25  Patrol use records to track disproportionate impacts

Page 155

1  of arrests?
2      A.    Not that I'm aware of.
3      Q.    In your time at the KHP, did the KHP
4  use records to assess the effectiveness of stops?
5      A.    I've got to think about that just a
6  minute.
7         MS. GREATHOUSE:  While you think, I'm
8  going to grab another water.
9      A.    I think it's fair to say, while maybe
10  not collecting the data, I think it's fair to say
11  that a supervisor could use an officer's arrest
12  report and review that to determine whether or not he
13  was understanding laws, applying the laws
14  appropriately.
15  BY MS. GREATHOUSE:
16     Q.    So the KHP would use records to assess
17  the effectiveness of individual stops I think is what
18  you were saying.  Do I have that right?
19     A.    They could possibly, yes.
20     Q.    Okay.  So, other than on an
21  incident-by-incident kind of basis, are you aware of
22  any way in which the KHP used records while you were
23  there to assess the effectiveness of stops across the
24  Patrol?
25     A.    I think over my time and other times,

Page 156

1  the Patrol has used records on, for example, holiday
2  weekends, record of DUI arrests to show
3  effectiveness, in terms of like DUI enforcement or
4  accident reports to show that accidents were up or
5  down.  So, yes, I think there were times when the
6  Patrol has done that in certain cases.
7      Q.    During your time at the KHP, were you
8  aware of the KHP using records to assess the
9  effectiveness of searches?
10     A.    Not to my knowledge.
11     Q.    In your time at the KHP, was it your
12  experience that troopers were resistant to having to
13  fill out more forms and more data?
14     A.    Troopers hate all change.
15     Q.    Well, then I guess I'm asking -- so is
16  the answer to my question yes?
17     A.    Generally, yes.  Troopers are human
18  beings and they don't like more work piled on them
19  than any of us.
20     Q.    Would you agree that in your time at
21  the KHP, that the Patrol accepted the bureaucracy or
22  an increase in bureaucracy was necessary to ensure
23  that the KHP was accountable for its activities?
24         MR. CHALMERS:  Object to form.  It's
25  assuming facts that aren't in evidence.

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                          July 28, 2021

Page 157

1      A.    I don't know about the bureaucracy
2  part.  I do know that under Colonel Bruce
3  accountability was very important.  In fact, one of
4  the things that our administration did was we began
5  seeking accreditation as an agency through an entity
6  called "CALEA," another acronym.
7  BY MS. GREATHOUSE:
8      Q.    C-A-L-E-A?
9      A.    Yes.  And I don't remember exactly
10 what all the letters are, but it's something,
11 something law enforcement accreditation.  The
12 commission on -- commission for accreditation for law
13 enforcement or something like that.  So, I would say
14 that, you know, that was very important to us.
15     Q.    And what were the kinds of things, in
16 your understanding, that CALEA was looking at in
17 order to get that accreditation for the KHP?
18     A.    They looked at about every aspect of
19 the patrol.  I mean, it was an interesting
20 experience.  It was almost like being audited.  They
21 would take, you know, pretty much everything and
22 measure it against what were deemed to be best
23 practices.
24           And, I mean, there's just a myriad of
25 things that they looked at.  I'd have to refer back

Page 158

1  to some material because I simply don't remember all
2  the different things that they looked at.
3      Q.    Do you recall whether they looked at
4  recordkeeping policies?
5      A.    Oh, yes.
6      Q.    Do you know what aspects -- do you
7  remember what aspects of recordkeeping policies they
8  looked at?
9      A.    No.
10     Q.    Now, in order to comply -- well, in
11 order to get the CALEA accreditation, were their
12 additional bureaucratic steps that had to be taken or
13 built inside the KHP in order to meet and get that
14 accreditation?
15     A.    Yes.  And again I'm not sure I'd use
16 the term "bureaucratic," but there were definitely
17 additional steps that the Patrol had to take to meet
18 the standards.  Oftentimes, and many times, it really
19 related to changes in policy.  Sometimes it related
20 to change in practice.  For example, the way that we
21 moved evidence had to change.  The way we stored
22 evidence had to change.
23     Q.    Do you remember any other changes that
24 the KHP had to make as a result of CALEA
25 accreditation?

Page 159

1      A.    There were certainly some, I just
2  don't remember all of them.
3      Q.    Other than CALEA, are there other
4  steps that you are aware of that the KHP took to be
5  accountable to the public?
6      A.    Yes.  I'd like to think that we, you
7  know, the Patrol polices itself to some extent.  And,
8  you know, the Patrol has high standards and not
9  everybody can be a trooper.  And so there's not only
10 supervisory accountability, there's peer
11 accountability.  So, yeah, I think so.
12           MS. GREATHOUSE:  I lost my train of
13 thought.  Would you read back my last question?
14           (Whereupon, the requested portion of
15 the record was read by the reporter as follows:
16     Q.    Other than CALEA, are there other
17 steps that you are aware of that the KHP took to be
18 accountable to the public?)
19     A.    I mean, quite frankly, that's one
20 aspect of why agencies have Internal Affairs.
21 BY MS. GREATHOUSE:
22     Q.    And in order to internally police
23 yourself, the KHP, or itself, the KHP had to have
24 accurate information on its activities; is that
25 correct?

Page 160

1      A.    Yes.  I think that's a fair statement.
2  Although, although, I'll caveat that and say that
3  sometimes information is just not accurate.  We
4  strive to accurate information, but, as often
5  outlined in the media today, not all information is
6  accurate.
7      Q.    Is it fair to say that a measure of
8  how the KHP can police itself is entirely dependent
9  on the accuracy and existence of information?
10          MR. CHALMERS:  Asking for an opinion.
11 Object.
12     A.    Yes.  I think, you know, as we have
13 learned today in 2021, that information is very
14 powerful.  And particularly in public agencies,
15 information is important.
16 BY MS. GREATHOUSE:
17     Q.    And information was equally important
18 in 2015 through 2019?
19     A.    Sure.
20     Q.    Is that fair?
21     A.    Sure.  Absolutely.
22     Q.    Okay.  Do you also agree that
23 gathering data and recordkeeping are necessary to
24 ensure that the KHP is effective in its role?
25          MR. CHALMERS:  Incomplete

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                              July 28, 2021

Page 161

1  hypothetical.  And it, additionally, is calling for
2  an opinion.  I object.
3      A.    Yes.  In my opinion, it's important.
4  BY MS. GREATHOUSE:
5      Q.    In the time that you were at the KHP
6  and in the command structure, was there a discussion
7  about accountability to the public?
8      A.    Well, I think we had those types of
9  discussions on a regular basis at the command staff
10  level.  One of the members of the command staff is
11  the Internal Affairs commander, and so, yes, there
12  were always discussions about accountability.  As I
13  said earlier, the Patrol has no vested interest in
14  doing anything wrong.
15      Q.    At the time you were at the KHP, in
16  your understanding, was the KHP interested in having
17  its records be transparent and available to the
18  public?
19      A.    That's a topic that Colonel Bruce and
20  I discussed, in fact, with the command staff.  I
21  don't know today, but at that time our policies were
22  not available to the public, for example, on the
23  internet.
24         And we discussed the merits of that
25  and, you know, I, for one, personally believe that

Page 162

1  the Patrol had absolutely nothing to hide concerning
2  its policies or its practices.  And that information
3  that can be made available to the public should.
4         But, on the other hand, there are some
5  investigative techniques and things that need not be
6  revealed so as not to endanger officers.
7         But, yes, we talked about those
8  things.  In fact, that again was -- kind of went hand
9  in hand with our decision to seek CALEA
10  accreditation.
11      Q.    When you were on the command staff at
12  the KHP, was there a conclusion, an official
13  conclusion, of the KHP about whether or not it wanted
14  to be transparent?
15      A.    Well, I'll answer that as yes, because
16  when the colonel says we're going to be transparent,
17  that's official.
18      Q.    Okay.  Previously, you told me it was
19  your opinion that the KHP should be transparent.  Do
20  you recall that?
21      A.    Yes.
22      Q.    And now you're saying that it was
23  actually also Colonel Bruce's opinion that the KHP
24  should be transparent?
25      A.    That's correct.

Page 163

1      Q.    I've got some questions about the kind
2  of data that is stored in the RMS of the KHP because
3  I want to determine what is and isn't stored.  I'm
4  asking for your knowledge when I ask these questions
5  during the time that you were there.  All right?
6      A.    Yes.
7      Q.    Okay.  So, did the KHP collect
8  information and store it in the RMS about a person
9  who was stopped, such as, like, name, age, gender,
10  that basic data?
11      A.    Yes.  That would be information that
12  would have been originating with the CAD and then
13  moved in to the RMS.
14      Q.    Is that also true for vehicle
15  registration?  That it would have been gathered in
16  the CAD and moved on to the RMS?
17      A.    Yes.
18      Q.    Did, during that time, the KHP collect
19  information on ethnicity of people who were stopped?
20      A.    I am not certain on that one.
21      Q.    Do you know whether the KHP was
22  collecting information on the nationality of people
23  who were stopped?
24      A.    I do not believe so.  Because that
25  would require a trooper to make a guess.

Page 164

1      Q.    Or to ask a question, right?
2      A.    Yes.  But that question leads to
3  complaints from the public, so.  Trust me, it does.
4  You make an assumption about that and ask somebody,
5  or not even make the assumption, just ask somebody,
6  not everybody is very happy to divulge that kind of
7  information.  So, I don't think we stored that.
8      Q.    Did the KHP collect information on the
9  name or badge number of the trooper involved?
10      A.    Yes.  On traffic citation or arrest
11  reports, yes, those all would have been captured.
12      Q.    And also in the CAD; is that correct?
13      A.    Yes.
14      Q.    Did the KHP collect and store
15  information on the time, date and place of the stop?
16      A.    Yes.
17      Q.    Did the KHP collect information on the
18  law or violation that caused the stop?
19      A.    Yes.
20      Q.    If a trooper stopped someone for
21  speeding, would that have been reported via the CAD
22  in the initial interactions between the trooper and
23  the dispatcher?
24      A.    Not necessarily.
25      Q.    So there wasn't a policy that required

BLAINE FRANKLIN SHAW, et al. vs                      DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                             July 28, 2021

Page 165

1    that --
2        A.    No.
3        Q.    -- in the CAD; is that correct?
4        A.    That's correct.
5        Q.    Did the KHP collect information on
6    individualized grounds for suspicion?
7        A.    No.
8        Q.    Did the KHP collect information on the
9    reason for a stop?
10       A.    Yes.
11       Q.    And how would that have been
12   collected?
13       A.    It could have been collected in the
14   CAD.  If not, then if an arrest were made or a
15   traffic summons, then it would have been captured
16   that way.
17       Q.    Did the KHP collect information when a
18   search was occurring on what the troopers were
19   looking for?
20       A.    Not on what they were looking for.
21       Q.    When the KHP stopped people -- strike
22   that.
23             In your experience at the KHP, was the
24   Patrol collecting information and storing it on the
25   outcome of a stop?

Page 166

1        A.    I don't know if that's every case.
2        Q.    Are you aware of whether or not the
3    KHP had a policy about collecting and storing
4    information on the outcome of stops?
5        A.    I don't remember.
6        Q.    Are you aware during the time that you
7    were a part of the KHP on whether the Patrol
8    collected information and stored it on the length of
9    a stop?
10       A.    Yes.  That would have been recorded in
11   the CAD and then pushed into the RMS.
12       Q.    And is that true if it was only a stop
13   that didn't result in a citation or arrest?
14       A.    Yes.  Because the trooper initiating
15   the traffic stop with the Communications Center would
16   trigger a CAD call.
17       Q.    And then is that CAD call ended when
18   the interaction is over?
19       A.    Yes.
20       Q.    So the trooper calls in an end to that
21   interaction?
22       A.    Yes.
23       Q.    Is that correct?
24       A.    Yes.
25       Q.    And that time is stored in the CAD?

Page 167

1        A.    Yes.
2        Q.    Did the KHP collect and store
3    information on the type of search that might be being
4    conducted?
5        A.    I am not certain about that.
6        Q.    Did the KHP collect and store
7    information on the use of force during an encounter?
8        A.    Yes.
9        Q.    And how was that recorded?
10       A.    Electronically through a Use of Force
11   form.
12       Q.    So a Use of Force form would be filled
13   out by the trooper involved; is that correct?
14       A.    And his supervisor.  Filled out by the
15   trooper and then reviewed by the supervisor.  And in
16   some cases reviewed even higher, depending on the
17   outcome.
18       Q.    And also dependent on the type of
19   force; is that fair?
20       A.    Yes.
21       Q.    Would handcuffing somebody trigger a
22   Use of Force report?
23       A.    No.
24       Q.    Do you recall what level of force
25   required that kind of reporting?

Page 168

1        A.    I don't remember all the categories
2    that triggered that, but.  Certainly resistance,
3    injury, death.
4        Q.    Do you recall whether the KHP actually
5    had a policy on what had to be filled out in that Use
6    of Force form?
7        A.    Yes.
8        Q.    Were CAD stop data ever sent to
9    trooper supervisors for review?
10       A.    Yes.
11       Q.    Was that done in a regular way?  Or on
12   an incident basis?
13       A.    I think primarily on an incident
14   basis.
15       Q.    So, is it fair to say that the KHP was
16   not using CAD data in performance reviews of
17   troopers?
18       A.    I don't know that entirely.  I think
19   some supervisors may have.  I don't know that it was
20   a widespread, adopted widespread.  But I think in,
21   you know, my time that it has been used for that
22   purpose.
23       Q.    But is it fair to say that that wasn't
24   a regular occurrence?
25       A.    Yes.

**MCR**

METROPOLITAN
COURT REPORTING • LEGAL VIDEO

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 169

1      Q.    When it comes to stops performed by
2  the KHP, was there a way that the KHP could create
3  statistics to analyze stop trends?
4            MR. CHALMERS:  Lack of foundation.
5  It's also vague.
6      A.    I do not know about that.  I'm not
7  certain.
8  BY MS. GREATHOUSE:
9      Q.    We were talking earlier about the fact
10 that audio and video is captured regarding stops; is
11 that correct?
12     A.    Yes.
13     Q.    Is it fair to say that neither of
14 those provide any quantitative data?
15           MR. CHALMERS:  Object to form.  I
16 don't think -- well, it's so vague, I don't know what
17 that means.
18           But go ahead and answer if you can.
19     A.    Yes.
20 BY MS. GREATHOUSE:
21     Q.    Did the video and audio information
22 that the KHP was capturing on stops allow the KHP to
23 analyze patterns of stop practices?
24           MR. CHALMERS:  Lack of foundation.
25     A.    It could.

Page 170

1  BY MS. GREATHOUSE:
2      Q.    Okay.  And how would that work in your
3  experience at the KHP?
4      A.    As I mentioned earlier, as a first
5  line supervisor, I had the ability to review video of
6  traffic stops.  So, in the course of those reviews, I
7  would certainly consider whether or not, based on the
8  information that was available, whether or not it
9  appeared that the trooper was doing what he was
10 trained to do and was properly enforcing the laws.
11     Q.    And when you were a first line
12 supervisor, were you reviewing lots of the video and
13 audio so as to be able to identify a pattern with a
14 specific trooper?
15     A.    In one case, yes, I did that in one
16 case.  It didn't necessarily deal with the reasons
17 for the stop.  It had to do with the trooper's
18 conduct during the stop.
19     Q.    And so you looked at multiple sets of
20 video and audio in order to determine if that
21 particular trooper was conducting him or herself
22 properly; is that right?
23     A.    That's correct.
24     Q.    Okay.  So, but is it fair to say that
25 the video and audio data that is gathered by the KHP

Page 171

1  cannot be used to analyze patterns of stop practices
2  across the Patrol?
3      A.    I don't think it would be very easy to
4  do that.  It would be, I think, possible to do that.
5  But I think it would be difficult to do that.  The
6  amount of time required and personnel to do that
7  would make it extremely difficult.
8            But could it be done, theoretically,
9  yes, it could be, but, whew, be tough.
10     Q.    Is it fair to say that it would be
11 easier to do that if additional items of data were
12 gathered about stop practices --
13           MR. CHALMERS:  Vague.
14 BY MS. GREATHOUSE:
15     Q.    -- not just video and audio?
16           MR. CHALMERS:  The question is vague
17 and assumes an unstated hypothetical I guess.
18     A.    Possibly.
19 BY MS. GREATHOUSE:
20     Q.    What kinds of data do you think would
21 have helped the KHP be able to analyze patterns of
22 stop practices across the Patrol?
23     A.    Well, I think one could argue things
24 like ethnicity, certainly.  Race, certainly.  Those
25 are a couple of examples.

Page 172

1      Q.    Is it fair to say -- well, strike
2  that.
3            Did the video and audio data that was
4  captured and stored by the KHP allow it to analyze
5  patterns of search practices across the Patrol?
6      A.    I don't think as a practice.  But it
7  was -- it could have been available for that use.
8  But I don't think, generally speaking, except for
9  perhaps Troop N where that occurred on a regular
10 basis.  I can't speak for what Captain Hogelin may or
11 may not have used the troopers' video data for, but
12 it's certainly possible.
13     Q.    Are you aware of the KHP actually
14 using that video or audio in the Interdiction troop
15 while you were there?
16     A.    I'm not personally aware of that.
17     Q.    But, again, doing a review of video
18 and audio could take many hours, even just inside the
19 Interdiction troop; is that correct?
20     A.    Yes, it does.
21     Q.    And could you identify any additional
22 kinds of data that could have been stored and
23 recorded by the KHP other than video and audio in
24 order to analyze those patterns of search practices
25 across the Patrol?



BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 173

1     A.    I can't think of any offhand, but I'm
2  sure there are many, many types of data that could be
3  useful.
4     Q.    Would one of those be recording
5  reasonable suspicion factors for each stop?
6     A.    I suppose so.
7     Q.    Did the video and audio data that was
8  recorded and stored by the KHP allow it to review
9  bias in stops across the KHP?
10    A.    Yes, it could.  In fact, I believe we
11  were required annually to do some type of reporting
12  concerning bias.  So it could be, I don't know if
13  that was a methodology that was used, though.
14    Q.    And by "methodology that was used,"
15  you mean whether or not the video and audio was
16  reviewed to determine ethnicity of people stopped?
17    A.    Well, that would have been used to
18  determine that.  I just don't know specifically.
19    Q.    So are you saying that the KHP would
20  review all video of stops to determine the ethnicity
21  of the person who was stopped?
22    A.    No.  I'm not saying that.
23    Q.    Are you indicating that there would
24  have been a form of data that the KHP was identifying
25  and storing that allowed you to collect ethnicity

Page 174

1  data on persons who were stopped?
2     A.    No.
3     Q.    Okay.  How would the KHP do any
4  reporting on ethnicity in your experience?
5     A.    If we received complaints of
6  bias-based policing, then the ethnicity and race
7  would become known to us.
8     Q.    Okay.  So, the review for bias in
9  stops would be happening on an incident basis, not
10  across the troop; is that correct?
11    A.    That's correct.
12    Q.    Did the KHP have a way to review bias
13  in stops across the Patrol?
14    A.    Not that I'm aware of.
15    Q.    Okay.  In determining reasonable
16  suspicion during a stop, did the video and audio have
17  a way of capturing something that the troopers'
18  senses were detecting, such as a smell?
19    A.    No.  A video could not capture that.
20    Q.    Okay.  And the audio would only
21  capture it if the trooper said it; is that correct?
22    A.    That's correct.  Well, let me back up.
23  No, no, I'll stay with what I'm...
24    Q.    And is it correct that the video and
25  audio could not record what the trooper could see in

Page 175

1  a vehicle that could not be seen from the camera
2  angle; is that correct?
3     A.    That's correct.
4     Q.    Generally, when you were in the
5  command at the KHP, did the command find value in the
6  information systems was dependent on what you were
7  actually storing?
8     A.    You might ask me that a different way.
9     Q.    As soon as it came out of my mouth, I
10  thought he's going to ask me to clarify that one.
11        Is it correct that the value in the
12  KHP's information systems while you were there
13  depends on the data that the KHP was actually
14  storing?
15    A.    Yes.
16    Q.    Did the KHP do any anonymized
17  statistical reporting on bias?
18    A.    Say that one more time, I'm sorry.
19    Q.    Did the KHP do any statistical
20  reporting on bias in its policing efforts?
21    A.    Yes.  I think we were required to
22  complete an annual form.  I don't know, I don't
23  remember the form itself or the data elements.  But I
24  think that's a requirement of all Kansas law
25  enforcement.

Page 176

1     Q.    Where would the KHP get that
2  information in order to do the statistical analysis?
3     A.    I don't -- I'm not certain it was
4  based on statistics as it was based on maybe other
5  factors, complaints and so forth.
6     Q.    So, correct me if I'm wrong, I want to
7  make sure that I understand what you're saying.  That
8  reporting that was done on bias in policing was based
9  only on when there were complaints?
10    A.    I've got to stop here and try to think
11  back of whether or not I'm even being accurate on the
12  reporting.  And I'm not certain that I remember.
13    Q.    Okay.
14    A.    I think I'll just say move on because
15  I don't remember exactly.
16    Q.    That's fair.
17    A.    And I don't want to misspeak.
18    Q.    Is it fair to say that unless the KHP
19  was recording the ethnicity of the persons that its
20  troopers interacted with in each case, there wouldn't
21  be a way to do a statistical analysis of
22  ethnicity-biased policing?
23    A.    I think that's fair.
24    Q.    And my understanding from today is
25  that the KHP was not collecting ethnicity data on all

Page 177

1 of the people who were stopped; is that correct?
2         MR. CHALMERS:  Well, it's been asked
3 and answered and I'm not sure it's an accurate
4 statement.
5         But go ahead and answer again.
6         MS. GREATHOUSE:  I want him to correct
7 me if I'm wrong.
8         MR. CHALMERS:  Well, maybe you ought
9 to just move on with the questions.
10        A.    Well, let me back up here a minute.
11 As we've been talking through this, I do believe the
12 KHP collected ethnicity.  It did not collect race.  I
13 think, if I'm not mistaken, they collected ethnicity,
14 but not race.
15 BY MS. GREATHOUSE:
16        Q.    What is your understanding of the
17 difference between ethnicity and race?
18        A.    Origin.
19        Q.    Tell me what you mean by that.
20        A.    Somebody can be of -- well, I guess
21 there is no difference now that I think about it.
22        Q.    So what information do you think was
23 being stored on individuals that would have to do
24 with either ethnicity or race?
25        A.    Yeah, I'm not sure that the Patrol

Page 178

1 did.  I think decades ago the Patrol's citation
2 contained that information, but I don't believe it
3 does currently.  That's why I was having a little bit
4 of, a little bit of confusion because at one time
5 that information was collected, but it hasn't been
6 collected for a while.
7         MS. GREATHOUSE:  I just want to do a
8 review of my questions to see if I've got anything
9 else.  Do you want to take a break while I do that
10 and then we can come back?  Or do you want to ask
11 your questions and I can review?
12        MR. CHALMERS:  I want you to be done,
13 so do whatever you have to do to get your questions
14 done.
15        MS. GREATHOUSE:  Okay, well, then
16 let's go ahead and take a break and let me review my
17 questions to see if I've got anything else and we'll
18 get moving.
19        VIDEOGRAPHER:  The time is 3:53, we're
20 taking a short break and going off the record.
21        (Recess.)
22        VIDEOGRAPHER:  The time is 3:59 PM, we
23 are back on the record.
24 BY MS. GREATHOUSE:
25        Q.    When you were at the KHP, was it your

Page 179

1 experience that its data systems were designed for
2 law enforcement purposes, not directly for public
3 accountability?
4         A.    I'd say they were designed primarily
5 for law enforcement.
6         Q.    What aspects of the KHP systems in
7 your experience were designed for public
8 accountability?
9         A.    Well, I think elements of those
10 systems are utilized, for example, through our
11 Internal Affairs for public accountability in so much
12 as if there's there is a complaint, the trooper -- or
13 the investigator is able to look at some of the data
14 that may be available to help determine whether or
15 not that complaint can be substantiated or not.
16         So, I mean, I think in that example,
17 there is public accountability.
18         VIDEOGRAPHER:  Can I interrupt just
19 for one moment?
20         MS. GREATHOUSE:  Yep.
21         VIDEOGRAPHER:  We can still stay -- I
22 just need to check something real quick.  Just bear
23 with me.
24 BY MS. GREATHOUSE:
25         Q.    All right.  Earlier, we were talking

Page 180

1 about when you were in the command that there were
2 discussions of adding new systems or parts of
3 systems, but that budgetary constraints didn't always
4 let that happen; is that correct?
5         A.    Yes.
6         Q.    What kinds of additional data were you
7 wanting to capture?
8         A.    You probably don't remember,
9 Counselor, you asked a very similar question earlier
10 about that, and I really don't recall.
11         Q.    If I did, I'm not trying to trick you,
12 I don't remember --
13         A.    Yes.
14         Q.    -- that I asked that, so.
15         A.    And I really don't recall.  We had
16 discussions over those years about various things
17 that we had hoped that we would be able to obtain
18 over the course of our administration.  But, you
19 know, some things were, you know, more successful
20 than others.
21         But in the data area, that stuff was
22 just very, very expensive.  When you're talking about
23 a Records Management System, you know, you're talking
24 about hundreds of thousands of dollars.
25         Q.    Was there any discussion of the fact

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                          July 28, 2021

Page 181

1  that collection of additional data may impact the law
2  enforcement officers themselves and how they behave
3  in the field?
4          MR. CHALMERS:  It's been asked and
5  answered.
6          MS. GREATHOUSE:  No, it hasn't.
7          MR. CHALMERS:  He just told you he
8  didn't remember.
9          MS. GREATHOUSE:  This was a different
10  question.
11      A.    I think we had a discussion one
12  occasion concerning, for example, when an officer
13  drew his firearm.  That information would be helpful
14  to the administration in so much as knowing, you
15  know, well, a lot of things, but, you know, we had a
16  discussion about that.
17          There was, in fact, there was some
18  amount of conversation about that because there were
19  those who were in favor of that and there were those
20  who were not.  But, I mean, I could see where that
21  type of information would be beneficial.
22  BY MS. GREATHOUSE:
23      Q.    And an example of where data
24  collection has impacted law enforcement officers in
25  the field would be when video was introduced in the

Page 182

1  cars; is that correct?
2      A.    Yes.
3      Q.    And would that also have been true of
4  when audio recording was automated in the cars?
5      A.    Yes.
6      Q.    Are there any other times that you
7  recall in your experience in law enforcement that
8  there was a change in the way data was recorded that
9  really impacted how law enforcement officials were
10  acting in the field?
11      A.    Over 3-1/2 decades, I know that there
12  were.  I know that there were.  I'm not sure that I
13  can remember all the instances, but there was, you
14  know, one thing, one constant, about law enforcement
15  is that there's going to be change.  Sometimes that
16  change is because of technology, and sometimes it's
17  because of things like case law, so.  Yes, I'm sure
18  there were.
19      Q.    Okay.  I forgot to ask if you are
20  currently employed.
21      A.    Nope.
22      Q.    So, since you retired from the Patrol,
23  you have not had outside employment; is that correct?
24      A.    I worked for just a short period.  My
25  fiancée is the director of Special Education

Page 183

1  Services, and they didn't have anybody to take care
2  of their building and it needed a lot of attention,
3  so after she made a few attempts at trying to hire
4  somebody and not having any luck, said I'd pay you if
5  you did the job.  So I came in and did that for a
6  while, but I'm not even really sure I consider that
7  employment.
8          I mean, I was getting paid, but it was
9  more for me to have something to do when I got tired
10  of working on the Jeep rock crawler and things like
11  that that I do when I'm just enjoying retirement.
12      Q.    In your retirement from the KHP, do
13  you have any agreement with it when you're giving
14  testimony like in this case?
15      A.    No.
16      Q.    Okay.
17          MS. GREATHOUSE:  I have no further
18  questions.
19          VIDEOGRAPHER:  The time is still
20  4:06 --
21          MR. CHALMERS:  I would like kind of
22  like to ask some questions.
23          VIDEOGRAPHER:  Oh, oh, I'm sorry,
24  strike that.  The time is 4:06 and we are still on
25  the record.

Page 184

1          (Moon Exhibit 73 was marked for
2  identification.)
3              EXAMINATION
4  BY MR. CHALMERS:
5      Q.    I represent the Highway Patrol Colonel
6  Jones in this litigation.  I don't think we've ever
7  met before, have we?
8      A.    No, I don't believe so.
9      Q.    I don't have a whole lot to ask you.
10  Hopefully, I will only confine my questions to things
11  that are maybe relevant.  But what I'd like to do is
12  clarify one little thing quickly.
13          When you talk about the e-Citation, is
14  that the same thing as digiTICKET?
15      A.    Yes.
16      Q.    Okay.  So, I think that now the
17  Highway Patrol uses the digiTICKET system, and where
18  you talked about e-Citation, yours was a generic
19  description of what the software is; is that right?
20      A.    Yes, the term e-Citation is electronic
21  citation.  The software that captures that is
22  digiTICKET.
23      Q.    I tossed over to you, and I apologize
24  for doing it in that fashion, but I didn't want to
25  reach into your face, a copy of what's been

BLAINE FRANKLIN SHAW, et al. vs                                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                                              July 28, 2021

Page 185

1  previously marked as Exhibit 20.  I've got it folded
2  to a page, it's the Vasquez versus Lewis decision
3  that have issued in 2016.
4          Do you have that in front of you?
5      A.    This one?
6      Q.    You got it.
7          If you look at the page that I turned
8  to, which is Page 5, at the top on the right there's
9  a paragraph that starts out, "Vasquez's status as a
10  resident of Colorado."
11          Do you see what I'm referring to?
12      A.    Yes.
13      Q.    And the Court says, "The officers rely
14  heavily on the Vasquez's residency because Colorado
15  is 'known to be home to medical marijuana
16  dispensaries.'"
17          It's what's reported by the Court.  Do
18  you see that?
19      A.    Yes.
20      Q.    And I want to skip down here and get
21  down to the nut of what the Court then concluded.
22          At the bottom of that paragraph, there
23  is a looks like couple sentences from the bottom it
24  starts, "It is wholly improper to assume."
25          Do you see what I'm talking about?

Page 186

1  Are you there?
2      A.    Not yet.  Down at the bottom of
3  the --
4      Q.    Yes.  It says, "Thus the officers."
5  Actually you see in 1138 there's the little asterisk
6  and they say, "Thus, the Officer's reasoning would
7  justify the search and seizure of the citizens of,"
8  but I want to talk about the next sentence.
9      A.    Yes, I see that.
10      Q.    The Court said, "It is wholly improper
11  to assume that an individual is more likely to be
12  engaged in criminal conduct because of his state of
13  residence, and thus any fact that would inculpate
14  every resident of a state cannot support reasonable
15  suspicion."
16          Do you see I've read that correctly?
17      A.    Yes.
18      Q.    Wasn't it the position that the Kansas
19  Highway Patrol by training policy that the mere state
20  of residence was not a basis for reasonable suspicion
21  to detain a suspect to detain a motorist?
22      A.    Yes.
23      Q.    That's always been the policy, hasn't
24  it, so long as you've been around?
25      A.    Yes.

Page 187

1      Q.    Now it then went on to say,
2  Accordingly, it is to abandon the pretext -- or --
3  Accordingly, it is time to abandon the pretext -- I
4  apologize, let me start over again see if I can't
5  read this afternoon.
6          "Accordingly, it is time to abandon
7  the pretense that state citizenship is a permissible
8  basis upon which to justify detention in search of
9  out-of-state motorists, and time to stop the practice
10  of the detention of motorists for nothing more than
11  an out-of-state license plate."
12          Do you see what I've read?
13      A.    Yes.  You read that correctly.
14      Q.    Has it ever been the policy, either by
15  training or practice that you're aware of at the
16  Highway Patrol, that the state of citizenship or, for
17  that matter, the out-of-state license plate is a
18  basis for reasonable suspicion to detain a motorist?
19      A.    No.  It is not.
20      Q.    Now after the Vasquez decision which
21  came out, according to this document, August 2016,
22  would there have been a need to change Kansas Highway
23  Patrol policies to comply with the instructions that
24  we just read from the decision?
25      A.    No.  And, in fact, that's why we

Page 188

1  didn't -- we felt like we were complying.
2      Q.    You mentioned that during the course
3  of the interview with I think it was the Topeka
4  Journal writer that there were other people there
5  with you other than just the journalist.  You had
6  Captain Hogelin, was he there?
7      A.    Yes.
8      Q.    And Sarah Washburn, she was also
9  present?
10      A.    Yes.
11      Q.    And during the course of that
12  interview, both Hogelin and Washburn made statements
13  for purposes of the article to the reporter; is that
14  correct?
15      A.    Yes.
16      Q.    Did you hear those statements?
17      A.    Yes.
18      Q.    And were they, at the time that they
19  were giving the statements, expressing what you
20  understood to be Kansas Highway Patrol's position?
21      A.    Yes.
22      Q.    Now, if we look at Exhibit 72, that's
23  the article, let's talk about it for a second.
24          In that article on the second page,
25  there's a little description a heading that says

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 189

1 "Record request." I want you to move up just a few
2 paragraphs.
3     A.    Yes.
4     Q.    It says, "In a deposition, Lewis
5 explained the troopers were referring to vehicles
6 with Colorado plates, but he said that wasn't a
7 factor in the Vasquez stop."
8           And then there's a quote that I want
9 to talk to you about from Ms. Washburn. Says, "I am
10 very confident that the patrol has never trained that
11 you look at the license plate." End quote. And it
12 refers that to Ms. Washburn.
13          Do you have a recollection of her
14 saying that?
15    A.    Yes.
16    Q.    And is that accurate in your opinion,
17 her statement?
18    A.    Well, her statement of you never look
19 at a license plate, well, of course, we look at
20 license plates. But in this context, the
21 conversation dealt with the license plate itself for
22 the reason of the stop.
23    Q.    And I want to have you turn to Page 4
24 then if you can. And the third full paragraph up
25 where it says, "Washburn said," see if you can find

Page 190

1 that.
2     A.    Yes, I have it.
3     Q.    Said, "Washburn said license plates
4 become a factor in a stop only when they are expired,
5 incorrectly displayed or associated with specific
6 suspect or criminal information."
7           Do you remember her saying something
8 to that effect?
9     A.    Yes.
10    Q.    And do you agree with that?
11    A.    Yes, I do.
12    Q.    But when you're talking about
13 reasonable suspicion, Washburn said, moving up a
14 couple of paragraphs and it's quoted, "That's not a
15 factor in why you stop a car, ever."
16          Do you remember her saying that?
17    A.    Yes.
18    Q.    And has that been what your
19 understanding is of policy and practice at the
20 Highway Patrol since you were there?
21    A.    Yes.
22    Q.    Well, now in this lawsuit, Captain
23 Hogelin has provided a declaration and at
24 Paragraph 22 of that declaration he makes the
25 following statement, and I want to see if this is

Page 191

1 consistent with your belief and understanding.
2           But before I do that, Captain Hogelin,
3 what was his position when you were there?
4     A.    He held the rank of captain and he was
5 the commander over a troop, Troop N. And, as I
6 testified earlier, that troop's purpose is criminal
7 interdiction. And I cited several, several areas
8 that that troop focuses on.
9     Q.    And as part of his responsibilities,
10 were you aware that he was involved in giving
11 training on how to conduct a traffic stop, when it's
12 appropriate to detain, when it's appropriate to
13 search?
14    A.    That would not surprise me.
15    Q.    Okay. Those would be issues that
16 would be pretty routine to Troop N?
17    A.    Yes. Of course.
18    Q.    In his declaration, at Paragraph 22,
19 he said, "Even before the Vasquez decision was
20 rendered, KHP troopers' training had established that
21 the reasonable suspicion required to extend a traffic
22 stop is not supported by (a) a driver's travel,
23 origin or destination alone; (b) a driver's state
24 citizenship; or (c) nothing more than out-of-state
25 license plate."

Page 192

1           Is that consistent with your
2 understanding of the training before the Vasquez
3 decision?
4     A.    Where are you finding that at?
5     Q.    It's not in there. I'm sorry.
6     A.    Oh, okay. I'm sorry. Could you read
7 it one more time?
8     Q.    I'd be happy to do that again. In his
9 declaration at Page 22, he said, or Paragraph 22, he
10 said, "Before the Vasquez decision was rendered, KHP
11 troopers' training had established that a reasonable
12 suspicion required to extend a traffic stop is not
13 supported by," and we'll take it in chunks, "(a) a
14 driver's travel origin or destination alone."
15          Do you agree with that statement?
16    A.    Yes.
17    Q.    And is that what you understood to be
18 the training when you were with the Highway Patrol?
19    A.    Yes.
20    Q.    And was it consistent with what the
21 practice was from what you knew of your officers?
22    A.    It was my understanding, yes.
23    Q.    B, again it's not established by a
24 driver's state citizenship. That wasn't a factor
25 according to training when you were there; is that

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 193

1  right?
2      A.    That's correct.
3      Q.    And it was not established by nothing
4  more than an out-of-state license plate, we discussed
5  that.  That also was not a factor based on the
6  training that you were aware of at the time you
7  were --
8      A.    That's correct.
9      Q.    Now, was there some sort of, to your
10  knowledge, widespread practice of conducting traffic
11  stops and extending the traffic stops on the basis
12  of -- for reasonable suspicion based on those, any of
13  those three categories, even though it would have
14  been inconsistent with the training?
15      A.    No.  Not that I'm aware of.
16      Q.    You were, turning then to page -- or
17  back to Exhibit 72, you were asked about a couple of
18  quotes that you gave, and that's at Page 5, if you
19  could turn to that.
20          You were asked about this last -- the
21  second to last paragraph.  And I think the quote that
22  was attributed to you -- and this was a quote that
23  you remember giving, is that correct, is that, "It's
24  not an unreasonable expectation to think that people
25  are going to come across the country to go to the

Page 194

1  state to purchase marijuana, and then leave the state
2  and go back to where they come from, and once they do
3  that, they are committing violations of law."
4          You were asked about that quote?  And
5  that's a quote that you gave; is that correct?
6      A.    Yes.
7      Q.    Keep that in mind, but let's turn to
8  the next page.  And talks under license plate on
9  Page 6 of the exhibit.  And if you go down one, two,
10  three, four, the fourth paragraph, where it starts
11  out, "Reasonable suspicion."
12          Do you see that?
13      A.    Yes.
14      Q.    Says, "Reasonable suspicion, Washburn
15  says, takes into account the totality of
16  circumstances, which could be positive or negative.
17  Factors include the presence of air fresheners, the
18  number of air fresheners, where the person is coming
19  from or going, and if they're being honest and if
20  they're exhibiting extreme nervousness."
21          Do you remember Washburn saying words
22  to that effect?
23      A.    Yes.
24      Q.    And do you agree with that statement?
25      A.    Yes.  In fact, there are many other

Page 195

1  factors that can be included --
2      Q.    Sure.
3      A.    -- in those.
4      Q.    And where the person is --
5          MS. GREATHOUSE:  Were you done with
6  your answer?
7          THE WITNESS:  Yes.
8          MS. GREATHOUSE:  Okay, thank you.
9  BY MR. CHALMERS:
10      Q.    And where the person is coming from or
11  going, is that what you're referring to back on
12  Page 5 where you talk about it's not an unreasonable
13  expectation to think people who are going to come
14  from the country to go to that state to purchase
15  marijuana and then leave the state?
16          MS. GREATHOUSE:  Are you looking at
17  the article?  I'm sorry, Art, I lost it.  I missed it
18  if you said if there was a reference.
19          MR. CHALMERS:  Exhibit 72.
20          MS. GREATHOUSE:  Yes.  Where?
21  BY MR. CHALMERS:
22      Q.    Okay, and at Page 6 we've talked about
23  what Washburn said.  And one of the things that
24  Washburn said was, that you agreed could be part of
25  the totality of the circumstances along with a lot of

Page 196

1  other things --
2      A.    Yes.
3      Q.    -- is where the person -- excuse
4  me -- where the person is coming from or going.
5          And what I'm asking you is where the
6  person are coming from and going, is that what you
7  were trying to describe or what you were actually
8  describing at Paragraph 5 -- or excuse me -- Page 5
9  when you talk about coming across the country to go
10  to a state to purchase marijuana?
11      A.    Yes.
12      Q.    Okay.  Then going to Page 6, again
13  back to Page 6, Washburn is given to quote or
14  attributed a statement the third paragraph up,
15  "Coming from a drug source state is a very small
16  piece, if it is considered at all, Washburn said.
17  She reiterated that an out-of-state license plate
18  won't be a factor."
19          And is that something that you
20  remember her saying?
21      A.    Yes.
22      Q.    And do you agree with that statement?
23      A.    Yes.
24      Q.    In fact, the very article itself, the
25  title, Exhibit 72, says, "KHP says out-of-state

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 197

1  license plates not a factor in stops," and then it
2  says, "Agency can't provide records substantiating
3  claim."
4         But the point was, in your
5  conversation with this reporter, was to communicate
6  that out-of-state license plates were not a factor,
7  wasn't it?
8      A.    That's correct.  In fact, I'll expand
9  just a minute on that.
10     Q.    Please.
11     A.    This particular reporter, and it's my
12 recollection, that the statement that the agency
13 could not provide the records substantiating the
14 claim, we visited with her in the middle of the
15 afternoon on I want to say March 3rd, and then this
16 article was written and published on March 4th.  So,
17 whether or not we had any information to provide her,
18 we couldn't possibly have given her that information
19 that quickly.
20     Q.    Okay.  I want you to look at another
21 exhibit real quickly.  It's a single page, typed at
22 the top it says "34."  Do you find that?
23     A.    Yes.
24     Q.    I'll let you know that this is an
25 excerpt from the First Amended Complaint that was

Page 198

1  filed in this lawsuit by the plaintiffs.
2         As I recall, you read some of the
3  documents that were filed by the plaintiffs in this
4  lawsuit; is that correct?
5      A.    Yes.
6      Q.    This particular document, what's
7  called a "First Amended Complaint" and I want to talk
8  to you about Paragraph 36.  Just take a second and
9  look at Paragraph 36 and let me know if that's one of
10 the things that you remember reading.
11     A.    Yes.
12     Q.    Now, that paragraph of the allegations
13 made in this lawsuit by the plaintiffs and their
14 attorneys quotes you as saying, "It's not an
15 unreasonable expectation" in quotation marks.  Do you
16 see that?
17     A.    Yes.
18     Q.    And if you compare that to Exhibit 72
19 which their footnote references, that's the paragraph
20 that we just talked about where you said it's not an
21 unreasonable expectation to think that people where
22 they're going to come across the country to go
23 through the state to purchase marijuana and so forth.
24     A.    Yes.
25     Q.    Do you see that?

Page 199

1      A.    Yes.
2      Q.    Now, did you communicate in this
3  article or otherwise that it was your opinion that
4  it's not unreasonable expectations for troopers to
5  assume that drivers and out-of-state plates heading
6  to or returning from Colorado are trafficking
7  marijuana?
8      A.    No.
9      Q.    Did you make that assumption?
10     A.    No.
11     Q.    In your view, is that even a fair
12 interpretation of what you were reported to have said
13 to the newspaper reporter?
14     A.    No.  This is not a proper
15 characterization.
16         MR. CHALMERS:  I don't have any other
17 questions.  Thank you.
18         MS. GREATHOUSE:  I have a few
19 follow-ups.
20              EXAMINATION
21 BY MS. GREATHOUSE:
22     Q.    Do you know whether the KHP trains in
23 advanced interdiction that two of the most important
24 factors in questioning a person who has been stopped
25 is where they are going to and where they are coming

Page 200

1  from?
2      A.    The first part of the question, yes,
3  I'm aware that the Patrol offers advanced
4  interdiction.
5         The second part of the question, I
6  don't know necessarily that there's any more or less
7  weight added to that particular question as to its
8  importance.  It is a factor.
9      Q.    So, in interdiction, one of the
10 factors to be considered in determining whether or
11 not a search might be conducted of a vehicle is where
12 the driver says they are coming from and where they
13 are going to; is that correct?
14     A.    No.  We are talking about reasonable
15 suspicious, so the totality of the circumstances
16 really are what's important in determining whether or
17 not the trooper believes something is going on that
18 might lead him to search.  The state of residency
19 alone would not be constituting enough reasonable
20 suspicion to make that search.  There should be other
21 factors.
22         MS. GREATHOUSE:  Move to strike the
23 answer as non-responsive.
24         Will you please read the question
25 back?

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 201

1          (Whereupon, the requested portion of
2   the record was read by the reporter as follows:
3       Q.    So, in interdiction, one of the
4   factors to be considered in determining whether or
5   not a search might be conducted of a vehicle is where
6   the driver says they are coming from and where they
7   are going to; is that correct?
8          MR. CHALMERS:  Wait a second.  He's
9   given you an answer, you've moved to strike it,
10  that's fine.  But he's not obligated to give you
11  another answer.
12          MS. GREATHOUSE:  I don't want you to
13  coach the witness.  And so if you and I want to have
14  this conversation, I am going to ask the witness to
15  leave the room.  It's not appropriate to you to coach
16  the witness, Art.
17          MR. CHALMERS:  He's not obligated to
18  answer a question that he's answered, whether you
19  think it's irresponsive or not, on the basis that
20  you've raised that motion.
21          MS. GREATHOUSE:  Okay.
22          MR. CHALMERS:  You don't get to ask
23  the question twice.
24          MS. GREATHOUSE:  That's not true.
25          MR. CHALMERS:  Ask a new question.

Page 202

1          MS. GREATHOUSE:  No.  He can answer
2   the question and you can stop interfering with my
3   examination.
4   BY MS. GREATHOUSE:
5       Q.    I asked if -- do you understand the
6   difference between one factor and a totality of
7   factors?
8       A.    Yes.
9          MS. GREATHOUSE:  Okay.  Will you
10  please read the question again?
11          (Whereupon, the requested portion of
12  the record was read by the reporter as follows:
13      Q.    So, in interdiction, one of the
14  factors to be considered in determining whether or
15  not a search might be conducted of a vehicle is where
16  the driver says they are coming from and where they
17  are going to; is that correct?
18      A.    That's the question.  That was the
19  question that was asked, and I stand by the answer I
20  provided.
21  BY MS. GREATHOUSE:
22      Q.    So your answer is that one factor is a
23  totality of the circumstances?
24      A.    No.  I did not say that, Counsel.
25      Q.    But the question was, is travel --

Page 203

1          MR. CHALMERS:  You're arguing with
2   him.
3          MS. GREATHOUSE:  It's a different
4   question.
5   BY MS. GREATHOUSE:
6       Q.    Is travel a factor in the totality of
7   factors?
8       A.    It can be.
9       Q.    Yes.  So the question is, in
10  interdiction training, does the KHP teach that
11  questions to be asked during a stop are where the
12  driver is coming from and where they are going to?
13      A.    Counsel, I attended advanced
14  interdiction -- or criminal interdiction back in the
15  '80s, and I simply cannot recall if that particular
16  question was asked.
17      Q.    So it's fair to say --
18      A.    Nor do I know today if that is what is
19  taught.
20      Q.    Okay.  So it's fair to say you have no
21  idea one way or the other whether it is appropriate
22  to include where a person is traveling from and where
23  they are traveling to as part of building reasonable
24  suspicion; is that correct?
25      A.    No.

Page 204

1          MR. CHALMERS:  Object to the form.
2   But he's answered.  Go ahead.
3       A.    No, I don't think that's correct,
4   Counsel.
5   BY MS. GREATHOUSE:
6       Q.    Okay.  Are you agreeing that it is
7   appropriate to use where someone is going to and
8   where they are coming from in building reasonable
9   suspicion?
10      A.    I think it depends on the
11  circumstances.  I simply cannot answer that
12  singularly.  It depends on the circumstances.
13      Q.    Right.  And in the circumstances of
14  someone who is traveling through Kansas out of state,
15  it is appropriate for troopers to consider that that
16  person may have been in a state where marijuana is
17  legal; is that correct?
18          MR. CHALMERS:  Argumentative.  And
19  it's also leading.  Not my witness.
20      A.    You're asking whether it's appropriate
21  that the troopers consider that they may have been in
22  a state where marijuana is legal?
23          MS. GREATHOUSE:  Will you please read
24  back the question?
25          (Whereupon, the requested portion of

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

METROPOLITAN
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                              July 28, 2021

Page 205

1  the record was read by the reporter as follows:
2      Q.    Right.  And in the circumstances of
3  someone who is traveling through Kansas out of state,
4  it is appropriate for troopers to consider that that
5  person may have been in a state where marijuana is
6  legal; is that correct?)
7      A.    I suppose it depends on the traffic
8  stop and any additional circumstances.  I can't say
9  that in every single instance.
10 BY MS. GREATHOUSE:
11     Q.    Well, nothing applies in every single
12 interaction in policing; is that fair?
13     A.    Yes.
14     Q.    But it's also fair to say that at the
15 time you spoke on behalf of the KHP in 2017 when you
16 gave this interview, that the KHP was not asking its
17 troopers -- strike that.
18           It's fair to say that at the time you
19 gave the interview in 2017, the KHP thought it was
20 appropriate for troopers to consider if out-of-state
21 travelers coming through Kansas had been in a state
22 where marijuana is legal; is that correct?
23           MR. CHALMERS:  Asked and answered.
24     A.    I don't think that's accurate,
25 Counsel.

Page 206

1  BY MS. GREATHOUSE:
2      Q.    So how is what I just said different
3  than what you said in the article?  I'm talking about
4  Exhibit 72 that's there in front of you.
5      A.    Primarily because I believe you're
6  trying to paint a picture that our troopers are
7  stopping motorists simply because they have traveled
8  through Colorado, and that is not the case.
9      Q.    I have never said that today.  So that
10 is --
11     A.    That is the picture that I feel that's
12 being painted here.  Or, or, searching them because
13 of the fact that they've been in Colorado.
14     Q.    And, in fact, you said in this
15 interview that that is an appropriate factor for your
16 troopers to consider in a stop; is that correct?
17     A.    No.
18           MR. CHALMERS:  Object to the form.
19 BY MS. GREATHOUSE:
20     Q.    That's not what you said?
21     A.    No.  That is not what I said.
22     Q.    Did you say, "We cannot ask our
23 troopers to ignore the fact it's not an unreasonable
24 expectation to think that people are going to come
25 across the country to go to the state to purchase

Page 207

1  marijuana and then leave that state and go back to
2  where they came from, and, once they do that, they
3  are committing violations of the law"?
4      A.    Yes.  That's what I said.
5      Q.    And how is that different than
6  including the factor that somebody has traveled
7  through a marijuana state, a marijuana-legal state,
8  and then they come to Kansas as a factor in the
9  totality of circumstances?
10     A.    Because not every motorist is coming
11 from Colorado.  Not every motorist is trafficking
12 drugs.
13           I'm talking, in this article, I'm
14 talking specifically about motorists or citizens who
15 intend to traffic in narcotics.  Who intend to leave
16 wherever they are and to come to a state where --
17 and, by the way, they cannot legally buy pounds and
18 pounds of marijuana.  So whether it's being provided
19 through the cartels that are in those states or
20 whether it's being sold out of back door of the
21 dispensaries, that's what I'm talking about.  I'm not
22 saying anything other than that.
23           The troopers of the Highway Patrol
24 cannot ignore the fact that that occurs.  That does
25 happen.

Page 208

1           That's not giving rise to any
2  reasonable suspicion, it's just simply a fact that
3  they can't ignore because it does happen.
4      Q.    But you were also talking, not only
5  about what the intent was of the driver, you were
6  talking about what the troopers should consider.
7           MR. CHALMERS:  It's argumentative.
8  BY MS. GREATHOUSE:
9      Q.    Correct?
10           MR. CHALMERS:  It's argumentative.
11     A.    I don't know that I am saying that the
12 troopers should consider that.  I'm saying that they
13 cannot ignore the fact that Kansas is right next to
14 Colorado.  We can't ignore that.  We know that
15 legalized marijuana is in Colorado and we're right
16 next to that.  We can't ignore that.
17           So, if somebody is traveling through
18 Kansas to Colorado for purposes of trafficking
19 marijuana or any other kind of narcotics, we can't
20 ignore that just because marijuana is legal in
21 Colorado.
22 BY MS. GREATHOUSE:
23     Q.    Would you agree with me that legalized
24 marijuana in Colorado is something entirely different
25 than marijuana that came from a cartel?

Page 209

1    A.    Yes.
2    Q.    You were asked some questions about
3  the Vasquez opinion that is in front of you.  You
4  recall that, correct?
5    A.    Okay.
6    Q.    If you look at the -- you see the
7  paragraph where you were asked questions about -- on
8  Page 5 at the upper right, and I'm talking about the
9  decision that's in front of you, Exhibit 20.
10    A.    Okay.
11    Q.    Okay.  So beneath that, the first full
12  paragraph in the right column on Page 5 it starts
13  with the words "and we cannot."  Do you see that
14  paragraph?
15          I'm sorry move down.  Next paragraph.
16  The next paragraph down.  That one.
17    A.    Okay.
18    Q.    So, is it correct that a totality of
19  the circumstances -- and this isn't from
20  this -- we're going to talk about this paragraph.
21  But, first, is it true that a totality of the
22  circumstances takes a variety of different factors
23  and puts them together to create reasonable
24  suspicion?
25    A.    Yes.

Page 210

1    Q.    And here in the Vasquez decision, the
2  Court said that they "could not think of a scenario
3  in which a combination of otherwise innocent factors
4  becomes suspicious because the individual is from one
5  of the aforementioned 25 states or the District of
6  Columbia," which are the legalized marijuana states
7  at that point in time; is that correct?
8    A.    Okay.  Yes.
9    Q.    And so here the Court is saying that
10  if travel from out of state, even a state where
11  marijuana is legal, that can't be added with other
12  innocent factors to come up with reasonable
13  suspicion.  Is that your understanding of that
14  paragraph?
15          MR. CHALMERS:  Well, wait a second.
16  Wait a second.  It's a misstatement of what it says.
17  And you're asking him to give a legal opinion, I
18  suppose, as to a document.
19  BY MS. GREATHOUSE:
20    Q.    Go ahead.  You can answer.
21    A.    Well, I'm not sure that I'm in a
22  position to debate what the thought of the Court was
23  in their findings here.  However, I can say that it
24  is the Patrol's experience, whether the Court agrees
25  with it or not, it is the Patrol's experience over

Page 211

1  decades that individuals who traffic in narcotics
2  don't necessarily live in a state where the narcotic
3  is legal.
4          So, that means they have to come from
5  somewhere else.  If they are coming to a state, like
6  let's assume Colorado or Washington where it's
7  legally grown and accessible -- I don't remember
8  where I was going with that point.  But they --
9    Q.    Okay.  Would you like her to read back
10  your answer?
11    A.    No, that's all right.
12          It's not -- it's not unreasonable for
13  our troopers to understand that fact, which is again
14  part of what I was trying to say in my quote.
15          And I'm not sure -- I'm not sure that
16  the Court's analysis of this where they are
17  indicating in here this notion of the state of
18  residency is the justification.
19          Of course, anybody, I mean, you can
20  take a set of circumstances and throw them together
21  and call it reasonable suspicion.  But they could
22  also be innocent factors also.  We understand that.
23          But given these officers' experience
24  with what their training has told them, that, to me,
25  that changes the dynamic.

Page 212

1    Q.    If you'd look back at that paragraph
2  we were discussing in Vasquez, if you look at the
3  last sentence.  The Court has said, "Absent a
4  demonstrated extraordinary circumstance, the
5  continued use of state residency as a justification
6  for the fact of or continuation of a stop is
7  especially permissible."
8    A.    Yes.
9    Q.    Is that what that says?
10    A.    That's what that says.
11    Q.    Can you tell me how you think that
12  statement by the Court that says you can't use the
13  state of residency, absent some exceptions, they do
14  say there might be exceptions, is different than what
15  you said in the article where you said we can't ask
16  our troopers to ignore travel?
17    A.    I think they're exactly the same,
18  Counsel.
19    Q.    Right.  The Court said you can't do
20  it, and you said we can't ask our troopers to ignore
21  it.
22    A.    No, I'm saying I think they're exactly
23  the same.
24          When the Court's talking about absent
25  demonstrated extraordinary circumstances, well, what

**MCR**
METROPOLITAN
COURT REPORTING • LEGAL VIDEO

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                        July 28, 2021

Page 213

1  I'm talking about is traveling from one state to a
2  state like Colorado to purchase more than the legal
3  amount of marijuana to traffic is an extraordinary
4  circumstance.
5      Q.    Got it.
6          Do you recall that Mr. Chalmers was
7  asking you a series of questions about three
8  categories of information that weren't being used by
9  the KHP in stops?
10     A.    Yes.
11     Q.    How do you know those categories of
12  information aren't being used by the troopers --
13  or strike that.
14          How did KHP command when you were part
15  of KHP command know the troopers weren't using those
16  three categories in conducting stops?
17     A.    Well, I think we rely on our policy
18  and our training. Now, to say that officers don't go
19  outside that, I'm not going to take that step. But
20  based on our policies and our training, I think I
21  answered that appropriately.
22     Q.    So, you're saying the official policy
23  of the KHP is to not use those three categories, or
24  was when you were part of the KHP; is that correct?
25     A.    Yes.

Page 214

1      Q.    And it's also correct that the KHP
2  command has absolutely no way to confirm that across
3  the Patrol troopers aren't using those three
4  categories, because there's nowhere that reasonable
5  suspicion is stored in your data systems for searches
6  that don't result in arrests?
7          MR. CHALMERS: Okay, let me pose an
8  objection. First, it's calling for opinion. Second,
9  it's compound because you've got multiple elements
10  floating around.
11         You can go ahead and answer if you
12  can.
13     A.    I think it is impossible for one human
14  being to know what is in the mind of another human
15  being.
16  BY MS. GREATHOUSE:
17     Q.    Right. They would have to write down
18  -- strike that.
19         A trooper would have to write down
20  their reasonable suspicion and store it in the KHP
21  systems before KHP command could know what the
22  trooper believed was reasonable suspicion in any
23  particular stop; is that correct?
24         MR. CHALMERS: Object to the form.
25  Calls for opinion. And it's also compound.

Page 215

1      A.    I think the KHP's command could merely
2  review or report or ask the officer what his
3  reasonable suspicion was. I doesn't have to be
4  recorded in a Records Management System.
5  BY MS. GREATHOUSE:
6      Q.    And is it your experience that the
7  troopers are always honest?
8      A.    No, that is not my experience.
9      Q.    Right. So, troopers may add factors
10  to reasonable suspicion after the fact if they
11  haven't been recorded at the time of the stop; is
12  that accurate?
13     A.    I don't think that's accurate. I
14  couldn't really answer that. That's being a bit
15  speculative --
16     Q.    Okay.
17     A.    -- on what they could or couldn't do.
18     Q.    So, you think that all of the KHP
19  troopers in the time that you were in the command, if
20  they had to write down their reasonable suspicion
21  after the fact would be able to remember every single
22  item they were using as reasonable suspicion at the
23  time of the stop?
24     A.    I don't know that.
25         MR. CHALMERS: Speculation.

Page 216

1  BY MS. GREATHOUSE:
2      Q.    So let's just say there's an internal
3  investigation related to a stop that did not result
4  in an arrest. So there is no contemporaneous record
5  of reasonable suspicion during the stop. Okay?
6      A.    Yes.
7      Q.    Do you except that as a hypothetical?
8      A.    Yes.
9      Q.    The only way the KHP could review
10  reasonable suspicion is to believe what the trooper
11  said after the fact; is that accurate?
12         MR. CHALMERS: Object to the form.
13  Lack of foundation. Incomplete hypothetical.
14     A.    I think the answer to that question is
15  that the investigating officer, whether he would
16  believe it or not, would use the basis of what the
17  officer said in the investigation.
18         Whether he believes it or not is
19  another story. But there are other factors that
20  would be considered before that investigating officer
21  would make recommendations to myself or to the
22  colonel.
23  BY MS. GREATHOUSE:
24     Q.    What would the other factors be that
25  you would consider in identifying reasonable

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

Page 217

1  suspicion in that scenario?
2       A.    If there were other witness there that
3  corroborate what the trooper is saying.
4       Q.    Okay.  So if there's a second trooper
5  there, right?
6       A.    If the defendant himself corroborates
7  what the trooper says.
8       Q.    Okay.
9       A.    If independent witnesses corroborate
10  what the trooper's saying.  I mean, there are a
11  number of things.  If the video camera captures audio
12  that corroborates what the trooper says or was
13  thinking or.
14       Q.    Anything else?
15       A.    No.
16             MS. GREATHOUSE:  I think I'm done.
17             MR. CHALMERS:  I don't have any
18  further questions.  Thank you, Mr. Moon.
19             THE WITNESS:  Thank you, all.
20             MS. GREATHOUSE:  Thank you.  Sorry
21  this went longer than I expected.
22             VIDEOGRAPHER:  The time is 4:51.  That
23  concludes this deposition.  We are now off the
24  record.
25             MS. GREATHOUSE:  Did you want to

Page 218

1  review it and sign the deposition when it's complete?
2  Or waive that right?  You have the opportunity to
3  review and correct if you'd like to.
4             THE WITNESS:  Actually, yes, I would.
5             MS. GREATHOUSE:  Okay.
6             REPORTER:  Mr. Chalmers, can I send
7  you an Etran?
8             MR. CHALMERS:  I'd like an Etran and a
9  scanned copy of the exhibits.
10             MS. GREATHOUSE:  I never remember what
11  our standing order is, but just sent me that.
12             (The deposition concluded at 4:53 PM.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 219

1
2
3
4
5
6             _____
7             RANDY MOON
8
9
10
11             Subscribed and Sworn to
12  before me this _____ day of _____, 2021.
13
14
15             _____
16             Notary Public
17
18             County of _____
19
20             State of _____
21
22
23  BLAINE FRANKLIN SHAW, et al. Vs. HERMAN JONES, in his
    official capacity as the Superintendent of the Kansas
24  Highway Patrol, et al.
25

Page 220

1             ERRATA SHEET
2  RE:  BLAINE FRANKLIN SHAW, et al. vs. HERMAN JONES,
    in his official capacity as the Superintendent of the
3  Kansas Highway Patrol, et al.
4  DEPOSITION OF:  RANDY MOON
5  PG/LN NO.     CORRECTION      REASON FOR CHANGE
6  :_____:_____:_____
7  :_____:_____:_____
8  :_____:_____:_____
9  :_____:_____:_____
10  :_____:_____:_____
11  :_____:_____:_____
12  :_____:_____:_____
13  :_____:_____:_____
14  :_____:_____:_____
15  :_____:_____:_____
16  :_____:_____:_____
17  :_____:_____:_____
18  :_____:_____:_____
19  :_____:_____:_____
20
             _____ I certify that I have read my deposition in
21  the above case and I request that no changes be made.
             _____ I certify that I have read my deposition in
22  the above case and I request that the above changes
    be made.
23
             SIGNATURE OF DEPONENT:
24             _____
25  DATED:  _____

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                               July 28, 2021

                                                        Page 221
1               C E R T I F I C A T E
2          I, Nissa M. Sharp, a Certified Court
3    Reporter, do hereby certify:
4          That prior to being examined the witness was
5    by me duly sworn;
6          That said deposition was taken down by me in
7    shorthand at the time and place hereinbefore stated
8    and was thereafter reduced to writing under my
9    direction;
10         That I am not a relative or employee or
11   attorney or counsel of any of the parties, or a
12   relative or employee of such attorney or counsel, or
13   financially interested in the action.
14         The original transcript is in the custody of:
15         Ms. Leslie A. Greathouse
           Spencer Fane, LLP
16         1000 Walnut Street
           Suite 1400
17         Kansas City, Missouri  64106
18
           WITNESS my hand and seal this 28th day of
19   July, 2021.
20
21         _____
                  Nissa M. Sharp
22           CSR No. 1365, CCR No. 528
23
     BLAINE FRANKLIN SHAW, et al. Vs. HERMAN JONES, in his
24   official capacity as the Superintendent of the Kansas
     Highway Patrol, et al.
25

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

**Exhibits**

**Moon_072821_Ex 71**
  3:17 39:10,16 55:23

**Moon_072821_Ex 72**
  93:5,6,9 94:9 99:5 117:19
  188:22 193:17 195:19
  196:25 198:18 206:4

**Moon_072821_Ex 73**
  184:1

**$**

**$90**  78:19

**(**

**(a)**  191:22 192:13

**(b)**  191:23

**(c)**  191:24

**0**

**06**  38:13

**1**

**1**  21:12 98:19

**1,000**  78:5

**10**  25:10 76:10

**100**  62:5 98:15 100:9,13

**10:06**  4:1,5

**10th**  108:21 110:6,10
  113:6,9

**1138**  186:5

**11:01**  39:7

**11:16**  39:12

**11th**  8:17

**12**  20:22,23

**12-month**  142:1

**12:16**  72:25

**12:23**  73:3

**133**  134:14 135:1

**136**  94:1

**14**  14:7 49:7

**15**  29:21 38:13 49:7,8

**15-year**  75:22

**17**  54:18 57:16 115:16

**19**  45:21 54:19 57:16
  75:15

**1963**  8:17

**1981**  8:25 10:21,24

**1982**  12:7

**1984**  10:24 12:25

**1986**  11:7 13:19 15:4

**1987**  10:23

**1989-ish**  11:8

**1990**  14:21

**1995**  14:25 15:4

**1995-ish**  18:11

**1996**  30:11

**1:42**  117:12

**2**

**2**  13:10 14:24 77:25

**2-year**  9:16

**20**  20:25 34:10,12 45:21
  185:1 209:9

**2000**  16:20,21,23,25
  19:14 21:25 29:4,22 30:1,
  15,18,24 49:7

**2000s**  30:6

**2001**  19:14

**2005**  20:13 35:22

**2006**  20:15 21:25 29:4,22
  32:24 34:19 35:1 37:12
  38:5 44:22 45:17 46:2

**2008**  32:24

**2010**  10:3 37:12,16,22
  75:15

**2012**  60:13

**2015**  38:2,5 44:22 49:10
  77:4 80:6 116:15 160:18

**2016**  51:6 107:25 108:7
  112:10 115:16 116:10,20
  185:3 187:21

**2017**  89:7 90:14 92:2,5
  93:22 95:21 97:10 116:10
  146:16 205:15,19

**2018**  148:3

**2019**  45:24 46:3 48:12,16
  51:6 118:8 119:25 120:5
  146:16 160:18

**2021**  160:13

**22**  190:24 191:18 192:9

**25**  210:5

**28th**  4:4

**2:04**  117:15

**3**

**3**  10:25 73:21

**3-1/2**  182:11

**3-month**  9:21 73:19

**34**  197:22

**34A**  5:3

**36**  198:8,9

**3:53**  178:19

**3:59**  178:22

**3rd**  197:15

**4**

**4**  11:6 189:23

**4-1/2**  16:18

**40,000**  75:9

**4:06**  183:20,24

**4:51**  217:22

**4:53**  218:12

**4th**  197:16

**5**

**5**  99:5 185:8 193:18
  195:12 196:8 209:8,12

**6**

**6**  20:17 36:15 132:22
  194:9 195:22 196:12,13

**6-year**  20:20

**619-CV-01343**  4:7

**65**  38:21

**7**

**70-some**  35:5

**700**  51:17,19,21,23 52:2

**71**  39:10,16 55:23

**72**  93:5,6,9 94:9 99:5
  117:19 188:22 193:17
  195:19 196:25 198:18
  206:4

**73**  184:1

**76**  43:5

**8**

**8-hour**  26:25

**80**  34:10 43:5

**800**  43:3 51:14,15,24

**80s**  18:10 35:15 36:12
  203:15

**84**  12:7,17 13:5

**85**  12:17

**48**:12,16 49:10 118:8



Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 60 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                            July 28, 2021

**86** 14:2

**9**

**9/11** 58:25 59:2 60:11

**900-ish** 78:6

**90s** 30:5 35:16 36:12

**911** 43:17,18

**96** 15:10,15

**96-98** 18:13

**98** 16:23

**99** 16:20,23

**A**

**abandon** 187:2,3,6

**ability** 57:4,18 103:7,24 170:5

**absent** 212:3,13,24

**absolutely** 55:19 141:23 160:21 162:1 214:2

**academy** 13:23 14:4,9 74:6 75:1,4,7 76:4,5

**accept** 113:2

**accepted** 74:20 86:16 112:23 156:21

**access** 64:21 68:8

**accessible** 211:7

**accident** 17:5 23:24 28:18 34:17 50:13 156:4

**accidents** 156:4

**accompany** 141:16

**account** 126:4 194:15

**accountability** 157:3 159:10,11 161:7,12 179:3, 8,11,17

**accountable** 156:23 159:5,18

**accreditation** 157:5,11,

12,17 158:11,14,25 162:10

**accuracy** 160:9

**accurate** 16:10,11 24:14 39:22 75:16 90:3 97:16 98:19 112:12 125:13 130:21 133:20 137:19 159:24 160:3,4,6 176:11 177:3 189:16 205:24 215:12,13 216:11

**accurately** 56:22,25 132:12

**achieve** 23:5

**acronym** 55:1 71:21 157:6

**acronyms** 71:24

**act** 83:15 88:10

**acting** 182:10

**activated** 139:13

**active** 10:24 11:17

**activities** 5:12 34:13 108:9 109:6 130:11 154:14 156:23 159:24

**activity** 86:20,21,22

**actual** 24:2 92:4,16 97:5 147:1

**add** 215:9

**added** 62:16 200:7 210:11

**adding** 180:2

**additional** 106:13 116:15 125:3,20 151:23 158:12, 17 171:11 172:21 180:6 181:1 205:8

**additionally** 161:1

**address** 5:2 83:22

**addressed** 73:15

**administration** 9:11 12:5 157:4 180:18 181:14

**administrative** 34:10 116:19

**administrator** 74:7

**adopted** 168:20

**adult** 126:21

**advance** 84:9

**advanced** 199:23 200:3 203:13

**advantage** 137:25 138:3, 9

**advised** 112:17

**advisories** 105:21

**advisory** 60:14,19,20,21 61:3,5,9,10 62:3 63:9

**affairs** 78:16 121:24 142:14,18,21 143:6,13 159:20 161:11 179:11

**affiliation** 4:9

**afforded** 16:1

**AFIS** 54:17 63:5 69:1

**aforementioned** 210:5

**afternoon** 187:5 197:15

**afterthought** 44:11,16

**age** 126:21 163:9

**agencies** 47:9 52:21 53:8,21 54:5 58:14 59:3,4, 23 61:19 71:5 72:5 74:16 75:9 101:15 146:5 159:20 160:14

**agencies'** 64:22

**agency** 36:5,16 59:22,24 74:10 78:2,11 83:21 93:18 104:1 129:2,4,5,23 146:22 157:5 197:2,12

**agree** 121:5 148:12 149:4 150:5,10 153:2 156:20 160:22 190:10 192:15 194:24 196:22 208:23

**agreed** 195:24

**agreeing** 204:6

**agreement** 23:15 183:13

**agrees** 210:24

**ahead** 39:2 93:4 96:10 117:8 169:18 177:5 178:16 204:2 210:20 214:11

**aid** 28:11 117:1

**aided** 47:13 127:6 136:13

**air** 16:4 194:17,18

**airplane** 91:16

**alert** 69:10

**Allan** 115:18

**Allan's** 115:18

**allegations** 198:12

**alleged** 67:12

**allegedly** 67:11

**allowed** 134:15 173:25

**alphabet** 68:9

**Amended** 197:25 198:7

**America** 58:25

**amount** 18:20 28:22 37:20 98:23 102:8 126:22 127:19 128:12 129:17,21 145:12 171:6 181:18 213:3

**amounts** 98:10

**analysis** 176:2,21 211:16

**analyze** 169:3,23 171:1, 21 172:4,24

**and/or** 74:9 111:11

**angle** 175:2

**annual** 116:21 175:22

**annually** 61:22 173:11

**anonymized** 175:16

**answers** 6:7

**anymore** 43:6,24 106:7 126:14

**apologize** 60:8 184:23 187:4



appeal 113:2

appealed 112:19

appeared 26:21 170:9

appears 94:7

applied 76:1 77:12 113:3, 11

applies 205:11

apply 74:20 75:11

applying 155:13

appoint 70:18

appointed 60:13 77:4

approach 24:25

appropriately 57:1,2 65:10 89:23 140:10,24 141:8,12 142:2 143:22 155:14 213:21

approval 62:7

approve 61:11

approved 62:5

approximately 5:8 20:9, 18 78:19 146:14

April 45:20

area 14:11 24:3 27:2,10 31:2 36:22 37:3 44:13 76:17 126:16 135:7 180:21

areas 21:3 23:13 27:6 91:3 191:7

argue 171:23

arguing 203:1

argumentative 142:6 204:18 208:7,10

arrest 28:21 29:1 32:7 50:12,15 59:12 66:9,13, 14,16 67:1,2,7,11 104:16, 25 106:6,19 107:2,3,9 125:10,16 126:12 129:18 133:16 134:11,17 135:12, 15,18 138:15 142:22 153:13 155:11 164:10 165:14 166:13 216:4

arrested 72:2 104:10

arrests 119:1 144:5,17 155:1 156:2 214:6

arrived 30:23

Art 93:11 195:17 201:16

Arthur 4:13

article 7:17,19,23 36:19 84:23 92:6,7,8,11,14,20 93:16,21 94:5 97:1,17,24 98:24 100:2 117:20,25 118:4 188:13,23,24 195:17 196:24 197:16 199:3 206:3 207:13 212:15

articles 35:19 62:20

ascend 79:25

asleep 67:4

aspect 21:25 51:4 53:10 157:18 159:20

aspects 51:2 102:2 144:23 158:6,7 179:6

assess 155:4,16,23 156:8

asset 88:20 90:14,20,24 91:2,7

assign 46:17

assigned 11:20 14:10 15:1,9 55:18 80:9,14,20 146:22

assignment 14:18 16:8 20:14 37:9

assignments 11:16

assigns 55:20

assist 35:17

assistance 147:1,18

assistant 38:3 77:16,20, 22,25 78:1,7,9,12,14,15, 17,20 79:2,6 83:4,9

association 23:16 59:18

assume 56:2 86:4 185:24 186:11 199:5 211:6

assumed 82:20 88:2

assumes 171:17

assuming 156:25

assumption 11:12 164:4, 5 199:9

asterisk 186:5

Atkinson 115:17

atmosphere 73:22

attached 42:25 57:16

attacks 58:25

attempts 90:25 183:3

attend 12:23 24:13 74:3

attended 9:18 11:3 74:15 75:4,5,6,19 203:13

attendees 73:20

attention 79:5 183:2

attest 127:13

attorney 4:14 65:18 112:18

attorneys 29:9 198:14

attributed 97:6 117:25 118:4 193:22 196:14

audio 140:3 169:10,21 170:13,20,25 171:15 172:3,14,18,23 173:7,15 174:16,20,25 182:4 217:11

audit 53:21,22 56:9

audited 53:17 157:20

auditing 53:11 54:4

auditor/trainer 56:1,3

auditors 57:4 102:15

audits 72:8

August 187:21

authority 61:17

automated 182:4

automatic 63:6

automatically 55:17

awaited 12:2

aware 37:1 47:19 48:10 74:24 75:5 79:11 85:11, 13,14 101:20 106:4 110:25 111:17,19 113:8 118:18 120:16 121:13 122:14 128:10 131:10 136:21 143:12 144:15,20 147:16 154:3,10 155:2,21 156:8 159:4,17 166:2,6 172:13,16 174:14 187:15 191:10 193:6,15 200:3

B

Bachelor's 9:21

back 10:17 12:25 13:5 14:24 18:10 20:10,21 22:15 25:16 26:7 28:6 29:7 30:12 31:21 32:5,16 33:4,17 35:15 39:13 44:12 55:23 58:6 62:8 67:23 73:4 92:15 95:3 96:12 99:25 100:10,24 106:10 107:19 114:20 117:16 121:23 125:22 127:13 128:1 130:13 132:11 138:4 144:22 148:24 157:25 159:13 174:22 176:11 177:10 178:10,23 193:17 194:2 195:11 196:13 200:25 203:14 204:24 207:1,20 211:9 212:1

back-up 71:10,11,15

background 8:14 50:7

bad 84:20 131:24

badge 164:9

balance 27:8

band 51:16,22,25

bands 51:19

Barber 20:6

barracks 12:1

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

**Barton** 9:5 11:2,3,5 20:5

**base** 140:23

**based** 24:23 25:1 46:18, 24 62:24 63:1 64:8,10 65:1,23,25 66:2,6,10 68:25 74:5 107:12 143:7 149:16 150:11 170:7 176:4,8 193:5,12 213:20

**basement** 44:3,17

**basic** 17:3 57:22 163:10

**basically** 58:23 80:21

**basis** 132:4 140:20 155:21 161:9 168:12,14 172:10 174:9 186:20 187:8,18 193:11 201:19 216:16

**Bates** 39:17

**bear** 179:22

**began** 13:20 29:23 157:4

**begin** 34:25 131:14

**beginning** 22:4 23:4

**behalf** 36:5 54:24 205:15

**behave** 181:2

**beings** 156:18

**belief** 191:1

**believed** 214:22

**believes** 200:17 216:18

**belong** 60:25

**Bend** 9:8

**beneath** 209:11

**beneficial** 181:21

**benefit** 57:11

**bias** 173:9,12 174:8,12 175:17,20 176:8

**bias-based** 174:6

**bifurcated** 65:6,15 70:5

**birth** 8:16

**birthday** 8:16

**bit** 8:1 9:23 19:8 20:5 35:14 41:17 53:9 59:19 67:23 98:6 106:21 144:22 149:17 178:3,4 215:14

**bits** 134:21

**black** 132:16

**blended** 19:9

**board** 60:14,19,20 61:3,4, 5,6,9,10 62:3,4,11 63:9

**bogged** 32:3

**booking** 118:17

**born** 8:17

**bottom** 185:22,23 186:2

**boundaries** 80:23

**boxes** 133:13 134:21

**branch** 65:18,19

**Branson** 36:21

**break** 6:23 7:1 39:5,8 73:1 117:9,12 178:9,16,20

**Brent** 86:5

**briefed** 110:17

**briefly** 12:11

**briefs** 7:18

**bring** 92:19 100:10

**bringing** 97:20

**broad** 62:21 131:17 132:2,7 133:20

**broader** 140:23

**broadly** 62:19 143:8

**broken** 53:15

**brought** 33:17 92:20 110:9

**Bruce** 79:21 81:18 82:9, 14,18,22 157:2 161:19

**Bruce's** 162:23

**budget** 15:22 78:19 123:6,12

**budgetarily** 123:1

**budgetary** 180:3

**build** 59:1 144:3

**building** 43:21,25 44:3, 12 59:9 135:20 137:12 138:24 139:5 140:10,24 141:8 142:2 143:8,14,23 144:16 147:1 183:2 203:23 204:8

**built** 138:1 147:8 158:13

**Bureau** 9:19 47:7 52:24 64:6 68:6,16

**Bureau's** 65:7

**bureaucracy** 156:21,22 157:1

**bureaucratic** 158:12,16

**Butler** 14:12

**buy** 91:16 100:9,16 207:17

---

## C

**C-A-L-E-A** 157:6

**CAD** 46:11,20 47:14,22 48:2,5,14 49:5,11 51:7 121:10 122:8 130:16,19, 25 131:11 132:24 133:8, 12 150:17 151:20 163:12, 16 164:12,21 165:3,14 166:11,16,17,25 168:8,16

**cafeteria-style** 73:23

**CALEA** 157:6,16 158:11, 24 159:3,16 162:9

**California** 97:8

**call** 45:4 63:5 64:7 66:13 70:2 77:15 83:3 102:13 151:14,20 166:16,17 211:21

**called** 28:12 35:7 49:25 54:13 58:19 61:16 64:9 135:1 150:23 157:6 198:7

**calling** 161:1 214:8

**calls** 46:14,16,18 166:20 214:25

**camera** 136:2 139:4,5,7, 11,19,21 175:1 217:11

**cameras** 138:8

**Camp** 12:3,4,6

**candidates** 76:1

**cap** 58:5

**capability** 126:2

**capacities** 88:19

**capacity** 14:22 85:2

**capital** 7:17 63:14,15 85:10

**captain** 17:25 20:14,15 22:20 34:20 35:3 37:23 38:8 41:1,9 48:25 51:11 55:16 72:19 79:16 80:3 81:9 82:19 86:4,5,7 115:17,18,24 116:7,10,20 146:24 172:10 188:6 190:22 191:2,4

**captains** 79:8

**capture** 122:24 123:18,22 125:7 139:5,8 149:25 174:19,21 180:7

**captured** 135:5 148:2,4 164:11 165:15 169:10 172:4

**captures** 149:11 184:21 217:11

**capturing** 169:22 174:17

**car** 33:17 103:12,13 119:22 135:24 139:17 190:15

**carbon** 29:19

**care** 45:6,7 69:15 78:23 79:9 80:18,25 183:1

**career** 11:20 13:20 17:15, 23 24:16 36:3,8 75:2

**careers** 36:9

**carried** 78:10



Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 63 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                          July 28, 2021

carrying 119:24

cars 101:20 139:19,20
182:1,4

cartel 208:25

cartels 207:19

case 4:7 8:2 15:9 25:25
29:10 67:7 86:17 88:6
94:2 108:18,20 109:8,16
110:5 112:21 113:2,14
117:6 118:14 128:24
135:20 141:9 142:19,23
143:9,15 144:4,17 152:18,
21 154:18 166:1 170:15,
16 176:20 182:17 183:14
206:8

cases 78:16 142:3,24
156:6 167:16

cash 145:16

catalog 74:1

categories 27:19 28:13
62:12,16 67:19,21 73:12
82:4 168:1 193:13 213:8,
11,16,23 214:4

categorize 46:16

caused 164:18

causing 99:15

caveat 160:2

cellular 33:21,24,25 34:2

center 35:4 37:23 38:1,23
42:11 43:16 44:4,20 45:5
52:19 57:10 88:25 149:25
166:15

centered 85:14 113:14

central 32:1 43:3 44:2
80:21 81:23

chair 51:12,15,16,17

Chalmers 4:13 90:1
93:14 96:6,20 97:23
109:18,22 115:4,12
128:18 131:19 132:8
133:19,24 134:3,23 137:4,
15 140:25 141:13 142:5,
12 144:18 150:8 152:15,

19 154:1,8 156:24 160:10,
25 169:4,15,24 171:13,16
177:2,8 178:12 181:4,7
183:21 184:4 195:9,19,21
199:16 201:8,17,22,25
203:1 204:1,18 205:23
206:18 208:7,10 210:15
213:6 214:7,24 215:25
216:12 217:17 218:6,8

chance 6:18

change 17:10 24:24
29:10 30:19 34:22 108:2,
4,8 109:15 111:12,22
115:21 127:17 150:20
156:14 158:20,21,22
182:8,15,16 187:22

changed 25:17 28:5 29:8
52:25 81:15 110:23 115:7,
10 128:15

changing 29:17 149:13

characteristics 98:22
149:24

characterization 90:4
98:1,4 199:15

characterize 14:16

charge 40:1 68:18 116:8,
11 145:7

chart 39:21,24 40:1,19,24
55:24

check 57:6 102:5,6
134:21 138:23 141:7
150:16 179:22

checking 133:13

chief 61:18 74:8

child 36:20

chunks 192:13

Circuit 108:21 110:7
113:6,9

Circuit's 110:10

circumstance 35:24
212:4 213:4

circumstances 194:16
195:25 200:15 202:23

204:11,12,13 205:2,8
207:9 209:19,22 211:20
212:25

citation 119:13 148:19,24
151:25 152:2 153:4,6,16
164:10 166:13 178:1
184:21

citations 28:8

cited 84:23 191:7

citizen 24:23,25

citizens 25:2 186:7
207:14

citizenship 187:7,16
191:24 192:24

civic 23:20

civilian 38:20,22,23 78:3
81:6

civilians 40:20,21 81:8

CJIS 37:10,17,18 38:1,18,
20 40:13 42:16,19 52:9,
10,11,20 53:4 54:14,22
55:3,6,8,23 59:17,19 60:4,
18,21,22,24 65:4 66:20
69:4 101:3,8,18 102:9,19,
23 103:3 104:5

claim 93:18 197:3,14

clarify 30:13 42:23 87:13
148:22 175:10 184:12

classes 116:23,25 117:2,
3

clear 6:14 50:19 81:21

clearance 12:2

close 117:10

closely 41:21,23

coach 201:13,15

coffee 89:3

colleagues 61:21

collect 64:18 148:13
149:5,21,22 150:14 153:7,
12,15 163:7,18 164:8,14,
17 165:5,8,17 167:2,6

173:25 177:12

collected 66:17 149:13
150:4,7 165:12,13 166:8
177:12,13 178:5,6

collecting 101:4 148:17,
20 150:20 155:10 163:22
165:24 166:3 176:25

collection 181:1,24

collects 47:8 66:10 69:2

college 9:1,3,5,16 10:9
11:2,10,15 126:21

college-like 73:22

colonel 77:5 78:6 79:16,
21 80:3,7 82:18 83:3,8,15
84:8 85:3,6 108:1,8
110:15 112:3 116:14
122:10 157:2 161:19
162:16,23 184:5 216:22

colonels 111:9

color 125:25

Colorado 89:13 95:22,
24,25 96:5,19,23 97:3,7,8,
19 99:6,10,23 100:8,17,22
185:10,14 189:6 199:6
206:8,13 207:11 208:14,
15,18,21,24 211:6 213:2

Columbia 210:6

column 209:12

combination 210:3

combined 25:7

command 111:5,7,8
112:6,11 114:11,24
122:14,18 123:8,10,15
124:2,12,19,22 125:2,14
130:8,16,20 143:21
146:18 161:6,9,10,20
162:11 175:5 180:1
213:14,15 214:2,21 215:1,
19

commander 40:9 41:14
45:16 47:24 48:22 54:6
55:21 85:12 112:1 115:15
130:14 161:11 191:5



BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

**commands** 80:17

**commenced** 4:1

**commercial** 51:25

**commission** 157:12

**committing** 95:4 194:3
207:3

**communicate** 33:15
56:17 66:1 69:18 70:14
71:2 85:5 197:5 199:2

**communicated** 33:19
66:5 68:19 84:9 85:8
108:10,22

**communicating** 109:15

**communication** 42:10
47:15 49:11,16 69:6

**communications** 35:4
37:9,23 38:1,16,19 40:13
41:4,12,19,22 42:11,18,22
43:3,11,16,20 44:4,14,20
45:5 47:18 51:4 54:7
74:12 79:4 107:14 166:15

**community** 9:5 10:9
11:2,10 27:23

**company** 61:15 77:24

**comparatively** 15:20

**compare** 198:18

**complaint** 179:12,15
197:25 198:7

**complaints** 24:23 25:1,
15 26:2,5 121:25 143:16
151:2 164:3 174:5 176:5,9

**complete** 6:3,24 28:23,
25 49:12 105:1,15 147:11
150:22 175:22 218:1

**completed** 49:14,16

**completing** 28:19

**complex** 47:25 48:2 63:3

**complicated** 70:5 72:3

**comply** 146:21 158:10
187:23

**complying** 188:1

**components** 33:12
95:18

**compound** 214:9,25

**comprised** 122:7

**computer** 31:12,16,23,25
32:12,17 33:10 44:24,25
47:13 105:9,14 106:18
119:22,25

**computer-aided** 47:12

**computer-assisted**
46:6,10,11

**computerized** 29:20
31:6,9 32:8 105:11

**computers** 29:20 30:5,7,
19,21 31:4,20,23 33:15
101:5,9,20 105:23

**computing** 32:15

**concern** 100:5

**concerned** 86:16

**concluded** 185:21
218:12

**concludes** 217:23

**conclusion** 162:12,13

**conduct** 24:23 89:16
153:8 170:18 186:12
191:11

**conducted** 167:4 200:11
201:5 202:15

**conducting** 89:11
143:24 170:21 193:10
213:16

**confident** 120:14 148:5
189:10

**confine** 184:10

**confirm** 140:12,14 214:2

**confusion** 178:4

**Congress** 58:25

**congressional** 59:2

**connected** 60:18 86:24

**connection** 70:3,11 71:5,
6,11,12 72:10

**connections** 53:22,23
56:14 70:11 71:8

**connects** 70:22

**consent** 105:20,24

**consideration** 62:4 91:1

**considered** 89:18 128:2
196:16 200:10 201:4
202:14 216:20

**consistent** 191:1 192:1,
20

**constant** 182:14

**constitute** 53:3

**constituting** 200:19

**Constitution** 113:10

**Constitutional** 144:12

**constrained** 23:14

**constraints** 180:3

**construed** 154:21

**contact** 27:14 42:10
46:24 69:14

**contained** 129:15 136:10
178:2

**contemporaneous**
216:4

**contents** 127:7

**context** 189:20

**continuation** 212:6

**continue** 116:21

**continued** 212:5

**continuum** 30:25

**conversation** 92:16
111:6 181:18 189:21
197:5 201:14

**conversations** 122:11
125:5,11,18

**conveyed** 150:2

**COO** 77:24

**cooperate** 99:19

**copies** 121:20

**copy** 93:4,11 94:14
184:25 218:9

**Corps** 10:11,15,20 11:9,
20,23

**correct** 5:16,17 7:20 8:5,
22,23 9:7 13:1,21,24
15:12 18:4 19:1 21:5 23:6
24:11 26:10 27:17,20,25
28:3 32:18,19 33:9 34:20,
23 38:13 40:2,10,13 43:1,
12,13,22 45:21 46:21 48:3
49:10 56:3,4,18,19,23,24
60:11,14 63:12,15,22 64:4
68:21 69:18,21,22,25
70:23,24 71:3,22 73:8
77:5,10 79:18 82:12,17,24
85:3 86:1 88:14 89:25
90:12 91:13,17,23 93:19,
22 94:18 95:11,18,22 97:4
99:1,7 102:21 104:13,18
105:5 107:16 109:21
110:11,20 111:15,16,23
112:7 113:4,22,25 114:3,
8,10 115:11 117:22 118:1
119:19 120:4 121:4
127:24 128:16 133:10,14
134:25 137:14 138:15
139:9,10,13,14 140:20
141:12 142:10 144:10
145:1,17 146:9 150:21
151:22 159:25 162:25
164:12 165:3,4 166:23
167:13 169:11 170:23
172:19 174:10,11,21,22,
24 175:2,3,11 176:6
177:1,6 180:4 182:1,23
188:14 193:2,8,23 194:5
197:8 198:4 200:13 201:7
202:17 203:24 204:3,17
205:6,22 206:16 208:9
209:4,18 210:7 213:24
214:1,23 218:3

**correctly** 46:17 186:16
187:13



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

*i6*

Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 65 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                          July 28, 2021

**corroborate** 217:3,9

**corroborates** 217:6,12

**counsel** 4:8 7:3 72:13
85:11 88:14,20 96:8
110:18 111:5 112:16
113:7 114:16 120:23
129:25 132:11 134:5
137:16 143:18 147:20
151:13 202:24 203:13
204:4 205:25 212:18

**Counselor** 180:9

**counted** 66:23

**counties** 20:1,5,8

**country** 47:9 52:17 54:22
57:12 59:11 61:21 64:17
70:17 75:10 91:7 95:1
193:25 195:14 196:9
198:22 206:25

**County** 9:5 11:2,4,5
14:10,12,23,25 19:24,25
20:1,5,6

**couple** 12:4 25:17 35:19
44:24 55:4 61:1 68:17
81:14 88:19 128:1 150:11
171:25 185:23 190:14
193:17

**courses** 73:24 74:2,3,4,
12 76:3,5,7,11,14,24
144:1

**court** 4:3,16 6:9 7:24
84:24 112:22 113:2
138:10 144:5 185:13,17,
21 186:10 210:2,9,22,24
212:3,12,19

**Court's** 211:16 212:24

**courts** 29:9 105:14
119:16

**cover** 62:12 73:12

**covered** 9:24 73:13 80:15

**covering** 38:1 131:18

**Cowley** 11:4 14:12

**crawler** 183:10

**create** 64:20 169:2

209:23

**created** 18:15,17 62:11
63:9 97:2,3 107:3

**Crime** 52:18 57:9

**criminal** 17:4 21:2 34:18
35:7 52:11,13 58:13,24
59:12 64:21,22 68:14,20
71:25 72:1,3 74:13 76:15
85:12 86:17,20,21,22
88:21,22,23 120:12
126:17,23 186:12 190:6
191:6 203:14

**criteria** 23:3,8,11 24:18
25:7

**cross-recorded** 48:15

**CSO** 55:1 60:25 61:16
65:5 70:15,19

**CSOS** 54:22

**current** 5:2 84:4 123:23

**curriculum** 73:23

---

**D**

**D-E-X** 63:15

**D.C.** 12:1

**daily** 27:14 42:8,12

**data** 32:19,21,25 47:14,
17,22 48:2,5,14 49:3 50:3
51:5 53:17,18 56:8,12,20
58:13,16,23,24 59:7
62:12,16 64:18,22 66:4,9,
16,19 67:13,14 69:6,20,23
70:7 101:4,5,9,19 102:20
104:4,17,19 106:17
118:17,20 119:3 120:17,
20,22 121:2,15 122:19,22,
23 123:18,21,25 124:24
125:3,6,9,15,20,24 128:1
130:5,17,20,25 131:4,18
132:3,7 133:2 135:3
146:25 147:3,6 148:1,6,8,
13,16 149:5,12,21 150:4,
6,20 151:7 153:1,3,5,12,
15 155:10 156:13 160:23
163:2,10 168:8,16 169:14

170:25 171:11,20 172:3,
11,22 173:2,7,24 174:1
175:13,23 176:25 179:1,
13 180:6,21 181:1,23
182:8 214:5

**database** 68:5 119:5,15
121:17,24,25 146:8 147:2,
10

**databases** 102:10,18

**date** 8:16 45:19 164:15

**David** 12:3,4,6

**day** 11:22 26:25 27:16
77:15 83:7 100:13,14,16
107:18 111:3 141:21

**day-to-day** 141:17

**days** 20:21 22:16 25:16
28:6 29:7 30:12 31:22
32:5,20 41:5 44:12 45:1,
10,13 46:1,2 58:6 69:2
102:14 127:13 139:18

**deal** 70:17 78:18 170:16

**dealing** 41:18 92:2

**dealt** 56:11,13 189:21

**death** 168:3

**debate** 210:22

**debrief** 112:15

**decades** 28:6 178:1
182:11 211:1

**decide** 152:14

**decided** 18:14 108:20
115:11 116:11

**deciding** 26:18

**decision** 110:10,20,24
111:22 112:3,10,15 113:9,
11,22 114:1,5,12,25
126:11 162:9 185:2
187:20,24 191:19 192:3,
10 209:9 210:1

**decisions** 70:9

**declaration** 190:23,24
191:18 192:9

**deem** 73:24

**deemed** 157:22

**defendant** 67:9,13
140:14 217:6

**defendants** 4:14 8:2
99:18 105:21

**Defensive** 117:2

**define** 47:4

**defined** 47:10

**degree** 9:12,16 11:4

**delegation** 55:19 79:8

**delivered** 84:5,6

**demonstrated** 212:4,25

**department** 10:13,18
13:6,9 103:12 104:2 119:9
130:9 146:23

**departments** 52:16

**depend** 131:20

**depended** 27:12 31:2

**dependent** 160:8 167:18
175:6

**depending** 167:16

**depends** 149:6 175:13
204:10,12 205:7

**deposition** 4:1,7 5:5,9
7:15 8:8,11 9:25 39:16
189:4 217:23 218:1,12

**depositions** 5:11,15

**describe** 33:1 44:20
52:10 58:21 90:18 99:14
101:23 196:7

**describing** 55:14 196:8

**description** 13:15 41:8
184:19 188:25

**designated** 83:18

**designates** 54:15

**designed** 179:1,4,7

**desire** 73:25 112:18



Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 66 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                            July 28, 2021

desk 32:17

destination 191:23
192:14

destinations 119:15

detail 12:12,25 15:10,17
16:17 17:18 19:6 134:15

details 134:16 135:8

detain 186:21 187:18
191:12

detecting 174:18

detention 187:8,10

determine 7:22 139:2
140:16 141:11,18 142:1,
19 151:4 155:12 163:3
170:20 173:16,18,20
179:14

determined 114:1,13
115:1 135:11

determines 15:25

determining 89:15
174:15 200:10,16 201:4
202:14

develop 62:2

developed 61:25

developing 31:22 61:25
146:25 147:18

device 59:14

dictates 113:21

difference 63:24 177:17,
21 202:6

difficult 75:8,12 171:5,7

digital 105:14,16,22

digiticket 184:14,17,22

digitized 106:8,11

direct 42:9,10 147:16

directives 78:9

directly 33:15,19 69:17
70:14 78:7 79:7,9 151:23
179:2

director 54:24 62:7
182:25

directory 60:21

disagree 153:2

disapprove 61:11

discharged 10:16

disciplinary 21:19 78:15

discrete 134:21

discuss 22:17 61:1,22
85:18 122:19 124:23

discussed 112:11
123:15 161:20,24 193:4

discussing 73:12 112:17
123:11,22 124:19 212:2

discussion 84:2 95:22,
23 112:2,14 161:6 180:25
181:11,16

discussions 42:4 122:21
123:17 125:2,8 147:2
161:9,12 180:2,16

dispatch 38:21,23 43:15,
17 46:6,10,11 47:12
149:25

dispatcher 44:21 102:13
103:14,19 133:4,9 164:23

dispatchers 46:13,15,17
52:21 103:25

dispensaries 207:21

dispensaries.' 185:16

displayed 190:5

disproportionate
153:19,25 154:6,13,21,25

disseminated 108:3

distinction 56:5,10

distribution 127:22
128:24

district 29:9 210:5

ditch 127:7,9 128:12

division 22:21 142:14

divulge 164:6

document 39:18 135:10
187:21 198:6 210:18

documentation 104:17

documents 92:19 94:1
198:3

dollar 145:6,12

dollars 180:24

door 207:20

download 33:17

dozen 35:8

drew 126:5 181:13

drifted 149:17

drills 12:21,23

drive 5:3 100:7

driver 104:9 136:11,12
149:15 200:12 201:6
202:16 203:12 208:5

driver's 102:4 103:6
104:23 150:14 191:22,23
192:14,24

drivers 97:18 199:5

driving 45:8 50:14 97:13

drug 100:21 196:15

drugs 126:12,13 129:17
207:12

drunk 45:7 50:13 104:9

DUI 32:7 104:25 156:2,3

duly 4:19

dumping 127:7,9 128:11

duties 12:11 14:17 17:10
26:22 28:20 37:18 41:8
77:20 78:24 80:10 87:23

duty 10:24 11:17,21 14:8,
20 33:3 34:22

dynamic 211:25

dynamics 127:17 128:15

---

**E**

e-citation 119:5,7,11
121:16 122:8 184:13,18,
20

earlier 84:22 101:25
108:17 127:23 129:20
141:15 148:18 161:13
169:9 170:4 179:25 180:9
191:6

early 11:20,22 30:6 32:20
35:15 36:12 38:2

easier 64:15 171:11

easiest 45:4

easily 31:21

east 31:4,5

eastern 37:3 80:24 81:25
100:6,11

easy 171:3

edible 96:22

edibles 98:10 99:24

education 8:19 9:15 10:5
27:23 73:7 182:25

educational 24:8 27:5

effect 190:8 194:22

effective 160:24

effectively 46:13

effectiveness 155:4,17,
23 156:3,9

effort 87:22

efforts 87:9,10,14,18 88:7
175:20

electronic 108:13 147:8
148:6 184:20

electronically 107:21
108:3,11 119:12,14,18
150:22 167:10

element 66:19

elements 28:15 143:1
175:23 179:9 214:9

---



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 67 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                        July 28, 2021

**elevate** 17:22

**eligible** 18:3

**eliminate** 18:14

**employed** 79:20 182:20

**employee** 22:3,8,17

**employees** 35:5,9 38:20, 22,23 41:14 42:7 75:18,23 78:5 81:6 130:19

**employment** 9:18 11:7 182:23 183:7

**empty** 82:23

**EMS** 52:7

**enables** 46:12,17

**encompassed** 75:18 80:16

**encompasses** 74:11

**encounter** 167:7

**end** 20:13 166:20 189:11

**endanger** 162:6

**ended** 12:22 20:4 36:21 44:16 59:18 80:2 166:17

**energy** 127:3

**enforce** 54:16

**enforcement** 5:12,16 13:17 14:16 15:5 17:4 21:2 23:14 28:16,20 34:11,13,17,18 37:2 47:1, 9 52:15 53:13 56:21 57:12,25 58:11 59:10,21 60:23 101:15 121:7,14 130:10 136:9 145:4 146:10 154:14 156:3 157:11,13 175:25 179:2,5 181:2,24 182:7,9,14

**enforcing** 170:10

**engaged** 186:12

**enjoying** 183:11

**enlighten** 113:7

**ensure** 15:23 16:1 41:14 53:23 78:9,21 156:22

160:24

**ensuring** 12:13 41:24 54:8 147:20

**entailed** 13:16 14:11 15:17 21:11,16 101:21

**enter** 103:20

**entire** 42:5,14 54:12 65:13 80:15,17

**entitled** 93:16

**entity** 70:16 72:5 157:5

**entries** 51:7

**equally** 53:9 160:17

**equipment** 21:14 41:19 42:15 44:20 91:15 117:3,4

**essential** 121:6

**essentially** 61:11 73:22 74:6

**established** 191:20 192:11,23 193:3

**ethnicity** 163:19 171:24 173:16,20,25 174:4,6 176:19,25 177:12,13,17, 24

**ethnicity-biased** 176:22

**Etran** 218:7,8

**evaluate** 25:13

**events** 44:8 140:14

**eventually** 22:19 49:2 59:10 74:8 112:22

**evidence** 156:25 158:21, 22

**examination** 4:21 184:3 199:20 202:3

**examples** 150:11 171:25

**exceptions** 212:13,14

**excerpt** 197:25

**Exchange** 58:23

**excuse** 14:6 30:20 33:2 117:11 196:3,8

**execute** 36:4

**execution** 35:21 36:7

**executions** 36:1

**executive** 9:18 10:1 65:18 73:19

**exhibit** 39:10,16 55:23 93:5,6,9 94:9 99:5 117:19 184:1 185:1 188:22 193:17 194:9 195:19 196:25 197:21 198:18 206:4 209:9

**exhibiting** 194:20

**exhibits** 39:3 218:9

**existed** 40:1

**existence** 160:9

**expand** 197:8

**expect** 24:10

**expectation** 25:11 94:25 193:24 195:13 198:15,21 206:24

**expectations** 22:5 199:4

**expected** 23:19 26:23 217:21

**expenditures** 78:18

**expensive** 180:22

**experience** 149:16 156:12 157:20 165:23 170:3 174:4 179:1,7 182:7 210:24,25 211:23 215:6,8

**experimented** 120:7

**expired** 190:4

**explain** 90:23 149:7

**explained** 134:4 189:5

**explanation** 94:25

**explanations** 27:1

**expressing** 188:19

**extend** 191:21 192:12

**extending** 193:11

**execute** 36:4

**extent** 92:17 159:7

**extracted** 147:6

**extraction** 148:8

**extraordinary** 212:4,25 213:3

**extreme** 194:20

**extremely** 171:7

**F**

**face** 184:25

**facets** 89:19,20

**facility** 12:14

**fact** 45:1 57:12 97:3 103:25 117:21 125:23 135:14 143:25 157:3 161:20 162:8 169:9 173:10 180:25 181:17 186:13 187:25 194:25 196:24 197:8 206:13,14, 23 207:24 208:2,13 211:13 212:6 215:10,21 216:11

**fact,'** 94:24

**factor** 93:17 145:22,23 189:7 190:4,15 192:24 193:5 196:18 197:1,6 200:8 202:6,22 203:6 206:15 207:6,8

**factoring** 154:23

**factors** 26:17 126:24 128:25 145:24 146:4 173:5 176:5 194:17 195:1 199:24 200:10,21 201:4 202:7,14 203:7 209:22 210:3,12 211:22 215:9 216:19,24

**facts** 156:25

**fails** 71:12,13

**fair** 15:3,7 25:7,8 30:10,21 35:25 43:14 46:3 49:6,15 57:23 87:1 96:5,19 97:14 111:21 114:12,25 116:7,9 122:5 125:17 127:4



Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 68 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                               July 28, 2021

138:16,19 143:19,24 144:5 148:7 155:9,10 160:1,7,20 167:19 168:15,23 169:13 170:24 171:10 172:1 176:16,18,23 199:11 203:17,20 205:12,14,18

**fairly** 5:18 16:5 39:23 47:11 75:21 109:8 148:4

**fall** 10:3

**familiar** 5:18 35:22 46:7 48:7 92:12 105:20 110:12 113:5

**family** 15:24

**fashion** 31:4 184:24

**favor** 181:19

**FBI** 54:15,22,24 57:11 59:1,9,19 60:14,18,21 61:22,24 62:6 64:9 69:10 70:14,15 71:23 72:10 73:7,15,18 74:4 76:20,21

**FBI's** 54:13 75:4

**February** 15:10

**fed** 49:4 51:9

**federal** 9:19 54:16 59:4 64:14 145:4,20,25 146:5

**feed** 64:13

**feeds** 121:10

**feel** 206:11

**fell** 67:4

**felony** 53:3 98:20 128:22

**felt** 25:24 65:10 79:23 125:6 135:8 188:1

**fiancée** 182:25

**field** 11:23 17:2 30:18 31:8 32:15 34:7,16 44:1 76:15,18 80:13 106:6,19 107:4 126:11 133:2,7 181:3,25 182:10

**fields** 123:25 132:21 135:3,6 146:25

**figure** 136:17 145:6

**figured** 32:3

**filed** 7:23 112:21 198:1,3

**files** 53:6 54:18 57:15 58:15 103:6 121:19

**filings** 84:24

**fill** 31:24 32:16 104:25 119:13 133:18 134:20 135:11 149:10 150:20 151:23,25 152:1,2,14,22 156:13

**filled** 135:14 147:24 148:9 167:12,14 168:5

**filling** 32:9 106:5 119:19 152:11

**fills** 119:17

**finalized** 113:20

**find** 57:8 175:5 189:25 197:22

**finding** 192:4

**findings** 59:3 210:23

**fine** 201:10

**fingerprint** 63:5,6 65:24 69:1

**finish** 107:23

**Finished** 89:2

**fire** 52:7

**firearm** 181:13

**Firearms** 117:3

**firewalls** 53:25

**fit** 79:23 98:22

**fitness** 74:14

**flat** 149:10

**floating** 214:10

**flow** 69:20

**focus** 16:12 86:22 97:21 126:19

**focused** 102:19

**focuses** 191:8

**focusing** 127:3

**folded** 185:1

**folder** 92:22

**folks** 65:7 66:20 132:1

**follow** 113:21 117:19

**follow-ups** 199:19

**footnote** 198:19

**force** 167:7,10,12,19,22,24 168:6

**forfeiture** 88:21 90:25 91:2,8

**forgot** 11:1 182:19

**forgotten** 45:9

**form** 22:15 54:23 90:5 96:6 97:23 118:16 133:9,17,25 134:4,14,19 137:4,15 140:25 141:13 142:5 144:18 147:23 148:9 149:10 150:22,25 152:1,14,20 154:1 156:24 167:11,12 168:6 169:15 173:24 175:22,23 204:1 206:18 214:24 216:12

**formal** 8:18 9:15 10:5 73:7 83:9

**format** 105:15,22

**forms** 29:19,20 31:25 32:7,8 102:1 105:11,12,21 135:4 140:5 147:8,19 151:4,6 152:11 156:13

**formulated** 61:13

**formulating** 134:10

**forwarded** 126:15

**found** 126:12 127:2

**foundation** 109:18,22 131:19 132:8 133:19 134:23 144:19 152:15 169:4,24 216:13

**fourth** 194:10

**frame** 19:18 22:1 32:24 35:16,22 36:14

**frankly** 79:7 159:19

**free** 133:9,17 134:19

**freeways** 87:20

**frequency** 51:16,24

**frequently** 36:10

**fresheners** 194:17,18

**front** 44:21 92:22 93:10,12 94:9 117:19 185:4 206:4 209:3,9

**full** 19:12 119:24 120:1 189:24 209:11

**fully** 31:6,9

**function** 142:17

**funds** 91:21

**future** 62:9 113:11

**G**

**gain** 109:9

**Gant** 81:17

**garner** 125:24

**gather** 130:10 142:24

**gathered** 163:15 170:25 171:12

**gathering** 136:22 160:23

**gave** 85:1,6 89:6 90:9 102:9 110:7 193:18 194:5 205:16,19

**gender** 163:9

**general** 13:17 14:17 16:5 21:23 65:19 87:17 91:22 118:6 126:25

**General's** 4:14 112:18

**generalize** 77:21

**generally** 21:2,12 23:8 24:2,15 25:20 29:16 40:4 41:8 42:13 43:6 47:2,10 50:3 61:17 86:16 91:14



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

METROPOLITAN
COURT REPORTING • LEGAL VIDEO

*i10*

114:9 123:14 124:15
135:3,16 145:5 148:13
156:17 172:8 175:4

**generated**  105:22

**generating**  26:5

**generic**  184:18

**gentleman**  81:16

**geographically**  83:24,25

**get all**  103:15

**ginormous**  58:23

**give**  13:15 21:23 23:19
27:15 41:7 85:21 98:3
101:12 106:23 134:21
149:20 151:21 152:4,8
201:10 210:17

**giving**  5:19 24:7 28:11
84:7 85:2 183:13 188:19
191:10 193:23 208:1

**Global**  124:4,11,14

**goal**  25:4,7 64:12 75:17,
23,25

**goals**  23:17 24:18,24
144:2

**good**  4:2 6:18 27:4,5 39:4
41:15 121:5

**goodness**  74:14

**gosh**  19:13

**governing**  61:23

**government**  91:4 122:25
146:5

**governor**  15:24,25 16:13
65:18

**governor's**  15:1,10,17
16:17

**governors**  15:19 17:12,
18 19:6

**grab**  89:2 155:8

**graduate**  8:24

**graduated**  8:19 10:8 14:9

**great**  5:24 9:8 26:21
78:18 98:17

**Greathouse**  4:10,11,22
39:1,14 60:7,9 68:9,12
72:23 73:5 89:1,5 90:6
93:8,11,15 96:9,12,24
98:2 109:20 110:3 114:20
115:8,14 117:8,17 128:19
131:23 132:9,23 133:22
134:1,7,24 137:7,9,20
141:4,20 142:8 143:4
144:21 150:18 152:16,24
154:4,11 155:7,15 157:7
159:12,21 160:16 161:4
169:8,20 170:1 171:14,19
177:6,15 178:7,15,24
179:20,24 181:6,9,22
183:17 195:5,8,16,20
199:18,21 200:22 201:12,
21,24 202:1,4,9,21 203:3,
5 204:5,23 205:10 206:1,
19 208:8,22 210:19
214:16 215:5 216:1,23
217:16,20,25 218:5,10

**ground**  16:4 44:13

**grounds**  165:6

**group**  43:20 47:15 51:5,
12 60:19 61:14 75:5

**groups**  23:20 60:25 61:2,
13 62:1 63:8

**grown**  211:7

**guess**  44:9 45:4 64:11
73:25 82:21 87:12 98:6
113:5 121:23 141:2
156:15 163:25 171:17
177:20

**guesses**  12:9

**guessing**  64:25

**guilty**  152:11

---

## H

**H-O-G-E-L-I-N**  86:5

**half**  20:4

**hand**  59:19 65:6,7 162:4,

8,9

**handcuffing**  167:21

**handful**  65:14

**handling**  114:14 115:2

**handwritten**  105:17
106:14

**happen**  36:6,7,9 107:19
109:16 152:12 180:4
207:25 208:3

**happened**  19:13 77:18
113:12 138:11 146:15

**happening**  87:19 112:14
174:9

**happy**  164:6 192:8

**hard**  6:9 72:12 131:8

**hardware**  57:10 70:22

**Harper**  19:25

**hate**  156:14

**head**  54:2 65:8 122:13
124:17 139:9 147:17

**heading**  188:25 199:5

**headquarters**  22:20
43:24 44:1 50:1

**hear**  47:5 96:8 188:16

**heard**  46:5

**heavily**  113:15 185:14

**heavy**  33:3

**held**  69:6 191:4

**helped**  171:21

**helpful**  126:3,4,6 181:13

**helping**  54:23

**helps**  54:16

**hey**  69:14 77:16 103:13

**hide**  162:1

**high**  8:19,21 9:15 11:14
26:2 51:25 126:20 159:8

**higher**  9:22 27:9 61:5
128:23 167:16

8,9

**highway**  7:4 11:7 13:20
18:10 25:18 36:3 42:1,6
43:18 45:5 52:1,15 69:24
71:2 74:9,24 77:9,22
78:22 83:20 86:8,15 87:3,
19 88:24 89:10 104:9
105:11 107:10 108:9
184:5,17 186:19 187:16,
22 188:20 190:20 192:18
207:23

**highways**  87:4,20

**hire**  183:3

**hired**  13:6

**hiring**  78:15

**history**  41:4 72:1

**hit**  66:19 102:10 119:13

**Hogelin**  86:5 146:24
172:10 188:6,12 190:23
191:2

**hold**  50:4

**holds**  50:3,9,11,12,13,18,
25 51:1 53:1 70:6

**holiday**  156:1

**home**  10:17 185:15

**hometown**  10:18

**honest**  194:19 215:7

**honorably**  10:16

**hooked**  33:12

**hope**  78:24

**hoped**  180:17

**hoping**  72:14

**host**  53:25 54:17

**hosted**  9:19

**hotline**  45:7,8

**hotlines**  45:3

**hour**  39:3

**hours**  141:10 172:18

**house**  72:5



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

METROPOLITAN
COURT REPORTING • LEGAL VIDEO

*i11*

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

**housed** 52:24 65:21 68:5 70:4 71:11

**houses** 43:25 64:9 72:5

**how's** 147:3

**HP** 134:14 135:1

**huh-uh** 6:8

**human** 22:21 86:23 156:17 214:13,14

**hundreds** 99:11 180:24

**Hutch** 19:15

**Hutchinson** 17:1,7 19:17,19 30:24 31:13,19 34:14

**hyphen** 63:14

**hypothetical** 150:9 161:1 171:17 216:7,13

**I**

**ID** 103:22

**idea** 88:5 154:18 203:21

**identifiable** 148:20

**identification** 39:11 71:20,24 93:7 103:17 184:2

**identify** 170:13 172:21

**identifying** 151:15 173:24 216:25

**ignore** 94:24 206:23 207:24 208:3,13,14,16,20 212:16,20

**III** 71:25 72:7,9

**illegal** 86:24

**illegally** 97:20

**imagine** 64:16 66:12 81:2

**immediately** 146:6

**impact** 17:15,18 42:6 107:15 111:10 154:13 181:1

**impacted** 108:9 181:24 182:9

**impacts** 153:19,25 154:6, 25

**impaired** 136:11

**implementation** 49:11 59:20 62:7

**implied** 105:20,24

**importance** 200:8

**important** 59:21 102:2 135:9 157:3,14 160:15,17 161:3 199:23 200:16

**imposed** 113:6

**impossible** 214:13

**improper** 185:24 186:10

**improve** 24:3

**improvement** 24:4,6,10 25:12

**in-car** 25:18

**in-service** 107:24 108:15,22 109:12,17,25 116:21,24

**in-state** 154:20

**inactive** 12:22

**inappropriate** 57:23

**inartfully** 82:22

**incarceration** 118:20

**incident** 46:24,25 58:13 62:24 63:1 64:8,10 65:1, 23,25 66:1,6,10,13 67:10 68:25 106:16 107:11 118:10,13 132:5,20 134:16 143:7 168:12,13 174:9

**incident-based** 46:21,22 47:4,6,8,11 50:11,12 63:4 64:3,13

**incident-by-incident** 132:4 140:19 155:21

**incidents** 104:6 143:16

**include** 24:19 42:1 52:5 150:3 194:17 203:22

**included** 195:1

**including** 59:4 207:6

**inclusive** 97:8

**incomplete** 150:8 160:25 216:13

**inconsistent** 193:14

**incorporate** 122:3

**incorrectly** 190:5

**increase** 156:22

**inculpate** 186:13

**independent** 109:3 217:9

**independently** 22:10 140:15

**index** 60:6 63:17,19 71:20,24

**indicating** 130:3 173:23 211:17

**indicator** 26:21

**individual** 36:8 54:15,20 59:6 70:18 74:2 131:21 147:17 148:21 151:15 155:17 186:11 210:4

**individualized** 165:6

**individually** 85:16

**individuals** 61:20 72:1 74:25 75:6 127:6 142:3 177:23 211:1

**infantry** 11:21,22

**inform** 122:16

**information** 8:14 15:13 29:8,12 31:24 35:7 47:8 52:12,13,19 56:21 57:10, 20,21 58:8,16 59:5,7,11, 12,13 61:8 62:23 64:14 66:23,24 67:8,9,10 68:8 72:17 73:11 84:13 99:20, 21 102:11,14,16 103:10, 15,20,23 105:16,17

108:13 118:7,23,25 119:18 120:9 129:15 133:10,16,18 134:20,22 135:20 136:3,14 147:9,21 148:20 149:12,23 150:1,3, 15,16 151:15,16,20,23 153:8 159:24 160:3,4,5,9, 13,15,17 162:2 163:8,11, 19,22 164:7,8,15,17 165:5,8,17,24 166:4,8 167:3,7 169:21 170:8 175:6,12 176:2 177:22 178:2,5 181:13,21 190:6 197:17,18 213:8,12

**informed** 111:8

**inherits** 55:17

**initial** 164:22

**initially** 18:9 32:14

**initiating** 166:14

**initiative** 109:5

**injury** 168:3

**innocent** 210:3,12 211:22

**input** 51:5 59:20 62:12,23 102:24 103:8,10 104:5 106:18 119:10

**inputting** 102:20 104:1, 16

**inquiries** 59:3 104:12

**inside** 17:21 32:17 39:21 49:19 101:12 132:2 147:5 158:13 172:18

**inspections** 28:9,10

**installed** 33:14

**instance** 205:9

**instances** 182:13

**instantaneously** 104:21

**instructed** 53:17

**instructions** 187:23

**integral** 72:9

**intelligence** 59:13,14


11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

METROPOLITAN
COURT REPORTING • LEGAL VIDEO

*i12*

intend 207:15

intended 59:14

intent 208:5

interacted 176:20

interacting 26:3

interaction 25:14 134:10
166:18,21 205:12

interactions 122:7
138:21 140:4 164:22

interchangeable 83:12,
13

interdiction 21:7 85:12,
25 86:8,13,14,17 87:2,9,
10,14,18,22 88:1,7 120:12
126:17 172:14,19 191:7
199:23 200:4,9 201:3
202:13 203:10,14

interest 98:7,17 109:5
125:24 126:20 138:20
144:11 161:13

interested 91:20 98:9
161:16

interesting 44:9 157:19

interestingly 11:19 18:8
151:2

interface 147:3

interfaced 107:11

interfaces 147:19

interfering 202:2

internal 76:25 78:16
110:23 121:24 139:19,20
142:13,18,21 143:5,6,13
159:20 161:11 179:11
216:2

internally 159:22

international 74:17

internet 49:21 76:8 93:1
161:23

interpretation 199:12

interrogation 76:23

interrupt 179:18

Interstate 71:20,24

interview 84:7 85:1,7,13,
16,20 88:14 89:6,21 90:4,
10 92:5,10 99:18,21
188:3,12 205:16,19
206:15

interviewed 85:21
117:22

interviews 99:18

intricacies 48:19

introduced 181:25

invalidate 138:13,14

investigated 143:13

investigating 216:15,20

investigation 9:20 21:3
23:25 28:18 34:17 47:7
50:13,14 52:25 64:7 68:6,
16 74:13 76:15,18 216:3,
17

investigations 17:5
121:25 146:4

investigative 135:2
162:5

investigator 179:13

involved 78:13,14 102:23
110:15 111:22 122:11
129:1 130:5 142:23
147:20 148:10 164:9
167:13 191:10

involves 87:3

involving 132:15

irresponsive 201:19

issue 84:1,10 85:6 90:15,
19 91:10,21 92:1 96:2,16
97:2 113:15 125:19
126:17

issued 153:3 185:3

issues 56:13 61:2,23
83:25 116:25 126:23
191:15

issuing 28:8

item 70:2 215:22

items 62:22 171:11

J

January 8:17

Jeep 183:10

Jimmie 115:17

job 5:24 10:9,10 12:10,11
15:16 16:2,3 17:6 21:11,
15,25 31:8 34:9 36:2
37:25 41:13 46:13 56:6
77:7,8,12 80:10 131:21
183:5

jobs 18:3,7

John 81:17

join 10:20 61:21

joined 29:22

joint 126:21 127:1,9

Jones 8:4 184:6

Josh 4:11

Journal 85:10 188:4

journalist 188:5

judge 7:6

July 4:4

jumped 79:17,19

June 45:24

justice 9:11 35:7 52:12,
13 58:13,24 64:21,22 72:3

justification 211:18
212:5

justify 186:7 187:8

K

K-9 132:25

K-B-R-S 64:25

K-DOT 41:21,23 105:13

K-I-B-R-S 65:1

Kansas 4:14 5:4 7:4 9:6
11:7 12:25 13:20 17:1
22:15 23:16 32:6 34:2
35:4 36:3 37:2,3,19 41:22
42:1 45:6 47:7 50:11
52:23,24 53:14 55:9 56:21
57:14 64:6,8 65:1,2,4,13,
20 66:10 68:4,6,16 69:5,
24 70:5,6 71:2,17 72:2,18
74:24 77:22 86:8,15 87:3,
4,19,20 88:10,24 89:9
90:15 91:5,6,11 96:2,4,16,
18 97:2,14,21 98:20
99:12,16 100:11 101:16
103:5,6 108:4,9,13 113:4,
12 146:7 175:24 186:18
187:22 188:20 204:14
205:3,21 207:8 208:13,18

KBI 53:2 65:3,4,23 66:5,7,
17,20 68:8,18 69:6,12,14,
17,23 70:4,6,10,13 71:1,6,
13 72:8 76:18 105:13
146:8,24 148:2,6

KBI's 65:7 66:1 69:20
70:22 107:11

KHP 15:6 17:15,21 29:15
32:17 33:16 39:21 47:23
48:10 49:17,19 53:13 66:5
68:7 69:21 71:4,11 72:7
77:5 80:6,11 82:11 85:3
87:25 89:25 90:10,11
91:23 92:2 93:16 101:12,
19 106:10 107:13,14,15
109:4,15 110:10,23
112:17 116:19 118:8,9,16,
19,22,25 119:3 120:9,17,
20 121:2,9 122:6,11
123:10 124:2,13,20,23
125:1,14 126:10 128:5,11
129:7,8,14,15 130:4 134:8
135:19 136:4,21,25
137:10,17,21,23 138:19,
23 139:1,19,21 140:8,22
141:7,23 142:9,13 143:12,
20 144:2,8,14 146:11,20
149:17 151:10 152:7
153:11,18,24 154:5,24
155:3,16,22 156:7,8,11,



Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 72 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                            July 28, 2021

21,23 157:17 158:13,24
159:4,17,23 160:8,24
161:5,15,16 162:12,13,19,
23 163:2,7,18,21 164:8,
14,17 165:5,8,17,21,23
166:3,7 167:2,6 168:4,15
169:2,22 170:3,25 171:21
172:4,13,23 173:8,9,19,24
174:3,12 175:5,13,16,19
176:1,18,25 177:12
178:25 179:6 183:12
191:20 192:10 196:25
199:22 203:10 205:15,16,
19 213:9,14,15,23,24
214:1,20,21 215:18 216:9

**KHP's** 48:15 50:3 65:25
70:8 97:17 100:19 104:17
130:5 139:20 140:2 146:9
147:5,18 175:12 215:1

**KIBRS** 64:7,24 65:7

**kicked** 62:8

**kind** 23:8 34:15 58:6 66:4
77:18 104:4 118:20
129:22 142:10 148:5,16
155:21 162:8 163:1 164:6
167:25 183:21 208:19

**kinds** 18:7 21:3 34:13
62:15 64:18 73:11,14 74:2
76:3 87:10 103:9 106:17
116:23 123:14,18,21
124:18 125:4,5 127:17,21
130:25 131:4,16 140:18
157:15 171:20 172:22
180:6

**Kingman** 14:23 20:1

**knew** 99:17,21 100:1,4
130:19 132:10 135:19
192:21

**knowing** 181:14

**knowledge** 50:6,20,21
51:6 52:6 68:7 87:8,14
108:1 109:9 118:9 134:6,8
136:5 145:8 151:10
156:10 163:4 193:10

**L**

**lack** 109:18,22 131:19
132:8 133:19 134:23
138:12 144:19 152:15
169:4,24 216:13

**lady** 15:24

**Lakeshore** 5:3

**language** 97:5 129:19,22

**laptop** 33:2,3,7 120:1

**large** 16:6 24:22 44:15
73:23 74:11 102:7

**largely** 16:8 96:4,18

**larger** 145:4

**largest** 102:8

**late** 30:5 35:15 36:12

**latitude** 126:16 127:20
129:21

**law** 5:12,16 29:10 37:2
47:1,8 52:14 53:13 56:21
57:11,25 58:10 59:10,21
60:22 88:21,22,23 95:5
100:20 101:15 107:15,20
108:2,4,5,8 109:5,15
113:3,6 121:6,14 130:10
138:10 145:4 146:10,11
154:13 157:11,12 164:18
175:24 179:2,5 181:1,24
182:7,9,14,17 194:3 207:3

**laws** 13:18 29:10 34:18
58:12 155:13 170:10

**lawsuit** 8:4 110:9,12,14
144:14 190:22 198:1,4,13

**lay** 58:3

**laziness** 152:21

**lead** 200:18

**leader** 74:10

**leadership** 9:18 10:2
73:18 74:5,12 76:7

**leading** 142:6 204:19

**leads** 164:2

**learn** 107:23 108:15
109:3,12,25 110:1,4

**learned** 136:8 160:13

**learning** 74:7

**leave** 95:2 194:1 195:15
201:15 207:1,15

**left** 12:24 29:15 31:8
45:18 49:7,12 119:25
120:5 147:11

**legal** 85:11 88:13 89:14
94:23 95:8,21 97:10 98:13
110:17 111:5,8,11 112:1,
16,17 116:25 138:21
146:23 147:20 204:17,22
205:6,22 208:20 210:11,
17 211:3 213:2

**legalistic** 109:11

**legalities** 147:21

**legalization** 99:1,6,10,15

**legalized** 95:16,25 97:3
208:15,23 210:6

**legally** 207:17 211:7

**legislative** 125:24

**legislature** 90:23 91:1,11
146:8

**legislatures** 91:7,20

**lend** 127:21

**length** 166:8

**Leslie** 4:10

**letters** 157:10

**level** 9:22 40:23 54:21
57:23 61:8 79:10,13 84:3
91:2 98:18,20 145:2,7
161:10 167:24

**Lewis** 185:2 189:4

**license** 68:3 88:6 93:17
102:4 103:6,18 104:23
113:15,16 149:12 150:3,
14 187:11,17 189:11,19,
20,21 190:3 191:25 193:4

194:8 196:17 197:1,6

**lieutenant** 16:24 17:8,11,
15,25 18:2,7,23,24 19:1,6,
10,12 22:19,23 38:15,17,
24 42:10 77:5 78:6 79:16
80:3,7 83:3,8,14 84:8 85:2
108:1,7 110:15 116:14
122:10

**lieutenant's** 42:8

**lieutenants** 18:15,16,17,
19 40:12,16 41:1

**likewise** 80:24

**limited** 50:5 123:1

**link** 49:16

**linkage** 49:3

**linked** 43:6 45:1,11 46:1

**list** 28:14 62:21 135:7

**listed** 10:6 76:3

**literally** 70:21 75:10

**litigation** 184:6

**live** 5:3 149:24 211:2

**local** 13:17 61:16,17,19
70:16

**locally** 121:20

**located** 32:12 37:10 44:1,
5,6 46:19 129:6

**location** 67:10 131:7

**locations** 37:24

**logged** 46:14

**logging** 46:12

**long** 13:8 14:4,19 16:16
18:18 20:11 36:15 37:25
41:6 70:9 73:19 186:24

**longer** 55:5 217:21

**looked** 12:10 28:4,7,10
84:23 120:7 157:18,25
158:2,3,8 170:19

**lost** 159:12 195:17

**lot** 21:19 22:11 29:6,7,8



Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 73 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                            July 28, 2021

30:3 36:8 48:22 65:12
74:14 75:11 79:5 81:7
105:5 123:4 125:22 150:6
181:15 183:2 184:9
195:25

**lots** 126:8 170:12

**loves** 71:23

**low** 51:25

**lower** 27:10

**LPR** 68:3,8

**luck** 183:4

**M**

**made** 11:12 18:23 33:12
70:9 79:10 88:3,8,11
111:18 112:3 113:9
114:14,17 115:2,6,21
131:11 135:15 136:7
151:2 162:3 165:14 183:3
188:12 198:13

**maintain** 70:10

**maintained** 37:13

**maintains** 57:11

**major** 79:19 80:4,15,18,
20,24,25 81:12,18 82:9,
10,14,17,22 96:2,16

**major's** 82:19

**majority** 87:2,21

**majors** 79:8,20 80:5,9,12
81:10 111:9

**make** 5:20,25 6:6,14 12:9
19:12 22:20 31:15 54:2
55:11 56:15 63:23,24
66:11 67:24 72:12 103:16
104:12 111:12 114:6
116:4 122:14 126:11,12
129:17 131:16 135:12,18
137:2,12 140:23 143:22
151:12,21 158:24 163:25
164:4,5 171:7 176:7 199:9
200:20 216:21

**makes** 43:2 72:2 151:19
190:24

**making** 21:13 44:7 56:20
57:19,24 62:16 64:11
86:11 138:20 153:12,16

**male** 132:16

**manage** 55:20

**managed** 38:22,24 51:18
52:2,20 53:2 65:2,5,22,23

**management** 48:8,11,16
50:8 105:3 106:15 107:10
118:11 119:2 121:18,21
180:23 215:4

**manages** 49:19 64:7
65:13 68:16

**mandated** 59:1

**mandatory** 74:4

**manner** 25:1 105:16

**manpower** 15:22

**manual** 29:18 32:9 129:7,
8,12,15,23 130:2

**March** 93:21 197:15,16

**marijuana** 89:14 95:2,11,
12,13,16,17,25 96:3,17,22
97:4,10,13,18 98:7,10,13,
15,20,23 99:1,6,10,11,24
100:9,10,16 127:15 128:6,
9 185:15 194:1 195:15
196:10 198:23 199:7
204:16,22 205:5,22 207:1,
7,18 208:15,19,20,24,25
210:6,11 213:3

**marijuana-legal** 207:7

**Marine** 10:10,15,20 11:9,
20,23 12:1

**Marines** 10:14 11:18

**Marion** 5:4

**mark** 39:4 93:4,25

**marked** 39:5,10,16 93:6
94:1 184:1 185:1

**marks** 198:15

**Marshal** 36:20

**Marshals** 35:13,17 36:18

**Maryland** 12:3

**Marymount** 44:13

**Master's** 9:22

**material** 158:1

**matter** 187:17

**mattered** 138:6

**matters** 70:17 78:13,14
83:22

**meaning** 17:2 45:15
53:11,17 57:6,19 59:11
61:17 65:22 69:8 86:18
146:23

**means** 46:24 56:2 106:12
109:24 148:6 169:17
211:4

**meant** 18:2 55:1 91:8

**measure** 157:22 160:7

**mechanical** 143:2

**media** 74:13 76:12 160:5

**medical** 185:15

**meet** 22:2,3,7,16 61:22
85:17,18 158:13,17

**meeting** 53:23 111:1,4
112:11

**meetings** 22:12 37:21
42:4 54:21 65:9 111:7
112:7

**megahertz** 43:4 51:14,
16,17,19 52:3

**member** 61:4

**members** 146:22 161:10

**memory** 32:22 33:13
92:8,11 124:9

**men** 27:15 78:22

**mention** 35:20

**mentioned** 17:7 36:11
51:14 64:24 73:7 108:17
127:8 129:20 141:15
143:5 150:19 170:4 188:2

**mentioning** 36:19

**mere** 186:19

**merits** 161:24

**met** 41:25 58:17 61:1
147:21 184:7

**methodology** 173:13,14

**methods** 142:20

**Metropolitan** 4:3

**mic** 135:24

**microphone** 135:25
136:11

**mid** 13:19

**middle** 30:9,19 197:14

**mild** 21:18

**million** 78:19

**millions** 75:10

**mind** 92:24 93:13 146:6
194:7 214:14

**minorities** 126:1

**minus** 43:18

**minute** 67:5 72:24 89:22
155:6 177:10 197:9

**miscellaneous** 133:5

**misconduct** 122:1

**misdemeanor** 53:1
128:22

**missed** 195:17

**missing** 67:14

**Missouri** 36:22 37:3

**misspeak** 176:17

**misspoke** 137:5

**misstatement** 210:16

**Misstates** 97:24

**mistaken** 177:13

**misuse** 53:12,18

**misuses** 58:2



Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 74 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                            July 28, 2021

**mobile** 32:19,21,25 101:4,9,19 102:12

**model** 103:16

**module** 139:13

**moment** 179:19

**money** 91:21

**moneys** 90:25 91:12

**month** 141:25

**monthly** 111:7

**months** 11:25 26:10 36:15 73:21 88:9 132:22

**moon** 4:7,18,25 5:1 37:2 39:10,15 93:6 94:24 184:1 217:18

**morning** 4:2

**morphed** 18:18

**motion** 201:20

**motorist** 149:9,23 186:21 187:18 207:10,11

**motorist's** 149:11

**motorists** 28:11 154:20, 21 187:9,10 206:7 207:14

**motorized** 87:15

**mouth** 175:9

**move** 7:12 17:24 99:15 176:14 177:9 189:1 200:22 209:15

**moved** 15:13 37:22 99:11 158:21 163:13,16 201:9

**movement** 31:22 96:3,17

**moving** 67:24 81:4 178:18 190:13

**multiple** 26:16,19 100:14 131:18 170:19 214:9

**myriad** 28:13 157:24

**N**

**N-DEX** 58:19,21,22 59:20 60:2,3,5,10 61:24 63:7,12,

20

**named** 82:14,16

**names** 81:22

**narcotic** 211:2

**narcotics** 35:21,25 86:23 98:18 126:19,23 207:15 208:19 211:1

**Narrative** 134:13

**nation** 15:19 59:22 99:22 103:21

**national** 52:18 54:21 57:9 58:23 64:10 68:20,25 69:7,18 70:22 71:2,16 73:18,19 74:16

**nationality** 163:22

**nature** 60:25 87:23

**NCIC** 52:19 53:1,7 54:17 57:15,16 61:12,23 63:3,10 64:3 65:23 68:21,24 69:23 70:7,9,11 71:5,12 72:8 102:2 103:5,10,21 104:12

**Nebraska** 80:22

**necessarily** 27:9 138:13 140:7 153:17 154:22 164:24 170:16 200:6 211:2

**necessitated** 37:19

**necessity** 111:11

**needed** 21:14 24:24 37:15,20 65:11 79:10 89:15 114:13 115:1 183:2

**needing** 125:2,19

**negative** 194:16

**nervousness** 194:20

**News** 7:17

**newspaper** 199:13

**NIBRS** 64:9 68:24 69:3

**Nissa** 4:15

**non-ncic** 69:22

**non-responsive** 200:23

**normal** 86:19

**north** 19:25 44:2

**notes** 121:19 135:8

**notified** 69:13

**notion** 211:17

**number** 22:4 23:25 24:20,22,25 26:2 28:2 32:3 42:2 49:24 62:5 74:11 75:19 88:3,8 97:9 99:23 103:17,18,22 105:12 125:21 127:5 128:23 131:2 150:23 164:9 194:18 217:11

**numbered** 134:14

**numbers** 24:2 45:2

**numerical** 25:6

**numerical-based** 25:4

**numerically** 24:11

**numerous** 63:7

**nut** 185:21

**nutshell** 21:20,22

**O**

**OAG017625** 39:17

**oath** 4:19

**object** 7:4 90:4 96:6 97:23 137:4,15 140:25 141:13 142:5 144:18 152:20 154:1 156:24 160:11 161:2 169:15 204:1 206:18 214:24 216:12

**objected** 133:24

**objection** 7:8 90:2 96:10, 20 133:23 134:2 142:12 154:8 214:8

**objects** 7:7

**obligated** 134:5 201:10, 17

**observing** 135:25

**obtain** 180:17

**occasion** 181:12

**occasions** 5:9 127:5

**occur** 22:11 87:9 122:15

**occurred** 67:11,12 79:12 172:9

**occurrence** 168:24

**occurring** 42:11 165:18

**occurs** 29:10 108:16 207:24

**off-duty** 35:14,17 36:11, 17

**offense** 32:7 50:14 59:12 66:9 134:17

**offered** 101:15

**offers** 200:3

**offhand** 173:1

**office** 4:14 32:13,16,17 33:4,18 35:13,17 37:12, 13,14 43:21 106:10 112:18

**officer** 13:7,12 28:22 33:7 37:18 38:9 47:1 54:14 55:3,6,8 57:24 59:18 65:4 69:5 84:6 126:5 181:12 215:2 216:15,17,20

**officer's** 67:9 155:11 186:6

**officers** 60:24 75:11 83:23 162:6 181:2,24 185:13 186:4 192:21 213:18

**officers'** 211:23

**official** 50:24 61:17 103:15 121:18,20 128:10 136:14 162:12,17 213:22

**officials** 41:24 182:9

**officing** 37:11

**oftentimes** 26:20 46:15 158:18



Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 75 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                               July 28, 2021

**Oklahoma** 80:22

**one's** 17:23

**ongoing** 146:4

**online** 7:25

**Open** 88:10

**operate** 43:3

**operated** 59:6 118:8

**operation** 41:13 42:14

**operational** 41:25 42:12

**operations** 78:2,3 80:19 81:2 91:13,15,22

**opinion** 29:6 98:6 110:7 113:23 160:10 161:2,3 162:19,23 189:16 199:3 209:3 210:17 214:8,25

**opportunity** 74:18 218:2

**opposed** 16:9 57:25 87:10 102:20 134:21

**order** 17:22,24 57:8 146:21 147:9,25 148:1 157:17 158:10,11,13 159:22 170:20 172:24 176:2 218:11

**ordinarily** 79:25

**Oregon** 97:9

**organization** 81:3 121:7

**organizational** 39:20,24, 25 40:23 55:24

**organized** 40:6

**origin** 177:18 191:23 192:14

**originally** 19:5,24 20:2 33:23

**originating** 163:12

**ounce** 98:13 100:18

**ounces** 100:15

**out-of-state** 93:17 97:21 154:20 187:9,11,17 191:24 193:4 196:17,25 197:6 199:5 205:20

**outcome** 165:25 166:4 167:17

**outlined** 160:5

**oversaw** 35:3,4,6 41:12 42:14 51:13 86:8

**overseeing** 72:19 78:18 147:18

**overseen** 38:24

**oversees** 55:16 78:2,7,8 119:7

**oversight** 22:11 61:5

**overview** 16:7

**owned** 41:21

---

**P**

**P000128** 94:1

**paid** 183:8

**paint** 206:6

**painted** 206:12

**paper** 105:8,25 106:4,9

**paperwork** 104:24 105:1, 2,5,20 106:13

**paragraph** 94:21 96:25 99:4 185:9,22 189:24 190:24 191:18 192:9 193:21 194:10 196:8,14 198:8,9,12,19 209:7,12, 14,15,16,20 210:14 212:1

**paragraphs** 94:17 117:24 189:2 190:14

**parole** 118:22

**part** 20:23 36:2 43:15,18 44:2 51:11 58:18 72:7 80:17 82:11 83:19 97:3 100:6,11 106:15 121:6 122:14,19 123:9,16 124:20,22 125:1 128:4 129:14 136:25 137:10 139:24,25 140:3,9,12 143:21 144:7 146:11,17 147:13,16 151:10 157:2 166:7 191:9 195:24 200:2,

5 203:23 211:14 213:14, 24

**participated** 54:20

**parts** 81:4 180:2

**passed** 41:6 146:12,17

**past** 152:12

**Patrick** 4:3

**patrol** 7:4 11:7 13:20 18:10 25:18 31:3 35:2 36:3 42:1,6 43:18 45:5,18, 20,24 48:20 51:2,18 52:1, 15 65:22 71:2 74:9,24,25 75:6,13,15 77:9,22 78:8 79:17,24 81:3,7 82:10 83:15,20,23 86:9,16 87:3, 19 88:11,20,24 90:16,19, 23,24 91:3,12,13 98:17 101:14 103:11 105:11 108:9 113:21,24 114:14 115:2 121:17 147:11 150:25 153:21,25 154:6, 19,25 155:24 156:1,6,21 157:19 158:17 159:7,8 161:13 162:1 165:24 166:7 171:2,22 172:5,25 174:13 177:25 182:22 184:5,17 186:19 187:16, 23 189:10 190:20 192:18 200:3 207:23 214:3

**Patrol's** 41:3 69:24 87:23 89:10 98:5,8 105:23 107:10 114:6 130:2 178:1 188:20 210:24,25

**patrolman** 10:13

**pattern** 170:13

**patterns** 169:23 171:1,21 172:5,24

**pause** 89:1

**pay** 183:4

**paying** 79:5

**peer** 54:21 61:21 159:10

**pen** 22:14 148:4

**pencil** 148:4

**pending** 6:25

**people** 40:19 42:15 43:10 44:19 55:25 56:1,10 65:8 81:5 89:12 95:1 97:12 99:21 102:9 107:14 125:25 131:16 163:19,22 165:21 173:16 177:1 188:4 193:24 195:13 198:21 206:24

**percent** 34:10,12

**percentage** 87:9,18

**perform** 23:23

**performance** 21:18,24 23:3 26:20 27:19 168:16

**performed** 22:9 169:1

**performing** 23:13 148:14

**period** 20:3,20,24 23:4,5 26:8 35:15 75:22 115:22 141:25 142:1 154:19 182:24

**permissible** 187:7 212:7

**person** 54:14 57:7 58:3 75:14 77:25 88:16 116:11 126:13 149:20 151:16 163:8 173:21 194:18 195:4,10 196:3,4,6 199:24 203:22 204:16 205:5

**personal** 5:14 52:1 57:24 58:5,7,9 67:13 98:7 126:22 127:20 148:20

**personally** 109:14 111:19 161:25 172:16

**personnel** 21:18 38:21 52:22 75:3 78:3,4,21 79:24 80:13,14 83:24 171:6

**persons** 62:20 102:5 174:1 176:19

**pertained** 108:13

**pertaining** 129:12

**pertains** 139:4

**pertinent** 103:16 135:9



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

METROPOLITAN
COURT REPORTING ♦ LEGAL VIDEO

*i17*

Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 76 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                            July 28, 2021

**Peter** 110:9

**phone** 77:15 120:3

**phones** 120:6

**phrase** 46:2,6,7 48:7
63:12 95:7 118:12,13
154:12

**physical** 70:25 71:1
74:14 149:24

**physically** 32:12

**picture** 206:6,11

**piece** 41:17 57:10 63:3,4
64:3 70:21 72:9 196:16

**pieces** 66:16 109:11,12

**Pierson** 4:11

**piled** 156:18

**place** 120:16 129:11
134:18 164:15

**plaintiffs** 4:12 198:1,3,13

**plate** 68:3 103:18 113:15,
17 149:12 150:3 187:11,
17 189:11,19,21 191:25
193:4 194:8 196:17

**plates** 88:6 93:17 189:6,
20 190:3 197:1,6 199:5

**platforms** 64:16,20

**play** 145:25

**pleased** 124:13

**plugged** 33:3

**plural** 143:16

**PM** 72:25 73:3 117:12,15
178:22 218:12

**point** 6:19,23 7:4 14:5,13
20:3 22:18,22 30:3 31:6
33:25 35:12 36:2 40:19
61:3 81:16 82:8,9 95:21
96:3,17 113:1 116:18
117:9 119:25 128:15
145:17 146:7 197:4 210:7
211:8

**police** 10:13,18 13:6,7,9,
11 28:22 52:7,16 54:4

57:14 59:22,23 61:17
65:12,20 71:5 72:5 74:7,8,
10,16 75:9 77:1 103:12,14
104:2 159:22 160:8

**policed** 57:14

**polices** 159:7

**policies** 58:12 62:10,17
110:23 129:5 158:4,7
161:21 162:2 187:23
213:20

**policing** 16:9,12 174:6
175:20 176:8,22 205:12

**policy** 54:23 61:1,3,6,9,
10,11,23 62:2 63:9 70:15
78:13 84:2 111:12,14
115:6 129:2,4,7,8,11,15,
16,23 130:2 152:7 158:19
164:25 166:3 168:5
186:19,23 187:14 190:19
213:17,22

**political** 65:15 90:15,19
91:4 92:1 97:2 144:23

**politics** 84:1

**populated** 135:3

**pornographer** 36:21

**port** 33:4

**portable** 120:2

**portion** 43:11 44:3 55:24
80:21 96:14 114:22
159:14 201:1 202:11
204:25

**pose** 90:1 214:7

**position** 18:14,16,17,19
38:3 41:18 42:9 80:1
81:13 82:16,17,19 89:10,
24 90:10 97:17 98:5
100:19 110:13 126:10
128:10 140:2 186:18
188:20 191:3 210:22

**positions** 40:25 82:20
84:5

**positive** 194:16

**possess** 98:14

**possibly** 72:13 155:19
171:18 197:18

**potential** 135:20

**pound** 98:19 127:15,23
128:2,5,9

**pounds** 98:15 99:11
100:9,14 207:17,18

**powerful** 160:14

**powwow** 85:18

**practical** 78:22

**practice** 158:20 172:6
187:9,15 190:19 192:21
193:10

**practices** 157:23 162:2
169:23 171:1,12,22 172:5,
24

**Pratt** 8:21 10:13,17 13:1,
5,7,9 20:6

**preceding** 88:4,9

**precisely** 48:18

**preface** 113:23 124:16

**preparation** 7:15 8:8

**prepare** 104:24

**preparing** 104:16,19

**presence** 194:17

**present** 39:24 45:16
188:9

**president** 12:14 15:21
16:15

**presidential** 12:3,25

**press** 84:8

**pretense** 187:7

**pretext** 187:2,3

**pretty** 30:9 66:7 126:16
157:21 191:16

**prevalent** 58:4,7 102:1

**previous** 99:17 130:13,
22

**previously** 162:18 185:1

**primarily** 12:13 14:11
15:23 16:12 37:13 38:20
43:21 52:24 65:15,23
66:8,9 98:9 103:5 108:24
126:18 147:17 168:13
179:4 206:5

**primary** 47:14 109:24

**printed** 7:16 92:7

**printouts** 94:4

**priorities** 123:1

**priority** 123:2

**prisoners** 35:18

**probability** 128:23

**probable** 134:9 137:1,5,
17

**probation** 118:23

**problem** 69:13 134:4
142:25

**problems** 69:9

**proceedings** 111:11

**proceeds** 91:2 145:3,4

**processors** 30:4,5,21

**produced** 94:1

**products** 96:4,18 97:14,
19 100:9

**professional** 33:11

**proficient** 27:3

**profiling** 125:23

**program** 9:24 10:2 68:14,
15 73:7,10,16,17 74:19

**programs** 23:20 28:12
34:17 68:18

**project** 60:16 147:14

**promoted** 15:1 16:24
17:7,11,14 20:14 34:20
81:15 82:19,22

**promotion** 37:9 38:2



BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

**promotions** 17:23

**proper** 97:25 98:3 144:3 199:14

**properly** 141:19 170:10, 22

**protection** 53:25

**protective** 15:2,18 16:1, 9,13

**protocol** 114:17 115:7,10

**protocols** 53:24

**provide** 93:18 99:20 169:14 197:2,13,17

**provided** 16:3 22:15 57:20 58:10 64:22 105:21 147:9 190:23 202:20 207:18

**providing** 41:14 104:16 148:6

**proximity** 46:19

**public** 23:19 25:14 26:4 41:16 46:25 51:18,21 52:2,4 83:23 84:6,15 122:7 134:10 138:21 140:4 144:9 153:20 159:5, 18 160:14 161:7,18,22 162:3 164:3 179:2,7,11,17

**publication** 15:9

**publicity** 125:22

**publicized** 109:8

**publicly** 129:9

**published** 93:21 197:16

**pull** 132:21

**pulled** 51:9 91:22 104:9

**pulls** 49:4

**purchase** 95:2 98:14 99:24 194:1 195:14 196:10 198:23 206:25 213:2

**purchased** 97:18

**purpose** 168:22 191:6

**purposes** 44:7 63:11 86:11 150:24 179:2 188:13 208:18

**pursuits** 51:1

**purview** 111:24,25

**pushed** 51:9 166:11

**put** 44:14 58:5

**puts** 209:23

**putting** 56:22 58:16

---

**Q**

**qualified** 146:3

**qualities** 127:17

**quality** 56:8,12,20

**Quantico** 73:21

**quantitative** 169:14

**queried** 103:21 132:17

**queries** 57:19 102:4,10, 20 131:11,16

**query** 57:24 104:22 132:3,6

**question** 6:1,19,20,25 17:17 30:16 48:18 50:20 55:22 81:21 84:20 87:16 90:8 96:11 97:24 99:3 100:24 107:1 108:6 114:19,21 116:2 117:18 122:3 124:16 128:3 130:13,22 131:25 133:20 137:8,16,19 138:18 145:18 146:3 151:18 153:23 156:16 159:13 164:1,2 171:16 180:9 181:10 200:2,5,7,24 201:18,23,25 202:2,10,18, 19,25 203:4,9,16 204:24 216:14

**questioning** 199:24

**questions** 6:18 7:5,11 42:18 85:22 163:1,4 177:9 178:8,11,13,17 183:18,22 184:10 199:17 203:11

209:2,7 213:7 217:18

**quick** 179:22

**quickly** 19:10 184:12 197:19,21

**quota** 25:9

**quotas** 23:15

**quotation** 198:15

**quote** 94:21 189:8,11 193:21,22 194:4,5 196:13 211:14

**quoted** 7:17,23 8:5 99:5 190:14

**quotes** 193:18 198:14

---

**R**

**race** 171:24 174:6 177:12, 14,17,24

**racial** 117:1 125:23

**radio** 41:18,21 42:24 43:4 44:25 51:13

**radiofrequency** 33:24

**radios** 42:2,3,24

**raised** 201:20

**ran** 57:5

**Randy** 4:7,18,25 37:1

**rank** 14:14 16:24 19:10 79:19 80:3 191:4

**ranks** 79:18

**ratio** 20:22

**re-ask** 87:16 116:2 153:23

**reach** 79:10 184:25

**reaching** 75:25 79:13

**read** 7:19 92:8,11,14 94:20 96:12,15 114:20,23 159:13,15 186:16 187:5, 12,13,24 192:6 198:2 200:24 201:2 202:10,12 204:23 205:1 211:9

**reader** 68:3

**reading** 94:6 198:10

**ready** 11:14

**Reagan** 12:5

**real** 179:22 197:21

**realistic** 69:11 83:21

**realistically** 86:21

**realized** 64:1 100:25

**reallocated** 18:22

**reallocation** 18:21

**reason** 57:25 136:25 137:10 142:14 165:9 189:22

**reasonable** 136:2,22 137:6,11,18,22 138:1,24 139:4 140:6,10,16,24 141:8 142:2,15 143:1,9, 15,23 144:4,16 173:5 174:15 186:14,20 187:18 190:13 191:21 192:11 193:12 194:11,14 200:14, 19 203:23 204:8 208:2 209:23 210:12 211:21 214:4,20,22 215:3,10,20, 22 216:5,10,25

**reasoning** 186:6

**reasons** 65:15 131:3 152:13 170:16

**recall** 30:24 35:23 49:13 67:20 76:4,19 84:24 86:3 92:4 110:8,22 111:1 112:2 117:5 123:11,14,24 124:18 125:2,8,19,21 129:14 130:25 131:4 144:24 146:14 147:24 158:3 162:20 167:24 168:4 180:10,15 182:7 198:2 203:15 209:4 213:6

**received** 15:13 24:22 37:8 77:7 92:9 103:22 108:12 174:5

**receiving** 25:15

**Recess** 39:9 73:2 117:14 178:21



Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 78 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                               July 28, 2021

recollection 36:22 67:16,
19 85:17 132:25 189:13
197:12

recommendations
216:21

record 4:5,9,24 6:1,3,14
7:6,8 39:8,13,17 48:8,15
50:12 63:11 72:24 73:1,4
88:10 93:25 96:10,15
106:15 107:3,10 114:23
116:4 117:13,16 132:24
133:17 134:9 135:19
136:3,22 137:1,11,17,22
139:12 153:3 156:2
159:15 174:25 178:20,23
183:25 189:1 201:2
202:12 205:1 216:4
217:24

recorded 4:6 56:22
166:10 167:9 172:23
173:8 182:8 215:4,11

recorder 135:24

recorders 138:5

recording 136:20 137:25
140:4,5 173:4 176:19
182:4

recordkeeping 121:6,14
122:6 158:4,7 160:23

records 48:11 50:8,12,
13,14,15,17,25 63:25 72:1
93:18 104:23 105:3
106:15 118:11 119:2
121:17,21 139:14 153:19,
25 154:6,25 155:4,16,22
156:1,8 161:17 180:23
197:2,13 215:4

recreational 97:4 100:8,
16

recreational-use 100:10

reduce 24:25

redundancy 71:13

refer 94:18 157:25

reference 46:2 195:18

references 198:19

referencing 98:25 99:5

referred 40:15 55:25 56:1
73:18 83:2,8

referring 35:24 60:1
88:10 95:10 185:11 189:5
195:11

refers 95:17 189:12

refresh 92:7

refreshed 92:11

refreshing 124:9

regard 42:22 118:7 124:5
129:24 130:24 132:25

region 61:15 80:12,15

regional 51:12

regionally 80:14

registration 102:5 103:7
104:24 150:15 163:15

regular 12:20 36:2 161:9
168:11,24 172:9

reiterated 196:17

related 60:16 69:23 79:23
80:13 87:22 88:14 89:19
106:6 119:3 126:19
158:19 216:3

relates 42:16 105:11
154:13

relating 112:5 121:25

relation 5:12

relations 83:23 84:6,15

relevant 53:9 184:11

rely 185:13 213:17

remember 18:12 31:5,12
51:8 76:10,11,22 77:2
92:10,15 111:3 123:21
124:3,10,11,25 125:5,11
129:25 132:13,18,19
133:6 143:18 148:1
150:23 157:9 158:1,7,23
159:2 166:5 168:1 175:23
176:12,15 180:8,12 181:8
182:13 190:7,16 193:23

194:21 196:20 198:10
211:7 215:21 218:10

remembered 147:10

remembering 136:13

rendered 28:12 150:24
151:6 191:20 192:10

Reno 19:25

renovation 44:12

rephrase 30:16 108:6
122:2 128:3 137:7 145:18
151:18

report 21:19 29:16 31:1,
20 81:10,12 82:4 107:3
118:13,14 134:11,17
150:21 155:12 167:22
215:2

reported 38:16,25 61:2
66:25 81:14,16,17 128:8
164:21 185:17 199:12

reporter 4:16 6:9 63:23
85:21 87:24 92:5,16 96:15
114:23 128:7 159:15
188:13 197:5,11 199:13
201:2 202:12 205:1 218:6

Reporters 4:4

reporting 46:21 47:4,6,
11 63:4 64:3,8,10,13 65:2,
24 66:1,2,10 68:14 69:9
71:16 76:25 79:4 82:9
107:12 120:4 167:25
173:11 174:4 175:17,20
176:8,12

reports 28:19,23,25 29:4,
11,12 32:7,16 66:23 76:25
77:1 106:5 107:9 118:10
136:14 142:22 156:4
164:11

repositories 70:6,10

repository 121:18

represent 65:10 184:5

representative 60:19

represented 61:15,18

request 85:9 130:16

132:14 189:1

requested 36:6 90:23
96:14 114:22 131:20
159:14 201:1 202:11
204:25

requests 88:3,4,9,10
130:25 131:1

require 163:25

required 28:23,25 29:9
46:16 104:25 105:12,13
147:21 152:4 164:25
167:25 171:6 173:11
175:21 191:21 192:12

requirement 146:21
175:24

requirements 29:17
58:17

requires 29:11 46:25
74:5

research 8:1

researched 8:3

reserve 10:25 12:23

Reserves 12:17

residence 186:13,20

residency 89:19 113:17
185:14 200:18 211:18
212:5,13

resident 185:10 186:14

resigned 45:20

resistance 168:2

resistant 156:12

Resources 22:21

respective 32:13 61:13

responders 52:7

responsibilities 37:21
41:20 191:9

responsibility 17:3 47:7
51:5 68:13 69:5

responsible 54:8 65:5
68:1,3 69:12 70:8 71:19


11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

METROPOLITAN
COURT REPORTING • LEGAL VIDEO

i20

Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 79 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                               July 28, 2021

132:13

**restate** 90:7 96:11

**result** 60:11 99:11
11:14,18 120:21 121:3
125:10,16 144:17 158:24
166:13 214:6 216:3

**resulted** 92:5

**resulting** 120:10,17

**resume** 39:6

**retired** 45:22,23 81:15,17
129:10 182:22

**retirement** 183:11,12

**retreat** 12:3

**retrieval** 130:5

**retrieve** 130:16 132:2

**returning** 199:6

**revealed** 162:6

**review** 21:24 22:4,13,15,
18 23:4,5 25:19 26:8,12,
18 140:6,9 142:1,10
155:12 168:9 170:5
172:17 173:8,20 174:8,12
178:8,11,16 215:2 216:9
218:1,3

**reviewed** 167:15,16
173:16

**reviewing** 21:19 22:23
25:22 27:13 143:6 170:12

**reviews** 21:18 24:19
78:16 140:18 168:16
170:6

**revise** 62:1

**revised** 63:9

**Rice** 19:24

**rid** 126:13 128:11 129:16

**ride** 22:8

**rights** 144:9,12

**rise** 208:1

**RMS** 48:11 49:4,12,20
50:3 51:6,9,10 121:10

122:8,12,20 123:11,16,19,
23 124:1,5 125:6 148:9
151:8,9,24 163:2,8,13,16
166:11

**road** 11:25 14:16 15:4
34:16 127:14

**Robinson** 4:3

**robust** 33:24 41:24

**rock** 183:10

**role** 13:12 51:11 54:11
55:17,18 59:17 61:7 79:3
83:1,2 84:3,4 130:8,14
160:24

**roles** 56:6

**rolled** 20:15

**rolling** 31:3

**room** 44:17 201:15

**roughly** 11:8

**routine** 191:16

**routing** 91:3

**rows** 56:10

**rule** 7:6 134:5

**rules** 5:20 7:12 58:11,17
102:17

**run** 102:3,9

**running** 102:20

---

**S**

**safe** 16:2 44:8

**safeguards** 53:24

**safety** 23:19 28:10,12
34:17 45:6 51:19,22 52:2,
5

**Salina** 32:1 35:4,9 37:11,
13,24 43:21 47:25 48:2
71:12,14 88:25

**Sarah** 88:18 188:8

**saved** 48:15

**scale** 15:21

**scan** 106:13

**scanned** 106:11 218:9

**scenario** 210:2 217:1

**scene** 105:1

**school** 8:19,22 9:15
11:14 45:6 74:15 126:21

**schools** 23:20 27:4

**screens** 44:25

**search** 35:21 36:1,7
89:16 113:10 114:8 126:6,
7 153:9 165:18 167:3
172:5,24 186:7 187:8
191:13 200:11,18,20
201:5 202:15

**searches** 36:1 89:19
90:11 114:15 115:3
120:10,17,21 121:2 154:7
156:9 214:5

**searching** 206:12

**secondary** 108:25

**Secret** 15:20 16:14

**section** 19:23 49:21,22,
23 53:16 131:17 133:5,17
134:13,19

**sections** 35:2 53:16 81:7

**secure** 12:14

**security** 12:2 15:10,17
53:21 76:8

**seek** 162:9

**seeking** 57:21 157:5

**seized** 126:8 145:21

**seizure** 126:6 127:24
128:6,12,16 145:2,3,19,25
146:1 148:10 153:16
186:7

**seizures** 90:15,20 91:12
92:2 96:23 120:10,13,15,
18,21 121:3 126:20
144:23 145:17 146:9,10

**selected** 11:22 73:20
77:8 79:21

**selects** 74:3

**semi** 61:22

**send** 75:17,24 107:14
218:6

**sending** 75:14 133:16

**senior** 38:9

**sense** 27:15 56:15

**senses** 174:18

**sensitivity** 117:1

**sentence** 95:6 186:8
212:3

**sentences** 185:23

**separate** 53:15 71:8
148:9

**sergeant** 15:1 17:24
18:9,15,22 30:11 40:2

**series** 43:4 213:7

**serve** 15:19

**served** 10:23 12:4 54:13
88:19

**server** 32:1

**servers** 48:1

**serves** 60:20

**service** 15:20 16:14
28:12 36:18,20 41:15
150:24 151:6

**services** 15:2,18 16:1,4
35:8 52:12,13,14 54:10
61:9 124:13 183:1

**serving** 61:5

**set** 22:4 23:3,15,17 39:21
45:19 78:10 211:20

**sets** 170:19

**setting** 24:19 25:9

**share** 59:5,11

**shared** 135:6



BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

**sharing** 59:7 64:14 72:18

**Sharp** 4:15

**Shaw** 8:4

**she'd** 88:8

**shear** 75:25

**sheriff** 61:18 74:8

**sheriff's** 52:16

**shifts** 22:8

**Shoot** 60:7

**short** 35:15 39:8 44:10 46:12 69:8 73:1 178:20 182:24

**shortly** 18:23 20:15 110:6

**show** 40:5 93:24 144:15 156:2,4

**shows** 40:8,12

**shy** 78:5

**side** 53:17 56:11,13,16,20 101:3 116:19

**sign** 218:1

**significance** 17:20

**significant** 75:22 98:10, 12,22 126:19 127:24 128:2,6,12,16

**silenced** 60:8

**silos** 59:6

**similar** 69:3 180:9

**similarly** 54:7

**simple** 149:13

**simplified** 64:12

**simply** 69:13 76:9 83:22 109:23 132:13 158:1 203:15 204:11 206:7 208:2

**single** 94:6 100:14 197:21 205:9,11 215:21

**singular** 143:16

**singularly** 204:12

**sit** 22:14,16 67:20 115:9 141:9

**sitting** 43:21 44:21 129:13

**situation** 46:19 111:10 143:7 144:13

**size** 83:22 145:2

**skip** 185:20

**skipping** 80:3

**slightly** 114:18

**slow** 151:16

**small** 65:14 126:22 127:1 196:15

**smaller** 15:21

**smell** 174:18

**sniffs** 132:25

**software** 31:16 184:19,21

**sold** 95:15 207:20

**solicit** 133:20

**sort** 8:14 23:3 27:18 30:25 33:7,21 37:2 38:9 40:18 46:24 51:13 56:9 57:13,14,22 58:9 62:11 73:6 79:3,17,22 82:3 92:1, 15 104:5 118:6 145:7 152:25 193:9

**sound** 15:11 35:22 75:16

**sounded** 17:17

**sounds** 27:18 63:19 75:13 133:8

**soup** 68:10

**source** 100:21 125:15 196:15

**sources** 102:17

**south** 19:25

**space** 133:9

**speak** 42:12 48:17,25 58:15 75:18 83:24 104:3 135:24 143:3 172:10

**speaking** 5:25 21:12 25:20 42:13 47:2,10 60:5 68:22 79:22 87:11,12 114:9 132:12 134:2 135:16 145:5 172:8

**Special** 182:25

**specialist** 84:15

**specialists** 41:4 84:13

**specialized** 11:23 14:18 21:6 81:1,25 82:11

**specially** 86:18

**specific** 19:8 31:14 86:20 104:6 111:3 131:17 133:1 170:14 190:5

**specifically** 36:6 49:4 51:8 65:8 76:6,22 90:24 95:13,24 97:1 98:25 123:11,13 129:19 130:24 173:18 207:14

**speculate** 106:23

**speculating** 106:21 152:19

**Speculation** 215:25

**speculative** 215:15

**speech** 76:8

**speed** 28:8

**speeding** 164:21

**spend** 10:12 25:21 73:21

**spending** 28:15 37:17

**spends** 78:17

**spent** 11:21,25

**spoke** 25:1 136:11 205:15

**spoken** 73:25

**spokesperson** 83:16

**spokespersons** 83:20

**spot** 82:23

**staff** 111:5,7,8,9 112:1,7, 11 114:11,24 122:14,18 130:16,20 161:9,10,20

162:11

**Stafford** 20:6

**stand** 33:11 144:5 202:19

**stand-alone** 33:5,6 64:5 68:24,25 69:2

**standard** 32:7 66:8

**standards** 158:18 159:8

**standing** 218:11

**standpoint** 69:11 70:15 83:21

**stands** 52:11 58:22 71:25

**start** 6:2 8:15 11:17 13:4 39:3 106:25 149:1 187:4

**started** 13:4 37:11

**starting** 12:17 32:23 127:16

**starts** 94:14 185:9,24 194:10 209:12

**state** 4:8,23 13:17 22:15 23:16 31:3 37:19 41:22 43:8 44:2 45:6 52:17 53:14 54:12,13,15 55:8 57:14 60:20 61:16,19 64:6 65:12,17,20 70:16 71:17 72:4 80:16,18,21 89:13 91:2,6,22 94:22 95:2,3 97:20 99:15,22 100:21 113:3,12,17 133:22 145:2, 20,25 186:12,14,19 187:7, 16 191:23 192:24 194:1 195:14,15 196:10,15 198:23 200:18 204:14,16, 22 205:3,5,21 206:25 207:1,7,16 210:10 211:2, 5,17 212:5,13 213:1,2

**State's** 64:12

**stated** 100:2 134:3

**statement** 25:9 90:9 91:9 125:17 138:16,18 148:12 154:22 160:1 177:4 189:17,18 190:25 192:15 194:24 196:14,22 197:12 212:12



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

**statements** 118:1
188:12,16,19

**states** 10:10 64:17 65:12,
14 95:15,20 97:7,9,12
98:14,25 99:6,10,23
100:7,12 112:22 113:1,10
207:19 210:5,6

**station** 14:9,20 34:22

**statistical** 175:17,19
176:2,21

**statistically** 87:11
144:16

**statistics** 23:12 28:7
130:10 169:3 176:4

**status** 42:12 185:9

**statutes** 108:14

**stay** 20:11 79:4 174:23
179:21

**stayed** 20:13 37:23

**stays** 145:2

**steals** 103:11

**step** 18:1 19:1 213:19

**steps** 137:1 146:20
158:12,17 159:4,17

**stole** 103:13

**stolen** 62:20 102:6
103:23

**stop** 26:12 42:17 50:16
89:11 104:11 113:9 114:8
116:6 126:25 129:3,17
138:25 140:11 141:9
143:9 148:14,17,21,23
149:2,5,6 150:1 151:11,
19,21 153:1,16 164:15,18
165:9,25 166:9,12,15
168:8 169:3,23 170:17,18
171:1,12,22 173:5 174:16
176:10 187:9 189:7,22
190:4,15 191:11,22
192:12 202:2 203:11
205:8 206:16 212:6
214:23 215:11,23 216:3,5

**stopped** 89:17 126:14
142:4 149:21 154:20

**stopping** 98:17 206:7

**stops** 24:20 28:3 87:20
90:11 93:17 99:17 113:11
114:14 115:2 125:9,12,15,
25 131:17 132:15 143:9,
15,24 144:17 149:15
151:13 153:20 155:4,17,
23 166:4 169:1,10,22
170:6 173:9,20 174:9,13
193:11 197:1 213:9,16

**store** 118:10,16,22,25
119:3 120:9,20 121:14
125:19 137:11 163:8
164:14 167:2,6 214:20

**stored** 47:22,25 48:2
118:19 120:17 151:7,8,9
158:21 163:2,3 164:7
166:8,25 171:12 172:4,22
173:8 177:23 214:5

**storing** 101:6 165:24
166:3 173:25 175:7,14

**story** 44:9 216:19

**strike** 45:18 48:6 87:7
104:7 106:24 116:8 119:6
123:8 165:21 172:1
183:24 200:22 201:9
205:17 213:13 214:18

**strive** 160:4

**structure** 124:2,13,19,23
125:14 130:8 143:21
146:18 161:6

**students** 74:15

**study** 9:9

**stuff** 180:21

**submit** 119:13,14

**subpoena** 92:9

**substantiated** 179:15

**substantiating** 93:18
197:2,13

**substantively** 24:14

**succeed** 75:24

**successful** 180:19

**suited** 66:21

**summarily** 94:7

**summarize** 47:12 62:19
66:18

**summary** 66:22 67:21

**summer** 14:1

**summons** 165:15

**Sumner** 14:10,11,25

**sums** 91:20

**superintendent** 18:13
55:18 74:9 77:9,17,20,22,
25 78:1,7,9,10,12,14,16,
17,20 79:3,6,22 81:19
82:15 83:4,10,17,19 84:10
85:8 111:2,4

**superintendent's** 84:4

**superintendents** 38:3

**supervise** 42:7

**supervised** 20:7 31:18
104:5 107:5

**supervising** 19:22 20:19
21:8 38:5 101:1

**supervision** 21:17
147:13,16

**supervisor** 17:1 18:4,10
20:12,22 21:11 22:3,7
24:17 25:19 27:7 29:14,24
30:9,12,15,17,18 31:8
34:7,11 56:8,9 82:23
85:25 115:16 155:11
167:14,15 170:5,12

**supervisors** 141:16
168:9,19

**supervisory** 159:10

**supply** 130:20

**support** 81:1 82:5,7,10,
11,16 186:14

**supported** 191:22
192:13

**suppose** 16:7 83:8 89:13
130:22 140:13 173:6
205:7 210:18

**supposed** 54:9 137:3,13
139:3 142:17 152:6

**Supreme** 112:22 113:1

**surface** 32:23

**surprise** 191:14

**surrounding** 56:14
125:22,25

**suspect** 67:2,13 186:21
190:6

**suspect's** 66:24 67:9

**suspected** 136:10

**suspicion** 136:2,22
137:6,12,18,22 138:1,24
139:4 140:6,10,17,24
141:9 142:3,16 143:1,9,
15,23 144:4,16 165:6
173:5 174:16 186:15,20
187:18 190:13 191:21
192:12 193:12 194:11,14
200:20 203:24 204:9
208:2 209:24 210:13
211:21 214:5,20,22 215:3,
10,20,22 216:5,10 217:1

**suspicious** 200:15 210:4

**swathe** 132:7

**swathes** 132:3

**swear** 4:17

**swim** 54:2

**switch** 52:8 70:2,21,25
71:1,14,16

**switched** 33:25 37:24

**switches** 71:13

**sworn** 4:19 40:25 41:5

**synonymous** 118:15

**system** 32:4 33:16 41:22,
24 42:5,24,25 43:2,3,4
44:25 46:10,12,15,16,21,
22 47:12,14,18 48:8,11,16
50:8 51:14 52:19,22 53:2,



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

METROPOLITAN
COURT REPORTING ◆ LEGAL VIDEO

*i23*

Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 82 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                               July 28, 2021

4,5 56:22 58:17,22 59:1,9
62:13,24 64:8,9,11,14
65:2,6,13,16 66:1,2,10
68:4,20,24,25 69:1,2 70:6
103:2,20 104:20 105:3
106:15 107:5,7,11,12
118:11 119:2,8,11 121:6,
18,21 122:6,8 123:10
131:11 132:24 133:8,12,
17 136:2,21 143:2 150:17
180:23 184:17 215:4

**systems**  31:9,12 33:20,
22 37:18 45:11 46:1 47:17
48:18,23 50:22 52:23
53:6,11,12,19,22,23
54:14,16,24 55:3,6,8
56:14,17 57:5 59:17
60:22,24 61:12,24 63:7
64:13 65:4,21,24 67:25
69:4,7,18,21,24 70:22,23
71:3,16 72:4 73:11 102:24
103:3,8 104:5,17 121:9,14
122:6,24 124:19 130:6
136:20 147:5 175:6,12
179:1,6,10 180:2,3 214:5,
21

---

### T

**tablet**  120:3

**tablets**  120:6,8

**tactics**  117:2

**tag**  103:22

**tailored**  73:24

**takeaways**  59:8

**takes**  28:21,24 29:6 45:6,
7 194:15 209:22

**taking**  20:4 39:8 73:1
76:11,22 91:1 99:25
117:12 136:13 178:20

**talk**  8:18 9:23 41:11 43:7,
9,10 52:8 59:4 67:23
87:25 111:2 184:13 186:8
188:23 189:9 195:12
196:9 198:7 209:20

**talked**  8:10 27:22 35:20
68:17 72:17 84:22 101:25

117:21,24 121:16 148:18
150:11 162:7 184:18
195:22 198:20

**talking**  24:1 26:1 30:14
36:23 42:23,24 43:17
45:14 52:12,14 56:6 73:6,
17 75:22 81:13 88:5
95:12,20 97:11 98:13,14
100:25 119:18 128:21,24
142:22 144:22 145:16
148:22 152:25 169:9
177:11 179:25 180:22,23
185:25 190:12 200:14
206:3 207:13,14,21 208:4,
6 209:8 212:24 213:1

**talks**  194:8

**tasked**  59:9 126:18

**taught**  88:21,22 89:4
144:1 203:19

**teach**  59:23 88:23 203:10

**teaching**  102:15 103:4
109:10

**team**  53:21 86:17

**tech**  56:2

**technical**  41:17 53:20
54:1 56:2,9,13,16 109:11
146:25

**technically**  68:22 70:1,
13

**techniques**  74:13 162:5

**technology**  30:25 49:21
56:18 123:5 182:16

**telecommunications**
41:19

**telephone**  45:2

**telephonic**  45:3

**telling**  109:24 133:3

**tells**  151:16

**term**  47:5 52:5 158:16
184:20

**termed**  56:12

**terms**  21:17 54:9 64:11

83:11 109:10 156:3

**terribly**  32:4

**tertiary**  109:1

**testified**  4:19 191:6

**testimony**  5:19 183:14

**THC**  95:13,14,18 96:3,17
98:11 100:9

**THC-CONTAINING**
97:13,19

**theoretically**  171:8

**thick**  130:3

**thing**  6:24 23:24 40:5
51:13 55:12 95:14,15
114:7 182:14 184:12,14

**things**  21:14,16 23:25
24:20 25:17 28:5 29:7
50:10,11 54:1,4 59:20
64:19 65:10 73:13,15
77:15 79:9,11 83:20 86:23
89:4 91:14 102:4 117:1
118:3,8 121:20 122:3
123:2,4,8 126:8 136:1
144:11 151:3 154:23
157:4,15,25 158:2 162:5,8
171:23 180:16,19 181:15
182:17 183:10 184:10
195:23 196:1 198:10
217:11

**thinking**  58:5 217:13

**thought**  31:23 60:7
128:14 147:23 159:13
175:10 205:19 210:22

**thoughts**  22:14

**thousands**  180:24

**threshold**  145:10,12

**throw**  211:20

**ticket**  125:10,16 148:24

**tickets**  119:4

**tied**  48:18,24

**time**  5:25 10:12 13:12
14:5 15:12 18:9,14 19:11,
15,18 20:20,24 21:25

22:13 24:22 25:21,23
26:19,24 28:15,17,22,24
29:3,6,14,15,17 31:7,13,
18 32:24 34:1,6,23 35:14,
16,22 36:14 37:17 39:4,7,
12 40:10 41:3 43:25 44:22
45:15 47:24 48:11,21,24
49:1,6,9,16 51:18,20 53:2
55:20 70:9 72:25 73:3
74:23 75:4,21 78:18 80:6
81:18 86:1 89:9 91:6 92:9
96:1,3,17,22 98:21 101:1
105:19 107:13,18 115:21,
22 116:18 117:11,12,15
123:7,9 125:13 126:5,6
127:3 128:4 129:10 131:8
138:4 141:6,25 143:11,21
146:7,16 147:11 151:5
152:23 153:18,24 154:5,
19,24 155:3,25 156:7,11,
20 161:5,15,21 163:5,18
164:15 166:6,25 168:21
171:6 175:18 178:4,19,22
183:19,24 187:3,6,9
188:18 192:7 193:6
205:15,18 210:7 215:11,
19,23 217:22

**timeline**  77:3

**times**  6:7,12 22:12 26:11,
16,19 28:11 29:19 41:25
61:1 130:15,23 141:16
155:25 156:5 158:18
182:6

**tire**  149:10,14 150:20

**tired**  183:9

**title**  56:8 83:9 196:25

**today**  4:4,16 5:22 6:19
7:15 8:8,11 25:17 28:21,
24 48:19 63:12 67:20
92:12,19 105:18 107:20
115:9 129:13 138:8
139:18 141:6 160:5,13
161:21 176:24 203:18
206:9

**told**  66:7 81:22 110:19
162:18 181:7 211:24

**tool**  140:22



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

METROPOLITAN
COURT REPORTING • LEGAL VIDEO

*i24*

BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

**tools** 72:18

**top** 116:3 135:3 185:8
197:22

**Topeka** 7:16 15:2 35:6,10
37:14,15,18,20,22 50:1
85:10 188:3

**topic** 85:21 161:19

**topics** 80:10

**tossed** 184:23

**totality** 194:15 195:25
200:15 202:6,23 203:6
207:9 209:18,21

**tough** 171:9

**towed** 131:8

**towers** 34:2 43:5

**track** 29:16 120:12,14,15
121:2 125:15 153:19,21,
22,25 154:6,25

**tracking** 72:15 125:9,12

**traffic** 14:16 15:5 17:3,4
21:2 24:20 28:2,16,20
34:8,16 87:9,15,20,22
125:12 126:25 132:15
136:9 164:10 165:15
166:15 170:6 191:11,21
192:12 193:10,11 205:7
207:15 211:1 213:3

**trafficking** 86:23,24 98:9,
18 199:6 207:11 208:18

**trail** 57:8

**train** 53:7 136:4 159:12

**trained** 52:20,21 53:4,16
86:18 102:3 117:5 141:2,
19 170:10 189:10

**trainers** 101:18 103:4

**training** 9:19,21 27:5
53:10 54:3 73:15,19,20
74:17 86:19 88:24 91:15
101:9,11,14,19,21 102:8,
19,24 107:24 108:16,23
109:4,17 111:12,17,23,25
114:17 115:7,10,16 116:1,
12,16,21 117:3,4 136:7,17

**141**:1,2,5 143:20 186:19
187:15 191:11,20 192:2,
11,18,25 193:6,14 203:10
211:24 213:18,20

**trains** 72:8 199:22

**Transaction** 57:6

**transactions** 57:5

**transferred** 14:21,23,24
16:25 37:6

**transitioning** 30:6

**transparent** 161:17
162:14,16,19,24

**transportation** 16:4
35:18

**travel** 191:22 192:14
202:25 203:6 210:10
212:16

**traveled** 37:14 206:7
207:6

**traveler** 100:20

**travelers** 87:3 205:21

**traveling** 100:21 203:22,
23 204:14 205:3 208:17
213:1

**travels** 119:14

**trends** 169:3

**trick** 180:11

**trigger** 166:16 167:21

**triggered** 168:2

**troop** 19:20,23 20:12
38:4,5,9,10 39:21 40:2,6,
9,19 41:9 43:11,15,23,24,
25 47:15 49:7,10,19,24
51:5,12 55:16,20 58:18
67:25 68:2,13 71:19 72:19
79:3,16 80:16 81:9 100:25
101:2,3 107:5 115:24
116:8,10,20 119:7 120:11,
14 129:11 130:14 132:2
146:24 172:9,14,19
174:10 191:5,8,16

**troop's** 191:6

**trooper** 14:14,15,17 15:5
17:3 23:5,12,19,21 24:22
25:11,24 26:1,12,13,21,24
27:3,9 28:7,8,22,25 31:18
33:8,17 34:16 89:11,12,14
104:12,15 105:15 106:13,
18 107:4 119:10 127:14
129:16 131:7 133:3,18
134:9,15,20 135:7,11,17,
19 136:21 138:2,5,11
139:12 140:5,13,16
141:11,17,24 142:2,15,23,
25 143:8,12 148:10
149:15 150:2 151:4,13,19,
22 152:14 153:1,3 159:9
163:25 164:9,20,22
166:14,20 167:13,15
168:9 170:9,14,21 174:21,
25 179:12 200:17 214:19,
22 216:10 217:3,4,7,12

**trooper's** 25:14 26:22
119:21 138:13,14 139:8,
16 141:19 170:17 217:10

**troopers** 17:2 20:8,10,18,
23 21:1,8,13 22:10 23:16
26:8 27:14 29:3,24 30:15,
24 31:24 41:15 42:3 43:7
44:1 46:18 81:5,6 86:18
89:18,23 94:23 98:7,8
100:3 101:19 102:3,9,15,
21,24 103:7,24 107:21
108:3,10,22 109:3,16
113:20,24 114:2,6,7
116:12 120:8 121:19
125:16 126:11 127:6
129:12,20 133:15 135:23
136:4,8,17,20 137:2,11,
13,21 138:8,24 139:2
140:9,23 141:1,8 143:20,
22 144:3,8,15 148:13
149:5,9 150:13 151:1
152:4 156:12,14,17
165:18 168:17 176:20
189:5 199:4 204:15,21
205:4,17,20 206:6,16,23
207:23 208:6,12 211:13
212:16,20 213:12,15
214:3 215:7,9,19

**troopers'** 36:9 42:25
101:5,20 111:22 138:20
172:11 174:17 191:20

192:11

**troops** 108:12

**true** 38:12 163:14 166:12
182:3 201:24 209:21

**trunked** 43:4

**Trust** 164:3

**turn** 94:10 103:20 189:23
193:19 194:7

**turned** 185:7

**turning** 193:16

**Twelve** 26:10

**two-thirds** 94:15

**tying** 48:23

**type** 25:9 27:5 42:2 52:14
81:2 109:5,6 133:10 135:7
167:3,18 173:11 181:21

**typed** 197:21

**types** 29:11 45:3 122:19,
22,23 125:3 143:25 151:3
161:8 173:2

**typewriter** 29:19

**typewriters** 29:25 30:4,
20

**typical** 32:6

**typically** 20:21 22:2 36:4
55:17 80:13 102:13 103:9

**typing** 105:9

---

**U**

**UCR** 69:2

**uh-huh** 6:8 17:19 23:7
24:9 27:24 28:1 29:2
45:12 63:13 66:15 105:6
149:19

**unclear** 6:19

**underground** 44:4,7,10

**underperformance**
27:19



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

METROPOLITAN
COURT REPORTING ♦ LEGAL VIDEO

*i25*

Case 6:19-cv-01343-KHV   Document 309-1   Filed 09/08/22   Page 84 of 85

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                        July 28, 2021

**underperforming** 25:25 26:22 27:11

**understand** 6:4,10,17,20 7:1 26:4 29:16 31:15 66:12 67:25 86:14 99:2 100:3 112:20,25 113:13, 19 118:12 138:17 154:12 176:7 202:5 211:13,22

**understanding** 5:21 21:23 44:15 46:9,23 47:22 50:2,9 78:25 86:12 87:17 96:21 99:9 106:24 113:14 118:7 128:5 142:24 143:1 145:1 151:12 152:17 153:11 154:17 155:13 157:16 161:16 176:24 177:16 190:19 191:1 192:2,22 210:13

**understood** 188:20 192:17

**uniformed** 38:15,17 40:16,22 68:14 78:3

**uniforms** 41:5 43:1

**unique** 54:11

**unit** 15:2,18 16:25 17:12 33:1 35:6,8 37:17,22 38:17,18,19,20 41:12,13 42:16 44:14 52:9,10,20 53:4,7,10 54:6,7,23 55:6 57:13 59:19 65:8 86:8 120:12 121:24 126:17

**United** 10:10 97:12 100:7, 11 112:22 113:1,10

**units** 30:18 31:9 32:19,21 33:14 34:7 35:10,12 41:10 54:3 102:12

**universal** 64:20

**unreasonable** 89:11 94:25 100:3 193:24 195:12 198:15,21 199:4 206:23 211:12

**unstated** 171:17

**unusually** 26:2

**updates** 122:12 123:10, 15,16

**upgrades** 42:5

**uploaded** 32:1 104:20,21 105:2 106:11 107:4,8,10

**upper** 61:8 209:8

**users** 64:21

**utilize** 52:17 57:9

**utilized** 51:20 59:16 124:7 138:10 179:10

**utilizing** 59:24

---

**V**

**vague** 154:2,9 169:5,16 171:13,16

**varied** 26:15

**variety** 209:22

**Vasquez** 88:6 108:17,20 109:16 110:5,9,14 111:2, 14,18,23 112:4,9,10 113:3,9,14,20,22 114:1,5, 8,12,25 115:10 116:10 117:6 185:2 187:20 189:7 191:19 192:2,10 209:3 210:1 212:2

**Vasquez's** 185:9,14

**vehicle** 33:8 89:17 102:6 103:16,17 131:8 132:15 136:10 149:11 151:14,16 163:14 175:1 200:11 201:5 202:15

**vehicles** 28:9 33:10,15 42:25 62:21 97:22 101:5 139:23 189:5

**vendor** 124:6

**verbal** 6:7 149:21 150:6, 14 151:11,21

**verify** 138:10

**version** 92:25 93:12 140:14

**versions** 92:25

**versus** 8:4 40:21 148:9 185:2

**vested** 144:11 161:13

**vice-president** 77:23

**victim** 67:8

**victim's** 66:22 67:8

**video** 4:6 25:22 26:12,23 135:23 138:5,8 139:3,5,7, 11 140:3 141:10 169:10, 21 170:5,12,20,25 171:15 172:3,11,14,17,23 173:7, 15,20 174:16,19,24 181:25 217:11

**videos** 25:18,19 26:3,19 27:13

**view** 15:9 199:11

**violate** 144:8

**violated** 113:10

**violating** 100:20 144:11

**violation** 67:12 164:18

**violations** 95:4 194:3 207:3

**Virginia** 73:21

**virus** 53:25

**visit** 85:10

**visited** 197:14

**voice** 89:3 120:3 136:19 139:13

**volume** 75:25 76:1 152:25

**voluntarily** 99:20

**voracity** 138:11,13,15

---

**W**

**wait** 201:8 210:15,16

**waive** 218:2

**wanted** 23:4 57:7 62:19 63:23 66:8 87:25 89:16 102:5,11 104:23 117:18 123:25 125:6 127:3 137:17,24 162:13

**wanting** 123:18 180:7

**warehousing** 58:24

**warning** 149:21 150:6,14, 17 151:11,22 152:1,3,5,8, 11,14 153:2,6

**warnings** 28:9

**warrant** 35:21 36:1

**warrants** 36:4,7 53:1,2 62:20 150:16

**Washburn** 88:18 144:1 188:8,12 189:9,12,25 190:3,13 194:14,21 195:23,24 196:13,16

**Washington** 12:1 97:8 211:6

**water** 89:2 155:8

**ways** 59:15 110:2

**weapon** 126:5

**weapons** 86:24,25

**weather** 44:8

**weekends** 12:21 156:2

**weekly** 111:7 112:7

**weeks** 14:7 88:4,9 92:13 141:10

**weight** 200:7

**weights** 127:21

**welfare** 21:13 42:15 78:23

**west** 20:5 31:4,5

**western** 37:3 80:15,17 81:23 97:12,20

**whew** 171:9

**white** 132:15

**wholly** 185:24 186:10

**Wichita** 14:22 35:18

**wide** 126:16

**widespread** 168:20 193:10



BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.

DEPOSITION OF RANDY MOON
July 28, 2021

**wise**  123:6

**witnesses**  217:9

**woman**  85:9

**women**  27:16 78:22

**wondering**  81:21,22

**word**  30:4,5,20 63:17,19
70:20 94:6 95:7 105:4

**words**  6:7 85:17 194:21
209:13

**wore**  41:4

**work**  5:16 9:20 10:17 15:5
22:10 32:2 33:12 34:8,15
35:12,17 36:11,17 48:22
49:25 65:6 76:15,18
129:12 130:4,9 141:17
146:24 156:18 170:2

**worked**  14:11,17 22:9
27:2 35:5,9 38:16,17
41:23 62:9 64:19 84:12
88:13,17 136:9 147:12
182:24

**working**  11:4 41:20 43:10
44:19 58:19 60:25 61:2,4,
13,14 62:1,3 63:8 113:23
127:25 183:10

**world**  57:12 76:2

**worthy**  79:13

**wow**  74:14

**writ**  112:21

**write**  29:4 31:20 134:15
214:17,19 215:20

**writer**  188:4

**writing**  29:17 31:1 76:8
105:8 152:9

**written**  152:5 197:16

**wrong**  27:17 113:24
114:2 144:11 161:14
176:6 177:7

---

**Y**

---

**year**  8:24 11:25 14:22

15:15 20:4 22:5,7,12
23:22 24:5 25:12 26:9,12
61:1 75:11,14,16,17,24
108:16

**years**  9:3 10:19,24,25
11:6 12:4 13:10 14:24
16:18 18:21 20:8,17 25:18
29:8,13,21 31:6 32:3
34:14 37:16 38:13,15 55:4
75:19,20 76:10 90:22
122:22 125:22 127:6
128:1 180:16



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

METROPOLITAN
COURT REPORTING + LEGAL VIDEO

*i27*