# Exhibit 12

SARAH WASHBURN  8/9/2021

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF KANSAS
2
3
4  BLAINE FRANKLIN SHAW, et al.,
5
       Plaintiffs,
6
7  vs.          Case No. 19-1343-KHV-GEB
8
9  HERMAN JONES in his official
   capacity as the
   Superintendant of the Kansas
10 Highway Patrol, et al.,
11
       Defendants.
12 ---------------------------------
13 MARK ERICH, SHAWNA MALONEY,
   Individually and as mother
14 and natural guardian of
   minors DM and MM,
15
       Case No. 20-1067-KHV-GEB
16     Plaintiffs,
17 vs.
18 HERMAN JONES, KHP Superintendent,
19
       Defendant.
20
21
22    VIDEOTAPED DEPOSITION OF SARAH WASHBURN
23
24    August 9, 2021
25

## Page 2

1           INDEX
2  SARAH WASHBURN                    PAGE
3  Examination by Mr. McInerney       5
4
5           EXHIBITS
6  NUMBER      DESCRIPTION          PAGE
7  Exhibit 73  PowerPoint OAG000435-000465    21
8  Exhibit 74  PowerPoint OAG001915-001975    27
9  Exhibit 75  E-mails OAG019551-19552        28
10 Exhibit 76  E-mail and PowerPoint          35
              OAG021353-021367
11
12 Exhibit 77  Motion to Quash Stop, Detention, 41
              and Arrest and Suppress Evidence
13 Exhibit 78  Handwritten minutes            41
14 Exhibit 79  Motion to Suppress Evidence    48
15 Exhibit 80  Order of Dismissal and Recall  48
              of Warrant
16
17 Exhibit 81  E-mail and PowerPoint          51
              OAG020738-020778
18 Exhibit 82  E-mail and Lesson Plan Approval 62
              Form OAG022535-022538
19
20 Exhibit 83  PowerPoint OAG022557-22564     63
21 Exhibit 84  P000117-000150                 70
22 Exhibit 85  Affidavit of Richard Jimerson  70
23 Exhibit 86  E-mail OAG008521               110
24 Exhibit 87  E-mail OAG022717               116
25 NOTE:  Deposition Exhibits were attached to the
        original transcript.

## Page 3

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF KANSAS
2
3
4  BLAINE FRANKLIN SHAW, et al.,
5      Plaintiffs,
6  vs.          Case No. 19-1343-KHV-GEB
7  HERMAN JONES in his official
   capacity as the
8  Superintendent of the Kansas
   Highway Patrol, et al.,
9
       Defendants.
10 ---------------------------------
11 MARK ERICH, SHAWNA MALONEY,
   Individually and as mother
12 and natural guardian of
   minors DM and MM,
13          Case No. 20-1067-KHV-GEB
       Plaintiffs,
14
15 vs.
       HERMAN JONES, KHP Superintendent,
16
       Defendant.
17
18    VIDEOTAPED DEPOSITION OF SARAH WASHBURN,
19 produced, sworn and examined on August 9, 2021,
20 between the hours of 9:01 a.m. and 12:09 p.m., at
21 the Kansas Attorney General's Office, 120 Southwest
22 10th Avenue, Topeka, Kansas 66612, before Sarah A.
23 Davison, a Certified Court Reporter in a certain
24 cause now pending in the United States District
25 Court for the District of Kansas.

## Page 4

1           A P P E A R A N C E S
2
3  For the Plaintiffs:
4    MR. PATRICK McINERNEY
     MS. LESLIE GREATHOUSE
5    SPENCER FANE, LLP
     1000 Walnut Street
6    Suite 1400
     Kansas City, Missouri  64106
7    Pmcinerney@spencerfane.com
     Lgreathouse@spencerfane.com
8
9  For the Defendants:
10   MR. ARTHUR S. CHALMERS
     KANSAS ATTORNEY GENERAL'S OFFICE
11   Memorial Building
     120 Southwest 10th Avenue
12   Topeka, Kansas  66612
     Art.chalmers@ag.ks.gov
13
14   MR. LUTHER GANIEANY
     GENERAL COUNSEL FOR THE
     KANSAS HIGHWAY PATROL
15
16
17 VIDEOGRAPHER:  GUS RODRIGUEZ
18
19 COURT REPORTER:
   SARAH A. DAVISON, RPR
20 CCR #1397-MO  #1589-KS
   Alaris Litigation Services
21 1608 Locust Street
   Kansas City, Missouri  64108
22 1-816-221-1160
   1-800-280-DEPO
23
24
25

1 (Pages 1 to 4)

SARAH WASHBURN  8/9/2021

## Page 5

1      (Deposition commenced at 9:01 a.m.)
2          THE VIDEOGRAPHER:  We are now on the
3  record.  Today's date is August 9th, 2021, and the
4  time is 9:01 a.m.
5          This is the video-recorded deposition
6  of Sarah Washburn.
7          Would the court reporter please swear
8  in the witness.
9          SARAH WASHBURN,
10  being first duly sworn, testified under oath as
11  follows:
12          EXAMINATION
13  BY MR. McINERNEY:
14      Q.  Good morning, ma'am.
15      A.  Good morning.
16      Q.  Your name for the record?
17      A.  Sarah Washburn.
18      Q.  Ms. Washburn, I'm Pat McInerney.  I'm
19  one of the lawyers representing the plaintiffs in
20  this case, and we're going to be obviously taking
21  your deposition today.
22          Have you ever had your deposition
23  taken?
24      A.  No, not taken.
25      Q.  I thought it might be a first.  Well,

## Page 6

1  I -- I'll walk over some rules that you're probably
2  familiar with and give you some of the advice and
3  warnings that you've probably dished out yourself
4  from time to time.
5          We -- as I ask you questions, I'll ask
6  you to answer with a verbal yes or a verbal no
7  instead of an uh-huh or huh-uh.  That's for purposes
8  of keeping the record clear.
9          If I ask you a question that you don't
10  understand, please ask me to rephrase it, okay?
11          If you go ahead and answer the
12  question, I'm going to assume that you understood
13  it; is that fair?
14      A.  Fair.
15      Q.  Okay.  If at any time you need to take
16  a break, just say so.  The only thing I would ask is
17  that if there is a question pending, you would go
18  ahead and answer the question, then we'll take the
19  break; is that okay?
20      A.  Yes.
21      Q.  All right.  And if Mr. Chalmers makes
22  objections, obviously I'll ask you to stop your
23  response and he can make his objection for the
24  record, and then I'll probably ask you to answer if
25  you're able, all right?

## Page 7

1      A.  Understood.
2      Q.  Okay.  Ma'am, where are you employed?
3      A.  With the Kansas Highway Patrol.
4      Q.  How long have you been employed there?
5      A.  A little over six years.
6      Q.  What is your job?
7      A.  I am classified as a staff attorney.
8      Q.  Is that in the general counsel's office
9  at highway patrol?
10      A.  Yes, it is.
11      Q.  How many people -- sorry -- how many
12  lawyers are employed by the Kansas Highway Patrol's
13  general counsel's office?
14      A.  At this point, two.
15      Q.  Is there a hierarchy?  Is there a chief
16  counsel and an assistant?
17      A.  There's not an assistant.  There is a
18  general counsel.
19      Q.  Okay.  And who is the general counsel?
20      A.  Luther Ganieany.
21      Q.  When you -- we're going to work
22  backwards a little bit.  I think you said you've
23  been employed there since 2016?
24      A.  '15.
25      Q.  '15, excuse me.

## Page 8

1          Where were you employed before that?
2      A.  With the Lyon County attorney's office.
3      Q.  And what did you do for the Lyon County
4  attorney's office?
5      A.  I was an assistant county attorney.
6      Q.  How long were you an assistant county
7  attorney in Lyon County?
8      A.  Just shy of four years.
9      Q.  And before that?
10      A.  I was with Kansas Legal Services in
11  Garden City.
12      Q.  What were your general duties and
13  responsibilities with Kansas Legal Services?
14      A.  I provided indigent defense to
15  juveniles mostly, occasionally some misdemeanor
16  defense for adults.
17          Periodically, I would also appear as a
18  guardian ad litem or fill in for that position in
19  child-in-need-of-care cases.
20          And I think very rarely we would do
21  some municipal defense.  It was a very small office
22  with a large caseload.
23      Q.  And you were at the -- at that office
24  for how long?
25      A.  That one was a little under a year.

2 (Pages 5 to 8)

SARAH WASHBURN  8/9/2021

**Page 9**

1    Q.   Okay.  And prior to that, where were
2 you employed?
3    A.   In law school with LexisNexis.
4    Q.   Okay.  Where did you go to law school?
5    A.   Washburn.
6    Q.   And what year did you graduate from law
7 school?
8    A.   2010.
9    Q.   Sounds like you worked for LexisNexis
10 during school?
11    A.   That's correct.
12    Q.   And before you went to law school,
13 where did you go -- where did you get your
14 undergrad?
15    A.   The College of William and Mary.
16    Q.   And what was your undergraduate degree
17 in?
18    A.   My bachelor's degree is in philosophy
19 with a minor in history.
20    Q.   And prior to college, where did you go
21 to high school?
22    A.   Well, I have two undergraduate degrees.
23 I don't know if you care.
24    Q.   Let's -- you brought it up, let's --
25    A.   Okay.

**Page 10**

1    Q.   What's your second undergraduate
2 degree?
3    A.   I have an associate's degree in police
4 science.
5    Q.   Where did you attain your associate's
6 degree in police science?
7    A.   Thomas Nelson Community College.
8    Q.   And where is that?
9    A.   That's in Hampton, Virginia.
10    Q.   Is that the area where you grew up?
11    A.   Mostly, yes.
12    Q.   I'm not going to get into a lot of
13 detail about specifically where you grew up.
14         In your role right now in the general
15 counsel's office for Kansas Highway Patrol, how
16 would you describe your duties and responsibilities?
17    A.   Primarily I handle our asset forfeiture
18 cases as well as training for our personnel,
19 anything from the basic academy, advanced
20 interdiction.  I also do some training for the
21 collegiate law program.  I handle our quiet title
22 cases.  And I am, for lack of a better word, a
23 phone-a-friend for our personnel on patrol, so if
24 they have a question, they're welcome to call me day
25 or night and I will do the best I can to provide

**Page 11**

1 that answer.
2    Q.   And who is your colleague?  You said
3 there were two lawyers there; who's the other one?
4    A.   Luther Ganieany.
5    Q.   I think you answered that already.
6         And what is Mr. Ganieany's duty and
7 responsibility in the general counsel's office?
8    A.   He -- primarily the way we have it
9 divided, he also does quite a bit of training.  We
10 have that kind of split.
11         And he does a lot of the liaison work
12 between the highway patrol and outside counsel.  And
13 he primarily provides counsel to command staff as a
14 direct report.
15         I do as well, but not to the same
16 degree.  He will usually come to me, and so any
17 counsel I provide is usually through him.
18    Q.   You mentioned outside counsel.  In what
19 situations does Kansas Highway Patrol employ outside
20 counsel?
21    A.   When we've been sued.
22    Q.   Is any of the litigation involved --
23 excuse me -- is any of the litigation involving KHP
24 handled internally?
25    A.   The only litigation we handle

**Page 12**

1 internally would be asset forfeiture cases and quiet
2 titles.  And in quiet titles, we are a named
3 defendant, but it's more an administrative role than
4 anything.
5         But for substantive issues, no, I
6 believe we request counsel from the AG's office with
7 all of that.
8    Q.   In the asset forfeiture cases, do you
9 appear as lead counsel?
10    A.   If the highway patrol handles it, yes.
11    Q.   Is it also part of your duties and
12 responsibilities -- I think you mentioned just a
13 minute ago forfeitures, seizures, things like
14 that -- is it part of your duties and
15 responsibilities to make a determination for the
16 Kansas Highway Patrol whether a seizure will remain
17 a state seizure or whether federal authorities will
18 be?
19    A.   No, not at all.
20    Q.   Okay.  Is there someone in your office
21 who makes that decision?
22    A.   In the legal counsel's office?
23    Q.   Yes.
24    A.   No.
25    Q.   Do you know whether that decision --

3 (Pages 9 to 12)

SARAH WASHBURN  8/9/2021

Page 13

1  excuse me -- do you know who makes that decision?
2      A.   I believe it's set by statute for the
3  most part.
4      Q.   Okay.
5      A.   I believe there's an opportunity for --
6  well, it's set by statute as to how that works.
7      Q.   I think you used the phrase
8  phone-a-friend and described it as I think being a
9  resource for troopers from time to time; is that
10 accurate?
11     A.   Yes.
12     Q.   What kinds of circumstances give rise
13 to a situation where you're on the phone as a
14 phone-a-friend with a trooper?
15     A.   It could be anything as simple as they
16 were at coffee and had a question about a statute
17 and they wanted someone to be the tie breaker or to
18 provide that legal analysis, to they're on the road
19 and they're trying to figure out if the felon in
20 possession of a firearm statute would apply because
21 of the time periods in that statute.  They may be
22 calling to ask questions about whether or not -- not
23 whether or not -- but where they can find
24 information because they're completing a warrant,
25 that type of thing.  It really kind of runs the

Page 14

1  gamut.
2      Q.   Do you ever appear at crime scenes to
3  provide counsel to investigators or highway patrol
4  personnel?
5      A.   Only telephonically.  Never in person.
6      Q.   Is -- is it -- is your role as a
7  counselor in those situations that you just
8  described, is that set by policy or is that just the
9  practice of the office?
10     A.   I don't believe there's a written
11 policy, but it has been the practice of the agency
12 since I started.
13     Q.   When an officer reaches out to you --
14 excuse me -- a trooper reaches out to you in any one
15 of those circumstances that you described, what
16 record is made of the communication between you and
17 the trooper?
18     A.   It will vary.
19     Q.   Can you describe those for me, please?
20     A.   Sometimes if it's not something that is
21 pressing they're dealing with right away, I may ask
22 them to send me an e-mail and make sure that I have
23 all of what they're looking for in front of me if
24 I'm not able to handle it right at that moment,
25 because obviously there are times I need to do some

Page 15

1  research and to look at things and I'm simply not
2  capable of doing that when I'm out of the office,
3  something like that.
4          But if that is not the case, then there
5  is no record.  If it's just a question of something
6  I happen to know because I get the question often
7  enough or I've dealt with it recently or I'm
8  comfortable answering it right then, there is no
9  record.  It's a phone call.
10     Q.   Okay.  And in the situation where there
11 is an e-mail generated, where it's not a pressing
12 situation like you described, what ultimately
13 happens with that e-mail?  Do you retain copies of
14 the e-mail transactions?
15     A.   Usually, yes.
16     Q.   Are those forwarded or provided to the
17 prosecutor's office in whatever the appropriate
18 district is?
19     A.   I don't know.
20     Q.   Are you familiar with any situations in
21 which your e-mail advice has been subpoenaed, say,
22 in connection with a motion to suppress?
23     A.   I don't know.  I'm sorry.
24     Q.   But not that you can recall?
25     A.   Nothing I know of, that's correct.

Page 16

1      Q.   Do you know whether the troopers -- I'm
2  going -- I'm going to ask you about the other end of
3  that transaction -- do you know whether the troopers
4  retain records of correspondence with you?
5      A.   Unless it's an e-mail, I don't know
6  that they would, but I don't know.
7      Q.   Okay.  Do you ever use text messages to
8  have these exchanges instead of e-mail?
9      A.   Not really, no.
10     Q.   Okay.  You mentioned as part of -- part
11 of your duties and responsibilities, that you do
12 some training for the highway patrol?
13     A.   Yes.
14     Q.   Describe, if you will, what kind of
15 training, what is involved in terms of creating
16 course materials and how the presentations work.
17     A.   That was a couple different questions.
18     Q.   That's a lot of questions actually.
19     Q.   Can you break it down?
20     Q.   Why don't we start -- yeah, why don't
21 we start with kind of a general question and then
22 I'll ask you some specifics.
23     A.   Okay.
24     Q.   What is your responsibility when it
25 comes to training Kansas Highway Patrol troopers?

4 (Pages 13 to 16)

SARAH WASHBURN  8/9/2021

## Page 17

1   A.  I teach several classes in the basic
2  academy starting at the beginning of a trooper's
3  career.  I usually start with teaching
4  constitutional law, I teach search and seizure,
5  Fourth Amendment, warrants, juvenile justice, a lot
6  of the legal requirements that KLETC puts out, I do
7  teach a lot of those, not all.
8       And then kind of moving on as the
9  trooper's career progresses, I have done inservice
10  every year except last year when Mr. Ganieany did
11  it, and I provided legal -- a couple hours of legal
12  updates in that.
13       And then I also have taught at least a
14  few hours for advanced interdiction as well.
15       Q.  Do those courses involve the
16  development of materials, say, PowerPoints or hard
17  copy materials?
18       A.  Yes.
19       Q.  Describe, if you will, how those
20  materials are generated?  Who -- and specifically
21  I'm asking about your role in the creation and
22  distribution of those.
23       A.  It depends on the class.
24       Q.  Okay.  Let's say advanced interdiction.
25       A.  I generate the PowerPoint.  I'm getting

## Page 18

1  a little uncomfortable with this.  I think it's
2  going into attorney work product just because you're
3  asking me how I determine what goes in there, and
4  so --
5       Q.  And just so I'm clear about --
6       A.  Yeah.
7       Q.  -- about that, I'm not asking about
8  specific cases.
9       A.  Okay.
10       Q.  I'm not asking about materials created
11  in anticipation of litigation.
12       A.  Okay.
13       Q.  I'm only talking about the training
14  materials.  So when we say -- as an example, I'll
15  use advanced interdiction.  As I understand, that's
16  a course that's regularly presented, correct?
17       A.  Yes.
18       Q.  And for some years I think in a row
19  you've been the one who has presented, correct?
20       A.  Yes.
21       Q.  Okay.  When I ask about how those
22  materials are created, I'm talking about just those
23  training sessions, not advice you would give about
24  advanced interdiction with regard to a specific
25  stop.

## Page 19

1       Does that make sense?
2       A.  It does, but the way that we do that,
3  there's conversations that would be privileged.
4       Q.  Okay.
5       A.  So that's what I'm trying to avoid.
6  And I don't want to answer your question, but
7  I'm trying to also protect the privilege as well.
8       Q.  So you -- we mixed a couple things up
9  here.
10       A.  We did, yeah.
11       Q.  Is this a work product issue or a
12  privilege issue?
13       A.  I think it ultimately comes down to
14  both.
15       Q.  Okay.
16       A.  What I can tell you in generalities,
17  and maybe this will answer your question, is that
18  there is often conversations between myself and
19  members of Troop N.  It will be taken from
20  conversations had with the command staff, and then
21  there's a foundation that I do try and include in
22  all of that training, but there is some change from
23  year to year to include things, new cases or new
24  issues that I'm seeing or new issues that the --
25  concerns that maybe the command staff has.

## Page 20

1       Is that responsive to what you were
2  looking for?
3       Q.  It is, and I'm going to go a little bit
4  further than that.  When you -- when you develop
5  these materials, and I think you said some of this
6  is -- tell me if I'm mischaracterizing this -- some
7  of this is informed by conversations you have
8  with -- with troopers and with command staff about
9  their jobs, fair?
10       A.  I think so, yes.
11       Q.  Okay.  In developing or in updating
12  materials, and I think the legal update that you
13  mentioned is probably a good example, are those
14  materials authored only by you?
15       A.  Okay.  We've -- we're talking about two
16  different things, so I want to make sure I
17  understand.  When you say legal update, I don't know
18  exactly what you're meaning, because the legal
19  department puts out legal updates that are not
20  authored just by me, so I want to make sure that's
21  clear.
22       Q.  So let's use a tangible example.
23       A.  Okay.
24       Q.  Maybe this will help with --
25       A.  Yes, thank you.

5 (Pages 17 to 20)

SARAH WASHBURN  8/9/2021

Page 21

1    Q.  -- the conversation.
2        I'm going to show you what is marked as
3    Exhibit Number 73.
4        (Washburn Exhibit Number 73 was marked
5        for identification by Mr. McInerney.)
6    Q.  And for our record reference, the Bates
7    number is OAG000435 and it runs through 000465.
8    A.  Thank you.
9    Q.  You bet.  If you'll take a minute to
10   familiarize yourself with that, then we can -- and
11   let me know when you're finished, please.
12       MR. CHALMERS:  What was the Exhibit
13   Number, counsel?
14       MR. McINERNEY:  It's 73.
15       MR. CHALMERS:  Thank you.
16   A.  I'm ready.
17   BY MR. McINERNEY:
18   Q.  Do you recognize Exhibit 73?
19   A.  I do.
20   Q.  What is that?
21   A.  It is -- appears to be a paper copy of
22   a PowerPoint that I presented in advanced
23   interdiction in 2019.
24   Q.  Okay.  And it's -- I'm not going to
25   make you go through every page, but it's roughly a

Page 22

1    30 pages or so PowerPoint -- printed version of a
2    PowerPoint, correct?
3    A.  It appears to be, yes.
4    Q.  Okay.  Did you author this material?
5    A.  Yes, except for the quotes from
6    opinions.  I --
7    Q.  Sure.
8    A.  -- just wanted to be very clear.  I
9    don't want to take credit for anyone else's work.
10   Q.  So in terms of the content, but for the
11   cites and the layout, this was created by you,
12   correct?
13   A.  Yes.
14   Q.  When -- when you teach the advanced
15   interdiction course like you did evidently in 2019,
16   is there any other assistance inside the general
17   counsel's office with research or format or anything
18   else?
19   A.  At that time there would not have been,
20   no.
21   Q.  Is there now?
22   A.  Yes.
23   Q.  What's that assistance?
24   A.  Mr. Ganieany.
25   Q.  Can you describe for the record the

Page 23

1    drafting and editing and finalizing process for a
2    PowerPoint like Exhibit 73?
3    A.  Can you break that question down?  I'm
4    not sure I'm completely sure what you're looking
5    for.
6    Q.  I'd like you to describe what the
7    process is that goes into the drafting and editing
8    and the final product of an exhibit like 73.
9    A.  I usually know I want to start at the
10   very beginning, which is the US Constitution, so I
11   usually start with that.  I have certain I guess I
12   would call them fundamental issues that I just want
13   to remind all of our personnel of, the text of the
14   Fourth Amendment, the text of Section 15, the fact
15   that all warrantless searches are, per se,
16   unreasonable, what the aid exceptions to the warrant
17   requirement are, and I understand this is advanced
18   interdiction, but I believe those all bear repeating
19   and reminding.
20       Usually after that point, get into some
21   definitions, because in my mind that's a logical
22   progression.
23       And then from there, specifically if
24   there's any case law I think would be helpful to our
25   personnel, things that I think they need to know.

Page 24

1    For example, this year in 2018, the three cases out
2    of Geary County had come out and I wanted to make
3    sure that that was, again, in the forefront because
4    that was the first time we had had any published
5    asset forfeiture cases since mine.  And mine was
6    procedural, it wasn't a Fourth Amendment issue.  So
7    I wanted to make sure that we were -- I was
8    providing the information of what the most recent
9    opinions and attitude of the court were towards
10   those traffic stops.
11   Q.  Can I interrupt you for just a second?
12   A.  Of course, please.
13   Q.  You -- you talked about the three cases
14   from '19 that were -- that were fairly recent at the
15   time, and then you said they were the first three
16   that had come down since mine.
17       What's that a reference to?
18   A.  There are not usually very many
19   published asset forfeiture cases, and I want to
20   say -- gosh, when was that case -- 2016 or 2017 I
21   had a published asset forfeiture case that dealt
22   with the procedure only and it was out of Ellsworth
23   County.
24       But then these three came out and they
25   were substantive in that they dealt with Fourth

6 (Pages 21 to 24)

## Page 25

1  Amendment issues, traffic stops, and because this is
2  an interdiction program and they were interdiction
3  cases, not our agency's cases, and they had come out
4  in June of 2016 -- excuse me -- 2018, so they would
5  have been after the previous years advanced
6  interdiction, I wanted to kind of include some of
7  the high points of those cases.
8      Q.  A couple questions.  The case that you
9  referred to that came out in '16, do you recall the
10 name of that case?
11     A.  It was a State of Kansas, ex rel,
12 Kansas Highway Patrol versus a 1995 Chevrolet
13 Impala.
14     Q.  Okay.  Thank you.  It was a -- it was a
15 pure asset forfeiture case?
16     A.  Yes, it was.
17     Q.  Right.
18     A.  And as I said, it was procedure only on
19 the court end of it.  It had nothing to do with the
20 stop or the seizure or anything like that.
21     Q.  And then I, as I understand, tell me if
22 I'm wrong, the three cases that came down in '18,
23 Jimenez, Lowery and Schooler, were interdiction
24 cases that turned into criminal cases, correct?
25     A.  I believe they were criminal and

## Page 26

1  forfeiture cases, but, yes, those were the criminal
2  cases.
3      Q.  And you described those as involving
4  procedure.  Can you tell me what you mean by that?
5      A.  No, the case that was in '16 would have
6  been a pure procedure case.  I'm sorry if that was
7  unclear.
8      Q.  No, not at all.
9      A.  These cases I believe I said were more
10 substantive in that they dealt with an issue dealing
11 with traffic stops and Fourth Amendment concerns,
12 which is why I did want to include them.
13         I don't think I've ever trained on the
14 Impala case just because I don't think it's of
15 interest or a necessity to our personnel.
16     Q.  But you have trained on traffic stops,
17 correct?
18     A.  Yes.
19     Q.  On the details of traffic stops,
20 including elements like reasonable suspicion?
21     A.  Yes.
22     Q.  Including elements like length of
23 detention, correct?
24     A.  The legal standard for a detention when
25 you can extend, yes.

## Page 27

1      Q.  Correct.  Okay.  And that -- those have
2  been issues that you have trained on, or trained KHP
3  personnel on, since you got there in '16 -- or in
4  '15?
5      A.  Yes.
6      Q.  Okay.
7      A.  And just to clarify, in '15 I would not
8  have done advanced interdiction.
9      Q.  Understood.
10     A.  Because I think I started in July and
11 they do that in May.
12         Would you like that back?
13     Q.  You know, if you'll stack it right over
14 there just so we can keep track of it, I'd
15 appreciate it.
16     A.  Absolutely.
17     Q.  The court reporter probably would, too.
18         (Washburn Exhibit Number 74 was marked
19         for identification by Mr. McInerney.)
20     Q.  And I'm going to show you now what we
21 have marked for identification as Exhibit Number 74.
22 And the Bates reference is OAG001915.
23         Thank you.
24         Oh, I'm sorry, yes, I'm ready.
25     Q.  Okay.  Do you recognize Exhibit 74?

## Page 28

1      A.  I do not.
2      Q.  Okay.  Haven't ever seen it?
3      A.  I don't believe so.
4      Q.  Do you -- is it consistent with
5  materials provided to -- in trainings for KHP
6  personnel?
7      A.  I don't know.
8      Q.  Okay.  Appreciate your patience here.
9          I'm going to show you what is shortly
10 marked as Exhibit Number 75.
11         (Washburn Exhibit Number 75 was marked
12         for identification by Mr. McInerney.)
13     Q.  The reference is OAG019551, and ask you
14 to take a look at that and let me know when you've
15 had a chance to review it.
16     MR. McINERNEY:  Art, here it is.
17     A.  I've reviewed it.
18 BY MR. McINERNEY:
19     Q.  With regard to Exhibit 75, this is an
20 e-mail chain, a two e-mail exchange, actually, from
21 May 20th of last year, and, notably, you're not on
22 the e-mail chain.
23     A.  I am not.
24     Q.  Okay.  The -- the e-mail at the bottom
25 of the first page at -- of Page 551 looks to be an

SARAH WASHBURN  8/9/2021

Page 29

1  e-mail from Dax Lewis to Luther -- and I'm going to
2  mess up the last name -- Ganieany.
3       A.  Ganieany.
4       Q.  Ganieany, thank you.
5           Who is Mr. Lewis?
6       A.  Lieutenant Lewis is the administrative
7  lieutenant of Troop N, which is our interdiction
8  unit, our criminal interdiction unit.
9       Q.  Okay.  And we've already talked about
10  Mr. Ganieany.
11          The e-mail indicates, again, at the
12  bottom of that first page, that Colin had informed
13  Mr. Lewis that he had been in contact regarding the
14  advanced criminal interdiction case, and then
15  there's some questions about the materials.
16          So let me direct your attention back to
17  May of last year around May 20th.  Was there -- were
18  there some changes that you recall in the materials
19  in the advanced interdiction course?
20       A.  I don't recall.  I'm sorry.
21       Q.  Oh, that's okay.
22          Let me direct your attention to the top
23  of that first page, and there's an e-mail back from
24  Mr. Ganieany to Mr. Lewis, and the e-mail says this:
25  I talked to him for a while yesterday afternoon.

Page 30

1          Let me pause right there.  Do you know
2  who the Colin who's referred to in that first e-mail
3  would be?
4       A.  My only guess is that it would be Colin
5  Wood, who's an Assistant United States Attorney who
6  occasionally handles asset forfeiture cases for the
7  US Attorney's office.
8       Q.  Does Mr. Wood do some training as well?
9       A.  Yes, he does.
10       Q.  Okay.  Do you -- do you and Mr. Wood
11  train together?
12       A.  I wouldn't say together.  We train in
13  close proximity occasionally.
14       Q.  Some of the same subject matter anyway?
15       A.  Similar, absolutely, sure.
16       Q.  I guess what do you mean by similar?
17       A.  My understanding is that he does not
18  cover exactly the same thing I do, but I've only
19  heard him teach once as far as advanced interdiction
20  goes.  When I was prosecuting, I had taken a class,
21  but other than that, I have not heard him teach
22  otherwise.
23       Q.  Okay.  Thank you.
24          The -- the e-mail at the top indicates:
25  I talked to him for a while yesterday afternoon, and

Page 31

1  I think we will be in good shape with his extra
2  four-hour class on traffic stops.  I told him that
3  what we needed covered was the Vasquez case and
4  others in 10th Circuit.  He said that wouldn't be a
5  problem and he would be happy to do that.
6          Did I read that accurately?
7       A.  Appears to be, yes.
8       Q.  Do you recognize what's meant by the
9  Vasquez case reference?
10       A.  I know of the Vasquez case.
11       Q.  What is the Vasquez case?
12       A.  It's a 10th Circuit opinion involving
13  the highway patrol -- well, highway patrol troopers
14  as defendants.
15       Q.  And do you recall when the Vasquez case
16  was decided?
17       A.  I think the initial decision -- I
18  believe the initial decision was 2015, and I don't
19  think that was the appellate decision.  I believe
20  that was the actual district court opinion.
21       Q.  Okay.
22       A.  But it was '15 and '16, I believe, was
23  that time period.
24       Q.  When the Vasquez case was decided by
25  the 10th Circuit, did you incorporate that into your

Page 32

1  training?
2       A.  No.
3       Q.  Do you recall as you sit here -- strike
4  that.  Let me rephrase this question.
5          I think you mentioned that the Vasquez
6  case was a case involving the Kansas Highway Patrol
7  in which the highway patrolman was a defendant; is
8  that right?
9       A.  I believe so, yes.
10       Q.  Do you remember what the holding of the
11  Vasquez case was?
12       A.  My understanding is that it was
13  totality of the circumstances, repeating of RV Zoo
14  (sp), repeating of Wood, so no new case law, but
15  essentially directing law enforcement to articulate
16  the factors and again reinforcing some of the weight
17  that courts were giving some of those factors.
18       Q.  Do you recall that one of those factors
19  was the existence of out-of-state license plates?
20       A.  I recall that being a large part of
21  what the media concern was, yes.
22       Q.  The immediate or media?
23       A.  Media.
24       Q.  Okay.
25       A.  And I recall that that was mentioned in

8 (Pages 29 to 32)

SARAH WASHBURN  8/9/2021

Page 33

1  the decision, but I believe it was given greater
2  weight in the media than it was in the actual
3  decision.
4        Q.   When Vasquez was decided and -- and
5  handed down, in response to that, in response to the
6  opinion itself, did you make changes to any of your
7  training materials?
8        A.   I don't believe so.
9        Q.   Do you recall whether you authored or
10  distributed a legal update as a result of the
11  Vasquez case?
12        A.   I don't recall.  I'm sorry.
13        Q.   That's okay.
14             Is there, ma'am, a threshold that
15  determines from where you sit in your role as
16  counsel for the highway patrol when you will issue a
17  legal update as a result of a recent case?
18        A.   Well, certainly if it presents a newer,
19  novel legal holdings and rulings.  For example, if
20  Rodriguez had been -- if I had been with the patrol
21  when Rodriguez came out, I certainly would have put
22  out an update on that.
23             If based on conversations I've had with
24  troopers or the questions I've been asked I believe
25  that a case will help clarify an ongoing issue, I

Page 34

1  will certainly put it out at that point.
2             Pretty much anything coming out of the
3  US Supreme Court that has anything to do with law
4  enforcement we put out.
5             And then after that I believe it's --
6  at this point it's not really my decision as much as
7  it is coming out of the legal department as a whole,
8  so I don't have the final say anymore.
9        Q.   The legal department meaning the Kansas
10  Highway Patrol's general counsel?
11        A.   Yes.
12        Q.   And you're -- are you half that office?
13        A.   Yes, but a staff attorney rather than
14  the legal --
15        Q.   Understood.
16        A.   -- general counsel, yes.
17        Q.   Okay.  Is -- what's the process
18  internally, if you will, to determine whether a
19  particular holding is -- merits distribution among
20  highway patrol personnel?
21        A.   Well, as I said, with a lot of the US
22  Supreme Court decisions, there's not a whole lot of
23  discussion if it affects law enforcement.  There's
24  an, I believe, an assumption that we're going to put
25  out something on it.

Page 35

1             With state cases, if I see something
2  that I believe is necessary, I will usually have
3  that conversation with Mr. Ganieany, and if I write
4  it, he will review it.  If he writes it, I review
5  it.  And then once we're both comfortable with what
6  it says and that we're articulating it as clearly as
7  we can for our personnel, then it will go out.
8             (Washburn Exhibit Number 76 was marked
9             for identification by Mr. McInerney.)
10        Q.   I'm going to show you what is marked as
11  Exhibit 76.  The OAG reference is 21353, and that's
12  also the listing on the tab.  If you will just take
13  a moment and review that and let me know when you're
14  finished.
15        A.   Yes.
16        Q.   The first page of Exhibit Number 76 is
17  an e-mail from August 6th of 2018 from you to Mr.
18  Carr; is that correct?
19        A.   Yes.
20        Q.   And if I'm not using Mr. Carr's correct
21  title, I -- I apologize.
22             And then it appears as though it is
23  connected with a -- what looks to be a PowerPoint
24  concerning consent; is that accurate?
25        A.   Yes.

Page 36

1        Q.   Do you recognize that PowerPoint that's
2  attached to that, and can you -- first of all, do
3  you recognize that?
4        A.   I recognize pieces of it, and can I
5  explain that?
6        Q.   Yes, please.
7        A.   I don't believe I created this
8  PowerPoint.  I believe that part of the PowerPoint
9  is from material I had taught that lieutenant --
10  he's now a lieutenant -- Lieutenant Carr had
11  requested.  So I did not author this, but some of it
12  is information I had provided.
13        Q.   Okay.  That gets to my question.
14        A.   Okay.
15        Q.   This was, as I understand, not a
16  product that you authored, but is it accurate to say
17  that Lieutenant Carr had submitted it to you for
18  your review?
19        A.   He had asked for my opinion and for any
20  help just to make sure there was nothing glaringly
21  wrong with it legally.
22        Q.   Do you know who the audience was for
23  this presentation?
24        A.   At the time I did.  Now I don't recall.
25        Q.   How often is it the case that someone

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

SARAH WASHBURN  8/9/2021

Page 37

1  like Lieutenant Carr or someone else inside Kansas
2  Highway Patrol has you look over a product like this
3  or review for accuracy a product like this?
4      A.  Not very.  Maybe once or twice a year,
5  if that.  Not very.
6      Q.  When it comes to issues -- and as we
7  said, this involves content in the context of a car
8  stop -- when it comes to issues like that, is there
9  any sort of policy or procedure that requires
10  submission of materials, training materials,
11  education materials, to counsel's office prior to
12  distribution?
13      A.  Not that I'm aware of.
14      Q.  And I think your testimony was -- well,
15  I don't want to characterize it -- how often?
16      A.  Do I review it?
17      Q.  How often do you -- do you find
18  yourself being asked to review material like that?
19      A.  Not very often.
20      Q.  Okay.  Yearly?
21      A.  That kind of makes it sound like it's a
22  repeated thing, and I wouldn't say that.  It is not.
23  It is dependent on the individual who's teaching and
24  whether they want my input.  So when I say it
25  doesn't happen very often, it doesn't.  It's not a

Page 38

1  regular occurrence.
2      Q.  Understood it's not regular.  I'm just
3  thinking about, you know, roughly, how frequently it
4  happens.  So does it happen, say, maybe once a year?
5      A.  Maybe.
6      Q.  Okay.  Probably less frequently than
7  that?
8      A.  Once a year is probably a good average
9  I think.
10      Q.  In your role as counsel for the highway
11  patrol, are you also involved in the process by
12  which troopers' failure to abide by the law is
13  handled?
14      A.  Sometimes.
15      Q.  In what way?
16      A.  Occasionally if there's been a
17  complaint made to professional standards and they
18  want a legal opinion, I am asked.
19      Q.  So what's your job in that situation
20  where there's -- when you say professional
21  standards, by the way, that is an internal sort of
22  look at conduct based on complaints?
23      A.  That's my understanding, yes.
24      Q.  Okay.  What specifically is your role
25  in that process?

Page 39

1      A.  When I'm asked for an opinion, I render
2  one.
3      Q.  Who do you render it to?
4      A.  Usually the investigator who asks.
5      Q.  What happens -- once you render that
6  opinion, what then happens with your opinion?
7      A.  I don't know.  Once I've rendered it,
8  it's kind of out of my hands, so I'm -- I'm not sure
9  that I understand.
10      Q.  Is -- is that part of the disciplinary
11  process?
12      A.  It can be, I would imagine, but, again,
13  I don't know.
14      Q.  Is it -- is it part of a retraining or
15  a re-education process?
16      A.  It can be.
17      Q.  Are you ever called upon to continue a
18  trooper's training or education with regard to legal
19  issues?
20      A.  I have been, yes.
21      Q.  In what sorts of circumstances?
22      A.  If there's a concern about the
23  performance that they think can be remedied by more
24  training, more legal training, then I provide that
25  legal training.  That's the best way I know how to

Page 40

1  answer --
2      Q.  Okay.
3      A.  -- that question.
4      Q.  Give me -- and I'm not looking for
5  specific circumstances, but give me a for instance.
6  When does that come to your desk for action?
7      A.  I have been asked to provide additional
8  training or refresher training on Fourth Amendment
9  issues, search and seizure, which does include
10  traffic stops by necessity, and that's the biggest
11  one I can think of off the top of my head.
12      Q.  Is there a standard procedure that you
13  use involving the trooper when that situation
14  arises?
15      A.  No, because it depends on what I'm told
16  they want to do.  In -- in some instances they may
17  say we just want this trooper to sit in on parts of
18  the basic academy where you're teaching specific
19  subjects.
20      They may say we want you to do an hour,
21  hour-and-a-half of remedial training and here is the
22  issue and here's all of the material that we have so
23  that I can tailor that training and make sure that
24  we are addressing any concerns that exist.
25      So it's -- the training is tailored to

10 (Pages 37 to 40)

## SARAH WASHBURN  8/9/2021

Page 41

1  fit the situation and to make sure that it is -- it
2  addresses the concerns.
3      Q.   Is there any other way that that issue
4  comes to you than the professional standards
5  investigation?
6      A.   There's no other way it has come to me.
7      Q.   Okay.  Let me get -- I'll get some
8  specifics here.
9          (Washburn Exhibit Number 77 was marked
10         for identification by Mr. McInerney.)
11     Q.   I'm going to show you what is marked
12  for identification as Exhibit Number 77.  It is
13  beneath tab CTRL72.  If you would take just a moment
14  to review that.
15     A.   Okay.
16     Q.   Let me know when you're finished,
17  please.
18     A.   Sure.  Okay, I've reviewed it.
19         (Washburn Exhibit Number 78 was marked
20         for identification by Mr. McInerney.)
21     Q.   And now I'm going to show you a
22  one-page exhibit with a sticker on it that's
23  Exhibit 78, and the reference on that is the same
24  prefix, CTRL73.
25     A.   Thank you.  Okay.

Page 42

1      Q.   The first exhibit, 77, that I handed
2  you, correct me if I'm wrong, is a Motion to Quash
3  Stop, Detention and Arrest and Suppress Evidence in
4  a case called State of Kansas versus Joshua Jones.
5  Did I -- is that accurate?
6      A.   It appears to be, yes.
7      Q.   Are you familiar with that case?
8      A.   Not at all.
9      Q.   That case involved a trooper by the
10  name of Adam Simone.  Do you know Trooper Simone?
11     A.   Yes, I do.
12     Q.   Okay.  That case involved a 2017 stop
13  of a car that had Ohio tags by Trooper Simone,
14  involved a traffic warning, and then the stop was
15  ended and a narcotics interrogation began.  Mr.
16  Jones declined consent, there was a K-9 called, and
17  there were drugs and paraphernalia that were
18  recovered.
19         This -- this occurred -- well, you'll
20  see the date on Exhibit Number 78 is 3/22 of '19,
21  and 78 is what looks to be a handwritten text entry
22  in the case, for lack of a better description, by
23  the court granting this -- the motion that is
24  Exhibit 77.
25         And when motions like this -- and I

Page 43

1  think you testified that you're not familiar with
2  this particular case?
3      A.   Not at all.
4      MR. CHALMERS:  Let me interrupt for
5  just a second.  The discussion that you gave, the
6  description of the case is facts not in evidence.
7  Now you've moved on to the next question.  I would
8  just object to the statement as lack of foundation.
9  Wouldn't be proper anyway for you to testify,
10  counsel.
11     THE REPORTER:  Would you say that last
12  part?
13     MR. CHALMERS:  Wouldn't be proper
14  anyway for you to testify, counsel.
15     But go ahead and ask your question.
16  BY MR. McINERNEY:
17     Q.   When a motion is filed, whether it's a
18  state case or federal case, that is premised on
19  Kansas Highway Patrol troopers' failure to follow
20  the law with regard to search and seizure
21  procedures, is that something you're made aware of?
22     A.   Almost never.
23     Q.   In what circumstances would it come to
24  your attention?
25     A.   If the trooper were to call me and ask

Page 44

1  me about it.  Or I suppose it could come to me
2  through a lieutenant who supervises a trooper who
3  had that happen.  But those are the only two ways I
4  might -- and it's almost incidental.  It doesn't
5  happen very often at all.
6      Q.   You mentioned if a lieutenant reaches
7  out to you about one of his supervisee troopers.
8  What -- from where you sit, what's the purpose of
9  that contact?
10     A.   Sometimes it's just clarification about
11  what the law is.  Either there's a misunderstanding
12  or -- that's not the correct word, excuse me --
13  there's a difference of understanding sometimes
14  about what they are permitted to do, and so they
15  reach out to me to find out and make sure that they
16  are doing what they are supposed to be doing and
17  they're not exceeding their authority under the law.
18  That has been the reasons I've had lieutenants or
19  supervisors reach out to me in the past.
20     Q.   What's your job past that?  Do you have
21  responsibility for retraining?
22     A.   If requested.
23     Q.   By who?
24     A.   A supervisor.
25     Q.   And just so I understand your

11 (Pages 41 to 44)

## SARAH WASHBURN  8/9/2021

Page 45

1  testimony, as a matter of course, though, this
2  wouldn't necessarily come to your attention, the
3  this being a motion to suppress?
4      A.  Motions to suppress almost never come
5  to my attention.
6      Q.  Order suppressing evidence?
7      A.  Same.
8      Q.  Okay.  In a situation where a trooper's
9  conduct or failure to -- to execute, say, a lawful
10  search results in the dismissal of a case, does that
11  come to your attention?
12      A.  Very rarely.
13      Q.  Does it come to your attention in your
14  job where a trooper has repeated violations that are
15  found by courts or even internally?
16      A.  Probably not my attention.  If anyone's
17  attention, it would be probably brought to Mr.
18  Ganieany's attention.
19      Q.  Are you familiar with the process by
20  which it would come to Mr. Ganieany's attention?
21      A.  I am not.
22      Q.  Is there a policy or written procedure
23  of the Kansas Highway Patrol that raises issues like
24  that to the attention of Mr. Ganieany or whoever's
25  in his position?

Page 46

1      A.  Not that I can think of right now.
2      Q.  Do you know of any procedure within the
3  highway patrol for -- for retraining or re-education
4  where a trooper has repeated violations of law?
5      A.  I can't think any -- of any off the top
6  of my head.
7      Q.  Prior to Mr. Ganieany occupying the
8  position he occupies now, was there a different
9  process or was there a -- was there a different
10  process?
11      A.  I believe so, but I would not have been
12  involved with that at all.
13      Q.  And what was the different process?
14      A.  I don't know.  I wasn't involved with
15  it at all.  And now I am at least read into it, in
16  part, because Mr. Ganieany and I have conversations,
17  but at that point I was not.
18      Q.  But you believe there was a different
19  process?
20      A.  I believe there was, but that's only to
21  the best of my understanding.
22      Q.  Okay.
23      MR. CHALMERS:  It's not really
24  bothering me, but is the phone picking up that
25  dinging sound, is that where that's coming from?

Page 47

1      THE REPORTER:  It's just people getting
2  on and off.
3      MR. CHALMERS:  Is there a way to
4  communicate to them they probably need to put their
5  stuff on silent?
6      THE WITNESS:  I don't think they can
7  control that.
8      MR. McINERNEY:  I think it's a function
9  of the platform.
10      MR. CHALMERS:  Oh, I see.
11      MR. McINERNEY:  Yeah.
12  BY MR. McINERNEY:
13      Q.  Do you know if there's a process at the
14  highway patrol now or in the past for troopers who
15  have one or more violations of law like we've --
16  like I've described to you to be placed on a
17  probationary status?
18      A.  Not any more than any other employee
19  who has an unsatisfactory review.  And I would not
20  have been involved with that at all because that's
21  personnel and I -- I have not been involved with
22  that traditionally.
23      Q.  Does a situation like we've described,
24  that is an unlawful search and seizure resulting in
25  the dismissal of a case, does that yield an

Page 48

1  unsatisfactory review?
2      MR. CHALMERS:  Object to form.  Assumes
3  facts not in evidence.
4      A.  I don't know.
5  BY MR. McINERNEY:
6      Q.  Okay.
7      (Washburn Exhibit Number 79 was marked
8      for identification by Mr. McInerney.)
9      Q.  I'm going to show you now what is
10  marked as Exhibit Number 79.  The Bates reference is
11  CTRL74.  And if you would, ma'am, take a look at
12  that and let me know when you've had a chance to
13  review it.
14      A.  Yes, sir.
15      Q.  Please.
16      (Washburn Exhibit Number 80 was marked
17      for identification by Mr. McInerney.)
18      A.  Done.
19      Q.  Exhibit 79 is a Motion to Suppress in a
20  case called State of Kansas versus Marquis Burton.
21      Are you familiar with that case?
22      A.  I am not.
23      Q.  I'm going to show you what's marked as
24  Exhibit Number 80 and have you take a quick look at
25  that if you would, please.

12 (Pages 45 to 48)

SARAH WASHBURN  8/9/2021

Page 49

1    A.  Done.
2    Q.  Do you recognize Exhibit 80?
3    A.  I do not.
4    Q.  Okay.  I will direct your attention to
5  the second page of 80.  Do you see that caption,
6  Order of Dismissal and Recall of Warrant, in the
7  same case, State of Kansas versus Marquis Burton?
8    A.  I do.
9    Q.  And I think your testimony was that
10  you've never heard of either of these cases,
11  correct?
12    A.  That is correct.
13    Q.  Have you ever had occasion -- I'll just
14  represent to you that the same trooper, Trooper
15  Simone, was involved in both cases, both of which
16  were dismissed following the filing of a motion to
17  suppress.
18      Have you ever had any contact with
19  Trooper Simone?
20      MR. CHALMERS:  Let me object to the
21  form, initially the statement.  Again, counsel, it
22  would be helpful if you don't testify.
23      You can go ahead and answer the
24  question, whether you had contact.
25      MR. McINERNEY:  It's foundational.

Page 50

1    A.  I have --
2      MR. CHALMERS:  I don't think
3  foundational as you testify, counsel.
4      Go ahead.
5    A.  I have had contact with Trooper Simone.
6  BY MR. McINERNEY:
7    Q.  What kind of contact have you had with
8  Trooper Simone?
9    A.  I believe he's been in classes I've
10  taught, and I believe I've spoken with him on the
11  phone and run into him out at the -- where this --
12  when he was with the interdiction unit out there,
13  and now that he's a lieutenant with Troop B, out at
14  that office, which is the same office.
15    Q.  Same office as Troop N?
16    A.  Troop N is housed out of Troop B, yes,
17  sir.
18    Q.  Have you ever had a conversation with
19  Trooper Simone regarding either one of these cases?
20    A.  Not that I recall.
21    Q.  Do you know whether anybody from your
22  office, that is the general counsel's office, has
23  had any conversation with Mr. -- excuse me --
24  Trooper Simone about either of these cases?
25    A.  I don't.

Page 51

1      MR. McINERNEY:  Let's, if we can, take
2  about a five-minute break, please.
3      THE WITNESS:  Good.  I was just about
4  to ask you if we could do that.
5      MR. McINERNEY:  I'm reading your mind.
6      THE VIDEOGRAPHER:  We are now off the
7  record at 9:59 a.m.
8      (Recess taken.)
9      THE VIDEOGRAPHER:  We are now on the
10  record at 10:07 a.m.
11      (Washburn Exhibit Number 81 was marked
12      for identification by Mr. McInerney.)
13  BY MR. McINERNEY:
14    Q.  Ma'am, I'm going to show you what has
15  been marked for identification as Exhibit Number 81.
16  If you would take a look at that and let me know
17  when you're finished, I would appreciate it.
18      MR. CHALMERS:  Does it have a Bates
19  number?
20      MR. McINERNEY:  It is, yes.  OAG020738.
21    A.  Okay.
22  BY MR. McINERNEY:
23    Q.  Do you recognize Exhibit 81?
24    A.  I recognize the PowerPoint, and I don't
25  specifically remember the e-mail, but it appears to

Page 52

1  be something I would have sent.
2    Q.  Okay.  The -- what is the
3  PowerPoint and -- well, what's the PowerPoint?
4    A.  The PowerPoint appears to be the one
5  that I would have presented at the 2018 advanced
6  interdiction, at least based upon the e-mail that is
7  the first page of that exhibit.
8    Q.  And that -- the e-mail was to Jimmie
9  Atkinson and Christopher Bauer.
10      Do you see that in the "to" line?
11    A.  I do.
12    Q.  Who are those people?
13    A.  At the time, Captain Atkinson was the
14  captain of the training academy, and Lieutenant
15  Bauer was a lieutenant under him.
16    Q.  And this was -- am I correct this was
17  one course or one presentation in the advanced
18  interdiction course?
19    A.  It was one part of it, yes.
20    Q.  Okay.  Do you remember whether -- and
21  we're talking about three years ago -- was this the
22  only presentation that you did in the advanced
23  interdiction course?
24    A.  I believe so, yes.
25    Q.  Okay.  There are Bates numbers on the

## SARAH WASHBURN  8/9/2021

Page 53

1 lower right-hand corner of every page in that
2 exhibit, and they -- it starts with OAG.
3         I'm going to ask you, if you will, to
4 turn to the page that has 20749 at the bottom.
5     A.  Okay.
6     Q.  That page at the top says Trooper
7 Two-Step.
8         Do you see that?
9     A.  I do.
10     Q.  I should have asked you this before,
11 did you create this PowerPoint?
12     A.  Yes, I did.
13     Q.  And then there's a couple bullet
14 points, but let me ask you before we get there, what
15 is Trooper Two-Step?
16     A.  I believe it to be shorthand for a
17 practice of physically disengaging at the end of a
18 traffic stop to attempt to engage in a consensual
19 encounter.  I didn't create the term, but that's the
20 way I understand it to be used.
21     Q.  Okay.  What significance does Trooper
22 Two-Step have in the context of an advanced
23 interdiction course?
24     A.  It is shorthand, and if you go back a
25 couple of pages, it's shorthand for dealing with a

Page 54

1 consensual encounter as long as a reasonable person
2 would feel -- feel free to leave.
3         And I believe I also explained in a
4 couple pages later, just using that as the
5 shorthand, as language that the troopers would
6 understand to present case law and some other
7 factors, specifically State versus Thompson, it
8 appears on 20752.
9     Q.  Okay.  On that -- on the next page, the
10 20750.
11     A.  Uh-huh.  Sorry.
12     Q.  That -- that second bullet point
13 indicates at first:  It's not mandatory to disengage
14 as long as a reasonable person in the suspect's
15 position would feel free to leave, even if they are
16 not.
17         Did I read that accurately?
18     A.  You did.
19     Q.  Is that a -- was that your statement of
20 law as it existed in 2018?
21     A.  That's what's in the PowerPoint.
22     Q.  You wrote the PowerPoint?
23     A.  I did.
24     Q.  Okay.
25     A.  And there would have been explanation

Page 55

1 surrounding that that is not contained in the
2 PowerPoint.  So the PowerPoint -- and none of my
3 PowerPoints are meant to be stand-alone.  They're
4 meant to accompany the actual instruction that is
5 given.
6     Q.  What instruction or additional
7 information would have accompanied that second
8 bullet point?
9     A.  I believe the explanation would have
10 been, well, there's no case law that they must
11 disengage.  It is judged as part of the totality of
12 the circumstances and the standard is would a
13 reasonable person feel free to leave.
14         So, you know, just kind of elaborating
15 on the point that is present, that that is -- the
16 Trooper Two-Step is not a mandated -- it is not a
17 court-created -- it's not a court-created factor.
18 It's language that someone else has created and that
19 has kind of made its way into the lexicon.  But it
20 would have been an explanation that that is only an
21 explanation of one of the factors the court looks at
22 is potential disengagement, and that none of those
23 factors by themselves is sufficient to create that
24 impression that an individual -- a reasonable person
25 would feel free to leave.  It's all a part of the

Page 56

1 totality of the circumstances.
2     Q.  Is it -- did you teach -- let me ask
3 you a better question.
4         In 2018, was it part of your teaching
5 at the advanced interdiction course that the --
6 what's known as this Trooper Two-Step, and I think
7 we have an understanding of what that is, is
8 unnecessary?
9     A.  It's -- yes.  To the point where
10 anything is unnecessary as long as the court can
11 rule from the totality of the circumstances that the
12 total encounter is consensual.  It's not necessary
13 to actually have a break in time, and I believe
14 there's actually case law, state case law, that
15 dictates that.  And that would have been the State
16 versus Thompson case I believe that I cited a couple
17 pages later.
18     Q.  The training in '18 that you presented
19 this advanced interdiction course, is that training
20 recorded?
21     A.  No, I don't believe it was.
22     Q.  Do you know whether it was broadcast at
23 the same time that you were presenting it?
24     A.  I don't believe it was.
25     Q.  If you'll turn to 20752, that cites at

14 (Pages 53 to 56)

SARAH WASHBURN  8/9/2021

Page 57

1  the very bottom, that cites the Thompson case that
2  you've discussed or mentioned a couple times.
3      A.   Yes.
4      Q.   The -- and what you represent there is
5  that you -- it says you don't have to physically
6  engage or two-step, but it's a factor.
7          I -- I assume that that is part of what
8  you were calling the totality of the circumstances,
9  correct?
10     A.   Well, it says I don't have -- you don't
11 have to physically disengage, and I think you said
12 engage.
13     Q.   Oh, excuse me.
14     A.   Just misread it.
15     Q.   Yep.
16     A.   But I believe that is a clear -- that's
17 a clear summary or at least a synopsis of what
18 Thompson indicated, yes.  And while it's not a
19 direct quote, obviously there's no quotes, but I
20 believe that to be a fair interpretation of what
21 Thompson articulated.
22     Q.   And this exhibit was the 2018
23 interdiction course, correct?
24     A.   I believe that to be true, yes.
25 Normally I put the year on the first slide and I

Page 58

1  didn't, so just like I said, based on that e-mail, I
2  think that's correct.
3      Q.   Let me refer you back in that pile to
4  Exhibit Number 76.  And -- and for -- it's the
5  consent exhibit that we discussed that is topped by
6  an e-mail from you to Lieutenant Carr.
7      A.   Yes, sir.
8      Q.   If you would, thumb about halfway
9  through that to the page at the bottom right-hand
10 corner that says OAG21358.
11     A.   Okay.  I have it.
12     Q.   At the top it says in red "consent" and
13 then there are several bullet points.
14         The first bullet point says:  You don't
15 have to actually break contact or tell them they are
16 free to go.
17         Do you see that?
18     A.   I do.
19     Q.   Did I read that right, accurately?
20     A.   Yes.
21     Q.   Okay.  Do you recall in that exhibit,
22 76, whether that was your content or was that
23 Lieutenant Carr's content?
24     A.   That wouldn't have been mine.
25     Q.   Okay.  Is -- nevertheless, I think you

Page 59

1  testified earlier you reviewed this for accuracy,
2  correct?
3      A.   I believe it to be, while not perhaps
4  the best statement of law, I do believe it to be
5  accurate, yes.
6      Q.   How is it not the best statement of
7  law?
8      A.   I don't think it's as clear as it could
9  be and I don't think it emphasizes the totality of
10 the circumstances the way it should.
11     Q.   Okay.  The second half of that
12 sentence, "Or tell them they are free to go," is
13 that a tenet of what you teach in your advanced
14 interdiction course?
15     A.   I believe my statement has always been
16 if you use the phrase "free to go," they must be
17 free to go.
18     Q.   As opposed to?
19     A.   As opposed to any other phrase that may
20 signal the end of the traffic stop.
21         But my statement has always been, and
22 this is based on Justice Beier's statements when
23 they were hearing oral arguments on those three
24 Geary County cases, you know, free to go means free
25 to go.  If he was a law enforcement officer, tell

Page 60

1  them that.  Any consent based on that could be
2  problematic because it appears to be based on an
3  untruth, and if you're seeking to waive a
4  fundamental right, you can't base that on an
5  untruth.
6          I believe there's actually a couple of
7  slides to that effect in the last exhibit we were
8  looking at as well.
9      Q.   In Exhibit 81?
10     A.   I believe that's the number, yes, sir.
11     Q.   I think you're talking about Page 754?
12     A.   I've got to get back there, sorry.
13     Q.   That's okay.  Take your time.
14     A.   I'm trying to keep these in order.
15 752, is that what you said?
16     Q.   754.
17     A.   54, okay, thank you.  Yes.
18     Q.   And in that slide, in fact it's titled
19 Free to Go?
20     A.   Yes.
21     Q.   In that slide, your recommendation is
22 to adopt different phrases, correct?
23     A.   If they're going to -- if they are
24 choosing to signal the end of the enforcement action
25 and they wish to pursue a consensual encounter, yes,

15 (Pages 57 to 60)

SARAH WASHBURN  8/9/2021

Page 61

1  they may wish to chose a different phrase.
2      Q.  Does the end of the enforcement action
3  mean that a motorist is free to go?
4      A.  It should.
5      Q.  But the phrase "free to go" is not
6  something you recommend, correct?
7      A.  Unless they are absolutely free to go,
8  unless they have -- unless they have not established
9  reasonable suspicion that would allow a continued
10  detention.
11      Q.  From -- from your position as -- as a
12  trainer in this -- in the situation we're talking
13  about, are there degrees of freedom to go?
14      A.  I think we're talking across purposes.
15  May I try and explain?
16      Q.  Please.
17      A.  Okay.  So there are times I believe
18  that law enforcement attempts to build reasonable
19  suspicion during the course of a traffic stop, and
20  in order to maintain a cordial environment, they at
21  the same time will try to seek a consensual
22  encounter, seeking two parallel tracts as exceptions
23  to the warrant requirement.
24          My statement has been if you're going
25  to do that and you have reasonable suspicion, don't

Page 62

1  tell someone they're free to go because they're not
2  free to go, you have reasonable suspicion.
3          However, if you do not have reasonable
4  suspicion and you wish to seek a purely consensual
5  encounter, there's no problem with telling someone
6  they're free to go.  But if you tell them they're
7  free to go, they must be free to start the car and
8  leave the encounter.  And that goes back to, I
9  believe I've -- and I don't remember which
10  PowerPoint it was in that I did -- I talked about
11  the four types of law enforcement citizen
12  encounters.
13          Did that clarify what you were asking?
14      Q.  I -- I appreciate your statement.
15      A.  Okay.
16          (Washburn Exhibit Number 82 was marked
17          for identification by Mr. McInerney.)
18      Q.  I'm going to show you what's marked as
19  Exhibit 82.  It is OAG22535 through 538.
20      A.  Thank you.  Okay.
21          (Washburn Exhibit Number 83 was marked
22          for identification by Mr. McInerney.)
23      Q.  And I'm going to show you what's marked
24  as Exhibit 83, which is OAG22557 through 564.
25      A.  Okay.

Page 63

1      Q.  Directing your attention to Exhibit 82,
2  can you tell us what that is?
3      A.  It appears to be an e-mail from myself
4  to Patty Wolfe out at the academy, including the
5  lesson plan -- well, the PowerPoint.  And then there
6  appears to be a Lesson Plan Approval Form attached
7  as well.
8      Q.  Is that a -- is that part of the
9  process for submitting materials?
10      A.  Yes, it is.
11      Q.  What is that process, briefly?
12      A.  If I know that I'm teaching something,
13  and every time that I teach something, I have to
14  submit -- any PowerPoint that I'm using, materials
15  that I'm using, and this HP-119 form, the Lesson
16  Plan Approval Form, and I submit that to the
17  training academy.
18      Q.  And it comes back approved?
19      A.  I've never had a response at all.
20      Q.  Okay.
21      A.  I would imagine if there was an issue I
22  would be told.  There are times when I have sent the
23  HP-119 to the academy, but only after I have
24  submitted it just for review and to kind of look at,
25  so as an FYI to lieutenants and captains where I'm

Page 64

1  doing training as a courtesy.
2      Q.  And on Exhibit Number 82, that, just so
3  the record's clear, that's the 2020 lesson plan and
4  legal update, correct?
5      A.  Appears to be, yes, sir.
6      Q.  Exhibit Number 83, a later part of the
7  cover page that's in Exhibit 82, is -- runs from
8  OAG22557 through 564.
9          Did you author this PowerPoint?
10      A.  I did.
11      Q.  The section that we've -- that I pulled
12  out that is Exhibit Number 83 concerns roadside
13  detentions, correct?
14      A.  It does.
15      Q.  Can you describe -- and using for
16  reference this -- the PowerPoint from 2020, how do
17  you go about training on the sufficiency of a break
18  between the stop and a consensual encounter --
19  encounter?
20      A.  I relate it back to the totality of the
21  circumstances because it's a heavily fact-driven
22  determination, so there has to be a sufficient break
23  in the encounter that based on the totality of the
24  circumstances, everything else that's happening, a
25  reasonable person would feel free to leave.

16 (Pages 61 to 64)

## SARAH WASHBURN  8/9/2021

Page 65

1       Q.   With respect to -- you use the phrase
2   "multitasking" from time to time.
3       A.   Well, that's because the court uses the
4   phrase multitasking.
5       Q.   Right.  And I understand that.  It
6   shows up in --
7       A.   Schooler.
8       Q.   -- Schooler and that references
9   Rodriguez.
10          When you train on the issue of roadside
11   detentions, and specifically the issue of questions
12   during the detention, do you train on what's --
13   what's known as multitasking?
14       A.   As a short form, but I explain what I
15   mean by that.
16       Q.   And what do you mean by that?
17       A.   What I mean by that is while you were
18   diligently pursuing the ends of the traffic stop,
19   you may ask additional questions.  The courts have
20   routinely said that you may ask questions not
21   related to the scope of the traffic stop if it does
22   not impermissibly extend the stop, and they suggest
23   multitasking in the plain language of the opinion.
24          I have also explained that the courts
25   do allow you to ask questions that are related to

Page 66

1   the purpose of the initial traffic stop and those
2   are not deemed to extend the traffic stop because
3   they are related to the initial purpose and for
4   which you've already articulated reasonable
5   suspicion.
6          So when I tell them if they're going to
7   ask questions that they believe may be unrelated,
8   they need to still be pursuing the ends of the
9   traffic stops such as asking for license, proof of
10   insurance, registration, running the checks,
11   drafting the citation or the warning, any paperwork
12   attendant with that, all normal functions attendant
13   of a traffic stop, and they need to be doing those
14   at the same time so as to not impermissibly extend
15   the traffic stop.
16       Q.   In the -- in the course of developing
17   this materials -- these materials, we talked about a
18   small handful of presentations that you've given,
19   usually in the advanced interdiction course context.
20   I want to loop back on something that you said
21   earlier today, and tell me, first of all, whether
22   you recall this testimony because I want to get it
23   right.
24          I think you testified earlier that with
25   respect to review and finalization of the materials,

Page 67

1   that you don't have final say anymore.
2       Q.   Do you remember that testimony?
3       A.   That's correct.
4       Q.   Okay.  Seems to me that refers back to
5   a time prior to now when you did have final say; is
6   that accurate?
7       A.   It sounds that way, but I need to
8   clarify because I don't think it is an accurate
9   representation of what was going on.  I work for a
10   paramilitary organization and I have never had final
11   say over anything.
12          However, I was -- there was less
13   collaboration prior to Mr. Ganieany's on-boarding
14   than there is now.  Now there is significantly more
15   collaboration and review, and I loop him in quite a
16   bit more than I did in the past, quite frankly
17   because my boss previously didn't want to know
18   everything I was doing, even though I told her as
19   much as I could.
20          I have never had zero oversight.  I
21   have always had some oversight.  Whether it is a
22   lieutenant, a captain, there's always been someone
23   who has -- I have tried to work with, if not
24   directly for, to make sure that what we are
25   presenting is accurate and it is the best possible

Page 68

1   training we can give.  But I don't have complete
2   control, and never have had complete control over
3   what I teach.
4       Q.   You mentioned by title, but not name,
5   your prior boss.  Who was that?
6       A.   I believe she's using her maiden name,
7   so it would be Tammy Mundil, M-U-N-D-I-L.
8       Q.   And she was general counsel when you
9   arrived in 2015; is that right?
10       A.   She was not.
11       Q.   Okay.
12       A.   She was promoted to general counsel
13   when I was there.  There was a restructuring of the
14   legal department, oh, gosh, perhaps 2016, 2017.  I
15   don't remember the exact year.
16       Q.   Okay.
17       A.   When I arrived, I reported directly to
18   a major.
19       Q.   Okay.  And once the restructuring had
20   occurred, then you reported to Tammy, and I --
21       A.   Yes.
22       Q.   -- don't recall her name, prior to
23   that.
24          You mentioned that she didn't -- I
25   think your phrase was she didn't want to know.  Was

17 (Pages 65 to 68)

SARAH WASHBURN  8/9/2021

Page 69

1   that by policy or practice?
2       A.   That was not by policy or practice of
3   the highway patrol.  That was simply the way she
4   worked.  I have always had a practice of telling my
5   supervisors what I'm doing and looping them in and
6   asking for advice and counsel when I felt it was
7   necessary, and it's a pattern and practice that goes
8   back to my first job.  It's just now I have someone
9   who actually will participate in that process rather
10  than being a more passive part of that process.
11      Q.   So is it a fair statement that with
12  respect to materials that you authored and
13  developed, those were pretty much your materials?
14      A.   They're my materials, but often they
15  were -- again, I sent them to and discussed them
16  with members of the patrol prior to sending them and
17  prior to teaching them, so if there were concerns
18  about the clarity, if there were concerns about the
19  content, we could discuss it prior to presenting it
20  to our personnel.
21          But that was not always with my direct
22  supervisor as the general counsel.  Sometimes it was
23  with members of the chain of command for -- excuse
24  me -- the interdiction unit, because as law
25  enforcement officers, they know what -- what they

Page 70

1   can get out of training.  And sometimes it was a
2   question of, well, you probably should clarify what
3   you mean by that, and occasionally it was maybe we
4   should talk about this, too; okay, that's a great
5   idea.
6          (Washburn Exhibit Number 84 was marked
7          for identification by Mr. McInerney.)
8       Q.   I'm going to show you an exhibit marked
9   Number 84.  The Bates reference number begins with
10  P000117 and it runs through 150.  If you would --
11  I'm sorry -- if you would take a look at that and
12  let me know when you've had a chance to scan it.
13         (Washburn Exhibit Number 85 was marked
14         for identification by Mr. McInerney.)
15      A.   Okay.
16      Q.   Ma'am, that exhibit is -- I'll describe
17  it as kind of a compilation exhibit, several
18  articles, media pieces, if you will, so I want --
19  and it's not all the same piece.  I want to talk to
20  you about several elements of this, so I'm going to
21  refer to, again, those Bates number pages toward the
22  bottom.  The -- so we're going to start kind of in
23  the middle.
24          If you go to Bates 128; do you see
25  that?

Page 71

1       A.   I do.
2       Q.   Okay.  Do you recall this article?  And
3   I'll tell you that it's from March of 2017, so
4   it's -- it's four-plus years old, but do you recall
5   this article in the Topeka Capital Journal?
6       A.   I don't, and I don't recall providing
7   the quotes they have listed in there.  I believe
8   they took them from another news source.
9       Q.   Okay.  Were you, in your capacity in
10  the counsel's office, were you aware that the
11  Capital Journal was working on this piece?
12      A.   I may have been, but I don't recall as
13  I sit here today.
14      Q.   Okay.
15      A.   I imagine I was at the time.
16      Q.   When -- when you're made aware of media
17  inquiries similar to this, what -- what -- whatever
18  the topic is, are you -- are you often a quoted
19  source for media pieces?
20      A.   No.  I try not to be.
21      Q.   Do you undergo any media training in
22  your capacity as counsel for the highway patrol?
23      A.   No.
24      Q.   Okay.  When -- when you're made aware
25  of pieces that are either in the works or being

Page 72

1   investigated by media outlets, do you work with the
2   agency's public information officer?
3       A.   I have, yes.
4       Q.   Okay.  Who is the public information
5   officer?
6       A.   Oh, gosh.
7       Q.   Today?
8       A.   Today.  We have several of them, but I
9   would imagine -- oh, and I blanked on her name now.
10  And I can only think of her first name, I'm sorry.
11      Q.   That's okay.
12      A.   She's a lieutenant.  It's Candice.
13      Q.   Do you recall in March of '17 when this
14  article appeared who the PIO was at that point,
15  public information officer?
16      A.   I believe it may have been Lieutenant
17  Winters, Adam Winters.
18      Q.   Okay.  Is it a practice in your office
19  or in the highway patrol to have meetings to prepare
20  for media pieces or providing information to media?
21      A.   Not sit-down meetings, but if they are
22  requesting information or they're requesting any
23  counsel on what they can and cannot release, we will
24  provide that.  And when I say we, I mean the office,
25  which it usually means I'm looped into it.

18 (Pages 69 to 72)

## SARAH WASHBURN 8/9/2021

### Page 73

1       But currently Mr. Ganieany, as the
2 general counsel, would probably spearhead that and
3 ask for my input, and then one or both of us -- one
4 or the other of us, not both -- would provide our
5 response.
6       **Q.** Okay. You just mentioned information
7 that is appropriate or not appropriate to release.
8 I'm assuming that that takes into account the Kansas
9 Open Records Act?
10       **A.** Absolutely.
11       **Q.** Is there a designated officer in the
12 highway patrol who is the KORA, Kansas Open Records
13 Act, officer?
14       **A.** Not as such, but Mr. Ganieany, as the
15 records custodian, fulfills that role.
16       **Q.** Okay. Do you have any responsibilities
17 when it comes to -- let me ask you a better
18 question.
19       Do you have any agency-wide
20 responsibilities when it comes to KORA?
21       **A.** Only as designated by Mr. Ganieany, if
22 he has -- can't handle something, he'll ask me to
23 take care of it.
24       **Q.** If you will turn your -- that Exhibit
25 Number 84 to P 129.

### Page 74

1       **A.** Yes.
2       **Q.** The piece represents that there had
3 been some communication back and forth between the
4 Capital Journal, the Topeka Capital Journal, and the
5 Kansas Highway Patrol. And then about halfway down
6 that page there's a -- there's a quote with regard
7 to requesting information. The quote is attributed
8 to you. It says: The problem is not that the data
9 doesn't exist. The data probably does exist
10 somewhere, Washburn said. The problem is actually
11 that it doesn't exist in a way that we can extract
12 it for you.
13       Did I read that accurately?
14       **A.** You did.
15       **Q.** Do you recall that quote?
16       **A.** I do not.
17       **Q.** Okay. Do you recall what you were
18 referring to when you said the data probably does
19 exist somewhere?
20       MR. CHALMERS: Assumes facts not in
21 evidence.
22       **A.** I -- I don't recall what the context
23 was. I'm sorry.
24 BY MR. McINERNEY:
25       **Q.** Do you recall whether you were the

### Page 75

1 Kansas Highway Patrol official responsible for
2 responding to these data requests by the Capital
3 Journal?
4       **A.** The KORA, Kansas Open Records Act,
5 individual would have still been records custodian
6 and at that time that would have been Ms. Mundil.
7 At the time I believe she was Tammy Lord (sp).
8       **Q.** Okay.
9       **A.** I may have assisted, but I don't have
10 any more information. I don't recall specifically
11 what they asked for.
12       **Q.** Let me direct your attention to the
13 next page, 130. Excuse me. At the very top there's
14 another quote attributed to you, and the quote is:
15 I am very confident that the patrol has never
16 trained that you look at the license plate, Washburn
17 said.
18       Did I read that accurately?
19       **A.** You did.
20       **Q.** Okay. Do you recall making that --
21 offering that quote?
22       **A.** Not specifically, no. If I said that,
23 it would have been taken out of context.
24       **Q.** Out of context how?
25       **A.** In the -- out of context in that's the

### Page 76

1 sole basis for the stop, because I remember that
2 being an issue at the time with out-of-state plates,
3 and my -- my statement has always been that we do
4 not train that the purpose of a stop can be based on
5 the fact that the license plate comes from another
6 state.
7       So while that is probably an accurate
8 quote, I believe it was taken out of context.
9       **Q.** And this is all in the context, is it
10 not, of the Vasquez case, correct?
11       **A.** It -- I don't know. I don't remember
12 that.
13       **Q.** Okay.
14       **A.** I'm sure it's related to it, yes.
15       **Q.** If you'll turn to the page right before
16 that, 129, the very bottom of that page reads in
17 a -- and this is -- I should have asked you this
18 before, but it says: In a deposition Lewis
19 explained that troopers were referring to vehicles
20 with Colorado license plates, but said that that was
21 not -- excuse me -- but said that wasn't the factor
22 in Vasquez's stop.
23       Then that's followed by your quote.
24       Did I read that accurately?
25       **A.** Yes.

Page 77

1    Q.  You -- you indicate that the -- in that
2  quote -- that the patrol has never trained that you
3  look at the license plate.
4          Is that an accurate statement?
5    A.  Not as part of the reasonable suspicion
6  for a stop.  So, as I said, while that may be an
7  accurate quote, I believe it was taken out of
8  context.
9    Q.  Okay.  Is -- is one of the appropriate
10  factors in compiling reasonable suspicion the origin
11  of the vehicle?
12    A.  I believe you're asking me for a legal
13  conclusion.  It can be.  The totality of the
14  circumstances, anything can be, because the courts
15  look at the totality of the circumstances, so...
16    Q.  And just -- just so I'm clear on the --
17  the nature of this question, I'm not asking you for
18  your legal opinion.  I'm asking about the content of
19  the training you've provided to the troopers.
20          So when I -- when I ask you questions
21  about factors that contribute to reasonable
22  suspicion, that is in the context of the training
23  and education you provide to the Kansas Highway
24  Patrol?
25    A.  It's part of the totality of the

Page 78

1  circumstances, and as such, it's certainly something
2  they should be paying attention to.
3    Q.  Okay.  Do you train or educate Kansas
4  Highway Patrol troopers about drug corridors?
5    A.  Not in any great detail.  I believe
6  it's mentioned on a handout I did for advanced
7  interdiction, but that's just to reflect what the
8  courts have said.  It's not part of any training
9  that I stand in front of a class and give, no, I
10  don't.
11    Q.  Okay.  Is -- just I want to be really
12  clear about that.  Is that to say you don't train
13  with respect to drug corridors in the -- in the
14  context of reasonable suspicion?
15    A.  I don't believe I have ever stood in
16  front of a class and told them that was part of
17  reasonable suspicion specifically.  I don't think
18  I've ever mentioned drug corridors.
19          I know that it is on a handout I have
20  prepared, but, again, that's to reflect some of the
21  language from the courts.  But as far as instructing
22  them on specific factors to look for, I don't recall
23  teaching that, but...
24    Q.  Is it part of the training or education
25  provided to Kansas Highway Patrol troopers that in

Page 79

1  formulating reasonable suspicion, they can consider
2  drug source states?
3    A.  I can only speak for what I can
4  provide -- what I have provided.
5    Q.  That's my question.
6    A.  Again, it's part of the totality of the
7  circumstances, where someone's coming from, where
8  they're going to, and whether or not that state has
9  legal marijuana is certainly a factor, but it's part
10  of the totality of the circumstances.
11    Q.  So it's part of the totality of the
12  circumstances.
13          Do I understand your testimony?
14    A.  Well, yeah, the totality of the
15  circumstances is everything, so, yes.
16    Q.  So it's an element, can be?
17    A.  Can be.
18    Q.  Okay.  When you talk about drug source
19  states, is that another way of saying states that
20  have legal, either recreational or medicinal,
21  marijuana statutes?
22    A.  Not as far as I understand.  Not always
23  anyway.
24    Q.  Okay.  What does drug source state
25  mean?

Page 80

1    A.  My understanding is that it's a
2  location where large amounts of some kind of illegal
3  narcotic are known to come from, whether that is
4  from transnational shipping, whether it's
5  cross-border.  But once they hit our shores, what
6  state are they -- what state are they originating
7  out of once they start hitting the road to be
8  dispersed, like any other supply chain.
9    Q.  Do you provide a list of drug source
10  states --
11    A.  Absolutely not.
12    Q.  -- in training?
13          What states are -- again, I'm asking
14  about the meaning of this term as it is presented in
15  training and education to the Kansas Highway
16  Patrol -- what states are not drug source states?
17    A.  Since I don't actually train on what
18  states are and aren't, I couldn't tell you.  It's
19  something for law enforcement to articulate as part
20  of the totality of the circumstances.
21          My focus is always whether or not they
22  can articulate it appropriately to meet that legal
23  standard, not what factors are or are not.
24    Q.  And your training is that that can be
25  part of the elements considered in forming

20 (Pages 77 to 80)

SARAH WASHBURN  8/9/2021

Page 81

1  reasonable suspicion?
2      A.  If they're properly articulated, I
3  think it can be, yes.
4      Q.  Do you view it as -- strike that.
5      Is it -- in your training, is it
6  further defined, it being drug source states?
7      A.  I don't believe I mentioned it other
8  than perhaps in that one handout at all, that I
9  recall.  It's not -- certainly not something I focus
10  on.
11      I focus on what the legal standards are
12  and how best to articulate them, and perhaps if
13  there have been issues that the courts have had with
14  some of the ways officers have -- other officers
15  have articulated it in the past, but I try and focus
16  very heavily not on the facts themselves except as
17  they are applied to the law.  I try to focus on what
18  the legal standards are.
19      But, no, I don't train -- I cannot
20  think of a time where I have actively trained on
21  what a drug source state is or drug corridors or
22  anything like that.
23      Q.  Do you recall a time when you have
24  trained on drug source cities?
25      A.  I don't.  Again, that's not something

Page 82

1  that would really -- I would consider to be in my
2  wheelhouse or my bailiwick because that changes, as
3  I understand it, or can change.
4      Q.  Can change as a component of reasonable
5  suspicion?
6      A.  No, can change as a component of what
7  the source -- supply and demand.  But, again, that's
8  not something I would have trained on because that's
9  outside of my area of expertise.
10      Q.  How -- if you had to, how would you
11  define your area of expertise as it relates to
12  training and education for highway patrol troopers?
13      A.  My job is to train them on the legal
14  standards involved in the Fourth Amendment and any
15  other constitutionally-protected rights of the
16  citizens of which we encounter, and to make sure
17  that they are operating, to the best of my ability,
18  within their authority.
19      Q.  And reasonable suspicion is the center
20  of gravity --
21      A.  Absolutely.
22      Q.  -- is part of the Fourth Amendment
23  paradigm, correct?
24      A.  Absolutely.
25      Q.  Okay.  So -- okay.  I'm going to show

Page 83

1  you -- we kind of diverted a little bit here, but
2  I'm going to draw your attention back to Page 130,
3  the quote at the top that's attributed to you.
4      And just so I'm clear, you don't -- you
5  don't deny this quote, do you?
6      A.  I don't recall it, so I can't say that
7  I said it or not.  It -- it sounds like something I
8  would say, but I don't recall it at all.
9      Q.  Okay.  You're not aware that anybody
10  from KHP followed up with the Capital Journal and
11  said Sarah Washburn was misquoted, are you?
12      A.  I don't know.
13      Q.  Okay.
14      A.  I don't.
15      Q.  Let me show you what's marked as
16  Exhibit Number 85 for identification.
17      A.  Thank you.
18      Q.  If you would take a moment and -- and
19  familiarize yourself with that, please.
20      MR. CHALMERS:  What's the Bates?
21      MR. McINERNEY:  The Bates is -- I don't
22  know what the Bates is.
23      A.  Okay.
24  BY MR. McINERNEY:
25      Q.  Do you recognize that?

Page 84

1      A.  I don't.
2      Q.  On the first page near the top, does it
3  say Affidavit of Richard Jimerson?
4      A.  It does.
5      Q.  Do you know who Richard Jimerson is?
6      A.  By name only.
7      Q.  How do you know him?
8      A.  Just that he was involved in the
9  Vasquez case.  I believe he was also involved in
10  Wood.
11      Q.  Does -- is he still employed by the
12  Kansas Highway Patrol?
13      A.  I don't know.
14      Q.  Okay.  At -- let me direct your
15  attention, if I can, to the second page of Exhibit
16  Number 85, and the numbered paragraph, Number 5.
17      In Paragraph Number 5, and, again, this
18  is -- this is Mr. -- or Trooper Jimerson's
19  affidavit, Trooper Jimerson says that I-70 -- and
20  I'm reading about -- starting the end of three lines
21  down:  I-70 is known among law enforcement,
22  including DEA and the Kansas Highway Patrol, as a
23  high volume primary drug corridor used for
24  trafficking drugs across the country.
25      Did I read that accurately?

ALARIS LITIGATION SERVICES
www.alaris.us                          Phone: 1.800.280.3376                          Fax: 314.644.1334

## Page 85

1   A.  You did.
2        Q.  Is that information that Trooper
3   Jimerson got from your training?
4        A.  There was no way he could have.
5        Q.  Is that accurate?
6        A.  It's his affidavit.  I would have no
7   idea.  He swore to this in 2013, and at that time I
8   was still with the county attorney's office, so I
9   would have had nothing to do with his training.
10       Q.  Okay.  And you understand that Vasquez
11  came down in '16, correct?
12       A.  That is correct.
13       Q.  Okay.  And you were at the Kansas
14  Highway Patrol in '16, correct?
15       A.  Yes, but I believe the events of that
16  date were long before I came with the patrol.
17       Q.  I understand that, yeah.
18       A.  Okay.  Okay.
19       Q.  And we're going to go back and talk
20  about some additional comments in just a second.
21            But remaining in that Paragraph Number
22  5 of Exhibit 85, further down, about six lines from
23  the bottom, Jimerson says:  The direction of travel
24  from east to west, particularly given the Colorado
25  temporary tag and his driver's license showing the

## Page 86

1   Aurora, Colorado address, was also significant as
2   Aurora, Colorado, a Denver suburb, is home to
3   medical marijuana dispensaries and is considered a
4   source of high-grade marijuana, which can be and is
5   sold at substantial profit on the east coast,
6   including such states as Maryland, Mr. Vasquez's
7   stated destination.
8            Did I read that accurately?
9        A.  I believe so, yes.
10       Q.  If I can direct your attention to --
11  back to Exhibit Number 84, and specifically Page
12  P-136.
13       A.  Okay.
14       Q.  That third paragraph down, ma'am, says:
15  Though the Vasquez car stop involved a temporary tag
16  that was taped to the interior of the car, Joseph
17  said, the court focused on state citizenship because
18  that was one of the justifications the troopers used
19  for searching Vasquez.
20            The next paragraph says:  Washburn said
21  that was inaccurate.
22            Did I read that right?
23       A.  Yes.
24       Q.  How is that statement inaccurate?
25       A.  I believe my objection was to him

## Page 87

1   qualifying the state of citizenship as part of the
2   justification for the search.
3        Q.  Had you had the benefit of reading
4   Trooper Jimerson's affidavit prior to making these
5   comments?
6        A.  I had not.
7        Q.  Had you, particularly given his
8   comments about the Colorado temporary tag and Mr.
9   Vasquez's residence in Colorado, would you have made
10  that same comment?
11            MR. CHALMERS:  Object to the form,
12  calls for speculation.
13  BY MR. McINERNEY:
14       Q.  You can answer.
15            MR. CHALMERS:  Comment on another
16  witness's testimony.
17       A.  I may have tempered it, but I -- I
18  don't know.
19  BY MR. McINERNEY:
20       Q.  Let me direct your attention now to the
21  last page of Exhibit 85, it's Paragraph Number 9.
22  The Paragraph Number 9 in 85, I'm going to read the
23  second sentence, which starts on the second line:
24  These circumstances included that he was -- he,
25  Vasquez -- was traveling alone in the middle of the

## Page 88

1   night having apparently left at dusk for the long
2   trip from a drug source area, Aurora, Colorado, to a
3   drug market area, East Coast-Maryland, along a known
4   drug corridor, I-70, in a recently purchased older
5   vehicle.
6            And then that sentence goes on to list
7   several other factors.
8        A.  It does.
9        Q.  We talked about drug source areas, drug
10  source cities and states.  In your training,
11  especially your advanced interdiction training, do
12  you train on drug market areas?
13       A.  I do not.
14       Q.  Do you train on drug source areas?
15       A.  I do not.
16       Q.  Why not?
17       A.  Because that's a fact -- it's fact
18  dependent and I'm more interested in what the legal
19  standards are.  Whether or not they wish to use any
20  of the factors that they have observed personally,
21  as long as all of those factors as articulated meet
22  the legal standard of reasonable suspicion or
23  probable cause for a search, that's what I'm
24  concerned with.
25       Q.  Are you aware whether or not Kansas

22 (Pages 85 to 88)

SARAH WASHBURN  8/9/2021

Page 89

1  Highway Patrol troopers continue today to use the
2  location of a traveler's destination, the location
3  of their point of origin as factors lending to
4  reasonable suspicion?
5      A.  I believe they take into account the
6  totality of the circumstances when articulating
7  reasonable suspicion and probable cause.
8      Q.  Are those two things appropriate
9  elements?
10     A.  They are part of the totality of the
11  circumstances.
12     Q.  So they -- they may be considered
13  appropriately?
14     A.  I believe to some degree they may.
15     Q.  What determines the degree to which
16  they can be considered?
17     A.  I'm not sure I understand exactly what
18  you're asking.
19     Q.  Well, you said to some degree they can,
20  it's appropriate to consider them, correct?
21     A.  That would be true of any of the
22  factors that they observed on a traffic stop.  To
23  some degree it is appropriate to consider them based
24  on the subject to any limitations placed on them,
25  such as are placed on nervousness by the courts.

Page 90

1      Q.  Placed on nervousness?
2      A.  Right.  Nervousness has a very low
3  weight, so if the court has specifically articulated
4  that certain factors are to be given a lower weight
5  or that they give factors a lower weight, I believe
6  the troopers are bound to follow those dictates.
7      Q.  Has the 10th Circuit or any authority
8  that you're aware of discussed the notion of drug
9  source states?
10     A.  I don't believe there's anything other
11  than passing statements as to what the officer has
12  articulated.  I don't recall it being a holding.
13     Q.  I want to go back, if I can, to Page
14  129 of that same Exhibit Number 84.
15     A.  Okay.
16     Q.  And I'm jumping around a little bit
17  here, but we're talking again about this data
18  collection question.
19     A.  Yes.
20     Q.  And I've got a couple further questions
21  for you about that.  The -- again, to orient you, in
22  the middle of that page, you say that it's not that
23  the data doesn't exist, that it exists somewhere,
24  just not the way that we can extract it.
25          And then there are -- you later discuss

Page 91

1  a custom query, and I'm going to point you to
2  exactly where that is.
3          MR. CHALMERS:  When you get there, I'm
4  going to make an objection that you're, again,
5  reciting facts that aren't in evidence and
6  testifying, counsel.
7          MR. McINERNEY:  Well, go ahead and make
8  your objection.
9          MR. CHALMERS:  (Inaudible).
10         THE REPORTER:  What was that?
11         MR. CHALMERS:  I hope I've made the
12  objection.
13  BY MR. McINERNEY:
14     Q.  Let me ask you this, ma'am:  The -- in
15  the context of the request that had been made by the
16  Capital Journal to the Kansas Highway Patrol, the
17  highway patrol was eventually able to create a
18  document that had a breakdown by state of
19  significant seizures.
20          Do you recall that?
21     A.  I don't think we created it to respond
22  to the request.  I believe it's something that --
23  that Troop N keeps, and Ms. Lord is the -- is the
24  KORA point person, I don't -- I think she was given
25  that information that it existed and that's why it

Page 92

1  was ultimately produced.
2      Q.  Okay.  Let me point you to the bottom
3  of Page 130 if I can.
4      A.  Yes.
5      Q.  It's the paragraph that begins with a
6  single line on the bottom of 130.  It says:  The
7  highway patrol also said it could perform the custom
8  query, but that would remove a trooper from patrol
9  duties.  State -- statewide license plate records
10  would cost more than $1,180.  Other pieces of
11  information such as the date and location of
12  citations would cost hundreds of dollars more.
13          Do you recall whether it was you who
14  provided that information to the Capital Journal?
15     A.  I am almost -- if I did, it was at the
16  direction of Ms. Lord.  And just for clarification
17  for the record.
18     Q.  Yes.
19     A.  Tammy Lord was her married name.  She's
20  now Tammy Mundil.  It's her maiden name.  I just
21  wanted to make sure that was clear.
22     Q.  Yeah.
23     A.  Because I think I've used them
24  interchangeably.
25     Q.  Yeah, I think that's right.

23 (Pages 89 to 92)

## SARAH WASHBURN  8/9/2021

Page 93

1    The -- where it says the custom query
2 that the highway patrol could perform, what is a
3 custom query?
4    A.  In the context of this case, and in
5 general when we're talking about Open Records Act
6 requests, I believe it to be referencing our
7 digiTICKET system, although I am not positive of
8 that.
9    Q.  So if you don't know, just tell me, but
10 when we're talking about custom queries, is that
11 limited to the digiTICKET system as you understand?
12    A.  I believe so, but, again, I'm not sure.
13    Q.  So in connection with such a search,
14 like a search for the statewide license plates for
15 state of origin, has that sort of a search, I guess
16 that would be a custom query as I understand the
17 term?
18        MR. CHALMERS:  Lack of foundation.
19    A.  I -- I --
20 BY MR. McINERNEY:
21    Q.  Is that -- okay, you don't know?
22    A.  That would be something I would have to
23 ask our IT people.  I don't know.
24    Q.  Do you know -- have you done that in
25 connection with this case?

Page 94

1    A.  With this case?  I would not have done
2 anything like that in connection with this case.
3    Q.  Okay.
4    A.  That would be mostly the province of
5 Mr. Ganieany.
6    Q.  To follow that through, the initial
7 estimate, according to the article, was $1,180.
8    The -- approximately a week later, and
9 I'm looking at Page 131, the second full paragraph,
10 indicates that a week later, Lord, I'm assuming
11 Tammy Lord, said the document previously costing
12 $185.50 would be available for $0.50 because the
13 data was compiled by the KHP for our purposes and
14 was readily available.
15        Were you part of that process?
16    A.  I'm sure I was some part of that
17 process, but I don't recall specifically what I did.
18 I know I wouldn't have been involved in calculating
19 the cost except to provide information for her to do
20 that.
21    Q.  Do you recall whether you were involved
22 in the process that determined that the information
23 was already compiled?
24    A.  I may have made inquiries over to our
25 Troop N people, but that would have been, I believe,

Page 95

1 the extent of it as far as that goes.
2    Q.  That article, again, on Page 131 where
3 we were, a little bit lower under the heading,
4 License Plate Data, indicates that the document,
5 that is the KHP document, shows that 88.2 percent of
6 significant drug and currency seizures from 2014 to
7 '16 involved out-of-state vehicles.
8        Do you see that?
9    A.  I do.
10    Q.  Is that information that you determined
11 and/or provided to the highway -- or excuse me -- to
12 the Capital Journal?
13    A.  I may have facilitated the provision,
14 but I didn't provide it.  It's not information I
15 would have kept.  And that would be, you know,
16 speaking to Troop N and the interdiction unit and
17 asking them if they had anything.  That would have
18 been the extent of my involvement.
19    Q.  Is -- is information like -- this is
20 going to be kind of a systems question -- and is
21 information like that, meaning the number of
22 out-of-state stops, seizures, recoveries of
23 narcotics, is that maintained on a troop-by-troop
24 basis?
25        MR. CHALMERS:  First of all, it's lack

Page 96

1 of foundation.
2        Secondly, like that, you've got two
3 records requests that are going on in this exhibit.
4 Maybe you don't mean to misstate what the document
5 talks about, maybe you do, but when you say that,
6 you are implying perhaps a broader search than what
7 is referenced in this exhibit and misleading the
8 witness with your question.
9 BY MR. McINERNEY:
10    Q.  Did you understand my question, ma'am?
11    A.  I don't think so anymore.
12    Q.  Okay.  After -- after Mr. Chalmers'
13 objection, that happens.
14    A.  Well -- well, now that he mentions it,
15 I can see where I could have had an issue with that,
16 yeah.
17    Q.  Okay.
18    A.  Here's what I can tell you.
19    Q.  Can I rephrase it?
20    A.  Absolutely.
21    Q.  I want to make sure we're talking about
22 the same thing.
23    A.  Absolutely.
24    Q.  My question is this:  Is information
25 regarding the license tag state of origin in

24 (Pages 93 to 96)

## Page 97

1  relation to stops, seizures and recoveries of
2  narcotics kept by the highway patrol on a
3  troop-by-troop basis or is it kept patrol-wide?
4      A.  I don't know.  I don't know what the
5  individual troops would keep.  I'm not sure I could
6  tell you.  It would be something, if we had a
7  request come in, I would probably query and try and
8  find out, but I don't know as I sit here.
9      Q.  Okay.  If you did have that request
10 come in, what would you query?
11     A.  Probably the captains at the various
12 troop levels, admin- -- administrative lieutenants
13 perhaps, maybe start with them, just to see if
14 that's data that they keep.  I know if I found out
15 that it was a case that had a significant
16 narcotics -- a significant amount of narcotics
17 involved, I would probably start with Troop N and
18 just ask them what kind of data they keep and if
19 there's a way we can produce it.  And now with the
20 KBI portal that we fill in for all forfeiture cases,
21 that's also a good source of information, and we
22 have provided that in the past, since it's -- since
23 we've been filling it.  So I would probably ask
24 questions before I would say yes or no, we could or
25 couldn't provide it, just because I don't know

## Page 98

1  everything that we keep unfortunately.
2      Q.  Okay.  Thank you for that.
3          And you say you would ask questions,
4  that sounds like individual person-to-person
5  contact; is that accurate?
6      A.  Probably.
7      Q.  So there's not a function of the
8  statewide KHP computer information that you can go
9  to, to your knowledge, and do a query for that
10 information?
11     A.  I'm thinking.  If a citation or a
12 written warning has been issued, I believe there's a
13 field that allows for that document -- that
14 information to be collected.
15         But I believe, and, this, again, this
16 is where my inquiries to our IT people and our
17 records group would come in to figure out if that is
18 something we can query, if the people who run
19 digiTICKET have to run a separate query, how would
20 we get that information, is there a way to get that
21 information, and then what would we need in order
22 to, as far as manpower, to provide what we are
23 permitted to provide under KORA and what information
24 would we have to redact if it -- if there is some
25 part of that that is not permitted under KORA.

## Page 99

1      I believe the license -- I'm thinking
2  back to my prosecution days and trying to
3  remember -- but I believe license -- I know the
4  license plate, the actual tag number, is on the
5  digiTICKET, but I don't know if the state is.  I
6  don't recall that as I sit here.
7          But if it is a field on digiTICKET,
8  that would be something I would have to ask our IT
9  about, running those queries.
10     Q.  Again, I'm asking based on your
11 understanding, not anybody else's here.  If there is
12 not a citation issued and not a warning issued, but,
13 rather, there is a search conducted that yields
14 nothing, do you know whether there's a record kept
15 of that?
16     A.  Not at this time I don't believe.  I
17 don't -- I don't believe so.
18     Q.  For your purposes, and I mean for
19 training, education purposes in your role, are you
20 able to access information about the basis on which
21 troopers make stops?
22     A.  If there's a report in the record
23 management system, I can access that.  I can get
24 copies of narratives and ORs and ARs if those exist.
25     Q.  Correct me if I'm wrong.  My

## Page 100

1  understanding is that there's not required to be
2  that report in RMS; is that accurate?
3      MR. CHALMERS:  The question's vague.
4      A.  Yeah, those reports are required if
5  there's a seizure, but I think your question is
6  relating to if there's nothing.
7  BY MR. McINERNEY:
8      Q.  Correct.
9      A.  Okay.  If there's nothing, as of this
10 date I don't believe there's anything in RMS, yes.
11     Q.  Okay.  Are you aware, again, in your
12 role, of either policy or a procedure that requires
13 troopers to record somewhere the basis for search of
14 a vehicle?
15     A.  I don't know if it is currently in
16 effect.
17     Q.  Begs the question, is there something
18 that's not in effect right now?
19     A.  I don't know if it has gone live.
20     Q.  Okay.  What's the "it"?
21     A.  The -- a policy.
22     Q.  What policy?
23     A.  That would relate to documenting
24 reasonable suspicion of probable cause for a search.
25     Q.  And I'm not asking for a verbatim

SARAH WASHBURN  8/9/2021

Page 101

1  recitation of the policy.
2      A.  Oh, good.
3      Q.  What is this policy?
4      A.  I believe it -- I believe it is
5  requiring the troopers to document what the
6  reasonable suspicion and probable cause that they're
7  relying on in some written form, and that would be
8  submitted to RMS if there -- if there is no -- in
9  addition to any other forms that they would be
10 required.  So if there is a seizure, if there is a
11 citation issued, it would be in addition to any
12 other forms that were required.  And that's to the
13 best of my recollection.
14     Q.  Right.  So this would -- to shorthand
15 it a little bit -- this would fill the gap where
16 there's not an arrest, not a seizure with regard to
17 information on which reasonable suspicion was based?
18     A.  I believe so.
19     Q.  Okay.  Who authored that policy?
20     A.  I don't know.
21     Q.  I think you testified a minute ago it's
22 not enacted yet; is that correct?
23     A.  I don't know --
24     Q.  Okay.
25     A.  -- if it is yet.

Page 102

1      Q.  If -- okay.
2          Do you know when that policy was
3  drafted or proposed?
4      A.  Not the first beginning date, no, I
5  don't.
6      Q.  Do you know roughly when it was drafted
7  or proposed?
8      A.  I don't.  I don't recall.
9      Q.  Okay.  When was the first time you were
10 aware of that policy?
11     A.  Earlier this year, but I don't -- I
12 couldn't tell you when.  I'm sorry.
13     Q.  Again, I'm not looking for --
14     A.  I know, I just -- I don't remember.
15     Q.  -- date and time.
16         Earlier in 2021?
17     A.  Yes.
18     Q.  How did you become aware of it?
19     A.  My boss asked me to look at some
20 documents.
21     Q.  Okay.
22     A.  And provide any suggestions I had.
23     Q.  And did you do what your boss asked you
24 to do?
25     A.  I always do what my boss asks me to do.

Page 103

1      Q.  That's the right answer.
2      A.  Unless I have a problem with it legally
3  speaking, yes.
4      Q.  And once you had reviewed it and
5  perhaps made edits, perhaps not, what then did you
6  do with it?
7      A.  Returned it to my boss.
8      Q.  If you know, what is the procedure for
9  enacting a new policy of the Kansas Highway Patrol?
10     A.  I don't know that I could speak to the
11 policy -- the procedure in any specific form.
12     Q.  You don't know?
13     A.  No, because I'm usually involved in the
14 review part of it towards the end.  I don't know
15 that I'm involved with it at the front end so I have
16 sufficient ability to tell you what it is.
17     Q.  Have you received any other
18 communications about this policy that you described
19 other than the draft policy itself?
20     A.  I don't believe so.
21     Q.  Who else to your knowledge has been
22 involved in the review and drafting of the policy?
23     A.  My boss for sure.  I'm sure there were
24 other -- I can't say that.  I believe there were
25 other people involved, but I can't think of who they

Page 104

1  are off the top of my head.  I'm sorry.
2      Q.  No, that's okay.  I'm asking whether
3  you know.
4          What was the reason this new policy
5  was -- or is being enacted, if you know?
6          MR. CHALMERS:  Calls for speculation.
7  BY MR. McINERNEY:
8      Q.  If you know.
9          MR. CHALMERS:  And I'm worried you're
10 also walking into attorney/client privileged
11 communication.  I don't know.
12     A.  I'm a little concerned about the
13 privilege as well.  I believe those conversations to
14 be privileged.
15 BY MR. McINERNEY:
16     Q.  I'm not asking for the content of the
17 conversations.  So my question is, are you aware of
18 the reason for the formation of this new policy?
19     A.  No, I don't think I am.  I just was
20 presented with it as something that was discussed.
21     Q.  Tell me if I'm accurate.  I think your
22 testimony was you don't know whether that policy
23 is -- has been enacted; is that correct?
24     A.  I don't know if it's live, that's
25 correct.

26 (Pages 101 to 104)

SARAH WASHBURN  8/9/2021

## Page 105

1  Q.  Okay.  And by live, you mean
2  finalized --
3  A.  Is published in our policy manual,
4  correct.
5  Q.  Okay.
6  MR. McINERNEY:  Let's take a
7  five-minute break if we can, please.
8  THE VIDEOGRAPHER:  We are now off the
9  record at 11:17 a.m.
10  (Recess taken.)
11  THE VIDEOGRAPHER:  We are now on the
12  record at 11:34 a.m.
13  BY MR. McINERNEY:
14  Q.  Ma'am, I would like to return to
15  Exhibit Number 75 for just a minute if we can.  It
16  is the two-page exhibit, the e-mail exchange between
17  Dax Lewis and Brent Hogelin.
18  A.  Let me get down there.  Okay.
19  Q.  Do you have that in front of you?
20  A.  Sorry.  I do.
21  Q.  For reorientation, it's -- well, it's
22  exactly as I said, it's the May 2020 e-mail
23  exchange.  And let me draw your attention to the top
24  e-mail on that first page.  And there's -- I won't
25  read it -- but there's a comment about covering the

## Page 106

1  Vasquez case and others in the 10th Circuit.  And as
2  I understand it, this is in connection with trooper
3  training, correct?
4  A.  I would assume so because Colin Wood's
5  involved, but I don't know that.
6  Q.  Okay.  And I think you testified that
7  he's an AUSA who sometimes engages in training for
8  KHP?
9  A.  Yes.
10  Q.  Okay.  So this is a 2020 e-mail.  Do
11  you know whether the first time Vasquez was the
12  subject of training or education for Kansas Highway
13  Patrol troopers was last year?
14  A.  I don't know because I can only speak
15  for what I have done, and so I don't know if anyone
16  else is trained on it, including Mr. Wood.
17  Q.  Were you involved -- did you present
18  any training that touched on Vasquez last year?
19  A.  I don't believe I did.
20  Q.  Okay.  Broader question, have you ever
21  presented a training that touched on Vasquez?
22  A.  Yes.
23  Q.  In what context?
24  A.  I believe it's -- I believe I mention
25  it at the basic academy when we're -- excuse me, I'm

## Page 107

1  sorry -- when we're talking about articulating
2  reasonable suspicion.
3  Q.  Okay.  Do you remember the first year
4  you presented content on Vasquez?
5  A.  I know I've done it this year.  I don't
6  remember if I've done it in previous years, because
7  there's a very good footnote that my boss drew my
8  attention to, and I thought that's a really great
9  way to articulate how you have to -- how you have to
10  articulate reasonable suspicion, so I included it.
11  And I think it's just value-added.  I don't know
12  that it replaced anything.
13  Q.  Okay.  And when you say footnote, it's
14  a footnote in the Vasquez decision?
15  A.  Yes.
16  Q.  Okay.
17  A.  I'm sorry, that's correct.
18  Q.  That's okay.
19  And did I understand you to say that
20  the first time you presented content that included
21  Vasquez was this year?
22  A.  That's the first time I specifically
23  remember including it.  I don't think I've included
24  it in advanced interdiction, again, because it
25  wasn't new or novel.  There -- it -- it -- Wood was

## Page 108

1  already there and Wood was already in the outline
2  that I had passed out, so this is the first year I remember it
3  specifically being in there.
4  Q.  And Vasquez -- I think we talked about
5  this -- was a 2016 decision from the 10th Circuit,
6  correct?
7  A.  Yes.  I believe so, yes.
8  Q.  Okay.  It had -- fair to say it had
9  been in existence for some years prior to the first
10  time you taught it to Kansas Highway Patrol
11  personnel?
12  A.  Yeah, first time I've included it in
13  training.  Let's be clear, I don't actually teach
14  Vasquez.  Because when I -- to explain what I mean
15  when I say that, when you're asking me if I teach a
16  case, I include the facts of the case, the holdings
17  and all of that.  I reference Vasquez and I use
18  pieces of it.
19  Q.  Understood.
20  A.  Yeah, I just wanted to make that very
21  clear.
22  Q.  Did -- did your inclusion of Vasquez as
23  a reference in your training have anything to do
24  with the filing of this lawsuit?

27 (Pages 105 to 108)

SARAH WASHBURN  8/9/2021

Page 109

1  A.  I think it brought my attention back to
2  it and I went back and read the case and saw the
3  footnote, but other than that -- and just really
4  thought that the footnote was very well written and
5  was useful.  But other than that, no.
6  I'm sorry, I need to correct something.
7  Q.  Okay.
8  A.  I believe I did train on Vasquez this
9  year for advanced interdiction.  I believe I did
10 include it, and, again, it was that footnote, so I
11 believe it was the same type of thing that I had
12 done for the basic academy.  I believe that's
13 correct.
14 But, again, not because of the case,
15 but more so because I thought that it was a
16 well-written piece of articulation on reasonable
17 suspicion and the factors.
18 Q.  Thank you for the clarification.  The
19 basic academy is -- is the academy for incoming
20 troopers, correct?
21 A.  Yes.  Yes.
22 Q.  And that's a course of training and
23 education that lasts how long?
24 A.  Approximately six months.
25 (Washburn Exhibit Number 86 was marked

Page 110

1  for identification by Mr. McInerney.)
2  Q.  I'm going to show you what is marked as
3  Exhibit Number 86.
4  A.  Thank you.
5  Q.  If you would take a fast look at that
6  and let me know when you have finished.
7  A.  Okay.
8  Q.  Exhibit 86 appears to be an e-mail from
9  Jason Vanderweide to Joseph Bullock, and the subject
10 matter is McMillan Follow Up-Completion, 2019-0130.
11 Do you see that?
12 A.  I do.
13 Q.  The -- do you know Trooper Brandon
14 McMillan?
15 A.  I do.
16 Q.  Do you recall in -- or just before
17 September of 2019 having contact with Trooper
18 McMillan in connection with a remedial training?
19 A.  Yes.
20 Q.  Okay.  Who contacted you about that?
21 A.  I believe it was Captain Vanderweide
22 who asked me to do the training.
23 Q.  Is that something that you're called
24 upon from time to time to do with troopers?
25 A.  It is, but it's not -- it's not

Page 111

1  frequent.
2  Q.  Okay.  And you -- do you design
3  separate -- syllabus is the wrong word -- but do
4  you -- do you design separate material depending on
5  the nature of the remedial legal training?
6  A.  I don't know that I actually design
7  material as far as a PowerPoint goes.  If I do have
8  a PowerPoint, it's usually I'm pulling slides from
9  other presentations I've already done because most
10 of what I'm teaching is Fourth Amendment and I do a
11 lot of that already.  So there wouldn't be anything
12 specifically as far as a PowerPoint goes submitted
13 that would say this is what I covered.
14 Q.  So this isn't the same sort of
15 situation where you have to get the approval,
16 whether it's explicit or not, for course materials
17 that you teach?
18 A.  No.
19 Q.  Okay.  Do you recall this remedial
20 legal training with Trooper McMillan?
21 A.  I do.
22 Q.  Can you describe it for us?  What was
23 involved?
24 A.  It was a one-on-one conversation using
25 some of the slides I have taught from in the past

Page 112

1  dealing with what the legal authority is on a
2  traffic stop, what is necessary for law enforcement
3  to have to extend the stop, and really I think we
4  focused mostly on that.  A lot of Rodriguez and
5  Jimenez, Schooler and Lowery, talking about that,
6  and talking about just really the found- the found-
7  -- excuse me -- fundamentals of the traffic stop and
8  the Fourth Amendment and making sure that he was
9  pretty comfortable with that when we were done.
10 When it's one-on-one like that, I try
11 to keep it very conversational because I think
12 they're already feeling kind of defensive, so I try
13 and make it as comfortable as I can so that I think
14 they'll actually learn something and take away, they
15 don't have those barriers to taking in the new
16 information.
17 Q.  Okay.  Is there any document that's
18 created when you engage in that one-on-one remedial
19 legal training along the lines of here's what we
20 talked about, he completed it satisfactorily, et
21 cetera?
22 A.  Not unless it's requested.
23 Q.  Is -- is it requested as a matter of
24 course --
25 A.  I can think of --

28 (Pages 109 to 112)

SARAH WASHBURN  8/9/2021

Page 113

1   Q.  -- in your experience?
2   A.  I can think of three separate times
3   I've done some remedial legal training, two of which
4   were one-on-one.  In one case it was, in one case it
5   was not.
6   Q.  Okay.
7   A.  So I don't think that there's -- I am
8   not aware of a policy that requires it.  Sometimes
9   supervisors want it and sometimes they're
10  comfortable with the fact that I've -- I've had that
11  training with them.
12  Q.  When you do this, do you make yourself
13  available to the trooper that you have remedial
14  legal training with for future questions, contact,
15  et cetera?
16  A.  I am always available to any trooper,
17  any law enforcement officer with the highway patrol.
18  I give out my -- my work cellphone number like candy
19  and I sometimes feel like I'm begging them to use it
20  at every training.  But I strongly encourage them to
21  call me if they have any questions that I can help
22  them with, to the point where it does feel like I'm
23  begging, but I always encourage that.
24  Q.  In your experience providing remedial
25  legal training from time to time for Kansas Highway

Page 114

1   Patrol personnel, have you ever been compelled to
2   make a retraining recommendation to the trooper
3   supervisor?
4   A.  No, and I'm not sure when that would
5   ever come up because that would be a command staff
6   decision.  And in the three trainings I can think
7   of -- well, the two one-on-ones specifically, I
8   think that there was -- it appeared to me that the
9   trooper was tracking what I was talking about and
10  was internalizing what I was trying to have them
11  comprehend.
12      So I don't know why I would ever be
13  involved in asking for retraining because I wouldn't
14  have any kind of information that would indicate
15  that was necessary.  That's a supervision deal.
16  Q.  Okay.
17  A.  At least the way I understand it.
18  Q.  My question was along the lines of
19  if -- well, never mind.  It appears as though
20  that's -- that's not been the case for you, so...
21  A.  Okay.
22  Q.  Do you have any involvement in the
23  contracting process for the computer systems that
24  are operated by the Kansas Highway Patrol?
25  A.  If I am involved at all, and I almost

Page 115

1   never am, it is maybe to look at an MOU or a
2   contract.  But as to determining who does what or
3   who we go -- no, not at all.
4   Q.  Okay.  Yeah, let me -- let me narrow my
5   question a little bit.
6   A.  Okay.
7   Q.  When I talk about the contracting
8   process, I'm talking about -- and being unfamiliar
9   with exactly how it proceeds here -- the RFP or RFQ
10  process?
11  A.  Not at all.
12  Q.  Okay.
13  A.  Not at all.
14  Q.  You said that -- that if you are, so it
15  sounds like you don't recall having been involved in
16  the contracting process for computer systems?
17  A.  If I am involved in any contracting for
18  any services or -- of any kind, it is only to look
19  at the contract and to see whether or not I have any
20  concerns about the language, because usually they're
21  using boilerplate, and in some cases they have been
22  willing to make changes to say the indemnification
23  clause or that, but that is not something I do
24  regularly.  It's -- oh, gosh -- maybe once, twice a
25  year, if even that.

Page 116

1   Q.  Okay.
2      (Washburn Exhibit Number 87 was marked
3      for identification by Mr. McInerney.)
4   Q.  I want to show you a document that's
5   been marked as Exhibit 87.  The OAG Bates number is
6   022717.  If you take just a moment and take a look
7   at that, please.
8   A.  Okay.
9   Q.  In Exhibit 87 -- well, first of all, is
10  that an e-mail from you to Lieutenant Carr dated
11  April 17th of 2018?
12  A.  Yes.
13  Q.  Let me direct your attention to the
14  second line down there with the sentence that
15  begins, "The trooper," and goes on to say, "will
16  articulate the two-step and come back to the window
17  and then just go into the conversation that he/she
18  and the occupants then had."
19      You described that as one of your
20  concerns; is that fair?
21  A.  Yes, referencing the reports.  I'm
22  seeing narrative reports, yes.
23  Q.  That's -- you're getting to my
24  question.
25  A.  Okay.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

SARAH WASHBURN  8/9/2021

Page 117

1    Q.  Was this a result of particular
2  circumstances that you had been -- particular
3  situations that had come to your attention?
4    A.  It would have been an amalgamation of
5  reports I had seen come through as part of my duties
6  in prosecuting asset forfeiture cases and just some
7  preferences from having to defend those, or
8  prosecute those, excuse me.
9    Q.  Okay.
10   A.  But not any one particular case, no.
11   Q.  Do you recall whether there were cases
12 leading up to this time in which there had been some
13 judicial scrutiny of this practice that you identify
14 engaging in the two-step and then getting right back
15 into the same conversation?
16   A.  There's always scrutiny of any kind of
17 that, so I'm sure there has -- there was, but I
18 can't come up with a specific.
19   Q.  Okay.  That's my question.  You -- and
20 then you go on to say toward the end, in fact, I
21 think it's the final sentence, you say:  Since the
22 appellate courts are looking hard -- all caps -- at
23 Geary County and Junction City right now for their
24 interdiction stops and are focusing on extensions of
25 the encounter via consent or reasonable suspicion,

Page 118

1  the troopers should probably be articulating any
2  factors for consent very clearly.
3        Very is in all caps as well.
4        First of all, did I read that
5  accurately?
6    A.  You did.
7    Q.  I assume, based on the language of that
8  sentence, that you are talking about specific cases
9  coming out of Geary County and Junction City?
10   A.  Yes, at that time, Schooler, Lowery and
11 Jimenez were on appeal to the Supreme Court, and I
12 don't recall if they had had oral arguments.  I want
13 to say they had because those all came out in June
14 and so I had watched those oral arguments, and based
15 on the questions being asked of Mr. Kruse (sp) who
16 represented -- I always get these mixed up -- I
17 believe he's Geary County attorney, I wanted to make
18 sure that any issues -- that we were addressing any
19 issues I thought the Court was having.
20   Q.  Okay.  As a result of your observations
21 and what you knew to be kind of a confluence of
22 three different cases coming out of Geary County,
23 was there any re-education or retraining that --
24 that took place, whether you were involved or not,
25 to address some of these issues that you identify?

Page 119

1    A.  As far as the report writing?
2    Q.  Yes.
3    A.  I don't know.
4    Q.  Not that you were involved in any way?
5    A.  I don't know.
6    Q.  Okay.  We talked for a little while
7  about the Topeka Capital Journal article and the --
8  some of the comments that you made and the
9  circumstances around that.  The -- so and I want to
10 return to that for just a moment if I can.
11   A.  What exhibit was that?  I'm sorry.
12   Q.  That one --
13   A.  I think it's 84.  I just found it.
14   Q.  I think that's correct.
15   A.  P00117 if that helps.
16   Q.  It probably should.
17   A.  Been there, done that.
18   Q.  Here we go.  So the -- I asked you
19 about a number of different statements and your
20 recollection was limited, and that's -- that's not
21 what I want to ask you about.
22        Do you have any independent
23 recollection of sitting down with the reporter who
24 wrote the story for the Topeka Capital Journal?
25   A.  I do not.

Page 120

1    Q.  Okay.  Do you remember whether -- I
2  believe it's -- is it lieutenant Moon?
3    A.  Lieutenant Colonel Moon at the time.
4    Q.  Sorry, Lieutenant Colonel Moon, do you
5  remember whether he was involved in that process?
6    A.  I think you're talking about the KMBC
7  article, because I believe he was quoted in that
8  article, is he not?
9    Q.  He is quoted, yes, he is.
10   A.  Okay.  I remember being interviewed by
11 KMBC.  I don't remember being interviewed by the
12 Capital Journal.
13   Q.  Okay.  Were you interviewed along with
14 Lieutenant Colonel Moon for the KMBC piece?
15   A.  No, I was interviewed at the time, and
16 I'm trying to remember if he was a captain yet or if
17 he was lieutenant still, it would have been Hogelin,
18 Brent Hogelin.  I believe that Lieutenant Colonel
19 Moon is quoted, but he wasn't present in the room
20 when the video segment that was with that was
21 filmed.
22   Q.  I'm sorry, can you say that again for
23 me, please?
24   A.  There was a video segment that went
25 along with Mr. Joy's article, and Lieutenant Colonel

30 (Pages 117 to 120)

## Page 121

1  Moon was not in the room when that was being filmed.
2  I believe they got any quotes from him separately.
3      Q.  Okay.
4      A.  And I was not aware of that conversation
5  until it was printed.
6          THE REPORTER:  Did you say Mr. Joy?
7          THE WITNESS:  Yes.
8          THE REPORTER:  Thank you.
9  BY MR. McINERNEY:
10     Q.  Was your involvement -- the material
11 that you're looking at in the exhibit, and the
12 Exhibit Number is --
13     A.  84.
14     Q.  -- 84, is a print of what began as a
15 television story with Channel 9; is that correct?
16     A.  I know it was a television story, and I
17 know it was Kansas City, but I don't know the
18 number.
19     Q.  Okay.  Were you interviewed on camera
20 for that?
21     A.  Unfortunately, yes.
22     Q.  Okay.  Thank you.
23         MS. GREATHOUSE:  If you're done, let's
24 take five.
25         MR. McINERNEY:  Okay.  Let's take five

## Page 122

1  and we will put our heads together and then come
2  right back.
3          THE VIDEOGRAPHER:  We are now off the
4  record at 11:55 a.m.
5          (Recess taken.)
6          THE VIDEOGRAPHER:  We are now on the
7  record at 12:05 p.m.
8  BY MR. McINERNEY:
9      Q.  Ma'am, I want to return one more time
10 to Exhibit Number 84, which is the -- those two
11 articles that we have talked a little bit about, and
12 specifically the Capital Journal article that was
13 published on March 4th of 2017.  And if I -- tell me
14 if I have asked this question before, but I'm trying
15 to get some clarification here.
16     The -- with respect to your comments to
17 the -- the Topeka Capital Journal, that story also
18 included comments from Lieutenant Colonel Moon.  Do
19 you have an independent recollection that you were
20 present at an interview along with Lieutenant
21 Colonel Moon for that article?
22     A.  I don't recall being interviewed for
23 that article at all.
24     Q.  Okay.  If Lieutenant Colonel Moon
25 recalls your quotes as being accurate, would that be

## Page 123

1  a matter of your memory versus his?
2      A.  I think my statement was that I don't
3  discount that the quotes are accurate, I think
4  they're taken out of context.
5      Q.  Okay.  So you don't dispute the
6  accuracy of the quotes; is that correct?
7      A.  I don't have an independent
8  recollection, but I -- I don't know that they're not
9  accurate, that's correct.
10     Q.  And I think that's correct.  At the
11 beginning earlier in your deposition you raised the
12 context issue, but not the accuracy issue?
13     A.  I -- I have no reason to believe
14 they're not accurate, but I don't recall saying
15 those particular words.  But, again, I believe that
16 they were taken out of context.
17     Q.  Let me turn one more time to Trooper
18 McMillan and the remedial legal training that you
19 provided to him.
20     A.  Okay.
21     Q.  And I think you testified that you did
22 recall this interaction with lieutenant -- or with
23 Trooper McMillan.  Did -- do you recall whether
24 Trooper McMillan told you that he disagreed with the
25 findings of the PSU?

## Page 124

1      A.  I don't recall that at all.
2      Q.  Do you recall whether Trooper McMillan
3  understood that he had acted improperly in the
4  Bosire stop?
5      A.  I don't believe we discussed his
6  feelings on that.  I think we were just focused on
7  providing the remedial training as requested.
8      Q.  Did you under- -- did you discuss his
9  understanding of it, his feelings aside, did you
10 discuss his understanding?
11     A.  To the point where I was trying to make
12 sure he comprehended why I was giving him the
13 remedial training and what he did that wasn't
14 correct.
15     Q.  Did he acknowledge that?
16     A.  That it was incorrect or that he
17 understood what he -- that my position was that it
18 was incorrect?
19     Q.  Both.
20     A.  I know he acknowledged that -- I'm
21 trying to make sure that I'm responding accurately.
22 My recollection is that he understood why he was at
23 the training, and that's probably the best I can do
24 as far as explaining that and answering your
25 question.

31 (Pages 121 to 124)

SARAH WASHBURN  8/9/2021

## Page 125

1    Q.  Based on your recollection, did -- I'm
2  going to ask about your sense -- did you come away
3  with a sense that he understood not only the
4  purpose, but the training that you provided?
5    A.  I believe he did.  I believe he
6  comprehended what I was attempting to convey, yes.
7    Q.  What did he say to you about the Bosire
8  stop?
9    A.  I don't recall specific statements.
10  I'm sorry.
11    Q.  Do you recall him saying, "I made a
12  mistake"?
13    A.  Not in so many words, no.
14    Q.  Ma'am, that's all the questions I have
15  for you today.  Thank you for your time.
16    MR. CHALMERS:  She'll read and sign.
17    THE VIDEOGRAPHER:  We are now off the
18  record at 12:09 p.m.
19    (Deposition ended at 12:09 p.m.)
20
21
22
23
24
25

## Page 126

1    CERTIFICATE
2
3    I, Sarah A. Davison, a Certified Court
4  Reporter, within and for the State of Kansas and the
5  State of Missouri, and a Registered Professional
6  Reporter, do hereby certify that the witness whose
7  testimony appears in the foregoing deposition was
8  duly sworn by me; that the testimony of said witness
9  was taken by me to the best of my ability and
10  thereafter reduced to typewriting under my
11  direction; that I am neither counsel for, related
12  to, nor employed by any of the parties to the action
13  in which this deposition was taken, and further that
14  I am not a relative or employee of any attorney or
15  counsel employed by the parties thereto, nor
16  financially or otherwise interested in the outcome
17  of the action.
18
19    _____
20    Sarah A. Davison, RPR
    CCR #1397-MO  #1589-KS
21
22
23
24
25

## Page 127

1    ALARIS LITIGATION SERVICES
2
3  August 24, 2021
4
5  MR. ARTHUR S. CHALMERS
   KANSAS ATTORNEY GENERAL'S OFFICE
   Memorial Building
6  120 Southwest 10th Avenue
   Topeka, Kansas  66612
7
8  IN RE: BLAINE FRANKLIN SHAW, et al. v. HERMAN
     JONES in his official capacity as the
     Superintendent of the Kansas Highway
9    Patrol, et al.
   ----------------------------------------
10   MARK ERICH, SHAWNA MALONEY, Individually
     and as mother and natural guardian of
11   minors DM and MM v. HERMAN JONES, KHP
     Superintendent
12
   Dear Mr. Chalmers:
13
14  Please find enclosed your copies of the deposition of
   SARAH WASHBURN taken on August 9, 2021 in the
15  above-referenced case. Also enclosed is the original
   signature page and errata sheets.
16
   Please have the witness read your copy of the
17  transcript, indicate any changes and/or corrections
   desired on the errata sheets, and sign the signature
18  page before a notary public.

   Please return the errata sheets and notarized
19  signature page within 30 days to our office at 711 N
   11th Street, St. Louis, MO 63101 for filing.
20
   Sincerely,
21
22
23  Sarah A. Davison
24
25  Enclosures

## Page 128

1    ERRATA SHEET
   Witness Name: SARAH WASHBURN
2  Case Name: BLAINE FRANKLIN SHAW, et al. v. HERMAN
     JONES in his official capacity as the
3    Superintendent of the Kansas Highway
     Patrol, et al.
4  ----------------------------------------
5    MARK ERICH, SHAWNA MALONEY, Individually
     and as mother and natural guardian of
6    minors DM and MM v. HERMAN JONES, KHP
     Superintendent
   Date Taken: AUGUST 9, 2021
7
    Page #_____  Line #_____
8   Should read: _____
    Reason for change: _____
9
    Page #_____  Line #_____
10  Should read: _____
11  Reason for change: _____
12
13  Page #_____  Line #_____
14  Should read: _____
15  Reason for change: _____
16
17  Page #_____  Line #_____
18  Should read: _____
19  Reason for change: _____
20
21  Page #_____  Line #_____
22  Should read: _____
23  Reason for change: _____
24
25  Witness Signature: _____

32 (Pages 125 to 128)

SARAH WASHBURN  8/9/2021

Page 129

```
1    STATE OF _____)
2
3    COUNTY OF _____)
4
5    I, SARAH WASHBURN, do hereby certify:
6         That I have read the foregoing deposition;
7         That I have made such changes in form
8    and/or substance to the within deposition as might
9    be necessary to render the same true and correct;
10        That having made such changes thereon, I
11   hereby subscribe my name to the deposition.
12        I declare under penalty of perjury that the
13   foregoing is true and correct.
14        Executed this _____ day of _____,
15   20____, at _____.
16
17
18
19        _____
20             SARAH WASHBURN
21
22        _____
23             NOTARY PUBLIC
24   My Commission Expires:
25
```

33 (Page 129)

SARAH WASHBURN 8/9/2021

**A**

a.m 3:20 5:1,4 51:7,10 105:9 105:12 122:4
abide 38:12
ability 82:17 103:16 126:9
able 6:25 14:24 91:17 99:20
above-refere... 127:14
absolutely 27:16 30:15 61:7 73:10 80:11 82:21,24 96:20,23
academy 10:19 17:2 40:18 52:14 63:4,17 63:23 106:25 108:3 109:12 109:19,19
access 99:20 99:23
accompanied 55:7
accompany 55:4
account 73:8 89:5
accuracy 37:3 59:1 123:6,12
accurate 13:10 35:24 36:16 42:5 59:5 67:6,8,25 76:7 77:4,7 85:5 98:5 100:2 104:21 122:25 123:3 123:9,14
accurately 31:6 54:17 58:19 74:13 75:18 76:24 84:25 86:8 118:5

124:21
acknowledge 124:15
acknowledged 124:20
Act 73:9,13 75:4 93:5
acted 124:3
action 40:6 60:24 61:2 126:12,17
actively 81:20
actual 31:20 33:2 55:4 99:4
ad 8:18
Adam 42:10 72:17
addition 101:9,11
additional 40:7 55:6 65:19 85:20
address 86:1 118:25
addresses 41:2
addressing 40:24 118:18
admin- 97:12
administrative 12:3 29:6 97:12
adopt 60:22
adults 8:16
advanced 10:19 17:14,24 18:15 18:24 21:22 22:14 23:17 25:5 27:8 29:14,19 30:19 52:5,17,22 53:22 56:5,19 59:13 66:19 78:6 88:11 107:24 109:9
advice 6:2 15:21 18:23 69:6
affidavit 2:21

84:3,19 85:6 87:4
afternoon 29:25 30:25
AG's 12:6
agency 14:11
agency's 25:3 72:2
agency-wide 73:19
ago 12:13 52:21 101:21
ahead 6:11,18 43:15 49:23 50:4 91:7
aid 23:16
al 1:4,10 3:4,8 127:7,9 128:2 128:3
Alaris 4:20 127:1
allow 61:9 65:25
allows 98:13
amalgamation 117:4
Amendment 17:5 23:14 24:6 25:1 26:11 40:8 82:14,22 111:10 112:8
amount 97:16
amounts 80:2
analysis 13:18
and/or 95:11 127:16 129:8
answer 6:6,11,18 6:24 11:1 19:6 19:17 40:1 49:23 87:14 103:1
answered 11:5
answering 15:8 124:24
anticipation 18:11

anybody 50:21 83:9 99:11
anymore 34:8 67:1 96:11
anyone's 45:16
anyway 30:14 43:9,14 79:23
apologize 35:21
apparently 88:1
appeal 118:11
appear 8:17 12:9 14:2
appeared 72:14 114:8
appears 21:21 22:3 31:7 35:22 42:6 51:25 52:4 54:8 60:2 63:3,6 64:5 110:8 114:19 126:7
appellate 31:19 117:22
applied 81:17
apply 13:20
appreciate 27:15 28:8 51:17 62:14
appropriate 15:17 73:7,7 77:9 89:8,20 89:23
appropriately 80:22 89:13
approval 2:18 63:6,16 111:15
approved 63:18
approximately 94:8 109:24
April 116:11
area 10:10 82:9 82:11 88:2,3
areas 88:9,12,14
arguments 59:23 118:12 118:14

arises 40:14
arrest 2:12 42:3 101:16
arrived 68:9,17
ARs 99:24
Art 28:16
Art.chalmers... 4:12
ARTHUR 4:10 127:4
article 71:2,5 72:14 94:7 95:2 119:7 120:7,8,25 122:12,21,23
articles 70:18 122:11
articulate 32:15 80:19,22 81:12 107:9,10 116:16
articulated 57:21 66:4 81:2,15 88:21 90:3,12
articulating 35:6 89:6 107:1 118:1
articulation 109:16
aside 124:9
asked 33:24 36:19 37:18 38:18 39:1 40:7 53:10 75:11 76:17 102:19,23 110:22 118:15 119:18 122:14
asking 17:21 18:3,7,10 62:13 66:9 69:6 77:12,17 77:18 80:13 89:18 95:17 99:10 100:25 104:2,16

SARAH WASHBURN  8/9/2021

108:16 114:13
asks 39:4
  102:25
asset 10:17 12:1
  12:8 24:5,19
  24:21 25:15
  30:6 117:6
assistance
  22:16,23
assistant 7:16,17
  8:5,6 30:5
assisted 75:9
associate's 10:3
  10:5
assume 6:12
  57:7 106:4
  118:7
Assumes 48:2
  74:20
assuming 73:8
  94:10
assumption
  34:24
Atkinson 52:9
  52:13
attached 2:24
  36:2 63:6
attain 10:5
attempt 53:18
attempting
  125:6
attempts 61:18
attendant 66:12
  66:12
attention 29:16
  29:22 43:24
  45:2,5,11,13,16
  45:17,18,20
  45:24 49:4
  63:1 75:12
  78:2 83:2
  84:15 86:10
  87:20 105:23
  107:8 109:1
  116:13 117:3
attitude 24:9
attorney 3:21

4:10 7:7 8:5,7
  18:2 30:5
  34:13 118:17
  126:14 127:5
attorney's 8:2,4
  30:7 85:8
attorney/client
  104:10
attributed 74:7
  75:14 83:3
audience 36:22
August 1:24
  3:19 5:3 35:17
  127:3,14 128:6
Aurora 86:1,2
  88:2
AUSA 106:7
author 22:4
  36:11 64:9
authored 20:14
  20:20 33:9
  36:16 69:12
  101:19
authorities 12:17
authority 44:17
  82:18 90:7
  112:1
available 94:12
  94:14 113:13,16
Avenue 3:22
  4:11 127:22
average 38:8
avoid 19:5
aware 37:13
  43:21 71:10,16
  71:24 83:9
  88:25 90:8
  100:11 102:10
  102:18 104:17
  113:8 121:4

**B**

B 50:13,16
bachelor's 9:18
back 27:12
  29:16,23
  53:24 58:3

60:12 62:8
  63:18 64:20
  66:20 67:4
  69:8 74:3
  83:2 85:19
  86:11 90:13
  99:2 109:1,2
  116:16 117:14
  122:2
backwards 7:22
bailiwick 82:2
barriers 112:15
base 60:4
based 33:23
  38:22 52:6
  58:1 59:22
  60:1,2 64:23
  76:4 89:23
  99:10 101:17
  118:7,14 125:1
basic 10:19 17:1
  40:18 106:25
  108:2 109:12
  109:19
basis 76:1
  95:24 97:3
  99:20 100:13
Bates 21:6
  27:22 48:10
  51:18 52:25
  70:9,21,24
  83:20,21,22
  116:5
Bauer 52:9,15
bear 23:18
began 42:15
  121:14
begging 113:19
  113:23
beginning 17:2
  23:10 102:4
  123:11
begins 70:9
  92:5 116:15
Begs 100:17
Beier's 59:22
believe 12:6

13:2,5 14:10
  23:18 25:25
  26:9 28:3
  31:18,19,22
  32:9 33:1,8,24
  34:5,24 35:2
  36:7,8 46:11
  46:18,20 50:9
  50:10 52:24
  53:16 54:3
  55:9 56:13,16
  56:21,24
  57:16,20,24
  59:3,4,15
  60:6,10 61:17
  62:9 66:7
  68:6 71:7
  72:16 75:7
  76:8 77:7,12
  78:5,15 81:7
  84:9 85:15
  86:9,25 89:5
  89:14 90:5,10
  91:22 93:6,12
  94:25 98:12
  98:15 99:1,3
  99:16,17
  100:10 101:4,4
  101:18 103:20
  103:24 104:13
  106:19,24,24
  108:8 109:8,9
  109:11,12
  110:21 118:17
  120:2,7,18
  121:2 123:13,15
  124:5 125:5,5
beneath 41:13
benefit 87:3
best 10:25
  39:25 46:21
  59:4,6 67:25
  81:12 82:17
  101:13 124:23
  126:9
bet 21:9
better 10:22

42:22 56:3
  73:17
biggest 40:10
bit 7:22 11:9
  20:3 67:16
  83:1 90:16
  95:3 101:15
  115:5 122:11
BLAINE 1:4 3:4
  127:7 128:2
blanked 72:9
boilerplate
  115:21
Bosire 124:4
  125:7
boss 67:17 68:5
  102:19,23,25
  103:7,23 107:7
bothering
  46:24
bottom 28:24
  29:12 53:4
  57:1 58:9
  70:22 76:16
  85:23 92:2,6
bound 90:6
Brandon 110:13
break 6:16,19
  16:19 23:3
  51:2 56:13
  58:15 64:17
  64:22 105:7
breakdown
  91:18
breaker 13:17
Brent 105:17
  120:18
briefly 63:11
broadcast
  56:22
broader 96:6
  106:20
brought 9:24
  45:17 109:1
build 61:18
Building 4:11
  127:5

SARAH WASHBURN  8/9/2021

bullet 53:13
54:12 55:8
58:13,14
Bullock 110:9
Burton 48:20
49:7

**C**

C 4:1
calculating
94:18
call 10:24 15:9
23:12 43:25
113:21
called 39:17
42:4,16 48:20
110:23
calling 13:22
57:8
calls 87:12
104:6
camera 121:19
Candice 72:12
candy 113:18
capable 15:2
capacity 1:9 3:7
71:9,22 127:8
128:2
Capital 71:5,11
74:4,4 75:2
83:10 91:16
92:14 95:12
119:7,24
120:12 122:12
122:17
caps 117:22
118:3
captain 52:13,14
67:22 110:21
120:16
captains 63:25
97:11
caption 49:5
car 37:7 42:13
62:7 86:15,16
care 9:23 73:23
career 17:3,9

Carr 35:18
36:10,17 37:1
58:6 116:10
Carr's 35:20
58:23
case 1:7,15 3:6
3:13 5:20 15:4
23:24 24:20
24:21 25:8,10
25:15 26:5,6
26:14 29:14
31:3,9,10,11,15
31:24 32:6,6
32:11,14 33:11
33:17,25
36:25 42:4,7
42:9,12,22
43:2,6,18,18
45:10 47:25
48:20,21 49:7
54:6 55:10
56:14,14,16
57:1 76:10
84:9 93:4,25
94:1,2 97:15
106:1 108:17,17
109:2,14 113:4
113:4 114:20
117:10 127:14
128:2
caseload 8:22
cases 8:19 10:18
10:22 12:1,8
18:8 19:23
24:1,5,13,19
25:3,3,7,22
25:24,24 26:1
26:2,9 30:6
35:1 49:10,15
50:19,24
59:24 97:20
115:21 117:6,11
118:8,22
cause 3:24
88:23 89:7
100:24 101:6
CCR 4:20

126:20
cellphone
113:18
center 82:19
certain 3:23
23:11 90:4
certainly 33:18
33:21 34:1 78:1
79:9 81:9
CERTIFICATE
126:1
Certified 3:23
126:3
certify 126:6
129:5
cetera 112:21
113:15
chain 28:20,22
69:23 80:8
Chalmers 4:10
6:21 21:12,15
43:4,13 46:23
47:3,10 48:2
49:20 50:2
51:18 74:20
83:20 87:11,15
91:3,9,11 93:18
95:25 100:3
104:6,9 125:16
127:4,12
Chalmers'
96:12
chance 28:15
48:12 70:12
change 19:22
82:3,4,6 128:8
128:11,15,19,23
changes 29:18
33:6 82:2
115:22 127:16
129:7,10
Channel 121:15
characterize
37:15
checks 66:10
Chevrolet 25:12
chief 7:15

child-in-need-...
8:19
choosing 60:24
chose 61:1
Christopher
52:9
Circuit 31:4,12
31:25 90:7
106:1 108:6
circumstances
13:12 14:15
32:13 39:21
40:5 43:23
55:12 56:1,11
57:8 59:10
64:21,24 77:14
77:15 78:1
79:7,10,12,15
80:20 87:24
89:6,11 117:2
119:9
citation 66:11
98:11 99:12
101:11
citations 92:12
cited 56:16
cites 22:11
56:25 57:1
cities 81:24
88:10
citizen 62:11
citizens 82:16
citizenship
86:17 87:1
City 4:6,21 8:11
117:23 118:9
121:17
clarification
44:10 92:16
109:18 122:15
clarify 27:7
33:25 62:13
67:8 70:2
clarity 69:18
class 17:23
30:20 31:2
78:9,16

classes 17:1
50:9
classified 7:7
clause 115:23
clear 6:8 18:5
20:21 22:8
57:16,17 59:8
64:3 77:16
78:12 83:4
92:21 108:14
108:22
clearly 35:6
118:2
close 30:13
coast 86:5
Coast-Maryla...
88:3
coffee 13:16
Colin 29:12
30:2,4 106:4
collaboration
67:13,15
colleague 11:2
collected 98:14
collection 90:18
college 9:15,20
10:7
collegiate 10:21
Colonel 120:3,4
120:14,18,25
122:18,21,24
Colorado 76:20
85:24 86:1,2
87:8,9 88:2
come 11:16 24:2
24:16 25:3
40:6 41:6
43:23 44:1
45:2,4,11,13
45:20 80:3
97:7,10 98:17
114:5 116:16
117:3,5,18
122:1 125:2
comes 16:25
19:13 37:6,8
41:4 63:18

SARAH WASHBURN 8/9/2021

73:17,20 76:5
comfortable
15:8 35:5
112:9,13 113:10
coming 34:2,7
46:25 79:7
118:9,22
command 11:13
19:20,25 20:8
69:23 114:5
commenced 5:1
comment 87:10
87:15 105:25
comments
85:20 87:5,8
119:8 122:16
122:18
Commission
129:24
communicate
47:4
communication
14:16 74:3
104:11
communicatio...
103:18
Community 10:7
compelled 114:1
compilation
70:17
compiled 94:13
94:23
compiling 77:10
complaint 38:17
complaints
38:22
complete 68:1,2
completed
112:20
completely
23:4
completing
13:24
component
82:4,6
comprehend
114:11

comprehended
124:12 125:6
computer 98:8
114:23 115:16
concern 32:21
39:22
concerned
88:24 104:12
concerning
35:24
concerns 19:25
26:11 40:24
41:2 64:12
69:17,18
115:20 116:20
conclusion
77:13
conduct 38:22
45:9
conducted
99:13
confident 75:15
confluence
118:21
connected
35:23
connection
15:22 93:13
93:25 94:2
106:2 110:18
consensual
53:18 54:1
56:12 60:25
61:21 62:4
64:18
consent 35:24
42:16 58:5,12
60:1 117:25
118:2
consider 79:1
82:1 89:20,23
considered
80:25 86:3
89:12,16
consistent 28:4
Constitution
23:10

constitutional
17:4
constitutionall...
82:15
contact 29:13
44:9 49:18,24
50:5,7 58:15
98:5 110:17
113:14
contacted
110:20
contained 55:1
content 22:10
37:7 58:22,23
69:19 77:18
104:16 107:4
107:20
context 37:7
53:22 66:19
74:22 75:23
75:24,25 76:8
76:9 77:8,22
78:14 91:15
93:4 106:23
123:4,12,16
continue 39:17
89:1
continued 61:9
contract 115:2
115:19
contracting
114:23 115:7,16
115:17
contribute 77:21
control 47:7
68:2,2
conversation
21:1 35:3
50:18,23
111:24 116:17
117:15 121:4
conversational
112:11
conversations
19:3,18,20
20:7 33:23
46:16 104:13

104:17
convey 125:6
copies 15:13
99:24 127:13
copy 17:17 21:21
127:16
cordial 61:20
corner 53:1
58:10
correct 9:11
15:25 18:16,19
22:2,12 25:24
26:17,23 27:1
35:18,20 42:2
44:12 49:11,12
52:16 57:9,23
58:2 59:2
60:22 61:6
64:4,13 67:3
76:10 82:23
85:11,12,14
89:20 99:25
100:8 101:22
104:23,25
105:4 106:3
107:17 108:7
109:6,13,20
119:14 121:15
123:6,9,10
124:14 129:9
129:13
corrections
127:16
corresponde...
16:4
corridor 84:23
88:4
corridors 78:4
78:13,18 81:21
cost 92:10,12
94:19
costing 94:11
counsel 4:14
7:16,18,19 11:12
11:13,17,18,20
12:6,9 14:3
21:13 33:16

34:10,16 38:10
43:10,14 49:21
50:3 68:8,12
69:6,22 71:22
72:23 73:2
91:6 126:11,15
counsel's 7:8,13
10:15 11:7
12:22 22:17
37:11 50:22
71:10
counselor 14:7
country 84:24
county 8:2,3,5
8:6,7 24:2,23
59:24 85:8
117:23 118:9,17
118:22 129:3
couple 16:17
17:11 19:8 25:8
53:13,25 54:4
56:16 57:2
60:6 90:20
course 16:16
18:16 22:15
24:12 29:19
45:1 52:17,18
52:23 53:23
56:5,19 57:23
59:14 61:19
66:16,19
109:22 111:16
112:24
courses 17:15
court 1:1 3:1,23
3:25 4:19 5:7
24:9 25:19
27:17 31:20
34:3,22 42:23
55:21 56:10
65:3 86:17
90:3 118:11,19
126:3
court-created
55:17,17
courtesy 64:1
courts 32:17

SARAH WASHBURN  8/9/2021

45:15 65:19
65:24 77:14
78:8,21 81:13
89:25 117:22
cover 30:18
64:7
covered 31:3
111:13
covering
105:25
create 53:11,19
55:23 91:17
created 18:10
18:22 22:11
36:7 55:18
91:21 112:18
creating 16:15
creation 17:21
credit 22:9
crime 14:2
criminal 25:24
25:25 26:1
29:8,14
cross-border
80:5
CTRL72 41:13
CTRL73 41:24
CTRL74 48:11
currency 95:6
currently 73:1
100:15
custodian 73:15
75:5
custom 91:1
92:7 93:1,3,10
93:16

D

data 74:8,9,18
75:2 90:17,23
94:13 95:4
97:14,18
date 5:3 42:20
85:16 92:11
100:10 102:4
102:15 128:6
dated 116:10

Davison 3:23
4:19 126:3,20
127:23
Dax 29:1 105:17
day 10:24
129:14
days 99:2
127:19
DEA 84:22
deal 114:15
dealing 14:21
26:10 53:25
112:1
dealt 15:7 24:21
24:25 26:10
Dear 127:12
decided 31:16
31:24 33:4
decision 12:21
12:25 13:1
31:17,18,19
33:1,3 34:6
107:14 108:6
114:6
decisions 34:22
declare 129:12
declined 42:16
deemed 66:2
defend 117:7
defendant 1:19
3:16 12:3 32:7
defendants 1:11
3:9 4:9 31:14
defense 8:14,16
8:21
defensive
112:12
define 82:11
defined 81:6
definitions
23:21
degree 9:16,18
10:2,3,6 11:16
89:14,15,19,23
degrees 9:22
61:13
demand 82:7

Denver 86:2
deny 83:5
department
20:19 34:7,9
68:14
dependent
37:23 88:18
depending 111:4
depends 17:23
40:15
deposition 1:22
2:24 3:18 5:1
5:5,21,22
76:18 123:11
125:19 126:7
126:13 127:13
129:6,8,11
describe 10:16
14:19 16:14
17:19 22:25
23:6 64:15
70:16 111:22
described 13:8
14:8,15 15:12
26:3 47:16,23
103:18 116:19
description 2:6
42:22 43:6
design 111:2,4,6
designated
73:11,21
desired 127:17
desk 40:6
destination
86:7 89:2
detail 10:13 78:5
details 26:19
detention 2:11
26:23,24 42:3
61:10 65:12
detentions
64:13 65:11
determination
12:15 64:22
determine 18:3
34:18
determined

94:22 95:10
determines
33:15 89:15
determining
115:2
develop 20:4
developed
69:13
developing
20:11 66:16
development
17:16
dictates 56:15
90:6
difference
44:13
different 16:17
20:16 46:8,9
46:13,18
60:22 61:1
118:22 119:19
digiTICKET
93:7,11 98:19
99:5,7
diligently 65:18
dinging 46:25
direct 11:14
29:16,22 49:4
57:19 69:21
75:12 84:14
86:10 87:20
116:13
directing 32:15
63:1
direction 85:23
92:16 126:11
directly 67:24
68:17
disagreed
123:24
disciplinary
39:10
discount 123:3
discuss 69:19
90:25 124:8
124:10
discussed 57:2

58:5 69:15
90:8 104:20
124:5
discussion
34:23 43:5
disengage
54:13 55:11
57:11
disengageme...
55:22
disengaging
53:17
dished 6:3
dismissal 2:15
45:10 47:25
49:6
dismissed
49:16
dispensaries
86:3
dispersed 80:8
dispute 123:5
distributed
33:10
distribution
17:22 34:19
37:12
district 1:1,1 3:1,1
3:24,25 15:18
31:20
diverted 83:1
divided 11:9
DM 1:14 3:12
127:11 128:5
document 91:18
94:11 95:4,5
96:4 98:13
101:5 112:17
116:4
documenting
100:23
documents
102:20
doing 15:2
44:16,16 64:1
66:13 67:18
69:5

SARAH WASHBURN  8/9/2021

dollars 92:12
draft 103:19
drafted 102:3,6
drafting 23:1,7
  66:11 103:22
draw 83:2
  105:23
drew 107:7
driver's 85:25
drug 78:4,13,18
  79:2,18,24
  80:9,16 81:6
  81:21,21,24
  84:23 88:2,3
  88:4,9,9,12,14
  90:8 95:6
drugs 42:17
  84:24
duly 5:10 126:8
dusk 88:1
duties 8:12
  10:16 12:11,14
  16:11 92:9
  117:5
duty 11:6

E

E 4:1,1
e-mail 2:10,16
  2:18,22,23
  14:22 15:11,13
  15:14,21 16:5,8
  28:20,20,22
  28:24 29:1,11
  29:23,24
  30:2,24 35:17
  51:25 52:6,8
  58:1,6 63:3
  105:16,22,24
  106:10 110:8
  116:10
E-mails 2:9
earlier 59:1
  66:21,24
  102:11,16
  123:11
east 85:24 86:5

88:3
editing 23:1,7
edits 103:5
educate 78:3
education 37:11
  39:18 77:23
  78:24 80:15
  82:12 99:19
  106:12 109:23
effect 60:7
  100:16,18
either 44:11
  49:10 50:19
  50:24 71:25
  79:20 100:12
elaborating
  55:14
element 79:16
elements 26:20
  26:22 70:20
  80:25 89:9
Ellsworth 24:22
else's 22:9
  99:11
emphasizes
  59:9
employ 11:19
employed 7:2,4
  7:12,23 8:1 9:2
  84:11 126:12,15
employee 47:18
  126:14
enacted 101:22
  104:5,23
enacting 103:9
enclosed 127:13
  127:14
Enclosures
  127:25
encounter
  53:19 54:1
  56:12 60:25
  61:22 62:5,8
  64:18,19,23
  82:16 117:25
encounters
  62:12

encourage
  113:20,23
ended 42:15
  125:19
ends 65:18
  66:8
enforcement
  32:15 34:4,23
  59:25 60:24
  61:2,18 62:11
  69:25 80:19
  84:21 112:2
  113:17
engage 53:18
  57:6,12 112:18
engages 106:7
engaging 117:14
entry 42:21
environment
  61:20
ERICH 1:13 3:11
  127:10 128:4
errata 127:15,17
  127:18 128:1
especially 88:11
essentially
  32:15
established
  61:8
estimate 94:7
et 1:4,10 3:4,8
  112:20 113:15
  127:7,9 128:2
  128:3
events 85:15
eventually 91:17
evidence 2:12
  2:14 42:3 43:6
  45:6 48:3
  74:21 91:5
evidently 22:15
ex 25:11
exact 68:15
exactly 20:18
  30:18 89:17
  91:2 105:22
  115:9

Examination
  2:3 5:12
examined 3:19
example 18:14
  20:13,22 24:1
  33:19
exceeding
  44:17
exceptions
  23:16 61:22
exchange
  28:20 105:16
  105:23
exchanges 16:8
excuse 7:25
  11:23 13:1 14:14
  25:4 44:12
  50:23 57:13
  69:23 75:13
  76:21 95:11
  106:25 112:7
  117:8
execute 45:9
Executed
  129:14
exhibit 2:7,8,9
  2:10,11,13,14,15
  2:16,18,19,20
  2:21,22,23
  21:3,4,12,18
  23:2,8 27:18
  27:21,25
  28:10,11,19
  35:8,11,16 41:9
  41:12,19,22,23
  42:1,20,24
  48:7,10,16,19
  48:24 49:2
  51:11,15,23
  52:7 53:2
  57:22 58:4,5
  58:21 60:7,9
  62:16,19,21,24
  63:1 64:2,6,7
  64:12 70:6,8
  70:13,16,17
  73:24 83:16

84:15 85:22
  86:11 87:21
  90:14 96:3,7
  105:15,16
  109:25 110:3,8
  116:2,5,9
  119:11 121:11,12
  122:10
Exhibits 2:5,24
exist 40:24
  74:9,9,11,19
  90:23 99:24
existed 54:20
  91:25
existence 32:19
  108:10
exists 90:23
experience
  113:1,24
expertise 82:9
  82:11
Expires 129:24
explain 36:5
  61:15 65:14
  108:15
explained 54:3
  65:24 76:19
explaining
  124:24
explanation
  54:25 55:9
  55:20,21
explicit 111:16
extend 26:25
  65:22 66:2,14
  112:3
extensions
  117:24
extent 95:1,18
extra 31:1
extract 74:11
  90:24

F

facilitated 95:13
fact 23:14 60:18
  76:5 88:17,17

SARAH WASHBURN  8/9/2021

113:10 117:20
**fact-driven**
  64:21
**factor** 55:17
  57:6 76:21
  79:9
**factors** 32:16,17
  32:18 54:7
  55:21,23
  77:10,21 78:22
  80:23 88:7
  88:20,21 89:3
  89:22 90:4,5
  109:17 118:2
**facts** 43:6 48:3
  74:20 81:16
  91:5 108:17
**failure** 38:12
  43:19 45:9
**fair** 6:13,14 20:9
  57:20 69:11
  108:9 116:20
**fairly** 24:14
**familiar** 6:2
  15:20 42:7
  43:1 45:19
  48:21
**familiarize** 21:10
  83:19
**FANE** 4:5
**far** 30:19 78:21
  79:22 95:1
  98:22 111:7,12
  119:1 124:24
**fast** 110:5
**federal** 12:17
  43:18
**feel** 54:2,2,15
  55:13,25
  64:25 113:19
  113:22
**feeling** 112:12
**feelings** 124:6,9
**felon** 13:19
**felt** 69:6
**field** 98:13 99:7
**figure** 13:19

98:17
**filed** 43:17
**filing** 49:16
  108:25 127:19
**fill** 8:18 97:20
  101:15
**filling** 97:23
**filmed** 120:21
  121:1
**final** 23:8 34:8
  67:1,5,10
  117:21
**finalization**
  66:25
**finalized** 105:2
**finalizing** 23:1
**financially**
  126:16
**find** 13:23 37:17
  44:15 97:8
  127:13
**findings** 123:25
**finished** 21:11
  35:14 41:16
  51:17 110:6
**firearm** 13:20
**first** 5:10,25
  24:4,15 28:25
  29:12,23 30:2
  35:16 36:2
  42:1 52:7
  54:13 57:25
  58:14 66:21
  69:8 72:10
  84:2 95:25
  102:4,9
  105:24 106:11
  107:3,20,22
  108:3,10,13
  116:9 118:4
**fit** 41:1
**five** 121:24,25
**five-minute** 51:2
  105:7
**focus** 80:21
  81:9,11,15,17
**focused** 86:17

112:4 124:6
**focusing** 117:24
**follow** 43:19
  90:6 94:6
  110:10
**followed** 76:23
  83:10
**following** 49:16
**follows** 5:11
**footnote** 107:7
  107:13,14
  109:3,4,10
**forefront** 24:3
**foregoing** 126:7
  129:6,13
**forfeiture** 10:17
  12:1,8 24:5,19
  24:21 25:15
  26:1 30:6
  97:20 117:6
**forfeitures** 12:13
**form** 2:18 48:2
  49:21 63:6,15
  63:16 65:14
  87:11 101:7
  103:11 129:7
**format** 22:17
**formation**
  104:18
**forming** 80:25
**forms** 101:9,12
**formulating** 79:1
**forth** 74:3
**forwarded** 15:16
**found** 45:15
  97:14 119:13
**found-** 112:6,6
**foundation**
  19:21 43:8
  93:18 96:1
**foundational**
  49:25 50:3
**four** 8:8 62:11
**four-hour** 31:2
**four-plus** 71:4
**Fourth** 17:5
  23:14 24:6,25

26:11 40:8
  82:14,22
  111:10 112:8
**FRANKLIN** 1:4
  3:4 127:7
  128:2
**frankly** 67:16
**free** 54:2,15
  55:13,25
  58:16 59:12,16
  59:17,24,24
  60:19 61:3,5,7
  62:1,2,6,7,7
  64:25
**freedom** 61:13
**frequent** 111:1
**frequently** 38:3
  38:6
**front** 14:23 78:9
  78:16 103:15
  105:19
**fulfills** 73:15
**full** 94:9
**function** 47:8
  98:7
**functions** 66:12
**fundamental**
  23:12 60:4
**fundamentals**
  112:7
**further** 20:4
  81:6 85:22
  90:20 126:13
**future** 113:14
**FYI** 63:25

---

**G**

**gamut** 14:1
**Ganieany** 4:13
  7:20 11:4 17:10
  22:24 29:2,3
  29:4,10,24
  35:3 45:24
  46:7,16 73:1,14
  73:21 94:5
**Ganieany's** 11:6
  45:18,20

67:13
**gap** 101:15
**Garden** 8:11
**Geary** 24:2
  59:24 117:23
  118:9,17,22
**general** 4:14 7:8
  7:13,18,19 8:12
  10:14 11:7 16:21
  22:16 34:10,16
  50:22 68:8,12
  69:22 73:2
  93:5
**General's** 3:21
  4:10 127:5
**generalities**
  19:16
**generate** 17:25
**generated** 15:11
  17:20
**getting** 17:25
  47:1 116:23
  117:14
**give** 6:2 13:12
  18:23 40:4,5
  68:1 78:9
  90:5 113:18
**given** 33:1 55:5
  66:18 85:24
  87:7 90:4
  91:24
**giving** 32:17
  124:12
**glaringly** 36:20
**go** 6:11,17 9:4,13
  9:20 20:3
  21:25 35:7
  43:15 49:23
  50:4 53:24
  58:16 59:12,16
  59:17,24,25
  60:19 61:3,5,7
  61:13 62:1,2,6
  62:7 64:17
  70:24 85:19
  90:13 91:7
  98:8 115:3

SARAH WASHBURN  8/9/2021

116:17 117:20
119:18
goes 18:3 23:7
30:20 62:8
69:7 88:6
95:1 111:7,12
116:15
going 5:20 6:12
7:21 10:12 16:2
16:2 18:2 20:3
21:2,24 27:20
28:9 29:1
34:24 35:10
41:11,21 48:9
48:23 51:14
53:3 60:23
61:24 62:18
62:23 66:6
67:9 70:8,20
70:22 79:8
82:25 83:2
85:19 87:22
91:1,4 95:20
96:3 110:2
125:2
good 5:14,15
20:13 31:1
38:8 51:3
97:21 101:2
107:7
gosh 24:20
68:14 72:6
115:24
graduate 9:6
granting 42:23
gravity 82:20
great 70:4 78:5
107:8
greater 33:1
GREATHOUSE
4:4 121:23
grew 10:10,13
group 98:17
guardian 1:14
3:12 8:18
127:10 128:5
guess 23:11

30:4,16 93:15
GUS 4:17

H
half 34:12 59:11
halfway 58:8
74:5
Hampton 10:9
handed 33:5
42:1
handful 66:18
handle 10:17,21
11:25 14:24
73:22
handled 11:24
38:13
handles 12:10
30:6
handout 78:6
78:19 81:8
hands 39:8
handwritten
2:13 42:21
happen 15:6
37:25 38:4
44:3,5
happening
64:24
happens 15:13
38:4 39:5,6
96:13
happy 31:5
hard 17:16
117:22
he'll 73:22
he/she 116:17
head 40:11 46:6
104:1
heading 95:3
heads 122:1
heard 30:19,21
49:10
hearing 59:23
heavily 64:21
81:16
help 20:24
33:25 36:20

113:21
helpful 23:24
49:22
helps 119:15
HERMAN 1:8,18
3:7,15 127:7,11
128:2,5
hierarchy 7:15
high 9:21 25:7
84:23
high-grade
86:4
highway 1:10
3:8 4:14 7:3,9
7:12 10:15 11:12
11:19 12:10,16
14:3 16:12,25
25:12 31:13,13
32:6,7 33:16
34:10,20 37:2
38:10 43:19
45:23 46:3
47:14 69:3
71:22 72:19
73:12 74:5
75:1 77:23
78:4,25 80:15
82:12 84:12
84:22 85:14
89:1 91:16,17
92:7 93:2
95:11 97:2
103:9 106:12
108:11 113:17
113:25 114:24
127:8 128:3
history 9:19
hit 80:5
hitting 80:7
Hogelin 105:17
120:17,18
holding 32:10
34:19 90:12
holdings 33:19
108:17
home 86:2
hope 91:11

hour 40:20
hour-and-a-half
40:21
hours 3:20 17:11
17:14
housed 50:16
HP-119 63:15,23
huh-uh 6:7
hundreds 92:12

I
I-70 84:19,21
88:4
idea 70:5 85:7
identification
21:5 27:19,21
28:12 35:9
41:10,12,20
48:8,17 51:12
51:15 62:17,22
70:7,14 83:16
110:1 116:3
identify 117:13
118:25
illegal 80:2
imagine 39:12
63:21 71:15
72:9
immediate
32:22
Impala 25:13
26:14
impermissibly
65:22 66:14
implying 96:6
impression
55:24
improperly
124:3
inaccurate
86:21,24
Inaudible 91:9
incidental 44:4
include 19:21,23
25:6 26:12
40:9 108:17
109:10

included 87:24
107:10,20,23
108:13 122:18
including 26:20
26:22 63:4
84:22 86:6
106:16 107:23
inclusion
108:23
incoming
109:19
incorporate
31:25
incorrect 124:16
124:18
indemnification
115:22
independent
119:22 122:19
123:7
INDEX 2:1
indicate 77:1
114:14 127:16
indicated 57:18
indicates 29:11
30:24 54:13
94:10 95:4
indigent 8:14
individual 37:23
55:24 75:5
97:5 98:4
Individually 1:13
3:11 127:10
128:4
information
13:24 24:8
36:12 55:7
72:2,4,15,20
72:22 73:6
74:7 75:10
85:2 91:25
92:11,14 94:19
94:22 95:10
95:14,19,21
96:24 97:21
98:8,10,14,20
98:21,23

SARAH WASHBURN  8/9/2021

99:20 101:17
112:16 114:14
informed 20:7
29:12
initial 31:17,18
66:1,3 94:6
initially 49:21
input 37:24
73:3
inquiries 71:17
94:24 98:16
inservice 17:9
inside 22:16
37:1
instance 40:5
instances 40:16
instructing
78:21
instruction 55:4
55:6
insurance 66:10
interaction
123:22
interchangea...
92:24
interdiction
10:20 17:14,24
18:15,24 21:23
22:15 23:18
25:2,2,6,23
27:8 29:7,8,14
29:19 30:19
50:12 52:6,18
52:23 53:23
56:5,19 57:23
59:14 66:19
69:24 78:7
88:11 95:16
107:24 109:9
117:24
interest 26:15
interested
88:18 126:16
interior 86:16
internal 38:21
internalizing
114:10

internally 11:24
12:1 34:18
45:15
interpretation
57:20
interrogation
42:15
interrupt 24:11
43:4
interview
122:20
interviewed
120:10,11,13,15
121:19 122:22
investigated
72:1
investigation
41:5
investigator
39:4
investigators
14:3
involve 17:15
involved 11:22
16:15 38:11
42:9,12,14
46:12,14
47:20,21
49:15 82:14
84:8,9 86:15
94:18,21 95:7
97:17 103:13
103:15,22,25
106:5,17 111:23
114:13,25
115:15,17
118:24 119:4
120:5
involvement
95:18 114:22
121:10
involves 37:7
involving 11:23
26:3 31:12
32:6 40:13
issue 19:11,12
24:6 26:10

33:16,25
40:22 41:3
63:21 65:10,11
76:2 96:15
123:12,12
issued 98:12
99:12,12 101:11
issues 12:5
19:24,24
23:12 25:1
27:2 37:6,8
39:19 40:9
45:23 81:13
118:18,19,25

_____ J _____

Jason 110:9
Jimenez 25:23
112:5 118:11
Jimerson 2:21
84:3,5,19 85:3
85:23
Jimerson's
84:18 87:4
Jimmie 52:8
job 7:6 38:19
44:20 45:14
69:8 82:13
jobs 20:9
Jones 1:8,18 3:7
3:15 42:4,16
127:8,11 128:2
128:5
Joseph 86:16
110:9
Joshua 42:4
Journal 71:5,11
74:4,4 75:3
83:10 91:16
92:14 95:12
119:7,24
120:12 122:12
122:17
Joy 121:6
Joy's 120:25
judged 55:11
judicial 117:13

July 27:10
jumping 90:16
Junction 117:23
118:9
June 25:4
118:13
justice 17:5
59:22
justification
87:2
justifications
86:18
juvenile 17:5
juveniles 8:15

_____ K _____

K-9 42:16
Kansas 1:1,9 3:1
3:8,21,22,25
4:6,10,12,14,21
7:3,12 8:10,13
10:15 11:19
12:16 16:25
25:11,12 32:6
34:9 37:1 42:4
43:19 45:23
48:20 49:7
73:8,12 74:5
75:1,4 77:23
78:3,25 80:15
84:12,22
85:13 88:25
91:16 103:9
106:12 108:11
113:25 114:24
121:17 126:4
127:5,6,8
128:3
KBI 97:20
keep 27:14
60:14 97:5,14
97:18 98:1
112:11
keeping 6:8
keeps 91:23
kept 95:15 97:2
97:3 99:14

KHP 1:18 3:15
11:23 27:2
28:5 83:10
94:13 95:5
98:8 106:8
127:11 128:5
kind 11:10 13:25
16:14,21 17:8
25:6 37:21
39:8 50:7
55:14,19
63:24 70:17
70:22 80:2
83:1 95:20
97:18 112:12
114:14 115:18
117:16 118:21
kinds 13:12
KLETC 17:6
KMBC 120:6,11
120:14
knew 118:21
know 9:23
12:25 13:1 15:6
15:19,23,25
16:1,3,5,6
20:17 21:11
23:9,25 27:13
28:7,14 30:1
31:10 35:13
36:22 38:3
39:7,13,25
41:16 42:10
46:2,14 47:13
48:4,12 50:21
51:16 55:14
56:22 59:24
63:12 67:17
68:25 69:25
70:12 76:11
78:19 83:12
83:22 84:5,7
84:13 87:18
93:9,21,23,24
94:18 95:15
97:4,8,14,25
99:3,5,14

SARAH WASHBURN  8/9/2021

100:15,19
101:20,23
102:2,6,14
103:8,10,12,14
104:3,5,8,11
104:22,24
106:5,11,14,15
107:5,11 110:6
110:13 111:6
114:12 119:3,5
121:16,17,17
123:8 124:20
knowledge
98:9 103:21
known 56:6
65:13 80:3
84:21 88:3
KORA 73:12,20
75:4 91:24
98:23,25
Kruse 118:15

L
lack 10:22
42:22 43:8
93:18 95:25
language 54:5
55:18 65:23
78:21 115:20
118:7
large 8:22
32:20 80:2
lasts 109:23
law 9:3,4,6,12
10:21 17:4
23:24 32:14
32:15 34:3,23
38:12 43:20
44:11,17 46:4
47:15 54:6,20
55:10 56:14,14
59:4,7,25
61:18 62:11
69:24 80:19
81:17 84:21
112:2 113:17
lawful 45:9

lawsuit 108:25
lawyers 5:19
7:12 11:3
layout 22:11
lead 12:9
leading 117:12
learn 112:14
leave 54:2,15
55:13,25 62:8
64:25
left 88:1
legal 8:10,13
12:22 13:18
17:6,11,11 20:12
20:17,18,19
26:24 33:10
33:17,19 34:7
34:9,14 38:18
39:18,24,25
64:4 68:14
77:12,18 79:9
79:20 80:22
81:11,18 82:13
88:18,22 111:5
111:20 112:1,19
113:3,14,25
123:18
legally 36:21
103:2
lending 89:3
length 26:22
LESLIE 4:4
lesson 2:18
63:5,6,15 64:3
let's 9:24,24
17:24 20:22
51:1 105:6
108:14 121:23
121:25
levels 97:12
Lewis 29:1,5,6
29:13,24
76:18 105:17
lexicon 55:19
LexisNexis 9:3
9:9
Lgreathouse...

4:7
liaison 11:11
license 32:19
66:9 75:16
76:5,20 77:3
85:25 92:9
93:14 95:4
96:25 99:1,3
99:4
lieutenant 29:6
29:7 36:9,10
36:10,17 37:1
44:2,6 50:13
52:14,15 58:6
58:23 67:22
72:12,16 116:10
120:2,3,4,14,17
120:18,25
122:18,20,24
123:22
lieutenants
44:18 63:25
97:12
limitations
89:24
limited 93:11
119:20
line 52:10 87:23
92:6 116:14
128:7,9,13,17
128:21
lines 84:20
85:22 112:19
114:18
list 80:9 88:6
listed 71:7
listing 35:12
litem 8:18
litigation 4:20
11:22,23,25
18:11 127:1
little 7:5,22
8:25 18:1 20:3
83:1 90:16
95:3 101:15
104:12 115:5
119:6 122:11

live 100:19
104:24 105:1
LLP 4:5
location 80:2
89:2,2 92:11
Locust 4:21
logical 23:21
long 7:4 8:6,24
54:1,14 56:10
85:16 88:1,21
109:23
look 15:1 28:14
37:2 38:22
48:11,24 51:16
63:24 70:11
75:16 77:3,15
78:22 102:19
110:5 115:1,18
116:6
looking 14:23
20:2 23:4
40:4 60:8
94:9 102:13
117:22 121:11
looks 28:25
35:23 42:21
55:21
loop 66:20
67:15
looped 72:25
looping 69:5
Lord 75:7 91:23
92:16,19 94:10
94:11
lot 10:12 11:11
16:18 17:5,7
34:21,22 111:11
112:4
Louis 127:19
low 90:2
lower 53:1 90:4
90:5 95:3
Lowery 25:23
112:5 118:10
Luther 4:13
7:20 11:4 29:1
Lyon 8:2,3,7

M
M-U-N-D-I-L
68:7
ma'am 5:14 7:2
33:14 48:11
51:14 70:16
86:14 91:14
96:10 105:14
122:9 125:14
maiden 68:6
92:20
maintain 61:20
maintained
95:23
major 68:18
making 75:20
87:4 112:8
MALONEY 1:13
3:11 127:10
128:4
management
99:23
mandated
55:16
mandatory
54:13
manpower
98:22
manual 105:3
March 71:3
72:13 122:13
marijuana 79:9
79:21 86:3,4
MARK 1:13 3:11
127:10 128:4
marked 21:2,4
27:18,21 28:10
28:11 35:8,10
41:9,11,19 48:7
48:10,16,23
51:11,15 62:16
62:18,21,23
70:6,8,13
83:15 109:25
110:2 116:2,5
market 88:3,12

SARAH WASHBURN  8/9/2021

Marquis 48:20
49:7
married 92:19
Mary 9:15
Maryland 86:6
material 22:4
36:9 37:18
40:22 111:4,7
121:10
materials 16:16
17:16,17,20
18:10,14,22
20:5,12,14
28:5 29:15,18
33:7 37:10,10
37:11 63:9,14
66:17,17,25
69:12,13,14
111:16
matter 30:14
45:1 110:10
112:23 123:1
McInerney 2:3
4:4 5:13,18
21:5,14,17
27:19 28:12,16
28:18 35:9
41:10,20 43:16
47:8,11,12
48:5,8,17
49:25 50:6
51:1,5,12,13,20
51:22 62:17
62:22 70:7,14
74:24 83:21
83:24 87:13
87:19 91:7,13
93:20 96:9
100:7 104:7,15
105:6,13 110:1
116:3 121:9,25
122:8
McMillan 110:10
110:14,18
111:20 123:18
123:23,24
124:2

mean 26:4
30:16 61:3
65:15,16,17
70:3 72:24
79:25 96:4
99:18 105:1
108:15
meaning 20:18
34:9 80:14
95:21
means 59:24
72:25
meant 31:8 55:3
55:4
media 32:21,22
32:23 33:2
70:18 71:16,19
71:21 72:1,20
72:20
medical 86:3
medicinal
79:20
meet 80:22
88:21
meetings 72:19
72:21
members 19:19
69:16,23
Memorial 4:11
127:5
memory 123:1
mention 106:24
mentioned 11:18
12:12 16:10
20:13 32:5,25
44:6 57:2
68:4,24 73:6
78:6,18 81:7
mentions 96:14
merits 34:19
mess 29:2
messages 16:7
middle 70:23
87:25 90:22
mind 23:21 51:5
114:19
mine 24:5,5,16

58:24
minor 9:19
minors 1:14 3:12
127:11 128:5
minute 12:13
21:9 101:21
105:15
minutes 2:13
mischaracteri...
20:6
misdemeanor
8:15
misleading 96:7
misquoted
83:11
misread 57:14
Missouri 4:6,21
126:5
misstate 96:4
mistake 125:12
misunderstan...
44:11
mixed 19:8
118:16
MM 1:14 3:12
127:11 128:5
MO 127:19
moment 14:24
35:13 41:13
83:18 116:6
119:10
months 109:24
Moon 120:2,3,4
120:14,19 121:1
122:18,21,24
morning 5:14,15
mother 1:13 3:11
127:10 128:5
motion 2:11,14
15:22 42:2,23
43:17 45:3
48:19 49:16
motions 42:25
45:4
motorist 61:3
MOU 115:1
moved 43:7

moving 17:8
multitasking
65:2,4,13,23
Mundil 68:7
75:6 92:20
municipal 8:21

————————
N
N 4:1 19:19 29:7
50:15,16 91:23
94:25 95:16
97:17 127:19
name 5:16
25:10 29:2
42:10 68:4,6
68:22 72:9,10
84:6 92:19,20
128:1,2 129:11
named 12:2
narcotic 80:3
narcotics 42:15
95:23 97:2,16
97:16
narrative 116:22
narratives
99:24
narrow 115:4
natural 1:14 3:12
127:10 128:5
nature 77:17
111:5
near 84:2
necessarily
45:2
necessary 35:2
56:12 69:7
112:2 114:15
129:9
necessity 26:15
40:10
need 6:15 14:25
23:25 47:4
66:8,13 67:7
98:21 109:6
needed 31:3
neither 126:11
Nelson 10:7

nervousness
89:25 90:1,2
never 14:5
43:22 45:4
49:10 63:19
67:10,20 68:2
75:15 77:2
114:19 115:1
nevertheless
58:25
new 19:23,23
19:24 32:14
103:9 104:4,18
107:25 112:15
newer 33:18
news 71:8
night 10:25 88:1
normal 66:12
Normally 57:25
notably 28:21
notarized
127:18
notary 127:17
129:23
NOTE 2:24
notion 90:8
novel 33:19
107:25
number 2:6
21:3,4,7,13
27:18,21 28:10
28:11 35:8,16
41:9,12,19
42:20 48:7,10
48:16,24 51:11
51:15,19 58:4
60:10 62:16,21
64:2,6,12
70:6,9,9,13,21
73:25 83:16
84:16,16,17
85:21 86:11
87:21,22
90:14 95:21
99:4 105:15
109:25 110:3
113:18 116:2,5

119:19 121:12
121:18 122:10
**numbered**
84:16
**numbers** 52:25

**O**

**OAG** 35:11 53:2
116:5
**OAG000435**
21:7
**OAG000435-...**
2:7
**OAG001915**
27:22
**OAG001915-0...**
2:8
**OAG008521**
2:22
**OAG019551**
28:13
**OAG019551-1...**
2:9
**OAG020738**
51:20
**OAG020738-...**
2:17
**OAG021353-...**
2:10
**OAG022535-...**
2:18
**OAG022557-...**
2:19
**OAG022717**
2:23
**OAG21358**
58:10
**OAG22535**
62:19
**OAG22557**
62:24 64:8
**oath** 5:10
**object** 43:8
48:2 49:20
87:11
**objection** 6:23
86:25 91:4,8

91:12 96:13
**objections** 6:22
**observations**
118:20
**observed**
88:20 89:22
**obviously** 5:20
6:22 14:25
57:19
**occasion** 49:13
**occasionally**
8:15 30:6,13
38:16 70:3
**occupants**
116:18
**occupies** 46:8
**occupying** 46:7
**occurred** 42:19
68:20
**occurrence** 38:1
**offering** 75:21
**office** 3:21 4:10
7:8,13 8:2,4,21
8:23 10:15 11:7
12:6,20,22
14:9 15:2,17
22:17 30:7
34:12 37:11
50:14,14,15,22
50:22 71:10
72:18,24 85:8
127:5,19
**officer** 14:13
59:25 72:2,5
72:15 73:11,13
90:11 113:17
**officers** 69:25
81:14,14
**official** 1:8 3:7
75:1 127:8
128:2
**oh** 27:24 29:21
47:10 57:13
68:14 72:6,9
101:2 115:24
**Ohio** 42:13
**okay** 6:10,15,19

7:2,19 9:1,4,25
12:20 13:4
15:10 16:7,10
16:23 17:24
18:9,12,21 19:4
19:15 20:11,15
20:23 21:24
22:4 25:14
27:1,6,25
28:2,8,24
29:9,21 30:10
30:23 31:21
32:24 33:13
34:17 36:13,14
37:20 38:6,24
40:2 41:7,15
41:18,25 42:12
45:8 46:22
48:6 49:4
51:21 52:2,20
52:25 53:5,21
54:9,24 58:11
58:21,25 59:11
60:13,17 61:17
62:15,20,25
63:20 67:4
68:11,16,19
70:4,15 71:2,9
71:14,24 72:4
72:11,18 73:6
73:16 74:17
75:8,20 76:13
77:9 78:3,11
79:18,24
82:25,25
83:9,13,23
84:14 85:10,13
85:18,18 86:13
90:15 92:2
93:21 94:3
96:12,17 97:9
98:2 100:9,11
100:20 101:19
101:24 102:1,9
102:21 104:2
105:1,5,18
106:6,10,20

107:3,13,16,18
108:9 109:7
110:7,20 111:2
111:19 112:17
113:6 114:16,21
115:4,6,12 116:1
116:8,25 117:9
117:19 118:20
119:6 120:1,10
120:13 121:3,19
121:22,25
122:24 123:5
123:20
**old** 71:4
**older** 88:4
**on-boarding**
67:13
**once** 30:19
35:5 37:4
38:4,8 39:5,7
68:19 80:5,7
103:4 115:24
**one-on-one**
111:24 112:10
112:18 113:4
**one-on-ones**
114:7
**one-page** 41:22
**ongoing** 33:25
**Open** 73:9,12
75:4 93:5
**operated** 114:24
**operating** 82:17
**opinion** 31:12
31:20 33:6
36:19 38:18
39:1,6,6
65:23 77:18
**opinions** 22:6
24:9
**opportunity**
13:5
**opposed** 59:18
59:19
**oral** 59:23
118:12,14
**order** 2:15 45:6

49:6 60:14
61:20 98:21
**organization**
67:10
**orient** 90:21
**origin** 77:10
89:3 93:15
96:25
**original** 2:25
127:14
**originating** 80:6
**ORs** 99:24
**out-of-state**
32:19 76:2
95:7,22
**outcome** 126:16
**outlets** 72:1
**outline** 108:1
**outside** 11:12,18
11:19 82:9
**oversight** 67:20
67:21

**P**

**P** 4:1,1 73:25
**P-136** 86:12
**p.m** 3:20 122:7
125:18,19
**P000117** 70:10
**P000117-0001...**
2:20
**P00117** 119:15
**page** 2:2,6
21:25 28:25
28:25 29:12
29:23 35:16
49:5 52:7 53:1
53:4,6 54:9
58:9 60:11
64:7 74:6
75:13 76:15,16
83:2 84:2,15
86:11 87:21
90:13,22 92:3
94:9 95:2
105:24 127:15
127:17,19

128:7,9,13,17
128:21
pages 22:1
53:25 54:4
56:17 70:21
paper 21:21
paperwork
66:11
paradigm
82:23
paragraph
84:16,17 85:21
86:14,20
87:21,22 92:5
94:9
parallel 61:22
paramilitary
67:10
paraphernalia
42:17
part 12:11,14 13:3
16:10,10 32:20
36:8 39:10,14
43:12 46:16
52:19 55:11,25
56:4 57:7
63:8 64:6
69:10 77:5,25
78:8,16,24
79:6,9,11
80:19,25
82:22 87:1
89:10 94:15,16
98:25 103:14
117:5
participate 69:9
particular 34:19
43:2 117:1,2,10
123:15
particularly
85:24 87:7
parties 126:12
126:15
parts 40:17
passed 108:2
passing 90:11
passive 69:10

Pat 5:18
patience 28:8
PATRICK 4:4
patrol 1:10 3:8
4:14 7:3,9
10:15,23 11:12
11:19 12:10,16
14:3 16:12,25
25:12 31:13,13
32:6 33:16,20
34:20 37:2
38:11 43:19
45:23 46:3
47:14 69:3,16
71:22 72:19
73:12 74:5
75:1,15 77:2
77:24 78:4,25
80:16 82:12
84:12,22
85:14,16 89:1
91:16,17 92:7
92:8 93:2
97:2 103:9
106:13 108:11
113:17 114:1,24
127:9 128:3
Patrol's 7:12
34:10
patrol-wide
97:3
patrolman 32:7
pattern 69:7
Patty 63:4
pause 30:1
paying 78:2
penalty 129:12
pending 3:24
6:17
people 7:11 47:1
52:12 93:23
94:25 98:16
98:18 103:25
percent 95:5
perform 92:7
93:2
performance

39:23
period 31:23
Periodically
8:17
periods 13:21
perjury 129:12
permitted 44:14
98:23,25
person 14:5
54:1,14 55:13
55:24 64:25
91:24
person-to-per...
98:4
personally
88:20
personnel 10:18
10:23 14:4
23:13,25
26:15 27:3
28:6 34:20
35:7 47:21
69:20 108:12
114:1
philosophy 9:18
phone 13:13
15:9 46:24
50:11
phone-a-friend
10:23 13:8,14
phrase 13:7
59:16,19 61:1,5
65:1,4 68:25
phrases 60:22
physically 53:17
57:5,11
picking 46:24
piece 70:19
71:11 74:2
108:3 109:16
120:14
pieces 36:4
70:18 71:19,25
72:20 92:10
108:19
pile 58:3
PIO 72:14

place 118:24
placed 47:16
89:24,25 90:1
plain 65:23
plaintiffs 1:5,16
3:5,13 4:3 5:19
plan 2:18 63:5,6
63:16 64:3
plate 75:16 76:5
77:3 92:9
95:4 99:4
plates 32:19
76:2,20 93:14
platform 47:9
please 5:7 6:10
14:19 21:11
24:12 36:6
41:17 48:15,25
51:2 61:16
83:19 105:7
116:7 120:23
127:13,16,18
Pmcinerney@...
4:7
point 7:14
23:20 34:1,6
46:17 54:12
55:8,15 56:9
58:14 72:14
89:3 91:1,24
92:2 113:22
124:11
points 25:7
53:14 58:13
police 10:3,6
policy 14:8,11
37:9 45:22
69:1,2 100:12
100:21,22
101:1,3,19
102:2,10 103:9
103:11,18,19,22
104:4,18,22
105:3 113:8
portal 97:20
position 8:18
45:25 46:8

54:15 61:11
124:17
positive 93:7
possession
13:20
possible 67:25
potential 55:22
PowerPoint 2:7
2:8,10,16,19
17:25 21:22
22:1,2 23:2
35:23 36:1,8,8
51:24 52:3,3,4
53:11 54:21,22
55:2,2 62:10
63:5,14 64:9
64:16 111:7,8
111:12
PowerPoints
17:16 55:3
practice 14:9,11
53:17 69:1,2,4
69:7 72:18
117:13
preferences
117:7
prefix 41:24
premised 43:18
prepare 72:19
prepared 78:20
present 54:6
55:15 106:17
120:19 122:20
presentation
36:23 52:17
52:22
presentations
16:16 66:18
111:9
presented 18:16
18:19 21:22
52:5 56:18
80:14 104:20
106:21 107:4
107:20
presenting
56:23 67:25

SARAH WASHBURN  8/9/2021

69:19
presents 33:18
pressing 14:21
15:11
pretty 34:2
69:13 112:9
previous 25:5
107:6
previously
67:17 94:11
primarily 10:17
11:8,13
primary 84:23
print 121:14
printed 22:1
121:5
prior 9:1,20
37:11 46:7
67:5,13 68:5
68:22 69:16
69:17,19 87:4
108:10
privilege 19:7,12
104:13
privileged 19:3
104:10,14
probable 88:23
89:7 100:24
101:6
probably 6:1,3
6:24 20:13
27:17 38:6,8
45:16,17 47:4
70:2 73:2
74:9,18 76:7
97:7,11,17,23
98:6 118:1
119:16 124:23
probationary
47:17
problem 31:5
62:5 74:8,10
103:2
problematic
60:2
procedural
24:6

procedure
24:22 25:18
26:4,6 37:9
40:12 45:22
46:2 100:12
103:8,11
procedures
43:21
proceeds 115:9
process 23:1,7
34:17 38:11,25
39:11,15 45:19
46:9,10,13,19
47:13 63:9,11
69:9,10 94:15
94:17,22
114:23 115:8,10
115:16 120:5
produce 97:19
produced 3:19
92:1
product 18:2
19:11 23:8
36:16 37:2,3
professional
38:17,20 41:4
126:5
profit 86:5
program 10:21
25:2
progresses 17:9
progression
23:22
promoted 68:12
proof 66:9
proper 43:9,13
properly 81:2
proposed 102:3
102:7
prosecute 117:8
prosecuting
30:20 117:6
prosecution
99:2
prosecutor's
15:17
protect 19:7

provide 10:25
11:17 13:18 14:3
39:24 40:7
72:24 73:4
77:23 79:4
80:9 94:19
95:14 97:25
98:22,23
102:22
provided 8:14
15:16 17:11
28:5 36:12
77:19 78:25
79:4 92:14
95:11 97:22
123:19 125:4
provides 11:13
providing 24:8
71:6 72:20
113:24 124:7
province 94:4
provision 95:13
proximity 30:13
PSU 123:25
public 72:2,4,15
127:17 129:23
published 24:4
24:19,21 105:3
122:13
pulled 64:11
pulling 111:8
purchased 88:4
pure 25:15 26:6
purely 62:4
purpose 44:8
66:1,3 76:4
125:4
purposes 6:7
61:14 94:13
99:18,19
pursue 60:25
pursuing 65:18
66:8
put 33:21 34:1,4
34:24 47:4
57:25 122:1
puts 17:6 20:19

**Q**

qualifying 87:1
Quash 2:11 42:2
queries 93:10
99:9
query 91:1 92:8
93:1,3,16 97:7
97:10 98:9,18
98:19
question 6:9,12
6:17,18 10:24
13:16 15:5,6
16:21 19:6,17
23:3 32:4
36:13 40:3
43:7,15 49:24
56:3 70:2
73:18 77:17
79:5 90:18
95:20 96:8,10
96:24 100:5
100:17 104:17
106:20 114:18
115:5 116:24
117:19 122:14
124:25
question's
100:3
questions 6:5
13:22 16:17,18
25:8 29:15
33:24 65:11,19
65:20,25
66:7 77:20
90:20 97:24
98:3 113:14,21
118:15 125:14
quick 48:24
quiet 10:21 12:1
12:2
quite 11:9 67:15
67:16
quote 57:19
74:6,7,15
75:14,14,21
76:8,23 77:2,7

83:3,5
quoted 71:18
120:7,9,19
quotes 22:5
57:19 71:7
121:2 122:25
123:3,6

**R**

R 4:1
raised 123:11
raises 45:23
rarely 8:20
45:12
re-education
39:15 46:3
118:23
reach 44:15,19
reaches 14:13,14
44:6
read 31:6 46:15
54:17 58:19
74:13 75:18
76:24 84:25
86:8,22
87:22 105:25
109:2 118:4
125:16 127:16
128:8,10,14,18
128:22 129:6
readily 94:14
reading 51:5
84:20 87:3
reads 76:16
ready 21:16
27:24
really 13:25 16:9
34:6 46:23
78:11 82:1
107:8 109:3
112:3,6
reason 104:4,18
123:13 128:8,11
128:15,19,23
reasonable
26:20 54:1,14
55:13,24 61:9

SARAH WASHBURN  8/9/2021

61:18,25 62:2
62:3 64:25
66:4 77:5,10
77:21 78:14,17
79:1 81:1 82:4
82:19 88:22
89:4,7 100:24
101:6,17 107:2
107:10 109:16
117:25
**reasons** 44:18
**recall** 2:15 15:24
25:9 29:18,20
31:15 32:3,18
32:20,25
33:9,12 36:24
49:6 50:20
58:21 66:22
68:22 71:2,4,6
71:12 72:13
74:15,17,22,25
75:10,20
78:22 81:9,23
83:6,8 90:12
91:20 92:13
94:17,21 99:6
102:8 110:16
111:19 115:15
117:11 118:12
122:22 123:14
123:22,23
124:1,2 125:9
125:11
**recalls** 122:25
**received** 103:17
**Recess** 51:8
105:10 122:5
**recitation** 101:1
**reciting** 91:5
**recognize** 21:18
27:25 31:8
36:1,3,4 49:2
51:23,24
83:25
**recollection**
101:13 119:20
119:23 122:19

123:8 124:22
125:1
**recommend**
61:6
**recommendat...**
60:21 114:2
**record** 5:3,16
6:8,24 14:16
15:5,9 21:6
22:25 51:7,10
92:17 99:14
99:22 100:13
105:9,12 122:4
122:7 125:18
**record's** 64:3
**recorded** 56:20
**records** 16:4
73:9,12,15
75:4,5 92:9
93:5 96:3
98:17
**recovered**
42:18
**recoveries**
95:22 97:1
**recreational**
79:20
**red** 58:12
**redact** 98:24
**reduced** 126:10
**refer** 58:3 70:21
**reference** 21:6
24:17 27:22
28:13 31:9
35:11 41:23
48:10 64:16
70:9 108:18
108:24
**referenced**
96:7
**references**
65:8
**referencing**
93:6 116:21
**referred** 25:9
30:2
**referring** 74:18

76:19
**refers** 67:4
**reflect** 78:7,20
**refresher** 40:8
**regard** 18:24
28:19 39:18
43:20 74:6
101:16
**regarding** 29:13
50:19 96:25
**Registered**
126:5
**registration**
66:10
**regular** 38:1,2
**regularly** 18:16
115:24
**reinforcing**
32:16
**rel** 25:11
**relate** 64:20
100:23
**related** 65:21
65:25 66:3
76:14 126:11
**relates** 82:11
**relating** 100:6
**relation** 97:1
**relative** 126:14
**release** 72:23
73:7
**relying** 101:7
**remain** 12:16
**remaining**
85:21
**remedial** 40:21
110:18 111:5,19
112:18 113:3,13
113:24 123:18
124:7,13
**remedied**
39:23
**remember**
32:10 51:25
52:20 62:9
67:2 68:15
76:1,11 99:3

102:14 107:3,6
107:23 108:3
120:1,5,10,11
120:16
**remind** 23:13
**reminding**
23:19
**remove** 92:8
**render** 39:1,3,5
129:9
**rendered** 39:7
**reorientation**
105:21
**repeated** 37:22
45:14 46:4
**repeating** 23:18
32:13,14
**rephrase** 6:10
32:4 96:19
**replaced** 107:12
**report** 11:14
99:22 100:2
119:1
**reported** 68:17
68:20
**reporter** 3:23
4:19 5:7 27:17
43:11 47:1
91:10 119:23
121:6,8 126:4
126:6
**reports** 100:4
116:21,22 117:5
**represent** 49:14
57:4
**representation**
67:9
**represented**
118:16
**representing**
5:19
**represents** 74:2
**request** 12:6
91:15,22 97:7
97:9
**requested** 36:11
44:22 112:22

112:23 124:7
**requesting**
72:22,22 74:7
**requests** 75:2
93:6 96:3
**required** 100:1,4
101:10,12
**requirement**
23:17 61:23
**requirements**
17:6
**requires** 37:9
100:12 113:8
**requiring** 101:5
**research** 15:1
22:17
**residence** 87:9
**resource** 13:9
**respect** 65:1
66:25 69:12
78:13 122:16
**respond** 91:21
**responding**
75:2 124:21
**response** 6:23
33:5,5 63:19
73:5
**responsibilities**
8:13 10:16
12:12,15 16:11
73:16,20
**responsibility**
11:7 16:24
44:21
**responsible**
75:1
**responsive** 20:1
**restructuring**
68:13,19
**result** 33:10,17
117:1 118:20
**resulting** 47:24
**results** 45:10
**retain** 15:13 16:4
**retraining** 39:14
44:21 46:3
114:2,13 118:23

SARAH WASHBURN  8/9/2021

return 105:14
119:10 122:9
127:18
Returned 103:7
review 28:15
35:4,4,13
36:18 37:3,16
37:18 41:14
47:19 48:1,13
63:24 66:25
67:15 103:14
103:22
reviewed 28:17
41:18 59:1
103:4
RFP 115:9
RFQ 115:9
Richard 2:21
84:3,5
right 6:21,25
10:14 14:21,24
15:8 25:17
27:13 30:1
32:8 46:1
58:19 60:4
65:5 66:23
68:9 76:15
86:22 90:2
92:25 100:18
101:14 103:1
117:14,23
122:2
right-hand 53:1
58:9
rights 82:15
rise 13:12
RMS 100:2,10
101:8
road 13:18 80:7
roadside 64:12
65:10
Rodriguez 4:17
33:20,21 65:9
112:4
role 10:14 12:3
14:6 17:21
33:15 38:10

38:24 73:15
99:19 100:12
room 120:19
121:1
roughly 21:25
38:3 102:6
routinely 65:20
row 18:18
RPR 4:19
126:20
rule 56:11
rules 6:1
rulings 33:19
run 50:11 98:18
98:19
running 66:10
99:9
runs 13:25 21:7
64:7 70:10
RV 32:13

**S**
S 4:1,10 127:4
Sarah 1:22 2:2
3:18,22 4:19
5:6,9,17 83:11
126:3,20
127:14,23
128:1 129:5,20
satisfactorily
112:20
saw 109:2
saying 79:19
123:14 125:11
says 29:24
35:6 53:6
57:5,10 58:10
58:12,14 74:8
76:18 84:19
85:23 86:14
86:20 92:6
93:1
scan 70:12
scenes 14:2
school 9:3,4,7
9:10,12,21
Schooler 25:23

65:7,8 112:5
118:10
science 10:4,6
scope 65:21
scrutiny 117:13
117:16
se 23:15
search 17:4
40:9 43:20
45:10 47:24
87:2 88:23
93:13,14,15
96:6 99:13
100:13,24
searches 23:15
searching 86:19
second 10:1
24:11 43:5
49:5 54:12
55:7 59:11
84:15 85:20
87:23,23 94:9
116:14
Secondly 96:2
section 23:14
64:11
see 35:1 42:20
47:10 49:5
52:10 53:8
58:17 70:24
95:8 96:15
97:13 110:11
115:19
seeing 19:24
116:22
seek 61:21 62:4
seeking 60:3
61:22
seen 28:2 117:5
segment
120:20,24
seizure 12:16,17
17:4 25:20
40:9 43:20
47:24 100:5
101:10,16
seizures 12:13

91:19 95:6,22
97:1
send 14:22
sending 69:16
sense 19:1
125:2,3
sent 52:1 63:22
69:15
sentence 59:12
87:23 88:6
116:14 117:21
118:8
separate 98:19
111:3,4 113:2
separately 121:2
September
110:17
services 4:20
8:10,13 115:18
127:1
sessions 18:23
set 13:2,6 14:8
shape 31:1
SHAW 1:4 3:4
127:7 128:2
SHAWNA 1:13
3:11 127:10
128:4
She'll 125:16
SHEET 128:1
sheets 127:15,17
127:18
shipping 80:4
shores 80:5
short 65:14
shorthand
53:16,24,25
54:5 101:14
shortly 28:9
show 21:2
27:20 28:9
35:10 41:11,21
48:9,23 51:14
62:18,23 70:8
82:25 83:15
110:2 116:4
showing 85:25

shows 65:6
95:5
shy 8:8
sign 125:16
127:17
signal 59:20
60:24
signature
127:15,17,19
128:25
significance
53:21
significant 86:1
91:19 95:6
97:15,16
significantly
67:14
silent 47:5
similar 30:15,16
71:17
Simone 42:10
42:10,13 49:15
49:19 50:5,8
50:19,24
simple 13:15
simply 15:1 69:3
Sincerely
127:20
single 92:6
sir 48:14 50:17
58:7 60:10
64:5
sit 32:3 33:15
40:17 44:8
71:13 97:8
99:6
sit-down 72:21
sitting 119:23
situation 13:13
15:10,12 38:19
40:13 41:1
45:8 47:23
61:12 111:15
situations 11:19
14:7 15:20
117:3
six 7:5 85:22

SARAH WASHBURN  8/9/2021

109:24
slide 57:25
60:18,21
slides 60:7 111:8
111:25
small 8:21 66:18
sold 86:5
sole 76:1
someone's 79:7
sorry 7:11 15:23
26:6 27:24
29:20 33:12
54:11 60:12
70:11 72:10
74:23 102:12
104:1 105:20
107:1,17 109:6
119:11 120:4
120:22 125:10
sort 37:9 38:21
93:15 111:14
sorts 39:21
sound 37:21
46:25
sounds 9:9
67:7 83:7
98:4 115:15
source 71:8,19
79:2,18,24
80:9,16 81:6
81:21,24 82:7
86:4 88:2,9
88:10,14 90:9
97:21
Southwest 3:21
4:11 127:6
sp 32:14 75:7
118:15
speak 79:3
103:10 106:14
speaking 95:16
103:3
spearhead 73:2
specific 18:8,24
40:5,18 78:22
103:11 117:18
118:8 125:9

specifically
10:13 17:20
23:23 38:24
51:25 54:7
65:11 75:10,22
78:17 86:11
90:3 94:17
107:22 108:4
111:12 114:7
122:12
specifics 16:22
41:8
speculation
87:12 104:6
SPENCER 4:5
split 11:10
spoken 50:10
St 127:19
stack 27:13
staff 7:7 11:13
19:20,25 20:8
34:13 114:5
stand 78:9
stand-alone
55:3
standard 26:24
40:12 55:12
80:23 88:22
standards 38:17
38:21 41:4
81:11,18 82:14
88:19
start 16:20,21
17:3 23:9,11
62:7 70:22
80:7 97:13,17
started 14:12
27:10
starting 17:2
84:20
starts 53:2
87:23
state 12:17 25:11
35:1 42:4
43:18 48:20
49:7 54:7
56:14,15 76:6

79:8,24 80:6
80:6 81:21
86:17 87:1
91:18 92:9
93:15 96:25
99:5 126:4,5
129:1
stated 86:7
statement 43:8
49:21 54:19
59:4,6,15,21
61:24 62:14
69:11 76:3
77:4 86:24
123:2
statements
59:22 90:11
119:19 125:9
states 1:1 3:1,24
30:5 79:2,19
79:19 80:10,13
80:16,16,18
81:6 86:6
88:10 90:9
statewide 92:9
93:14 98:8
status 47:17
statute 13:2,6
13:16,20,21
statutes 79:21
sticker 41:22
stood 78:15
stop 2:11 6:22
18:25 25:20
37:8 42:3,12
42:14 53:18
59:20 61:19
64:18 65:18,21
65:22 66:1,2
66:13,15 76:1
76:4,22 77:6
86:15 89:22
112:2,3,7
124:4 125:8
stops 24:10
25:1 26:11,16
26:19 31:2

40:10 66:9
95:22 97:1
99:21 117:24
story 119:24
121:15,16
122:17
Street 4:5,21
127:19
strike 32:3 81:4
strongly 113:20
stuff 47:5
subject 30:14
89:24 106:12
110:9
subjects 40:19
submission
37:10
submit 63:14,16
submitted 36:17
63:24 101:8
111:12
submitting 63:9
subpoenaed
15:21
subscribe
129:11
substance
129:8
substantial
86:5
substantive
12:5 24:25
26:10
suburb 86:2
sued 11:21
sufficiency
64:17
sufficient 55:23
64:22 103:16
suggest 65:22
suggestions
102:22
Suite 4:6
summary 57:17
Superintendant
1:9 3:8 127:8
128:3

Superintendent
1:18 3:15 127:11
128:6
supervisee 44:7
supervises 44:2
supervision
114:15
supervisor
44:24 69:22
114:3
supervisors
44:19 69:5
113:9
supply 80:8
82:7
suppose 44:1
supposed 44:16
suppress 2:12
2:14 15:22
42:3 45:3,4
48:19 49:17
suppressing
45:6
Supreme 34:3
34:22 118:11
sure 14:22
20:16,20 22:7
23:4,4 24:3,7
30:15 36:20
39:8 40:23
41:1,18 44:15
67:24 76:14
82:16 89:17
92:21 93:12
94:16 96:21
97:5 103:23
103:23 112:8
114:4 117:17
118:18 124:12
124:21
surrounding
55:1
suspect's 54:14
suspicion
26:20 61:9,19
61:25 62:2,4
66:5 77:5,10

SARAH WASHBURN  8/9/2021

77:22 78:14,17
79:1 81:1 82:5
82:19 88:22
89:4,7 100:24
101:6,17 107:2
107:10 109:17
117:25
swear 5:7
swore 85:7
sworn 3:19 5:10
126:8
syllabus 111:3
synopsis 57:17
system 93:7,11
99:23
systems 95:20
114:23 115:16

**T**

tab 35:12 41:13
tag 85:25 86:15
87:8 96:25
99:4
tags 42:13
tailor 40:23
tailored 40:25
take 6:15,18
21:9 22:9
28:14 35:12
41:13 48:11,24
51:1,16 60:13
70:11 73:23
83:18 89:5
105:6 110:5
112:14 116:6,6
121:24,25
taken 5:23,24
19:19 30:20
51:8 75:23
76:8 77:7
105:10 122:5
123:4,16 126:9
126:13 127:14
128:6
takes 73:8
talk 70:4,19
79:18 85:19

115:7
talked 24:13
29:9,25
30:25 62:10
66:17 88:9
108:5 112:20
119:6 122:11
talking 18:13,22
20:15 52:21
60:11 61:12,14
90:17 93:5,10
96:21 107:1
112:5,6 114:9
115:8 118:8
120:6
talks 96:5
Tammy 68:7,20
75:7 92:19,20
94:11
tangible 20:22
taped 86:16
taught 17:13
36:9 50:10
108:11 111:25
teach 17:1,4,7
22:14 30:19,21
56:2 59:13
63:13 68:3
108:14,16
111:17
teaching 17:3
37:23 40:18
56:4 63:12
69:17 78:23
111:10
telephonically
14:5
television 121:15
121:16
tell 19:16 20:6
25:21 26:4
58:15 59:12
59:25 62:1,6
63:2 66:6,21
71:3 80:18
93:9 96:18
97:6 102:12

103:16 104:21
122:13
telling 62:5
69:4
tempered 87:17
temporary
85:25 86:15
87:8
tenet 59:13
term 53:19
80:14 93:17
terms 16:15
22:10
testified 5:10
43:1 59:1
66:24 101:21
106:6 123:21
testify 43:9,14
49:22 50:3
testifying 91:6
testimony 37:14
45:1 49:9
66:22 67:2
79:13 87:16
104:22 126:7
126:8
text 16:7 23:13
23:14 42:21
thank 20:25
21:8,15 25:14
27:23 29:4
30:23 41:25
60:17 62:20
83:17 98:2
109:18 110:4
121:8,22
125:15
thereon 129:10
thereto 126:15
thing 6:16 13:25
30:18 37:22
96:22 109:11
things 12:13 15:1
19:8,23 20:16
23:25 89:8
think 7:22 8:20
11:5 12:12 13:7

13:8 18:1,18
19:13 20:5,10
20:12 23:24
23:25 26:13
26:14 27:10
31:1,17,19 32:5
37:14 38:9
39:23 40:11
43:1 46:1,5
47:6,8 49:9
50:2 56:6
57:11 58:2,25
59:8,9 60:11
61:14 66:24
67:8 68:25
72:10 78:17
81:3,20 91:21
91:24 92:23
92:25 96:11
100:5 101:21
103:25 104:19
104:21 106:6
107:11,23
108:5 109:1
112:3,11,13,25
113:2,7 114:6,8
117:21 119:13,14
120:6 123:2,3
123:10,21
124:6
thinking 38:3
98:11 99:1
third 86:14
Thomas 10:7
Thompson 54:7
56:16 57:1,18
57:21
thought 5:25
107:8 109:4,15
118:19
three 24:1,13,15
24:24 25:22
52:21 59:23
84:20 113:2
114:6 118:22
threshold 33:14
thumb 58:8

tie 13:17
time 5:4 6:4,4
6:15 13:9,9,21
22:19 24:4,15
31:23 36:24
52:13 56:13
56:23 60:13
61:21 63:13
65:2,2 66:14
67:5 71:15
75:6,7 76:2
81:20,23 85:7
99:16 102:9,15
106:11 107:20
107:22 108:11
108:13 110:24
110:24 113:25
113:25 117:12
118:10 120:3
120:15 122:9
123:17 125:15
times 14:25
57:2 61:17
63:22 113:2
title 10:21 35:21
68:4
titled 60:18
titles 12:2,2
today 5:21
66:21 71:13
72:7,8 89:1
125:15
Today's 5:3
told 31:2 40:15
63:22 67:18
78:16 123:24
top 29:22
30:24 40:11
46:5 53:6
58:12 75:13
83:3 84:2
104:1 105:23
Topeka 3:22
4:12 71:5 74:4
119:7,24
122:17 127:6
topic 71:18

SARAH WASHBURN  8/9/2021

topped 58:5
total 56:12
totality 32:13
   55:11 56:1,11
   57:8 59:9
   64:20,23
   77:13,15,25
   79:6,10,11,14
   80:20 89:6,10
touched 106:18
   106:21
track 27:14
tracking 114:9
tracts 61:22
traditionally
   47:22
traffic 24:10
   25:1 26:11,16
   26:19 31:2
   40:10 42:14
   53:18 59:20
   61:19 65:18,21
   66:1,2,9,13,15
   89:22 112:2,7
trafficking
   84:24
train 30:11,12
   65:10,12 76:4
   78:3,12 80:17
   81:19 82:13
   88:12,14 109:8
trained 26:13,16
   27:2,2 75:16
   77:2 81:20,24
   82:8 106:16
trainer 61:12
training 10:18
   10:20 11:9
   16:12,15,25
   18:13,23 19:22
   30:8 32:1 33:7
   37:10 39:18
   39:24,24,25
   40:8,8,21,23
   40:25 52:14
   56:18,19 63:17
   64:1,17 68:1

70:1 71:21
77:19,22 78:8
78:24 80:12
80:15,24 81:5
82:12 85:3,9
88:10,11 99:19
106:3,7,12,18
106:21 108:14
108:24 109:22
110:18,22 111:5
111:20 112:19
113:3,11,14,20
113:25 123:18
124:7,13,23
125:4
trainings 28:5
   114:6
transaction 16:3
transactions
   15:14
transcript 2:25
   127:16
transnational
   80:4
travel 85:23
traveler's 89:2
traveling 87:25
tried 67:23
trip 88:2
troop 19:19 29:7
   50:13,15,16,16
   91:23 94:25
   95:16 97:12,17
troop-by-troop
   95:23 97:3
trooper 13:14
   14:14,17 40:13
   40:17 42:9,10
   42:13 43:25
   44:2 45:14
   46:4 49:14,14
   49:19 50:5,8
   50:19,24 53:6
   53:15,21 55:16
   56:6 84:18,19
   85:2 87:4
   92:8 106:2

110:13,17
111:20 113:13
113:16 114:2,9
116:15 123:17
123:23,24
124:2
trooper's 17:2,9
   39:18 45:8
troopers 13:9
   16:1,3,25 20:8
   31:13 33:24
   44:7 47:14
   54:5 76:19
   77:19 78:4,25
   82:12 86:18
   89:1 90:6
   99:21 100:13
   101:5 106:13
   109:20 110:24
   118:1
troopers' 38:12
   43:19
troops 97:5
true 57:24
   89:21 129:9,13
try 19:21 61:15
   61:21 71:20
   81:15,17 97:7
   112:10,12
trying 13:19 19:5
   19:7 60:14
   99:2 114:10
   120:16 122:14
   124:11,21
turn 53:4 56:25
   73:24 76:15
   123:17
turned 25:24
twice 37:4
   115:24
two 7:14 9:22
   11:3 20:15
   28:20 44:3
   61:22 89:8
   96:2 113:3
   114:7 122:10
two-page

105:16
two-step 53:7
   53:15,22
   55:16 56:6
   57:6 116:16
   117:14
type 13:25
   109:11
types 62:11
typewriting
   126:10

U

uh-huh 6:7
   54:11
ultimately 15:12
   19:13 92:1
unclear 26:7
uncomfortable
   18:1
under- 124:8
undergo 71:21
undergrad 9:14
undergraduate
   9:16,22 10:1
understand
   6:10 18:15
   20:17 23:17
   25:21 36:15
   39:9 44:25
   53:20 54:6
   65:5 79:13,22
   82:3 85:10,17
   89:17 93:11,16
   96:10 106:2
   107:19 114:17
understanding
   30:17 32:12
   38:23 44:13
   46:21 56:7
   80:1 99:11
   100:1 124:9,10
understood
   6:12 7:1 27:9
   34:15 38:2
   108:20 124:3
   124:17,22

125:3
unfamiliar 115:8
unfortunately
   98:1 121:21
unit 29:8,8
   50:12 69:24
   95:16
United 1:1 3:1,24
   30:5
unlawful 47:24
unnecessary
   56:8,10
unreasonable
   23:16
unrelated 66:7
unsatisfactory
   47:19 48:1
untruth 60:3,5
Up-Completion
   110:10
update 20:12,17
   33:10,17,22
   64:4
updates 17:12
   20:19
updating 20:11
use 16:7 18:15
   20:22 40:13
   59:16 65:1
   88:19 89:1
   108:18 113:19
useful 109:5
uses 65:3
usually 11:16,17
   15:15 17:3
   23:9,11,20
   24:18 35:2
   39:4 66:19
   72:25 103:13
   111:8 115:20

V

v 127:7,11 128:2
   128:5
vague 100:3
value-added
   107:11

SARAH WASHBURN  8/9/2021

Vanderweide
110:9,21
various 97:11
vary 14:18
Vasquez 31:3,9
31:10,11,15,24
32:5,11 33:4,11
76:10 84:9
85:10 86:15,19
87:25 106:1,11
106:18,21
107:4,14,21
108:5,15,18,23
109:8
Vasquez's
76:22 86:6
87:9
vehicle 77:11
88:5 100:14
vehicles 76:19
95:7
verbal 6:6,6
verbatim
100:25
version 22:1
versus 25:12
42:4 48:20
49:7 54:7
56:16 123:1
video 120:20
120:24
video-recorded
5:5
VIDEOGRAP...
4:17 5:2 51:6,9
105:8,11 122:3
122:6 125:17
VIDEOTAPED
1:22 3:18
view 81:4
violations 45:14
46:4 47:15
Virginia 10:9
volume 84:23
vs 1:7,17 3:6,14
_____
W

waive 60:3
walk 6:1
walking 104:10
Walnut 4:5
want 19:6 20:16
20:20 22:9
23:9,12 24:19
26:12 37:15
37:24 38:18
40:16,17,20
66:20,22
67:17 68:25
70:18,19 78:11
90:13 96:21
113:9 116:4
118:12 119:9,21
122:9
wanted 13:17
22:8 24:2,7
25:6 92:21
108:21 118:17
warning 42:14
66:11 98:12
99:12
warnings 6:3
warrant 2:15
13:24 23:16
49:6 61:23
warrantless
23:15
warrants 17:5
Washburn 1:22
2:2 3:18 5:6,9
5:17,18 9:5
21:4 27:18
28:11 35:8
41:9,19 48:7
48:16 51:11
62:16,21 70:6
70:13 74:10
75:16 83:11
86:20 109:25
116:2 127:14
128:1 129:5,20
wasn't 24:6
46:14 76:21
107:25 120:19

124:13
watched 118:14
way 11:8 19:2
38:15,21
39:25 41:3,6
47:3 53:20
55:19 59:10
67:7 69:3
74:11 79:19
85:4 90:24
97:19 98:20
107:9 114:17
119:4
ways 44:3 81:14
we'll 6:18
we're 5:20 7:21
20:15 34:24
35:5,6 52:21
61:12,14 70:22
85:19 90:17
93:5,10 96:21
106:25 107:1
we've 11:21
20:15 29:9
47:15,23 64:11
97:23
week 94:8,10
weight 32:16
33:2 90:3,4,5
welcome 10:24
well-written
109:16
went 9:12 109:2
120:24
west 85:24
wheelhouse
82:2
whoever's
45:24
William 9:15
willing 115:22
window 116:16
Winters 72:17,17
wish 60:25 61:1
62:4 88:19
witness 5:8
47:6 51:3 96:8

121:7 126:6,8
127:16 128:1
128:25
witness's 87:16
Wolfe 63:4
Wood 30:5,8,10
32:14 84:10
106:16 107:25
108:1
Wood's 106:4
word 10:22
44:12 111:3
words 123:15
125:13
work 7:21 11:11
16:16 18:2
19:11 22:9
67:9,23 72:1
113:18
worked 9:9
69:4
working 71:11
works 13:6
71:25
worried 104:9
wouldn't 30:12
31:4 37:22
43:9,13 45:2
58:24 94:18
111:11 114:13
write 35:3
writes 35:4
writing 119:1
written 14:10
45:22 98:12
101:7 109:4
wrong 25:22
36:21 42:2
99:25 111:3
wrote 54:22
119:24

_____
X
_____
Y
_____
yeah 16:20 18:6
19:10 47:11

79:14 85:17
92:22,25
96:16 100:4
108:13,21 115:4
year 8:25 9:6
17:10,10 19:23
19:23 24:1
28:21 29:17
37:4 38:4,8
57:25 68:15
102:11 106:13
106:18 107:3,5
107:21 108:2,3
109:9 115:25
Yearly 37:20
years 7:5 8:8
18:18 25:5
52:21 71:4
107:6 108:10
Yep 57:15
yesterday
29:25 30:25
yield 47:25
yields 99:13

_____
Z
_____
zero 67:20
Zoo 32:13

_____
0
_____
0.50 94:12
000465 21:7
022717 116:6

_____
1
_____
1-800-280-DE...
4:22
1-816-221-1160
4:22
1,180 92:10 94:7
10:07 51:10
1000 4:5
10th 3:22 4:11
31:4,12,25
90:7 106:1
108:6 127:6
11:17 105:9

SARAH WASHBURN  8/9/2021

**11:34** 105:12
**11:55** 122:4
**110** 2:22
**116** 2:23
**11th** 127:19
**12:05** 122:7
**12:09** 3:20
  125:18,19
**120** 3:21 4:11
  127:6
**128** 70:24
**129** 73:25 76:16
  90:14
**130** 75:13 83:2
  92:3,6
**131** 94:9 95:2
**1397-MO** 4:20
  126:20
**1400** 4:6
**15** 7:24,25
  23:14 27:4,7
  31:22
**150** 70:10
**1589-KS** 4:20
  126:20
**16** 25:9 26:5
  27:3 31:22
  85:11,14 95:7
**1608** 4:21
**17** 72:13
**17th** 116:11
**18** 25:22 56:18
**185.50** 94:12
**19** 24:14 42:20
**19-1343-KHV-...**
  1:7 3:6
**1995** 25:12

      **2**
**20** 129:15
**20-1067-KHV-...**
  1:15 3:13
**2010** 9:8
**2013** 85:7
**2014** 95:6
**2015** 31:18 68:9
**2016** 7:23

  24:20 25:4
  68:14 108:6
**2017** 24:20
  42:12 68:14
  71:3 122:13
**2018** 24:1 25:4
  35:17 52:5
  54:20 56:4
  57:22 116:11
**2019** 21:23
  22:15 110:17
**2019-0130**
  110:10
**2020** 64:3,16
  105:22 106:10
**2021** 1:24 3:19
  5:3 102:16
  127:3,14 128:6
**20749** 53:4
**20750** 54:10
**20752** 54:8
  56:25
**20th** 28:21
  29:17
**21** 2:7
**21353** 35:11
**24** 127:3
**27** 2:8
**28** 2:9

      **3**
**3/22** 42:20
**30** 22:1 127:19
**35** 2:10

      **4**
**41** 2:11,13
**48** 2:14,15
**4th** 122:13

      **5**
**5** 2:3 84:16,17
  85:22
**51** 2:16
**538** 62:19
**54** 60:17
**551** 28:25

**564** 62:24 64:8

      **6**
**62** 2:18
**63** 2:19
**63101** 127:19
**64106** 4:6
**64108** 4:21
**66612** 3:22 4:12
  127:6
**6th** 35:17

      **7**
**70** 2:20,21
**711** 127:19
**73** 2:7 21:3,4,14
  21:18 23:2,8
**74** 2:8 27:18,21
  27:25
**75** 2:9 28:10,11
  28:19 105:15
**752** 60:15
**754** 60:11,16
**76** 2:10 35:8,11
  35:16 58:4,22
**77** 2:11 41:9,12
  42:1,24
**78** 2:13 41:19,23
  42:20,21
**79** 2:14 48:7,10
  48:19

      **8**
**80** 2:15 48:16
  48:24 49:2,5
**81** 2:16 51:11,15
  51:23 60:9
**82** 2:18 62:16,19
  63:1 64:2,7
**83** 2:19 62:21
  62:24 64:6,12
**84** 2:20 70:6,9
  73:25 86:11
  90:14 119:13
  121:13,14
  122:10
**85** 2:21 70:13

  83:16 84:16
  85:22 87:21
  87:22
**86** 2:22 109:25
  110:3,8
**87** 2:23 116:2,5
  116:9
**88.2** 95:5

      **9**
**9** 1:24 3:19
  87:21,22
  121:15 127:14
  128:6
**9:01** 3:20 5:1,4
**9:59** 51:7
**9th** 5:3