1          UNITED STATES DISTRICT COURT
                DISTRICT OF KANSAS
2

3
   BLAINE SHAW, ET AL.,              )
4                                    )    Case No. 19-1343-KHV
       Plaintiffs,                   )
5                                    )
       v.                            )    Kansas City, Kansas
6                                    )    Date:  1/3/2023
   HERMAN JONES, ET AL.,             )
7                                    )
       Defendants.                   )
8  ...................................

9
              TRANSCRIPT OF MOTION HEARING
10            PROCEEDINGS HELD IN CHAMBERS

11        BEFORE THE HONORABLE KATHRYN H. VRATIL
          SENIOR UNITED STATES DISTRICT COURT JUDGE
12

13  APPEARANCES:

14   For the Plaintiffs:

15   Brian M. Hauss                 Sharon Brett
     American Civil Liberties       ACLU Foundation of Kansas
16   Union Foundation - NY          6701 W. 64th Street
     125 Broad Street               Suite 210
17   New York, NY 10004             Overland Park, KS 66202

18   Madison A. Perry
     Spencer Fane, LLP - KC
19   1000 Walnut Street
     Suite 1400
20   Kansas City, MO 64106

21
     For the Defendants:
22
     Arthur S. Chalmers
23   Office of Attorney General - Kansas
     120 SW 10th Avenue
24   Topeka, KS 66612-1597

25   Proceedings recorded by machine shorthand, transcript produced
           by computer-aided transcription.

1                          I N D E X

2

3    Order to Show Cause                                      30

4    Ruling on Fourth Amendment Summary Judgment             36

5    Ruling Testimony of Christi Asbe                         36

6    Ruling Moving Trial to Kansas City                      39

7    Ruling Motion in Limine Expert Aden                     40

8    Ruling Motion in Limine Mummolo Expert                  56

9    Discussion Samuel Shaw Settlement                       60

10   Discussion Settlement Offer Deadline                    67

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (Court called to order.)

2         THE COURT:  And, I mean, I want to say, so this is --

3    this is the first time I have ever had a case which combines

4    regular 1983 claims against individual officers with an

5    *Ex parte Young* claim and no claim against, in this case,

6    Mr. Jones and in his personal capacity.  And I'm kind of

7    spinning trying to get my head around what you all seem to

8    think are the governing standards and what I think are the

9    governing standards.  I'm not sure I figured it out, so I want

10   to start by asking what -- why did you sue Jones only in his

11   official capacity and how -- how do you think that changed --

12   how do you think your decision changes what we would be doing

13   if it weren't in his personal capacity?

14        MS. BRETT:  So my understanding is that the

15   Eleventh Amendment requires the suit be against Jones in his

16   official capacity as the head of the agency.  And it's just a

17   suit for prospective for leave against Jones, which is sort of

18   a different posture than if we were suing, say, a police

19   department of, you know, the City of Kansas City, Kansas.  The

20   official capacity lawsuit is about, you know, his decisions as

21   the policy maker for the agency and his oversight of the agency

22   and the actions of the individual troopers within that agency.

23   So that's the proper vehicle to use as the *Ex parte Young*

24   lawsuit against Defendant Jones in his official capacity.

25        THE COURT:  So you're saying that you think you could

```
 1    not have sued him in his personal capacity?

 2              MS. BRETT:  That's my understanding as well.

 3              THE COURT:  And do you agree with that, Mr. Chalmers?

 4              MR. CHALMERS:  I don't think there's evidence that

 5    would support a claim against him in his individual capacity.

 6    I think that would require --

 7              THE COURT:  Now, stop, I'm just talking about

 8    theoretically.

 9              MR. CHALMERS:  That's -- and I think that explains it.

10    I mean, he's like any other individual.  A person can be sued

11    in his individual -- in his individual capacity.  Just he

12    happens to be the head of the KHP doesn't change that.  But I

13    agree that if what you're doing is essentially suing KHP, then

14    he has to be sued in his official capacity.

15              THE COURT:  But, I mean, do you agree that they --

16    they could -- I'm not saying that it would be a meritorious

17    claim, but that in theory they could have brought a personal

18    capacity claim against him under 1983?

19              MR. CHALMERS:  Sure.

20              THE COURT:  I mean, that's the way I see these cases

21    teed up all the time.  So I've never seen one that's brought as

22    what you all are referring to as an *Ex parte Young* case.  And

23    it's very confusing to me, because I'm having a hard time

24    figuring out what the standards of liability would be if there

25    even is a standard of liability.  And I find myself kind of
```

1   going and coming around because you're taking the language from

2   -- from the 1983 cases in *Monell* and acting like this is a case

3   against him in his personal capacity where you are trying to

4   establish that he has a pattern or practice of responsibility,

5   but you're specifically disavowing any reliance on that line of

6   cases, and I don't get that.  I don't understand what you're

7   trying to accomplish here.

8           MS. BRETT:  Sure, I'm happy to speak to that a little

9   bit if that would be helpful.

10          THE COURT:  Sure, please.

11          MS. BRETT:  So I think we intentionally in the

12  complaint stayed away from asserting a traditional *Monell* claim

13  for liability because a *Monell* claim is not an appropriate type

14  of claim against a state actor.  It's the type of claim that's

15  issued against municipalities, and the *Monell* decision

16  discusses as much, that it is a specific to claims against a

17  municipality, his holding municipality reliable -- or liable

18  for the actions of individual officers.

19          Here it is a claim that is about the practices of KHP.

20  It's about what they are doing in practice on a widespread

21  scale.  So I certainly understand that there's overlap in the

22  language used to discuss the claim, but what we're trying to

23  say in our papers is that a claim for *Monell* liability needs to

24  meet the standards that the Supreme Court and the Tenth Circuit

25  have held out for holding a municipality liable for the actions

1    of individual officers, and that's not what we are doing here.

2    What we are doing here is more akin to a traditional tort

3    lawsuit under *Ex parte Young* against Jones who is, we assert,

4    engaging in and endorsing and promulgating a widespread

5    practice of violating the constitutional rights of motorists by

6    detaining them without adequate reasonable suspicion.

7          So I certainly understand that there's some tension

8    there, and I think it's -- as a doctrinal matter, it is quite

9    interesting because it doesn't come up in your average case.

10   Most cases, under 1983 liability, are going to be against

11   municipalities or counties because that's where most law

12   enforcement authority lies rather than at the state level.  So

13   it's infrequent that the -- the head of a state police agency

14   would be sued, which is why you don't have a ton of authority

15   on the proper standard for an *Ex parte Young* lawsuit against

16   the head of a state police agency.  It's just there's only a

17   small number of them as compared to the number of law

18   enforcement agencies at the municipality level or at the county

19   level.

20         So I think that's why there's a little bit of a lack

21   of law sort of laying this out very clearly, but I do think

22   that there is law saying that the -- the heightened standards

23   that the Supreme Court has found must be met to hold a

24   municipality liable under a *Monell* theory don't have the same

25   application in an *Ex parte Young* lawsuit, and that's what we

```
 1   are trying to tease out in our pleadings.

 2          THE COURT:  So what do you think the standard is?

 3          MS. BRETT:  I think it's whether -- I think we address

 4   this most clearly in our reply brief in support of our

 5   affirmative motion for summary judgment.  It's -- it's almost

 6   one of tort liability.  It's the actions of Defendant Jones,

 7   does he have the -- were his actions the ones that were

 8   contributing to and allowing a pattern of unconstitutional

 9   conduct to continue unabated.  And we are arguing that because

10   he is the principal policy maker, he is the one that is

11   endorsing this policy.  He is the one who is basically signing

12   off on it and saying this is what troopers should do under my

13   watch; that -- that he is responsible for these continued

14   constitutional violations in that way and he's the proper

15   vehicle for injunctive relief.

16          THE COURT:  So you both filed cross-motions for

17   summary judgment, and I've been really struggling with them

18   because obviously you all disagree about what the standard of

19   liability should be and you -- you refer to this Ex parte Young

20   claim, and I really do not know what that would be.  I don't

21   know what an Ex parte Young claim would be because, as I

22   understand Ex parte Young, it has to do with sovereign immunity

23   and, you know, the capacity in which Jones could be made a

24   defendant here in court, but it doesn't really speak to the

25   circumstances in which you would grant relief against him.  It
```

```
 1   doesn't say what does plaintiff have to show other than ongoing
 2   constitutional violations and some connection between Jones and
 3   those violations.  I mean, is there more to it than that?
 4            MS. PERRY:  No, I think that's exactly right, Your
 5   Honor.  I think what plaintiffs need to show is that he is
 6   responsible or connected to those alleged constitutional
 7   violations, and so that here that's what we've alleged and
 8   argued:  that he's maintaining that practice and he's doing
 9   that through endorsing this policy of permitting impermissible
10   factors as a -- as part of a reasonable suspicion calculous.
11   He is endorsing the policy even in this litigation by saying
12   that troopers can continue to rely on those factors:  the
13   travel plans, the residency, destination, origin from drug
14   source areas.
15            But specifically back to your question on what the
16   standard is, I think you're right, Your Honor, what we need to
17   prove is he's connected to those alleged constitutional
18   violations, that causal nexus language.
19            THE COURT:  All right.  So we're on the same page so
20   far.  So -- and we'll come to Mr. Chalmers' argument that you
21   need also show pattern or practice, whatever, but for now let's
22   assume we're on the same page.  What are the ongoing
23   constitutional violations that you believe you will be able to
24   prove?
25            MS. PERRY:  Sure.  So those are Fourth Amendment
```

1    violations.  We have the examples of the three stops related to

2    our plaintiffs:  that's the Erich and Maloney stop with their

3    children, that is the Shaw stop, that is the Bosire stop.

4            Those would be three examples of the constitutional

5    violations.  We also have Mr. Mummolo's report this practice is

6    widespread, that troopers continue to rely on travel plans or

7    residency as part of detaining drivers for canine sniffs.

8            And we also have trooper testimony, which a number of

9    troopers have testified, and that goes from Jones' testimony at

10   the head of the agency, that general counsel's testimony, as

11   well as a number of troopers, including troopers who train

12   other troopers, that they are continuing to rely on these

13   impermissible factors.  And then Dr. Mummolo's report really

14   pulls that together that shows that this is happening.

15           MS. BRETT:  And will continue to happen into the

16   future.

17           MS. PERRY:  Yes.

18           THE COURT:  Okay.  So the three stops that you

19   mentioned, those were in 2017 and 2019; right?

20           MS. PERRY:  2017, 2018 and 2019.

21           THE COURT:  Okay.  So you don't have any evidence of

22   specific stops of specific people in the last three years?

23           MS. PERRY:  So in the summary judgment record, we

24   supported that with Dr. Mummolo's evidence.  But, generally

25   speaking, yes, at trial we would plan to call certain Rule 26

19-1343 Shaw et al v Jones et al  1.3.23                          10

```
 1    witnesses that we've disclosed, and there are other stops at

 2    issue, yes.

 3              THE COURT:  Okay.  And who -- how many are there and

 4    when were they and that kind of thing?

 5              MS. PERRY:  Sure.  And so the answer is there are

 6    Rule 26 disclosures.  I believe we disclosed around 20 stops

 7    with the benefit of Dr. Mummolo's testimony showing that it's

 8    widespread.  We plan to call somewhere between three and five

 9    Rule 26 witnesses, and they are spread out in the time frame of

10    that 2017 to 2019 period.  In addition, we have stops -- is it

11    '20 and 2021?

12              MS. BRETT:  We have one as recently as this August we

13    plan to call as a Rule 26 witness.

14              MS. PERRY:  And that specific one, Your Honor, was

15    part of a discovery dispute that we had earlier in this case.

16    We asked for additional discovery when we learned of his stop.

17    That discovery was denied, but we do still plan to call him as

18    a witness.

19              THE COURT:  Okay.  So we've got the three stops

20    involved in this case.  At trial you say there will be evidence

21    of three to five additional stops, the most recent one being

22    from August of 2022.

23              MS. BRETT:  That's correct.

24              THE COURT:  And as to -- how do you pronounce his

25    name?  Mummolo?  Mummolo?
```

1          MS. PERRY:  Mummolo.

2          THE COURT:  I've read his report.  I understand what

3     he says about the disproportionate number of stops and that

4     kind of thing, but we don't know anything about stops of these

5     hypothetical other people in terms of whether they consented to

6     the detention or anything about the circumstances there; right?

7          MS. PERRY:  Yes, Your Honor, but in part that's

8     because the Kansas Highway Patrol does not keep records --

9          THE COURT:  Doesn't matter.

10         MS. PERRY:  -- of stops.

11         THE COURT:  Doesn't matter.  I'm just talking about

12    what the evidence would be that the jury might hear.

13         So -- so we don't really know anything about whether

14    the drivers consented to a prolonged detention or whether they

15    had committed a traffic violation or anything like that?

16         MS. BRETT:  I actually do think we have some of that.

17         THE COURT:  Okay.  What is it?

18         MS. BRETT:  In the form of the canine sniff reports.

19    So for many of those which we reviewed -- in which Dr. Mummolo

20    reviewed as part of his analysis, there is an explanation

21    saying, "I asked for a consent and was denied," "I suspected,"

22    "I had reasonable suspicion to detain the person for a canine

23    sniff, and then I conducted a canine sniff."  So for a number

24    of those there is some sort of narrative write-up.  It is

25    certainly not the entire universe of canine sniffs where that

1    narrative write-up is included, but I think we included some of

2    those in the summary judgment record --

3              THE COURT:  Okay.

4              MS. BRETT:  -- as well as some complaints that were

5    filed with the Professional Standards Unit of KHP where people

6    complained of the exact same conduct we alleged happened to our

7    individual clients.

8              THE COURT:  Okay.  And if -- for the three stops at

9    issue here if we go to trial and plaintiffs lose, have you

10   thought about whether they would have standing to seek relief

11   injunctively on behalf of these three to five other people who

12   will be testifying?

13             MS. BRETT:  Yes.  And I think this came up at the

14   hearing that Your Honor held in August of 2021, the specific

15   question of:  Is the liability of Jones necessarily dependent

16   on a finding of liability against the individual named

17   troopers?  And we said that it was not, and Mr. Chalmers on the

18   record said that it was not as well, that the claims against

19   Superintendent Jones did not require a finding of liability on

20   behalf of the individual trooper officers in the damages

21   claims.

22             THE COURT:  Did you say that?

23             MR. CHALMERS:  Yeah, that's accurate.

24             THE COURT:  Okay.

25             MR. CHALMERS:  It's -- now you're talking about a

19-1343 Shaw et al v Jones et al  1.3.23                    13

1    finding of liability.  I'm not necessarily talking about

2    standing, which is a little bit different issue, which I think

3    is what you had inquired about.  But the law has been that you

4    can have someone who may not be able to recover for a past

5    event who, if they can, in my view, satisfy the rigorous

6    requirements to have standing to the circuit claim for

7    injunctive relief prospectively, now you're looking at the

8    likelihood of them encountering the same experience that would

9    be a violation of those constitutional rights.  So, yeah,

10   conceivably you could have a policy that is ongoing approved

11   and that would be separate from.  You don't have to prove

12   liability for the -- from their prior experience.  It comes up

13   in qualified immunity situations quite a bit.

14        THE COURT:  Yeah, I'm thinking factually how that

15   would play out in this case.  Because I know, in your response

16   to the motion to sever, you say, well, the fact that plaintiffs

17   might lose their individual claims isn't dispositive because

18   you could have situations where there's nobody that is held

19   individually accountable but there's kind of a disbursed

20   responsibility, and you know, therefore, you could hold Jones

21   responsible even without -- or you could hold any state actor,

22   I guess, responsible even without proof that anybody was

23   personally liable for the constitutional violation.

24        I don't see factually how that would play out in this

25   case.  I mean, it seems to me that for these particular three

1    stops either plaintiffs' constitutional rights under the Fourth

2    Amendment were violated or they weren't.  And if they were,

3    they were violated by the officers who stopped them and not

4    some other people.  So who -- what's -- what am I missing here?

5         MS. BRETT:  Well, they have standing to bring the

6    claim against Superintendent Jones for prospective relief on

7    the basis that they will continue to travel through the state

8    of Kansas.  And if this is a widespread practice where

9    out-of-state motorists are targeted for traffic stops and for

10   prolonged detentions for the purposes of canine sniffs without

11   adequate reasonable suspicion, that there's a likelihood that

12   they could be subjected to that again.

13        And Ms. Perry can speak more to standing on the

14   injunctive relief claim generally, but that is the essence of

15   their -- of their prospective relief claim:  that they will be

16   engaging in this type of travel again in the future and that

17   the widespread practice that Superintendent Jones endorses

18   subjects them to the possibility that they will have their

19   constitutional rights violated again in the future.

20        THE COURT:  So, I mean, one of the issues I have with

21   your summary judgment briefing is you confuse and conflate the

22   issues of standing and the merits of your right to an

23   injunction.  So, yes, I agree they have standing because

24   they've alleged that they intend to travel on the highways in

25   Kansas in the future.  I think that does not mean that they --

1    just because they have standing doesn't mean they are entitled

2    to injunctive relief because you have to show more in the way

3    of a likelihood of future injury.  The likelihood of future

4    injury has to be non-speculative and, you know, that kind of

5    thing.

6          And so we've gotten kind of far away from where we

7    started here, but I don't see -- I don't see, especially if

8    they -- if they lose on their underlying claim -- Fourth

9    Amendment claims, I don't see the likelihood of them being able

10   to prevail on their injunctive claims.

11         MS. PERRY:  Well, I think too I'd just point to the

12   evidence that we already talked about too.  In addition to the

13   three stops, we've talked about standing for the injunctive

14   relief claim.  As far as the evidence, the evidence is more

15   than their three stops.  The evidence is also the widespread

16   practice, and that comes from other stops and other witnesses

17   that we'll bring in the other PSU complaints, other --

18   Dr. Mummolo's report about how widespread this is, and also

19   just trooper testimony too.

20         THE COURT:  So as you're saying some -- I'm thinking

21   about the issue of how we configure these trials.  So if we --

22   if we have a trial on the individual plaintiffs'

23   Fourth Amendment claims and they lose -- well, let's say they

24   win, okay.  So they win.  Let's say they have -- we have two

25   trials on the Fourth Amendment claims -- two or three?

 1            MR. CHALMERS:  Two.

 2            THE COURT:  That's what I thought.

 3            MS. PERRY:  Two.  The third stop doesn't have any.

 4            THE COURT:  Okay.  And you think we could do each of

 5   those within three days?

 6            MR. CHALMERS:  I think so.  I think we could do two

 7   days, but maybe I'm being overly optimistic with lawyers who

 8   like to hear such talk.

 9            THE COURT:  I've never had a two-day jury trial.  By

10   the time you pick the jury and instruct the jury, there's two

11   days itself.  How long do you think it would take to try each

12   of the underlying claims?

13            MS. BRETT:  Well, so I think maybe we'll start from

14   the -- from the position that we don't think that the claims

15   should be severed.

16            THE COURT:  Right, I'm aware, yeah.

17            MS. BRETT:  But that said, I think we have evidence

18   that we want to put on for punitive damages.  We still have a

19   live claim for punitive damages for each of them, too.  So I

20   think it would take quite a few days to try each one

21   individually.

22            MS. PERRY:  Essentially we believe that the evidence

23   would be overlapping each of the trials, so we think we would

24   be closer to seven days at a minimum for each of the trials.

25            THE COURT:  So, I mean, I don't -- I'm not saying that

1    this is my final ruling on the subject, but the way I see this

2    right now, and I guess you need to talk me out of this because

3    it could become my final ruling, is that what makes the most

4    sense is to sever the claims of each set of defendants -- I

5    mean, plaintiffs.  So we would have two -- two trials on the

6    underlying Fourth Amendment claims and then we would kick down

7    the road the claims against Jones.  If plaintiffs win on their

8    underlying claims, then they would have whatever damages,

9    actual and punitive and/or punitive, and they could seek

10   injunctive relief.  I don't know that we would need another

11   trial about that, but whatever, that would be a bench trial,

12   and that's not something we would need to build into this

13   schedule right up front.

14          If plaintiffs lose on those individual claims, then I

15   would think the case is basically over, because I don't see

16   that they would have standing to seek injunctive relief any

17   more than some random person on the street, we would have a

18   right to seek injunctive relief to -- of the kind that you're

19   asking for.

20          So tell me what's wrong with that.

21          MS. PERRY:  Go ahead.

22          MS. BRETT:  So a few things.  I think that severance

23   of these trials is supposed to be the exception rather than the

24   rule, and I think the arguments that we laid out for why it

25   doesn't meet that exception in our briefing are -- are valid

1   ones here:  that I think there's overlap among the claims and

2   amongst the evidence that would be presented, and having a

3   number of separate trials here is prejudicial to the plaintiffs

4   in how they want to present their case and not a good use of --

5   of everyone's resources in the sense that we're going to have

6   to call multiple witnesses multiple times and it would lead to,

7   I think, some very sticky logistical issues to work out in that

8   respect, including what we do with different jury verdicts,

9   right, or how we want to decide the ultimate question of

10  qualified immunity, which I am assuming the defendant troopers

11  are going to raise again.

12         It is possible that the jury finds a Fourth Amendment

13  violation and that Your Honor rules ultimately that qualified

14  immunity precludes relief.  In that case do the individual

15  plaintiffs prevail for the sake of having standing to go

16  forward on their claim against Jones?  I think that the case

17  law would say they do because, you know, the qualified immunity

18  analysis is what prevented them -- prevented them from getting

19  relief from the jury verdict.

20         But I think, you know, at bottom the plaintiffs

21  brought these cases -- these claims in a single case because

22  they are -- with the exception of the Erich and Maloney

23  plaintiffs who are joined into our case, because we --

24         THE COURT:  I thought we -- I thought they were

25  separately filed.

1          MS. BRETT:  No.

2          THE COURT:  We consolidated them for discovery.

3          MS. BRETT:  So -- so the Shaws filed their case pro se

4    originally and then we filed a First Amendment amended

5    complaint also adding Mr. Bosire's claims in, and then the

6    Erich and Maloney plaintiffs were a separate case that was then

7    consolidated for all purposes with ours later on.  But the

8    Shaws and Mr. Bosire were in one case with claims for

9    injunctive relief against -- against Jones in that case.

10         THE COURT:  So, I mean, if I could just jump in here,

11   I don't think they were properly joined, and so I -- it doesn't

12   give me any heartburn to split them apart at this point because

13   they -- I think the rules of joinder under -- I can't remember,

14   is it 17 or 16?

15         MR. CHALMERS:  Might be 20.

16         THE COURT:  I might have to actually look at the rule

17   book, but because they -- they don't -- there's no joint

18   liability or possibility -- there's no problem if there are

19   inconsistent verdicts here because they were independent

20   events, and the only real connection is that they have the same

21   theory and some of the same facts.

22         MS. PERRY:  I believe the injunctive relief ties them

23   as well, because both of the individual stops support the

24   injunctive relief claim, and so I think that's too where the

25   joinder comes in.

1      THE COURT:  Well, I mean, if we get to that point, we

2   could consolidate the trials for purposes of injunctive relief

3   and handle that as one proceeding.

4      MS. PERRY:  And I think too, just getting back to the

5   evidence, because I think some specifics are helpful when we're

6   considering these things, for example, I know Ms. Brett said

7   the punitive damages are still on the table.  One of the main

8   purposes of punitive damages is deterrence, and that's not only

9   against the individual troopers but other troopers.  And so

10  showing a jury that this a widespread practice is very

11  important to any claims in punitive damages.  So I just want to

12  raise that too.

13      And also the number -- the witnesses -- I know

14  Ms. Brett has talked about it, witness inconvenience and coming

15  to these trials, we do have a number of out-of-state witnesses

16  who would be traveling and do have that time blocked off on the

17  6th, the week.

18      THE COURT:  Okay.  Anyway, go ahead.  Is there

19  anything else you want to say about that scenario that I laid

20  out?

21      MS. BRETT:  No, Your Honor.  I think we continue to

22  believe that the way we should present the case is as one case

23  and that there are proper avenues through limiting instructions

24  and controlling the presentation of evidence that would

25  alleviate concerns of having a damages claims and a -- an

 1    *Ex parte Young* claim tried jointly.

 2         THE COURT:  Don't -- please don't say *Ex parte Young*

 3    claim unless you're going to tell me what that is.  You still

 4    haven't.

 5         MS. BRETT:  A claim for injunctive relief, Your Honor.

 6         THE COURT:  Usually those happen at the end of the

 7    case, you know, after there's been an underlying violation

 8    which is established.  And actually that's why I have a lot of

 9    heartburn with both of your cross-motions for summary judgment,

10    because at this point we have no evidence of any constitutional

11    violations.  Zero.  I mean, not only do we not have any

12    verdicts, but, I mean, we have conflicting evidence of whether

13    there's a constitutional violation.  So really how could you be

14    entitled to summary judgment?

15         MS. PERRY:  I understand the issue, Your Honor, but I

16    think we would just, again, point to the fact there can be a

17    verdict from Dr. Mummolo's evidence, these other stops, the PSU

18    complaints, all of that evidence is what we would point to.

19         THE COURT:  And that's another -- that's another

20    stumbling block that I have with the way both sides have teed

21    this up, because you are arguing that it's a constitutional

22    violation for them to instruct the troopers to do A, B, C,

23    right, or to fail to prevent them from doing A, B, C, and it's

24    not.  I mean, it's not -- there's nothing inherently illegal in

25    what they teach the officers.

 1          What's illegal is there's a violation is what happens

 2     with the boots on the ground, the interaction between the

 3     driver and the troopers, and that's the missing piece, you

 4     know, in this whole summary judgment context and in Mummolo's

 5     numbers too.  Because without knowing the length of the

 6     detention, how long it was prolonged, what the driver said, all

 7     of that, we don't know if it -- if it's illegal.  So neither --

 8     you can't show that there's no constitutional violations

 9     because in your cross-motion we have to give them the benefit

10     of every favorable inference, and you haven't shown any

11     constitutional violations let alone any ongoing violations.

12          So is there anything, as a practical matter, that I

13     can really do with these motions?  That's why we haven't ruled,

14     because it seems kind of like a fool's errand from our

15     standpoint to put a lot of time and energy into this.  It looks

16     to me like you have the cart before the horse.

17          Unless we have some established constitutional

18     violations, how can we address whether injunctive relief is

19     appropriate?  We don't know if the violations are ongoing,

20     whether they're stale, what.

21          MS. BRETT:  I think, Your Honor, maybe one alternative

22     framing or way of looking at it, is the claim that we have for

23     injunctive relief is that the way Jones is leading his

24     department is fostering the possibility of continued ongoing

25     constitutional violations.  We posit there will be enough

1   evidence that we produce at trial to show that these

2   constitutional violations are ongoing.  But the evidence that

3   we put forth in our summary judgment motion shows that he is

4   encouraging troopers to violate the law by ignoring *Vasquez*.

5          THE COURT:  Doesn't matter if they're not actually

6   violating it.  It's the flip side of the argument.  You know,

7   we're certified; therefore, you know, that means that we're

8   more likely to follow the law.  We teach good police

9   procedures; therefore, our officers aren't violating the law.

10  Well, you can teach them to violate the law, but that doesn't

11  mean they're going to violate it.  So there's like this gap

12  analytically between.  The teaching really, I think, is a red

13  herring.  Unless there's actual violations that are occurring,

14  it really doesn't matter what they're taught; right?

15         MS. BRETT:  And I think our position is that we show

16  both.  I understand that Your Honor doesn't see that as clearly

17  in the record as we may have liked, but I think our position is

18  that we show, both in the papers -- and we intend to show both

19  at trial, both that this is what Jones is encouraging troopers

20  to do and it is what, in fact, troopers are doing, and that we

21  can show that by the testimony the individual troopers that we

22  deposed gave where we said, "Do you consider this?" and they

23  said, "Yes, we consider these factors," which the Tenth Circuit

24  has said you're not supposed to consider.  "We give weight to

25  this under the totality of the circumstances," and the Tenth

1    Circuit has said you shouldn't give weight to that.  And

2    troopers testified that, in their practices today as they

3    currently police on Kansas highways, that they are doing that.

4          THE COURT:  What if I don't agree with your

5    interpretation of *Vasquez*?

6          MS. BRETT:  Well, then that's a different question.

7          THE COURT:  Yeah, also, the Texas two-step thing,

8    there's nothing in the abstract that is illegal about that.

9    And teaching officers that that's something they can do is not

10   a constitutional violation.  So it's all how it plays out on

11   the ground.

12         MS. BRETT:  That I certainly agree with, Your Honor,

13   there is nothing inherently unconstitutional about the

14   two-step.  We point to the two-step as a tactic that the KHP

15   engages in in its violation of motorists' constitutional rights

16   on an individual basis.  And I think we intend to present

17   evidence through our -- our named plaintiffs as well as Rule 26

18   witnesses the two-step is used to detain them without adequate

19   reasonable suspicion.

20         THE COURT:  So if -- if any of the plaintiffs get a

21   favorable verdict on the underlying Fourth Amendment claim,

22   then they would seek injunctive relief against Jones and --

23         MS. BRETT:  I don't want -- I don't want to cut Your

24   Honor off in your chain of thought.  I do want to just note too

25   the Erich and Maloney plaintiffs do not have a claim for

```
 1   damages.  They only have a claim for injunctive relief.  And I
 2   don't think it would be fair to foreclose their, you know,
 3   ability to seek injunctive relief against Defendant Jones on
 4   the basis of the Shaws and Mr. Bosire losing their claims at
 5   trial.
 6             THE COURT:  Okay.
 7             MS. BRETT:  I do think that's an important thing to
 8   talk about here.  They just joined for the injunctive relief
 9   claim.
10             THE COURT:  I guess then no matter what happens with
11   the liability trials, then we would take up the question of
12   injunctive relief.
13             MS. BRETT:  I think that's the case, Your Honor.  And
14   I think Your Honor, in ruling over a bench trial, would serve
15   as the fact finder on the -- the Erich and Maloney plaintiffs'
16   claims about their own constitutional violation.
17             THE COURT:  So in your cross-motions for summary
18   judgment, nobody really talks about what the standards would be
19   for the court to enter injunctive relief.  Just because -- so,
20   I mean, there's a -- there's a huge body of law about when it's
21   appropriate to enter injunctive relief and for what reasons.
22   None of you talk about that in the summary judgment --
23   cross-motions for summary judgment.  Nobody talks specifically
24   about the injunctive relief that you're asking for.
25             And, frankly, I think the injunctive relief that
```

1   you're asking for is so intrusive and overreaching that,

2   honestly, I can't imagine myself granting it.  And I -- I would

3   almost invite you -- well, it's not part of the -- the

4   cross-motions for summary judgment and I'm not going to make a

5   ruling on that right now, but have you all looked at some of

6   the Supreme Court cases and Tenth Circuit cases about when it's

7   appropriate to enter injunctive relief?

8            Basically I think what you would be asking me to do

9   is, first of all, completely unworkable, because then I would

10  be basically in a role of monitoring and supervising every

11  traffic stop by the Kansas Highway Patrol to see if it complies

12  with the injunction that has been entered.  I think it raises

13  huge issues about federalism and comity with regard to state

14  law, law enforcement procedures.  It's -- we don't have the

15  resources to do that.

16           And I -- I think it's particularly of concern that the

17  Fourth Amendment is already one of the most vigorously

18  protected parts of the Constitution.  We've got various ways

19  that people can vindicate denial of rights under the Fourth

20  Amendment from motion to suppress, tort liability under state

21  law, federal constitutional liability.

22           I guess I just don't see a need for the kind of

23  injunctive relief that you're seeking.  So I would let you

24  brief this before I would make a ruling on it, but just as a

25  practical matter so -- so there's another part of the tail --

1    the --

2              COURTROOM DEPUTY:  Cart before the horse.

3              THE COURT:  Cart before the horse.  Thank you very

4    much.

5              So not only do we have no evidence at this point of

6    ongoing constitutional violations, but if the only reason that

7    we're doing all this litigation about Jones and the practices

8    and policies and procedures is to get to injunctive relief, I

9    don't think we're going to get to injunctive relief, and that's

10   a practical matter that I think we have to take to -- into

11   account as we're figuring out the trial strategy and whether

12   we're going to sever or bifurcate or whatever.

13             I mean, I feel like, just looking at the pretrial

14   order and seeing the kind of injunctive relief that you're

15   asking for, we could almost do a judgment on the pleadings and

16   save everybody the time and the expense of getting witnesses in

17   to testify about that, because, like I said, I just don't see

18   that happening.

19             MS. BRETT:  Well, I'll say, first of all, that, of

20   course, Your Honor has the discretion to craft injunctive

21   relief --

22             THE COURT:  Right.

23             MS. BRETT:  -- that you find to be appropriate --

24             THE COURT:  Right.

25             MS. BRETT:  -- that would be our offering to curb this

1    practice.  I think it's coming in large part due to the fact

2    that we have testimony in the record from KHP troopers and

3    Jones himself saying that *Vasquez* did not alter their practices

4    at all.  And I think there's a concern that we have that even

5    with a ruling like *Vasquez* that the KHP does not seem to be

6    taking that seriously.  And so I think we would leave it within

7    the discretion of the court to -- to craft the appropriate

8    remedy to ensure that the ongoing constitutional violation that

9    we were hoping to enjoin is, in fact, enjoined.

10         So it's a suit for injunctive and declaratory relief

11   about the KHP's practices.  And I think our job in the pretrial

12   order is to offer what we think is the appropriate form of an

13   injunction to make sure this practice is stopped once and for

14   all.  But, of course, it's within the court's sound discretion

15   to craft what the court would find to be appropriate as a

16   remedy here.

17         THE COURT:  Yeah, if anything.  I mean, so the problem

18   is -- so the first thing that plaintiffs would have to show is

19   actual success on the merits.  So they have to win their

20   underlying suit.  So let's -- let's say they meet that hurdle.

21   Then they would have to show that there's a possibility of

22   irreparable harm unless the injunction is issued.

23         Typically we would say in that context are there legal

24   remedies that are available or is an injunction necessary -- is

25   it necessary to enter equitable relief to prevent future

1    damages?  And I would say there is no irreparable harm because

2    if this same thing happens -- and it's not likely to -- but if

3    it does happen again, plaintiffs would still have the same

4    remedies they have now.  They can file a motion to suppress if

5    there's drugs or contraband found in the car, on the ground,

6    that the search was illegal.  They can file a civil lawsuit

7    just like they've done now.  They could file a tort lawsuit

8    under the Kansas Tort Claims Act.  So to me there are multiple

9    remedies at law which are available and they would not suffer

10   any irreparable harm if the court fails to enter an injunction.

11           I would also have to find that the threatened injury

12   outweighs the harm that the injunction would cause.  And, I

13   mean, my judgment is that the exact opposite would be true,

14   because to have me riding herd on the Kansas Highway Patrol and

15   basically being super adjudicator of the lawfulness of every

16   stop that they make, I think that's -- that is, I think, a

17   outrageous imposition on their operations and violates

18   everything I understand about principles of comity and

19   federalism and respect for other branches of government.  So to

20   me some the -- the harm that would result from an injunction is

21   far worse than any benefit that would be gained.

22           So, again, I'm happy to let you brief this, but I

23   think we also have to be practical.  Given that that's the

24   direction I see this going, that has a big bearing on how I

25   think the trial should be shaping up.

 1          MS. BRETT:  I think we would take Your Honor up on the

 2     opportunity to brief it.  I think there's a few different

 3     things we would want to respond to in that.  I think there's a

 4     way to craft an injunction here that would not put Your Honor

 5     in the position of having to oversee the day-to-day operations

 6     of the Kansas Highway Patrol, which I think is a valid concern.

 7     And so if -- if we can have the opportunity to brief that

 8     issue, I think that's something we'd want to do.

 9          THE COURT:  I mean, like I said, I will let you do

10     that.  It's not my job to figure out an injunction that I would

11     feel comfortable with, because I'm comfortable with no

12     injunction.  And so -- and I want you to read a case called

13     *O'Shea versus Littleton*.  Are you familiar with that?

14          MS. BRETT:  Yes, Your Honor.

15          THE COURT:  I mean, to me a classic example of, you

16     know, all the reasons why we shouldn't have an injunction here,

17     because it would require the federal court to be continuously

18     involved in the operations of the Kansas Highway Patrol.  I

19     mean, that case kind of speaks for itself.  So let's -- I think

20     in the pretrial order you've laid out the injunction that you

21     want.  Let me see if -- it's on page 47.

22          So let's just say that I am verbally ordering you to

23     show cause in writing why the court should not deny your

24     request for injunctive relief.  This is tantamount to a motion

25     for judgment -- not a motion -- an order to show cause under

1   the same procedural posture as a motion for judgment on the

2   pleadings.

3           So when can you do that?  I really think the sooner

4   the better, because, like I said, this will affect how we --

5           MS. BRETT:  Sure, Your Honor.

6           THE COURT:  -- try the liability issues.

7           MS. PERRY:  Do you want to consider it on the 9th?

8           THE COURT:  That would be great if you can.  That

9   doesn't give defendant much time to respond, but I'm sure you

10  will rise to the occasion, right, work all next weekend?

11          MR. CHALMERS:  I'll do what I have to do.

12          THE COURT:  Okay.  So five o'clock on the 7th --

13          MS. PERRY:  Yes.

14          THE COURT:  -- you'll respond.  And then what time is

15  our hearing on the 9th?

16          MS. BRETT:  12:30 I believe.

17          THE COURT:  12:30.  How about can you respond -- is

18  the 7th a Sunday?

19          LAW CLERK:  7th is a Saturday.

20          THE COURT:  Five o'clock on the 8th, Mr. Chalmers,

21  give me the best response you can.  I think you know what the

22  issues are so you can already start looking.

23          MR. CHALMERS:  I can.  All right.

24          THE COURT:  So if -- if I resolve the injunction

25  issue, I mean, basically what I would be saying is it doesn't

1    matter if there's an ongoing constitutional violation.  I have

2    concerns whether you'll be able to prove that there is.  But

3    even assuming that you do, I would not grant you the injunctive

4    relief that you are seeking.  So, therefore, the claims against

5    Mr. Jones, Superintendent Jones, would be out of the case and

6    we would be looking at basically two garden variety trials of

7    Fourth Amendment violations in roadside detention type of --

8    when I say garden variety I don't mean that to be demeaning of

9    the plaintiffs or their claims or anything.  I actually think

10   their claims are strong claims and I think that this would be a

11   really interesting trial in terms of shining a spotlight on

12   some of the law enforcement techniques that are used, you know,

13   by the highway patrol.  So...

14          MS. BRETT:  Can I ask a point of clarification?

15          In our response to your show cause order, I take it

16   from Your Honor's comments that the injunction that we have

17   proposed in the pretrial order is not one that you would find

18   acceptable?

19          THE COURT:  Not even close.

20          MS. BRETT:  If we are able to craft one that you would

21   find acceptable that is much more limited in nature that

22   doesn't have the same concerns, is that something that we

23   should propose in our show cause?

24          THE COURT:  Well, yeah, because I think it's your last

25   chance to be heard.

 1          MS. BRETT:  I say that only because, in police

 2   misconduct claims like this claims for injunctive relief, there

 3   are times when a court would order something, you know, very

 4   wide-ranging that's very intrusive, which we're being counseled

 5   against, which I understand, and there's other times when the

 6   injunctive relief states something very simple like you cannot

 7   consider -- the Kansas Highway Patrol is enjoined from

 8   considering "x" in their reasonable suspicion calculous or from

 9   doing this one thing and that's it.  That's the sort of

10   contours of the -- of the injunction.  And so I -- if we

11   propose something that is much more limited like that, does it

12   have the same concerns of federalism?

13          THE COURT:  Uh-huh, and I can tell you why.

14          Number one, I don't agree with your interpretation of

15   *Vasquez* it is quite the bright line that you say it is.  I

16   think there's wiggle room in there that is very fact specific

17   and contingent on the boots on the ground situation.  So I

18   don't -- I don't think me issuing injunction saying you can't

19   ask this question, you can't consider that information, that

20   would be, number one, impossible to enforce, and it would just

21   drive underground, you know, all of the transparency that we're

22   trying to accomplish in having officers articulate why they do

23   what they do.  So I don't think that would be productive.

24          And I think it opens up the same issues about, in

25   every traffic stop, where, you know, people may have a criminal

 1   case, they may have civil cases under state or federal law, and

 2   they shouldn't be able to come to me and do an end-run and say,

 3   well, you said they couldn't consider this and they say they

 4   didn't but they really did.  And where does that leave the

 5   federal court if we have a difference of opinion between

 6   whether they violated the Constitution and, you know, what a

 7   court in -- in the criminal case might say or the court --

 8   different court in the civil liability case might say?

 9          I mean, there's no upside for this that I can see in

10   terms of the -- the workability, comity, federalism and all of

11   that.  But, I mean, if you think you can make it work, yes, you

12   better put it in the --

13          MS. BRETT:  I want to think about it and do some

14   research, Your Honor, then we'll brief it for you.

15          THE COURT:  Okay.  I mean, typically -- so the things

16   that you have in here are maybe, like, best practices.  I don't

17   think that they are necessary to vindicate Fourth Amendment

18   rights.  And even if they were, it's based on law that already

19   exists.  Typically we wouldn't, for example, in an employment

20   discrimination case, if plaintiff wins, follow that up with an

21   injunction against the employer saying don't violate Title VII

22   anymore.  You know, Title VII speaks for itself.  There's

23   independent enforcement mechanisms that are available, and so

24   an equitable remedy is not necessary.  I think that's exactly

25   the situation we're in.

```
 1            But, again, put your thinking cap on --
 2            MS. BRETT:  I will, Your Honor.
 3            THE COURT:  -- and...
 4            Okay.  Where are we?  So I think everybody knows what
 5   the standards of liability are on the 1983 claims.  Where --
 6   where does that leave -- wait -- where does that leave us in
 7   terms of the expert witnesses?  So if there's no injunctive --
 8   well, it doesn't -- we don't need to decide about whether
 9   there's going to be an injunctive proceeding right now.
10            On the two trials against -- based on the two
11   individual traffic stops, where does that leave us with regard
12   to the expert witnesses?  Does plaintiff still need expert
13   witnesses?
14            MR. HAUSS:  Yes, Your Honor, and part of that's
15   because if the court denies the injunctive claims, then the
16   punitive damages claims become incredibly important for both
17   ensuring that Fourth Amendment rights are respected going
18   forward, deterring this activity not just by these troopers but
19   by the rest of the Kansas Highway Patrol.  And so for purposes
20   of establishing those punitive damages claims, we believe the
21   expert's testimony is relevant.
22            We also believe that Chief Aden's testimony is
23   relevant to rebut Trooper Schulte's and McMillan's reliance on
24   their training and expertise to justify the existence of
25   objective reasonable suspicion.  And if they're going to try to
```

```
 1    bolster their testimony with training and expertise, Chief Aden
 2    should be permitted to respond and present argument so the jury
 3    can hear both sides of that issue.
 4              THE COURT:  Okay.  And what about your expert?
 5              MR. CHALMERS:  My expert wouldn't have any relevance
 6    to the two individual claims.
 7              THE COURT:  Okay.  All right.  So just let me catch up
 8    here.
 9              First of all, I'm overruling both cross-motions for
10    summary judgment on the Fourth Amendment claims.  As I said,
11    cart before the horse.  No need to even talk about that at this
12    point.
13              Number two, plaintiffs' motion to exclude testimony of
14    Christi Asbe is overruled because it's moot and defendant
15    doesn't intend to offer testimony by her.
16              We will have two separate trials on the underlying
17    Fourth Amendment claims.  And if we have a trial or any kind a
18    bench trial with regard to the injunctive relief claims, it
19    would probably be set after the two-week period that we have
20    reserved for trial here.
21              So trial is set in Wichita; right?
22              MR. CHALMERS:  Yes.
23              THE COURT:  And where is everybody from?  You're from
24    Lenexa.
25              MR. CHALMERS:  I am now.
```

```
 1            THE COURT:  You're from Kansas City.  I'm from Kansas
 2    City.  Where are you all from?
 3            MS. PERRY:  Kansas City.
 4            MS. BRETT:  Lawrence.
 5            MR. HAUSS:  New York.
 6            THE COURT:  So why are we doing this in Wichita?  Are
 7    there a lot of witnesses down there that --
 8            MR. CHALMERS:  I think it was initially designated by
 9    the plaintiff as Wichita's base of trial.  The trooper
10    defendants, if you're looking at what federal court would be,
11    the place that would have -- relate to them would put it in
12    Sedgwick County or in the Wichita courthouse.  I think that's
13    how we got there originally.  So you've got -- and you've got
14    one plaintiff who's from Wichita, and the other plaintiffs are
15    from Oklahoma.
16            MS. PERRY:  Your Honor, plaintiffs -- Mr. Chalmers is
17    right, the case was initially filed by the pro se plaintiffs in
18    Wichita.  The plaintiffs have said that they would be fine with
19    Kansas City or Wichita, whatever the judge's preference is.
20            THE COURT:  Well, is it -- is it too late, in terms of
21    juries and -- I guess it's a month away.  Should we revisit
22    that?  I mean, it would be a lot cheaper for everybody to try
23    this case if it's in Kansas City and you don't have to stay in
24    a hotel.  Of course you can stay at their house I'm sure.  What
25    do you think?
```

1          MS. PERRY:  That would be plaintiffs' preference.

2          MS. BRETT:  Yes.

3          MS. PERRY:  More convenient for us and, frankly, our

4    witnesses too.

5          MR. CHALMERS:  I think it would be more convenient for

6    them.  I have sold my house in Wichita, so I can't claim it's

7    more convenient for me to be there anymore.  For my clients,

8    the two troopers, Kansas City is less convenient than Wichita

9    from that standpoint.

10         THE COURT:  Still it could be a good trade-off for

11   getting your motion for severance granted.  I mean, as a

12   practical matter, my experience is that people who live in

13   Wichita like an excuse to come to Kansas City and stay in a

14   hotel, and your -- your clients might be in that position.  If

15   there's -- I don't see any prejudice to them.  It seems to me

16   it's in the interest of judicial economy and economy of the

17   parties to move it.  So unless you have some strenuous

18   objection you think I should consider, like let's consider that

19   done.

20         MR. CHALMERS:  The objections I would have are no

21   different than what I've already articulated:  that is we would

22   prefer it to be in Wichita in Sedgwick County as close to where

23   my defendants are and where it was originally designated.  I

24   don't know if that's any different that's going to persuade you

25   in your mind to change it to Kansas City.

19-1343 Shaw et al v Jones et al  1.3.23                    39

 1          From a witness standpoint, I don't think that there's

 2   any advantage to being in Kansas City.  From the plaintiffs'

 3   standpoint, which is usually not a factor, it's a lot more

 4   sensical to be here.

 5          THE COURT:  So, I mean, one of the issues for me is

 6   really practical.  We had set this for 10 days and -- and I can

 7   see how it's -- splitting this into two trials will -- may --

 8   I'm sure it will go longer than three days for one and five

 9   days I think is, like, best case, but I wouldn't be shocked if

10   it runs over.  That will create a lot of problems for the court

11   if we're down in Wichita trying to do this in two separate

12   trials, so I'm moving the trial to Kansas City.  I'm being very

13   decisive today.

14          So let's talk about the motions *in limine*.

15          First of all, do we need to say anything else about

16   plaintiffs' or defendants' motion to sever or for separate

17   trials?

18          MS. BRETT:  No.  I -- so, Your Honor, just so I'm

19   clear, I believe you overruled as moot plaintiffs' motion to

20   exclude Christy Asbe.  Did you issue a ruling or are you

21   planning to issue a ruling today on defense motion regarding

22   plaintiffs' experts?

23          THE COURT:  That's what we're going to talk about

24   right now.

25          MS. BRETT:  You said motions *in limine*.  I wasn't

1    sure.  Thank you.

2           THE COURT:  So the first one has to do with Hassan

3    Aden.  Chief Aden, is that his title?

4           MR. HAUSS:  That's right, Your Honor.

5           THE COURT:  So, first of all, I think he's clearly

6    qualified under Rule 702(a).  That was defendant's first

7    argument was that he's not qualified to offer opinions.  I

8    think he is qualified by virtue of his long and distinguished

9    career in law enforcement.  I don't think it matters that he

10   hasn't had specific highway patrol experience in exactly the

11   circumstances that were present here, because knowledge of

12   national standards is relevant and his -- the information which

13   he possesses about police standards could be very helpful to

14   the jury.

15           I understand defendants' argument that he doesn't

16   have -- his specific background doesn't line up sufficiently

17   with the expertise necessary to express opinions in this case,

18   but I think that's something you need to bring out on vigorous

19   cross-examination, and it goes to the weight rather than the

20   admissibility of his opinion.

21           I also think -- so defendant argues that Aden is

22   usurping the role of the jury and the court with regard to

23   legal issues in the case.  This is a really fine line to draw,

24   and I think sometimes it gets down to just very technical

25   wordsmithing about the words of the -- that the expert actually

1    uses on the stand.  When it comes to that, I think the best way

2    to address it is to deal with contemporaneous objections in the

3    courtroom if you think he's crossing a line.

4          But a lot of defendant's argument was with regard to

5    whether Aden is qualified to show that Jones acted with

6    deliberate indifference and whether he failed to exercise

7    accountability and proper supervision.

8          So are those -- if we're not trying the injunctive

9    issues in these first two trials, will that even come up?

10         MR. HAUSS:  It's hard to see how Aden's testimony

11   specifically with regards to Jones or KHP policies and

12   practices directly connects the individual troopers here.  I

13   think, you know, there is stuff both Aden and Dr. Mummolo could

14   testify to that would support an inference by the jury that the

15   troopers targeted plaintiffs because of their out-of-state

16   residence or travel plans and just intentionally disregarded it

17   whether they had reasonable suspicion.  And so we think a lot

18   of -- you know, a lot of that testimony could come in for

19   purposes of punitive damages.

20         THE COURT:  But -- but the level of supervision or

21   deliberate indifference, all that would be irrelevant; right?

22         MR. HAUSS:  I think that's right, Your Honor.

23         THE COURT:  Yeah, okay.  So I would agree then with

24   defendant that any opinions on that would not be helpful to the

25   jury, and so they should stay out.

 1        So then there's argument about best practices versus
 2   standard police practices.
 3        MR. HAUSS:  Your Honor, I just want to make one
 4   addendum to that.  I think there was Aden's specific testimony
 5   with regards to Trooper McMillan and the insufficient
 6   discipline he received after the Bosire stop and after the
 7   finding that he violated Mr. Bosire's rights, and I think that
 8   in particular would be relevant to punitive damages because it
 9   would go to show the need for punitive damages to encourage
10   deterrence.
11        THE COURT:  I think that's further down the road.  I
12   think we're going to come to that.  But the opinion that I was
13   looking at was his opinion that lack of supervision and
14   accountability caused rank and file troopers to act with a
15   pattern and practice of disregarding the Constitution, so more
16   of a higher generalized finding.
17        So, again, this argument about we can't -- he can talk
18   about standard police practices but not quote/unquote best
19   practices because that would be confusing to the jury, again, I
20   think this is sort of a wordsmithing argument.  And if he
21   testifies that something is national standard practice and you
22   think it's merely a best practice, then I think that's
23   something we sort out at trial through cross-examination.
24        You look like you're ringing your hands as I say that.
25        MR. CHALMERS:  Well, the problem is from my

1    perspective, if we're talking about the testimony that would be

2    relevant to the individual troopers' claims, whatever -- the

3    only time national standards become relevant, as I understand

4    it in that context, are really when you're talking about

5    excessive force sort of claims, not when we're talking about

6    was there reasonable suspicion, was there probable cause, which

7    the Tenth Circuit said are issues for the court.

8              And so are we going to allow Mr. Aden to use a

9    different standard saying, well, okay, this is what -- and he's

10   never said these are national standards by the way.  I mean, I

11   look at his report and he says these are his idea of his best

12   practices, his experience, but he's not identified national

13   standards.

14             He certainly hasn't done what experts typically do

15   then when they are relying on national standards to show that

16   his estimate of what a national standard is is reliable, which

17   is identify where he found those standards if they're

18   published, as they would be if they're a national standard, how

19   they're published, where they're published, any of that.

20             I think what he's done, he's said here's my vision of

21   what the constitutional law is.  And in my opinion, based on

22   how I have sorted out the facts, which I think is really the

23   jury's function, it's unconstitutional.  So that's part of my

24   reluctance.

25             But I think where I was getting a little bit more

1    concerned was is when we now then talk about the claims against

2    Jones it's even less so.  We've -- he does not establish any

3    national standards as I find it in his report.

4         So I don't think he should be permitted now to offer

5    up new opinions or to suggest that these are national

6    standards, anything other than his statement these are best

7    practices, which the Tenth Circuit says that doesn't establish

8    a violation of Constitution.  That's not relevant to whether

9    there's a violation of Constitution under any standard.  So

10   that's why I felt that that's where his testimony should be

11   excluded.

12        THE COURT:  Well, I mean, I thought what your argument

13   had to do with was documenting canine searches.  I thought that

14   was your only real complaint about that.

15        MR. CHALMERS:  No, no, that's the only place where he

16   does say something that he contends is a national standard.  He

17   says, look, I've got this publication that talks about

18   documenting canines.  It's not searches.  It's when there's a

19   canine bite.  But that's giving him the benefit of the doubt.

20   He says a national standard based on a document that doesn't

21   establish it's a national standard.  That's the only one.

22        The rest of them are all based on his "here's what I

23   think is my idea of best practices, this is how supervision

24   should be lined up, here's how we ought to punish people in the

25   event that -- in the event that there's a finding that they

 1    have somehow breached policy.  Those are all his ideas of best

 2    practices, which may or may not be good ideas.  They're not a

 3    constitutional standard, that's what I was objecting to.

 4         And to interject that testimony, the Tenth Circuit has

 5    said that that's not permissible, in part because I think it's

 6    confusing to the jury, which wouldn't be, I think, a concern if

 7    we're not presenting to a jury, but in part because it's simply

 8    not relevant.  It misstates what the proper standards are.

 9         THE COURT:  So is this something that you are planning

10    to get into?

11         MR. HAUSS:  I think from our perspective, Chief Aden

12    is talking about nationally accepted standards.  I recognize

13    those are not the exact words he used in his report, and I

14    don't think we would submit his testimony for him to say in

15    court these are the best practices.  In court we would be

16    talking about the nationally accepted standards.

17         Of course, I think this would have come out in a

18    deposition of Chief Aden if one were conducted, but there

19    wasn't one.  I really do think the report was intended to

20    convey what from his experience -- his wide experience with

21    nationally accepted standards what those standards are and how

22    they fell short in this case.

23         THE COURT:  And so but my question is what national

24    standards would be involved in a trial on the individual Fourth

25    Amendment claims?

```
 1          MR. HAUSS:  So I think in particular, you know, there
 2   are -- there are standards for when these detentions can be
 3   conducted.  And so in Chief Aden's report he goes through each
 4   of the stops and he goes through the factors that the troopers
 5   identified as suspicion, and he says these are, in fact, things
 6   that police officers encounter every day.  And so if you look
 7   at all of the things for which the troopers have identified --
 8   or the undisputed facts identified something suspicious,
 9   nothing in my experience tells me that those have traditionally
10   been regarded as something suspicious.
11          He also talks about the lack of documentation that
12   allows troopers to kind of identify suspicion factors post hoc,
13   and that creates problems like the ones I think we're seeing
14   here.
15          THE COURT:  Right.
16          MR. HAUSS:  And so I think those are the kinds of
17   things he would really be getting into.
18          THE COURT:  And I think that's a very proper subject
19   of testimony.  So I'm not going to let him invade the province
20   of the jury.  He certainly is not going to invade my province
21   on injunctive relief or any other issues that are resolved --
22   reserved for the court.
23          I think if your objection is to the form of his expert
24   report, what you're really saying is -- first you said he
25   didn't have requisite expertise.  Then you said even if he did
```

1   have the expertise, he didn't write down what was the source of

2   his opinion that these were best practices, and he wasn't

3   required to.  I think that goes to the form of his report, and

4   you can cross-examine him about the basis for that.  So I don't

5   think that that's a sufficient objection under *Daubert*.

6            MR. CHALMERS:  I've always thought of that as part of

7   the reliability test; that he needs to establish what

8   methodology or reasoning he has and the court takes a look at

9   that to sort out whether or not that is essentially reliable.

10           And so I -- the cases -- this *Rodella* case that we

11   both cite out of New Mexico, another New Mexico case, both

12   emphasize the idea of, look, if you're going to come in as a

13   police expert and you're going to testify to something that is

14   a national standard, which in some settings can be admissible

15   because it might help the jury on the issue of -- of -- the

16   reason they allowed that in was to allow the jury on the issue

17   of -- of deliberate indifference.

18           I guess sometimes they allow standards in on whether

19   or not there's been reasonable conduct, for instance, in the

20   excessive force cases, which I see as a different issue, where

21   you might say, okay, you use a choke hold or you do something

22   that is a different sort of technique in terms of the force you

23   use.

24           But when you're calculating whether or not there is

25   reasonable suspicion, it is not a national standards sort of

1    question.  It is whether or not a common sense -- the facts --

2    the historical facts that are found by the fact finder in

3    addition with the "here are the troopers' experiences and

4    training" would lead the objective reasonable trooper to

5    conclude that there's reasonable suspicion, which is ultimately

6    what the court has to decide.  Within that there's --

7            THE COURT:  I disagree that that's for me to decide in

8    the context of this civil case, but go ahead.

9            MR. CHALMERS:  Okay, well, or for the jury decide in

10   which case --

11           THE COURT:  But so here's the problem?  This is always

12   how it plays out.  You get these officers up there and they act

13   like they're bulletproof because you -- you don't know what

14   it's like to be a officer on the street, you don't know what

15   it's like to pull over a -- a driver who might be dangerous or

16   might be carrying drugs, and we officers, we have special

17   expertise and intuition that nobody else except for us really

18   gets, and that's really -- it's not fair to let them do that

19   without a countervailing point of view coming from the same

20   perspective.

21           MR. CHALMERS:  Okay.  I don't anticipate that's what

22   the testimony from these officers --

23           THE COURT:  Well, that's how they play it.  I mean,

24   I've seen so many of these cases, and maybe -- maybe they won't

25   do it in this case, but, you know, I've read all their reports

```
 1    about the basis for their stop and prolonging the stop and so
 2    forth and they will rely on their expertise and experience
 3    dealing with these stops, and I think it's fair for people who
 4    have objective information about how policing works to also
 5    state an opinion.  I mean, otherwise you're kind of just
 6    forcing the jury to take your clients' objective that -- stated
 7    intentions at face value.
 8              MR. CHALMERS:  I hear what you're saying and --
 9              THE COURT:  I know you disagree.
10              MR. CHALMERS:  -- I don't agree.
11              THE COURT:  I'm going to let Aden testify about
12    accepted police practices.  And I think by definition we're not
13    dealing with -- I mean, we're dealing with national standards.
14    There's no localized standards at issue here, are there, other
15    than being close to Colorado?
16              MR. CHALMERS:  No, I think the localized issues is it
17    would have to do with a traffic stop on an interstate highway
18    that happens to be in Kansas and the experience that the
19    troopers have in that area.  But, you know, I don't -- I don't
20    think that's a national standards question.
21              THE COURT:  Right.
22              MR. CHALMERS:  But I -- I always tell myself don't
23    argue -- whether I'm winning or losing continue to argue.  But
24    I don't know what testimony Mr. Aden can offer that's in his
25    opinions expressed in his report.  We're kind of talking about
```

 1   hypothetically what he might have done had I taken his

 2   deposition.  Of course I wasn't obligated to; that's the

 3   purpose of the disclosure.

 4           THE COURT:  Right.

 5           MR. CHALMERS:  So I got what's in his report where he

 6   is doing either your job or the jury's job, and that is he's

 7   deciding facts and then saying this violates the constitutional

 8   standard.  That's --

 9           THE COURT:  That's not what he will be saying, because

10   I won't let him say that.

11           MR. CHALMERS:  But that's what -- that's the only

12   opinion he's offered, and that's the one I sought to exclude.

13   So now they're saying we'd like to offer a little different

14   opinion, whatever that might be.

15           THE COURT:  I think what I heard him say is they -- he

16   wants him to talk about national standards in conducting stops,

17   forming reasonable suspicion, evaluating that kind of evidence

18   in the moment.

19           MR. HAUSS:  That's absolutely right, Your Honor.

20           MR. CHALMERS:  He might.  It's not in his report.

21   It's not part of the opinion.

22           THE COURT:  Well, I am going to limit his opinion to

23   -- or his testimony to what was in his report, but I thought he

24   went through each of the stops and expressed --

25           MR. HAUSS:  He did.

1        THE COURT:  Mr. Chalmers, you have taken an extremely

2   crabbed reading of his report, and I think a fair reading is

3   what I'm required to give it.

4        MR. HAUSS:  The relevant passages, Your Honor, are on

5   pages 7 and 9 of doctor -- of Chief Aden's report.

6        THE COURT:  I assume you don't have any objection if I

7   limit him to what he put forth in his report, and that's pretty

8   much Hornbook law; right?

9        MR. HAUSS:  That's right, Your Honor.  I think he's

10   not limited to the specific words he used in his report.

11        THE COURT:  Right.

12        MR. HAUSS:  He can't opine outside of the topics

13   discussed.

14        THE COURT:  Right.  For example, the factors listed by

15   Trooper Schulte are not factors that a reasonable officer would

16   rely on to develop reasonable articulable suspicion for an

17   extended detention.

18        MR. CHALMERS:  Isn't that expressing what the

19   constitutional standard is?  Maybe I am being too -- obviously

20   that's the way I read that.

21        THE COURT:  I mean, just because something is in the

22   report doesn't mean he gets to say it.  But the stuff that's

23   admissible that's in the report comes in even though there's

24   improper opinions -- legal opinions mixed in there.  So if you

25   think he's crossing the line in court, then you'll need to make

 1    a contemporaneous objection.

 2           MR. CHALMERS:  Okay.

 3           THE COURT:  But I'm usually pretty much on top of that

 4    too, and we'll try and cut off the expert if I think he or she

 5    is going too far.

 6           Is there anything else we need say about Aden?  There

 7    were some opinions he had about effective training, policies

 8    addressing stops and searches and seizures, the unity command

 9    structure of the KHP, failing to hold troopers accountable.  I

10    don't know that any of that would be relevant.

11           MR. HAUSS:  Well, I think the failing to hold troopers

12    accountable in particular would be relevant to the punitive

13    damages claim because it -- it would go towards the need for

14    punitive damages as a deterrent mechanism because KHP is not

15    exercising its own supervisory responsibilities.

16           THE COURT:  Do you have any problem with that?

17           MR. CHALMERS:  I have a different vision as to what

18    punitive damages -- what evidence would be relevant for that.

19    The deterrence deals with the defendant.

20           THE COURT:  It's two -- it's right in the jury

21    instructions "to deter defendant and others" --

22           MR. CHALMERS:  "Similarly situated."

23           THE COURT:  -- "from engaging in similar conduct."

24           MR. CHALMERS:  Yeah.  I -- so we are going to allow

25    evidence then of what Jones allegedly did or didn't do to

1    respond to this officer to show how the officer or similarly

2    situated troopers should be deterred?  I don't -- I don't think

3    that's a fair connection.

4         THE COURT:  Well, what do you think would be fair?

5         MR. CHALMERS:  Well, I don't -- I have a hard time

6    understanding how a response by the KHP or a non-response by

7    the KHP to Officer McMillan has any relevance.  But it

8    certainly wouldn't have relevance to the question of punitive

9    damages to a trooper or similarly situated troopers, if you

10   will.

11        THE COURT:  I mean, that's -- that's probably a good

12   point.  I mean, it's not up to the individual -- the punitive

13   damages should be based on the conduct of the individual

14   defendant, and that -- and I guess if defendant was coming in

15   and saying don't assess punitive damages against me because the

16   KHP can take care of this issue in-house, then you could come

17   back in reply and say, well, it's not doing that.  But I don't

18   see punitive damages as a kind of a proxy for in-house

19   discipline by the KHP.

20        MR. HAUSS:  Well, Your Honor, I think we agree that,

21   in order to establish liability for punitive damages, we need

22   to show that the individual officer knowingly or recklessly

23   violated our client 's constitutional rights.  But in setting

24   the amount of punitive damages, we maintain that the jury can

25   consider the need for deterrence, and that the evidence of the

```
 1   lack of sufficient alternative to deterrence mechanisms would
 2   help them figure out what an appropriate punitive damages award
 3   would be.
 4           THE COURT:  But the -- the individual officer doesn't
 5   really have any control over the disciplinary policies.  I
 6   mean, why would you be punishing him?
 7           MS. BRETT:  Perhaps -- if I could jump in here.
 8   Perhaps a good example of this is in Mr. Bosire's stop with
 9   Trooper McMillan where the testimony that he gave during his
10   deposition was that he learned nothing from the disciplinary
11   process and it hasn't changed his behavior at all.  So showing
12   what the insufficiency of the disciplinary process were at
13   large and specifically in that case where Mr. McMillan received
14   essentially what amounted to a slap on the wrist we think is
15   appropriate information for the jury to consider in determining
16   what amount would have a deterrent value that's contemplated.
17           THE COURT:  So I understand that.  But I thought what
18   we were talking about was having Aden come in and testify -- so
19   having an expert come in and testify that KHP does not hold
20   troopers accountable for policies and laws which pertain to
21   searches and seizures.  I mean, I think that's a different kind
22   of way of getting at that point.
23           MS. BRETT:  Sure.  It's a -- it's another piece of
24   information in that puzzle in answering that question.  And I
25   think -- I think our position was that those various pieces of
```

1    information are all proper for the jury to consider.  And they

2    may give different weight to different pieces of it, but --

3    because it considers the deterrent value on officers as a

4    whole, but it's an appropriate piece of information for the

5    jury to consider in deciding the amount.

6            THE COURT:  So I'll continue to think about this, but

7    I doubt I will let Aden come in and testify about that, and it

8    has more to do with I think maybe there's slight relevance but

9    not enough to be outweighed -- not enough to outweigh the

10   dangers under Rule 403 under undue prejudice, undue delay,

11   undue expense.  Because really the accountability for failure

12   to supervise and discipline the troopers is with Jones.  It's

13   not on the individual troopers to be punished for Jones'

14   failure to discipline them.  That's kind of an awkward way of

15   saying it, but do you know what I mean?

16           MR. HAUSS:  I understand, Your Honor.

17           MS. PERRY:  The only thing I would add, Your Honor, is

18   Jones himself is someone who would need to be deterred from

19   continuing this practice -- training on this practice, so to

20   that extent --

21           THE COURT:  Right, but the punitive damages in these

22   cases are to deter these particular officers from continuing to

23   engage in unnecessarily prolonging the roadside stops, which

24   Jones doesn't do, and taking into account information about

25   residence in a way that is not allowed, which Jones doesn't do

 1    either.  So if we want to deter Jones from doing something,

 2    then you should have brought a personal capacity suit and

 3    sought punitive damages against him.  So I think that it's kind

 4    of a red herring about trying to send a message to Jones by

 5    putting punitive damages on these officers individually.  So --

 6    so Aden is not going to testify about that.

 7              Okay.  Is that all on Aden?

 8              MR. HAUSS:  I think so, Your Honor.

 9              THE COURT:  Okay.  Then Mr. Mummolo.  This is pretty

10    interesting methodology.  And I know you didn't take his

11    deposition, Mr. Chalmers, so you're kind of handicapped in

12    showing that his methodology is not acceptable under the

13    standards that would apply in the field of statical evidence

14    and, you know, reconstructing these models, but on the face of

15    it it seems reliable enough to me to pass the smell test, and

16    it doesn't scream junk science in any way that I think is

17    significant under *Daubert*.  So I'm inclined to let it in.

18              You -- you take a lot of issue with many of his

19    conclusions and with part of the methodology, but since you

20    don't have your own expert to tell me that this methodology is

21    not reasonably acceptable in the field, I don't have any reason

22    to think it's not.  So to me your issues are ones that we need

23    flesh out on cross-examination.

24              I've been through the report in detail.  I've been

25    through your briefs in detail.  I don't know that you can

1    convince me otherwise, but if you want to make one last stab at

2    it, here's your chance.

3          MR. CHALMERS:  I think I've told you I've learned long

4    ago not to try to argue once a decision has been made, and I

5    think one has been made.

6          I -- I am questioning whether the professor's statical

7    analysis has any relevance, and I would probably include that

8    in a motion *in limine* if the court wants to have that briefed,

9    but has any relevance to the individual claims where (A) his

10   statistics don't answer whether or not there's reasonable

11   suspicion.  They're, I guess, an attempt to try to make a

12   Eleventh Amendment sort of claim really at best, but -- not

13   Eleventh Amendment -- sorry long day -- equal protection claim

14   of selective prosecution.

15         But I don't see how their evidence then -- or his

16   evidence or his statistics would have any relevance to whether

17   there's reasonable suspicion or not emphasizing the *Whren* case,

18   which held the subjective intentions of the officers even if

19   they singled out people from Colorado, okay, I'm going to pull

20   them over, is not the measurement as to whether there's

21   reasonable suspicion or not.  So I didn't think that for any of

22   the cases I looked at that I was required to have an expert to

23   challenge the methodology.  But if you find it reliable, it is,

24   and then --

25         THE COURT:  I was --

1          MR. CHALMERS:  -- the question is whether it's

2    admissible.

3          THE COURT:  I haven't found that it's reliable.  You

4    haven't shown that it's unreliable.

5          MR. CHALMERS:  I always thought -- I interrupted; I

6    apologize.  I always thought that the burden of proof was on

7    the proponent of the expert testimony which would have required

8    them to show that this was a -- a reliable methodology.  That

9    was the approach I was taking.

10         THE COURT:  Well, I mean, like I said, I read the

11   report.  It seemed reliable enough to pass that hurdle unless

12   you had some.

13         MR. CHALMERS:  Nothing to add further briefing, no.

14         THE COURT:  So is this something that you really -- I

15   mean, are you going to pay to bring this guy in for two

16   individual traffic stops?  What would he have to add?

17         MR. HAUSS:  Yes, I do think we would pay to bring him

18   in for these cases.  And what I think he adds is for one thing

19   he shows that there is widespread targeting of out-of-state

20   drivers by the KHP, and that provides a possible motive for the

21   individual officers to have -- not just stop but engage the

22   plaintiffs in this case in prolonged detentions, and that goes

23   both to their credibility on the fact disputes that are still

24   at issue here and it goes to the punitive damages whether they

25   intentionally violated the plaintiffs' rights because they had

1    out-of-state travel origins or destinations, whether they were

2    part of this pattern that Mummolo has identified through his

3    testimony.  So we think it's probative both on the credibility

4    of the officers by providing this reason why they would have

5    targeted the plaintiffs and on the punitive damages.

6              THE COURT:  And response?

7              MR. CHALMERS:  Well, I'm not sure how widespread

8    practices statically shown by a variety of officers, if that's

9    what -- really is what this shows is necessary evidence of the

10   credibility as to these individual officers and how they are

11   conducting their traffic stops.

12             And then on the punitive damage issue, again I think

13   we're looking at trying to punish Jones and not punishing the

14   two individual officers if that's what the evidence would be

15   presented.

16             MR. HAUSS:  With respect to the second point, the

17   punitive damages issue, we maintain it's relevant because it

18   shows or intends to show that the officers detained the

19   plaintiffs knowing -- recklessly disregarding that they lacked

20   reasonable suspicion.  So it wouldn't be for a deterrence

21   purpose solely, it would also be for establishing the necessary

22   *mens rea* on the part of the officers.

23             THE COURT:  Okay.  I mean, that I think you've

24   articulated colorable grounds for allowing his testimony.  Part

25   of this is going to depend on what the officers actually say

1    when they testify, and so we may have some fine-tuning of what

2    his testimony is allowed to be and the extent to which the

3    officers inject issues of personal credibility based on their

4    testimony.

5           But for now I'm -- I think Mummolo's report passes

6    muster under *Daubert*, and vigorous cross-examination is the way

7    to get at any of the problems in this analysis or specific

8    conclusions that the parties may disagree with.

9           Okay.  Is that all on him?  Anything to take up with

10   regard to witnesses?  I think that's all of the experts.

11          MR. CHALMERS:  I think that covers the waterfront of

12   what we have on our agenda for this afternoon, Your Honor.

13          THE COURT:  Well, not mine.

14          MR. CHALMERS:  Okay.

15          THE COURT:  So I saw in a footnote that somebody has

16   settled -- or one of the Shaw plaintiffs, Samuel Shaw.

17          MS. BRETT:  Samuel Shaw.  We reached a settlement in

18   principal on his claim.  He was the passenger in the stop of

19   the Shaw brothers.  We've exchanged drafts now at this point.

20   Since the filing with that footnote, we've exchanged drafts of

21   -- of potential settlement language but have not spoken and

22   reached agreement yet.

23          MR. CHALMERS:  So it doesn't blind-side, Your Honor,

24   the fiscal rules for the state are hard for me to get my arms

25   around.  If we were to settle without a consent decree that

```
 1   enters a judgment for a certain amount, then we need to get
 2   approval from the finance counsel post Gunner (ph) and so
 3   forth, which won't meet probably until after the trial.
 4        And so apparently what we can do is we can offer a
 5   consent order, which we've now exchanged drafts on, present it
 6   to you.  And if you're willing to enter in -- or, rather, enter
 7   judgment based on the settlement consent judgment, I know
 8   that's a hybrid -- hybrid deal, then the state can just go
 9   ahead and cut the check without the finance --
10        THE COURT:  What is the -- what are the terms of the
11   settlement and what would be in the consent decree?
12        MR. CHALMERS:  Just a straight up payment of a certain
13   sum of money.
14        THE COURT:  What is the certain sum of money?
15        MR. CHALMERS:  20 grand --
16        MS. BRETT:  20,000.
17        MR. CHALMERS:  -- in exchange for traditional release
18   language we don't admit liability, settles the court claims,
19   all those sorts of things.
20        THE COURT:  And no continuing supervision or
21   jurisdiction by the court?
22        MR. CHALMERS:  No, no.
23        THE COURT:  No injunctions, no nothing?
24        MS. BRETT:  It does -- yeah, that's correct.  It does
25   not settle Sam Shaw's claim for injunctive relief against
```

 1    Jones.  It is only settling his damages claim against Schulte.

 2            THE COURT:  Okay.

 3            MS. BRETT:  Just to clarify.

 4            MR. CHALMERS:  So that's the -- and they sent me

 5    language I think.

 6            MS. BRETT:  Making that explicit.

 7            MR. CHALMERS:  Yeah, I know but I don't know what the

 8    language is.  I got it the other day.  I looked at it and I'm

 9    going to get back to that.

10            THE COURT:  And why do you care -- why do you care

11    about that?

12            MS. PERRY:  About not waiving the injunctive relief

13    claim?

14            THE COURT:  Uh-huh.

15            MS. PERRY:  Because Mr. Shaw feels that's important to

16    move forward with that claim out of principal.  He has medical

17    reasons for settling the damages claim now, but he feels it's

18    important to continue with the injunctive relief claim.

19            THE COURT:  Okay.  Well, so the reason I brought this

20    up is, I mean, trial's in 30 days.  And I know that there are

21    sometimes problems dealing with the State of Kansas getting

22    them to shake loose the money from their coffers, and so make

23    sure -- and I'm not aware of this settlement or consent

24    judgment procedure.  I haven't run into that before.  So...

25            MR. CHALMERS:  I've -- my deputy notified me that was

```
 1    an option and we've done it, and so assured me it can be done.
 2    And so it's just a matter of, once there's a judgment entered,
 3    then we have the authority with the copy of the order.  We send
 4    it to the whoever cuts the checks and off it goes.
 5              THE COURT:  Okay.  So but just so we're all very
 6    clear, if -- if something about that falls through the cracks,
 7    we won't be, like, delaying the trial or anything like that to
 8    accommodate a settlement for him or anybody else if there are
 9    any other settlements.
10              MR. CHALMERS:  I understand.
11              MS. PERRY:  Understood.
12              THE COURT:  And that brings me to another question.
13    Have you all been to mediation or anything like that?
14              MR. CHALMERS:  We mediated at the outset of the case,
15    Your Honor, and then after that -- what I mean by "outset of
16    the case," probably, if I'm remembering correctly, the only
17    depositions that had been taken were of the plaintiffs.
18              MS. BRETT:  I think one plaintiff had been taken.  I
19    think it was October of 2020 mediation took place.
20              MR. CHALMERS:  That took place before a magistrate.
21    Was unsuccessful.  After Tenth Circuit appeal, the plaintiffs
22    inquired about settlement, and I said I don't really think
23    mediation is very workable from my end, in part for the reason
24    I just described, that is the state is a tough cat to herd.
25    But I said, "Make an offer."  They did.  They responded.  We
```

```
1    were able to get one out three settlements we exchanged back
2    and forth.  That's where we are on settlement.
3              THE COURT:  Are you still talking about the other
4    parties?
5              MR. CHALMERS:  Well, I think I made the last offer,
6    but I don't think -- I don't think there's fertile ground for
7    settlement.  I think the parties' evaluation of it is so
8    disparate that we're not going to be able to reach one.
9              THE COURT:  Some place recently -- so in the pretrial
10   order, interestingly enough on page 46, it talks about the
11   damage awards or damage claims, and, frankly, I was surprised
12   how low they are.  So when you -- are you saying that they were
13   demanding more than their damage claims --
14             MR. CHALMERS:  Yes because we've got --
15             THE COURT:  -- in terms of the settlement?
16             MR. CHALMERS:  -- attorney's fees issues.
17             THE COURT:  Oh, right.
18             MS. PERRY:  And punitive damages.
19             THE COURT:  Well, the punitive damages you're capped
20   at $50,000 a piece.  I mean, that's -- when -- when I saw
21   plaintiffs' damage claims, I thought, "Why isn't this case
22   settling?"  And I hope you guys will take another look at that
23   question, especially in light of our conversation today,
24   because I think you guys have a really strong case on the
25   individual claims and I think you have a really weak case --
```

```
 1    maybe more than weak on the injunctive relief claims.  And if
 2    that feedback -- and -- and I also think your damage claims are
 3    low, especially on punitive damages.
 4           So that's just an armchair reaction.  And maybe if you
 5    communicate with your clients about whether you want to try to
 6    resolve the issues, you know, between the additional parties --
 7    you know, we're getting really close to trial and I realize
 8    that we may be too close to trial for an appropriate settlement
 9    given the attorney's fees because you've already invested a lot
10    on both sides, but is it -- is it worth taking one more stab?
11    You have to do it fast.
12           MR. CHALMERS:  I don't know, as a practical matter,
13    how I'd be able to do it.  I mean, that's putting my cards on
14    the table, but I also don't think that my evaluation is going
15    to be in line with theirs.
16           THE COURT:  On the attorney's fees thing?
17           MR. CHALMERS:  Well, in part.  I mean, one of the --
18    one of the factors in there is we made an offer of judgment
19    early on, and so there's a question as to whether or not you
20    can get attorney's fees in part.  Then you've got attorney's
21    fees in my judgment being mostly incurred as related to the
22    injunctive relief, and I don't think we're ever going to reach
23    an agreement as to what a reasonable attorney fee would be.
24           THE COURT:  What was your offer of judgment?  I don't
25    know if I even knew about that at the time.
```

1        MR. CHALMERS:  Well, I don't -- I think the way the

2   procedure is we don't tell you the amount, right, when we file

3   it.  I have to look back.  I think it was 10 grand for Shaw's.

4        MS. PERRY:  That is just for Sam Shaw and Blaine Shaw.

5   So Sam Shaw is now almost settled.  So there's a $10,000 offer

6   of judgment for Blaine Shaw's claim.  There's no offer of

7   judgment for Bosire's claim.

8        THE COURT:  So how is that a factor?  Just is it

9   mentally you feel like it would be a process --

10        MR. CHALMERS:  Because under the offer of judgment

11   statute, in the event that they do not get an actual damages

12   award equal to essentially the 10,000, includes cost incurred

13   to date, then they don't get costs thereafter which includes

14   attorney's fees.

15        THE COURT:  But that's only as to one plaintiff.

16        MR. CHALMERS:  That's as to one plaintiff, yes.  No,

17   I --

18        THE COURT:  Really you're entitled to roll the dice,

19   so, I mean, that's your call.  I'm just surprised --

20        MR. CHALMERS:  But it's just one factor as to -- I had

21   looked at these trying to settle the case separately so -- or

22   each case separately.

23        THE COURT:  Okay.  But you're saying you're not in a

24   position to do ADR or mediation or anything, it's too close to

25   trial or you think it's futile or what's the --

1      MR. CHALMERS:  I think it's futile.  I don't think --
2 I think our evaluations are -- and then the practical problem
3 of being too close to trial.  Without boring you in detail --
4 I've got a new AG.  I don't know what his position will be.
5 And then the prospects of potentially going through finance
6 counsel where the counsel may meet in January but probably
7 won't.  And then once the legislation -- legislative session
8 begins, sometimes they push off their next meeting until way
9 down the line.  So I don't know -- in the traditional sense, I
10 would not be able to get settlement.
11      THE COURT:  Is this -- on this consent judgment
12 procedure, is there a cap for --
13      MR. CHALMERS:  Not that I'm aware of.  I think that
14 would go to the AG's judgment.
15      THE COURT:  Okay.  Well, given what you say, I'm not
16 going to order that you all go back to mediation or ADR, but I
17 do think that it's incumbent on both sides to communicate with
18 your parties -- with your clients obviously about what we've
19 talked about here today.  And I think that you should have,
20 after that communication, dust off the last offer that you made
21 to the other side -- and here I'm looking at you all -- make
22 one last final settlement proposal that would dispose of all
23 claims by all parties.  And send that to Mr. Chalmers by Friday
24 at five o'clock.
25      MS. PERRY:  Happy to do that, Your Honor.  In full

1  disclosure, this case is -- is very important our clients

2  beyond the monetary value, and so a -- I don't echo

3  Mr. Chalmers' comments about this being futile, but I am

4  concerned with whether or not there's a final push that's going

5  to be workable for both sides.

6          THE COURT:  Okay.  I mean, that's fine.  Like I said,

7  I think it will be an interesting trial and I personally think

8  that it would be help -- we don't have newspaper coverage of

9  trials anymore, so I don't know the extent to which.

10          MS. BRETT:  I don't know.  They show up.

11          THE COURT:  Unless it involves Roger Golubski, pretty

12  much everything else is just a sideshow.  But, you know, I

13  think it -- this would be an important case, in terms of public

14  interest in policing procedures and that kind of thing.  So I'm

15  not trying to urge you to settle just to strong arm a

16  settlement and especially since we can do it in Kansas City

17  now.  So, all right, I think that was all that -- so that is

18  all I have to say.  Anything else for the good of the order?

19          MS. BRETT:  I don't think so, Your Honor.  Thank you

20  for your time today.

21          MR. HAUSS:  Thank you, Your Honor.

22          THE COURT:  Thank you thank you.  It's been really

23  helpful to feel me to kind of get a better sense of where we're

24  going.  And I assume that the Shaw case would go first since

25  it's the lowest case number.  This is the oldest case on my

1    entire docket, so Mr. Shaw's case is --

2         MS. BRETT:  I think that -- sorry, we were just

3    conferring about which case would go first.  I think we need to

4    check with our clients and see if there's a preference between

5    them based on schedule, but I think the Shaws going first would

6    probably be fine.

7         THE COURT:  Okay.  Well, let's get that settled very

8    quickly because that could affect witnesses and subpoenas and

9    things like that.  So can you figure that out by the close of

10   business tomorrow?

11        MS. BRETT:  Yes.

12        MS. PERRY:  Would you like us to let the court know or

13   just Mr. Chalmers?

14        THE COURT:  Yes, both, and just an e-mail is fine.

15        MR. CHALMERS:  Just as kind of a procedural thing, I

16   don't know we have rule final Rule 26 disclosures.  I'm

17   assuming that we'll want to do separate disclosures for each of

18   the three cases then.  Is that -- so we'll --

19        MS. PERRY:  Ours will likely overlap.

20        MS. BRETT:  Yeah.

21        MS. PERRY:  So.

22        THE COURT:  Each of the three cases you're including

23   the injunctive relief?

24        MR. CHALMERS:  Well, I was.

25        THE COURT:  I mean, I don't see any reason to do --

1           MR. CHALMERS:  Okay.  Just for the two.

2           THE COURT:  -- witness disclosures on them unless

3    after next Tuesday I say, yes, that injunctive relief claim

4    goes forward.  So I -- that was one of the reasons I --

5    normally I don't -- I'm not quite so bold in forecasting what I

6    think any future rulings will be before we get things

7    completely briefed and teed up in an appropriate way.  But you

8    guys are so close to trial and I think you need to be focusing

9    on the things that will get you the most bang for the buck, you

10   know, at this point and not be chasing down a whole bunch of

11   evidence on practice and policies and customs and, you know,

12   all the other issues which were necessarily relevant more

13   specifically only to injunctive relief.  So...

14          MS. PERRY:  Your Honor, one question I have on the two

15   damages claims, the Shaw and Bosire, are you envisioning one of

16   them starting on 2-6 and the other one starting the following

17   Monday?

18          THE COURT:  I would say one starts the day after --

19   you know, maybe we empanel -- we could considering impanel both

20   juries at the same time and we could have -- as soon as the

21   first jury starts to deliberate, we could start the evidence in

22   the other case.  Kind of depends on how many actual trial days

23   and how crunched we're going to be for time.  So maybe you all

24   can think about that and we'll talk about that on the 9th.

25   Okay.  Thank you all.

19-1343 Shaw et al v Jones et al  1.3.23

```
 1          MR. CHALMERS:  I've got my deadline is January 8th.

 2   What was your deadline?

 3          THE COURT:  7th.

 4          MS. BRETT:  7th.

 5       (Proceedings adjourned.)

 6

 7

 8                     CERTIFICATE

 9       I certify that the foregoing is a true and correct

10   transcript from the stenographically reported proceedings in

11   the above-entitled matter.

12       DATE:  January 4, 2023

13                     /s/Kimberly R. Greiner

14                     KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                       United States Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```