**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| BLAINE FRANKLIN SHAW, *et al.*, | |
| *Plaintiffs*, | |
| v. | **Case No. 19-1343-KHV-GEB** |
| HERMAN JONES in his official capacity as the Superintendent of the Kansas Highway Patrol, *et al.*, | |
| *Defendants*. | |

| | |
|---|---|
| MARK ERICH, *et al.*, | |
| *Plaintiffs,* | |
| v. | |
| HERMAN JONES, *KHP Superintendent,* | **Case No. 20-1067-KHV-GEB** |
| *Defendant.* | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a lawsuit brought under 42 U.S.C. § 1983 against Colonel Herman Jones in his official capacity as Superintendent of the Kansas Highway Patrol,  alleging an ongoing practice of violating drivers' rights to be free from roadside detentions absent reasonable articulable suspicion, pursuant to the Fourth Amendment.[1] Plaintiffs are five drivers and passengers—Blaine Shaw, Samuel Shaw, Joshua Bosire, Mark Erich, and Shawna Maloney—who were stopped and detained

---

[1] Pretrial Order, Doc. #290.

by Kansas Highway Patrol (KHP) troopers on I-70 while traveling to or from Colorado.[2] Each Plaintiff alleged that Col. Jones, as the head of the KHP, maintains a practice of detaining drivers for canine sniffs based in part on their state of origin and/or destination, in violation of Tenth Circuit law.[3] More specifically, Plaintiffs alleged that in deciding to detain a driver for a canine sniff, KHP troopers place an impermissible amount of weight on the fact that drivers are traveling to or from states that have legalized cannabis (medicinally or recreationally), in violation of the Tenth Circuit's holding in *Vasquez v. Lewis*.[4]

The Court held a two-week-long bench trial on Plaintiffs' consolidated claims against Col. Jones, beginning May 1, 2023. Prior to the start of the trial, the parties stipulated that evidence and testimony presented to the jury during the trials of Plaintiffs Blaine Shaw and Joshua Bosire's claims against the troopers involved in their respective stops, as well as the jury verdicts themselves, would be a part of the record in the case against Col. Jones.

---

[2] On November 10, 2020, *Erich et al v. Jones*, Case No. 20-1067 ("the *Erich/Maloney* Case") was consolidated with this action, Case No. 6:19-cv-01343 ("the Main Case"), for purposes of discovery and trial. Doc. #84 at 2. The *Erich/Maloney* Case followed on the Main Case and its complaint joined Count I of the Main Case. (*See Erich*, No. 20-1067, Doc. #1-3 ¶ 56.) Unless otherwise noted, "Plaintiffs" in this brief refers to all named Plaintiffs—Blaine and Samuel Shaw, Joshua Bosire, Mark Erich and Shawna Maloney—in the consolidated cases, and citations are to the Main Case docket. This lawsuit was originally filed as a class action with the Shaws and Bosire as proposed class representatives on behalf of persons travelling who were actually or appeared to be driving to or from Colorado in a vehicle with license plates from a state other than Kansas, and who were stopped, detained by the KHP and subjected to searches of their vehicles or persons by a canine but not subsequently convicted of a crime as a result of the stop, detainment, arrest, or search. Doc. #7, ¶ 99. The Shaw and Bosire claims were jointly filed because of these class allegations. On June 16, 2021, after a stipulation by the KHP Superintendent that "any equitable relief obtained by the Named Plaintiffs . . . would inure to the benefit of the putative class members without certification of a class," this Court held that the KHP Superintendent's agreement rendered the need for class certification moot and overruled the motion for class certification, as such. Doc. #185.

[3] Plaintiffs Blaine and Samuel Shaw also brought damages claims against Trooper Douglas Schulte, the KHP trooper who stopped and detained them. Plaintiff Joshua Bosire also brought claim for damages against Trooper Brandon McMillan, who stopped and detained him. Samuel Shaw settled his damages claim against Trooper Schulte prior to trial. Doc #366. Blaine Shaw and Joshua Bosire's claims for damages were resolved through jury trials in February and April 2023, respectively. Both trials resulted in favorable jury verdicts, finding that the KHP trooper violated the Plaintiff's constitutional rights to be free from unreasonable searches and seizures.

[4] *Vasquez v. Lewis*, 834 F.3d 1132, 1136 (10th Cir. 2016).

KC 20428204.1

At the conclusion of the bench trial, the Court set a briefing schedule for the parties' Proposed Findings of Fact and Conclusions of Law.[5] Plaintiffs' proposed findings and conclusions are set forth below.

Record citations are to the rough transcripts only.[6] Transcript Volumes correspond to trials and trial days as follows:

| Defendant's Trial | Volume No. | Date of Trial |
|---|---|---|
| Trooper Doug Schulte ("Schulte Tr.") | 1 | Feb. 6, 2023 |
| | 2 | Feb. 7, 2023 |
| | 3 | Feb. 8, 2023 |
| Trooper Brandon McMillan ("McMillan Tr.") | 1 | April 24, 2023 |
| | 2 | April 25, 2023 |
| | 3 | April 26, 2023 |
| | 4 | April 27, 2023 |
| Col. Herman Jones ("Jones Tr.") | 1 | May 1, 2023 |
| | 2 | May 2, 2023 |
| | 3 | May 3, 2023 |
| | 4 | May 4, 2023 |
| | 5 | May 5, 2023 |
| | 6 | May 10, 2023 |
| | 7 | May 12, 2023 |

Testimony for each witness may be found at the following Volumes and page ranges:

| Witness | Testimony Location |
|---|---|
| Blaine Shaw | Schulte Tr. Vol. 1<br>Direct: pp. 110-153<br>Cross: pp. 153-209<br>Re-Direct: p. 210 |
| Douglas Schulte | Schulte Tr. Vol. 2<br>Direct: pp. 2-39<br>Cross: pp. 44-55, pp. 62-93, and pp. 106-110 |

[5] Order, Doc. #520.

[6] Plaintiffs have a pending motion requesting leave to use uncertified transcripts.

3

| | |
|---|---|
| | Re-Direct: pp. 111-120<br>Re-Cross: pp. 120-122<br>Further Re-Direct: pp. 122-123<br>Further Re-Cross: pp. 123 |
| Hassan Aden | Schulte Tr. Vol. 2<br>Direct: pp. 124-148 and pp. 154-168<br>Cross: pp. 168-184, pp. 186-187, and pp. 189-197<br>Re-Direct: pp. 197-203 |
| Joshua Bosire | McMillan Tr. Vols. 1, 2 and 3<br>Direct: McMillan Tr. Vol. 1 pp. 12-23, McMillan Tr. Vol. 2 pp. 2-19, pp. 25-45, pp. 47-51, pp. 54-55, and pp. 58-66<br>Cross: McMillan Tr. Vol. 2 pp. 67-89, pp. 91-100, pp. 103-125<br>Direct: McMillan Tr. Vol. 3 pp. 2-4 |
| Brandon McMillan | McMillan Tr. Vol. 3<br>Direct: pp. 4-18, pp. 23-51, pp. 54-55, and pp.57-65<br>Cross: pp. 66-101, pp. 104-115, p. 117, and p. 120<br>Re-Direct: pp.121-132<br>Re-Cross: pp. 132-134, p. 136, p. 138, and p. 147 |
| Hassan Aden | McMillan Tr. Vol. 3<br>Direct: pp. 152-174 and pp. 176-187<br>Cross: pp. 187-214, and pp. 216-225<br>Re-Direct: pp. 226-228 |
| Douglas Schulte | McMillan Tr. Vol. 4<br>Direct: pp. 2-22<br>Cross: pp. 22-31, pp. 33-35, and p. 37<br>Re-Direct: pp. 38-39<br>Re-Cross: pp.39-40 |
| Shawna Maloney | Jones Tr. Vol. 1<br>Direct: pp. 12-50<br>Cross: pp. 51-54 |
| Mark Erich | Jones Tr. Vol.2<br>Direct: pp.55-80<br>Cross: pp. 80-84 |
| Justin Rohr | Jones Designation at Trial Exhibit 130 |
| Scott Proffitt | Jones Tr. Vol. 2<br>Direct: pp. 4-30 and pp. 37-44<br>Cross: pp. 45-56<br>Court: pp. 56-60<br>Cross con't: pp. 60-69<br>Re-Direct: pp. 69-75<br>Re-Cross: pp. 75-77 |
| Suzanne Dunn | Jones Tr. Vol. 2<br>Direct: pp. 77-110<br>Cross: p. 110 |

4

KC 20428204.1

| Chandler Rule | Jones Designation at Trial Exhibit 131 |
|---|---|
| James McCord | Jones Tr. Vol. 2<br>Direct: pp. 111-127<br>Cross: pp. 127-142<br>Re-Direct: pp. 142-145<br>Re-Cross: p. 145<br>Re-Direct: p.146 |
| Ryan Wolting | Jones Designation at Trial Exhibit 133 |
| Jonathan Mummolo | Jones Tr. Vol. 3<br>Direct: pp.1-10 and pp. 12-26<br>Court: pp. 26-29<br>Direct con't: pp. 29-51<br>Cross: pp. 51-81<br>Re-Direct: pp. 81-83 |
| Greg Jirak | Jones Designation at Trial Exhibit 132 |
| Mitchell Clark | Jones Tr. Vol. 3<br>Direct: pp. 88-121<br>Cross: pp. 121-128 |
| Randy Moon | Jones Designation at Trial Exhibit 134 |
| Joseph Bullock | Jones Tr. Vol. 4<br>Direct: pp. 4-26, pp. 28-44 |
| Sarah Washburn | Jones Tr. Vol. 5<br>Defendant Direct: pp. 2-36<br>Cross: pp.36-52<br>Re-Direct: pp. 52-54 |
| Brent Hogelin | Jones Tr. Vols. 5 and 6<br>Direct: Jones Tr. Vol. 5 pp. 54-94 and Jones Tr. Vol. 6 pp. 2-12<br>Cross: Jones Tr. Vol. 6 pp. 13-96 |
| Herman Jones | Jones Tr. Vol. 6<br>Direct: pp. 97-155<br>Cross: pp. 155-162<br>Re-Direct: pp.162-164 |
| Hassan Aden | Jones Tr. Vols. 6 and 7<br>Direct: Jones Tr. Vol. 6 pp. 167-199 and Jones Tr. Vol. 7 pp. 4-37<br>Cross: Jones Tr. Vol. 7 pp. 37-84 |

KC 20428204.1

## FINDINGS OF FACT

I. **KHP TROOPERS STOPPED AND DETAINED THE NAMED PLAINTIFFS AND OTHER WITNESSES WITHOUT REASONABLE SUSPICION, IN PART BASED ON THEIR STATE OF ORIGIN OR DESTINATION.**

### A.  Trooper Douglas Schulte's stop and detention of Blaine and Samuel Shaw

1.     Plaintiff Blaine Shaw prevailed in his claim against Trooper Douglas Schulte, which stemmed from Trooper Schulte's December 20, 2017 stop and detention of Blaine and his brother Samuel as they traveled from their home in Oklahoma City, Oklahoma to Denver, Colorado.[7] The basic facts surrounding the stop and detention are summarized below.

2.     Trooper Schulte has been employed by KHP for 19 years.[8] He is assigned to Troop D, Zone B, in Ellis and Russell counties.[9]

3.     Blaine and Samuel Shaw were stopped by Trooper Schulte while driving in their father's minivan westbound on I-70 near Hays, Kansas.[10] Blaine Shaw was driving. Once stopped, Trooper Schulte asked them questions about their travel plans, obtained Mr. Shaw's license and registration, and then returned to his patrol car to write Mr. Shaw a ticket for speeding. After writing the ticket, Trooper Schulte reapproached Mr. Shaw at the car, handed back his paperwork and the speeding ticket, and told him to drive safe. Trooper Schulte then performed the Two Step maneuver and returned to the window less than three seconds later and asked Mr. Shaw additional questions. He then asked Mr. Shaw for consent to search the car, which Mr. Shaw declined.[11]

---

[7] Doc. #483.

[8] Schulte Tr. Vol. 2, 2:18-19.

[9] Schulte Tr. Vol. 2, 2:22-25.

[10] Schulte Tr. Vol. 2, 4:15-21.

[11] Schulte Dash Cam Video, Ex. 1.

KC 20428204.1

4.      Trooper Schulte then detained the Shaws for a canine sniff of the vehicle. Trooper Schulte allegedly found Mr. Shaw suspicious because (1) he took too long to pull over, even though Schulte activated his police lights when he was in front of Mr. Shaw on the highway; (2) Mr. Shaw was driving a minivan belonging to his father; (3) the van had a "lived-in look," and (4) the passenger, Samuel Shaw, did not engage with Trooper Schulte.[12]

5.      Trooper Schulte also detained Mr. Shaw in part because of his travel plans to Colorado, which Trooper Schulte considered to be a drug source state, and Mr. Shaw's state-of-origin/residence (Oklahoma), which Trooper Schulte considered to be a drug destination state.[13]

6.      Finally, Trooper Schulte found Mr. Shaw suspicious because he did not consent to a search and was a criminal justice major, and Trooper Schulte believed criminal justice majors should consent to searches.[14]

7.      The canine alerted on the vehicle. Trooper Schulte then conducted a search, which did not result in the discovery of any contraband. The detention lasted approximately 48 minutes.[15]

8.      During the trial, Mr. Shaw provided compelling and credible testimony about the effect that his stop and detention has had on him. Mr. Shaw described feeling anxiety, fear, and distrust towards the police. He felt like his rights were violated and that the Constitution had lost meaning for him. He further testified that he is anxious driving now, particularly when in Kansas.[16]

---

[12] Schulte Decl., Ex. 4.

[13] Schulte Tr. Vol. 2, 24:25-25:5, 25:21-26:12, 86:25-87:6, 112:22-113:2, 113:6-10; Schulte Decl., Ex. 4 at 20; Schulte Dash Cam Video, Ex. 1.

[14] Schulte Tr. Vol. 2, 28:13-29:4.

[15] Schulte Dash Cam Video, Ex. 1.

[16] Schulte Tr. Vol. 1, 149:2-150:9, 152:15-24, 153:13-23.

KC 20428204.1

9.      Mr. Shaw continues to drive through Kansas, although it makes him nervous to do so.[17]

10.      Plaintiffs also presented evidence from their police practices expert, Chief Hassan Aden. Chief Aden has approximately three decades of experience in law enforcement.[18] He has served at all levels, from recruit through Deputy Chief or Chief of Police, and worked for both the Alexandria, Virginia and Greenville, North Carolina Police Departments.[19]

11.      Since leaving active service, Chief Aden worked with the International Association of Chiefs of Police[20] and currently serves as a consultant for law enforcement agencies through his company, the Aden Group.[21] Through the Aden Group, Chief Aden serves as a monitor for federal district court judges who are overseeing consent decrees that require widescale changes to law enforcement agencies' policies and practices in a variety of areas.[22]

12.      Chief Aden has received numerous awards for his work,[23] and participated in many trainings regarding law enforcement techniques and compliance with the law.[24] He has a breadth of experience evaluating the law enforcement activities of officers and agencies throughout the country.[25]

---

[17] Schulte Tr. Vol. 1, 152:8-12.

[18] Schulte Tr. Vol. 2, 125:1-4.

[19] Schulte Tr. Vol. 2, 125:25-134:1, 134:22-135:3.

[20] Schulte Tr. Vol. 2, 136:5-10.

[21] Schulte Tr. Vol. 2, 137:22-138:13.

[22] Shaw Tr. Vol. 2, 139:2-140:22.

[23] Shaw Tr. Vol. 2, 142:19-143:1.

[24] Shaw Tr. Vol. 2, 141:23-142:15.

[25] Shaw Tr. Vol. 2, 143:18-24.

KC 20428204.1

13.     Through this work, Chief Aden has gained significant exposure to the work of agencies across the country and developed expertise in nationally accepted policing practices. As Chief Aden testified, nationally accepted practices are not the equivalent of constitutional law, without more.[26] Instead, they reflect broader thinking in the field about the proper way to conduct police work.

14.     Chief Aden described nationally accepted policing practices as something that is not necessarily committed to writing, but rather practices known and accepted by national experts in the field. These practices are based on case law, policies developed by national law enforcement groups such as the International Association of Chiefs of Police, the Police Executive Research Forum, the Major City Chiefs of Police Association, and other groups that convene subject matter experts in the field, among other sources.[27]

15.     Chief Aden evaluated the evidence surrounding Mr. Shaw's detention and found that Trooper Schulte's detention of Mr. Shaw was not consistent with nationally accepted policing practices.[28] The Court credits and adopts Chief Aden's findings and opinions in this regard.

16.     On February 6, 2023, a unanimous jury found that Trooper Schulte violated Mr. Shaw's Fourth Amendment right to be free from unreasonable searches and seizures, in that Trooper Schulte detained Mr. Shaw without reasonable suspicion. The jury awarded $1 in damages.[29] The Court adopts the findings and verdict reached by the jury in full.

---

[26] Shaw Tr. Vol. 2., 144:19-145:2.

[27] Shaw Tr. Vol. 2, 144:19-145:2; *see also* Jones Tr. Vol. 7, 50:20-51:14; McMillan Tr. Vol. 3, 170:13-19.

[28] Schulte Tr. Vol. 2, 156:20-24.

[29] Jury Verdict, *Shaw v. Schulte*, Doc. #438.

KC 20428204.1

### B.  Trooper Brandon McMillan's stop and detention of Joshua Bosire

17.     Plaintiff Joshua Bosire prevailed in his claim against Trooper Brandon McMillan, who stopped and detained Mr. Bosire on February 10, 2019, on I-70 eastbound just east of Ellis, Kansas.[30] The basic facts are summarized below.

18.     KHP has employed Trooper McMillan since March 2010.[31] He is assigned to Troop T, which is the KHP's aircraft unit.[32]

19.      On February 10, 2019, Joshua Bosire was traveling home to Wichita, Kansas, from visiting his daughter for her birthday in Denver, Colorado. He was driving a rental car, which he often does when driving to Denver in the winter, because his personal vehicle does not have all-wheel drive.[33] He drove from Denver on I-70 into Kansas, and a few hours into Kansas, Mr. Bosire stopped for gas at a Love's Travel Plaza near Ellis.[34] Mr. Bosire attempted to fill up his tank, but the gas pump was not working, so he went inside the convenience store at the gas station to get an attendant to help him pump the gas.[35] KHP Trooper Brandon McMillan was also at the gas station and at some point noticed Mr. Bosire standing at the gas pumps. Trooper McMillan became suspicious of Mr. Bosire because he allegedly smelled marijuana inside the gas station, and later saw Mr. Bosire talking to a man in a hoodie at the gas pump. Trooper McMillan testified that he did not know who the smell of marijuana came from but suspected it might be Mr. Bosire.[36] Trooper McMillan also saw a Dodge Charger outside the gas station and thought it was connected

---

[30] Jury Verdict, *Bosire v. McMillan*, Doc. #499.

[31] McMillan Tr. Vol. 3, 5:3-6.

[32] McMillan Tr. Vol. 3, 5:9-10.

[33] McMillan Tr. Vol. 1, 118:17-24; McMillan Tr. Vol. 2, 3:16-25.

[34] McMillan Tr. Vol. 2, 5:20-6:7.

[35] McMillan Tr. Vol. 2, 7:4-13.

[36] McMillan Tr. Vol. 3, 25:14-22.

10

KC 20428204.1

to Mr. Bosire and/or that Mr. Bosire and the Dodge Charger were connected to the smell of marijuana inside the gas station. Trooper McMillan ran Mr. Bosire's plates and discovered he was driving a rental car. Trooper McMillan also noticed that Mr. Bosire had a camera in his car.[37]

20.     Trooper McMillan left the Love's and pulled onto the highway. A short time later he stopped Mr. Bosire for driving 7 miles over the speed limit.[38]

21.     During the traffic stop, Trooper McMillan asked numerous questions about Mr. Bosire's travel plans, and because Mr. Bosire invoked his right not to answer those questions, Trooper McMillan found Mr. Bosire to be "evasive."[39]

22.     Trooper McMillan called for an additional trooper, Trooper Doug Schulte, to come to the scene. When he arrived, Trooper McMillan informed Trooper Schulte that he did not have reasonable suspicion to detain Mr. Bosire for a canine sniff.[40]

23.     Despite that, Trooper McMillan reapproached Mr. Bosire and began asking more questions. Trooper McMillan eventually asked for consent to search the vehicle, and Mr. Bosire declined. Trooper McMillan then informed Mr. Bosire he was being detained for a canine sniff.[41]

24.     Trooper McMillan allegedly found Mr. Bosire suspicious for the following reasons: (1) the smell at marijuana at Love's, which was never connected to Mr. Bosire; (2) he was driving a rental car; (3) his failure to provide details about his travel plans; (4) Mr. Bosire did not initially roll his window down all the way; (5) Mr. Bosire's responses to questions about his "buddy" at the

---

[37] McMillan Tr. Vol. 1, 117:7-12; McMillan Tr. Vol. 3, 2:18-24, 5:20-6:7, 24:18-25:22, 34:24-35:5, 36:1-8.

[38] McMillan Tr. Vol. 3, 36:18-22, 72:17-73:7, 98:23-99:1.

[39] McMillan Tr. Vol. 3, 105:21-106:12.

[40] McMillan Tr. Vol. 3, 45:12-14, 49:22-50:8.

[41] McMillan Tr. Vol. 3, 50:16-18, 60:14-61:2.

11

KC 20428204.1

gas station; and (6) Mr. Bosire's cameras in the car.[42] The Court also finds as a factual matter that, although not listed by Trooper McMillan in his prior sworn declaration, Trooper McMillan suspected Mr. Bosire to be driving from Colorado, and considered that as part of his "totality of the circumstances."

25.     After over twenty minutes after their last interaction, Trooper McMillan reapproached Mr. Bosire, and told him to get out of the car so that the canine could sniff around the vehicle.[43] The canine conducted the sniff. It did not alert. Mr. Bosire was detained for approximately 41 minutes and was detained without reasonable suspicion for approximately 27 minutes.[44]

26.     Mr. Bosire provided compelling and credible testimony about the effect that this stop and detention had on him. He testified about how it destroyed his trust in law enforcement and how he now lives with significant anxiety and fear around the police.[45] Mr. Bosire does not participate in activities he once enjoyed as a result of this detention, and has refrained from volunteer work that he previously engaged in.[46] As a naturalized U.S. citizen,[47] Mr. Bosire was particularly disappointed to see that the constitutional protections he learned about during his citizenship classes were violated so easily. The detention also impacted how often he is able to see his daughter in Colorado.[48]

---

[42] McMillan Tr. Vol. 3, 36:1-8, 42:2-17, 47:7-48:1, 57:13-58:11.

[43] McMillan Dash Cam Video, Ex. 8 at 40:27-40:50.

[44] *See generally* McMillan Dash Cam Video, Ex. 8; *see also* McMillan Dash Cam Video, Ex. 8 44:05-44:21.

[45] McMillan Tr. Vol. 2, 62:3-12.

[46] McMillan Tr. Vol. 2, 62:13-63:21.

[47] McMillan Tr. Vol. 1, 109:14-19, 110:7-111:19.

[48] McMillan Tr. Vol. 2, 64:9-16.

12

KC 20428204.1

27.     Mr. Bosire continues to drive through Kansas and resides in Kansas. Although he sometimes flies to Denver to see his daughter, he does still drive to Colorado on I-70.[49]

28.     Similar to his testimony in the trial against Trooper Schulte, Chief Aden testified as an expert witness in the trial against Trooper McMillan. Chief Aden testified that he evaluated the evidence surrounding Mr. Bosire's detention and found that Trooper McMillan's detention of Mr. Bosire was not consistent with nationally accepted policing practices.[50] The Court credits and adopts Chief Aden's findings and opinions in this regard.

29.     On April 27, 2023, a jury found that Trooper McMillan violated Mr. Bosire's Fourth Amendment right to be free from unreasonable searches and seizures, in that Trooper McMillan detained Mr. Bosire without reasonable suspicion. The jury awarded Mr. Bosire $20,163.70 in actual damages and $20,000 in punitive damages.[51] The Court adopts the jury's findings and verdict in full.

30.     Additional testimony regarding this stop and detention was heard during the bench trial against Col. Jones. Specifically, the Court heard and considered evidence related to the Professional Standards Unit (PSU)'s investigation of a complaint filed by Mr. Bosire against Trooper McMillan following the stop.

31.     At the conclusion of the investigation, Col. Jones found: "It was determined under accepted protocols for criminal interdiction investigation, and the burdens of proof needed therein, there was not reason to detain Mr. Bosire further for a K-9 unit to respond to the scene for a drug

---

[49] McMillan Tr. Vol. 2, 64:5-10, 93:8-25.

[50] McMillan Tr. Vol. 3, 173:25-174:4, 182:21-184:1.

[51] Doc. #512.

KC 20428204.1

sniff. This caused you [Trooper McMillan] to hold Mr. Bosire for a longer duration than is legally acceptable."[52]

32.     Col. Jones's letter to Mr. Bosire at the conclusion of the investigation states, "we have determined some of your concerns had merit. . . . This contact with you was not what we would consider standard under the confines of investigative reasonable suspicion regarding criminal interdiction. . . . we feel the length of time you were detained roadside was unnecessary given the suspicions [Trooper McMillan] articulated."[53] The letter informed Mr. Bosire that Trooper McMillan's failure "would be handled in accordance with [KHP's] policies and procedures[.]"[54]

33.     Cpt. Hogelin, Commander of KHP's criminal interdiction unit, was asked by Lt. Joseph Bullock to review the PSU investigation involving Trooper McMillan's stop of Mr. Bosire and to offer an opinion.[55] Cpt. Hogelin reviewed the video and additional documents generated during the investigation including Trooper McMillan's statement.[56] Cpt. Hogelin used his experience and applied standards that KHP expects from its troopers in forming an opinion regarding the detention.[57]

34.     In response to a sustained finding of a constitutional violation, Trooper McMillan was not disciplined. Instead, he was only given corrective action in the form of additional

---

[52] McMillan PSU Report, Ex. 19 at 215 (OAG008503); Jones Tr. Vol. 3, 125:2-5.

[53] 08.09.2019 Correspondence to Bosire re PSU finding, Ex. 27.

[54] 08.09.2019 Correspondence to Bosire re PSU finding, Ex. 27.

[55] Jones Tr. Vol. 5, 57:19-25, 58:1-9.

[56] Jones Tr. Vol. 5, 58:10-18.

[57] Jones Tr. Vol. 5, 58:19-25.

KC 20428204.1

counseling and training through a one-hour legal review with legal counsel and a ride-along with supervisor from another troop.[58]

35.     Lt. Jirak was assigned to conduct the ride-along for Trooper McMillan.[59] When Lt. Jirak asked his commander what the purpose of the ride along was, he was told that it should be "business as usual."[60] During the ride-along there was no discussion between Lt. Jirak and Trooper McMillan regarding proper procedure for stops or searches.[61]

36.     Trooper McMillan did not learn anything from the remedial training or ride-along.[62]

### C. Lieutenant Justin Rohr's stop and detention of Mark Erich and Shawna Maloney

37.     The third set of Plaintiffs in this case are Mark Erich and Shawna Maloney. They are a married couple currently residing in Willowick, Ohio. In 2018, they resided in Loveland, Colorado.[63]

38.     On the evening of March 8, 2018, Mr. Erich and Ms. Maloney departed from their home in Colorado with their children on a road trip to visit family in Alabama. Their planned route took them through Kansas on I-70.[64] The Erich-Maloney family traveled to Alabama in a 2006 Winnebago Chalet recreational vehicle ("RV"), which they had purchased used on February 14, 2018.[65]

---

[58] McMillan PSU Report, Ex. 19 at 213 (OAG008501); Jones Tr. Vol. 3, 115:9-120:25; Jones Tr. Vol. 6, 111:10-17.

[59] Jirak Dep., Ex. 132A, 125:1-3; Jirak Video Dep. Desig., Ex. 132.

[60] Jirak Dep., Ex. 132A, 125:4-7, 18-21; Jirak Video Dep. Desig., Ex. 132, 47:40-47:50, 48:18-48:26.

[61] Jirak Dep., Ex. 132A, 126:4-8; Jirak Video Dep. Desig., Ex. 132, 48:43-48:57.

[62] Jones Tr. Vol. 7, 30:19-24.

[63] Jones Tr. Vol. 1, 13:1-8, 13:23-25, 55:17-22, 56:12-13.

[64] Jones Tr. Vol. 1, 14:5-24, 19:10-20:8, 56:2-57:4, 58:19-59:1.

[65] Jones Tr. Vol. 1, 15:2-13, 57:10-20.

KC 20428204.1

39.     Prior to the family purchasing the RV, the dealership had done some work to the RV, including removal of a large decal in the middle of the rear of the RV. The removal of that decal left a discolored spot on the RV's surface.[66]

40.     The Erich-Maloney RV had temporary tags from Colorado.[67]

41.     The Erich-Maloney family traveled through the night, with Mr. Erich driving, Ms. Maloney in the passenger seat, and their 10- and 13-year-old children in the back.[68]

42.     At approximately 5:00 am on March 9, 2018, the Erich-Maloney family took a short rest break at a rest area off the highway[69] Shortly after continuing their trip eastward on I-70, they were pulled over by KHP Lt. Justin Rohr, just east of Salina.[70]

43.     Lt. Rohr joined the KHP in July 2006.[71] He has worked in Troop S, the canine unit, since 2014.[72] He responds to calls for canines from other Troopers but spends the majority of his time working the road just like other Troopers.[73] As a Lieutenant, Lt. Rohr also continues be a canine handler.[74]

---

[66]   Jones Tr. Vol. 1, 15:14–18:22, 57:21–58:15; Photo of Erich-Maloney RV Rear, Ex. 36 at 5 (ERICHMALONEY0126).

[67]   Jones Tr. Vol. 1, 18:11-12, 58:6-7; Photo of Erich-Maloney RV Rear, Ex. 36 at 5 (ERICHMALONEY0126).

[68]   Jones Tr. Vol. 1, 18:24-19:22, 58:16-18, 59:2-3.

[69]   Jones Tr. Vol. 1, 20:5-16, 59:4-8.

[70]   Jones Tr. Vol. 1, 20:23-25, 24:1-4, 59:9-12; Rohr Dep., Ex. 137, 69:9-11, 70:3-9; Rohr Video Dep. Desig., Ex. 130, 0:22:33-0:22:47; Warning Ticket, Ex. 82 (listing location as I-70 eastbound near mile marker 226).

[71]   Rohr Dep., Ex. 137, 16:9-11; Rohr Video Dep. Desig., Ex. 130, 0:00:44-0:00:49.

[72]   Rohr Dep., Ex. 137, 17:24-18:6; Rohr Video Dep. Desig., Ex. 130, 0:00:44-0:01:55.

[73]   Rohr Dep., Ex. 137, 21:24-22:9; Rohr Video Dep. Desig., Ex. 130, 0:03:11-0:03:42.

[74]   Rohr Dep., Ex. 137, 28:15-17; Rohr Video Dep. Desig., Ex. 130, 0:04:47-0:04:50.

KC 20428204.1

44.     Lt. Rohr has never been a member of KHP's interdiction troop but does try to conduct criminal interdiction in his work.[75] Lt. Rohr has had conversations with his superiors about doing interdiction work, and his superiors approve of it and want him to do it.[76]

45.     Lt. Rohr's patrol vehicle had a dashboard camera that captured video of the Erich-Maloney stop. Recordings through a microphone on his uniform synchronized with the dashboard camera's video.[77]

46.     The dash cam video shows Lt. Rohr travelling westbound on I-70, passing the Erich-Maloney RV traveling in the opposite direction. Lt. Rohr slowed, crossed the grass median, then sped eastbound on I-70 to catch up to the RV.[78]

47.     When Lt. Rohr saw the RV and crossed the highway median to follow it eastbound, he had not observed the RV violate any traffic law. Lt. Rohr turned around "solely because it was an RV" and because the time of day made him suspicious, even though he acknowledged that neither driving a RV nor traveling in the early morning hours are criminal activities. [79]

48.     After catching up to the RV, Lt. Rohr maintained his position to the left and behind of the RV, in the RV's 7:00 position. This caused his headlights to reflect in the RV's rearview mirror and blind Mr. Erich. The RV ultimately crossed over the fog line, and Lt. Rohr turned on his overhead emergency lights and pulled the RV over.[80]

---

[75] Rohr Dep., Ex. 137, 27:7-18; Rohr Video Dep. Desig., Ex. 130, 0:04:07-0:04:31.

[76] Rohr Dep., Ex. 137, 27:23-28:3; Rohr Video Dep. Desig., Ex. 130, 0:04:32-0:04:47.

[77] Rohr Dep., Ex. 137, 74:11-25; *see also* Rohr Dep., Ex. 137, 78:14-79:11, 79:24-25; Rohr Video Dep. Desig., Ex. 130, 0:26:47-0:26:53, 0:30:06-0:31:01, 0:31:08-0:31:10.

[78] Rohr Dash Cam Video, Ex. 29 at 0:00–1:30; Rohr Dep., Ex. 137, 75:10-76:10, 83:4-85:10; Rohr Video Dep. Desig., Ex. 130, 0:27:11-0:28:13, 0:31:10-0:33:00.

[79] Rohr Dep., Ex. 137, 76:11-20, 77:4-78:13, 191:17-195:25; Rohr Video Dep. Desig., Ex. 130, 0:28:14-0:30:05, 2:13:28-2:17:40.

[80] Jones Tr. Vol. 1, 59:13-60:16; Rohr Dash Cam Video, Ex. 29 at 1:20-2:30; Rohr Dep., Ex. 137, 85:9-88:21, 191:17-192:4. Rohr's activation of lights caused his dashboard camera to go back two minutes from the point of activation.

KC 20428204.1

49.      As Lt. Rohr approached the RV, he observed the vehicle's Colorado tags. Lt. Rohr informed Erich that his "reason for contact" was to ensure Mr. Erich was not sleepy.[81]

50.      Lt. Rohr believes that "Colorado is a known source for a large amount of illegal marijuana . . . ."[82]

51.      KHP trained Lt. Rohr that the state of origin of a vehicle can be indicia of criminal illegal activity. According to Lt. Rohr, Colorado is one of several states where a large amount of drugs, narcotics, and criminal activity originate.[83]

52.      During Lt. Rohr's first encounter with Mr. Erich and Ms. Maloney, he requested Mr. Erich's driver's license and insurance, which Mr. Erich provided. Lt. Rohr claimed to smell paint and asked if Mr. Erich had just painted the RV. Mr. Erich and Ms. Maloney informed Lt. Rohr that they had just purchased the RV, that they did not know whether it had been painted, and that they were traveling to Alabama.[84]

53.      Neither Mr. Erich nor Ms. Maloney smelled any paint or bondo odor, which would have been very noticeable to them because Ms. Maloney was three months pregnant at the time and suffering from severe morning sickness that made her sensitive to smells.[85]

54.      Lt. Rohr claimed to have smelled a strong smell of "bondo or paint" around vehicle, but Rohr's partner, Trooper Gleason, did not smell anything. Lt. Rohr asserted to Gleason that the

---

Rohr Dep., Ex. 137, 78:14-79:11; Rohr Video Dep. Desig., Ex. 130, 0:32:59-0:36:16, 2:13:28-2:13:55, 0:30:06-0:31:00.

[81] Rohr Dash Cam Video, Ex. 29 at 2:45-4:00; Jones Tr. Vol. 1, 60:24-61:2; Rohr Dep., Ex. 137, 79:12-17, 92:18-99:23 ("A. I believe [Trooper Gleason] said you have a sniffer on you. . . . Q. What did you take him to mean? A. That he could not smell the odor that I was smelling."), 109:14-17.

[82] Rohr Dep., Ex. 137, 215:7-15; Rohr Video Dep. Desig., Ex. 130, 2:21:17-2:21:43.

[83] Rohr Dep., Ex. 137, 52:2-21; Rohr Video Dep. Desig., Ex. 130, 0:09:37-0:10:46.

[84] Rohr Dash Cam Video, Ex. 29 at 2:4-–4:02.

[85] Jones Tr. Vol. 1, 24:21-25:9, 61:3-14.

KC 20428204.1

discolored area on the back of the RV had been painted. Gleason claimed that the paint was fresh, and that it was on Gleason's hands. No evidence was produced at trial to confirm this. Lt. Rohr observed to Gleason that Erich had paint on his hand.[86]

55.    Mr. Erich had a small amount of white interior paint on his right hand, because he had painted trim earlier that day at work. Ms. Maloney did not smell the paint on Mr. Erich's hand at any point during their trip or during the stop.[87]

56.    While waiting for the dispatcher to run Mr. Erich's information, another trooper arrived. Lt. Rohr informed this trooper of his beliefs concerning the smell of paint or bondo, the discolored spot on the back of the RV, and the paint on Mr. Erich's hand. Lt. Rohr asked, "Is that enough to, like, say there is a compartment, or just -- do some more checking with him first?"[88]

57.    Lt. Rohr learned from the dispatcher that Erich had a prior arrest for drug paraphernalia in 2004—14 years prior to the stop. Erich was 19 years old in 2004.[89]

58.    Lt. Rohr returned to the RV and handed Mr. Erich his documents back along with a written warning. He told Mr. Erich to "have a safe trip" and "drive careful."[90]

59.    At this point, Mr. Erich and Ms. Maloney believed that the traffic stop was complete and that they should be free to leave.[91]

---

[86] Rohr Dash Cam Video, Ex. 29 at 4:05-5:50; Jones Tr. Vol. 1, 25:10-14.

[87] Jones. Tr. Vol. 1, 24:15-26:19, 61:18-62:12; Photo of Mark Erich's Hand, Ex. 127 (ERICHMALONEY0111).

[88] Rohr Dash Cam Video, Ex. 29 at 8:20-9:09; Rohr Dep., Ex. 137, 101:9–104:13; Rohr Video Dep. Desig., Ex. 130, 0:50:23-0:54:58.

[89] Rohr Dash Cam Video, Ex. 29 at 9:09-9:39; Rohr Dep., Ex. 137, 104:14-105:3, 105:18-106:11; Jones Tr. Vol. 1, 62:20-63:13; Rohr Video Dep. Desig., Ex. 130, 0:55:11-0:55:35, 0:56:18-0:57:13.

[90] Rohr Dash Cam Video, Ex. 29 at 9:39-10:53; Jones Tr. Vol. 1, 26:20-25, 63:14-65:12; Erich Warning, Ex. 32 at 1 (Erich OAG 000004); Rohr. Dep., Ex. 137, 107:21-108:22, 110:6-112:2, 191:17-195:25; Rohr Video Dep. Desig., Ex. 130, 0:59:17-1:00:37, 1:02:06-1:03:41, 2:13:28-2:18:04.

[91] Jones Tr. Vol. 1, 26:23-27:4, 65:13-19, 66:2-67:14.

KC 20428204.1

60.     But Lt. Rohr had already decided to detain Mr. Erich and Ms. Maloney.[92]

61.     Lt. Rohr claimed that the following factors contributed his reasonable suspicion: (1) Mr. Erich and Ms. Maloney were traveling in an RV in the early morning hours; (2) their travel plans, including their state of origin and destination; (3) the purported smell of paint or bondo; (4) the paint on Mr. Erich's hand; (5) what Lt. Rohr thought was a high probability of a false compartment on the back of the RV, and (6) Lt. Rohr's belief that Mr. Erich and Ms. Maloney's answers were dishonest.[93] Lt. Rohr did not articulate this full list of factors until his deposition in this case, although some were included in his post-incident canine deployment report concerning the detention of Mr. Erich and Ms. Maloney. That report also included errors and omissions, such as omitting Ms. Maloney and the children's presence, and incorrectly stating that Lt. Rohr had sought consent to search the RV.[94]

62.     In executing the Two Step, Lt. Rohr took a few steps back toward his patrol car, and then immediately turned around and re-approached the RV.[95] This maneuver took only a few seconds, which was not enough time for Mr. Erich to safely pull back into highway traffic.[96]

---

[92] Rohr Dep., Ex. 137, 100:6-101:8, 111:16-22, 114:4-115:11 ("Q. You had decided to detain him after your initial encounter with Mr. Erich; right? A. Yes. Q. And based on everything you had at that point, you decided you had enough for reasonable suspicion; right? A. Yes. Q. And that was before you returned his license and insurance card, before you gave him the warning; correct? A. Yes. Q. Like you say, so Mr. Erich was never free to go in this encounter once you pulled him over; right? A. I guess so, yes."); Rohr Video Dep. Desig., Ex. 130, 0:48:36-0:50:23, 1:03:16-1:03:23, 1:05:32-1:06:40.

[93] Rohr Dep., Ex. 137, 72:17-74:5 ,92:6-8, 98:5-8, 105:4-17, 105:23-106:11, 108:23-110:5, 111:16-22, 207:3-13, 212:24-216:3, 216:8-20; Rohr Video Dep. Desig., Ex. 130, 0:24:47-0:26:47, 0:40:26-0:40:30, 0:46:33-0:46:37, 0:56:47-0:57:14, 1:00:38-1:02:05, 1:03:15-1:03:26.

[94] Rohr Dep., Ex. 137, 146:18-154:11 ("Q. Does this document contain all of the things that you've considered in forming reasonable suspicion in detaining and the searching Mr. Erich's car? A. All of them, no. Q. Okay. Why didn't you include all of the factors leading to your reasonable suspicion? A. When at the time, and even still, it's just one of those things that we were never trained to put all of that stuff into our reports. We just always kept it brief, and somewhat short, I guess."); Police Service Dog Report Mar. 9, 2018, Ex. 87 (admitted at Jones Tr. vol. 1, 89:12-90:2); Rohr Video Dep. Desig., Ex. 130, 1:47:44-1:56:03.

[95] Rohr Dash Cam Video, Ex. 29 at 10:53-10:59; Rohr Dep., Ex. 137, 112:3-25. Rohr Video Dep. Desig., Ex. 130, 1:03:43-1:04:26.

[96] Jones Tr. Vol. 1, 65:20-66:1.

KC 20428204.1

63.     Lt. Rohr sought to ask Mr. Erich and Ms. Maloney more questions. At this point, Ms. Maloney was confused because she did not understand why Lt. Rohr wanted to ask more questions. She felt obligated to answer his questions and that she was afraid to leave due to Lt. Rohr's position of authority, his gun, and the fact that he was standing directly next to the RV, making it too dangerous to leave.[97]

64.     Mr. Erich knew that he did not have answer Lt. Rohr's additional questions, but he did not feel that it was safe to drive away because of Rohr's close proximity to the RV.[98]

65.     Mr. Erich asked if he had to answer Lt. Rohr's questions, and Lt. Rohr responded he did not have to. Mr. Erich then asked if he was free to go, and Lt. Rohr confirmed, "You are free to go." Lt. Rohr then immediately informed Mr. Erich and Ms. Maloney that he was detaining them because he believed they had a false compartment in their RV.[99]

66.     Lt. Rohr asked if Mr. Erich had any drugs in the vehicle, and he responded that he had family in the RV. Lt. Rohr questioned Mr. Erich further about the paint on his hand and the fresh paint on the back of the RV, to which Mr. Erich responded that he was a construction worker who painted things at work, and that there was no fresh paint on the RV.[100]

67.     Mr. Erich requested Lt. Rohr's name and badge number because he intended to submit a complaint about what he perceived to be an unlawful detention.[101]

---

[97] Rohr Dash Cam Video, Ex. 29 at 10:57-11:26; Jones Tr. Vol. 1, 27:5-22; Rohr Dep., Ex 137, 113:4-14; Rohr Video Dep. Desig., Ex. 130, 1:04:46-1:05:06.

[98] Jones Tr. Vol. 1, 66:2-67:14.

[99] Rohr Dash Cam Video, Ex. 29 at 10:57-11:26; Jones Tr. Vol. 1, 27:23-28:3; Rohr Dep. 113:4-115:11 ("Q. Like you say, so Mr. Erich was never free to go in this encounter once you pulled him over; right? A. I guess so, yes. Q. Okay. So why did you tell him you were free to go? A. I don't know."); Rohr Video Dep. Desig., Ex. 130, 1:04:46-1:06:45.

[100] Rohr Dash Cam Video, Ex. 29 at 11:26-12:24; Jones Tr. Vol. 1, 67:15-68:2; Rohr Dep., Ex. 137, 115:12-117:11; Rohr Video Dep. Desig., Ex. 130, 1:06:45-1:08:35.

[101] Rohr Dash Cam Video, Ex. 29 at 12:01-12:33; Jones Tr. Vol. 1, 68:10-11.

KC 20428204.1

68.     Lt. Rohr informed Erich and Maloney that he planned to conduct a canine sniff around the RV for drugs, and ordered the family exit the RV and stand to the right of the vehicle approximately five feet in the ditch. Lt. Rohr patted Mr. Erich down and requested that he leave his phone in the RV, which made Mr. Erich annoyed, nervous, and scared. The weather at this time was very cold and windy.[102]

69.     Following the deployment of Lt. Rohr's canine, Nico, for a canine sniff, Rohr informed the family that Nico had indicated that a drug odor was present.[103]

70.     Mr. Erich and Ms. Maloney witnessed the canine sniff occur. Both believed the canine to be disinterested in the RV, and Mr. Erich thought that the sniff was merely "a dog and pony show" that Lt. Rohr would use to gain access to search the RV. Neither Mr. Erich nor Ms. Maloney believed Lt. Rohr's statement that the dog had detected illegal drugs.[104]

71.     Upon realizing that Lt. Rohr was focused on the discolored spot on the back of the RV, Mr. Erich informed Lt. Rohr that the spot was the result of the removal of a decal, not paint.[105]

72.     The troopers offered to let the Erich-Maloney children sit in the patrol cars while the troopers searched the RV. Ms. Maloney stood next to one child in Lt. Rohr's vehicle directly behind the RV, and Mr. Erich stood next to the other child in the second patrol car behind Lt. Rohr's.[106]

---

[102] Rohr Dash Cam Video, Ex. 29 at 12:24-15:57; Jones Tr. Vol. 1, 28:4-30:12, 68:6-69:15; Rohr Dep., Ex. 137, 117:15-119:18, 120:25-122:3; Rohr Video Dep. Desig., Ex. 130, 1:09:34-1:11:31, 1:11:31-1:14:03.

[103] Rohr Dash Cam Video, Ex. 29 at 15:57-20:45; Jones Tr. Vol. 1, 31:2-19; Rohr Dep., Ex. 137, 122:3-128:25, 129:8-132:19; Rohr Video Dep. Desig., Ex. 130, 1:14:04-1:21:51, 1:23:00-1:26:51.

[104] Jones Tr. Vol. 1, 31:2-19, 68:3-7, 69:16-70:10; *see also* Rohr Dep., Ex. 137, 129:1-7 ("Q. Right. You searched this vehicle; right? A. Yes. Q. You didn't find any drugs; right? A. Correct. Q. So what --do you have any explanation for why Nico would alert? A. No, I don't."); Rohr Video Dep. Desig., Ex. 130, 1:22:44-1:22:54.

[105] Rohr Dash Cam Video, Ex. 29 at 20:35-20:42; Jones Tr. Vol. 1, 70:11-16.

[106] Rohr Dash Cam Video, Ex. 29 at 20:11-20:48; Jones Tr. Vol. 1, 32:13-33:7, 70:17-20; *see also* Rohr Dep., Ex. 137, 132:12-22; Rohr Video Dep. Desig., Ex. 130, 1:26:38-1:26:51.

KC 20428204.1

73.    While standing next to Lt. Rohr's patrol car, Ms. Maloney observed that Lt. Rohr's computer displayed a picture of a 2005 Winnebago Chalet, but that her RV was a 2006 model. She knew that the 2005 model had a spare tire on the back, whereas her 2006 model had the spare tire underneath the RV.[107]

74.    During the search, Ms. Maloney had to explain to her child for the first time what drugs were.[108]

75.    During the search, a trooper attempted to question one of the Erich-Maloney children about the family's travel plans without seeking parental permission first. Mr. Erich told the child to stop speaking with the trooper.[109]

76.    Lt. Rohr and his fellow troopers performed a thorough search of the interior and exterior of the RV for approximately 20 minutes. The troopers rummaged through the Erich-Maloney family's luggage and personal belongings.[110]

77.    At one point during the search, Lt. Rohr sniffed and commented that it "smell[ed] like paint" inside the RV. While searching, Lt. Rohr asked another trooper if he smelled the paint, and the other trooper replied, "Not yet."[111] At another point, Lt. Rohr asked another trooper to "smell in here" and asked if he smelled anything. The trooper responded in the affirmative, but stated that he did not know what the smell was.[112]

---

[107] Jones Tr. Vol. 1, 33:8-34:2; *see also* Rohr Dep., Ex. 137, 103:14-104:13, 106:17-107:20 (discussing spare tire on the back of Winnebago); Rohr Video Dep. Desig., Ex. 130, 0:54:00-0:54:59, 0:57:58-0:58:08.

[108] Jones Tr. Vol. 1, 35:4-10.

[109] Jones Tr. Vol. 1, 71:23-72:12.

[110] Rohr Dash Cam Video, Ex. 29 at 20:50-41:44; Jones Tr Vol. 1, 34:4-35:10, 72:13-73:4; Rohr Dep., Ex. 137, 135:2-140:10; Rohr Video Dep. Desig., Ex. 130, 1:27:39-1:41:36.

[111] Rohr Dash Cam Video, Ex. 29 at 21:24-22:08, 33:28-33:37; Jones Tr. Vol. 1, 70:21-24; Rohr Dep., Ex. 137, 136:4-16; Rohr Video Dep. Desig., Ex. 130, 1:32:26-1:32:40.

[112] Rohr Dep., Ex. 137, 137:19-24; Rohr Video Dep. Desig., Ex. 130, 1:35:29-1:35:37.

KC 20428204.1

78.     After completing the search, Lt. Rohr approached Ms. Maloney and told her that she and her family could get back in their RV. Lt. Rohr repeatedly apologized for "wast[ing] [their] time." Ms. Maloney felt obligated to continue conversing with Lt. Rohr and answering his questions because she feared being arrested for not cooperating.[113]

79.     After speaking to Ms. Maloney, Lt. Rohr handed Mr. Erich the keys back and again apologized for wasting their time. Lt. Rohr made a comment about the hood of the RV being painted, which Mr. Erich found confusing in light of Lt. Rohr's prior focus on the spot at the back of the RV, approximately 30 feet away from the hood.[114]

80.     Lt. Rohr then told Mr. Erich to "have a safe trip." Based on this statement, Mr. Erich believed that the encounter was over.[115]

81.     As Mr. Erich approached the RV to leave, Lt. Rohr detained him again, telling him to wait and directing him to stand in front of his patrol car. Lt. Rohr then climbed up the RV's ladder to investigate the top of the vehicle.[116] Lt. Rohr used his flashlight to investigate the top for a few seconds, and then allowed Mr. Erich and his family to leave.[117]

82.     In the approximately 40-minute detention by the KHP, Lt. Rohr suggested or implied that the encounter was over three times.[118] Each time, the detention continued.

---

[113] Rohr Dash Cam Video, Ex. 29 at 38:50–40:23; Jones Tr. Vol. 1, 35:12-25; Rohr Dep., Ex. 137, 139:23-142:23; Rohr Video Dep. Desig., Ex. 130, 1:39:47-1:44:06.

[114] Rohr Dash Cam Video, Ex. 29 at 40:21-41:10; Jones Tr. Vol. 1, 73:5-19; Rohr Dep., Ex. 137, 142:24-143:25; Rohr Video Dep. Desig., Ex. 130, 1:44:08-1:45:36.

[115] Rohr Dash Cam Video, Ex. 29 at 40:21-41:10; Jones Tr. Vol. 1, 73:20-25; Rohr Dep., Ex. 137, 142:24-143:25; Rohr Video Dep. Desig., Ex. 130, 1:44:08-1:45:36.

[116] Rohr Dash Cam Video, Ex. 29 at 38:50-41:31; Jones Tr. Vol. 1, 74:1-8; Rohr Dep., Ex 137, 144:1-145:20; Rohr Video Dep. Desig., Ex. 130, 1:45:41-1:47:42.

[117] Rohr Dash Cam Video, Ex. 29 at 41:32-41:45; Rohr Dep., Ex 137, 144:1-145:20; Rohr Video Dep. Desig., Ex. 130, 1:45:45-1:47:42.

[118] Jones Tr. Vol. 1, 74:9-15.

KC 20428204.1

83.     Ultimately, the troopers found no illegal drugs or contraband of any kind.[119]

84.     The only drugs in the RV were prescription medications, including medication for Ms. Maloney's high-risk pregnancy that she was supposed to take that morning while the troopers searched the RV. She asked the troopers if she could take her medication during the detention, but they did not permit her to do so.[120]

85.     When Mr. Erich and Ms. Maloney re-entered the RV, they discovered that the troopers had damaged their property during the search. The dash and CB radio had been disassembled. The domes for the lights and smoke detectors had been removed and some stepped on and broken. The troopers had searched through all cupboards and the refrigerator. The family's clothing had been dumped out of their bags. The mattress had been moved and the hoses underneath damaged. The bathroom door hung off the frame, and the bathroom door frame was also damaged. The towel rack had been broken. One of the panels underneath the shower had been removed and broken. The toilet no longer functioned.[121]

86.     Sometime after leaving the scene of the search, Mr. Erich and Ms. Maloney encountered another KHP trooper in the median, watching for speeders. This trooper pulled out behind their RV and drove to the RV's 7:00 position similar to how Lt. Rohr initiated his traffic stop of the RV. The trooper hovered there for a few minutes before ultimately pulling away.[122]

---

[119] Jones Tr. Vol. 1, 42:2-14, 74:16-75:2; Rohr Dep., Ex. 137, 129:1-7, 132:23-133:3; Rohr Video Dep. Desig., Ex. 130, 1:22:43-1:22:54, 1:26:52-1:27:02.

[120] Jones Tr. Vol. 1, 31:18-32:12.

[121] Jones Tr. Vol. 1, 36:1-39:16, 71:5-18, 75:3-11; Photos of Inside RV Damage, Ex. 34 (ERICHMALONEY0114–19); Photos of RV Restroom, Ex. 35 (ERICHMALONEY0120–21).

[122] Jones Tr. Vol. 1, 42:21-43:7, 75:1-76:2; Rohr Dep., Ex. 137, 133:4-24 ("Q. Would it be unusual for you to do damage to a vehicle during a search? A. Yes. . . . I have caused damage before. We've taken care of it, the patrol has."); Rohr Video Dep. Desig., Ex. 130, 1:27:02-1:27:39.

25

87.     The encounter with the KHP ruined the Erich-Maloney family vacation to Alabama. On their way back to Colorado, they chose to detour through Texas instead of going through Kansas because they feared being pulled over again by the KHP.[123]

88.     The encounter with the KHP affected Ms. Maloney deeply. She was unable to drive her personal vehicle for three months. She was unable to do daily tasks or go to the grocery store by herself. She was unable to focus at work and went from full-time to part-time work. She sought mental health therapy to address her anxiety and to learn how to help her children.[124]

89.     Because Ms. Maloney and their children experienced so much anxiety and were too afraid to go places by themselves, Mr. Erich's daily tasks increased because he had to make sure he was available to take them places. Although he did not seek treatment or therapy, his experience with the KHP left him feeling angry, violated, and saddened by the impact on his family.[125]

90.     The Erich-Maloney family did not take another family vacation for three years because the children were too scared after their experience with the KHP. They ultimately sold the RV.[126]

91.     Their experience with the KHP also affected Mr. Erich and Ms. Maloney's feelings toward law enforcement. Ms. Maloney fears law enforcement and no longer trusts them, even officers who are family members. Mr. Erich distrusts law enforcement. There have been multiple situations (including an attempted burglary, repeat trespassers, and a runaway child) in which they

---

[123] Jones Tr. Vol. 1, 43:8-20, 76:3-14.

[124] Jones Tr. Vol. 1, 43:21-44:15.

[125] Jones Tr. Vol. 1, 75:13-17, 76:15-77:13.

[126] Jones Tr. Vol. 1, 44:16-19, 45:8-46:9.

KC 20428204.1

each could have called the police for assistance but chose not to because they feared the police more.[127]

92.    Since March 2018, Mr. Erich and Ms. Maloney have driven through Kansas multiple times. They still have family and friends in Colorado that they drive on I-70 to visit.[128]

93.    However, as a result of their experience with the KHP, Mr. Erich and Ms. Maloney feel anxiety traveling through Kansas and have altered the way they travel through Kansas. They choose to rent cars instead of using their personal vehicles, because they surmised that the RV's Colorado tag attracted Lt. Rohr's attention initially, due to Colorado's legalization of recreational marijuana. They do not spend as much time in Kansas as they otherwise would, they do not drive at night, and they do not bring the children if they have a choice.[129]

94.    As part of his expert testimony, Chief Aden evaluated this stop and detention for compliance with nationally accepted policing practices. Chief Aden found that Trooper Rohr's stop and detention of the Erich-Maloney family was inconsistent with nationally accepted policing practices in several respects.[130]

95.    Specifically, Chief Aden found that Lt. Rohr's initiation of the stop was deficient, in that Lt. Rohr disregarded state law he was required to follow when conducting a traffic stop.[131] He further found that the multiple detentions of the Erich-Maloney family were not supported by sufficient facts and circumstances, and in particular, that Lt. Rohr relied on wholly innocent criteria

---

[127] Jones Tr. Vol. 1, 47:1-48:10, 78:15-79:3.

[128] Jones Tr. Vol. 1, 46:10-13, 77:14-78:1.

[129] Jones Tr. Vol. 1, 44:19-45:7, 46:10-25, 78:2-12.

[130] Jones Tr. Vol. 6, 174:4-7, May 10, 2023.

[131] Jones Tr. Vol. 6, 177:8-21; 180:19-25.

KC 20428204.1

and unsupported hunches to detain the family.[132] Of particular note, Chief Aden took issue with the fact that when Lt. Rohr reapproached the RV, Mr. Erich clearly did not want to answer Lt. Rohr's further questions, yet Lt. Rohr continued questioning and then quickly told Mr. Erich he was being detained.[133]

96.      Overall, Chief Aden did not find Lt. Rohr's conduct in detaining the Erich-Maloney family to be within nationally accepted practices.[134] The Court credits and adopts Chief Aden's findings and opinions in this regard.

97.      To this day, Lt. Rohr maintains that the Erich-Maloney family was up to no good and that there was something wrong with their vehicle.[135]

98.      Lt. Rohr did not change anything about his behavior or the way he enforces the laws of the state of Kansas as a result of the stop of the Erich and Maloney family.[136]

99.      Not long after the stop and detention of the Erich and Maloney family, in 2020, Lt. Rohr was promoted to a KHP Lieutenant.[137] As a Lieutenant, Lt. Rohr is a direct line supervisor for troopers who report directly to him.[138] He monitors their performance and conducts their evaluations.[139]

---

[132] Jones Tr. Vol. 6, 183:17-184:5; 185:14-24.

[133] Jones Tr. Vol. 6, 184:9-185:9.

[134] Jones Tr. Vol. 6, 185:14-24.

[135] Rohr Dep., Ex. 137, 212:24-213:2, 216:24-217:13; Rohr Video Dep. Desig., Ex. 130, 2:22:10-2:22:31.

[136] Rohr Dep., Ex. 137, 197: 16-198:9; Rohr Video Dep. Desig., Ex. 130, 2:18:36-2:19:14.

[137] Rohr Dep., Ex. 137, 18:15-20; Rohr Video Dep. Desig., Ex. 130, 0:02:20-0:02:37.

[138] Rohr Dep., Ex. 137, 29:13-17; Rohr Video Dep. Desig., Ex. 130, 0:04:50-0:04:58.

[139] Rohr Dep., Ex. 137, 29:13-23; Rohr Video Dep. Desig., Ex. 130, 0:04:50-0:05:09.

KC 20428204.1

### D.  Trooper James McCord's stop and detention of Daniel Kelly

100.    On May 27, 2020, Trooper McCord drove up behind Daniel Kelly, who was driving a rental vehicle eastbound on I-70.[140]

101.    Trooper McCord has served as a trooper with the KHP for 20 years.[141] Trooper McCord is assigned to Troop N near Hays, Kansas, which focuses on criminal interdiction.[142]

102.    As Trooper McCord first observed Mr. Kelly's car, he noticed it had California license plates.[143] After following Mr. Kelly for a short distance, Trooper McCord pulled Mr. Kelly over for following another vehicle too closely.[144]

103.    Trooper McCord approached Mr. Kelly's window and inquired about his travel plans. Mr. Kelly explained that he was driving through Kansas to pick up his nephew in Shawnee, Kansas.[145] At this time, Trooper McCord also learned that Mr. Kelly was driving a rental car.[146]

104.    Trooper McCord began to suspect that Mr. Kelly was trafficking drugs because, according to Trooper McCord, I-70 is a primary drug corridor, and because Mr. Kelly had California license plates.[147]

105.    After obtaining Mr. Kelly's license and rental agreement, Trooper McCord contacted dispatch to request information about Mr. Kelly's criminal history and prior drug offenses.[148]

---

[140] Jones Tr. Vol. 2, 116:1-4; McCord Dash Cam Video, Ex. 119, 0:00-2:25.

[141] Jones Tr. Vol. 2, 112:3-6.

[142] Jones Tr. Vol. 2, 112:7-16.

[143] Jones Tr. Vol. 2, 116:1-4; McCord Dash Cam Video, Ex. 119, 0:00-2:25.

[144] Jones Tr. Vol. 2, 115:19-25.

[145] Jones Tr. Vol. 2, 115:11-15; McCord Dash Cam Video, Ex. 119, 2:42-4:35.

[146] Jones Tr. Vol. 2, 117:2-10.

[147] Jones Tr. Vol. 2, 117:11-118:1.

[148] Jones Tr. Vol. 2, 118:2-21; McCord Dash Cam Video, Ex. 119, 12:30-13:25.

KC 20428204.1

106.     Trooper McCord testified that he does not request this on every stop.[149] Trooper McCord requested the information because he believed Mr. Kelly was a possible drug smuggler.[150]

107.     Although the dispatcher returned information about Mr. Kelly's suspected criminal history, Trooper McCord did not ask the dispatcher about the timing of what was reported or inquire any further.[151]

108.     After some time, Trooper McCord reapproached the vehicle to give Mr. Kelly a warning for following too closely, and to return his papers. Trooper McCord then waved and turned to walk back towards his trooper vehicle. Based on the dash cam footage, Mr. Kelly could not pull back onto the highway and into fast-moving traffic without risking injury to Trooper McCord.[152]

109.     About a second later, Trooper McCord turned back towards Mr. Kelly's vehicle and began to ask him a few more questions.[153]

110.     Trooper McCord began by asking him about his nieces and nephews, even though Mr. Kelly only mentioned picking up one nephew.[154]

111.     Trooper McCord then asked Mr. Kelly whether he had guns, drugs, or large sums of currency. Mr. Kelly denied having such items.[155]

112.     Trooper McCord then asked to search Mr. Kelly's car, and Mr. Kelly declined. Trooper McCord then detained Mr. Kelly.[156]

---

[149] Jones Tr. Vol. 2, 118:2-21; McCord Dash Cam Video, Ex. 119, 12:30-13:25.

[150] Jones Tr. Vol. 2, 118:19-2; McCord Dash Cam Video, Ex. 119, 12:30-13:25.

[151] Jones Tr. Vol. 2, 119:1-15; McCord Dash Cam Video, Ex. 119, 12:30-13:25.

[152] Jones Tr. Vol. 2, 120:11-14: McCord Dash Cam Video, Ex. 119, 14:20-15:34.

[153] Jones Tr. Vol. 2, 120:15-18: McCord Dash Cam Video, Ex. 119, 14:20-15:34.

[154] Jones Tr. Vol. 2, 115:11-15; Jones Tr. Vol. 2, 120:19-121:22; McCord Dash Cam Video, Ex. 119, 14:20-15:34.

[155] Jones Tr. Vol. 2, 121:5-8, 122:20-22; McCord Dash Cam Video, Ex. 119, 14:20-15:34.

[156] Jones Tr. Vol. 2, 123:4-13; McCord Dash Cam Video, Ex. 119, 14:20-15:34.

KC 20428204.1

113.    Trooper McCord claimed he had reasonable suspicion to detain Mr. Kelly because: (1) there were fingerprints on the back lid of the car; (2) there was a duffle bag inside Mr. Kelly's rental in the passenger seat; (3) Mr. Kelly was coming from California (which had legalized marijuana); and (4) Mr. Kelly's travel plans involve picking up his nephew in Kansas, which Trooper McCord found suspicious because he would not let his own kids travel with their uncle.[157] Trooper McCord also based his reasonable suspicion on Mr. Kelly choosing to drive from California to Kansas instead of fly, even though Mr. Kelly would have needed to pay for more than one plane ticket, and even though Trooper McCord's stop occurred about two months into the COVID-19 pandemic.[158]

114.    Even before Trooper McCord reapproached Mr. Kelly, he had planned to detain Mr. Kelly for a canine sniff.[159]

115.    When Mr. Kelly declined to consent to let Trooper McCord search the car, Trooper McCord called for a canine handler to sniff around Mr. Kelly's car. After the dog searched the outside of the car, it jumped through the open car window and went inside Mr. Kelly's car. Trooper McCord then informed Mr. Kelly that the dog alerted, which gave Trooper McCord probable cause to enter and search Mr. Kelly's rental car.[160]

116.    Trooper McCord did not find any evidence of drug trafficking in the car. He found a vape pen with a cartridge under the passenger seat, which Trooper McCord did not test for an illegal substance, and later discarded.[161]

---

[157] Jones Tr. Vol. 2, 139:9-140:11, 143:16-144:3.

[158] Jones Tr. Vol. 2, 139:9-140:11, 144:4-16, 146:3-6.

[159] Jones Tr. Vol. 2, 121:5-8, 123:23-25.

[160] Jones Tr. Vol. 2, 126:3-24; McCord Dash Cam Video, Ex. 119, 21:15-24:45.

[161] Jones Tr. Vol. 2, 126:25-127:18; McCord Dash Cam Video, Ex. 119, 21:15-24:45

31

117.    The detention lasted approximately 31 minutes.[162]

118.    Trooper McCord's supervisor, the Captain of Troop N, was never notified about Trooper McCord's detention of Mr. Kelly.[163]

### E.  Trooper Chandler Rule's stop and detention of Suzanne Dunn

119.     Trooper Rule pulled over Suzanne Dunn for a traffic stop in February 2021.[164] At the time of the stop, Trooper Frantz of Troop N, the interdiction unit, was riding with him.[165]

120.    Trooper Chander Rule joined the KHP in July of 2016 and became a canine handler (Troop S) in 2018.[166] As a canine handler, Trooper Rule works with all the KHP troops.[167] He works all over the state of Kansas, primarily all the highways from Emporia to Nebraska to Kansas City.[168] He both conducts his own traffic stops and gets called out to respond to other troopers' stops.[169]

121.    Ms. Dunn is a resident of Arlington, Virginia. She left Virginia to drive to Colorado on February 4, 2021, to pick up a refurbished camper van that she had purchased online. She was driving a rented Mercedes.[170]

122.    After stopping in Missouri overnight, Ms. Dunn continued her trip the morning on February 5, 2021, driving westbound on I-70 through Kansas.[171]

---

[162] McCord Dash Cam Video, Ex. 119.

[163] Jones Tr. Vol. 6, 94:5-8.

[164] C. Rule Dep., Ex. 131A, 103:21-23, 104:1-4; Rule Video Dep. Desig., Ex. 131, 29:19-29:29:35.

[165] C. Rule Dep., Ex. 131A, 105:10-23; Rule Video Dep. Desig., Ex. 131, 30:03-30:06, 30:31-30:34.

[166] C. Rule Dep., Ex. 131A, 10:7-9, 14:2-3; Rule Video Dep. Desig., Ex. 131, 00:52-00:57, 01:04-01:06.

[167] C. Rule Dep., Ex. 131A, 59:17-22; Rule Video Dep. Desig., Ex. 131, 12:30-12:41.

[168] C. Rule Dep., Ex. 131A, 60:16-19; Rule Video Dep. Desig., Ex. 131, 12:41-12:56.

[169] C. Rule Dep., Ex. 131A, 60:25-61:5; Rule Video Dep. Desig., Ex. 131, 12:56-13:07.

[170] Jones Tr. Vol. 2, 78:10-13; 79:7-16; 79:17-80:10.

[171] Jones Tr. Vol. 2, 80:8-81:5.

KC 20428204.1

123.    At some point west of Topeka on I-70, Trooper Chandler Rule noticed Ms. Dunn's rental vehicle, and began to follow her.[172]

124.    Trooper Rule's common practice is to run a car's plates before pulling it over, and typically when he runs a car's plates, he learns if it is a rental car.[173]

125.    Trooper Rule's dash cam shows his vehicle passing two cars and two semi-trucks in right lane before pulling his vehicle beside Ms. Dunn.[174] Trooper Rule subsequently pulled his vehicle behind Ms. Dunn's rental, and Ms. Dunn responded by entering the right lane.[175]

126.    Trooper Rule then activated his patrol car lights and pulled Ms. Dunn over. He approached Ms. Dunn and told her that she was driving in the left lane for too long, but mentioned nothing about her speed.[176]

127.    Trooper Rule then asked Ms. Dunn several questions about her travel plans, which Ms. Dunn answered. Trooper Rule asked why she decided not to fly from Virginia to Colorado.[177] Ms. Dunn responded that she was driving because of COVID, she had not yet been fully vaccinated, she had an autoimmune disease, and she did not want to take a commercial flight.[178]

128.    Trooper Rule took Ms. Dunn's information and returned to his car. After some time, he reapproached Ms. Dunn's rental and handed back some paperwork. Ms. Dunn believed that he

---

[172] Jones Tr. Vol. 2, 83:6-19.

[173] C. Rule Dep., Ex. 131A, 108:7-23; Rule Video Dep. Desig., Ex. 131, 31:32-32:07.

[174] Rule Dash Cam Video, Ex. 121 at 00:00-1:40.

[175] Rule Dash Cam Video, Ex. 121 at 1:40-2:30.

[176] Rule Dash Cam Video, Ex. 121 at 1:40-3:00.

[177] Rule Dash Cam Video, Ex. 121 at 3:00-3:27.

[178] Jones Tr. Vol. 2, 85:12-21; Rule Dash Cam Video, Ex. 121 at 3:00-3:27.

KC 20428204.1

was giving her a warning citation, but she later found out that Trooper Rule only gave her back her rental agreement and license.[179]

129.    Trooper Rule told Ms. Dunn to have a safe trip.[180] Trooper Rule then performed the Two Step: he took a step away from her rental vehicle, before reengaging Ms. Dunn and asking her if he could ask her some questions.[181]

130.    Ms. Dunn felt like she could not leave because she was trying to be polite, and because her father (himself a former police officer) gave her instructions about how to interact with police, which included answering their questions.[182] Trooper Rule also positioned his upper body inside Ms. Dunn's rental, and she felt like she could no longer safely leave.[183]

131.    Trooper Rule continued to ask Ms. Dunn questions about her trip, the details of the converted van, and what she does for a living.[184] Ms. Dunn continued to believe that she was not free to leave based on her father's comments to her about traffic stops.[185]

132.    Trooper Rule continued to ask Ms. Dunn questions, including questions about her rental agreement, and why she decided to drive instead of fly.[186] Ms. Dunn reminded Trooper Rule that she drove because of COVID and her underlying autoimmune disease, and that she felt more comfortable driving instead of flying.[187] Ms. Dunn felt like Trooper Rule was not listening to her,

---

[179] Jones Tr. Vol. 2, 86:1-6; 100:20-101:5; Rule Dash Cam Video, Ex. 122 at 2:30-3:04.

[180] Jones Tr. Vol. 2, 86:12-87:14; Rule Dash Cam Video, Ex. 122 at 2:30-3:04.

[181] Rule Dash Cam Video, Ex. 122 at 3:05-4:08.

[182] Jones Tr. Vol. 2, 87:24-88:15.

[183] Jones Tr. Vol. 2, 88:9-20.

[184] Rule Dash Cam Video, Ex. 122 at 4:08-4:45.

[185] Jones Tr. Vol. 2, 88:9-20; Rule Dash Cam Video, Ex. 122 at 4:08-4:45.

[186] Rule Dash Cam Video, Ex. 122 at 4:45-5:15.

[187] Jones Tr. Vol. 2, 91:4-9; Rule Dash Cam Video, Ex. 122 at 4:45-5:15.

KC 20428204.1

and that Trooper Rule's questions progressively became more intrusive-she felt "uneasy" with his line of questions.[188]

133.    Trooper Rule then asked Ms. Dunn about trafficking guns, drugs, and illegal cash, and he asked her if she had such items.[189] This made Ms. Dunn "acutely scared."[190]

134.    Trooper Rule asked Ms. Dunn if he could search the trunk of her car, and she responded that she would rather not.[191] Ms. Dunn found it really hard to say no because she was trained to be nice and polite to law enforcement.[192]

135.    Trooper Rule responded by questioning Ms. Dunn's refusal, and then asked Ms. Dunn if she did not mind if he had his dog run around the outside of her rental.[193] Ms. Dunn consented to Trooper Rule having a dog run around the outside of her car because she thought that she could stay inside the car, and she interpreted Trooper Rule's request as the dog literally just running around the outside of her car.[194]

136.    Trooper Rule told Ms. Dunn to exit the rental car, and as she did, another officer directed Ms. Dunn to keep her head forward and go stand in front of the rental.[195] Ms. Dunn interpreted the officer's tone as angry and intimidating, and she got more scared.[196]

---

[188] Jones Tr. Vol. 2, 91:10-21.

[189] Rule Dash Cam Video, Ex. 122 at 5:15-5:47.

[190] Jones Tr. Vol. 2, 91:25-92:10.

[191] Jones Tr. Vol. 2, 92:11-23; Rule Dash Cam Video, Ex. 122 at 5:15-5:47.

[192] Jones Tr. Vol. 2, 2023, 92:24-93:6.

[193] Rule Dash Cam Video, Ex. 122 at 5:57-5:52.

[194] Jones Tr. Vol. 2, 94:8-21; Rule Dash Cam Video, Ex. 122 at 5:57-5:52.

[195] Rule Dash Cam Video, Ex. 122 at 5:52-6:30.

[196] Jones Tr. Vol. 2, 96:7-15.

KC 20428204.1

137.     Trooper Rule then deployed his canine around Ms. Dunn's car for a drug sniff.[197] Ms. Dunn observed the dog going around her rental vehicle in a frenzied manner, and she noticed that the dog scratched the car and cracked one of the door handles.[198]

138.     Trooper Rule said the canine alerted by displaying deep nasal breathing, bracketing, and frantic behavior at the passenger door.[199] Trooper Rule told Ms. Dunn that the dog alerted for the presence of narcotics in the rental car.[200]

139.     Ms. Dunn asked for her phone to record what was happening because she knew that she didn't have drugs, guns, or money in the car, and she wanted proof of what was happening.[201] Trooper Rule denied Ms. Dunn's request.[202]

140.     Trooper Rule searched the entire car. At this point, Ms. Dunn was mad about the situation,[203] because she did not do anything wrong, and she believed the entire situation escalated quickly.[204]

141.     Trooper Rule found nothing. He then told Ms. Dunn that she could leave.[205]

142.     After Ms. Dunn left the location of her stop, she stopped at a rest stop to look at her warning citation, but she realized that Trooper Rule did not give her a citation.[206]

---

[197] C. Rule Dep., Ex. 131A, 123:5-10; Rule Video Dep. Desig., Ex. 131, 39:54-40:02.

[198] Jones Tr. Vol. 2, 96:19-97:6.

[199] C. Rule Dep., Ex. 131A, 123:11-124:14; Rule Video Dep. Desig., Ex. 131, 40:03-41:35.

[200] Rule Dash Cam Video, Ex. 122 at 6:30-7:45.

[201] Jones Tr. Vol. 2, 97:23-98:4; Rule Dash Cam Video, Ex. 122 at 7:45-8:48.

[202] Rule Dash Cam Video, Ex. 122 at 7:45-8:48.

[203] Jones Tr. Vol. 2, 99:13-20.

[204] Jones Tr. Vol. 2, 99:21-100:8.

[205] Rule Dash Cam Video, Ex. 122 at 11:10-11:54.

[206] Jones Tr. Vol. 2, 100:20-101:5.

KC 20428204.1

143.    Ms. Dunn made several calls to the KHP asking for additional information, but the KHP responded by providing her with different phone numbers to call, until someone within the KHP directed her to Lt. Justin Rohr.[207]

144.    Ms. Dunn made other calls, including calls to her children, her sister, and a couple of friends to explain how agitated she was about the stop.[208]

145.    Ms. Dunn continued to discuss the stop with Lt. Rohr after February 5, 2021. Lt. Rohr explained to Ms. Dunn why Trooper Rule allegedly found her suspicious, specifically stating that it was Ms. Dunn's drive across the country and that she had copious snacks.[209]

146.    Ms. Dunn also called the ACLU.[210]

147.    Trooper Rule completed a canine report regarding his detention and canine sniff of Ms. Dunn's car.[211] The report lists what Trooper Rule allegedly identified as indicators of criminal activity.[212] Trooper Rule found the following suspicious: (1) Ms. Dunn was traveling from a known narcotics hub, Arlington, Virginia; (2) Ms. Dunn was traveling to a known narcotics distribution hub, Denver, Colorado; (3) Ms. Dunn appeared nervous and would not make consistent eye contact and appeared hesitant with her answers; (4) the expensive cost of the rental vehicle; (5) Ms. Dunn's explanation that she did not want to fly because of COVID was extremely suspicious; (6) Ms. Dunn was a 52-year-old woman traveling halfway across the country by herself with inclement weather in the forecast. [213]

---

[207] Jones Tr. Vol. 2, 101:3-17.

[208] Jones Tr. Vol. 2, 102:4-16.

[209] Jones Tr. Vol. 2, 108:21-109:4.

[210] Jones Tr. Vol. 2, 102:4-16.

[211] C. Rule Dep., Ex. 131A, 105:1-7; Rule Video Dep. Desig., Ex. 131, 29:39-30:00.

[212] C. Rule Dep., Ex. 131A, 111:17-21; Rule Video Dep. Desig., Ex. 131, 32:28-32:39.

[213] C. Rule Dep., Ex. 131A, Plaintiffs' Designations at pp. 113-120; Rule Video Dep. Desig., Ex. 131, 32:44-39:02.

KC 20428204.1

148.    The Court does not find credible Trooper Rule's testimony that Ms. Dunn appeared nervous and hesitant to answer his questions. The dash cam audio clearly depicts a cordial conversation prior to Trooper Rule's request to search Ms. Dunn's vehicle.[214]

149.    Trooper Rule believed that the cost of the rental vehicle was too expensive because he believes Ms. Dunn could have had her van shipped for the cost she spent on the rental.[215] Trooper Rule based his belief on his experience that in the past he had stopped car haulers and seen bill of ladings that show how much it costs to ship a car.[216]

### F.  Lieutenant Scott Proffitt's stop and detention of Curtis Martinez

150.    On September 5, 2022, KHP Lt. Scott Proffitt was working a day shift and driving westbound on I-70. At approximately 2:30pm, Lt. Proffitt registered two vehicles speeding on his radar heading eastbound. He executed a U-turn across the median of I-70 to pursue a traffic stop.[217] Lt. Proffitt's patrol car dash camera recorded video of the traffic stop.[218]

151.    Lt. Proffitt has worked for the KHP since 2004—approximately 19 years.[219] He is a Troop C field lieutenant over three counties: Riley, Gary, and Dickinson Counties.[220] He supervises six other troopers.[221] He is not in the interdiction unit.

152.    Lt. Proffitt's dash cam video from September 5, 2022, shows Lt. Proffitt following at a distance behind several cars, then taking an exit ramp at some distance behind a silver Chevy

---

[214] Rule Dash Cam Video, Ex. 122.

[215] C. Rule Dep., Ex. 131A, 116:17-117:3; Rule Video Dep. Desig., Ex. 131, 35:18-35:59.

[216] C. Rule Dep., Ex. 131A, 130:25-131:16; Rule Video Dep. Desig., Ex. 131, 41:44-42:22.

[217] Jones Tr. Vol. 2, 5:8-6:20, 51:11-13, 53:2-5.

[218] Jones Tr. Vol. 2, 6:21-7:22; Proffitt Dash Cam, Ex. 954.

[219] Jones Tr. Vol. 2, 5:10-13.

[220] Jones Tr. Vol. 2, 5:14-17.

[221] Jones Tr. Vol. 2, 5:20-24.

KC 20428204.1

Cruze with a Colorado license plate. The car exited I-70 and turned left. When Lt. Proffitt caught up, the Chevy Cruze promptly stopped.[222]

153.    Lt. Proffitt approached the driver of the Chevy Cruze, Curtis Martinez. Lt. Proffitt asked Mr. Martinez to turn down his radio music and stated that this highway exit was not one Lt. Proffitt was accustomed to seeing people take. Mr. Martinez explained that he was looking for a restroom.[223]

154.    Lt. Proffitt informed Mr. Martinez that he stopped him for speeding and requested Mr. Martinez's driver's license and proof of insurance. Mr. Martinez provided his Colorado driver's license and informed Lt. Proffitt that the Cruze was his wife's car, that the car had a new registration, and that he was on his way to Missouri for work.[224]

155.    Lt. Proffitt asked Mr. Martinez's passenger for his name. The passenger declined to provide his name and asked why Proffitt wanted to know. Lt. Proffitt responded that Martinez's wife's name did not match the insured person's name, which Lt. Proffitt found "very odd." Mr. Martinez again stated that the car belonged to his wife, and then informed Lt. Proffitt that his mother-in-law was the named insured person.[225]

156.    Lt. Proffitt requested the Cruze's registration paperwork. Mr. Martinez informed Lt. Proffitt that they had just gotten new license plates, that he did not have the current registration for the car, and that they could call his wife,[226] but she was at the pool with their son.[227]

---

[222] Proffitt Dash Cam, Ex. 954 at 0:00-3:16; Jones Tr. Vol. 2, 7:25-8:21.

[223] Proffitt Dash Cam, Ex. 954 at 3:17-3:44; Jones Tr. Vol. 2, 9:15-20, 10:25-11:2.

[224] Proffitt Dash Cam, Ex. 954 at 3:45-4:31; Jones Tr. 9:21-10:17.

[225] Proffitt Dash Cam, Ex. 954 at 4:32-5:08; Jones Tr. Vol. 2, 8:22-9:14.

[226] Martinez Decl., Doc. #358-1, ¶ 8 (proffered by Plaintiffs in lieu of live testimony).

[227] Proffitt Dash Cam, Ex. 954 at 5:09-6:27.

KC 20428204.1

157.    Lt. Proffitt returned to his patrol vehicle and requested information from the dispatcher on Mr. Martinez's criminal and drug history. Lt. Proffitt does not normally request drug history information on traffic stops. The dispatcher informed Lt. Proffitt that Mr. Martinez had no criminal history whatsoever.[228]

158.    Nevertheless, Lt. Proffitt asserted that after his first interaction with Mr. Martinez, he already possessed reasonable suspicion that Mr. Martinez was involved in narcotics activity. His purported reasonable suspicion was based on the following factors: (1) Mr. Martinez had pulled off the highway and turned left in what Lt. Proffitt thought was an evasive maneuver; (2) Mr. Martinez was playing loud music; (3) Mr. Martinez's wallet had an image of El Chapo or Jesus Malverde, although Lt. Proffitt couldn't say for sure; (4) Mr. Martinez was driving his wife's car that was insured by his mother-in-law; (5) the Cruze's registration was expired; (6) the passenger's refusal to identify himself; (7) Mr. Martinez and his passenger's purported "defiance" toward Lt. Proffitt; and (8) Lt. Proffitt's belief that Mr. Martinez was dishonest about speeding and looking for a restroom.[229]

159.    Lt. Proffitt also claimed to be concerned for his personal safety at this point in time and that the passenger gave him "an officer safety vibe," because Lt. Proffitt perceived Mr. Martinez and his passenger as "defiant" based on their loud music and the passenger's refusal to identify himself.[230]

---

[228] Proffitt Dash Cam, Ex. 954 at 6:45-11:15; Jones Tr. Vol. 2, 11:5-12:12.

[229] Jones Tr. Vol. 2, 12:15-18:15, 55:9-56:13, 60:15-64:5.

[230] Jones Tr. Vol. 2, 14:1-3, 14:14-25, 15:9-24.

KC 20428204.1

160.    After learning that Mr. Martinez had no criminal or drug record, Lt. Proffitt re-approached the car. He handed Mr. Martinez back his documents and a citation for having expired registration and told him to "have a safe one."[231]

161.    Lt. Proffitt then took two steps away and immediately turned back around and asked Mr. Martinez, "Can I ask you something?" Lt. Proffitt's Two Step maneuver took one second, during which Mr. Martinez had already begun to pull away.[232]

162.    Lt. Proffitt then told Mr. Martinez that his use of this particular highway exit was "overly suspicious" and asked if he had any contraband. When Mr. Martinez denied having any contraband in the car, Lt. Proffitt asked for his consent to search the car. Mr. Martinez refused. Lt. Proffitt then informed Mr. Martinez that he was detaining him for a canine sniff.[233]

163.    Mr. Martinez then pulled forward and further onto the shoulder of the road.[234] Lt. Proffitt returned to his patrol car and called for a canine unit.[235]

164.    Officer Childs, a canine handler from Riley County, contacted Lt. Proffitt over the phone. Lt. Proffitt proceeded to describe the situation and provide some of the reasons he detained Mr. Martinez to Officer Childs. One of the first things Lt. Proffitt mentioned to Officer Childs was the fact that Mr. Martinez had Colorado tags. Lt. Proffitt also described Mr. Martinez's refusal to consent to a search and "attempt to elude." [236]

---

[231] Proffitt Dash Cam, Ex. 954 at 11:15-12:09; Martinez Citation, Ex. 953; Jones Tr. Vol. 2, 21:17-19, 64:4-6:15.

[232] Proffitt Dash Cam, Ex. 954 at 12:09-12:11; Jones Tr. Vol. 2, 18:17-20:3, 64:13-18.

[233] Proffitt Dash Cam, Ex. 954 at 12:11-12:42; Jones Tr. Vol. 2, 20:4-17, 64:19-65:1.

[234] Proffitt Dash Cam, Ex. 954 at 12:44-13:05; Jones Tr. Vol. 2, 24:10-13, 65:8-17, 71:8-25 ("Q. He was placing the car understanding that he was detained further out of the roadway, correct? A. Yes. Q. Safe move, correct? A. That's what it looked like.").

[235] Proffitt Dash Cam, Ex. 954 at 12:43-13:50; Jones Tr. Vol. 2, 22:21-23:4.

[236] Proffitt Dash Cam, Ex. 954 at 22:07-24:19, 27:24-28:16.

41

KC 20428204.1

165.    Lt. Proffitt also informed Officer Childs that Mr. Martinez was on his way to Missouri.[237]

166.    Lt. Proffitt told Officer Childs that Mr. Martinez and his passenger were "wanting to put on a show and be bullies," that they were not nervous but instead "angry and kind of bully-ish." He also claimed that Mr. Martinez and his passenger displayed anger and agitation and they "were planning on trying to be abrasive[.]" [238]

167.    Lt. Proffitt also repeatedly told Officer Childs that he was watching their hands, meaning that he was concerned that Mr. Martinez and his passenger were violent based on their outward appearance and tattoos, despite Mr. Martinez having no criminal record of any kind and Mr. Martinez complying with his requests for documents and information.[239]

168.    Lt. Proffitt also discussed his confusion over the car's registration to Mr. Martinez's wife and insurance to his mother-in-law. He expressed doubt that Mr. Martinez and his wife were legally married because they did not share a surname, and noted that "they're both Hispanic" and "their lifestyle can be different, so I can't always follow the name and if they're married. They'll say married, and it might be common law married."[240]

169.    Officer Childs arrived. Before the canine sniff began, Mr. Martinez and his passenger questioned Lt. Proffitt about his basis for detaining them. Upon being asked what his

---

[237] Proffitt Dash Cam, Ex. 954 at 26:39-26:47.

[238] Proffitt Dash Cam, Ex. 954 at 22:57-23:04, 23:45-23:51, 26:46-27:07; Jones Tr. Vol. 2, 29:2-11, 61:15-62:22.

[239] Proffitt Dash Cam, Ex. 954 at 24:20-25:10 ("I was actually watching hand movements on this one and not looking around. . . . They look – they look like I'd be more worried about their hands as opposed to air fresheners and Febreze in the backseat, stuff like that . . They're both tatted up pretty good . . . but I didn't look at the tats close enough to see if there's actually any indicators of certain specific tattoos on there, so."); 27:15-22 ("No, I didn't see anything . . . This was one where I was watching hands."); Jones Tr. Vol. 2, 24:14-25:7, 29:12-14.

[240] Proffitt Dash Cam, Ex. 954 at 25:11-26:23; Jones. Tr. Vol. 2, 25:8-27:7, 28:17-25 ("Q. . . . You're aware that women use their maiden name oftentimes after they're married as a matter of personal preference? A. Correct. Q. You're aware of that? A. That can happen, yes.").

42

probable cause was, Lt. Proffitt responded, "It's reasonable suspicion." When asked what reasonable suspicion was, Lt. Proffitt stated, "I can't explain it to you if you don't know it."[241]

170.    Officer Childs conducted the canine sniff on Mr. Martinez's car. The canine approached the right side of the car and sat down immediately. Officer Childs circled around the car once counter-clockwise, but the canine remained sitting on the right side of the car. The sniff lasted approximately 30 seconds. According to Lt. Proffit, the canine indicated to the odor of narcotics.[242]

171.    Lt. Proffitt proceeded to search Mr. Martinez's vehicle while Mr. Martinez and his passenger waited some distance in front of the car.[243]

172.    Mr. Martinez filmed his interactions with Lt. Proffitt and Officer Childs, the canine sniff, and the search on his cell phone.[244]

173.    After a thorough search, Lt. Proffitt did not find any large sums of cash, controlled substances, or weapons. Lt. Proffitt never recovered any drugs from the search.[245]

174.    The detention lasted one hour and thirteen minutes.[246] Mr. Martinez was not able to testify at trial due to a family emergency. In place of his anticipated live testimony, the Plaintiffs proffered a sworn declaration written by Mr. Martinez, previously filed on the docket at Doc. #358-

---

[241] Proffitt Dash Cam, Ex. 954 at 39:42-40:06.

[242] Proffitt Dash Cam, Ex. 954 at 37:50-40:51; Jones Tr. Vol. 2, 37:7-19; *see also* Martinez Cell Phone Video Part 1, Ex. 128 at 4:58-5:29.

[243] Proffitt Dash Cam, Ex. 954 at 44:40-56:55; Jones Tr. Vol. 2, 37:20-38:10.

[244] Martinez Cell Phone Video Part 1, Ex. 128; Martinez Cell Phone Video Part 2, Ex. 129.

[245] Martinez Cell Phone Video Part 2, Ex. 129 at 1:11-1:57; Jones Tr. Vol. 2, 38:13-25, 66:6-21, 73:14-74:2.

[246] Proffitt Dash Cam, Ex. 954 (incomplete; ends prior to end of vehicle search).

KC 20428204.1

1.[247] The Court credits and adopts the additional details provided by Mr. Martinez in his declaration, as they are not inconsistent with Lt. Proffitt's testimony.

## II.     THE KHP RELIES ON PRETEXTUAL TRAFFIC STOPS FOLLOWED BY ROADSIDE DETENTIONS FOR CANINE SNIFFS AS A CORE PART OF ITS INTERDICTION WORK.

175.     KHP recruits are taught at the academy to engage in pretextual stops (e.g., going six miles over the speed limit or drifting over the fog line or following too closely).[248] KHP troopers have discretion over whom they choose to stop.[249]

176.     Per their training, KHP troopers frequently engage in pretextual stops, then question motorists about their travel plans, destination, and origin. That questioning may be followed by the Two Step maneuver and additional questions to motorists.[250]

177.     KHP troopers use canine sniffs as part of their interdiction work. During a canine sniff, a canine handler walks the dog around the car and watches for changes in the dog's behavior. A canine alert is untrained behavior that the dog exhibits when he is smelling a trained odor.[251] It is often only seen by the handler because each canine's alert behavior is different.[252] So the specific canine handler is typically the only one who would notice the alerting behavior.[253]

---

[247] Jones Tr. Vol. 2, 4:1-21; Doc. #358-1.

[248] Jones Tr. Vol. 6, 144:9-21.

[249] Jones Tr. Vol. 6, 146:5-13.

[250] Jones Tr. Vol. 6, 144:9-145:17.

[251] C. Rule Dep., Ex. 131A, 38:13-17; Rule Video Dep. Desig., Ex. 131, 09:13-09:28.

[252] C. Rule Dep., Ex. 131A, 38:13-21; Rule Video Dep. Desig., Ex. 131, 09:13-09:41.

[253] C. Rule Dep., Ex. 131A, 38:13-21; Rule Video Dep. Desig., Ex. 131, 09:13-09:41.

KC 20428204.1

178.    An indication is a trained behavior that the dog exhibits when he is at the source of a trained odor.[254] KHP troopers believe they have probable cause to search when there is an alert, even if there is no indication.[255]

179.    The Court finds the testimony regarding alerting behavior questionable at best. Even for a specific canine, the alert can change based on the situation.[256] Examples can include deep nasal breathing, intensity change, and quick bracketing.[257] What "quick bracketing" means also changes depending on the situation.[258] For example, it could be a head jerk or it could be walking back and forth to an area.[259] And there are times when bracketing might not be an alert.[260]

180.    Nevertheless, KHP unquestionably chooses to search vehicles once a canine alerts or indicates during a sniff. KHP's specific practices regarding who to stop and who to detain for a canine sniff, and under what circumstances, are described below.

### A. The KHP targets out-of-state drivers for traffic stops and roadside detentions for canine sniffs.

181.    The Court heard extensive evidence regarding KHP's stop and detention practices, including various statistical analysis conducted by Dr. Jonathan Mummolo.

182.    Dr. Mummolo is an assistant professor of politics and public affairs at Princeton University.[261] He received a Ph.D. in political science from Stanford University in 2017.[262] He also

---

[254] C. Rule Dep., Ex. 131A, 38:13-24; Rule Video Dep. Desig., Ex. 131, 09:13-09:48.

[255] C. Rule Dep., Ex. 131A, 41:20-22; Rule Video Dep. Desig., Ex. 131, 09:49-10:03.

[256] C. Rule Dep., Ex. 131A, 39:9-13; Rule Video Dep. Desig., Ex. 131, 09:49-10:03.

[257] C. Rule Dep., Ex. 131A, 39:9-13; Rule Video Dep. Desig., Ex. 131, 09:49-10:03.

[258] C. Rule Dep., Ex. 131A, 39:14-21; Rule Video Dep. Desig., Ex. 131, 10:03-10:27.

[259] C. Rule Dep., Ex. 131A, 39:14-21; Rule Video Dep. Desig., Ex. 131, 10:03-10:27.

[260] C. Rule Dep., Ex. 131A, 45:12-20; Rule Video Dep. Desig., Ex. 131, 11:44-12:11.

[261] Jones Tr. Vol. 3, 1:20-21. Effective July 1, 2023, Dr. Mummolo will be an associate professor with tenure. Jones Tr. Vol. 3, 1:21-22.

[262] Jones Tr. Vol. 3, 2:3-8.

KC 20428204.1

has a master's degree in government from Georgetown University and a bachelor's degree in history and journalism from New York University.[263]

183.    Dr. Mummolo uses quantitative methods to study policing in the United States, including such issues as the impact of police reforms on police officers' behavior, how civilians think about police officers, and methodologies for developing improved statistical methods to estimate discrimination in police behavior.[264] He has about 20 peer reviewed publications.[265] He teaches an undergraduate course on the politics of policing, a master's level course on the politics of public policy, and an introduction to statistics course for Ph.D. students in the politics department.[266]

184.    Dr. Mummolo has received grants from Microsoft Corporation, to develop techniques to study police body-camera footage, and Arnold Ventures, to develop a generalizable toolkit to measure discrimination in different police agencies.[267] He is often invited to lecture at other universities and at conferences.[268]

185.    Together with Dean Knox, a professor at the University of Pennsylvania, Dr. Mummolo co-owns a business, Knox & Mummolo LLC, that provides statistical consulting services in lawsuits involving law enforcement.[269]

---

[263] Jones Tr. Vol. 3, 2:10-12.

[264] Jones Tr. Vol. 3, 2:14-20.

[265] Jones Tr. Vol. 3, 2:24.

[266] Jones Tr. Vol. 3, 3:18-22.

[267] Jones Tr. Vol. 3, 5:21-6:2.

[268] Jones Tr. Vol. 3, 6:5-6.

[269] Jones Tr. Vol. 3, 6:11-15.

KC 20428204.1

186.    Dr. Mummolo conducted a quantitative analysis of KHP's traffic enforcement practices to ascertain whether there is any evidence that KHP enforces traffic laws differently when dealing with Kansas versus out-of-state motorists.[270]

187.    To conduct this analysis, Dr. Mummolo reviewed: (1) a dataset created from KHP's traffic enforcement records reflecting the reason for a given stop, the state identified on the vehicle's license plate, and the date, time, and location of the stop;[271] (2) Kansas Department of Transportation (KDOT) records measuring traffic volume by hour of the day and also the speed of that traffic volume;[272] (3) a commercial dataset, purchased from the vendor SafeGraph, measuring the home locations of visitors to businesses in Kansas—which Dr. Mummolo used to determine the approximate composition of Kansas versus out-of-state drivers on the road;[273] (4) reports from KHP and other law enforcement agencies documenting canine sniffs conducted during KHP traffic stops;[274] and (5) data from the Centers for Disease Control and Prevention (CDC) regarding traffic fatalities by location in Kansas and Colorado.[275]

188.    SafeGraph maintains a dataset tracking the home and visitor locations of roughly 10% of all cellphone users in the United States.[276] SafeGraph determines the home location of a given cellphone by collecting sample location records during overnight hours and identifying the phone's most common location during those hours.[277] SafeGraph data is used in the scientific

---

[270] Jones Tr. Vol. 3, 7:13-17.

[271] Jones Tr. Vol. 3, 8:16-9:10, 67:17-20, 68:23-69:5.

[272] Jones Tr. Vol. 3, 9:12-16.

[273] Jones Tr. Vol. 3, 9:23-10:3.

[274] Jones Tr. Vol. 3, 16:24-18:5.

[275] Jones Tr. Vol. 3, 18:8-10.

[276] Jones Tr. Vol. 3, 12:19-13:1.

[277] Jones Tr. Vol. 3, 13:4-12.

KC 20428204.1

community to study human movement, and at least one study in a peer-reviewed journal found that SafeGraph data is highly accurate in determining the share of visitors at a given location that are coming from a particular state.[278] While there may be some measurement errors associated with using SafeGraph data to estimate the share of out-of-state motorists at a given place and time, Dr. Mummolo found that the enforcement disparities he observed are of such magnitude that they cannot plausibly be attributed to these measurement errors.[279]

189.    Based on his review of the data described above, Dr. Mummolo made several findings regarding KHP's differential traffic enforcement practices for Kansas and out-of-state motorists. In brief, he found that: (1) KHP is more likely to stop out-of-state drivers than Kansas driver; (2) KHP is more likely to stop out-of-state drivers for speeding than Kansas drivers; (3) differential speeding behavior between Kansas and out-of-state drivers cannot plausibly explain the disparity in speeding stops; (4) out-of-state drivers are more likely to be subject to canine sniffs than Kansas drivers; and (5) out-of-state drivers are not more likely to be found holding illegal drugs than Kansas drivers.[280]

190.    First, Dr. Mummolo performed a benchmark analysis to determine whether out-of-state motorists are being disproportionately stopped relative to their prevalence on the road.[281] He estimated the proportion of out-of-state versus Kansas drivers at a given section of the interstate on a particular date and time by examining the SafeGraph data measuring the home-state locations

---

[278] Jones Tr. Vol. 3, 14:21-15:14 (discussing Joakim A. Weill et al., *Social Distancing Responses to COVID-19 Emergency Declarations Strongly Differentiated by Income*, 117 Proc. Nat'l Acad. Sci. 33, 19658-19660 (2020), https://www.pnas.org/doi/10.1073/pnas.2009412117; David Holtz et al., *Interdependence and the Cost of Uncoordinated Responses to COVID-19*, 117 Proc. Nat'l Acad. Sci. 33, 19837-42 (July 30, 2020); Yun Liang et al., *Assessing the validity of mobile device data for estimating visitor demographics and visitation patterns in Yellowstone National Park*, 317 J. Environ. Mgmt. 115410 (Sept. 2022), https://pubmed.ncbi.nlm.nih.gov/35751247/).

[279] Jones Tr. Vol. 3, 15:22-16:18; *see also* Jones Tr. Vol. 3, 72:13-76:11.

[280] Jones Tr. Vol. 3, 7:21-8:11, 37:7-12, 45:20-46:8

[281] Jones Tr. Vol. 3, 19:2-20:8.

KC 20428204.1

of cell phones known to have visited businesses located within a quarter mile of the interstate highways he studied.[282] He applied the proportions represented in the SafeGraph data to the KDOT traffic volume data to determine the approximate number of Kansas and out-of-state cars at the times and places studied.[283] He then compared the KHP traffic enforcement data to the composition of drivers on the road to determine the probability that a Kansas or out-of-state driver would be stopped at a given place and time.[284]

191.    For each time and place, Dr. Mummolo ascertained the disparity between the probability that a Kansas driver would be stopped and the probability that an out-of-state driver would be stopped, and multiplied this number by the total number of out-of-state stops that occurred at that time and place to determine the number of excess stops—i.e., the number of stops of out-of-state drivers that exceeded the number one would expect if they were stopped at an equal rate to Kansas drivers.[285] He then aggregated the total number of excess stops for all measured times and places to estimate the total number of excess stops of out-of-state drivers.[286]

192.    Dr. Mummolo found that there were 50,000 excess stops of out-of-state drivers.[287] He found that these excess stops accounted for more than 70% of all stops of out-of-state drivers conducted by KHP in the studied places and times.[288]

193.    Using a chi-squared test, Dr. Mummolo found that this disparity was statistically significant, with a roughly 1% likelihood that these results would arise under circumstances where

---

[282] Jones Tr. Vol. 3, 19:8-15, 20:20-25.

[283] Jones Tr. Vol. 3, 20:25-21:3.

[284] Jones Tr. Vol. 3, 20:10-14, 21:9-16.

[285] Jones Tr. Vol. 3, 22:2-13.

[286] Jones Tr. Vol. 3, 22:13-16.

[287] Jones Tr. Vol. 3, 22:18-21.

[288] Jones Tr. Vol. 3, 22:21-24.

KC 20428204.1

there is no actual disparity in stop rates.[289] He found that the disparity between Kansas and out-of-state stop rates is so large that even an implausibly extreme measurement error could not account for it.[290]

194.    Second, Dr. Mummolo examined whether differences in speeding behavior between Kansas and out-of-state drivers could account for the disparity in stop rates between these two groups.[291] Dr. Mummolo performed a benchmark analysis similar to the one described above, except this time he focused on the subset of KHP traffic stops made for violating speed limits on the interstate.[292]

195.    To estimate the prevalence of out-of-state speeding drivers in the examined times and places, Dr. Mummolo started from the assumption that the share of out-of-state speeders is the same as the share of all out-of-state drivers.[293] On this assumption, Dr. Mummolo identified more than 20,000 excess speeding stops of out-of-state drivers at the studied times and places, reflecting more than 70% of all KHP speeding stops of out-of-state drivers at those times and places.[294]

196.    Third, Dr. Mummolo conducted a sensitivity analysis to estimate how wrong his assumption—that the share of out-of-state speeders matched the share of out-of-state drivers—would have to be to explain the excess out-of-state speeding stops.[295] He performed this analysis by increasing the share of out-of-state speeders at each time and place observed by one percentage point, recomputing the total disparity, and then repeating the process until the disparity in out-of-

---

[289] Jones Tr. Vol. 3, 24:23-25:23, 77:4-16.

[290] Jones Tr. Vol. 3, 26:13-16.

[291] Jones Tr. Vol. 3, 30:3-9.

[292] Jones Tr. Vol. 3, 30:11-17.

[293] Jones Tr. Vol. 3, 31:16-32:1.

[294] Jones Tr. Vol. 3, 32:5-10.

[295] Jones Tr. Vol. 3, 33:16-34:3.

KC 20428204.1

state speeding stops disappeared.[296] He found that he had to increase the share of out-of-state speeders by 23 percentage points before the estimated disparity in out-of-state speeding stops disappeared.[297] In other words, he found that roughly 88% of out-of-state drivers, and only 29% of Kansas drivers, would have to speed in the observed times and places to fully account for the estimated excess speeding stops of out-of-state drivers.[298]

197.    To assess the plausibility of such a wide disparity in speeding behavior between Kansas and out-of-state drivers, Dr. Mummolo examined CDC traffic fatality data for Kansas and Colorado.[299] He presumed that such a wide disparity between Kansas and out-of-state speeding behavior would also give rise to significant disparities in traffic fatality numbers.[300] He found that there is actually a slightly higher rate of road fatalities in Kansas than in Colorado, which is the opposite of what one would expect to see if Colorado drivers speed at three times the rate of Kansas drivers.[301]

198.    Fourth, Dr. Mummolo examined KHP's canine sniff practices to determine whether out-of-state drivers are more likely to be subject to canine sniffs than Kansas drivers.[302] He used two different benchmark analyses to answer this question.[303]

199.    On the one hand, Dr. Mummolo compared the canine sniff reports to the share of out-of-state drivers on the road at the relevant places and times, which he estimated using the

---

[296] Jones Tr. Vol. 3, 34:5-13.

[297] Jones Tr. Vol. 3, 34:10-13.

[298] Jones Tr. Vol. 3, 34:16-21.

[299] Jones Tr. Vol. 3, 36:15-24.

[300] Jones Tr. Vol. 3, 36:17-21.

[301] Jones Tr. Vol. 3, 37:1-4.

[302] Jones Tr. Vol. 3, 37:15-22.

[303] Jones Tr. Vol. 3, 37:22-23.

KC 20428204.1

SafeGraph data.[304] Dr. Mummolo found that, out of about 430 canine sniff reports he examined, 399 were of out-of-state drivers—representing more than 90% of the total.[305] By contrast, he estimated that out-of-state drivers represented only 35% of the total drivers on the road at the times and places studied.[306]

200.    On the other hand, Dr. Mummolo compared the canine sniff reports to the share of out-of-state drivers stopped by KHP at the relevant times and places.[307] Dr. Mummolo found that, although out-of-state drivers represent more than 90% of canine sniff, they represent only about 77% of stops at the times and places studied—leading him to conclude that, even accounting for the disparity in stops of out-of-state drivers, out-of-state drivers are disproportionately subject to canine sniffs.[308]

201.    With respect to both of these benchmark analyses, Dr. Mummolo found that the observed disparities in canine sniff reports were statistically significant, with the likelihood of sampling error approaching zero.[309]

202.    Fifth, Dr. Mummolo conducted an outcome test to determine whether the disparity in canine sniff rates for out-of-state and Kansas drivers led to the discovery of more drugs or contraband in the vehicles of out-of-state drivers.[310] He reasoned that, if KHP officers have a lower evidentiary threshold for determining whether to search one group versus the other, one would

---

[304] Jones Tr. Vol. 3, 37:25-38:7.

[305] Jones Tr. Vol. 3, 38:9-11.

[306] Jones Tr. Vol. 3, 38:11-13.

[307] Jones Tr. Vol. 3, 38:17-39:1.

[308] Jones Tr. Vol. 3, 39:3-9. An error in the rough transcript is corrected by reference to Dr. Mummolo's report, Ex. 55, which was not received into evidence but is part of the docket in this case. (Doc. #310-8.)

[309] Jones Tr. Vol. 3, 39:14-21.

[310] Jones Tr. Vol. 3, 39:22-40:4.

KC 20428204.1

expect KHP to be less successful in identifying contraband in the disproportionately searched group.[311]

203.    Dr. Mummolo found that KHP had a higher hit rate for the discovery of contraband in the vehicles of Kansas drivers than in those of out-of-state drivers, though he determined that this result was not statistically significant.[312] Put another way, he found no detectable evidence in the studied data that searches based on canine sniffs led to the discovery of contraband at a higher rate in one group versus another.[313] Based on this analysis, he concluded that there was no evidence that out-of-state drivers are more likely than Kansas drivers to be found holding illegal drugs or contraband at the conclusion of a canine sniff.[314]

204.    The Court finds Dr. Mummolo's testimony credible and persuasive, and it adopts his findings as its own.

205.    Beyond the statistical analysis conducted by Dr. Mummolo, Plaintiffs presented trooper testimony regarding how KHP continues to rely on state of origin or destination in forming reasonable suspicion. For example, Trooper Wolting considers the fact that someone is traveling from Denver, Colorado, as a factor when forming reasonable suspicion because marijuana is legal in Denver.[315]

206.    Trooper Wolting commonly uses travel plans as a factor to form reasonable suspicion.[316] Trooper Wolting believes the duration, the route, and the reason for travel plans are

---

[311] Jones Tr. Vol. 3, 40:6-21.

[312] Jones Tr. Vol. 3, 40:23-41:4.

[313] Jones Tr. Vol. 3, 41:4-6, 41:21-23.

[314] Jones Tr. Vol. 3, 42:7-10.

[315] Wolting Dep., Ex. 133A, 101:3-12; Wolting Video Dep. Desig. Ex. 133, 07:47-08:14.

[316] Wolting Dep., Ex. 133A, 103:23-104:7; Wolting Video Dep. Desig. Ex. 133, 08:44-09:36.

KC 20428204.1

all potentially suspicious.[317] Trooper Wolting believes a motorist's route could be suspicious if they are not taking the most direct route.[318] Trooper Wolting considers the destinations someone is heading to in their route as something that could add to reasonable suspicion.[319] Trooper Wolting considers a destination suspicious if the motorist does not have any connection to the destination.[320] Trooper Wolting considers drug source destinations and origins as factors in reasonable suspicion.[321] Trooper Wolting believes that someone traveling to and from Oklahoma or Colorado could be considered suspicious.[322]

207.    Lt. Jirak believes it is appropriate to consider the state of origin that someone is traveling from when he stops them.[323] He claims it is appropriate because drug production or distribution are prevalent in certain areas such as California, Colorado, Oklahoma, and Missouri; and he acknowledges there are no cities or states that he does not consider to be source locations for drugs because they could come from anywhere.[324] He claims that the states which are not typically origin states for drug distribution only include those that do not have legalized medical or recreational marijuana.[325]

---

[317] Wolting Dep., Ex. 133A, 106:7-9; Wolting Video Dep. Desig. Ex. 133, 09:37-09:53.

[318] Wolting Dep., Ex. 133A, 149:21-23; Wolting Video Dep. Desig. Ex. 133, 30:45-30:53.

[319] Wolting Dep., Ex. 133A, 150:7-10; Wolting Video Dep. Desig. Ex. 133, 31:39-31:48.

[320] Wolting Dep., Ex. 133A, 150:20-23; Wolting Video Dep. Desig. Ex. 133, 31:49-31:58.

[321] Wolting Dep., Ex. 133A, 151:8-21; Wolting Video Dep. Desig. Ex. 133, 31:59-32:48.

[322] Wolting Dep., Ex. 133A, 152:1-18; Wolting Video Dep. Desig. Ex. 133, 33:04-34:06.

[323] Jirak Dep., Ex. 132A, 65:20-25 (in part, "Is it ever appropriate for you, based on your experience, to consider the state of origin that someone is traveling from when you stop them? A. That can be a consideration."); Jirak Video Dep. Desig. Ex. 132, 21:16-21:38.

[324] Jirak Dep., Ex. 132A, 66:1-13, 66:25-67:14, 69:18-22 ("Q. Are there states or cities that you consider not to be source locations for drug activity? A. I'm going to say no, because it could come from anywhere"); Jirak Video Dep. Desig. Ex. 132, 21:38-23:13, 25:46-26:09.

[325] Jirak Dep., Ex. 132A, 67:3-23; Jirak Video Dep. Desig. Ex. 132, 22:35-23:40.

KC 20428204.1

208.    Lt. Jirak considers a motorist's destination state or city as a factor in reasonable suspicion.[326] Lt. Jirak considers any large population center to be a drug destination.[327] In Lt. Jirak's experience, he considers every city and state to be a distribution hub.[328]

209.    When Trooper Chandler Rule conducts a traffic stop, he always asks questions as motorists are retrieving their license and insurance, including where they are coming from, where they are going, and what's taking them out there.[329] Trooper Rule believes it is important for a trooper to understand why motorists are traveling to and from places because people are constantly using highways to further criminal enterprises.[330] Trooper Rule says troopers get information and talk to motorists "about their travel plans to decide if there are any other crimes afoot[.]"[331]

210.    Trooper Chandler Rule uses the state a person is traveling to or from as a factor in forming reasonable suspicion.[332]

211.    The KHP trained Trooper McCord that I-70 is a primary drug corridor because it crosses the country and he continues to consider this in forming reasonable suspicion.[333]

212.    Troopers are trained to consider where a motorist is coming from and going to in determining whether they have reasonable suspicion to believe criminal activity is taking place.[334]

---

[326] Jirak Dep., Ex. 132A, 69:1-6; Jirak Video Dep. Desig. Ex. 132, 24:50-25:02.

[327] Jirak Dep., Ex. 132A, 67:24-68:8; Jirak Video Dep. Desig. Ex. 132, 23:41-24:28.

[328] Jirak Dep., Ex. 132A, 69:12-17 (in part, "As you sit here today, are there states or cities that you consider not to be distribution hubs? A. No."); Jirak Video Dep. Desig. Ex. 132, 25:21-25:42.

[329] C. Rule Dep., Ex. 131A, 25:18-26:17; Rule Video Dep. Desig., Ex. 131, 02:16-03:18.

[330] C. Rule Dep., Ex. 131A, 26:18-27:7; Rule Video Dep. Desig., Ex. 131, 03:19-04:19.

[331] C. Rule Dep., Ex. 131A, 27:1-7, 30:6-11; Rule Video Dep. Desig., Ex. 131, 03:58-04:19, 05:21-05:44.

[332] C. Rule Dep., Ex. 131A, 91:7-12, 91:13-16; Rule Video Dep. Desig., Ex. 131, 24:55-25:06, 25:07-25:15.

[333] Jones Tr. Vol. 2, 117:19-23.

[334] Jones Tr. Vol. 5, 40:1-11.

KC 20428204.1

**B. The KHP aims to search as many cars as possible for evidence of criminal activity.**

213. Multiple troopers, including those with decades of experience, described KHP's practices as involving significant highway interdiction work wherein they patrol the highways searching for evidence of criminal activity beyond mere traffic stops.[335] KHP troopers are trained they must make high volume traffic stops,[336] because the higher the volume of stops, the better the odds are of conducting criminal interdiction.[337]

214. For example, Lieutenant Greg Jirak joined the KHP in 1987 and has been employed by the KHP for more than 34 years.[338] Lt. Jirak has been assigned to Troop N since 2009, and at the time of his deposition in July 2021, Lt. Jirak was a first line supervisor in Troop N.[339] He supervises the Troop N troopers on the western portion of the state.[340] Roughly 40% of his time is spent on the road working traffic like the troopers he supervises.[341]

215. Cpt. Brent Hogelin has been employed by the KHP for 23 years.[342] He is currently the commander of Troop N.[343] As Captain of Troop N, Cpt. Hogelin manages six field lieutenants and approximately 30 personnel within that troop.[344]

---

[335] *See, e.g.* Jirak Dep., Ex. 132A, 21:12-19; Jirak Video Dep. Desig. Ex. 132, 06:16-06:43; Wolting Dep., Ex. 133A, 106:24-107:4; Wolting Video Dep. Desig. Ex. 133, 09:54-10:17; Jones Tr. Vol. 6, 142:17-144:7, 146:14-147:1, 159:19-21.

[336] Jones Tr. Vol. 6, 12:5-10.

[337] Jones Tr. Vol. 6, 12:14-19.

[338] Jirak Dep., Ex. 132A, 9:23-25, 11:22-24; Jirak Video Dep. Desig. Ex. 132, 00:29-00:41.

[339] Jirak Dep., Ex. 132A, 12:22-13:2, 13:10-12; Jirak Video Dep. Desig. Ex. 132, 01:18-01:39.

[340] Jirak Dep., Ex. 132A, 17:1-5; Jirak Video Dep. Desig. Ex. 132, 05:13-05:29.

[341] Jirak Dep., Ex. 132A, 21:12-19; Jirak Video Dep. Desig. Ex. 132, 06:16-06:43.

[342] Jones Tr. Vol. 5, 54:20-25.

[343] Jones Tr. Vol. 5, 55:1-7.

[344] Jones Tr. Vol. 5, 55:16-21.

56

216.    Trooper Ryan Wolting joined the KHP in 2001 and has been employed with them since that time.[345] He is currently in Troop N.[346] He described that Troop N specializes in criminal interdiction[347] and criminal interdiction is its primary focus.[348] The goal of the interdiction work is to apprehend criminals and criminal activity.[349] A normal day as a trooper in Troop N is patrolling the highways.[350] In his role on Troop N, Trooper Wolting tries to pull over as many cars as he can for the purpose of finding criminals and criminal activity.[351]

217.    Troop N spends most of its time doing interdiction work. Troop N consists of approximately 30 sworn personnel, compared to approximately 475 sworn KHP personnel total.[352]

218.    Troopers in Troop N get more interdiction training than troopers who are not in Troop N.[353] Cpt. Hogelin, Lt. Jirak, Lt. Doug Rule, Trooper Wolting, and Trooper McCord are all in Troop N and have more interdiction training than other KHP troopers.[354]

219.    Even though Troop N focuses on interdiction work, all KHP troopers have a responsibility to engage in interdiction work.[355] The KHP encourages all its troopers, by policy, to employ Criminal Interdiction Traffic Enforcement (CITE) procedures following traffic stops.[356] In

---

[345] Wolting Dep., Ex. 133A, 18:20-25; Wolting Video Dep. Desig. Ex. 133, 00:51-01:03.

[346] Wolting Dep., Ex. 133A, 20:1-3; Wolting Video Dep. Desig. Ex. 133, 01:56-02:02.

[347] Wolting Dep., Ex. 133A, 36:3-6; Wolting Video Dep. Desig. Ex. 133, 02:14-02:24.

[348] Jones Tr. Vol. 5, 55:8-13.

[349] Wolting Dep., Ex. 133A, 107:14-17; Wolting Video Dep. Desig. Ex. 133, 10:18-10:29.

[350] Wolting Dep., Ex. 133A, 40:25-41:3; Wolting Video Dep. Desig. Ex. 133, 02:24-02:36.

[351] Wolting Dep., Ex. 133A, 106:24-107:4; Wolting Video Dep. Desig. Ex. 133, 09:54-10:17.

[352] Jones Tr. Vol. 6, 151:11-18; Jones Tr. Vol. 5, 55:22-23.

[353] Jones Tr. Vol. 5, 91:4-7.

[354] Jones Tr. Vol. 5, 91:8-18.

[355] Jones Tr. Vol. 6, 146:13-147:1.

[356] Policy ENF-07 Effective 7.26.19, Ex. 903; Policy ENF-07 Effective 9.19.22, Ex. 905.

KC 20428204.1

other words, criminal interdiction is not limited to Troop N,[357] and troopers need not be specifically trained as interdiction troopers in order to conduct criminal interdiction investigations.[358]

220.    KHP trains that to be a successful trooper, a trooper must be able to look past the traffic violations for indications of criminal activity.[359]

221.    Troopers use traffic laws and traffic stops as a way to accomplish their goal of interdiction work, which is to apprehend criminals and criminal activity.[360] This includes seizing drugs and sums of cash, among other things.

222.    Troopers have an incentive to conduct as many searches of cars as possible. The number of seizures is one metric in trooper performance assessment and in deciding whether to promote a trooper.[361]

223.    The KHP receives a share of currency seized in Kansas through the asset forfeiture process. The KHP can use that share of money for training and overtime purposes.[362]

224.    When troopers question motorists, they routinely inquire about large sums of cash. If troopers are able to search a car and recover a large sum of cash, part of that sum goes to the KHP.[363]

225.    KHP training explicitly directs troopers to engage in a large volume of traffic stops and detentions. For example, slides from advanced interdiction training instructs troopers to "go beyond the traffic stop," and lists a variety of reasons why, including that doing so "puts excitement

---

[357] Jones Tr. Vol. 6, 28:19-21.

[358] Jones Tr. Vol. 2, 59:16-22.

[359] Jones Tr. Vol. 6, 11:24-12:2.

[360] Wolting Dep., Ex. 133A, 107:22-24; Wolting Video Dep. Desig. Ex. 133, 10:30-10:39.

[361] Jones Tr. Vol. 6, 142:17-144:7, 146:14-147:1, 159:19-21.

[362] Jones Tr. Vol. 5, 147:2-148:23.

[363] Jones Tr. Vol. 6, 148:14-23.

58

into routine patrol." The slides note that a successful KHP trooper "must make high volume traffic stops" and that troopers should "avoid becoming discouraged when things are slow," because "hundreds of traffic stops might occur with no arrests made." For these reasons, the slides note two things indicative of KHP's general practices: "the key is high volume traffic stops" and troopers must "STOP A LOT OF CARS!" The final note on one slide states: "2,782 activities 2,144 public contacts = 36 significant seizures," indicating the math behind KHP's volume practice.[364]

226.    Evidence indicates that troopers are relentless in their pursuit of contraband in cars. For example, when Trooper Wolting has suspected criminal behavior but been unable to confirm it, he has radioed to let another officer know to be on the lookout for the car further down the highway, with the hopes of being able to pull them over again.[365] He has done this even when there was a canine sniff that turned up nothing.[366]

227.    In addition to his analysis regarding KHP's stop and detention practices, Dr. Mummolo also rebutted Col. Jones's estimation of the statistical likelihood that a particular person would be stopped and detained by KHP.

228.    In his Memorandum in Support of Defendant Jones' Motion for Summary Judgment, defense counsel estimated that the probability of a random motorist being stopped by KHP is 0.004096 or 0.41%.[367] At trial, Dr. Mummolo was asked to respond to that estimation.[368]

229.    Dr. Mummolo observed that the estimate supplied by defense counsel is based on an equation dividing the number of traffic stops made by the number of KDOT traffic censor

---

[364] KHP Training PowerPoints, Ex. 901 at 352-356.

[365] Wolting Dep., Ex. 133A, 109:21-110:1, 111:18-23; Wolting Video Dep. Desig. Ex. 133, 11:11-11:42.

[366] Wolting Dep., Ex. 133A, 112:5-11; Wolting Video Dep. Desig. Ex. 133, 11:42-12:03.

[367] Mem. in Supp. of Def. Jones' Mot. for Summ. J. 20 & nn. 5, 6, Doc. #296.

[368] Jones Tr. Vol. 3, 46:18-47:2.

KC 20428204.1

activations.[369] The problem with this arithmetic, Dr. Mummolo pointed out, is that a single motorist can, and often does, activate multiple KDOT sensors multiple times—for instance, a single motorist crossing Kansas might activate five KDOT sensors on the outbound trip and again on the reverse trip, resulting in ten sensor activations for a single round trip.[370] Dr. Mummolo concluded that using individual sensor activation data as a measure of unique individual motorists can result in estimations that are inaccurate by several orders of magnitude, drastically understating the probability that any individual motorist would be stopped.[371]

230.    Dr. Mummolo further disputed that the estimate supplied by defense counsel could be reliably applied to estimate the probability that drivers with perceived out-of-state origins, including Plaintiffs, would be stopped by KHP.[372] Dr. Mummolo found that, by applying a blanket probability to cover all motorists, defense counsel assumed away the substantial disparity Dr. Mummolo observed in KHP's traffic enforcement practices with respect to out-of-state drivers.[373]

231.    Col. Jones presented no evidence regarding the number of roadside stops that result in detentions for canine sniffs, or any evidence sufficient to rebut Dr. Mummolo's analysis and response to the Col. Jones's contentions.

232.    For these reasons, the Court further credits Dr. Mummolo's testimony in this regard, and finds that the disparities observed by Dr. Mummolo suggest more than a hypothetical possibility that Plaintiffs (as actual or perceived out-of-state drivers) will be targeted for pretextual traffic enforcement and detentions on their travels across I-70.

---

[369] Jones Tr. Vol. 3, 46:18-47:2.

[370] Jones Tr. Vol. 3, 48:15-22.

[371] Jones Tr. Vol. 3, 48:22-49:1.

[372] Jones Tr. Vol. 3, 49:4-9.

[373] Jones Tr. Vol. 3, 49:9-13.

60

**C.  The KHP finds everyone and everything suspicious—including that people are from, or are traveling from or to, "drug source states."**

233.    The Court also received significant evidence regarding what and who the KHP finds suspicious. For example, Trooper Wolting believes "literally any piece of information could play a role in forming" reasonable suspicion.[374]

234.    Lt. Jirak considers the following in determining whether he has reasonable suspicion: the way that a driver reacts to police presence, any information that they might offer, whether or not that information is consistent with what he considers to be normal behavior given his experience, and what he smells, sees, hears, and feels.[375] According to Lt. Jirak, the sorts of reactions which are reasonable and unreasonable depend on the totality of the circumstances.[376] Lt. Jirak questions whether a person's heightened nervous reaction to police presence is consistent with a low level speeding stop.[377] Lt. Jirak considers both whether someone is too calm and too nervous as factors in calculating reasonable suspicion.[378] Lt. Jirak finds it indicative of criminal activity when information a motorist gives him is not consistent with other motorists he has stopped or what he sees in the car.[379] For example, it would be suspicious to him if some says they are traveling for work but do not have tools associated with that line of work visible in the car.[380]

235.    Lt. Jirak was never formally trained, either at the academy or any continuing training since then, on what kinds of motorist behavior is associated with criminal activity.[381]

---

[374] Wolting Dep., Ex. 133A, 103:15-22; Wolting Video Dep. Desig. Ex. 133, 08:15-08:39.

[375] Jirak Dep., Ex. 132A, 59:18-19, 22-24, 60:1-9; Jirak Video Dep. Desig. Ex. 132, 17:47-18:38.

[376] Jirak Dep., Ex. 132A, 61:3-7; Jirak Video Dep. Desig. Ex. 132, 18:56-19:10.

[377] Jirak Dep., Ex. 132A, 61:3-12; Jirak Video Dep. Desig. Ex. 132, 18:56-19:26.

[378] Jirak Dep., Ex. 132A, 61:17-62:1; Jirak Video Dep. Desig. Ex. 132, 19:43-20:10.

[379] Jirak Dep., Ex. 132A, 64:15-22; Jirak Video Dep. Desig. Ex. 132, 20:11-20:41.

[380] Jirak Dep., Ex. 132A, 64:15-65:3; Jirak Video Dep. Desig. Ex. 132, 20:11-21:15.

[381] Jirak Dep., Ex. 132A, 72:9-13; Jirak Video Dep. Desig. Ex. 132, 26:09-26:26.

KC 20428204.1

236.    Based on Lt. Jirak's experience as of 2021, there are no particular vehicles that are favored more than others by people engaged in narcotics activity.[382]

237.    KHP troopers continue to use the fact of a rental car as a basis for reasonable suspicion, even when there is no discrepancy between the rental agreement and the other information the trooper obtains.[383] For example, Trooper Chandler Rule testified that he uses the fact that someone is driving a rental car to as a factor in forming reasonable suspicion.[384]

238.    Lt. Jirak has never seen any statistical analysis or scientific studies about rental cars versus non-rental cars when it comes to criminal activity, but he considers it appropriate for troopers to consider the rental status of a car in forming reasonable suspicion. [385]

239.    Lt. Rohr provided the following examples of particular indicia of criminal activity that he looks for when forming reasonable suspicion: large amount of air fresheners in a vehicle, nervousness, several cell phones, wrappers or a bunch of garbage or trash from fast food restaurants.[386] He said that, for him, wrappers or garbage from fast food restaurants is indicative of criminal activity because it indicates that a "motorist is traveling over the road without stopping much, continually that traveling not stopping to throw out trash, they're just eating on the road, and trying to make a quick trip."[387]

240.    Lt. Rohr considers travel on certain highways or roads as a factor in forming reasonable suspicion.[388] Lt. Rohr has even relied on the mere fact of travel on K-10, I-70, and I-

---

[382] Jirak Dep., Ex. 132A, 73:15-19; Jirak Video Dep. Desig. Ex. 132, 26:27-26:42.

[383] Jones Tr. Vol. 6, 120:19-121:7.

[384] C. Rule Dep., Ex. 131A ,91:17-21; Rule Video Dep. Desig., Ex. 131, 25:18-25:26.

[385] Jirak Dep., Ex. 132A, 75:9-14, 17-18, 75:20-76:1; Jirak Video Dep. Desig. Ex. 132, 26:54-27:38.

[386] Rohr Dep., Ex. 137, 50:4-15.

[387] Rohr Dep., Ex. 137, 50:16-25.

[388] Rohr Dep., Ex. 137, 54:18-22.

KC 20428204.1

35 as part of forming reasonable suspicion because it is easy to travel on those roads and quicker than traveling on back roads, meaning drug traffickers might use those roads.[389]

241.    Lt. Rohr has followed cars for a period of time in hopes that they violate a traffic law so that he can pull them over. One example Lt. Rohr provided of things that would cause him to follow someone in hopes of pulling them over is: if a motorist drove by during the daytime with hands at 10:00 and 2:00 positions and did not look at Lt. Rohr. [390]

242.    When Trooper Chandler Rule conducts a traffic stop, he always asks questions as the driver is retrieving their license and insurance, including how they know the owner of the car, if it's their car, and how long they have had it.[391] He indicated that if a motorist said they were going to Disneyland, he would follow up by asking how long.[392] When asked, based on his training, what other circumstances would make travel plans from Minnesota to California suspicious, he said in part, "There could be thousands of things that could bring by suspicion. . . . I can't possibly give you all of them."[393] When asked what might make him find a car suspicious based on his training, he said, "[E]very circumstance is different, and there's not one specific thing I can tell you. It's the totality of the circumstances from the scope of the traffic stop."[394]

---

[389] Rohr Dep., Ex. 137, 55:6-20 ("Q. What about just the mere fact of travel on the road itself, have you ever used just a fact of travel on K-10 or I-70 or I-35 as part of your formation of reasonable suspicion. A. Yes. Q. All right.  And what about that fact is indicative of criminal activity? A. It's a major corridor. Your interstate system, it's easy to travel on.  It's just something a lot quicker than traveling back roads, I guess you could say. Q. So, because it's easy to travel on and quicker than back roads, it's more likely that someone is engaged in criminal activity because they're on those roads? A. It could shorten their trip. And if they're trying to make a quick turnaround trip, then, yes.")

[390] Rohr Dep., Ex. 137, 60:25-61:11.

[391] C. Rule Dep., Ex. 131A, 25:18-26:17; Rule Video Dep. Desig., Ex. 131, 02:16-03:18.

[392] C. Rule Dep., Ex. 131A, 28:25-30-5; Rule Video Dep. Desig., Ex. 131, 04:20-05:20.

[393] C. Rule Dep., Ex. 131A, 30:17-23; Rule Video Dep. Desig., Ex. 131, 05:45-06:09.

[394] C. Rule Dep., Ex. 131A, 84:14-19; Rule Video Dep. Desig., Ex. 131, 17:45-18:03.

KC 20428204.1

243.    Trooper Chandler Rule finds the following suspicious: a motorist driving a third-party car, how long a motorist is traveling to a place, nervous behavior, and a lived-in appearance in a vehicle.[395] He finds a third-party car suspicious even if it is a relative's car.[396] Trooper Rule also considers any large metropolitan area to be a known narcotics hub and travel to or from such a location can be suspicious.[397]

244.    Trooper Rule finds a rental car suspicious if it is a one-way rental and if the rental is, in his opinion, too expensive for the trip.[398] For example, he finds a rental car suspicious for travel from Wichita to Las Vegas because his experience is that a plane ticket for that trip would cost $75.[399] However, troopers are not trained on any threshold for what would make the cost of a rental car suspicious.[400] When Trooper Rule is given an explanation for why a motorist has an expensive rental car, depending on the situation, he still finds it suspicious.[401]

245.    Trooper Rule considers a lived-in appearance to mean the appearance that someone is traveling hard, including having a pillow or blanket in the backseat, energy drinks, snacks, or a car that is more trashed than typical.[402] This contributes to Trooper Rule's suspicion because in his experience, people typically stop at restaurants and hotels.[403]

---

[395] C. Rule Dep., Ex. 131A, 84:20-85:6; Rule Video Dep. Desig., Ex. 131, 18:04-18:38.

[396] C. Rule Dep., Ex. 131A, 85:7-24; Rule Video Dep. Desig., Ex. 131, 18:38-19:24.

[397] C. Rule Dep., Ex. 131A, 113:23-1; Rule Video Dep. Desig., Ex. 131, 33:44-34:01.

[398] C. Rule Dep., Ex. 131A, 86:14-25; Rule Video Dep. Desig., Ex. 131, 19:24-19:58.

[399] C. Rule Dep., Ex. 131A, 87:1-9; Rule Video Dep. Desig., Ex. 131, 19:59-20:25.

[400] C. Rule Dep., Ex. 131A, 87:12-16; Rule Video Dep. Desig., Ex. 131, 20:30-20:42.

[401] C. Rule Dep., Ex. 131A, 87:21-24; Rule Video Dep. Desig., Ex. 131, 20:54-21:03.

[402] C. Rule Dep., Ex. 131A, 88:24-89:3; Rule Video Dep. Desig., Ex. 131, 21:59-22:15.

[403] C. Rule Dep., Ex. 131A, 89:4-13; Rule Video Dep. Desig., Ex. 131, 22:19-22:51.

KC 20428204.1

246.    Trooper Rule finds the amount of luggage a motorist has could be suspicious.[404] It could be suspicious if a motorist is traveling with a lot of luggage and suspicious if a motorist does not have enough luggage.[405] Trooper Rule assesses how much luggage is the correct amount based off of his experience.[406]

247.    When making an assessment of whether he is met with an ordinary vacationer, or someone traveling out of the ordinary, Trooper Rule says he uses his prior training and experience.[407] However, he testified that he has not been trained how to determine whether given travel plans are normal and testified that what is unordinary for someone could be ordinary for someone else.[408]

248.    Similar to Lt. Rohr, Trooper Rule finds it suspicious when a motorist makes too little or too much eye contact.[409]

249.    Much of this comes from KHP training, meaning other KHP troopers likely find the same things suspicious. One set of KHP training slides list the following as indicators of criminal activity: "clothing indicative of drug culture"; "air fresheners"; "source location"; "destination location"; and "contents of vehicle."[410]

250.    Another training includes the following: having food/energy drinks in the car; only one key on a key chain; printed out maps; inappropriate amount of luggage for the trip; airline tags on luggage; various body/facial cues like "leans excessively" or "covers/rubs eyes"; radar

---

[404] C. Rule Dep., Ex. 131A, 92:4-12; Rule Video Dep. Desig., Ex. 131, 25:52-26:05.

[405] C. Rule Dep., Ex. 131A, 92:4-12; Rule Video Dep. Desig., Ex. 131, 25:52-26:05.

[406] C. Rule Dep., Ex. 131A, 92:13-15; Rule Video Dep. Desig., Ex. 131, 26:07-26:12.

[407] C. Rule Dep., Ex. 131A, 89:14-90:12; Rule Video Dep. Desig., Ex. 131, 22:53-23:43.

[408] C. Rule Dep., Ex. 131A, 89:14-90:18; Rule Video Dep. Desig., Ex. 131, 22:53-24:07.

[409] C. Rule Dep., Ex. 131A, 115:25-116:10; Rule Video Dep. Desig., Ex. 131, 34:50-35:13.

[410] KHP Training PowerPoints, Ex. 901 at 291.

KC 20428204.1

detectors; "masking agents," including air freshener or even fruit; documents including newspapers in the car; military items, religious items, or other "disclaimers"; and finally tools or "after-market switches or buttons."[411]

251.    Overall, numerous troopers testified that state of origin or destination, or state of residence, can be indicative of criminal activity.[412] Lt. Rohr testified that state of origin can be indicative of criminal activity because large amounts of drug, narcotics, and criminal activity originate in California, Texas, Colorado, Arizona, Nevada, and Oregon.[413]

252.    Lt. Rohr admitted that he uses state of origin of a vehicle in forming reasonable suspicion.[414] He also uses state of origin of the driver or passengers, which he gets through their driver's license and talking to them.[415] This is, of course, using a driver or passenger's residence and calling it "origin."

253.    Lt. Rohr also uses travel destination in forming reasonable suspicion.[416] He said he considers states anywhere east as drug destinations, "even the state of Kansas."[417] He also considers travel to and from certain cities as indicative of criminal activity.[418] He testified there are a lot of cities that are indicative of criminal activity and he can't recall all of them.[419]

---

[411] KHP Training PowerPoints, Ex. 901 at 375-88.

[412] A fuller discussion of how KHP continues to train its troopers to find this particular factor suspicious is included in Findings of Fact, Section III.B.

[413] Rohr Dep., Ex. 137, 52:52:9-19.

[414] Rohr Dep., Ex. 137, 52:22-25.

[415] Rohr Dep., Ex. 137, 52:22-53:7.

[416] Rohr Dep., Ex. 137, 53:8-11.

[417] Rohr Dep., Ex. 137, 53:12-20

[418] Rohr Dep., Ex. 137, 55:24-56:7.

[419] Rohr Dep., Ex. 137, 56:12-28.

KC 20428204.1

254.    When Lt. Rohr is working criminal interdiction, he considers the type of vehicle in deciding whom to pull over for traffic violations.[420] He provided the following examples: a pickup pulling an empty trailer, and a newer vehicle that is traveling in the left lane.[421] He looks for the newer vehicles because a newer vehicle is more likely to be a rental vehicle, and he learned through criminal interdiction training and experience that criminals like to use rental vehicles.[422]

255.    Based on this evidence and testimony, KHP finds a large number of innocent, innocuous behaviors and conditions to be suspicious.

**D.  Prior to recently enacted changes, Col. Jones did not require that troopers document their reasons for detaining motorists unless it resulted in seizure or arrest.[423]**

256.    Up until very recently, troopers who detained someone for suspicion of drugs did not record that detention anywhere if there were no drugs found.[424]

257.    For example, Trooper Wolting learned in training that he was not required to write a report if he detains a motorist but there is no arrest.[425]

258.    Trooper Wolting testified regarding multiple police service dog reports spanning a number of years. Each reflected an instance of when he detained a motorist for a canine sniff and a canine handler completed a report. No drugs were found in any of the detentions. Trooper Wolting acknowledged the reports do not indicate what factors lead to his claimed reasonable suspicion. He did not recall the specifics of any of the stops. He did not recall what factors lead to

---

[420] Rohr Dep., Ex. 137, 57:5-24.

[421] Rohr Dep., Ex. 137, 57:5-24.

[422] Rohr Dep., Ex. 137, 58:4-17.

[423] A full explanation of the recent changes to KHP policy is contained in Findings of Fact Section III.C, *infra*.

[424] Wolting Dep., Ex. 133A, 54:14-18; Wolting Video Dep. Desig. Ex. 133, 03:24-03:40.

[425] Wolting Dep., Ex. 133A, 81:10-16; Wolting Video Dep. Desig. Ex. 133, 06:39-07:04.

KC 20428204.1

his reasonable suspicion. He did not know of a way anybody could find out what factors he relied on in forming reasonable suspicion.[426]

259.    Neither Trooper Wolting's supervisor nor anyone else higher in command ever talked with Trooper Wolting about his reasonable suspicion for any of those stops, or whether or not he was correct in finding the driver suspicious.[427] No one ever told Trooper Wolting what he could do differently to make sure he is only detaining motorists when there is something criminal going on.[428] There were never any internal consequences or discipline for detaining motorists but failing to find criminal activity.[429]

260.    Lt. Jirak testified he was not required to write a report when he searched a vehicle, or even when he found an amount of drugs that did not merit an arrest in his mind.[430]

261.    Importantly, Col. Jones has never requested information about the number of canine sniffs completed each month,[431] nor has he requested information about how many detentions for canine sniffs result in no narcotics being recovered.[432]

### E.  The KHP uses the Trooper Two Step to manipulate drivers into giving up additional information for the purposes of detaining them for a canine sniff.

262.    The Two Step is a practice or custom within the KHP that is taught in official KHP training as well as passed on from trooper to trooper.[433]

---

[426] Wolting Dep., Ex. 133A, Plaintiffs' designations at pp. 131-145; Wolting Video Dep. Desig. Ex. 133, 21:57-27:58.

[427] Wolting Dep., Ex. 133A, 145:14-17; Wolting Video Dep. Desig. Ex. 133, 28:00-28:09.

[428] Wolting Dep., Ex. 133A, 145:18-22; Wolting Video Dep. Desig. Ex. 133, 28:09-28:21.

[429] Wolting Dep., Ex. 133A, 145:23-146:9; Wolting Video Dep. Desig. Ex. 133, 28:32-29:09.

[430] Jirak Dep., Ex. 132A, 81:5-9, 81:20-25; Jirak Video Dep. Desig. Ex. 132, 28:38-28:58.

[431] Jones Tr. Vol. 5, 69:1-4.

[432] Jones Tr. Vol. 5, 69:16-19.

[433] Jones Tr. Vol. 6, 137:13-139:3; *see also* Rohr Dep., Ex. 137, 112:10-25. Rohr Video Dep. Desig., Ex. 130, 1:03:58-1:04:26.

KC 20428204.1

263.     The Two Step is a maneuver where a trooper makes contact at a window and ends the traffic stop, steps away from the vehicle, and then reengages or makes contact again with the driver.[434]

264.     Troopers are trained on the Two Step during their pre-service training at the KHP academy.[435] KHP further trains on the Two Step as part of its training on consensual encounters.[436] For example, Trooper McCord testified that he was trained on the Two Step and it is a maneuver he practices in the course of his employment with the KHP.[437]

265.     Troopers are trained that taking two steps away is not necessary for re-engagement.[438] And troopers are trained that it is "[n]ot mandatory to disengage, as long as a reasonable person in the suspect's position would _feel_ free to leave. Even if they are not."[439]

266.     Even though the break in time resulting from the Two Step may be less than a second, KHP maintains that the maneuver creates a second consensual encounter.[440]

267.     Lt. Rohr uses the tactic of starting to walk back to his car and returning to try to obtain consent to ask questions, although he does not limit it to two steps.[441]

268.     Troopers are trained not to tell a driver they "are free to go," but to instead use a different phrase, such as "have a safe trip," "take care," or "have a good day,"[442] because they want

---

[434] C. Rule Dep., Ex. 131A, 77:13-19; Rule Video Dep. Desig., Ex. 131, 13:48-14:04.

[435] C. Rule Dep., Ex. 131A, 77:20-23; Rule Video Dep. Desig., Ex. 131, 14:05-14:12

[436] Jones Tr. Vol. 6, 7:20-22, Fourth Amendment Training by Sarah Washburn, Ex. 67.

[437] Jones Tr. Vol. 2, 121:9-15.

[438] C. Rule Dep., Ex. 131A, 78:17-10; Jones Tr. Vol. 6, 7:23-8:2; Fourth Amendment Training by Sarah Washburn, Ex. 99, p. OAG020749.

[439] Fourth Amendment Training by Sarah Washburn, Ex. 99, p. OAG020750 (emphasis original); _see also_ C. Rule Dep., Ex. 131A, 78:17-10; Jones Tr. Vol. 6, 8:3-6.

[440] Jones Tr. Vol. 6, 145:9-12.

[441] Rohr Dep., Ex. 137, 61:21-62:22.

[442] Ex. 99, p. OAG020754; Jones Tr. Vol. 6, 8:17-24; Jones Tr. Vol. 6, 9:1-9.

KC 20428204.1

motorists to continue answering questions.[443] For example, when Trooper Rule conducts the Two Step, he says something like "have a good trip."[444] Even when Trooper Rule does the Two Step, motorists are not always free to leave, and he typically does the Two Step even if he has reasonable suspicion and plans to detain the driver before conducting the Two Step.[445]

269.    Merely by conducting the Two Step maneuver, troopers think consent to answer additional questions is voluntary and willing.[446] Lt. Rohr does not tell the driver or passengers that they do not need to answer his additional questions.[447] The Court does not find credible Lt. Rohr's testimony that he doesn't know why he does not tell a motorist that they do not need to answer his questions.

270.    In this way, the Two Step is a tactic designed to get more information in order to further detain drivers for canine sniffs or to obtain consent for a search.[448] The purpose of the Two Step is to move beyond the initial traffic stop and look for evidence of additional criminal activity.[449] The whole point of the Two Step is to get motorists to continue answering questions.[450]

271.    Troopers engage in the Two Step even if they think they already possess reasonable suspicion because it makes it easier for them to obtain consent and search a vehicle.[451] For

---

[443] Ex. 99, p. OAG020754; Jones Tr. Vol. 6, 8:17-24; Jones Tr. Vol. 6, 9:1-9.

[444] C. Rule Dep., Ex. 131A, 80:20-23; Rule Video Dep. Desig., Ex. 131, 16:13-16:21.

[445] C. Rule Dep., Ex. 131A, 80:24-81:12, 81:15-22; Rule Video Dep. Desig., Ex. 131, 16:21-17:26.

[446] C. Rule Dep., Ex. 131A, 79:14-17; 79:20-80:4; Rule Video Dep. Desig., Ex. 131, 15:36-16:13.

[447] Rohr Dep., Ex. 137, 63:3-6.

[448] Jones Tr. Vol. 6, 140:11-13, 140:20-141:1.

[449] Jones Tr. Vol. 6 145:13-17.

[450] Jones Tr. Vol. 6, 9:1-5.

[451] Jones Tr. Vol. 6, 141:2-17, 142:1-16 ("Q. . . .And [the Two Step] makes it easier to get inside the car? A. If that's what it needs to be, yes.").; Jones Tr. Vol. 2, 65:22–66:5 ("Q. Why ask [for consent to search], why not just go ahead with your reasonable suspicion detain for a dog? A. If I had consent to search, I could probably knock that out way quicker without waiting on a canine.").

KC 20428204.1

example, Lt. Rohr uses the tactic of attempting to end a stop and reengage even when he claims to have reasonable suspicion.[452]

272.     Sometimes the Two Step does not involve physically taking two steps at all, but instead involves something more subtle. For example, Lt. Jirak uses the phrase, "do you have any questions before you leave," and believes that clearly indicates to a motorist that they are free to go.[453] He testified that he does not walk away from the vehicle because he does not feel it is necessary to go to that extreme to demonstrate a break in contact.[454] When a driver makes a motion to put the car in gear or step on the brake, Lt. Jirak then asks if the motorist minds if he asks a few questions before they leave.[455] Even if a driver says no, he has nonetheless detained the driver.[456] When a driver has put the car in gear and left, he has started a car chase.[457]

273.     Trooper Wolting frequently uses the Two Step.[458]

274.     Troopers often brush past whether the consent they receive from drivers is knowing, intelligent, and voluntary. For example, Lt. Jirak, who has had one Spanish course in 1990 and by his own admission knows "very little Spanish" nonetheless utilizes his limited Spanish when encountering language barriers in the field, even in situations where he seeks consent to detain motorists.[459] The KHP has had no issue with this.[460]

---

[452] Rohr Dep., Ex. 137, 64:21-65:2, 66:21-24.

[453] Jirak Dep., Ex. 132A, 96:5-25; Jirak Video Dep. Desig. Ex. 132, 35:08-36:22.

[454] Jirak Dep., Ex. 132A, 101:12-102:1, 126:13-23; Jirak Video Dep. Desig. Ex. 132, 39:00-39:35, 48:58-49:36.

[455] Jirak Dep., Ex. 132A, 96:5-25; Jirak Video Dep. Desig. Ex. 132, 35:08-36:22.

[456] Jirak Dep., Ex. 132A, 97:21-98:1; Jirak Video Dep. Desig. Ex. 132, 36:39-36:55.

[457] Jirak Dep., Ex. 132A, 102:2-10; Jirak Video Dep. Desig. Ex. 132, 39:38-40:07.

[458] Wolting Dep., Ex. 133A, 116:6-8; Wolting Video Dep. Desig. Ex. 133, 14:38-14:52.

[459] Jirak Dep., Ex. 132A, 115:11-116:4; Jirak Video Dep. Desig. Ex. 132, 44:38-45:20.

[460] Jirak Dep., Ex. 132A, 128:19-22; Jirak Video Dep. Desig. Ex. 132, 52:14-52:28.

KC 20428204.1

**III.    COL. JONES DOES NOT PROVIDE APPROPRIATE OVERSIGHT, SUPERVISION, OR ACCOUNTABILITY TO ENSURE TROOPERS ARE FOLLOWING THE CONSTITUTION.**

275.    As KHP Superintendent, Col. Jones reports directly to the governor of Kansas.[461]

276.    Col. Jones is ultimately responsible for KHP operations, including training, policy changes, culture, and ensuring the KHP's compliance with the law, including constitutional requirements and state law.[462] He has sole discretion over policy changes, and no policy is implemented or changed without his approval.[463]

277.    The commander of the PSU reports directly to Col. Jones.[464] All PSU investigation results are sent to the Superintendent. As Superintendent, Col. Jones makes the final decision about whether to impose corrective action or discipline, and he may impose harsher or less harsh consequences than command staff recommends.[465]

278.    The ultimate responsibility for accountability of the KHP is with Col. Jones.[466] Any clear patterns of trooper misconduct or policy violations are ultimately Col. Jones's responsibility.[467]

---

[461] Jones Tr. Vol. 6, 97:24-25.

[462] Jones Tr. Vol. 6, 98:20-99:20.

[463] Jones Tr. Vol. 6, 99:2-7, 133:11-13.

[464] Jones Tr. Vol. 3, 90:5-8; Jones Tr. Vol. 6, 100:9-11; *see also* KHP Policy ADM-07, Complaint Reporting and Administrative Investigations ("Complaint Policy"), Ex. 72 at 10.

[465] Jones Tr. Vol. 6, 104:13-106:17.

[466] Jones Tr. Vol. 6, 106:18-107:10 ("Q. And again, that's because the ultimate responsibility is yours, right? A. Correct. Q. The buck stops with you? A. Correct.").

[467] Jones Tr. Vol. 6, 142:23-153:1.

KC 20428204.1

279.    The jurisdiction of the KHP covers the entire state of Kansas.[468] It emphasizes its patrol on interstates and highways.[469] By its very nature and structure, KHP patrol covers a large geographic area.

280.    Plaintiffs presented testimony from Chief Aden regarding Col. Jones's broader practices as they relate to supervision, oversight, and accountability of KHP troopers. Specifically, Chief Aden analyzed Col. Jones's practices for compliance with nationally accepted policing practices.[470]

281.    Chief Aden pointed out several ways in which Col. Jones's leadership of the KHP is inconsistent with nationally accepted policing practices, which are discussed in more detail below.[471] The Court credits Chief Aden's testimony in its entirety.

### A.  Leadership and Oversight

282.    Troopers work independently without a lot of oversight.[472]

283.    Col. Jones relies principally on Lieutenant Colonel Jason DeVore, whom he describes as the "chief operating officer" of the KHP. Col. Jones interacts mainly with Lt. Col. DeVore and passes information and instructions through Lt. Col. DeVore to other KHP command staff.[473]

---

[468] Jones Tr. Vol. 6, 17:16-20.

[469] Jones Tr. Vol. 6, 17:21-18:5.

[470] Schulte Tr. Vol. 2, 9-204:1; McMillan Tr. Vol. 3, 152:11-229:11; Jones Tr. Vol. 6, 167-199:18 and Vol. 7, 4:5-84:18.

[471] Jones Tr. Vol. 6, 167-199:18 and Vol. 7, 4:5-84:18.

[472] Moon Dep., Ex. 134a, 22:9-11.

[473] Jones Tr. Vol. 6, 100:4-101:10.

KC 20428204.1

284.    Col. Jones leaves ensuring compliance with cases like *Vasquez* to KHP legal counsel and KHP commanders.[474]

285.    Col. Jones relies on direct supervisors and commanders to obtain and review information such as the number of drivers detained absent reasonable suspicion. Col. Jones only receives information if there is "aberrant behavior."[475]

286.    KHP does not have a system of maintaining information about troopers who are found to have violated constitutional rights of motorists.[476]

287.    Col. Jones could request that troopers document additional information about car stops and detentions.[477] He could order that troopers document and track the number of traffic stops that result in roadside detentions for canine sniffs,[478] roadside detentions for canine sniffs that yield no narcotics,[479] and cars with out-of-state license plates that are stopped and detained for canine sniffs.[480] He could also order collection and tracking of data related to the proportion of in-state versus out-of-state motorists that are being stopped and detained.[481] No evidence was provided at trial that Col. Jones has requested or ordered that such information be documented.

288.    Troopers complete "15-day reports" to document some of their activities, but the 15-day reports do not identify roadside detentions or canine sniffs unless there is an arrest, seizure,

---

[474] Jones Tr. Vol. 6, 119:5-14.

[475] Jones Tr. Vol. 6, 126:1-17.

[476] Jones Tr. Vol. 5, 60:12-15.

[477] Jones Tr. Vol. 5, 63:20-23.

[478] Jones Tr. Vol. 5, 67:19-22.

[479] Jones Tr. Vol. 5, 67:23-68:1.

[480] Jones Tr. Vol. 5, 68:2-5.

[481] Jones Tr. Vol. 5, 68:6-10.

KC 20428204.1

or accident.[482] The 15-day reports do not track data on the number of out-of-state motorists stopped by a trooper, the proportion of out-of-state to in-state motorists, or factors that gave a trooper reasonable suspicion to detain motorists.[483] These reports also do not record the total number of dog sniffs they call out.[484]

289.    As a result, even the commander of Troop N, the interdiction unit, does not know the approximate percentage of traffic stops that lead to post-traffic stop detentions.[485]

290.    Troopers were not required to document reasons for detaining motorists absent arrest or seizure prior to Col. Jones's tenure as Superintendent, and he did not require them to do so when he became Superintendent. Therefore, the only time troopers were required to articulate their reasonable suspicion was if a complaint or lawsuit was filed. Troopers could have done so independently, but there is no information on how often, or if, that happened.[486]

291.    Col. Jones agrees that you cannot fix problems if you are not measuring conduct to identify what needs to be fixed.[487] Because of this lack of data collection on roadside detentions, there was no way for the Superintendent to assess whether roadside detentions were based on proper reasonable suspicion or whether a trooper's reasons were insufficient to justify detention, unless a trooper's supervisor raised concerns.[488]

---

[482] Jones Tr. Vol. 6, 90:5-11.

[483] Jones Tr. Vol. 6, 91:22-92:7.

[484] Wolting Dep., Ex. 133A, 52:1-23.

[485] Jones Tr. Vol. 6, 56:22-25.

[486] Jones Tr. Vol. 6, 123:18-124:13.

[487] Jones Tr. Vol. 6, 125:13-17 ("Q. And you -- well, you'd agree with me that as a general rule you can't fix what you don't measure; is that fair? You're not measuring things you don't see problems that you can't fix; fair? A. I've heard that, yes.").

[488] Jones Tr. Vol. 6, 122:10-14; *see also* Jones Tr. Vol. 6, 158:25–159:9 ("Q. You were asked how often drivers are detained without reasonable suspicion and if you have those statistics. Do you know if KHP is detaining drivers without reasonable suspicion? A. I don't have any data to show that either way.").

KC 20428204.1

292.     Because there has never been a data collection mandate from Col. Jones, there is no requirement that supervisors consider the number of roadside detentions of troopers that did not yield anything.[489] Likewise, there is no requirement that a supervisor consider the number of sustained motions to suppress that a trooper has each year.[490]

293.     Data collection is a critically important component of ensuring that law enforcement agencies are following policy and the law. Agencies need systems that allow leadership to analyze data and look for trends and patterns, which will allow agencies to determine what training is needed, what is being misunderstood by officers, and if there are any issues that are recurring that are in need of correction.[491]

294.     Prior to the creation of a new detention reporting policy and form, discussed in Section III.C below, KHP had no data to analyze to determine if there were patterns of misconduct or training needs regarding roadside detentions.[492]

295.     If the KHP were following nationally accepted policing practices, Col. Jones would require regular review of data collected by detention reports and analysis of that data, as part of KHP's regular oversight practices, to look for patterns and to determine what additional training might be needed, and how the agency can improve its practices.[493]

---

[489] Jones Tr. Vol. 6, 91:10-17.

[490] Jones Tr. Vol. 6, 91:18-21.

[491] Jones Tr. Vol. 7, 7:15-8:7.

[492] Jones Tr. Vol. 7, 17:3-11.

[493] Jones Tr. Vol. 7, 20:8-13.

KC 20428204.1

296.    To serve a data analysis and oversight function, data such as that included in the new detention report form would need to be stored electronically with sortable fields so that the head of the agency could analyze the form based on individual categories of information.[494]

297.    Col. Jones also appears to reward those who engage in a high-volume practice that results in significant seizures. While not praised or congratulated for the number of traffic stops completed, troopers are praised and congratulated for finding drugs.[495]

298.    Lt. Jirak considered the number of drug recoveries as one of the criteria in evaluating the troopers under his supervision.[496] That troopers have a high number of seizures, arrests, and searches is a positive thing for trooper evaluations.[497]

299.    There is a commendation process and praise-driven reward system for large seizures.[498] One such award, employee of the quarter, comes with a monetary reward.[499]

300.    Certain positions require that troopers meet set productivity numbers in order to be promoted. For example, to become a canine handler with the KHP, one of the requirements is a certain number of felony arrests.[500]

301.    Conversely, constitutional issues with a trooper's stops and detentions do not seem to factor into evaluations at all. For example, as a Technical Trooper, Lt. Rohr had annual performance evaluations with his supervisor.[501] The annual performance evaluations were not very

---

[494] Jones Tr. Vol. 7, 20:14-21:1.

[495] Wolting Dep., Ex. 133A, 60:12-19; Wolting Video Dep. Desig. Ex. 133, 04:29-04:50.

[496] Jirak Dep., Ex. 132A, 24:21-25; Jirak Video Dep. Desig. Ex. 132, 08:54-09:04.

[497] Jirak Dep., Ex. 132A, 26:18-22; Jirak Video Dep. Desig. Ex. 132, 09:04-09:18.

[498] Jirak Dep., Ex. 132A, 27:25-28:15; Jirak Video Dep. Desig. Ex. 132, 09:48-10:56.

[499] Jirak Dep., Ex. 132A, 28:16-22; Jirak Video Dep. Desig. Ex. 132, 10:57-11:17.

[500] C. Rule Dep., Ex. 131A, 17:18-18:2; Rule Video Dep. Desig., Ex. 131, 13:48-14:04.

[501] Rohr Dep., Ex. 137, 30:2-7, 14-18.

KC 20428204.1

long and lasted about fifteen minutes.[502] In those reviews, Lt. Rohr was not asked to discuss specific incidents or traffic stops with his supervisor.[503]

### B. Training and Legal Updates

302.    Col. Jones does not effectively educate his troopers on changes and developments in the law, particularly regarding constitutional matters.[504] Col. Jones delegates the job of communicating about training to his commanders.[505]

303.    Although Col. Jones provides pre-service and in-service training to all troopers,[506] there are significant deficiencies in the content and methodology—particularly those regarding the Fourth Amendment.

304.    Troopers review legal updates in one of three ways: PowerDMS, emails, and legal updates at in-service.[507] KHP is a decentralized agency, in that KHP troopers perform work across the state and have flexibility in their work hours and the type of work in which they engage. Because of this decentralization, in-person roll call trainings are infrequent,[508] and supervisors rely almost exclusively on email and PowerDMS to communicate updates to troopers.

305.    If troopers are advised on important Fourth Amendment cases when they are decided, it is done through email.[509] KHP relies on the troopers to read those emails and understand

---

[502] Rohr Dep., Ex. 137, 31:10-14.

[503] Rohr Dep., Ex. 137, 33:8-14.

[504] Jones Tr. Vol. 6, 190:16-21.

[505] Jones Tr. Vol. 6, 153:2-4.

[506] Jones Tr. Vol. 5, 4:23-5:18.

[507] Wolting Dep., Ex. 133A, 70:25-71:6, 71:13-15; Wolting Video Dep. Desig. Ex. 133, 4:50-05:25.

[508] Jones Tr. Vol. 6, 191:21-192:3.

[509] Jones Tr. Vol. 6, 3:5-8.

KC 20428204.1

the cases.[510] When those emails are sent, there is not a test or a quiz associated with the case law.[511] Even in Troop N, the commander does not test troopers or their direct supervisors regarding their understanding of how important Fourth Amendment decisions should change their practices.[512]

306.    The KHP has the ability to test troopers' knowledge and review when new policies come out, but does not do so all the time, and instead typically just allows troopers to scroll to the bottom of the new policy in PowerDMS to check a box that the new policy has been reviewed.[513]

307.    Chief Aden described that updates to the law are particularly important and, in a decentralized agency, require assurance of understanding. The Court credits and adopts Chief Aden's opinion that for an agency like KHP, training and legal updates on constitutional stops are of the utmost importance.[514]

308.    Trooper Wolting testified that he attended an online legal update training 5-6 months before his testimony, but that he could not remember what was covered in the update.[515] Trooper Wolting does not remember ever being tested on legal updates.[516] Trooper Wolting does not remember a time he learned something from a legal update and changed the way he did his job.[517] Trooper Wolting could not answer whether the legal updates are provided yearly.[518]

---

[510] Jones Tr. Vol. 6, 3:9-12.

[511] Jones Tr. Vol. 6, 3:13-16.

[512] Jones Tr. Vol. 6, 3:17-24.

[513] Jones Tr. Vol. 6, 88:3-17.

[514] Jones Tr. Vol. 6, 192:4-7.

[515] Wolting Dep., Ex. 133A, 72:1-3, 6-8, 14-16; Wolting Video Dep. Desig. Ex. 133, 05:39-05:58.

[516] Wolting Dep., Ex. 133A, 73:4-6; Wolting Video Dep. Desig. Ex. 133, 05:58-06:06.

[517] Wolting Dep., Ex. 133A, 73:7-14; Wolting Video Dep. Desig. Ex. 133, 06:09-06:27.

[518] Wolting Dep., Ex. 133A, 71:23-25; Wolting Video Dep. Desig. Ex. 133, 05:26-05:36.

KC 20428204.1

309.    Trooper Wolting does not remember receiving emailed legal updates or changing his policing practices after receiving legal updates by email.[519] Trooper Wolting does not recall any time that he ever changed how he policed as a result of a message he got through PowerDMS or an email.[520]

310.    Most relevant to this case, the *Vasquez v. Lewis* decision was not adequately communicated to KHP troopers, even though it was a decision that involved a KHP trooper.[521] When *Vasquez* was handed down, the KHP Superintendent came out in support of the patrol and did not fault KHP for the events in that case.[522]

311.    KHP did not make any changes to training materials as a result of *Vasquez*.[523] The KHP did not distribute a legal update as a result of *Vasquez*.[524] When *Vasquez* was finally presented to the KHP, there was no retraining or re-education beyond circulating the *Vasquez* case.[525] The KHP did not incorporate *Vasquez* into its training at the time it was decided by the Tenth Circuit.[526] The KHP did not incorporate *Vasquez* into its training in 2016, 2017, 2018, or 2019.[527]

---

[519] Wolting Dep., Ex. 133A, 130:3-8; Email regarding US v. Esteban, Ex. 101; Wolting Video Dep. Desig. Ex. 133, 21:34-21:48.

[520] Wolting Dep., Ex. 133A, 75:19-23; Wolting Video Dep. Desig. Ex. 133, 06:27-06:34.

[521] Jones Tr. Vol. 6, 190:19-21.

[522] Jones Tr. Vol. 5, 78:5-16.

[523] Jones Tr. Vol. 5, 46:10-12.

[524] Jones Tr. Vol. 5, 46:21-25.

[525] Jirak Dep., Ex. 132A, 105:5-9; Jirak Video Dep. Desig. Ex. 132, 42:36-42:47.

[526] Jones Tr. Vol. 5, 45:2-5.

[527] Jones Tr. Vol. 5, 45:16-18.

KC 20428204.1

312.     There was no change to KHP policy after *Vasquez*,[528] and troopers did not change their practices after *Vasquez*.[529] For example, after *Vasquez* came down, Lt. Jirak—a supervisor in the interdiction unit—did not change anything about the way he conducted traffic stops.[530]

313.     Former KHP legal counsel believes *Vasquez* is not new case law and merely repeats *United States v. Wood*.[531] But before and after *Vasquez*, KHP merely instructed its troopers to utilize the totality of the circumstances and not use state of registration of a vehicle as the *sole* or *only* purpose in forming reasonable suspicion.[532] KHP continues to train that out-of-state license plates can be *a* meaningful factor in reasonable suspicion in conjunction with the "totality of the circumstances."[533]

314.     KHP legal counsel did not think *Vasquez* held anything of substance to train troopers on at the time it was handed down.[534] As a result, KHP did not have trainers go out and observe roadside detentions after *Vasquez*.[535]

315.     After the *Vasquez* decision came down, then-Assistant Superintendent of the KHP Randy Moon gave an interview to the Topeka Capitol Journal wherein he said that it would be

---

[528] Jirak Dep., Ex. 132A, 105:2-4; Jirak Video Dep. Desig. Ex. 132, 42:26-42:34; Moon Dep., Ex. 134a, 110:22-25; 111:13-16; 115:6-7.

[529] Jones Tr. Vol. 5, 84:10-12.

[530] Jirak Dep., Ex. 132A, 104:22-105:1; Jirak Video Dep. Desig. Ex. 132, 42:10-42:26.

[531] Jones Tr. Vol. 5, 45:19-25.

[532] Jones Tr. Vol. 5, 84:4-9.

[533] Jones Tr. Vol. 5, 35:18-23.

[534] Jones Tr. Vol. 5, 46:6-9.

[535] Jones Tr. Vol. 5, 80:19-81:3.

KC 20428204.1

unreasonable to expect troopers to ignore the fact that drivers are coming into Kansas from a state (Colorado) that has legalized marijuana.[536] Mr. Moon reaffirmed that belief in his deposition.[537]

316.    Mr. Moon believed that because someone could be traveling to Colorado to purchase large amounts of marijuana, the legalization of marijuana in Colorado is an "extraordinary circumstance" that merits consideration of travel destination as part of the reasonable suspicion calculus, even after *Vasquez*.[538]

317.    When *Vasquez* first came down, KHP leadership thought troopers could just learn about it themselves through the news.[539]

318.    Some troopers do not remember the *Vasquez* decision or its central holdings. Lt. Jirak vaguely remembers *Vasquez*.[540] The only thing he recalls about the *Vasquez* case was that the Court indicated that they felt it was an unlawful detention.[541] Trooper Wolting, a trooper in the interdiction unit, does not remember hearing of the *Vasquez* case at all.[542] Trooper McCord, also a trooper in the interdiction unit, did not know about *Vasquez* at all, does not recall taking tests about case law that applied to stops, searches, and seizures, and did not participate in role-playing scenarios regarding citizen encounters from car searches.[543]

319.    Cpt. Hogelin of Troop N likewise did not understand the central ruling from *Vasquez*. When asked about the impact the decision had on his practices, Cpt. Hogelin testified

---

[536] Moon Dep., Ex. 134a, 93:16-23; 94:22-95:16

[537] Moon Dep., Ex. 134a, 208:11-21.

[538] Moon. Dep. Ex. 134a, 212:23-213:4.

[539] Moon Dep., Ex. 134a, 109:2-9.

[540] Jirak Dep., Ex. 132A, 102:21-23; Jirak Video Dep. Desig. Ex. 132, 40:28-40:32.

[541] Jirak Dep., Ex. 132A, 104:13-21; Jirak Video Dep. Desig. Ex. 132, 41:41-42:09.

[542] Wolting Dep., Ex. 133A, 120:9-11; Wolting Video Dep. Desig. Ex. 133, 15:41-15:49.

[543] Jones Tr. Vol. 2, 125:15-23.

that *Vasquez* "just reinforced our current - - our current and previous methodologies."[544] He said *Vasquez* was, in part, "an affirmation that [KHP was] teaching the tenets of *Vasquez* before it was ruled upon and not using a state registration as a ***sole*** factor for reasonable suspicion."[545] When asked how KHP regards a person's residence of Colorado in forming reasonable suspicion, Cpt. Hogelin again responded that its "not to be utilized as a ***sole*** factor."[546]

320.    Lt. Doug Rule and Lt. Jirak provide training on interdiction practices for other troopers.[547] Even after *Vasquez*, Lt. Rule conducted training for troopers that said the two most important questions troopers should be asking drivers are where they're coming from and where they're going to.[548] Troopers are trained that those two questions are critical pieces of information for troopers doing interdiction work as part of their investigatory stop.[549] The reason troopers ask those questions is because they're trying to figure out whether motorists are coming from or going to a drug source city or state.[550] Even though *Vasquez* says that travel to or from a drug source city or state is so broad as to be indicative of almost nothing, KHP troopers are still trained on destination and origin.[551]

321.    As noted in Section II.C, *supra*, many troopers continue to find people driving from or to certain cities or states to be suspicious. For example, Trooper Wolting testified that the state

---

[544] Jones Tr. Vol. 6, 76:11-18.

[545] Jones Tr. Vol. 6, 94:19-25 (emphasis added).

[546] Jones Tr. Vol. 6,73:24-74:1 (emphasis added).

[547] Jones Tr. Vol. 5, 87:20-23.

[548] Jones Tr. Vol. 5, 88:8-13.

[549] Jones Tr. Vol. 5, 89:15-19; Jones Tr. Vol. 5, 40:1-11; Jones Tr. Vol. 6, 83:11-14

[550] Jones Tr. Vol. 5, 90:4-9.

[551] Jones Tr. Vol. 5, 90:16-21.

KC 20428204.1

of the license plate can be a factor in deciding whom to pull over.[552] Cpt. Hogelin, commander of Troop N, testified that that KHP troopers rely on training that says "a state's origin for their license plate is not to be utilized as a *sole* reasonable suspicion factor" in deciding whether to detain for a canine sniff.[553]

322.     KHP troopers continue to use the state of origin, whether a state can be considered a "drug source state," and the notion that I-70 is a "drug corridor" in determining reasonable suspicion, even though travel on an interstate highway is worthless in the reasonable suspicion calculus.[554]

323.     Lt. Jirak acknowledged that courts are starting to believe that troopers detain people because they refuse consent rather than for reasonable suspicion, and Lt. Jirak agrees that is an accurate perception depending on the circumstances.[555]

324.     Other evidence indicates that troopers do not learn from their mistakes, even when the courts say they got the law wrong. For example, Lt. Rohr received an email from his supervisor regarding the *Vasquez* case, in which the supervisor shared an article and noted, "I'm attaching an article written by Washburn Law finding that the 10th Circuit erred in their findings that his rights were actually violated by KHP[.]"[556] The email was also sent to other troopers that reported to his supervisor.[557]

---

[552] Wolting Dep., Ex. 133A, 126:9-19; Wolting Video Dep. Desig. Ex. 133, 20:54-21:33.

[553] Jones Tr. Vol. 5, 84:21-85:3.

[554] Jones Tr. Vol. 6, 119:24-120:10 ("A. . . . [A]ny highway, any state can be used as a  -- as a corridor, any highway in the state of Kansas can be. Q. To the point that travel on an interstate highway . . . by itself is worthless when it comes to determining reasonable suspicion; is that a fair statement? A. That would be fair, yes.").

[555] Jirak Dep., Ex. 132A, 56:15-57:12, 57:22-24.

[556] Rohr Dep., Ex. 137, 179:5-180:6.

[557] Rohr Dep., Ex. 137, 179:5-180:6.

KC 20428204.1

325.    When needing to testify in court and defend their actions, KHP troopers are trained "to stick to your guns and explain over and over during your testimony that it was the totality of the situation and not just one indicator which led to your reasonable suspicion[.]"[558] Lt. Rohr stated that he has tried to testify consistent with that training both in the past and at his deposition in this case when explaining his reasonable suspicion for detaining the Erich-Maloney family.[559]

326.    Lt. Rohr also testified regarding multiple police service dog reports that he completed over a number of years, including Exhibits 88-93.[560] Each reflected an instance of when he detained a motorist for a canine sniff after the motorist refused consent to search.[561] In every instance, the driver was from out of state.[562] In every instance, the canine gave no alert or indication. In every instance, his reports do not list what factors lead to his reasonable suspicion.[563] In every instance, including those occurring the year after *Vasquez* was decided, Lt. Rohr could not say whether or not vehicle registration or state of residency played a role in his reasonable suspicion.[564] The reports and Lt. Rohr's testimony show no change in his practice after *Vasquez*.

327.    Notably, Lt. Rohr detained a driver from Indiana in 2017.[565] He testified that it is possible that the driver being from Indiana played a part of this reasonable suspicion.[566] When asked how that would be possible, he said: "Oh totality of the circumstances, being from Indiana,

---

[558] Rohr Dep., Ex. 137, 185:8-13.

[559] Rohr Dep., Ex. 137, 185:8-20.

[560] Rohr Dep., Ex. 137, Plaintiffs' designations at pp. 154-169.

[561] Rohr Canine Deployment Reports, Exs. 88-93; Rohr Dep., Ex. 137, Plaintiffs' designations at pp. 154-169.

[562] Rohr Canine Deployment Reports, Exs. 88-93; Rohr Dep., Ex. 137, Plaintiffs' designations at pp. 154-169.

[563] Rohr Canine Deployment Reports, Exs. 88-93; Rohr Dep., Ex. 137, Plaintiffs' designations at pp. 154-169.

[564] Rohr Canine Deployment Reports, Exs. 88-93; Rohr Dep., Ex. 137, Plaintiffs' designations at pp. 154-169.

[565] Rohr Dep., Ex. 137, 159:12-161:8; Rohr Canine Deployment Report 2.2.2017, Ex. 90.

[566] Rohr Dep., Ex. 137, 204:20-205:10.

KC 20428204.1

why is he going to where he's going. Indiana could be a known source -- or is a known source or area for illegal narcotics to be traveling to and going to. . . ."[567]

328.    For in-service trainings, troopers are not tested to see what subjects they need to be trained on and they are not tested after training to see if they have comprehended the material trained on.[568] Troopers do not do scenario-based training on legal updates.[569]

329.    KHP does not adequately ensure troopers know other important case law, either. For example, Trooper Rule does not recall ever receiving a legal update on *U.S. v. Esteban.*[570]

330.    Advanced Criminal Interdiction training is a promotion class that is required for troopers to be eligible for promotion to master troopers.[571] Lieutenants in Troop N typically teach Advanced Criminal Interdiction courses.[572] KHP's legal counsel does not review that training unless requested.[573] For example, Lt. Jirak is in charge of conducting ongoing training related to case law and legislative updates.[574]

331.    Overall, KHP training lacks adult learning methods, such as scenario-based training and hands-on activities.[575] And, importantly, KHP's legal counsel does not have final say on what training is provided to troopers, even on legal issues.[576]

---

[567] Rohr Dep., Ex. 137, 204:20-205:10.

[568] Jones Tr. Vol. 5, 37:17-21, 38:2-9.

[569] C. Rule Dep., Ex. 131A, 35:14-18; Rule Video Dep. Desig., Ex. 131, 08:52-09:01.

[570] C. Rule Dep., Ex. 131A, 102:4-6, 21-25, 103:15-23; Rule Video Dep. Desig., Ex. 131, 28:43-29:27.

[571] Jirak Dep., Ex. 132A, 53:13-54:4; Jirak Video Dep. Desig. Ex. 132, 14:39-15:40.

[572] Jones Tr. Vol. 5, 40:25-41:18.

[573] Jones Tr. Vol. 5, 41:20.

[574] Jirak Dep., Ex. 132A, 13:25-14:14, 14:20-23; Jirak Video Dep. Desig. Ex. 132, 02:09-02:48, 03:00-03:09.

[575] Jones Tr. Vol. 6, 192:24-193:17.

[576] Jones Tr. Vol. 5, 39:20-23.

KC 20428204.1

332.     As a result, troopers do not understand the law. Trooper Wolting testified that reasonable suspicion is "more than a hunch, it's the totality of the circumstances,"[577] but when asked for an example of when a trooper needs reasonable suspicion--i.e., under what circumstances is reasonable suspicion necessary—Trooper Wolting could not think of any.[578]

333.     Lt. Jirak believes that when he pulls a motorist over for a traffic violation, he can detain a driver for 45 minutes to an hour.[579]

334.     Follow-up training to ensure compliance with and understanding of the law is rare. KHP's staff attorney conducted substantive remedial training only three or four times during her seven and a half years with the Kansas Highway Patrol.[580] When troopers receive remedial training, they primarily go over presentations previously used in training.[581] There is no KHP policy or procedure that requires retraining or reeducation for violations of the law.[582]

335.     When a new policy is rolled out, troopers are not required to do any pre-testing on the relevant subject area before the new policy is distributed. Some post-testing in PowerDMS may occur, but it does not occur for all new policies.[583]

---

[577] Wolting Dep., Ex. 133A, 95:14-17; Wolting Video Dep. Desig. Ex. 133, 07:05-07:12.

[578] Wolting Dep., Ex. 133A, 97:19-98:5; Wolting Video Dep. Desig. Ex. 133, 07:13-07:46.

[579] Jirak Dep., Ex. 132A, 88:7-24 (in part, "how long are you permitted to detain a driver when you pull them over for a traffic violation . . . A. We follow the guidance that the courts give us, and currently that's in the neighborhood of 45 minutes to one hour. Q. Okay. And that's based on court decisions? A. Yes. Q. Regardless of the reason for the traffic stop? A. Yes.").

[580] Jones Tr. Vol. 5, 44:14-17.

[581] Jones Tr. Vol. 5, 50: 2-14.

[582] Jones Tr. Vol. 5, 44:10-13l; Jirak Video Dep. Desig. Ex. 132, 17:00-17:46.

[583] Jones Tr. Vol. 6, 151:19-23, 152:6-22.

KC 20428204.1

## C.  Policies

336.    KHP's policies on stops, searches, and arrests are primarily technical in nature and do not adequately explain important legal standards, such as reasonable suspicion and the factors that can be used to form reasonable suspicion, especially in light of *Vasquez*.[584]

337.    KHP's consent to search policy is likewise insufficient, in that it does not provide any meaningful guidance regarding whether, how, and when to request consent to search a vehicle.[585] And use of the "consent to search form" referenced in KHP's consent search policy is entirely optional.[586]

338.    As noted above, KHP recently changed its documentation policies related to detentions for canine sniffs. Prior to September 2022, if a motorist was detained for a canine sniff but no contraband was found following a search, no documentation by the detaining trooper would exist of that event. If that detention involved a KHP canine handler, that canine handler would fill out a canine deployment report, but such a report did not include a field for documenting reasonable suspicion, and that canine handler would only have the information provided by the detaining trooper.[587]

339.    Because KHP did not require that reasonable suspicion be documented at the time of a detention, there was a strong possibility that memory regarding the stop would fade, or troopers could go back and fill in the blanks regarding the stop at a later date.[588]

---

[584] Jones Tr. Vol. 7, 5:6-13, 5:17-6:6.

[585] Jones Tr. Vol. 7, 8:12-17; 9:21-10:12; Ex. 904.

[586] Jones Tr. Vol. 7, 15:3-13.

[587] Jones Tr. Vol. 6, 121:23-122:9.

[588] Jones Tr. Vol. 7, 18:8-21.

KC 20428204.1

340.     Because of this lack of data collection on roadside detentions, there was no way for the Superintendent to assess whether roadside detentions were based on proper reasonable suspicion or whether a trooper's reasons were insufficient to justify detention, unless a trooper's supervisor raised concerns.[589]

341.     None of the troopers who detained any of the Plaintiffs wrote reports detailing the stops at the time they took place. Trooper McMillan did not articulate his reasonable suspicion for stopping Mr. Bosire until Mr. Bosire filed a PSU complaint. Trooper Schulte did not create any written documentation of his reasons for detaining the Shaws. Lt. Rohr did not document his reasons for detaining Mr. Erich and Ms. Maloney until after this lawsuit was filed.

342.     The new detention report policy implemented in September 2022 requires that the detention reports be stored in non-electronic format only, which will limit the ability of KHP to sort the entire universe of forms by specific fields and identify trends.[590]

343.     The new detention documentation policy put in place in response to this litigation.[591] It was apparently discussed internally for some time before being approved by Col. Jones in 2022.[592] It was only after Plaintiffs filed suit and depositions began that Col. Jones realized that the KHP's system of oversight of unconstitutional practices depends on the victims of the unconstitutional practices themselves to report problems.[593]

---

[589] Jones Tr. Vol. 6, 122:10-14; *see also* Jones Tr. Vol. 6, 158:25-159:9 ("Q. You were asked how often drivers are detained without reasonable suspicion and if you have those statistics. Do you know if KHP is detaining drivers without reasonable suspicion? A. I don't have any data to show that either way.").

[590] Jones Tr. Vol. 7 23:7-22.

[591] Jones Tr. Vol. 5, 62:9-10.

[592] Jones Tr. Vol. 5, 62:12-14.

[593] Jones Tr. Vol. 6, 124:14-125:16, 131:23-132:10.

KC 20428204.1

344.     Faced with this evidence during discovery, Col. Jones apparently ordered his command staff to change KHP policy and begin documenting detentions even when no arrest or seizure occurs was delivered verbally at a meeting. No minutes of that meeting exist because the KHP does not maintain meeting minutes. Col. Jones did not write a memo memorializing that order. [594]

345.     This new policy and the use of Form HP-141 to document reasonable suspicion was not implemented until many months after Col. Jones gave his verbal order.[595]

346.     KHP troopers were notified of the new policy about documenting detentions and reasonable suspicion through an update in PowerDMS.[596]

347.     The first page of the new Form HP-141 provides checkboxes for indicators of criminal activity.[597] The form includes origin and destination fields at the top of the first page.[598] The origin is where the occupants indicate they began their trip, and the destination is where the occupants say they are traveling.[599] Among other things, the form also asks troopers to identify the purpose of the trip, signs of nervousness, whether the vehicle is a rental vehicle, whether a motorist is taking the most direct route, whether the vehicle has a lived in appearance, and whether there are disclaimers in the vehicles such as religious or military items.[600]

---

[594] Jones Tr. Vol. 6, 132:7-23, 149:3-23.

[595] Jones Tr. Vol. 6, 132:24-133:1; *see also* Jones Tr. Vol. 6, 124:14-24.

[596] Jones Tr. Vol. 6, 133:2-7, 149:24-150:13.

[597] Jones Tr. Vol. 5, 64:25-65:2.

[598] Jones Tr. Vol. 5, 65:3-9; Jones Tr. Vol. 6, 81:7-19.

[599] Jones Tr. Vol. 5, 65:17-22.

[600] Jones Tr. Vol. 5, 65:23-66:11.

KC 20428204.1

348.    The new form includes an extensive list of innocuous factors, which are the same factors that the KHP trains are criminal indicators.[601]

349.    The new policy does not require supervisors to review dashcam of roadside detentions.[602]

350.    Even with the new form, the only way a supervisor finds out if there is a problem with the reasonable suspicion underlying an extended detention at roadside is if there is a complaint or if there is an internal request to review it.[603]

351.    Importantly, the new detention report policy implemented by the KHP still directs troopers to inquire about and document the driver's state of origin, destination, and travel purpose, thereby suggesting that KHP would like its troopers to continue to consider these factors in deciding to detain drivers.[604]

352.    The new policy also does not contain any requirements that KHP leadership track and report on the completion of these forms, or any of the information contained therein.[605]

353.    No evidence was presented by Col. Jones regarding how these forms have been used by the KHP since their introduction late last year. And, importantly, when asked about trooper resistance to filling out new documentation and forms about their activities, former Assistant Superintendent Moon noted, "Troopers hate all change."[606]

---

[601] Jones Tr. Vol. 5, 66:12-17.

[602] Jones Tr. Vol. 5, 73:3-12.

[603] Jones Tr. Vol. 5, 73:8-12.

[604] Jones Tr. Vol. 7, 24:21-25:7.

[605] Jones Tr. Vol. 7, 26:2-6.

[606] Moon Dep., Ex. 134a, 156:11-14.

KC 20428204.1

354.    The new policy could be rescinded by Col. Jones or his successor at any time, reverting back to the previous policy of not documenting reasonable suspicion absent arrest, seizure, or investigation.[607]

355.    As the Superintendent, Col. Jones does not deal with the use of data to formulate KHP policy.[608]

356.    The PSU does not affirmatively or independently collect data on its own for use in formulating training and policy.[609]

357.    The PSU has not brought any information to Col. Jones's attention about trends that might require retraining or other remedial action that relates to the allegations of this lawsuit.[610]

358.    None of Col. Jones's executive staff, commanders, and supervisors have come to him with information about a trend or concern that troopers are conducting roadside detentions without reasonable suspicion or improper consent to search.[611]

### D.  Supervision

359.    The KHP is a decentralized agency, and troopers operate in different, separated geographic areas, generally not under a single command.[612] In this environment, leadership and oversight is critical for holding commanders and line troopers accountable to the Constitution.[613]

---

[607] Jones Tr. Vol. 6, 133:11-134:5 ("Q. Right. There's nothing that makes [the new policy] permanent? A. Other than policy. Policies do change. Q. And if that happened it would be back to business as usual; right? A. Whatever business as usual is.").

[608] Jones Tr. Vol. 6, 134:6-24.

[609] Jones Tr. Vol. 6, 126:23-137:2.

[610] Jones Tr. Vol. 6, 161:3-13.

[611] Jones Tr. Vol. 6, 161:18-162:1.

[612] Jones Tr. Vol. 7, 26:18-23.

[613] Jones Tr. Vol. 7, 27:4-7.

KC 20428204.1

360.    Col. Jones is a hands-off leader, who over-delegates and leaves data analysis and management up to his commanders.[614] Col. Jones shifts responsibility to commanders to do the important work that should lie with the head of the agency.[615]

361.    It is essential for the Superintendent of the KHP to hold the organization accountable, including through promulgating sound policies, ensuring that troopers understand those policies, and ensuring those policies are carried out.[616] But according to Col. Jones, ensuring compliance with the rule of *Vasquez* is ultimately the job of troopers' immediate supervisors.[617]

362.    In addition to the oversight issues described in Section III.A and the data collection deficiencies described in both Section III.A and C, Col. Jones also does not do enough to ensure that his troopers are directly and adequately supervised in their day-to-day work.

363.    First line supervisors do not meaningfully review the work of troopers under their watch. For example, Lt. Rohr stated that he reviewed reports of his troopers primarily for grammatical and spelling mistakes.[618] First line supervisors play an essential role in ensuring proper performance and community interactions, and Col. Jones's leadership does not emphasizes the importance of this level of supervision.[619]

---

[614] Jones Tr. Vol. 7, 28:1-3.

[615] Jones Tr. Vol. 7, 29:8-11.

[616] Jones Tr. Vol. 7, 29:23-30:1.

[617] Jones Tr. Vol. 6, 119:5-8.

[618] Jones Tr. Vol. 7, 35:5-21; Rohr Dep., Ex. 137, 148:13-149:23; Rohr Video Dep. Desig., Ex. 130, 1:49:40-1:50:48.

[619] Jones Tr. Vol. 7, 35:23-36:13.

KC 20428204.1

364.    As first line supervisor, Lt. Jirak evaluated performance of troopers under his supervision.[620] In doing so, Lt. Jirak did not track or evaluate the number of detentions the troopers made or the number of canine searches that were conducted.[621]

365.    No KHP policy requires supervisors to review roadside detentions.[622] While Cpt. Hogelin, the Troop N commander, requires supervisors under him to review roadside detentions, that accounts for less than 30 troopers.[623] Other than Troop N, the extent to which supervisors of other troops review video footage of stops or trooper activity is a random selection of dash cam videos on a quarterly basis. Whether that random selection includes a roadside detention by a non-Troop N trooper is a matter of luck.[624]

366.    In Lt. Jirak's time supervising troopers since 2000, he has never given a trooper an unsatisfactory performance evaluation.[625] And when there is a sustained complaint against a trooper, that trooper is not automatically given an unsatisfactory yearly evaluation.[626]

367.    Higher level leadership likewise does not adequately supervise front line supervisors. For example, Lt. Jirak is evaluated by Cpt. Hogelin, and Lt. Jirak's evaluations are based on his ability to lead his unit.[627]  In analyzing whether Lt. Jirak is doing a good job, the only areas Lt. Jirak remembers Cpt. Hogelin considering is Lt. Jirak's interpersonal relations with the

---

[620] Jirak Dep., Ex. 132A, 21:23-22:1; Jirak Video Dep. Desig. Ex. 132, 06:54-07:06.

[621] Jirak Dep., Ex. 132A, 23:14-17, 24:8-12; Jirak Video Dep. Desig. Ex. 132, 8:10-08:32.

[622] Jones Tr. Vol. 5, 70:3-71:21, 72:19–73:7; Jones Tr. Vol. 6, 4:19-5:7.

[623] Jones Tr. Vol. 5, 70:21-71:21; *see also* Jones Tr. Vol. 6, 4:19-5:7, 161:14-16.

[624] Jones Tr. Vol. 6, 128:19-129:21.

[625] Jirak Dep., Ex. 132A, 33:20-34:9; Jirak Video Dep. Desig. Ex. 132, 13.01-13:10.

[626] Jirak Dep., Ex. 132A, 32:16-19; Jirak Video Dep. Desig. Ex. 132, 13:10-13:42.

[627] Jirak Dep., Ex. 132A, 29:21-25; Jirak Video Dep. Desig. Ex. 132, 11:47-11:57.

KC 20428204.1

people he supervises and whether Lt. Jirak appropriately recommends his supervisees for recognition.[628]

368.    Col. Jones likewise does not require heightened supervision or training of troopers when evidence they have seized is suppressed in criminal court. KHP's legal counsel, who is responsible for legal training and remedial training, is almost never made aware when motions to suppress premised on a KHP trooper's failure to follow the law with regard to searches and seizures are filed.[629] And she is almost never made aware when there are orders suppressing evidence seized by KHP troopers,[630]or when cases are dismissed for a trooper's failure to execute a lawful search.[631]

369.    Aside from one-off requests, training instructors do not review or spot check stops to see whether or not troopers comply with training.[632]

370.    Sarah Washburn, who was responsible for the significant portion of KHP legal training from 2015-2023, does not know how she could know whether or not troopers are complying with her training.[633]

371.    As the KHP Superintendent with many commanders directly reporting to him, Col. Jones could direct that information on the number of drivers detained absent reasonable suspicion be sent to him, but he does not do so, instead leaving it to direct supervisors and commanders to obtain and review such information.[634]

---

[628] Jirak Dep., Ex. 132A, 30:1-12; Jirak Video Dep. Desig. Ex. 132, 11:58-12:40.

[629] Jones Tr. Vol. 5, 42:5-19.

[630] Jones Tr. Vol. 5, 42:5-19

[631] Jones Tr. Vol. 5, 42:20-23.

[632] Jones Tr. Vol. 5, 38:16-18.

[633] Jones Tr. Vol. 5, 38:19-22.

[634] Jones Tr. Vol. 6, 126:1-17.

KC 20428204.1

372.    Col. Jones does not receive reports about federal or state court cases where motions to suppress evidence based on a violation of a defendant's constitutional rights are sustained, unless a local commander or supervisor raises the issue with him.[635]

373.    Col. Jones does not receive data about how many stops or detentions take place that do not result in recovering any contraband.[636]

374.    The KHP does not systemically collect and analyze data related to the issues presented in this lawsuit, except as to the recently implemented detention report Form HP-141.[637]

375.    Col. Jones does not receive information or data about cases submitted to prosecutors but that the prosecutors decline to file because of constitutional violations. A KHP commander could obtain that data.[638]

376.    The only real system for investigating whether unconstitutional roadside detentions take place is the citizen complaint process, which relies on a citizen sensing that something wrong has happened. Complaints about violations of constitutional rights come primarily from citizens—the victims of civil rights violations themselves.[639] Deficiencies in that system are described below.

### E.  Accountability systems

377.    The Professional Standards Unit is the KHP's internal affairs unit.[640] The PSU's administrative investigation and the KHP's process for responding to complaints is outlined in

---

[635] Jones Tr. Vol. 6, 126:18-127:1.

[636] Jones Tr. Vol. 6, 91:10-17.

[637] Jones Tr. Vol. 6, 127:17-128:1.

[638] Jones Tr. Vol. 6, 128:3-9.

[639] Jones Tr. Vol. 6, 129:22-132:3.

[640] Jones Tr. Vol. 3, 90:15-91:17; Jones Tr. Vol. 6, 161:18-22; *see also* October 1, 2019 Version of KHP Policy ADM-07, Complaint Reporting and Administrative Investigations ("Complaint Policy"), Ex. 72 at 1.

KC 20428204.1

KHP Policy ADM-07, Complaint Reporting and Administrative Investigations ("the Complaint Policy").[641]

378.    The PSU is the investigative arm of the Superintendent's office.[642] It has two main functions: investigating complaints from the public about interactions with KHP personnel and conducting administrative investigations if asked by the Superintendent's office to investigate.[643]

379.    By policy, the PSU cannot initiate an investigation unless it receives a public complaint or request by the Superintendent's office.[644]

380.    Therefore, not all misconduct inside the KHP is investigated, even where PSU is aware of alleged misconduct, for example through civil lawsuits or sustained suppression motions.[645]

381.    PSU investigations are a reactive process in that it requires a complaint from a citizen or trooper.[646]

382.    The PSU commander's duties include, among other things: the receipt, processing, and investigation of complaints; conducting or coordinating special investigations directed by the Superintendent; developing investigative policy and procedure consistent with current administrative case law; notifying the Superintendent of complaints about KHP personnel containing serious allegations of misconduct; submitting weekly reports to the Superintendent on the status of active administrative investigations; ensuring that the public could figure out how to

---

[641] Complaint Policy, Ex. 72; Jones Tr. Vol. 6, 104:13-17.

[642] Jones Tr. Vol. 4, 5:9-11.

[643] Jones Tr. Vol. 4, 5:12-22.

[644] Jones Tr. Vol. 4, 41:23-42:7.

[645] Jones Tr. Vol. 4,37:2-4, 37:22-38:3, 39:5-8, 41:12-18, 42:8-12.

[646] Jones Tr. Vol. 6, 136:1-4.

KC 20428204.1

make complaints to the KHP; and liaising with KHP legal counsel and the Kansas Attorney-General in matters involving administrative investigations.[647]

383.    Another of the PSU commander's duties is to prepare an annual administrative review of all complaints to identify common causes of complaints that the KHP might need to address, including by taking appropriate remedial steps with an employee who has received a high number of complaints.[648]

384.    The 2020 annual report from the PSU commander did not include a review and report or identification of employees receiving a high number of complaints. The PSU commander did not include the requisite review and report of employees with high numbers of complaints because he followed the form used by prior PSU commanders, and that form did not include that information.[649]

385.    The PSU commander is required to immediately report to the Superintendent a complaint containing a serious allegation of violation of constitutional rights.[650]

386.    The KHP's Complaint Policy is supposed to "protect the public trust and the integrity of the agency by ensuring the professional conduct of all employees through systematic, uniform, administrative procedures, and the prompt, objective investigation of all complaints of employee misconduct."[651]

---

[647] Complaint Policy, Ex. 72 at 10; Jones Tr. Vol. 3, 91:18-93:14.

[648] Jones Tr. Vol. 3, 97:19-98:16; Complaint Policy, Ex. 72 at 11.

[649] Jones Tr. Vol. 3, 98:22-99:8.

[650] Jones Tr. Vol. 3, 99:9-100:4; Complaint Policy, Ex. 72 at 2, 10.

[651] Complaint Policy, Ex. 72 at 1.

KC 20428204.1

387.    The Complaint Policy sets forth how the PSU will conduct internal investigations and describes the process the PSU uses when conducting such an investigation.[652]

388.    The KHP's Complaint Policy requires that when a person communicates to any KHP employee that they wish to file a complaint about misconduct, the employee must "courteously provide the person with: a. One of their current Patrol business cards or give the person their name, badge or identification number (if applicable) . . . [and] b. A current Complaint Procedures pamphlet, or a brief, accurate summation of proper complaint procedures."[653]

389.    Members of the public may submit complaints by phone call, a written letter, the KHP website, email or social media, or in person.[654]

390.    KHP employees are not to interfere with, discourage, or delaying the making or investigation of a complaint.[655]

391.    The PSU is responsible for reviewing and investigating complaints. The PSU commander will assign a complaint for investigation based on the seriousness or sensitivity of the allegation, and the PSU is generally required to conduct an investigation of complaints concerning civil rights violations, such as an improper search and seizure.[656]

392.    The PSU process works as follows: First, allegations come to the PSU through public complaint or the Superintendent's office. Then, the PSU reviews the allegations in the complaint. Next, the trooper who is the subject of the investigation is notified. The investigation is conducted which can include review of dashcam, interviews, written statements, and reports.

---

[652] Complaint Policy, Ex. 72 at 5-9.

[653] Complaint Policy, Ex. 72 at 1-2.

[654] Complaint Policy, Ex. 72 at 3-4; Jones Tr. Vol. 3, 93:7-10.

[655] Complaint Policy, Ex. 72 at 2; Jones Tr. Vol. 3, 93:18-94:7.

[656] Complaint Policy, Ex. 72 at 5; Jones Tr. Vol. 3, 100:5-9.

KC 20428204.1

After the investigation is concluded, a PSU report is generated. The report is given to the trooper's commander for review, and once reviewed by the troop commander, then it continues its way up the chain of command and eventually reaches the Colonel's desk. After review by the Colonel, it goes back to the PSU, and the PSU sends out a citizen's closing letter which lets the complainant know the findings of the investigation.[657]

393.    Under this process, one of the first steps in investigating a complaint of misconduct is notifying the accused employee of the complaint.[658]

394.    Once a trooper is advised a PSU complaint has been filed against them and asked by PSU for a response, they are provided the date, time, and location of the stop under investigation and have access to the records of the stop including dashcam video.[659]

395.    Those records, including dash cam videos, are not typically made available to the motorists making the PSU complaint.[660]

396.    The PSU assigns an investigator to oversee an investigation, and that investigator is responsible for collecting all necessary data and submitting a written report. The written report must include a finding of fact(s) and conclusions, as well as any significant discrepancies in policy, training, or equipment.[661]

397.    The PSU report will include the investigator's recommendation as to whether the complaint should be classified as (a) "Unfounded" – the complaint allegation is not supported by facts or is false; (b) "Exonerated" – the allegation is factual and did occur but the involved

---

[657] Jones Tr. Vol. 4, 7:10-8:23.

[658] Complaint Policy, Ex. 72 at 6; Jones Tr. Vol. 3, 100:16-19.

[659] Jones Tr. Vol. 5, 75:25-76:13.

[660] Jones Tr. Vol. 5, 76:21-77:3.

[661] Complaint Policy, Ex. 72 at 6; Jones Tr. Vol. 3, 100:10-15, 100:20-101:5.

KC 20428204.1

employee acted lawfully and properly within the bounds of policy and acceptable conduct; (c) "Not Sustained" – insufficient evidence exists to prove or disprove the allegation, or applied to any anonymous complaint that lacks corroborative information or evidence; (d) "Sustained" – allegation found to be factual and substantiated by competent evidence; (e) "Misconduct Not Based On Complaint" – misconduct not alleged in the complaint but supported by facts during the investigation; or (f) "Closed" – investigation of the allegation was terminated.[662] A sustained complaint means that the investigation found that the misconduct occurred.[663]

398.   The PSU report will also include recommendations for any corrective measures or discipline that should be taken as to the accused employee.[664]

399.   The PSU commander receives, reviews, and may revise the findings, conclusions, and recommendations for each PSU complaint. The report is then sent up through the chain of command to the Superintendent.[665] The accused employee is informed at this time that the investigation is complete.[666]

400.   The results of all investigations are sent to the Superintendent. The Superintendent makes the final decision about whether to impose corrective action or discipline.[667] The PSU is not involved in disciplining troopers.[668]

401.   After the executive command has reviewed the report and made a decision, the PSU commander is required to notify the accused employee in writing of the resolution of the PSU

---

[662] Complaint Policy, Ex. 72 at 8-9, Jones Tr. Vol. 3, 101:6-105:14.

[663] Jones Tr. Vol. 4, 8:24-9:3.

[664] Complaint Policy, Ex. 72 at 9; Jones Tr. Vol. 3, 105:24-106:12.

[665] Complaint Policy, Ex. 72 at 9; Jones Tr. Vol. 3, 106:13-18.

[666] Jones Tr. Vol. 3, 106:19-107:1.

[667] Jones Tr. Vol. 6, 104:13-106:17.

[668] Jones Tr. Vol. 4, 9:4-6.

KC 20428204.1

investigation and of any corrective action. Where suspension, demotion, or termination are proposed, the Superintendent will notify the accused employee.[669]

402.    If the PSU makes a finding that a KHP employee violated a person's constitutional rights, the executive commanders will decide what corrective action or discipline will be imposed on the employee.[670]

403.    Overall, the PSU is an ineffective system for ensuring troopers are following the law, and evidence indicates that Col. Jones does not use the PSU consistent with policy and, as a result, does not take constitutional violations seriously.[671]

404.    KHP Policy ROC-05, Discipline and/or Corrective Actions ("the Discipline Policy") describes what measures the KHP may take to address employees' conduct unbecoming. The Discipline Policy applies once a PSU complaint is classified as "Sustained."[672]

405.    Corrective action is designed to correct a trooper's behavior and prevent it from happening again. Corrective action may take the form of counseling, denial of personal requests (e.g., requests for training, time off, etc.), documenting information for performance evaluation purposes, change in duty hours or extra duty assignments, a verbal reprimand, a written reprimand, paid administrative leave, recommendation of suspension or dismissal, repayment for damaged state property, and remedial training.[673]

---

[669] Complaint Policy, Ex. 72 at 9; Jones Tr. Vol. 3, 107:2-9.

[670] Jones Tr. Vol. 3, 107:10-15.

[671] Jones Tr. Vol. 7, 30:11-15.

[672] KHP Policy ROC-05, Discipline and/or Corrective Actions ("Discipline Policy"), Ex. 74 at 1; Jones Tr. Vol. 3, 107-21-108:5.

[673] Discipline Policy at 1-2; Jones Tr. Vol. 3, 108:6-17, 108:22-24, 109:3-113:25; Jones Tr. Vol. 6, 111:23-112:11.

KC 20428204.1

406.    Under the Discipline Policy, remedial training is the first option for addressing minor rule violations, inadequate job performance, or deficient work habits.[674]

407.    Corrective action is only to be used for minor rule violations.[675]

408.    In contrast to corrective action, discipline is a continuum of consequences such as suspension, demotion, transfer, or dismissal.[676]

409.    The Discipline Policy states that, under the Kansas Civil Service Act, disciplinary action may imposed for:

> c. Employees who do not maintain sufficient competency to properly perform their duties and assume the responsibility of their position.
> . . .
> e. Employees who lack knowledge of the application of laws required to be enforced.
> . . .
> j. Employees who disregard agency policies, procedures, or directives.[677]

Violations of the Constitution fall within these categories.

410.    The Discipline Policy also states that, under the Kansas Civil Service Act, disciplinary action may be imposed for personal conduct detrimental to state service including but not limited to "[e]mployees who do not obey all applicable laws regardless of the jurisdiction involved."[678]

411.    Violating a citizen's constitutional rights merits discipline in the form of dismissal, demotion, or suspension.[679]

---

[674] Discipline Policy at 2; Jones Tr. Vol. 3, 114:1-115:1; *see also* Jones Tr. Vol. 6, 113:5-18.

[675] Jones Tr. Vol. 3, 120:17-18.

[676] Discipline Policy at 3-5; Jones Tr. Vol. 3, 108:19-20, 108:25-109:2; Jones Tr. Vol. 6, 112:12-16, 112:24-113:5.

[677] Discipline Policy, Ex. 74 at 3-4; Jones Tr. Vol. 3, 125:11-126:19.

[678] Discipline Policy, Ex. 74 at 3, 4; Jones Tr. Vol. 3, 126:20-127:5.

[679] Jones Tr. Vol. 3, 126:3-127:5.

KC 20428204.1

412.    There was mixed testimony regarding the obligation of troopers to report misconduct by their fellow troopers to the PSU. For example, one supervisor stated that there is no mandatory reporting requirement for troopers to report violations committed by other troopers.[680] Major Mitchell Clark, however, said that KHP employees are obligated to promptly report known or reasonably suspected misconduct of other KHP employees, including a violation of a person's constitutional rights.[681] If that is in fact a requirement, it appears troopers do not know about it.

413.    Additionally, no KHP employee has ever made an internal report of a constitutional violation of a person's rights, at least as late as January 27, 2022.[682]

414.    A KHP employee is "very likely" to face ostracism from other employees for making an internal complaint, because a complainant's name is revealed to the accused employee who is the subject of the complaint as a matter of KHP policy.[683] If an employee makes an anonymous complaint, that complaint would be ultimately be classified as "Not Sustained" if the PSU investigators were unable to identify and interview the complainant.[684]

415.    There is no requirement that a trooper who has had a sustained PSU complaint be required to undergo regular oversight.[685]

---

[680] Jones Tr. Vol. 5, 75:6-9.

[681] Complaint Policy, Ex. 72 at 2; Jones Tr. Vol. 3, 94:8-17.

[682] Jones Tr. Vol. 3, 94:18-95:5, 89:13-24; *see also* Jones Tr. Vol. 6, 129:22-130:5 ("Q. And you've heard testimony in this case that that's a rare thing, right, one trooper reporting another? A. I think – yes. Well – yes.").

[683] Jones Tr. Vol. 3, 95:6-96:23; Complaint Policy, Ex. 72 at 6 (providing for notification of the subject of a complaint and providing them a copy of the complaint).

[684] Jones Tr. Vol. 3, 104:4-15.

[685] Jones Tr. Vol. 5, 74:1-6.

KC 20428204.1

416.     As described in Section I.B, *supra*, in 2019, Lieutenant Joseph Bullock conducted a PSU investigation regarding Trooper McMillan's stop and detention of Mr. Bosire.[686] Lt. Bullock has been employed by KHP since 2000.[687] He worked in the KHP's PSU from 2016 through 2021.[688]

417.     Lt. Bullock's investigation included reviewing dash cam, speaking with Mr. Bosire regarding his complaint, reviewing Trooper McMillan's written response, interviewing Trooper Schulte, and consulting with subject matter expert Cpt. Hogelin.[689]

418.     Upon conclusion of the investigation, Lt. Bullock wrote a letter to be sent under Col. Jones's signature to Trooper McMillan dated July 25, 2019.[690] This letter stated: "It was determined under accepted protocols for criminal interdiction investigation, and the burdens of proof needed therein, there was not reason to detain Mr. Bosire further for a K-9 unit to respond to the scene for a drug sniff. This caused you hold Mr. Bosire for a longer duration than is legally acceptable."[691]

419.     This letter to McMillan contained softened language that Col. Jones wanted to alter and tone down from the PSU's recommendations, despite Col. Jones not disputing the PSU investigation findings.[692]

---

[686] Jones Tr. Vol. 4, 9:12-18; Kansas Highway Patrol Professional Standards Unit Case No. #2019-0130 ("McMillan PSU Report"), Ex. 19.

[687] Jones Tr. Vol. 4, 4:4-9.

[688] Jones Tr. Vol. 4, 4:10-23.

[689] Jones Tr. Vol. 4, 12:12-13:6, 18:4-24.

[690] 07.25.19 Correspondence to McMillan re PSU finding, Ex. 110.

[691] McMillan PSU Report, Ex. 19 at 215 (OAG008503); Jones Tr. Vol. 3, 125:2-5.

[692] Jones Tr. Vol. 3, 107:11-111:9.

KC 20428204.1

420.    Cpt. Jason Vanderweide (McMillan's commander) also wrote Trooper McMillan a closing letter, dated August 5, 2019. The letter stated, "You held Bosire longer on the roadside than was necessary."[693]

421.    Col. Jones's letter to Mr. Bosire at the conclusion of the investigation states, "we have determined some of your concerns had merit. . . . This contact with you was not what we would consider standard under the confines of investigative reasonable suspicion regarding criminal interdiction. . . .we feel the length of time you were detained roadside was unnecessary given the suspicions [Trooper McMillan] articulated."[694] The letter informed Mr. Bosire that Trooper McMillan's failure "would be handled in accordance with [KHP's] policies and procedures[.]"[695]

422.    In response to a sustained finding of a constitutional violation, McMillan was not disciplined. Instead, he was only given corrective action in the form of additional counseling and training through a one-hour legal review with legal counsel and a ride-along with supervisor from another troop.[696]

423.    Despite the jury verdicts determining that Trooper Schulte violated Blaine Shaw's constitutional rights and that Trooper McMillan violated Joshua Bosire's constitutional rights, as well as an award against Trooper McMillan for punitive damages, no corrective action or discipline has been imposed on Troopers Schulte or McMillan as of May 10, 2023.[697]

---

[693] McMillan PSU Report, Ex. 19 at 213 (OAG008501); Jones Tr. Vol. 3, 115:9-120:25.

[694] 08.09.2019 Correspondence to Bosire re PSU finding, Ex. 27.

[695] 08.09.2019 Correspondence to Bosire re PSU finding, Ex. 27.

[696] McMillan PSU Report, Ex. 19 at 213 (OAG008501); Jones Tr. Vol. 3, 115:9-120:25; Jones Tr. Vol. 6, 111:10-17.

[697] Jones Tr. Vol. 6, 113:19-117:19, 158:5-16.

KC 20428204.1

424.    Col. Jones does not recall disciplining the supervisors of troopers who engaged in policy violations or constitutional violations, such as Trooper McMillan's supervisor.[698]

425.    The KHP or the state of Kansas will pay the damages assessed against Troopers McMillan and Schulte, not the troopers themselves.[699]

426.    Trooper McMillan's deposition testimony that he learned nothing from the corrective action he received as a result of his illegal detention of Mr. Bosire is further evidence that the PSU investigation process is an ineffective accountability mechanism.[700]

427.    It appears that Trooper McMillan did not learn anything from the corrective action.[701] The KHP staff attorney who provided Trooper McMillan's remedial training was not aware of Trooper McMillan's testimony to this effect, or his testimony that he has not changed the way he does things after receiving the remedial training, or that Trooper McMillan testified he believes Col. Jones's findings regarding his stop with Mr. Bosire are wrong.[702]

---

[698] Jones Tr. Vol. 6, 153:5-19.

[699] Jones Tr. Vol. 6, 116:20-118:13.

[700] Jones Tr. Vol. 7, 30:19-24.

[701] Jones Tr. Vol. 7, 30:19-24

[702] Jones Tr. Vol. 5, 50:15-18, 51:25-52:7.

107

KC 20428204.1

## CONCLUSIONS OF LAW

I.    **APPLICABLE LEGAL STANDARDS**

   A.  **42 U.S.C. § 1983**

Plaintiffs brought their lawsuit against Col. Jones pursuant to 42 U.S.C. § 1983. That statute reads in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, **subjects, or causes to be subjected**, any citizen of the United States or other person within the jurisdiction thereof **to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws**, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983 (emphases added). Section 1983 works to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."[703] Indeed, § 1983 "is a powerful legislative 'sword' providing injunctive relief and damages for the benefit of citizens whose Federal Constitutional rights have been violated by persons acting on behalf of a state or local government."[704]

Plaintiffs sued Col. Jones in his official capacity for declaratory and injunctive relief, alleging an ongoing practice of Fourth Amendment violations. Section 1983 allows for suit in law *and* in equity for good reason: to ensure that there is an appropriate remedy for ongoing violations of federal law.[705]

---

[703] *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citing *Carey v. Piphus*, 435 U.S. 247, 254–57 (1978)).

[704] *Leuallen v. Paulsboro Police Dep't*, No. CIV. 99-4353(JBS), 2001 WL 1700432, at *7 (D.N.J. Dec. 5, 2001).

[705] *See, e.g.*, *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) ("The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'"). "In carrying out that purpose, Congress plainly authorized the federal courts to issue injunctions in § 1983 actions, by expressly authorizing a 'suit in equity' as one of the means of redress." *Id.*

KC 20428204.1

Claims for injunctive relief brought against government officials under § 1983 are brought against those officials in their official, rather than personal, capacity.[706] This is in part because a personal capacity claim necessarily dies when that official leaves that position; a personal capacity lawsuit is against the individual, not the office holder.[707] Therefore, when a plaintiff in a civil rights lawsuit hopes to change the practices of a government agency as a whole—rather than seek compensation from a single individual for past conduct—a suit against the head of that government agency in his or her official capacity is the proper and only avenue for relief.

### B. *Ex parte Young*

Col. Jones is a state official.[708] Plaintiffs therefore bring their lawsuit pursuant to the doctrine of *Ex parte Young*.[709] *Ex parte Young* embodies the principle that sovereign immunity does not prevent plaintiffs harmed by state agencies acting in violation of federal law from seeking to enjoin the officials in charge of such an agency. "Under the *Ex parte Young* exception, a plaintiff may sue individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks only prospective relief."[710] The KHP itself, as a subdivision of the State, cannot be sued under the Eleventh Amendment.[711]

---

[706] *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1214 (10th Cir. 2022) ("Under § 1983, a plaintiff cannot sue an official in their individual capacity for injunctive or declaratory relief."); *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) ("Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief."); *DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714, 718 (10th Cir. 1988) ("An action for injunctive relief no matter how it is phrased is against a defendant in official capacity only.").

[707] *Cf.* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity [lawsuit] dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

[708] Pretrial Order, Doc. #290 at 16 (the KHP is a state agency under the direction of Col. Jones).

[709] 209 U.S. 123 (1908).

[710] *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021) *cert. denied*, 142 S. Ct. 423 (2021) (citing *Ex parte Young*, 209 U.S. at 159–60; *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

[711] U.S. Const. Amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . .").

KC 20428204.1

*Ex parte Young* represents a recognition that lawsuits for prospective injunctive relief against state officials for ongoing violations of federal law directly support, rather than undermine, notions of federal supremacy.[712] As noted by leading commentators, injunctions pursuant to *Ex parte Young* serve a vital role in ensuring that state actors do not flout federal Constitutional requirements with impunity:

> The effect of *Ex parte Young* is to bring within the scope of federal judicial review actions that might otherwise escape such review, and to subject the states to the restrictions of the United States Constitution that they might otherwise be able safely to ignore.[713]

"Thus, when a plaintiff alleges a continuing or future violation of federal law, the federal government's interest in ensuring compliance with federal law predominates, and a federal court has jurisdiction to enjoin the violation."[714] This is an important facet of this Court's equitable power and authority: the ability to stop violations of federal law in their tracks and to ensure that they do not continue in the future.

To prevail against Col. Jones in this *Ex parte Young* lawsuit, Plaintiffs must (1) show an ongoing violation of federal law (here, the Fourth Amendment), and (2) seek prospective relief only.[715] Plaintiffs only need to show that a causal nexus between Col. Jones's conduct—

---

[712] *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.") (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 89, 102 (1984)).

[713] 17A Fed. Prac. & Proc. Juris. § 4231 (3d ed.).

[714] 17A Moore's Fed. P. Civil 123.40.

[715] *Turner v. Nat'l Council of State Boards of Nursing, Inc.*, No. 11-2059-KHV, 2012 WL 1435295, at *15 (D. Kan. Apr. 24, 2012), aff'd, 561 F. App'x 661 (10th Cir. 2014). Because this is a suit under *Ex parte Young* against a state official, and not a municipality, the standard for *municipal liability* under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978), "has no applicability." *See Rounds v. Clements*, 495 Fed. App'x 938, 941 (10th. Cir. 2012) (citing *Monell*, 436 U.S. at 694-95); *see also Spann v. Hannah*, 2020 U.S. App. LEXIS 28845, at *8 (6th Cir. Sept. 10, 2020) (citing *Rounds*, 495 Fed. App'x at 941); *Cain v. City of New Orleans*, 2017 U.S. Dist. LEXIS 15124, at *53 (E.D. La. Feb. 3, 2017) (same). Col. Jones disputes the Court's ruling that *Monell*-like liability standards have no place in a lawsuit brought under *Ex parte Young* against a state official in his official capacity. He asserts that Plaintiffs must prove that he was deliberately indifferent to Plaintiffs' constitutional rights in order to prevail on their claim. This

110

specifically his failure as the head of the agency to ensure his troopers are complying with the Constitution—and the continuing constitutional violations occurring in the field under his watch.[716] Plaintiffs must prove their claim by a preponderance of the evidence. In other words, Plaintiffs must demonstrate that it is more likely than not that Col. Jones and the KHP are engaging in the constitutional violations that Plaintiffs allege—namely, prolonged roadside detentions without adequate reasonable suspicion in violation of the Fourth Amendment.

### C.  Fourth Amendment – Unreasonable Searches and Seizures

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "A traffic stop constitutes a seizure under the Fourth Amendment." *United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997). And the Fourth Amendment's "protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).

Consistent with the Fourth Amendment, roadside detentions should last "no longer than necessary to effectuate the purpose of the stop, and the scope [of the detention] must be carefully tailored to its underlying justification."[717] "During a traffic stop for speeding, a police officer is permitted to ask such questions, examine such documentation, and run such computer verification as necessary to determine that the driver has a valid license and is entitled to operate the vehicle."[718]

---

Court disagrees. *See* Doc. #515 at 14-15. Regardless, even if the Plaintiffs were required to prove deliberate indifference as Col. Jones suggests, the Court's ultimate ruling would be unchanged.

[716] *See* Order, Doc. #466 at 3.

[717] *Vasquez*, 834 F.3d at 1136.

[718] *Wood*, 106 F.3d at 945.

KC 20428204.1

Importantly, "the detention must be carefully tailored to its underlying justification."[719] Once "the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning."[720] And, importantly, questions regarding a driver's travel plans have been held to impermissibly prolong a traffic stop if not within the scope of the traffic stop.[721]

Once the business of a traffic stop is complete, officers need either consent or reasonable suspicion to continue the detention:

> An investigative detention may be permissibly expanded beyond the reason for its inception if the person stopped consents. . . . Absent valid consent, the scope or duration of an investigative detention may be expanded beyond its initial purpose only if the detaining officer at the time of the detention has "a particularized and objective basis for suspecting the particular person stopped of criminal activity."[722]

Absent consent or additional reasonable suspicion, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."[723]

Reasonable suspicion is not meant to be an exacting standard,[724] but neither does it grant license to law enforcement officials to detain motorists based on speculation, guesswork, or entirely innocent conduct. Common sense and ordinary human experience plays a role in

---

[719] *United States v. Lee*, 73 F.3d 1034, 1038-1039 (10th Cir. 1996) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)), overruled on other grounds by *United States v. Holt*, 264 F.3d 1215 (10th Cir. 2001).

[720] *Lee*, 73 F.3d at 1039.

[721] *State v. Jimenez*, 308 Kan. 315, 328 (2018).

[722] *Wood*, 106 F.3d at 946 (citing *United States v. Lambert*, 46 F.3d 1064, 1069 (10th Cir. 1995)).

[723] *Rodriguez v. United States*, 575 U.S. 348, 350 (2015).

[724] *Shaw v. Schulte*, 36 F.4th 1006, 1014 (10th Cir. 2022).

KC 20428204.1

determining whether an officer's suspicion was "reasonable" or not.[725] "An officer's 'inchoate and unparticularized suspicion or "hunch"' is insufficient to give rise to reasonable suspicion."[726] Most relevant to this case, although law enforcement is at times granted substantial deference by the courts, reasonable suspicion must still be *reasonable*. That is, this Court is not required to defer to an officer's judgment and experience when such judgment and experience is not supported by the law, the facts, or basic common sense.

### D.  *Vasquez v. Lewis*

In *Vasquez v. Lewis*, the Tenth Circuit held that "[i]t is time to abandon the pretense that state citizenship is a permissible basis upon which to justify the detention and search of out-of-state motorists."[727] Notably, the language in the *Vasquez* decision itself—"it is time to abandon" the practice of prolonging detentions based in part on travel plans—indicates the Tenth Circuit's awareness of KHP's longstanding custom of relying on these impermissible criteria in developing reasonable suspicion.[728] It stated: "Even under the totality of the circumstances, it is anachronistic to use state residence as a justification for the Officers' reasonable suspicion."[729]

KHP troopers seem to be under the mistaken belief that, so long as they offer other factors to justify the detention, their reliance on out-of-state plates or travel destinations is permissible. But that is not what the Tenth Circuit has held; as this Court has already recognized, the *Vasquez* court "held that *even when combined with other factors*, a driver's status as a Colorado resident

---

[725] *Shaw*, 36 F.4th at 1014 (citing *United States v. Walraven,* 892 F.2d 972, 975 (10th Cir. 1989) ("In determining the reasonableness of an investigative detention, '*common sense* and ordinary human experience must govern over rigid criteria.'" (emphasis added) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985))).

[726] *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989) and *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

[727] *Vasquez v. Lewis*, 834 F.3d 1132, 1138 (10th Cir. 2016).

[728] *See Vasquez*, 834 F.3d at 1137.

[729] *Vasquez*, 834 F.3d at 1138.

KC 20428204.1

does not give KHP troopers reasonable suspicion to subject the driver to prolonged detention and a vehicle search."[730]

*Vasquez* was unequivocal. Four years before the inception of this case and between one and three years before the stops at issue in this case occurred, the Tenth Circuit held that innocent-travel criteria such as state of origin or destination are "so broad as to be indicative of almost nothing."[731] Observing that it "cannot think of a scenario in which a combination of otherwise innocent factors becomes suspicious" because a driver happens to be coming from a state where marijuana is legal, the court ruled that continued reliance on these criteria is "impermissible" in almost all circumstances.[732] The Tenth Circuit reaffirmed that holding in Troopers Schulte and McMillian's appeal earlier in this case.[733] Although *implausible* or *contradictory* travel plans can contribute to reasonable suspicion,[734] a driver's state of residency, state of origin, or destination is virtually meaningless.[735]

### E. Permanent Injunctions Under Federal Rule of Civil Procedure 65(d)

For Plaintiffs to obtain a permanent injunction, they must prove: (1) actual success on the merits; (2) irreparable harm absent an injunction; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) if issued, the injunction will not adversely

---

[730] Order Overruling Def. Mot. to Dismiss, Doc. #36 at 4 (emphasis added).

[731] *Vasquez,* 834 F.3d at 1137.

[732] *Vasquez,* 834 F.3d at 1138.

[733] *Shaw v. Schulte*, 36 F.4th 1006, 1015 (10th Cir. 2022) (destination and state of origin are factors with "minimal value").

[734] *United States v. Pettit*, 785, F.3d 1374, 1381 (10th Cir. 2015); *UnitedStates v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005) ("Our holding that *suspicious* travel plans can form an element of reasonable suspicion should not be taken as an invitation to find travel suspicious per se." (emphasis original)); *see also United States v. Frazier*, 30 F.4th 1165, 1177–78 (10th Cir. 2022) ("Mr. Frazier's travel plans, meanwhile, add nothing at all. . . [T]he government points to nothing about Mr. Frazier's itinerary as it was known to Trooper Gibbs at this point in the stop to suggest that his travel plans were implausible or in any way inconsistent . .  Accordingly, absent other facts suggestive of criminal wrongdoing, we give no weight to the fact that Mr. Frazier was returning from a trip to the West Coast.").

[735] *Vasquez,* 834 F.3d at 1137.

KC 20428204.1

affect the public interest.[736] "None of the above factors, taken individually, is dispositive; rather, the court must weigh each factor against the other factors and against the form and magnitude of relief sought."[737]

## II.   PLAINTIFFS HAVE STANDING TO PURSUE CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF.

As an initial matter, the Court finds that Plaintiffs have standing to pursue their claims for equitable relief.

Article III standing is established when a plaintiff demonstrates "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"[738] A plaintiff establishes standing to sue for injunctive relief by demonstrating a "realistic threat" that he will be wronged in a similar way in the future.[739] A future injury does not need to be certain to establish standing for prospective relief; rather "[e]ven a small probability of injury is sufficient to create a case or controversy . . . ."[740] Courts have consistently found standing to sue for prospective relief against law enforcement profiling practices even where the statistical likelihood of the plaintiff being stopped again was unknown or low.[741] Similarly, the fact that a plaintiff has only been subjected

---

[736] *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (cleaned up).

[737] *Prairie Band Potawatomi Nation*, 476 F.3d at 822.

[738] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

[739] *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 109 (1983) (setting the standard that a plaintiff must make a "showing that he is realistically threatened by a repetition of his experience" in order to "meet the requirements for seeking an injunction in a federal court . . ."); *Harris v. Champion*, 51 F.3d 901, 907 (10th Cir. 1995) (abrogated on other grounds; citing the test from *Lyons*); *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004) (the plaintiff "established that she is under a realistic threat of experiencing a" similar situation in the next year, "suffic[ing] to establish an injury in fact."); *In re Motor Fuel Temperature Sales Practices Litig.*, 2012 WL 1672994, at *6 (D. Kan. May 14, 2012) (citing and applying the "realistic threat" standard cited in Tandy).

[740] *Massachusetts v. EPA*, 549 U.S. 497, 525 n. 23 (2007) (quotation omitted).

[741] *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979 (D. Ariz. 2011) (standing to challenge a stop policy where "likelihood that any particular named Plaintiff will again be stopped in the same way may not be high"); *Smith v. City*

KC 20428204.1

to the future harm they are seeking to enjoin once in the past does not undermine their standing to sue for prospective relief.[742] In addition to analyzing whether the defendant's conduct exposes the plaintiff to an increased risk of harm, courts consider whether: (1) the defendant has authorized the challenged practice; (2) the plaintiff has alleged they will engage in activities that would expose them to defendant's policies in the future; and, (3) the frequency of alleged injuries pursuant to defendant's policies.[743] A remote future harm confers injunctive standing where the risk of injury would be reduced if the court granted the relief sought by the plaintiff.[744] Stated another way, the threat of harm is realistic where enjoining the defendant's practice, policy, or custom will decrease the likelihood of the harm occurring.

Here, Plaintiffs have demonstrated more than a mere hypothetical risk of being subjected to constitutional violations in the future. Plaintiffs each testified that they still travel through

---

*of Chicago*, 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015) (finding standing where "Plaintiffs have alleged ongoing constitutional violations pursuant to an unconstitutional policy or practice in tandem with allegations . . . which lead[] to the reasonable inference of the likelihood that CPD officers will unlawfully stop and frisk Plaintiffs in the future."); *Maryland State Conference of NAACP Branches v. Maryland Dep't of State Police*, 72 F. Supp. 2d 560, 564 (D. Md. 1999) (distinguishing *Lyons*, because the plaintiffs had "allege[d] a pattern and practice of racially discriminatory stops); *Floyd v. City of New York* ("*Floyd II*"), 959 F. Supp. 2d 540, 658, 667 (S.D.N.Y. 2013). (granting injunction to reform NYPD's stop and frisk program, even though the total number of stops and frisks each year was small as compared to the total population of New York City).

[742] *Aid for Women v. Foulston*, 441 F.3d 1101, 1110 (10th Cir. 2006) (finding plaintiffs alleged realistic threat of a future constitutional injury absent no previous enforcement); *Leadholm v. City of Commerce City*, No. 16-CV-02786-MEH, 2017 WL 1862313, at *8 (D. Colo. May 9, 2017) (one alleged occasion of excessive force during traffic stop was sufficient to establish standing against city); *Roe v. City of New York*, 151 F. Supp. 2d 495, 503 (S.D.N.Y. 2001) ("there is no per se rule requiring more than one past act . . . as a basis for finding a likelihood of future injury"); *Floyd v. City of New York* ("*Floyd I*"), 283 F.R.D. 153, 170 (S.D.N.Y. 2012) ("Even [a] single stop, in light of the tens of thousands of facially unlawful stops, would likely confer standing.").

[743] *See, e.g., Lyons*, 461 U.S. at 105-06 (noting plaintiff would have established standing for prospective relief had plaintiff "allege[d] that he would have another encounter with the police" and "that the City ordered or authorized police officers to act in such manner."); *Honig v. Doe*, 484 U.S. 305, 320-21 (finding defendant was likely to re-inflict unconstitutional suspension on disabled plaintiff where plaintiff alleged he would continue to engage in classroom behavior that precipitated his suspension).

[744] *See, e.g., Massachusetts*, 549 U.S. at 526 (2007) (finding standing for prospective relief where "[t]he risk of catastrophic harm, though remote, is nevertheless real" and "[t]hat risk would be reduced to some extent if petitioners received the relief they seek"); *Baur v. Veneman*, 352 F.3d 625, 633 (2d Cir. 2003) ("threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing.").

116

KC 20428204.1

Kansas to and from Colorado and other states, and that they use Kansas highways to do so.[745] Statistical analysis from Dr. Mummolo confirms that out-of-state drivers are stopped by the KHP at highly disproportionate rates relative to their share of the total driving population on Kansas highways.[746] Once stopped, out-of-state drivers are detained for canine sniffs at disproportionate rates as well.[747] Moreover, given the abundance of evidence regarding KHP's continued practice of detaining drivers in part based on their travel to or from other states,[748] it is clear that Col. Jones has authorized this continued practice; Plaintiffs' risk of future injury would be reduced by an order from this Court; and the possibility of injury absent an order is more than merely hypothetical. Plaintiffs therefore have standing for the relief that they seek.

## III.   PLAINTIFFS HAVE DEMONSTRATED SUCCESS ON THE MERITS.

To obtain either form of equitable relief Plaintiffs seek against Col. Jones—declaratory or injunctive—they must first prevail on the merits of their claim. The evidence presented at trial is sufficient for Plaintiffs to meet this burden. Testimony and exhibits provided at trial showed two things: (1) the KHP is engaging in ongoing Fourth Amendment violations by targeting out-of-state drivers for pretextual traffic stops,[749] then detaining those drivers without adequate reasonable suspicion based in part on their state of origin or destination, and (2) there is a sufficient causal

---

[745] FOF ¶¶ 9, 27, 92.

[746] FOF ¶¶ 182-197.

[747] FOF ¶¶ 198-201.

[748] *See infra* Conclusions of Law Section III.C.

[749] Pretextual traffic stops in and of themselves do not violate the Constitution. *See Whren v. United States*, 517 U.S. 806 (1996). However, when those pretextual stops turn into prolonged roadside detentions without adequate reasonable suspicion, the Fourth Amendment is clearly implicated. The fact that KHP's practices begin with legitimate stops for traffic violations does nothing to diminish the resulting harm from the unconstitutional detentions, or the breadth of evidence suggesting that KHP is impermissibly factoring in a driver's state of origin in its discretionary enforcement decisions from the get-go.

KC 20428204.1

nexus between Col. Jones as the head of the agency and the demonstrated ongoing constitutional violations.

The stops of the named Plaintiffs in this action, combined with examples of stops of other drivers, make clear that these constitutional violations are occurring across time, across different troops and troopers, and across different geographical areas along I-70. Moreover, evidence adduced at trial demonstrates that KHP is targeting out-of-state drivers for its discretionary traffic enforcement activities, and once targeted, subjecting those drivers to detentions for canine sniffs at disproportionately high rates.[750] This is what KHP troopers are trained and expected to do: conduct a high volume of traffic stops for minor violations, then engage those drivers in questioning until either obtaining consent to search the car, or deciding to detain the driver for a canine sniff in the hopes of finding drugs or cash.[751] Cash can then be seized and converted into the KHP budget.[752]

All of this suggests to the Court that KHP is essentially engaged in a war on drivers. This war is driven by the policy, directives, and oversight of Col. Jones. KHP troopers continue to flout *Vasquez* and other Tenth Circuit case law and continue to impede on drivers' right to be free from unreasonable searches and seizures. Although KHP may claim to be engaged in this war for a legitimate purpose, the Court saw limited—if any–evidence that this "war" effectively serves any legitimate purpose, and KHP's practices clearly have harmful, enduring consequences for the drivers caught in the crosshairs. For all the reasons set forth below, Plaintiffs have proved their

---

[750] FOF ¶¶ 182-201.

[751] FOF ¶¶ 213-226; 270.

[752] FOF ¶¶ 221-224. Although a full examination of civil asset forfeiture practices is beyond the scope of the current litigation, evidence at trial suggests that civil asset forfeiture and the ability to seize money during these roadside detentions is at least one motivating factor for KHP to engage in these abusive policing practices.

claims against Jones by a preponderance of the evidence, and therefore met the first element necessary to obtain equitable relief.

### A.   KHP's ongoing violations of the Fourth Amendment are demonstrated by the unconstitutional stops and detentions of Plaintiffs and other motorists.

The initial evidence of KHP's ongoing constitutional violations exists in an examination of the patterns consistent throughout the three traffic stops and detentions involving the named Plaintiffs, and the three additional stops of other motorists that were presented during the bench trial. Although past constitutional violations alone are not sufficient to show ongoing violations,[753] they are plainly relevant to determining the scope and breadth of KHP's unconstitutional practices and patterns across the various violations. Each stop and detention presented in this case is discussed below.

*Blaine and Samuel Shaw*

On February 6, 2023, following a three-day trial, a unanimous jury concluded that Trooper Doug Schulte detained Blaine and Samuel Shaw without adequate reasonable suspicion while the brothers were traveling in their father's minivan from Oklahoma City, Oklahoma to the Denver, Colorado area.[754] During the stop, Trooper Schulte performed the Two-Step maneuver and reapproached Blaine Shaw at the driver's side window to continue asking questions about the Shaw's travel plans.[755] The evidence presented at that trial made clear that Trooper Schulte relied in part on the Shaw brothers' travel to Colorado—which KHP considers to be a "drug source state"—in deciding to detain the Shaws for the purposes of conducting a canine sniff of their car.[756]

---

[753] *Lyons*, 461 U.S. at 102 (past wrongs are evidence bearing on whether there is a real and immediate threat of future injury, but past wrongs alone are insufficient).

[754] FOF ¶¶ 1, 3, 4.

[755] FOF ¶ 3.

[756] FOF ¶ 5.

KC 20428204.1

He also relied on the fact that the brothers were traveling from Oklahoma, which he concluded was a "drug destination state."[757] In doing so, Trooper Schulte violated *Vasquez*. The remainder of the "indicia" of criminal activity that Trooper Schulte purported to rely on amounted to nothing more than a meaningless list of completely innocent conduct that, by any measure of common sense, did not amount to reasonable suspicion.[758]

Throughout the pendency of the damages action against Trooper Schulte, he insisted he did nothing wrong and that his conduct was consistent with the law. But a jury rejected Trooper Schulte's position and found that he detained the Shaws without adequate reasonable suspicion. They awarded nominal damages of $1.[759] This Court then denied Trooper McMillan's motion for judgment on the basis of qualified immunity.[760] In doing so, this Court adopted the jury's verdict and found that Trooper Schulte violated the Shaws' Fourth Amendment rights.

*Joshua Bosire*

On April 27, 2023, following a four-day trial, a unanimous jury concluded that Trooper Brandon McMillan detained Joshua Bosire without adequate reasonable suspicion when Mr. Bosire was driving back to his home in Wichita, Kansas after visiting his daughter for her birthday in the Denver, Colorado area.[761] The evidence presented at trial made clear that, like Trooper Schulte, Trooper McMillan was focused on the possibility that Mr. Bosire might have been traveling back into Kansas from Colorado, and therefore suspected him of trafficking drugs.[762] The

---

[757] FOF ¶ 5.

[758] FOF ¶¶ 4, 6.

[759] FOF ¶ 16.

[760] Doc. #460.

[761] FOF ¶¶ 17, 19, 29.

[762] FOF ¶¶ 21, 24.

KC 20428204.1

remainder of Trooper McMillan's alleged suspicions were equally insufficient to justify detaining Mr. Bosire.[763]

The jury found that Trooper McMillan not only violated Mr. Bosire's Fourth Amendment rights by detaining him without adequate reasonable suspicion, but also that Trooper McMillan did so *knowingly* or with *reckless disregard* to Mr. Bosire's rights.[764] In reaching this conclusion, the jury awarded Mr. Bosire both compensatory and punitive damages.[765] This Court then denied Trooper McMillan's motion for judgment on the basis of qualified immunity, finding that

> based on the evidence presented at trial, and considering the jury verdict—with which the Court whole-heartedly concurs—the record establishes that no matter how competent McMillan may have been in other technical areas, he was plainly incompetent to conduct roadside interdiction in compliance with the Fourth Amendment and/or knowingly violated the law[.][766]

The Court therefore adopts the jury's verdict and holds that Trooper McMillan violated Mr. Bosire's Fourth Amendment rights.

*Mark Erich and Shawna Maloney*

The third set of Plaintiffs in this case, Mark Erich and Shawna Maloney, were detained by Lt. Justin Rohr sometime before 6:00am on March 9, 2018, while driving their RV with their two children from Colorado to Alabama to visit family.[767] Lt. Rohr clearly targeted the RV for a pretextual traffic stop (a single drift across the fog line) and then engaged in much the same activity as the troopers in the Shaw and Bosire stops: after conducting the business of the traffic stop, Lt. Rohr performed the Two Step and attempted to reengage Mr. Erich and ask more questions about

---

[763] FOF ¶ 24.

[764] FOF ¶ 29.

[765] FOF ¶ 29.

[766] Doc. #512 at 2.

[767] FOF ¶¶ 37-38, 42.

KC 20428204.1

his travel plans.[768] When Mr. Erich declined to answer and asked if he was free to go, Lt. Rohr told

the family they were being detained.[769] Lt. Rohr's post-hoc justifications for detaining the family

relied primarily on four things: (1) an alleged smell of fresh paint or "bondo"; (2) white paint on

Mr. Erich's hand; (3) Mr. Erich's criminal record as reported by dispatch, which included only a

single 14-year-old report of possession of drug paraphernalia; (4) and the fact that the family was

traveling from Colorado, which Lt. Rohr considered to be a drug source state.[770] Based on these

factors, Lt. Rohr believed that the RV had a hidden compartment and was being used to traffic

drugs. He detained the family for a canine sniff, which ultimately led to a search of the entire RV,

during which Lt. Rohr and his colleagues caused significant damage to the RV and the Erich-

Maloney family's belongings.[771] Incredibly, after rummaging through the RV to no avail and again

suggesting to the family they were free to go, Lt. Rohr detained them *again* to climb on top the

RV.[772] In the end, no drugs were found.[773] The detention lasted approximately 40 minutes.[774]

 Much like the Shaw and Bosire detentions, Lt. Rohr's actions here were not supported by

anything approaching reasonable suspicion. It appears that Lt. Rohr suspected drug trafficking the

moment he saw an older-model RV on I-70 headed away from Colorado and filled in his narrative

from that point on. Critically, by his own admission, Lt. Rohr relied on the family's state of origin,

which was also their state of residence, as part of his reasonable suspicion—even though *Vasquez*

---

[768] FOF ¶¶ 42-49, 52, 56, 58-60, 62-63.

[769] FOF ¶¶ 64-66.

[770] FOF ¶¶ 49-55, 61.

[771] FOF ¶¶ 68-69, 76, 85.

[772] FOF ¶¶ 78, 80-81.

[773] FOF ¶ 83.

[774] FOF ¶ 82.

KC 20428204.1

instructs that such information is essentially meaningless.[775] And Mr. Erich's 14-year-old criminal charge was equally meaningless.[776] The alleged "wet paint" on the back of the RV that Lt. Rohr claims to have seen and/or smelled was unsupported by any other evidence—indeed, other troopers at the scene repeatedly said they did not smell the paint Lt. Rohr claimed was present. Not only did the other troopers at the scene not smell it, Shawna Maloney credibly testified that she was three months pregnant at the time of the stop and very sensitive to smells. If it had smelled like paint, she would have noticed and had a physical reaction.[777] No tangible evidence was produced by Col. Jones indicating that the alleged "spot" on the back of the RV was anything more than what Mr. Erich stated it was at the scene: an area where a decal that had been removed. Mr. Erich had a credible, legitimate explanation for the paint on his hand, namely that he painted trim the prior day at work.[778] But Lt. Rohr elected to disregard that explanation because it did not fit the narrative he had already created.

In all, Lt. Rohr relied on a series of unconfirmed hunches and factors that the Tenth Circuit has said are not worthy of legitimate weight to detain the Erich-Maloney family for a canine sniff. Accordingly, Plaintiffs proved by a preponderance of the evidence that Lt. Rohr violated Mr. Erich and Ms. Maloney's Fourth Amendment rights when he detained them for a canine sniff, and the detention was based on part on the family's out-of-state origin, in violation of *Vasquez*.

---

[775] FOF ¶ 61; *see also Vasquez*, 834 F.3d at 1138.

[776] As the Tenth Circuit has noted, the passage of time since a criminal arrest decreased its weight. *See Shaw v. Schulte*, 36 F.4th 1006 (10th Cir. 2022). This is because "[e]ven people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches." *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005).

[777] FOF ¶ 53.

[778] FOF ¶ 55

KC 20428204.1

*Daniel Kelly*

On May 27, 2020, Trooper James McCord (Troop N) stopped Mr. Kelly on I-70 eastbound for "following too closely."[779] Mr. Kelly was driving from California to Shawnee, Kansas in a rental car with California plates to pick up his nephew and drive him back to California for a visit. Once again, the Two Step comes into play: after completing the business of the traffic stop, Trooper McCord immediately reapproached Mr. Kelly and continued asking him questions about his travel plans.[780] Ultimately, Trooper McCord detained him for a canine sniff, claiming that Mr. Kelly was suspicious because: (1) Mr. Kelly's suitcase was in the front seat rather than the trunk; (2) Mr. Kelly was nervous; (3) Mr. Kelly's road trip is not something that Trooper McCord would have let his own kids do; (4) Mr. Kelly had prior criminal charges from some unknown time in the past, and (5) Mr. Kelly was driving from a state that had legalized marijuana (California).[781] The only thing recovered following a canine sniff and search of Kelly's car was a vape pen containing a substance that Trooper McCord claimed was THC, but did not test.[782] Trooper McCord detained Mr. Kelly for roughly 31 minutes.[783]

These factors, alone or in combination, do not amount to reasonable suspicion. Again, this detention involved a KHP trooper relying on a driver's state of residence in finding reasonable suspicion, in violation of *Vasquez*.

---

[779] FOF ¶¶ 100, 101.

[780] FOF ¶¶ 108-110.

[781] FOF ¶ 113.

[782] FOF ¶ 116.

[783] FOF ¶ 117.

KC 20428204.1

Although "extreme" nervousness can contribute to reasonable suspicion,[784] there was nothing evident in Trooper McCord's dash cam footage or his explanations of Mr. Kelly's behavior that suggests to the Court that this nervousness was extreme enough to merit significant suspicion. Likewise, the fact that Mr. Kelly's suitcase was in the front seat is meaningless. If the suitcase had been in the trunk, and Trooper McCord could not see it, he may have found Mr. Kelly *equally* suspicious because there was no visible luggage in the car for Mr. Kelly's purported road trip.[785] This is precisely the sort of Catch-22 that drivers find themselves in based on KHP's determination that virtually all innocent conduct can be indicative off criminal activity.[786]

Mr. Kelly's alleged criminal history fares no better. Without any indication that the history was recent—and importantly, without *any other meaningful evidence suggesting criminal activity*—this factor is entitled to little weight. To hold otherwise would mean that everyone with a criminal record will be forever suspicious, no matter what they have done to become a fully law-abiding citizen in the intervening years.[787] Such a result is far from reasonable.

But perhaps most troubling is that Trooper McCord found it reasonable to question Mr. Kelly's travel plans to pick up his nephew merely because Trooper McCord would not trust his own children's uncle to drive them cross-country. According to Trooper McCord, he thought Mr. Kelly's travel was suspicious because most people would just fly to pick up or drop off a relative.[788] Such a "suspicion" is plainly illegitimate and patently unreasonable. To hold otherwise would

---

[784] *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011) ("[N]ervousness is a common, natural reaction during a traffic stop, and thus only extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion" such that, normally, nervousness will only "contribute marginally to a reasonable suspicion of illegal activity.").

[785] FOF ¶ 250.

[786] *See infra,* Conclusions of Law, Section III.B.

[787] *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005).

[788] FOF ¶ 113.

KC 20428204.1

invite law enforcement to engage in unlimited, baseless judgment of innocent conduct whenever a person's legitimate choices differ, for whatever reason, from the officer's own personal circumstances or preferences. And in finding Mr. Kelly's road trip suspicious, Trooper McCord apparently disregarded the fact that it was only two months into the global COVID-19 pandemic, when few people were using commercial air travel. Finding Mr. Kelly's travel to be suspicious under these circumstances borders on the absurd.

Accordingly, Plaintiffs proved by a preponderance of the evidence that Trooper McCord violated Mr. Kelly's Fourth Amendment rights when he detained him for a canine sniff, and that detention was based on part on Mr. Kelly's out-of-state origin, in violation of *Vasquez*.

*Suzanne Dunn*

The stop and detention of Suzanne Dunn presents equally troublesome facts. On February 5, 2021, Trooper Chandler Rule stopped and detained Ms. Dunn when she was driving a rented Mercedes from Virginia to Colorado, where she planned to pick up her recently purchased refurbished camper van and drive it back to Virginia.[789] The stop occurred on I-70 westbound, just west of Topeka.[790] On the dash cam video, it is clear that Trooper Rule began following Ms. Dunn—likely for long enough to notice her out-of-state plates and the fact that she was driving a rental car—and eventually pulled her over for lingering in the left lane.[791] Trooper Rule, a canine handler in Troop S, puportedly found Ms. Dunn suspicious because: (1) Ms. Dunn was driving an expensive rental car; (2) the car had a "lived in look," i.e., it had snacks; (3) Ms. Dunn was a 52-year old woman traveling alone, and (4) Ms. Dunn was traveling from a "drug destination state"

---

[789] FOF ¶¶ 119, 121.

[790] FOF ¶¶ 122-123.

[791] FOF ¶¶ 123, 125-126.

KC 20428204.1

(Virginia) to a "drug source state" (Colorado).[792] Trooper Rule performed the Two Step, and then asked Ms. Dunn to consent to search of her car. Ms. Dunn declined.[793] Trooper Rule then asked Ms. Dunn if he could run his canine around her car. Ms. Dunn agreed under the mistaken impression that she could remain in the car during this time.[794] The canine allegedly alerted, but a subsequent search revealed nothing.[795]

Although Ms. Dunn technically agreed to have the canine sniff around her car, her stop and detention are nonetheless relevant to the broader issues in this case. Ms. Dunn credibly testified that she did not fully understand what would occur during the sniff and thought she could remain in her car.[796] And, testimony from Trooper Rule makes clear that it is his practice to attempt to get consent for a search even when he thinks he has reasonable suspicion to detain,[797] suggesting he would have detained Ms. Dunn even if she did not consent to the canine sniff. The record demonstrates once again that there would have been insufficient reasonable suspicion to do so. Ms. Dunn was subjected to the Two Step, just like the other drivers described above.[798] The rationales given by Trooper Rule once again are so broad and all-encompassing that they are virtually meaningless. Similar to Trooper McCord's suspicion of Mr. Kelly, Trooper Rule found it odd that Ms. Dunn elected to drive out and pick up her van during the COVID-19 pandemic, rather than flying or paying to have her van shipped.[799] But perhaps most alarmingly, Trooper Rule found

---

[792] FOF ¶¶ 120, 144, 147.

[793] FOF ¶¶ 129-135.

[794] FOF ¶ 135.

[795] FOF ¶ 141.

[796] FOF ¶ 135.

[797] FOF ¶ 268.

[798] FOF ¶ 129.

[799] FOF ¶¶ 147, 149.

127

it odd that a *52-year-old woman* would do that sort of road trip alone.[800] Such offensive, paternalistic, outdated tropes regarding women traveling without companions simply have no place in an officer's analysis of reasonable suspicion.

Accordingly, the Court also finds that Trooper Rule was prepared to detain Ms. Dunn without adequate reasonable suspicion, had she not consented to a canine sniff of her vehicle. The Court also seriously doubts that Ms. Dunn understood what was being asked of her when consent for the canine sniff was requested, although for the purposes of this case, the Court need not reach any particular conclusion on the legitimacy of the consent given.

*Curtis Martinez*

Finally, Plaintiffs presented evidence regarding the stop and detention of Curtis Martinez on September 5, 2022—months after the close of discovery in this case, and in the middle of summary judgment briefing.[801] Mr. Martinez was driving with his brother in his wife's car from their home in Colorado back to the Kansas City area, where Mr. Martinez's truck was parked and he was scheduled to continue work.[802] While on I-70 eastbound, he exited the highway to look for a place to relieve himself.[803] Lt. Scott Proffitt followed him off the highway and stopped him shortly thereafter, allegedly for speeding.[804] Lt. Proffitt conducted the business of the traffic stop and, after returning Mr. Martinez's documents and a ticket for late registration, performed the Two

---

[800] FOF ¶ 147.

[801] Although Defendant initially objected to allowing testimony regarding Mr. Martinez's stop and detention, he ultimately acquiesced to having the KHP trooper involved in the detention—Scott Proffitt—provide his side of the story. This evidence is more than enough for the Court to evaluate the legitimacy of this detention and its overall relevance to the claims in this case.

[802] FOF ¶¶ 150, 154; Doc. #358-1¶ 3.

[803] FOF ¶ 153.

[804] FOF ¶¶ 150, 152-153.

KC 20428204.1

Step and reapproached Mr. Martinez to ask additional questions about his travel plans, and asked for consent to search the car.[805]

After Mr. Martinez declined, Lt. Proffitt detained Mr. Martinez for a canine sniff, claiming the following factors made him suspicious: (1) Mr. Martinez was driving a car owned by his wife and insured by his mother-in-law; (2) Mr. Martinez took an exit without any rest area, which Lt. Proffitt found "evasive"; (3) Mr. Martinez had loud music playing when he was initially pulled over; (4) Mr. Martinez had a picture of someone in his wallet, whom Trooper Proffitt believed to be either El Chapo or Jesus Malverde,[806] which Lt. Proffitt associated with drug trafficking; and (5) Mr. Martinez and his brother were acting "defiant," apparently because they knew their rights.[807] Lt. Proffitt also knew that Mr. Martinez was traveling from Colorado, and despite not admitting this was a factor (perhaps because he understood the nature of this lawsuit), the Court finds that he likely relied on that fact in deciding to detain Mr. Martinez.[808] The canine alerted on the car, and a search—once again—turned up nothing. The detention lasted for one hour and twenty-two minutes.

As an initial matter, the fact that Mr. Martinez was driving a car owned by a family member is not inherently suspicious. A similar fact was at play in the Shaw detention, where Mr. Shaw was purportedly suspicious for driving his father's minivan.[809] Mr. Martinez provided Lt. Proffitt with the details of who owned and insured the car, and offered to call his wife so that Lt. Proffitt could

---

[805] FOF ¶¶ 156-157, 160-162.

[806] Two figures—one real, the other fictional—purportedly associated with narcotics traffickers.

[807] FOF ¶ 158.

[808] Importantly, there is no contemporaneous written account of Lt. Proffitt's reasons for detaining Mr. Martinez. Lt. Proffitt was apparently asked by the KHP to list those reasons out for the Plaintiffs for the first time while on the stand, being questioned by defense counsel.

[809] FOF ¶ 4.

KC 20428204.1

confirm. Lt. Proffitt did not do so, and later when talking to another officer, made disparaging remarks about Hispanic people being in "common law marriages" because the wife does not take the husband's surname.[810]

The Court is equally unconvinced by Lt. Proffitt's suspiciousness of the alleged image of "El Chapo" or "Jesus Malverde" in or on Mr. Martinez's wallet. The testimony was far from clear on this point, and in any event, the Court finds it bizarre that the KHP believes people involved in drug trafficking would carry or display photos of former drug lords or patron saints in or on their wallet and display them to officers when stopped and questioned. The Court did not find Lt. Proffitt credible in this regard.

Additionally, the fact that Mr. Martinez and his passenger apparently knew their rights and were displeased with being targeted by Lt. Proffitt and branded drug dealers should play no part in the reasonable suspicion calculus. Based on Lt. Proffitt's attitude towards Mr. Martinez, and the trooper's statements captured on the dash cam video regarding Hispanic families and Mr. Martinez's tattoos,[811] the Court is not surprised by Mr. Martinez's attitude towards Lt. Proffitt during this stop. On their face, none of these factors seems to indicate criminal activity.

Finally, the Court is unconvinced that Mr. Martinez was suspicious because he elected to pull off at an exit without an official rest stop on a warm September day. The dash camera footage does not make it clear that Mr. Martinez would have even known that Lt. Proffitt was behind him on the highway before pulling off at that exit. And, Mr. Martinez was clearly from out of town and unfamiliar with the local area. The Court does not find it plausible to assume that every driver

---

[810] FOF ¶¶ 155-156.

[811] FOF ¶¶ 155, 159; 166, 167-68.

KC 20428204.1

knows the location of every rest area along the highway, or to assume that all motorists will use an established rest area when they need to relieve themselves mid-road trip.

Once again, Lt. Proffitt's "suspicions" appear to be based on entirely innocent conduct that, even when taken together, does not amount to reasonable suspicion. The Court therefore finds that Lt. Proffitt found Mr. Martinez suspicious in part because of his travel plans and state-of-origin, and detained Mr. Martinez in violation of his constitutional rights.

***

All these examples demonstrate that KHP is conducting roadside detentions without adequate reasonable suspicion, based *in part* on the driver's residency, state of origin, or destination. As discussed more fully below, these six examples are likely only the tip of the iceberg. Records do not exist for many detentions that occurred over the last seven years since the *Vasquez* decision came down.[812] And discovery closed in this case nearly one year ago, making evidence of unconstitutional detentions occurring in the last 12+ months unavailable for review and presentation at trial.

Notably, however, Col. Jones did not present any stops of his own to demonstrate that the KHP *is* complying with the Constitution. Nor did he offer evidence of the volume of drugs being transported via Kansas interstates, evidence justifying the need for increased stops and roadside detentions in order to accomplish the legitimate law enforcement goal of interdiction of such narcotics, or the KHP's history of success in stopping, seizing and securing narcotics as they make their way across Kansas. He did not present any testimony that meaningfully rebutted Plaintiffs' evidence, and instead only presented testimony from Sarah Washburn, former KHP legal counsel, who essentially testified about KHP's general training requirements. For these reasons, and the

---

[812] *See infra* Conclusions of Law, Section III.C.b.

131

reasons set forth below, the Court has no reason to think that the examples presented during trial are anything but emblematic and representative of the broader problematic practices currently in place.

### B.  KHP's practice of unconstitutional detentions is widespread.

The unconstitutional detentions of the above Plaintiffs and other motorists are not limited to a particular subset of the KHP, or a single geographic area. Nor are they limited temporally. Put simply, there is no indication that these unlawful detentions are merely a relic of the past or limited glimpse into the practices of a small number of misguided troopers. Rather, the evidence at trial demonstrated that this is widespread across the entirety of the agency and the whole of the state.

Specifically, the troopers involved in the stops and detentions described above come from five different troops, spread out across different portions of I-70. For example, Trooper Schulte is a member of Troop D.[813] Trooper McMillan is a member of Troop T.[814] Lt. Rohr and Trooper Rule both belong to the canine unit troop, Troop S, but work in different geographic areas.[815] Lt. Proffitt is a member of Troop C.[816] And finally, Trooper McCord belongs to the interdiction unit, Troop N.[817] These troopers have varying levels of experience in law enforcement—but even the most senior, seasoned, experienced law enforcement officers, such as Lt. Rohr (12 years at time of

---

[813] FOF ¶ 2.

[814] FOF ¶ 18.

[815] FOF ¶¶ 43, 120.

[816] FOF ¶ 151.

[817] FOF ¶ 101.

KC 20428204.1

stop),[818] Trooper McCord (17 years at time of stop)[819] and Lt. Proffitt (18 years at time of stop)[820] violated the Constitution.

These stops also occurred across a wide stretch of I-70. Mr. Bosire was detained just east of Ellis, Kansas.[821] The Shaws were detained near Hays.[822] The Erich-Maloney family was stopped and detained just east of Salina.[823] And Suzanne Dunn was stopped just west of Topeka.[824] These stops span over 200 miles of interstate highway.

Finally, the evidence presented in this case indicates a pattern of unconstitutional detentions occurring over time, beginning with the stop at issue in *Vasquez*, which occurred in 2011—nearly twelve years ago. The Court considered testimony regarding unconstitutional detentions that occurred in every single year since 2017, including Mr. Martinez's in September 2022—a detention so recent that it occurred after discovery ended in this case, in the middle of summary judgment briefing.[825]

These examples, as well as evidence presented regarding KHP's training on reasonable suspicion and criminal interdiction, signify that Col. Jones directs his agency's interdiction efforts in such a way that KHP finds every*one* and every*thing* suspicious. No one will escape KHP's scrutiny, according to KHP's own records. Col. Jones trains his troopers to "go beyond the traffic

---

[818] FOF ¶ 43.

[819] FOF ¶ 101.

[820] FOF ¶ 151.

[821] FOF ¶ 17.

[822] FOF ¶ 3.

[823] FOF ¶ 42.

[824] FOF ¶ 123.

[825] FOF ¶¶ 150, 174.

KC 20428204.1

stop"[826] in each and every interaction with a motorist, essentially painting all people using Kansas highways as inherently suspicious in the eyes of the KHP. Training regarding *what* is suspicious likewise paints the innocent motoring public with a confoundingly broad brush. Wholly innocent, even nonsensical, behavior or conditions can make a driver suspicious in the eyes of the KHP: too much luggage, not enough luggage, too friendly, not friendly enough, driving a rental car or even just driving on I-70—all of this constitutes indicators of criminal activity under Col. Jones's approach to interdiction.[827] With such broad practices in place, if a KHP trooper *wants* to find a particular driver suspicious, they will. Such a practice has sweeping ramifications and undoubtedly results in countless roadside detentions that are justified by nothing more than a series of hunches, rather than specific, articulable *reasonable* suspicion.

All of this leads the Court to conclude that the practices Plaintiffs complain of are sufficiently widespread as to constitute ongoing constitutional violations.

### C. The KHP fails to follow *Vasquez v. Lewis* and other key Fourth Amendment case law, further evincing the ongoing violations.

In *Vasquez*, the Tenth Circuit held that "[i]t is time to abandon the pretense that state citizenship is a permissible basis upon which to justify the detention and search of out-of-state motorists."[828] *Vasquez* was not just an influential case; it was an influential case *against two KHP troopers*. Yet, despite this, Plaintiffs presented persuasive evidence that Col. Jones's agency (1) targets out-of-state drivers for traffic enforcement and canine sniff detentions at disproportionate rates; (2) is ignorant of or disregards *Vasquez* as having any relevance for KHP practices; and (3)

---

[826] FOF ¶ 225.

[827] FOF ¶¶ 233-255.

[828] 834 F.3d at 1138.

KC 20428204.1

did not take adequate steps to ensure troopers follow *Vasquez* and appropriately justify their detentions.

### a. KHP disregards Vasquez's relevance and import.

Ample evidence presented during the three separate trials in this case suggests that KHP never viewed the *Vasquez* decision as important or worthy of significant attention. Despite the fact that *Vasquez* was directed at the KHP, the agency did not make any policy changes as a result of *Vasquez*,[829] and did not incorporate *Vasquez* into KHP training until after this lawsuit was filed.[830] In fact, KHP's post-*Vasquez* training continued to instruct that state of residence of a driver is a proper consideration in determining reasonable suspicion, and remarkably, KHP trains troopers that where a driver is coming from and where they are going to are *the two most important* questions in drug interdiction.[831] KHP continues to ignore the Tenth Circuit's admonition that travel plans and/or out-of-state plates are worth little, if any, weight, even within the totality of the circumstances. Although *implausible* or *contradictory* travel plans can contribute to reasonable suspicion,[832] a driver's state of origin or state of destination is not inherently suspicious—whether alone or in combination with other factors.[833] Yet KHP still trains its troopers that certain travel origins and destination are an indicator of reasonable suspicion and to find certain travel origins and destinations to be indicative of criminal activity.[834]

---

[829] FOF ¶ 312.

[830] FOF ¶¶ 311, 313-317.

[831] FOF ¶ 32.

[832] *United States v. Pettit*, 785, F.3d 1374, 1381 (10th Cir. 2015); *see also United States v. Frazier*, 30 F.4th 1165, 1177–78 (10th Cir. 2022) ("Mr. Frazier's travel plans, meanwhile, add nothing at all. . . [T]he government points to nothing about Mr. Frazier's itinerary as it was known to Trooper Gibbs at this point in the stop to suggest that his travel plans were implausible or in any way inconsistent . .  Accordingly, absent other facts suggestive of criminal wrongdoing, we give no weight to the fact that Mr. Frazier was returning from a trip to the West Coast.").

[833] *Vasquez*, 834 F.3d at 1137.

[834] FOF ¶¶ 212, 313, 320.

KC 20428204.1

Testimony from KHP shows that troopers—and Col. Jones himself—lack awareness or understanding of the law post-*Vasquez*.[835] For example, some troopers do not remember receiving any training on *Vasquez*,[836] and even troopers that admit knowing about the case testified they do not recall *any* change in procedure regarding car stops and/or searches after *Vasquez*.[837] Troopers never received pre- or post-testing following training on *Vasquez* or other reasonable suspicion case law.[838] Virtually nothing was done to ensure troopers knew about this case and how it should impact their roadside detention practices, even within the interdiction unit, which arguably should have the most training on Fourth Amendment case law.[839] The testimony indicates that KHP continues to labor under the mistaken impression that travel to or from, or residency in, a "drug source state" may be properly considered in the reasonable suspicion calculus so long as the trooper articulates other factors as well—even where those factors are also wholly consistent with innocent travel.[840]

> *b.  KHP did not take adequate steps to ensure troopers justify their detentions.*

The Court heard significant testimony at trial regarding KHP's newly adopted policy requiring troopers to document every roadside detention, even if it does not result in a seizure or an arrest. Tellingly, this policy was not adopted by Col. Jones and made effective until the middle of summary judgment briefing in this case. Prior to that, Col. Jones did not require his troopers to

---

[835] FOF ¶¶ 318-319, 321-322.

[836] FOF ¶ 318.

[837] FOF ¶¶ 312, 319.

[838] FOF ¶¶ 318, 328, 331.

[839] FOF ¶¶ 218, 318.

[840] FOF ¶¶ 206-211, 315, 319-322.

KC 20428204.1

create *any* documentation of a roadside detention where the canine did not alert, or a search revealed nothing.[841]

As a result, troopers never created a contemporaneous record of their reasons for detaining drivers. Instead, they documented their reasonable suspicion in such cases only when the driver filed a complaint or initiated a lawsuit. Otherwise, there was no record made of the detention from the perspective of the detaining officer at all.[842] For this reason, there is no way of knowing just how many drivers were detained without adequate reasonable suspicion by the KHP prior to September 2023. The number of drivers detained each year and the other evidence presented in this case provide the Court with sufficient circumstantial evidence that the number is quite high.

Although it is true that Col. Jones developed and implemented a new policy requiring documentation of all detentions for canine sniffs and the reasonable suspicion in support thereof, his testimony at trial confirms that this policy was only put in place as a result of the instant litigation (and several years of litigation, at that), and there is currently no mandate that the policy stay in place after judgment is entered in this case or upon his retirement in July.[843] Furthermore, testimony from other witnesses, including Chief Aden and Col. Jones himself, demonstrates that the enactment of this policy is not a panacea for the KHP's unlawful practices.[844] Nor is the Court required to deny Plaintiffs the relief they seek merely because Col. Jones took one singular step to improve KHP's practices near the very end of this litigation—particularly where, as here, there is

---

[841] FOF ¶¶ 338-345.

[842] If a KHP canine was called to the scene to conduct the sniff of the vehicle, the canine handler would complete a report. These reports did not include a list of reasons why the driver was detained in the first place, and instead merely described the logistics of the canine sniff and what, if anything, was found. *See* FOF ¶ 338.

[843] FOF ¶ 354.

[844] FOF ¶¶ 347-353.

KC 20428204.1

no evidence in the record confirming that the new policy will definitively resolve the ongoing constitutional violations of which the Plaintiffs' complain.

The Court is therefore unpersuaded that this policy, given its untimely roll-out and established insufficiencies, does anything to mitigate the compelling evidence regarding ongoing constitutional violations in KHP's detention practices or promises that such violations will abate.

**D. KHP targets out-of-state drivers for traffic enforcement and canine detentions at disproportionate rates, further contributing to the ongoing violations.**

Even though documentation of troopers' reasonable suspicion for canine detentions was nonexistent up until eight months ago, the Court can still conclude that these practices are widespread given other evidence in the record. For example, Dr. Mummolo's findings provide significant further evidence that KHP has an ongoing practice of targeting out-of-state drivers for traffic enforcement, and then subjecting them to prolonged detentions at a rate far higher than their share of drivers on Kansas highways *and* those stopped by KHP.[845]

Specifically, Dr. Mummolo conducted an analysis of KHP traffic stops and canine searches in certain locations along interstate highways (where KHP does the majority of its interdiction policing) and compared rates of out-of-state drivers for each of those categories to a dataset that examined the number of in- versus out-of-state motorists on the road in the same locations.[846] Dr. Mummolo found that out-of-state drivers made up a vastly disproportionate number of the people stopped by KHP, relative to their proportion of total traffic on the road.[847] According to Dr. Mummolo's analysis, this meant that there were 50,000 excess stops of out-of-state drivers, which

---

[845] FOF ¶¶ 181-204.

[846] FOF ¶¶ 186-188, 190-191.

[847] FOF ¶¶ 192-193.

KC 20428204.1

accounted for more than 70% of all stops conducted by KHP in the studied places and times.[848] He further found that there was a roughly 1% likelihood that these results would arise under circumstances where there is no actual disparity in stopping behavior—in other words, the disparity between Kansas and out-of-state stop rates is so large that even an implausibly extreme measurement error could not account for it.[849] This provides strong circumstantial evidence that KHP is deliberately targeting out-of-state drivers for discretionary traffic stops.

To further test this hypothesis, Dr. Mummolo analyzed whether this disparity could be explained by differences in driving behaviors between in- and out-of-state drivers: if out-of-state drivers committed more speeding violations, that would offer a neutral reason why such drivers are subjected to more traffic stops.[850] But, in the places and times examined, Dr. Mummolo found out-of-state drivers were also significantly overrepresented in speeding stops relative to their presence on the road.[851] Starting from the assumption that the share of out-of-state speeders is the same as the share of all out-of-state drivers on the road, Dr. Mummolo found more than 20,000 excess speeding stops of out-of-state drivers, reflecting more than 70% of all KHP speeding stops of out-of-state drivers at those times and places.[852] Dr Mummolo conducted a sensitivity analysis to test that assumption and found that if the disparities he found were attributable to disparate speeding behavior among out-of-state drivers, roughly 88% of out-of-state drivers would need to be speeding compared to on 29% of in-state drivers, in the places and times Dr. Mummolo

---

[848] FOF ¶ 192.

[849] FOF ¶ 193.

[850] FOF ¶ 194.

[851] FOF ¶ 195.

[852] FOF ¶ 195.

KC 20428204.1

examined.[853] This would require that out-of-state drivers speed at roughly three times the rate of in-state drivers, representing an implausible gap in behavior.[854] Dr. Mummolo further tested that hypothesis by examining road fatalities in both Kansas and Colorado. If Colorado drivers speed at disproportionate rates as compared to Kansas drivers, the road fatality data would indicate a higher number of traffic fatalities in Colorado. Dr. Mummolo found the opposite: Colorado highways have seen fewer traffic fatalities than Kansas highways, according to the Centers for Disease Control and Prevention.[855] The significant disparity in KHP's speeding stops of out-of-state motorists therefore suggests that KHP is deliberately targeting out-of-state drivers for traffic stops. Col. Jones put on no independent evidence to rebut this suggestion or disprove the accuracy of Dr. Mummolo's analysis.

Importantly, Dr. Mummolo also found that when out-of-state drivers are stopped more frequently than in-state drivers relative to their share of the total traffic on Kansas highways, they are also subjected to canine sniffs at a higher rate.[856] On the interstates where Dr. Mummolo could measure the overall prevalence of out-of-state drivers, more than 90% of the canine sniffs involved out-of-state drivers.[857] This is particularly telling because Col. Jones wants his officers to engage in a high volume practice of traffic stops, where they conduct a high number of stops and detentions in order to increase their odds of being able to search cars and uncover drugs. As KHP's Advanced Interdiction Training notes, "hundreds of traffic stops might occur with no arrests made."[858]

---

[853] FOF ¶ 196.

[854] FOF ¶ 197.

[855] FOF ¶ 197.

[856] FOF ¶¶ 198-201.

[857] FOF ¶ 199.

[858] FOF ¶¶ 213, 225.

140

Dr. Mummolo's analysis demonstrates that the level of disparity in who is subjected to a canine sniff is unlikely to be the result of a policy or practice that is blind to a motorist's state of origin.[859] Instead, the disparities indicate that KHP regularly and systematically targets out-of-state drivers for both stops *and* prolonged detentions in violation of the Fourth Amendment.

Finally, Dr. Mummolo found that KHP is no more likely to find contraband during searches of in-state versus out-of-state drivers' cars.[860] And Col. Jones offered no evidence or testimony to suggest that out-of-state motorists are more likely to be transporting contraband on Kansas highways than Kansas residents. In fact, the evidence suggests that Col. Jones does not require data collection or documentation of trooper activities sufficient to provide a definitive answer to that question.[861] This raises concerns that KHP's practices not only violate the law, but that they are also potentially ineffective and misguided.

Again, Col. Jones offered no evidence or expert testimony to rebut Dr. Mummolo's study or its conclusions, which is significant.[862] Tellingly, Col. Jones presented no evidence suggesting that the KHP does *not* engage in the pattern that Dr. Mummolo identified; nor did he present any compelling argument other than the words of troopers that they "don't do that." Without any evidence to the contrary, the Court therefore accepts the conclusions of Dr. Mummolo's study and finds that KHP's own stop and detention data indicate that the KHP is impermissibly targeting out-of-state motorists for pretextual traffic stops and canine detentions in part because of the motorists' state of origin.

---

[859] FOF ¶¶ 200-291.

[860] FOF ¶¶ 202-203.

[861] FOF ¶¶ 287, 292, 374.

[862] *See, e.g.*, *Rogers v. Colorado Dep't of Corr.*, 2019 WL 4464036, at *16 (D. Colo. Sept. 18, 2019) (granting summary judgment on the plaintiffs' Americans with Disabilities Act and Rehabilitation Act claims, partly because the government "present[ed] no expert evidence to rebut Plaintiffs' expert opinions . . . .").

KC 20428204.1

### E. The KHP's use of the Two Step contributes to its continued practice of unconstitutional detentions.

The Kansas Court of Appeals has described the Two Step as follows: "After telling [the driver] to have a safe trip," the trooper "turned his body, took two steps toward his patrol vehicle, turned back around, and through [the car's] still open passenger window, asked [the driver] if he would answer a few more questions."[863] The KHP uses the Two Step to attempt to turn a traffic stop into a consensual encounter, but significant evidence presented at trial indicates that the maneuver is deliberately misleading and constitutionally problematic. As a result, drivers do not feel free to leave during the invasive questioning that occurs after the Two Step, and these "encounters" are not consensual in the way the KHP suggests.

The Tenth Circuit has long recognized that "[a] detention for a traffic citation can turn into a consensual encounter after the trooper has returned the driver his documentation" *only* if "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information."[864] Tenth Circuit precedent does not place any emphasis on whether or not there was physical contact between the officer and the car in determining whether an encounter was consensual.[865] Instead, the Tenth Circuit will look at "the coercive effect" of the encounter "taken as a whole on a reasonable person."[866] And while "a traffic stop may not be

---

[863] *State v. Gonzalez*, 455 P.3d 419, 423 (Kan. Ct. App. 2019); (Doc. #36 at 3.)

[864] *United States v. Wallace*, 429 F.3d 969, 974-75 (10th Cir. 2005) (quotation omitted); *see also United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308 (10th Cir. 2006) (no evidence that a reasonable person in the defendant's circumstances would have felt free to leave, so continued detention for questioning was not consensual); *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005) ("An unlawful detention occurs only when the driver has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way.") (internal quotations omitted); *see also State v. Gonzalez*, 57 Kan. App. 2d 510, 517-18 (2019) ("[W]e find reasonable persons would not have known they could refuse to answer questions and leave the scene," despite the detainee already driving forward, in part because he "could have concluded that leaving the scene would physically injure [the t]rooper[.]").

[865] *State v. Gomez-Arzate*, 981 F.3d 832, 842 (10th Cir. 2020).

[866] *United States v. Mercado-Gracia*, 989 F.3d 829, 836 (10th Cir 2021) (listing several non-exclusive factors used to evaluate whether an objectively reasonable person would feel free to leave or disregard the officer's request for

142

KC 20428204.1

deemed consensual unless the driver's documents have been returned . . . [t]he return of a driver's documentation is not . . . always sufficient to demonstrate that an encounter has become consensual."[867]

Justice Rosen of the Kansas Supreme Court has expressed misgivings about the Two Step maneuver—misgivings with which this Court agrees—stating that the Constitution does not "permit law enforcement officers to dangle liberty in front of someone like a carrot in an attempt to secure justification for the violation of individual constitutional rights."[868] Justice Rosen noted that the Two Step, "[w]hen used as an investigatory ploy . . . undermines the significance of the liberty interest it is intended to effectuate" and "reeks of fraud or coercion."[869]

It is true that in the motion to suppress context, courts in this district have found that a trooper's use of the Two Step does not necessarily result in a non-consensual encounter. However, this case is the first opportunity a court has had to evaluate this practice outside of individual fact-specific criminal cases,  in the context of a broader unconstitutional practice lawsuit under § 1983. This Court is not bound by a "totality of the circumstances" analysis conducted by prior courts at individual suppression hearings in independent criminal cases, with facts different from those

---

information, and noting that no single factor is dispositive; rather, courts look at the "coercive effect . . . taken as a whole on a reasonable person"). *see also United States v. Sandoval*, 29 F.3d 537, 544 (10th Cir. 1994) ("whether the driver was informed of his right to refuse consent or to proceed on his way" is an important factor); *United States v. Gomez-Azrate*, 981 F.3d 832, 842-43 (10th Cir. 2020) (reasonable driver would feel free to leave where deputies twice told driver he was free to go); *United States v. Mendenhall*, 446 U.S. 544, 558 (1980) (although not required, express statement to defendant that she could decline consent was "especially significant"); *United States v. Little*, 60 F.3d 708, 711 (10th Cir. 1995) ("The test is objective and fact specific, examining what the police conduct would have communicated to a reasonable person based on all the circumstances surrounding the encounter.").

[867] *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005).

[868] *State v. Schooler*, 308 Kan. 333, 356 (Kan. 2018) (J. Rosen concurring).

[869] *State v. Schooler*, 308 Kan. 333, 357 (Kan. 2018) (J. Rosen concurring).

143

established here. And in any event, many of those prior rulings regarding the Two Step can be easily distinguished from the broader practice evidence presented to this Court.[870]

Here, in the Shaws' stop, Trooper Schulte did not expressly tell Blaine Shaw that he was free to leave,[871] and the totality of the circumstances indicates that a reasonable person would not have felt free to leave. Lt. Rohr told the Erich-Maloney family that they were free to leave, yet as soon as Mr. Erich said he did not want to answer Lt. Rohr's questions, Lt. Rohr informed him that he was detained.[872] Reasonable people in the shoes of the other motorists whose stories were presented in this case, including Suzanne Dunn,[873] Daniel Kelly,[874] and Curtis Martinez,[875] likewise would not have felt free to leave and/or stop answering the troopers' questions: they were detained on the side of the highway or just off the highway by a trooper who just threatened them with a citation (or in the case of Mr. Martinez, actually issued a citation), and less than three seconds had passed since their last interaction with the trooper. Under these circumstances, none of these witnesses or an objectively reasonable person in their position would have felt free to disregard the trooper and immediately leave the scene. And, at least in the case of Ms. Dunn and Mr. Kelly, doing so would have threatened injury to the officer.[876]

---

[870] *See, e.g.*, *United States v. Lopez*, 2021-CR-40026, 2021 U.S. Dist. LEXIS 219341, at *27-28 (D. Kan. Nov. 12, 2021) (defendant voluntarily reengaged with the officer, indicating encounter was consensual); *Gomez-Arzate*, 981 F.3d at 843 (driver asked if he was free to go and trooper said yes, twice, indicating the subsequent interaction was consensual); *United States v. Wallace*, 429 F.3d 969, 975 (10th Cir. 2005) (trooper told driver "that's all I've got," didn't display weapon, didn't touch driver, or use commanding tone of voice).

[871] FOF ¶ 3.

[872] FOF ¶ 65.

[873] FOF ¶ 131.

[874] FOF ¶ 108.

[875] FOF ¶ 161.

[876] FOF ¶¶ 108, 130.

KC 20428204.1

The Two Step is a key part of the KHP's work.[877] Jones trains on the Two Step because he sees it as a tool for his officers to potentially learn more information and uncover criminal activity.[878] Many troopers use it, or a version of it, in their interdiction work.[879]

Importantly, the vast majority of drivers on Kansas highways might not have any idea that they can decline to answer additional questions that these figures of authority request they answer, or even decline to have a canine sniff around their car. That is precisely why the KHP's use of the Two Step is so effective: it preys on unwitting drivers who do not understand their rights and backs them into a corner of continuing to provide information to which the KHP is not entitled.[880]

But no matter how useful or efficient this tool may be for the KHP, the evidence has made clear that it results in detentions that are not actually consensual. These detentions are therefore unlawful unless supported by reasonable suspicion—and to a large degree, they are not. Troopers cannot be permitted to engage in law enforcement tactics that violate the Constitution merely because those tactics will, at times, result in discovery of evidence of crimes or lead to an arrest. As Justice Scalia has observed, "the Constitution is not a road map for maximally efficient government, but a system of carefully crafted restraints designed to protect the people from improvident exercise of power."[881] Where the use of a law enforcement tactic repeatedly results in unconstitutional detentions and the exercise of unrestrained power that infringes on basic civil liberties, that practice may be properly enjoined.

---

[877] FOF ¶¶ 262, 264-265, 270.

[878] FOF ¶¶ 268, 270.

[879] FOF ¶¶ 267-269, 273.

[880] FOF ¶¶ 269-272.

[881] *NLRB v. Noel Canning*, 573 U.S. 513, 601 (2014) (concurring).

145

**F.  Col. Jones's conduct is an actual and proximate cause of KHP's ongoing constitutional violations.**

To prevail on their claims against Col. Jones, Plaintiffs must not only prove ongoing constitutional violations, but also that there is a causal nexus between Col. Jones's conduct as the head of the agency and the ongoing constitutional violations.[882] Far from being a standard of mere vicarious liability, Plaintiffs must demonstrate that Col. Jones's action or inaction played a direct role in the harms they experienced. Plaintiffs have more than met this burden.

Throughout the trial in this case, Plaintiffs have pointed to significant gaps in leadership, oversight, training, and accountability, all of which occurred at the behest of Col. Jones. Col. Jones is solely responsible for ensuring troopers follow the law.[883] He shapes agency culture and fidelity to the Constitution.[884] And he has exclusive and final authority over KHP policy, discipline, training, and accountability.[885] But Col. Jones has turned a blind eye to constitutional violations occurring under his watch. He has had actual and constructive notice of the need to correct deficient practices since at least the *Vasquez* decision came down and he took over as Superintendent. But at no point prior to the initiation of this lawsuit—and indeed, well into this lawsuit—did Col. Jones take any affirmative steps to ensure his troopers knew, followed, and were accountable to the law.[886]

District courts analyzing evidence in injunctive relief cases regarding unconstitutional stop and detention policies have looked at the adequacy of leadership's supervision of the rank-and-file for evidence of a policy or custom of unconstitutional policing. For example, in ruling on the

---

[882] *See* Conclusions of Law, Section I.B.

[883] FOF ¶¶ 275-276.

[884] FOF ¶ 276.

[885] FOF ¶¶ 275, 278.

[886] FOF ¶ 343 (describing new detention policy put in place as a result of this litigation).

146

NYPD's abusive stop-and-frisk practices, former Judge Scheindlin of the Southern District of New York observed:

> Much evidence was introduced regarding inadequate monitoring and supervision of unconstitutional stops. Supervisors routinely review the *productivity* of officers, but do not review the facts of a stop to determine whether it was legally warranted. Nor do supervisors ensure that an officer has made a proper record of a stop so that it can be reviewed for constitutionality. Deficiencies were also shown in the training of officers with respect to stop and frisk and in the disciplining of officers when they were found to have made a bad stop or frisk. Despite the mounting evidence that many bad stops were made, that officers failed to make adequate records of stops, and that discipline was spotty or non-existent, little has been done to improve the situation.[887]

The same can be said of Col. Jones's supervision of the KHP. For all these reasons, as set forth below, Col. Jones is an actual and proximate cause of the Fourth Amendment violations that Plaintiffs experienced and the risk of future violations that Plaintiffs will face on their future travels through Kansas.

### a.   *Deficiencies in Col. Jones's leadership, supervision, and oversight of KHP*

Col. Jones fails to adequately supervise KHP leadership and troopers, fails to ensure that troopers follow recent case law interpreting the Fourth Amendment, and fails to take affirmative steps to prevent, detect, and respond to constitutional violations committed by his rank and file. All these failures create a practice of constitutional violations that Jones explicitly endorses and refuses to correct as the leader of the KHP.

As the head of the KHP, Col. Jones plays a key role in the ongoing constitutional violations at issue by neglecting to ensure his troopers are complying with the Constitution.[888] Col. Jones is responsible for final approval of agency policies and the discipline of troopers and insuring they

---

[887] *Floyd II*, 959 F. Supp. 2d at 561.

[888] FOF ¶¶ 276, 284, 287.

KC 20428204.1

know the law.[889] Yet testimony from trooper after trooper at trial laid bare that those under Col. Jones's command do not understand appropriate standards and boundaries for their interdiction work. Multiple troopers testified at trial or through designated deposition testimony that they did not know anything about the *Vasquez* decision or how it should impact their work.[890] Indeed, the troopers involved in each of the Plaintiffs' stops clearly had no idea what *Vasquez* required of them.[891] Those troopers who claimed to remember *Vasquez* got its central holdings wrong.[892] No one had been checking to make sure troopers adequately understood *Vasquez* and similar cases. Legal updates, advanced interdiction, and other law-specific training provided during in-service training programs are primarily Powerpoint presentations without post-training testing, and overall, KHP training does not appear to utilize adult learning methods.[893]

Col. Jones did not dispute that it is his job as the head of the agency to ensure the lessons of training are sinking in.[894] But clearly, they are not. Even Lt. Jirak, a supervisor in the interdiction unit, and Troopers McCord and Wolting, both in the interdiction unit as well, clearly did not understand *Vasquez* or how it should impact their practices.[895] If even interdiction unit troopers and supervisors, who receive the most training on these issues, do not understand important case law like *Vasquez*, then there is little hope for the rest of the agency.

KHP troopers and command staff that testified at trial attempted to rehabilitate Col. Jones on this point, but these efforts were ultimately unsuccessful. For example, when questioned on

---

[889] FOF ¶ 276.

[890] FOF ¶¶ 312, 318-320.

[891] FOF ¶¶ 319-322, 327, 332.

[892] FOF ¶¶ 208-209, 319, 321.

[893] FOF ¶¶ 328, 331.

[894] FOF ¶ 276.

[895] FOF ¶¶ 206-208, 312, 318, 320, 321.

KC 20428204.1

whether supervisors are required to do any "spot checks" of dash camera video for troopers under their command, the testimony was inconclusive at best. Cpt. Hogelin noted that he requires his interdiction supervisors to conduct spot checks of dash cam videos, but only three per quarter, and they are not required to focus on specific conduct. Supervisors may therefore not review any interdiction-related traffic stops and detentions at all.[896] This limited review of troopers' work will do little to ensure constitutional violations are discovered and properly addressed.[897]

This is just one example of the lack of supervision tolerated by Col. Jones, which undoubtedly creates the very conditions that allowed the stops and detentions of Plaintiffs in this case. Chief Aden, Plaintiffs' police practices expert, provided significant credible testimony regarding deficiencies in how Col. Jones requires his supervisors to oversee their subordinates' work. Because KHP has a diffuse geographic scope, Chief Aden noted how line-level supervision is vital to ensuring troopers are following the Constitution.[898] Yet, Chief Aden's assessment, based on his decades of law enforcement experience, was that Col. Jones had a relatively "hands off"

---

[896] FOF ¶¶ 362-365, 369.

[897] As the U.S. Department of Justice has previously found, the failure of supervisors to review reports and ensure that policing activities are compliant with the Constitution can be indicative of a broader practice of constitutional violations. *See generally* U.S. Dep't. of Just. C.R. Div. & U.S. Atty's Off. Dist. of N.M., *Findings Letter on Investigation of the Albuquerque Police Department* (Apr. 10, 2014) at 4, https://www.justice.gov/sites/default/files/crt/legacy/2014/04/10/apd_findings_4-10-14.pdf ("We found only a few instances in the incidents we reviewed where supervisors scrutinized officers'" reports, and "In nearly all cases, supervisors endorsed officers' version of events, even when officers' accounts were incomplete, were inconsistent with other evidence, or were based on canned or repetitive language."); U.S. Dep't. of Just. C.R. Div. & U.S. Atty's Off. N. Dist. of Ill., *Findings Letter on Investigation of the Chicago Police Department* (Jan 13, 2017) at 41, https://www.justice.gov/opa/file/925846/download ("The failure to ensure the accurate reporting, review, and investigation of officers' use of force has helped create a culture in which officers expect to use force and never be carefully scrutinized about the propriety of that use."); U.S. Dep't. of Just. C.R. Div. & U.S. Atty's Off. N. Dist. Ohio, *Findings Letter on Investigation of the Cleveland Division of Police* (Dec. 4, 2014) at 29–30, https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/04/cleveland_division_of_police_findings_letter.pdf ("Officers . . . [do] not describe with sufficient particularity the type of force they used. [...] This language does not adequately describe the level and type of force used for a supervisor to review and ensure that the force was within constitutional limits. [...] These shortcomings in CDP's policies inhibit supervisors' ability to review force and ensure that it is within constitutional limits.").

[898] FOF ¶¶ 359, 361.

149

supervision approach which trickled down to KHP line-level supervisors[899] and resulted in constitutional violations going undetected, undeterred, and unaddressed once they occurred.

These conclusions are buttressed by the fact that, up until very recently, Col. Jones did not require his troopers to make a record of why they were detaining individuals unless that detention would need to be defended in criminal court.[900] As he himself recognized, you cannot measure what you do not track.[901] The failure to keep any account of his troopers' reasonable suspicions—much less analyze those accounts to determine trends and legal concerns, and provide appropriate oversight of agency operations[902]—demonstrates a clear indifference to whether or not his troopers' roadside detentions were adequately supported. This has allowed constitutional violations to occur unnoticed and uncorrected. Col. Jones's sudden about face in the mounting pressure of this litigation provides little comfort that there is a current culture, practice, or framework in place necessary to prevent these constitutional violations from occurring again in the future.

> b. *Deficiencies in Col. Jones's systems of accountability within the KHP*

Finally, the Court heard significant evidence regarding the insufficient systems in place within the KHP to hold troopers accountable when constitutional violations occur. The internal affairs unit of a law enforcement agency—here, the Professional Standards Unit, or PSU—plays the vital role of serving as an internal check on officer misconduct.[903] When an internal affairs unit is functioning properly, it is essentially "policing the police": rooting out violations of law and

---

[899] FOF ¶ 360.

[900] FOF ¶¶ 290, 338, 341,

[901] FOF ¶ 291.

[902] FOF ¶¶ 291-295.

[903] FOF ¶¶ 377-378.

KC 20428204.1

policy, conducting investigations, and taking steps that will both hold officers accountable for their actions *and* deter future violations.

All of the evidence in this case indicates that the PSU is ineffective in this regard. Command staff testified that the PSU is entirely reactionary, dedicated almost exclusively to responding to complaints from the public rather than proactively identifying issues in need of solutions.[904] The former PSU Commander, Mitchell Clark, testified that he was not aware of any instances of troopers reporting their peers for misconduct, and in fact, doing so would lead them to be ostracized.[905]

When complaints are investigated, as in the case of Mr. Bosire's detention by Trooper McMillan, Col. Jones intervenes to soften the PSU's conclusions and analysis so that it is less punitive for the trooper.[906] And Col. Jones does not require that the PSU follow its own policies in imposing consequences on troopers that violate the Constitution. Although KHP policy mandated he receive discipline, Trooper McMillan received only corrective action for violating Mr. Bosire's constitutional rights—the kind of violation that is clearly more than a mere "rule violation."[907]

One of the most telling examples of the futility of the PSU as an accountability backstop comes from Trooper McMillan's response to the "corrective action" imposed by the PSU when he violated Mr. Bosire's constitutional rights. His corrective action consisted of a one-hour training with legal counsel and a short ride-along with a lieutenant.[908] As Chief Aden testified, based on the deposition testimony of Trooper McMillan, Trooper McMillan stated he learned nothing from

---

[904] FOF ¶¶ 379-381.

[905] FOF ¶¶ 412-414.

[906] FOF ¶ 419.

[907] FOF ¶¶ 406-407, 411.

[908] FOF ¶¶ 34-35, 422.

KC 20428204.1

the corrective action and did not change any of his behavior going forward.[909] Even Lt. Jirak, who conducted the ride-along, noted that it was just "business as usual."[910]

Col. Jones came forward with no evidence at all to rebut Plaintiffs' testimony and arguments about the insufficiency of the PSU. The Court was presented with no data, analysis, or testimony demonstrating that the PSU is anything other than a complaint processing factory that achieves little meaningful change in KHP policies and practices. And Col. Jones testified that he is directly responsible for the PSU.[911] His inability to hold troopers accountable and ensure they follow the law is one of the many ways in which he has causally contributed to the ongoing constitutional violations occurring within KHP.

*** 

Plaintiffs have clearly demonstrated that Col. Jones is directly and proximately responsible for the ongoing constitutional violations they have proven in this case. Regardless of how experienced Col. Jones is as a law enforcement officer, he has clearly not adequately fulfilled his obligation to provide supervision, oversight, *impactful* training, and accountability for his troopers, especially in the wake of prior court decisions *against the KHP* for nearly identical conduct to that at issue in this case.

For all of these reasons, Plaintiffs have succeeded on the merits of their claims against Col. Jones.

---

[909] FOF ¶ 426.

[910] FOF ¶ 35.

[911] FOF ¶¶ 207-278.

KC 20428204.1

## IV.     PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION.

In addition to succeeding on the elements, to obtain a permanent injunction, Plaintiffs must demonstrate three additional things: (1) they will suffer irreparable harm absent an injunction, for which there is no adequate remedy at law; (2) the balancing of harms merits injunctive relief; and (3) if issued, an injunction would not be against the public interest.[912] Plaintiffs have set forth sufficient evidence to meet each of these elements.

### A.  Plaintiffs have suffered irreparable harm for which there is no adequate remedy at law.

To obtain an injunction, in addition to success on the merits, Plaintiffs must also show irreparable harm that is incapable of being adequately addressed by remedies at law. As the Court noted previously, there is a substantial non-speculative risk that the KHP will stop Plaintiffs and others similarly situated again in the future and subject them to detention without adequate reasonable suspicion.[913] Plaintiffs proved that at trial.[914] As discussed below, a deprivation of a constitutional right is an irreparable harm not fully compensable by monetary damages or other remedies at law.

#### a.   Constitutional violations constitute irreparable harm.

The Tenth Circuit and the District of Kansas have consistently held that a violation of constitutional rights is, in and of itself, irreparable harm.[915] "[A] violation of the constitutional

---

[912] *Prairie Band Potawatomi Nation*, 476 F.3d at 822.

[913] *See* Order on Mot. to Dismiss, Doc. #36, at 15 ("Plaintiffs have established a real and immediate threat of future harm" in that they allege they "frequently drive through Kansas with out-of-state plates on their way to and from Colorado, and that KHP troopers will do what they are trained to do: target them for stops, prolonged detentions, and drug searches.").

[914] *See supra* Conclusions of Law, Section II (standing).

[915] *See, e.g.*, *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1236 (10th Cir. 2005) ("[T]he district court did not abuse its discretion in concluding that plaintiffs suffered irreparable injury through the loss of their First Amendment rights."); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (plaintiff satisfies irreparable harm requirement by demonstrating "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages."); *Kansas v. United States*, 171 F. Supp. 3d 1145, 1155 (D. Kan. 2016) (same), *aff'd*

KC 20428204.1

right to be free from unreasonable search and seizure protected by the Fourth Amendment causes

irreparable harm . . . ."[916] Indeed, "[w]hen an alleged constitutional right is involved, most courts

hold that no further showing of irreparable injury is necessary."[917] Other jurisdictions have applied

this rule when granting a permanent injunction[918] and in the search and seizure context.[919] Fourth

Amendment rights are no exception to this rule.[920]

---

in part sub nom. *Kansas by & through Kansas Dep't for Child. & Fams. v. SourceAmerica*, 874 F.3d 1226 (10th Cir. 2017); *Schell v. OXY USA, Inc.*, 822 F. Supp. 2d 1125, 1142 (D. Kan. 2011), *amended*, No. 07-1258-JTM, 2012 WL 3939860 (D. Kan. Sept. 10, 2012); *Adams By & Through Adams v. Baker*, 919 F. Supp. 1496, 1505 (D. Kan. 1996) ("A deprivation of a constitutional right is, itself, irreparable harm.").

[916] *Bannister v. Bd of Cnty. Comm'rs*, 829 F. Supp. 1249, 1252 (D. Kan. 1993) (J. Van Bebber).

[917] *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (cleaned up); *see also Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001), *abrogated on other grounds by Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019); *Elrod*, 427 U.S. at 373 (1976) (stating that the loss of constitutional freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury"); 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("When an alleged deprivation of a constitutional right is inVol.ved, . . . most courts hold that no further showing of irreparable injury is necessary."). *But see Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) ("[W]hile we must nonetheless engage in our traditional equitable inquiry as to the presence of irreparable harm in such a context, we remain cognizant that the violation of a constitutional right must weigh heavily in that analysis.").

[918] *See, e.g.*, *Doe v. Kentucky ex rel. Tilley*, 283 F. Supp. 3d 608, 615 (E.D. Ky. 2017) (granting permanent injunction and holding that, necessarily, "irreparable harm flows naturally from the constitutional violations"); *United States v. Colorado City*, No. 3:12-cv-8123-HRH, 2017 WL 1384353, at *12 (D. Ariz. Apr. 18, 2017) (holding that "irreparable harm is presumed because the Defendant Cities have violated civil rights statutes" and the Constitution).

[919] Here, "given the fundamental right involved, namely, the right to be free from unreasonable searches—that [plaintiff] has sufficiently demonstrated for preliminary injunction purposes that he may suffer irreparable harm arising from a possible deprivation of his constitutional rights." *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992); *see also Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.' Granted, the District is not currently imposing [a neighborhood safety zone] checkpoint, but it has done so more than once, and the police chief has expressed her intent to continue to use the program until a judge stops her." (internal citation omitted; quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) (noting that "this circuit has upheld injunctions against pervasive violations of the Fourth Amendment" and upholding a permanent injunction that required the California Highway Patrol to have probable cause that California's motorcycle helmet law has been violated before citing motorcyclists for violating the law; collecting cases); *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) (plaintiffs "demonstrated a possibility of irreparable injury by showing violations of their constitutional rights which, if proven at trial, could not be compensated adequately by money damages and by showing that the INS was reasonably likely to continue those practices."); *Doe v. Bridgeport Police Dep't*, 198 F.R.D. 325, 335 (D. Conn. 2001) ("The law is well-settled that plaintiffs establish irreparable harm through the allegation of fourth amendment violations." (cleaned up; citation omitted)), *modified*, 434 F. Supp. 2d 107 (D. Conn. 2006).

[920] *See, e.g.*, *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied."); *Herrera v. Santa Fe Pub. Sch.*, 792 F. Supp. 2d 1174, 1182 (D.N.M. 2011) ("The deprivation, or threat of deprivation, of a constitutional right is sufficient, standing alone, to constitute irreparable injury. As a result, courts have regularly found that being subjected to an unconstitutional search causes irreparable harm.") (internal citations omitted) (collecting cases). The District of

154

Regardless of whether irreparable harm is assumed under Tenth Circuit case law or not, it is clear that each of the Plaintiffs in this case have themselves suffered irreparable harm. All three sets of plaintiffs provided compelling testimony regarding the enduring effect their stops and detentions have had on them. Mr. Bosire, a proud naturalized U.S. citizen, testified about how his detention by Trooper McMillan fundamentally altered his views of law enforcement and the meaning of the Constitution.[921] He emotionally testified how the stop has taken away the pleasure he once found in his community volunteer work, which he now avoids because it would force him to interact with law enforcement.[922] Ms. Maloney described the fear and anguish she and her family experienced during the stop and how it has altered whether and when they contact law enforcement when they are in need of help.[923] She described not only property damage to her family's RV, but also something much deeper: the feeling of having your privacy invaded and your personal space violated when law enforcement decides to brand you a criminal.[924] Ms. Maloney and Mr. Erich both provided compelling testimony about the profound hurt the detention and subsequent search caused them as they attempted to help their kids process what happened to their family.[925] Mr. Shaw, a criminal justice major in college, testified about the distrust he now holds towards law enforcement and the frustration and resentment that he feels as a result of his detention.[926] Ms. Dunn, who experienced a similar stop and detention, was similarly impacted.[927] Without question,

---

Kansas has previously considered whether a violation of the constitutional right to be free from unreasonable searches and seizures causes irreparable harm in the context of a preliminary injunction. *Bannister*, 829 F. Supp. 1249.

[921] FOF ¶ 26.

[922] FOF ¶ 26.

[923] FOF ¶¶ 63, 68, 74, 78, 85, 87-91.

[924] FOF ¶¶ 85, 87-91.

[925] FOF ¶¶ 85, 87-91.

[926] FOF ¶ 8.

[927] FOF ¶¶ 133, 136, 139-143.

KC 20428204.1

these detentions have a profound impact on drivers, leaving them scared, anxious, frustrated, and distrustful of the police—all of which amount to irreparable harm.

     *b.   Money awards under 42 U.S.C. § 1983 are not a widely available remedy.*

Monetary damages are an insufficient remedy in cases such as this one, where the irreparable harm exists but is not easily quantifiable or subject to large monetary recovery. The cost of litigation, a paucity of counsel willing to represent plaintiffs in these cases, and other barriers to suit all signify that monetary awards are difficult to recover in Fourth Amendment cases such as this one.

Plaintiff Blaine Shaw's trial is telling. As a criminal justice major, Mr. Shaw had a unique and strong-willed interest in standing up to the trooper who violated his constitutional rights.[928] Mr. Shaw stayed committed through over three years of litigation, and although the jury agreed with him that Trooper Schulte unconstitutionally detained him, the damages award was $1.00.[929] Such an award does little to compensate Mr. Shaw for past wrong *or* to deter troopers from engaging in similar future misconduct.

Another court in this District has recognized the inadequacy of monetary awards in remedying unconstitutional searches and seizures in *Bannister v. Board of County Commissioners*.[930] There, the court granted the requested injunction and in doing so, held:

> [I]t is well-established that a violation of the constitutional right to be free from unreasonable search and seizure protected by the Fourth Amendment causes irreparable harm where monetary recovery could not remedy the constitutional violation . . . Because the injury inflicted by an unconstitutional drug test cannot be remedied by a damage award, the court

---

[928] FOF ¶ 8.

[929] FOF ¶ 16.

[930] 829 F. Supp. 1249 (D. Kan. 1993).

KC 20428204.1

concludes that plaintiff has established that she will be irreparably harmed if an injunction does not issue.[931]

*Bannister* makes clear that although monetary damages—if available—may provide some measure of redress for a one-off Fourth Amendment violation, it is not a complete remedy when the risk of continued violations is ongoing.[932]

Importantly, even if money damages were a sufficient remedy at law for ongoing constitutional violations, not everyone subjected to an unconstitutional search or seizure will be willing or able to bring a damages suit. Plaintiffs in this case were uniquely well situated to pursue their claims—for varying reasons, they each knew and understood their constitutional rights and were able to pursue their claims vigorously for nearly four years. Many individuals who endure an unconstitutional detention may not even know that their rights have been violated, may not be able to find an attorney,[933] or may conclude that the potential recovery is not large enough to justify the time and expense of litigation.[934] Furthermore, many attorneys decline to take on such cases because of the financial cost of the litigation, the plaintiffs' lack of resources, and the limited potential to recover significant fee awards in individual damages cases to offset contingency fee arrangements.[935] Additionally, the doctrine of qualified immunity often prevents aggrieved

---

[931] *Bannister*, 829 F. Supp. at 1253–54.

[932] *See Bannister*, 829 F. Supp. at 1252.

[933] *See* Joanna Schwartz, *Civil Rights Without Representation*, 64 William & Mary L. Rev. 641 (2022), available at https://scholarship.law.wm.edu/wmlr/Vol.64/iss3/3/.

[934] *See* Martinez Decl., Doc. #358-1 ¶ 16 (describing contacting at least 45 attorneys and being unable to find a single one to take on his § 1983 damages action against a KHP trooper for an unconstitutional roadside detention).

[935] *See id.* (describing being told that his claim is not worth the attorneys' expense)*;* Decl. of Christopher Joseph, Doc. #358-2 ¶¶ 7-9 (describing how the attorney fees recovery in *Vasquez* did not even cover his litigation costs, and therefore declining to take subsequent § 1983 cases because they are not financially feasible); *see also* Joanna Schwartz, *Civil Rights Without Representation*, 64 William & Mary L. Rev. 641, 658–60 (2022), detailing unavailability of representation:

plaintiffs from recovering damages, even when the Court finds a law enforcement officer violated a plaintiff's constitutional rights.[936]

The prospects for a monetary award—and any attendant effect such an award might impose on a wayward agency—are therefore quite dim in most circumstances. This is patently clear in the instant case—troopers such as Trooper McMillan, who a jury found *recklessly* disregarded Mr. Bosire's rights, will not have to pay any part of that damages award.[937] As courts have long recognized, "the lesson of experience is that remote possibility of money damages serves no deterrent to future police invasions."[938] The threat of individual damages liability has not deterred the KHP from detaining motorists based on innocent-travel indicia. *Vasquez* was a case against a

---

Even when attorneys believe that a § 1983 case has merit, they have strong financial incentives to decline it if their portion of the expected settlement will not adequately compensate them for the time they anticipate spending on the case. As one attorney explained to me:

Obviously death cases or severe injury cases, I'm going to take a longer look at the case. But if it's a simple, like, they called me a name, or they used a derogatory term or—I spent—they kept me in the back of their car for four hours. I'm not going to take a case like that.

As another explained: "[I]t sounds crass but we say, 'Well, is there blood on the street? Because if there isn't, why are we doing it?'" Even when the damages a potential client suffered were significant, attorneys I interviewed were reluctant to represent people who a judge or jury would not find sympathetic; lawyers feared judges and juries would award those people lower damages or no damages at all. As a result, attorneys reported looking for cases with plaintiffs the judge and jury would find "likeable," "credible," and "articulate"—criteria that may make attorneys less likely to rep- resent people of color, LGBTQ+ people, people with mental illness, and members of other marginalized groups, who are the very people subject to disproportionate levels of unconstitutional policing. Some of the attorneys I interviewed will not represent a person who was convicted of a crime in connection with the incident that is the basis for the civil rights case. Some attorneys will not represent people who have ever been convicted of a crime for fear that a jury would rule against them or award minimal damages.

(internal citations omitted).

[936] Qualified immunity only applies to suits for damages, not to claims for injunctive relief—yet another reason why injunctions are important, because other relief may not be available.

[937] FOF ¶¶ 29, 245.

[938] *Lankford v. Gelston*, 364 F.2d 197, 202 (4th Cir. 1966) (approvingly cited in *Allee v. Medrano*, 416 U.S. 802, 816 n.9 (1974)).

KC 20428204.1

KHP trooper that resulted in a damages award. Yet, virtually all the troopers deposed in this case testified that *Vasquez* changed *nothing* about the way they police.[939]

Clearly, individual damages actions are an insufficient remedy for widespread misconduct such as that found in this case.

### c. Motions to suppress are also an incomplete remedy at law.

In the event of a criminal prosecution, a defendant's opportunity to suppress unconstitutionally obtained evidence is likewise insufficient to address a law enforcement agency's persistent pattern of Fourth Amendment violations. Courts have suppressed evidence in numerous criminal cases involving KHP roadside detentions lacking adequate reasonable suspicion, many of which involved the Two Step.[940] Yet the pattern continues.

Many people subjected to unconstitutional searches or seizures will never have occasion to invoke the exclusionary rule because they will never be prosecuted. But as the Supreme Court noted, "a Fourth Amendment violation is fully accomplished by the illegal search or seizure, and no exclusion of evidence from a judicial or administrative proceeding can cure the invasion of the defendant's rights which he has already suffered."[941]

---

[939] *See supra* Conclusions of Law Section III.C.a.

[940] *See, e.g.*, *State v. Gonzalez*, 57 Kan. App. 2d 510, 513 (2019); *State v. Arrizabalaga*, 57 Kan. App. 2d 79, 96, (2019); First Amend. Compl. (Doc. #7), Exs. 2, 3, 4, 5 (collected cases from 2019 in Kansas District Courts where evidence seized by KHP troopers was suppressed because the troopers improperly relied on the driver's travel plans to or from states that have legalized cannabis).

[941] *Penn. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 362 (1998) (cleaned up) (quoting *United States v. Leon*, 468 U.S. 897, 906 (1984)); *see also Easyriders*, 92 F.3d at 1501 ("CHP argues that none of the motorcyclists is threatened with irreparable injury because the Fourth Amendment lack-of-probable-cause defense would be available at their trials on potential traffic citations. . . . [H]owever, the wrong that the Fourth Amendment is designed to prevent is completed when a motorcyclist is cited without probable cause.").

KC 20428204.1

And because the exclusionary rule provides relief only when it is invoked, it offers no relief to the numerous individuals, like Plaintiffs, who are unconstitutionally detained but were not arrested or prosecuted.[942] As Justice Jackson observed,

> Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.[943]

Herein lies a basic truth: remedies at law are *not* effective remedies when pervasive or systemic Fourth Amendment violations are at issue, and the risk of irreparable harm persists.[944] Repeated violation of one's constitutional rights, followed only by repeated damages awards or fighting to suppress evidence if criminally charged, is not what Congress envisioned when it enacted 42 U.S.C. § 1983 and specifically included equitable remedies therein.

For these reasons, Plaintiffs have carried their burden on this element.

---

[942] *See Lankford*, 364 F.2d at 202 ("It would be a grotesque irony if our courts protect only against the unlawful search which actually uncovers contraband (by the exclusionary rule), while offering no relief against an admittedly unlawful pattern and practice affecting hundreds of innocent homeowners.").

[943] *Lankford,* 364 F.2d at 202 (quoting *Brinegar v. United States,* 338 U.S. 160, 181–82 (1949) (J. Jackson dissenting)).

[944] *See* A Wright, Miller & Kane, Fed. Prac & Proc. Civ. § 2944 (3d ed.) ("Probably the most common method of determining that there is no adequate legal remedy is by showing that plaintiff will suffer irreparable harm if the court does not intervene and prevent the impending injury."); *cf. Steagald v. United States*, 451 U.S. 204, 215-16 (1981) ("The Government recognizes the potential for such abuses, but contends that existing remedies—such as motions to suppress illegally procured evidence and damages actions for Fourth Amendment violations—provide adequate means of redress. We do not agree. As we observed on a previous occasion, '[t]he [Fourth] Amendment is designed to prevent, not simply to redress, unlawful police action.'" (footnote omitted; quoting *Chimel v. California*, 395 U.S. 752, 766, n. 12 (1969))).

KC 20428204.1

**B.  The balance of harms weighs in Plaintiffs' favor.**

The third factor analyzing the propriety of a permanent injunction—the balance of the hardships between the parties—definitively tips in Plaintiffs' favor. The threatened injury of deprivation of constitutional rights to Plaintiffs and others who travel across Kansas outweighs any speculative harm that a well-tailored, narrow injunction may cause to Col. Jones or the KHP.[945] Without question, "[t]he right to physical liberty has long been at the core of our nation's commitment to respecting the autonomy and dignity of each person" and "[s]afeguarding this right is quintessentially the role of the judicial branch."[946]

Here, the KHP's practice of infringing the Fourth Amendment rights of those travelling across Kansas will continue if the injunction does not issue.[947] The Plaintiffs have "an interest in prevention of violations of . . . constitutional rights, whereas" the KHP Superintendent "has no interest in being allowed to act in an unconstitutional manner."[948] Col. Jones "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations."[949]

While isolated unconstitutional searches or seizures do not ordinarily give rise to prospective remedies, the Supreme Court has recognized the particular need for injunctive relief to address systematic Fourth Amendment violations by law enforcement and explained why the

---

[945] *Floyd II*, 959 F. Supp. 2d at 672 (footnote omitted) ("The balance of hardships tilts strongly in favor of granting a permanent injunction . . . . That is, the burden on the plaintiff class of continued unconstitutional stops and frisks far outweighs the administrative hardships that the NYPD will face in correcting its unconstitutional practices.").

[946] *Floyd I*, 283 F.R.D. at 158–59 (footnote omitted) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

[947] *Bannister*, 829 F. Supp. at 1253.

[948] *See Planned Parenthood of Ark. & E. Okla. v. Cline*, 910 F. Supp. 2d 1300, 1308 (W.D. Okla. 2012).

[949] *Zepeda*, 753 F.2d at 727.

161

balance of hardships tips in favor of granting injunctions in such circumstances.[950] Particularly relevant here, courts have recognized that injunctive relief is necessary to address the irreparable harm caused by law enforcement policies that unconstitutionally target individuals on the basis of innocent or impermissible criteria, and that the balance of hardships in such circumstances tips in in favor of granting injunctive relief.[951] As discussed above, Plaintiffs are undoubtedly harmed by this continued practice. And although an injunction may cause Col. Jones inconvenience or remove tools from his toolbox that he has relied on in effectuating his high-volume traffic stop-based criminal interdiction program, that is not a sufficient reason to deny Plaintiffs the injunction they seek.[952] Accordingly, this element is also met.

## C.  An injunction serves the public's interest.

Finally, Plaintiffs were required to demonstrate that the injunction they seek is in the public's interest. By their very nature, injunctions to uphold constitutional rights are necessarily in the public interest. The Tenth Circuit has recognized that "the public has a . . . profound and long-term interest in upholding an individual's constitutional rights."[953] As such, an injunction here would not be "adverse to the public interest in this case" because it would "prevent the infringement of plaintiff's . . . rights under the Fourth Amendment."[954] Through strict adherence

---

[950] *See Allee*, 416 U.S. at 815 ("Where, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate.").

[951] *See Melendres v. Arpaio (Melendres I)*, 695 F.3d 990, 1002 (9th Cir. 2012); *Colorado City*, 2017 WL 138453, at *12.

[952] *Cf. Goyette v. City of Minneapolis*, Slip Op., 2021 WL 5003065, at *11 (D. Minn. Oct. 28, 2021) ("The Court is mindful that the TRO may cause some inefficiencies, inconveniences, and other challenges for the State Defendants. But the United States Constitution requires inefficiency, sometimes by design, to limit abuses of power.").

[953] *Awad*, 670 F.3d at 1132 (internal quotation marks omitted).

[954] *Bannister*, 829 F. Supp. at 1253. *See also Planned Parenthood*, 910 F. 2d at 1308 ("The public has an interest in constitutional rights being upheld . . . ."); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) ("[T]he last factor . . . is also met, since the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional.")

KC 20428204.1

to the law, the KHP "will achieve greater cooperation between . . . officers and the communities they serve. Fostering trust in the police will promote, rather than hinder," the KHP's "mission of safely and effectively fighting crime."[955]

The Plaintiffs do not call for the KHP to abandon traffic enforcement or drug interdiction efforts altogether. Rather, the relief requested will require the KHP "to be *even more* proactive: proactive not only about crime control and prevention, but also about protecting the constitutional rights of the people" the KHP serves.[956] This undoubtedly serves the public interest, as "it is *always* in the public interest to prevent the violation of a party's constitutional rights."[957]

For the foregoing reasons, Plaintiffs have demonstrated that they are entitled to an injunction—one that both prohibits all KHP troopers from continuing to rely on a driver's out-of-state origin or destination as part of their reasonable suspicion to detain drivers for canine sniffs, and prohibits all KHP troopers from using the deceptive Trooper Two Step or other similar maneuver used to reapproach individuals after the conclusion of a traffic stop without first informing the individual that they are free to leave.

## V.   PLAINTIFFS ARE ENTITLED TO DECLARATORY RELIEF.

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act "provides an equitable remedy allowing a party to ask a federal court to 'declare [the party's] rights' through an order with 'the force and effect of a final judgment.'"[958]

---

[955] *Floyd II*, 959 F. Supp. 2d at 673.

[956] *Floyd II*, 959 F. Supp. 2d at 673.

[957] *Awad*, 670 F.3d at 1132 (internal quotation marks omitted; emphasis added).

[958] *Herrera v. Wyoming*, 139 S. Ct. 1686, 1712 (2019) (Alito, J., dissenting) (quoting the Act).

KC 20428204.1

Although a request for declaratory relief often accompanies a request for injunctive relief, they are nevertheless separate remedies.[959] A declaratory judgment lacks the explicit enforcement and management mechanisms of an injunction.[960] Even so, a declaratory judgment still binds the parties, and a public official defendant who loses a declaratory judgment claim does not ordinarily need a court order to correct their unlawful conduct.[961] Indeed, federal courts have an obligation to "say what the law is."[962]

To obtain declaratory relief in this case, Plaintiffs must succeed on the merits of their case, and the declaration sought must be prospective in nature—i.e., they cannot obtain a declaration that merely states that their rights were violated in the past.[963] Unlike the standard for obtaining

---

[959] *Van Deelen v. Fairchild*, No. 05-2017, 2005 U.S. Dist. LEXIS 30503, at *19–20 (D. Kan. Dec. 1, 2005) (citing cases); *see Steffel v. Thompson*, 415 U.S. 452, 467 (1974) ("'The express purpose of the Federal Declaratory Judgment Act was to provide a milder alternative to the injunction remedy.'" (quoting *Perez v. Ledesma*, 401 U.S. 82, 111 (1971) (Brennan, J., concurring in part and dissenting in part)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 33 (2008) (quoting *Steffel*'s statement that the declaratory judgment was "plainly intended" by Congress "to act as an alternative to the strong medicine of the injunction").

[960] Samuel L. Bray, *The Myth of the Mild Declaratory Judgment*, 63 Duke L.J. 1091, 1123–33 (2014) ("In contrast, the declaratory judgment is a less managerial remedy. It lacks the features needed for robust management, and it is primarily used in situations in which continuing direction and oversight of the parties would be unnecessary.").

[961] *Id.* at 1108. *See, e.g.*, *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 97–98 (1992) (White, J., concurring) (stating that "[t]here is nothing new about expecting governments to satisfy their obligations" and giving as an example the expectation that government officials will comply with a declaratory judgment); *Poe v. Gerstein*, 417 U.S. 281, 282 (1974) (per curiam) (affirming a three-judge district court's denial of an injunction—even though it had granted a declaratory judgment—because there was no reason to think the public officials in question would fail to "'acquiesce in the decision'" (quoting *Douglas v. City of Jeannette*, 319 U.S. 157, 165 (1943))); *Roe v. Wade*, 410 U.S. 113, 166 (1973) (noting the Court's confidence that state officials would comply with the declaratory judgment), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022); *Comm. on the Judiciary v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (per curiam) ("[W]e have long presumed that officials of the Executive Branch will adhere to the law as declared by the court. As a result, the declaratory judgment is the functional equivalent of an injunction."); J. Raz, *Legal Rights*, 4 O.J.L.S. 1, 3 (1984) (noting that there are "circumstances where by convention" a declaratory judgment "is respected as if it were an ordinary enforcement or remedial action").

[962] *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1322 (2016) (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).

[963] Declaratory relief is traditionally considered prospective. *See Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 31 (2010) (discussing declaratory relief as prospective); *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 676 n.6 (2010) (lawsuit "seeks only declaratory and injunctive—that is, prospective—relief").

KC 20428204.1

injunctive relief,[964] Plaintiffs need not show irreparable harm to obtain declaratory relief.[965] So long as the declaratory relief targets ongoing violations of the law, it is a proper equitable remedy under *Ex parte Young*.

Here, Plaintiffs seek a declaration that the KHP's practice of extending roadside detentions of motorists based in part on their travel to "drug source states" and without adequate reasonable suspicion violates motorists' Fourth Amendment rights to be free of unreasonable searches and seizures, and that practice results in ongoing constitutional violations under § 1983. Plaintiffs further seek a declaration that such a practice is inconsistent with prevailing Tenth Circuit law and the Fourth Amendment.

These declarations are prospective in nature and are an alternative form of relief sought by Plaintiffs throughout this case.[966] Plaintiffs are therefore entitled to declaratory relief as well.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to a permanent injunction and declaratory relief. Specific orders regarding this relief will be entered separately.

---

[964] *See supra* Conclusions of Law Section I.E.

[965] In *Steffel v. Thompson*, the Supreme Court held that the Court of Appeals erred in holding "that a failure to demonstrate irreparable injury—a traditional prerequisite to injunctive relief, having no equivalent in the law of declaratory judgments—precluded the granting of declaratory relief." 415 U.S. at 471–72 (citations omitted); *accord, e.g.*, *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992) ("Declaratory relief does not share injunctive relief's requirement of irreparable harm."); *Tierney v. Schweiker*, 718 F.2d 449, 457 (D.C. Cir. 1983) ("Although a party must demonstrate irreparable injury before obtaining injunctive relief, such a showing is not necessary for the issuance of a declaratory judgment."); *Woodruff v. Herrera*, No. CV 09-449 JH/KBM, 2014 WL 12727581, at *6 (D.N.M. Sept. 30, 2014) ("The Court left open the declaratory relief that Plaintiffs sought, but declined to award injunctive relief because Plaintiffs had failed to demonstrate irreparable harm.").

[966] Although there may be some overlap between injunctive and declaratory relief, and plaintiffs in civil rights cases often seek both, declaratory relief is still an important and independent—albeit "milder"—form of prospective relief. *See* Samuel L. Bray, *The Myth of the Mild Declaratory Judgment*, 63 Duke L.J. 1091, 1123–33 (2014).

KC 20428204.1

Respectfully submitted by,

**AMERICAN CIVIL LIBERTIES UNION**
**FOUNDATION OF KANSAS**
s/ Sharon Brett
Sharon Brett                          KS # 28696
Kunyu Ching                           *Pro Hac Vice*
10561 Barkley Street, Suite 500
Overland Park, KS 66202
Phone: (913) 490-4110
Fax: (913) 490-4119
sbrett@aclukansas.org
kching@aclukansas.org

**AMERICAN CIVIL LIBERTIES**
**UNION FOUNDATION**
Brian Hauss                           *Pro Hac Vice*
125 Broad Street, Floor 18
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
bhauss@aclu.org

and

**SPENCER FANE LLP**
s/ Madison A. Perry
Leslie A. Greathouse                  KS # 18656
Patrick McInerney                     KS # 22561
Madison A. Perry                      KS # 27144
Olawale O. Akinmoladun                KS # 25151
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Phone: (816) 474-8100
Fax: (816) 474-3216
lgreathouse@spencerfane.com
pmcinerney@spencerfane.com
mperry@spencerfane.com
wakinmoladun@spencerfane.com

*Attorneys for Plaintiffs*

166

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of May 2023, a copy of the foregoing was filed and served via the Court's electronic filing system on all counsel of record.

s/ Madison A. Perry
Attorney for Plaintiffs

167