## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Blaine Franklin Shaw, *et al.* | |
| Plaintiffs, | |
| v. | Case No. 6:19-CV-01343 |
| Herman Jones, in his official capacity as the Superintendent of the Kansas Highway Patrol, *et al.,* | |
| Defendants. | |
| Mark Erich, *et al.* | |
| Plaintiffs, | |
| v. | Case No. 20-CV-01067 |
| Herman Jones, in his official capacity as the Superintendent of the Kansas Highway Patrol, *et al.,* | |
| Defendants. | |

## DEFENDANT JONES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Findings of Fact

1. The Plaintiffs are Blaine Shaw ("B. Shaw"), Samuel Shaw, Joshua Bosire ("Bosire"), in Case No. 6:19-CV-01343, and Mark Erich ("Erich") and Shawna Maloney ("Maloney"), in Case No. 20-CV-01067.

2. Herman Jones is sued in his official capacity as the Superintendent of the Kansas Highway Patrol.

3. Plaintiffs' claim is:

   "Defendant Jones maintains a policy or practice of detaining drivers using state residency and innocent-travel indicia which violates the Fourth Amendment rights of Plaintiffs." Doc. 290, at 39.

4.  Plaintiffs seek injunctive and declaratory relief.

5.  The Kansas Highway Patrol ("KHP") is a state agency.

6.  The KHP is under the direction of the superintendent, who holds the rank of colonel. Colonel Herman T. Jones assumed that position April 3, 2019.

7.  KHP's State Troopers are certified law enforcement officers, pursuant to the Kansas Law Enforcement Training Act who enforce Kansas laws. These troopers have law enforcement jurisdiction throughout the state. Their daily responsibilities include performing traffic stops, providing emergency medical assistance, assisting motorists, investigating crashes, detecting and deterring criminal activity, and assisting other law enforcement agencies.

8.  There are approximately 440 KHP State Troopers.

9.  The KHP is organized into several divisions, and each are overseen by an executive commander. Each division or region is further divided by its geographical area of responsibility (known as a "troop") or its function. Each troop or functional group is overseen by a commander who holds the rank of captain. Administrative groups are overseen by a civilian director. Each troop is further divided into "zones" of one or several counties. Each zone is overseen by a field supervisor who holds the rank of lieutenant. Ex. 914a.

10. State Troopers receive 23 weeks of training at the Kansas Highway Patrol Training Academy ("KHP Academy") in Salina, Kansas.

11. The Kansas law enforcement training act created a commission on police officers' standards and training and a law enforcement training center, within the University of Kansas ("KLETC"). *See* K.S.A. 74-5601 *et seq.* The KLETC determines the curriculum and minimum hours of instruction for training of persons needed to obtain an active law enforcement certification. KHP troopers must have this certification.

12. The KHP Academy's curriculum includes instruction on an law enforcement officers' obligations concerning the United States Constitution's Fourth Amendment rights. The curriculum, among many other topics, also includes instruction on searches, seizures, consensual encounters and reasonable suspicion for post-traffic stop detentions.

13. Upon graduation from the KHP Academy, recruits begin sixteen weeks of field training with a veteran trooper (FTO). They ride along and observe a FTO for seven days, and then they have 70 working days of active training from the FTO.

14. Under Kansas statute and pursuant to KHP policy, beginning the second year after certification, every State Trooper is required to complete annually 40 hours of continuing law enforcement education or training ("in-service training") in subjects relating directly to law enforcement.

15. The KHP provides the annual in-service training to its Troopers. Attendance for some classes, such as legal updates, is mandatory. A smaller portion of the offered training is elective classes. The annual mandatory in-service includes instruction on recent or noteworthy legal decisions regarding constitutional issues pertaining to troopers' law enforcement activities.

16. Additionally, troopers are provided summaries, in updates, of noteworthy recent legal decisions about constitutional issues pertaining to their activities by email and/or on the KHP software called Power DMS.

17. The KHP also provides to its troopers a 34-hour class on advanced criminal interdiction at least once a year. Completion of the class is necessary for career advancement opportunities.

18. The Lieutenant front-line field supervisors frequently review the work of the troopers under their supervision. They conduct formal annual reviews. They review and approve all Kanas Standard Arrest Reports, Kansas Standard Offense Reports, Incident Narrative Reports and Vehicle Detention reports prepared by their subordinates. They have access to and review 15-day reports prepared by their troopers that outline the troopers' daily activities. They are required to watch a sampling (at least 3) of each of their supervised troopers' dash cam video/recordings each quarter.

19. These field supervisors are responsible to identify, correct and recommend appropriate discipline (subject to grievance processes) of any violation of KHP policy or training by their supervised troopers.

20. The KHP maintains written policies concerning its administration, communication, equipment, forms, operations and personnel. A copy of these policies is available to all troopers on-line. Policies applicable to troopers' day-to-day activities are provided and taught during academy training. Updated and new KHP policies are provided to troopers electronically as they are approved, through the KHP software, Power DMS. Troopers are required to read these policy changes and confirm that they have done so. Sometimes a few questions are tested on to confirm that troopers have read the changes.

21. KHP Policy Number ENF-01, Enforcement Guidelines, states "[t]he basic responsibility of an officer is to know the law." Ex. 902, ENF-01. KHP Policy Number ENF-07, Criminal Interdiction Traffic Enforcement, states:

   II. Policy

Officers are committed to the apprehension of criminals who use Kansas streets and highways in the furtherance of their criminal activity. Therefore, officers are encouraged to employ Criminal Interdiction Traffic Enforcement (CITE) procedures when, following a lawful traffic stop or other lawful encounter with the person(s), articulable suspicion exists to believe the person(s) is involved in criminal activity.
III. General provisions
***
B. Officers who are not trained in the application of criminal interdiction techniques should request the appropriate assistance when criminal activity is suspected. …
***
D. Officers shall take the appropriate steps to safeguard life and property while preserving the individual dignity and constitutional rights of everyone involved.
***

Ex. 903, ENF-07.

22. KHP Policy Number OPS-39 states, in part:

II. Policy
A. It is the policy of the Agency to conduct arrests, searches and seizures in compliance with the federal and state constitutions and state law. Members of the Agency must balance the constitutionally protected right to be free from unreasonable search and seizure, the evidentiary requirements of any given criminal case, and the need to protect the public and law enforcement officers. Stated guidelines can facilitate all interests.
***
Investigative Stop - A brief detention based on specific articulable reasonable suspicion that a crime is being, is about to be or has been committed. These detentions are justified by KSA 22-2402 and should only be long enough to either confirm or dispel the officer's concerns about the illegal activity. In order to confirm or dispel the officer's concerns he or she should use all reasonable investigative techniques and tools available at that time. These may include but are not limited to: holding the suspect for identification, using a canine to sniff for illegal substances, standardized tests or contact with dispatch or other law enforcement officers with relevant specialties. All detentions shall be based on the totality of the circumstances, which includes articulable reasonable suspicion and the individual officers training and experience.
***
B. Search and Seizure
***
6. Investigative Detention
a. A brief detention based on specific articulable reasonable suspicion that a crime is being, is about to be or has been committed. These detentions are justified by KSA 22-2402 and should only be long enough to either confirm or dispel the officer's concerns about the illegal activity. In order to confirm or dispel the officer's concerns he or she should use all reasonable investigative techniques and tools available at that

4

time. These may include but are not limited to: holding the suspect for identification, using a canine to sniff for illegal substances, standardized tests or contact with dispatch or other law enforcement officers with relevant specialties. All detentions shall be based on the totality of the circumstances, which includes articulable reasonable suspicion and the individual officers training and experience.

\*\*\*

C. Knowledge of Laws

Members of the Agency are expected to remain current in the knowledge of laws and judicial opinions as they apply to the issue of search and seizure. Whenever possible, the Agency will provide such updated information.

Ex. 905, OPS-39.

23. It is contrary to KHP's policy and training for troopers to (a) conduct or direct a canine sniff of a vehicle for drugs based solely on the trooper's belief that the driver is traveling to or from Colorado; (b) extend a vehicle stop and/or search a vehicle based only on a driver's travel origin or destination; (c) include the state citizenship as a permissible basis upon which to justify a detention and search of out-of-state motorists, and to detain motorists for nothing more than an out-of-state license plate.

24. While not an exhaustive listing, the KHP training includes instruction on the constitutional rights in traffic stops like:

"ONLY 4 COURT-RECOGNIZED POLICE CITIZEN ENCOUNTERS [are] 1. A 'CONSENSUAL ENCOUNTER' 2. A 'TEMPORARY DETENTION' 3. A 'SAFETY STOP' or 'COMMUNITY CARETAKING FUNCTION' 4. An 'ARREST'" [Legal Issues in Car Stops 2020, at bate stamped OAG000205. Also "Vehicle Stops – Legal Issues," Ganieany & Washburn (2021), at bate stamped OAG028886].

"Temporary Detention aka 'Terry Stop,' aka 'a car stop,' aka 'Investigative Detention,' aka a 'sidewalk detention;' requires reasonable suspicion to believe a crime has, is, or is about to be committed." [Legal Issues in Car Stops 2020, at bate stamped OAG000204].

"'Reasonable Suspicion' means a particularized and objective basis for suspecting the person stopped is involved in criminal activity. It is based upon the totality of the circumstances, and is viewed in terms as understood by those versed in the field of law enforcement. It is less than probable cause but more than a gut hunch." [Legal Issues in Car Stops 2020, at bate stamped OAG000202. Also "Vehicle Stops – Legal Issues," Ganieany & Washburn (2021), at bate stamped OAG028889].

"In making reasonable-suspicion determinations, reviewing courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. [ ] "This process allows officers to draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to

them that "might well elude an untrained person. [ ]" [2021 "4th Amendment Issues in Vehicle Stops," Luther Ganieany, at bate stamped OAG028567].

"REASONABLE SUSPICION FACTORS • Some carry more weight for court than others • Little weight: nervousness, drug route, food wrappers, a cellphone or pager • More weight: inconsistent stories of driver vs. passengers, an incomprehensible story, a rental car with renter not present, fly one way-drive back in rental, numerous air fresheners • Possible hidden compartment: tool marks, bondo, vehicle riding high or low, metal alterations not seen before in training/experience" [Legal Issues in Car Stops 2020, at bate stamped OAG000215].

"Indicators are seemingly innocent things heard, smelled, and/or observed during an enforcement encounter, including the contents of the vehicle, what was said, and the manner in which it is said, which when taken in there totality and compared with the innocent motoring public and traffic patterns of that particular geographical area, along with the officer's training and experience, show reasonable suspicion or probable cause that criminal activity is taking place." 2021 Advanced Interdiction, Troop N, at bate stamped OAG028421].

"Police may not extend an otherwise completed traffic stop, absent reasonable suspicion of criminal activity, in order to conduct a dog sniff." [Laws of Search & Seizure (2019), at bate stamped OAG001467; "Laws of Search & Seizure" (2021) at bate stamped OAG028754].

"You CANNOT detain a vehicle or its occupants absent reasonable articulable suspicion. THIS IS ILLEGAL!!!!" 2021 Advanced Interdiction, Troop N, at bate stamped OAG028440].

"If you 'measurably extend' the traffic stop without additional reasonable suspicion to believe there was 'other criminal activity,' any consent you get is invalid." [Laws of Search & Seizure (2019), at bate stamped OAG001465. Also "Laws of Search & Seizure" (2021), at bate stamped OAG028752].

Ex. 901, at the bates pages noted.

25. The Tenth Circuit's 2016 decision in *Vasquez v. Lewis* decision is now discussed in KHP's training. For example:

"EXTENDING THE STOP: INDICATORS

- Drug corridor / travel to or from a source or destination city for narcotics illegal in Kansas.
  - "that the defendant was traveling from a drug source city–or a drug source state–does little to add to the overall calculus of suspicion." The Court in *Vasquez* found that this factor was so "broad as to be indicative of almost nothing." *Vasquez v. Lewis*, 834 F.3d 1132, 1137 (10th Cir. 2016).
  - It is wholly improper to assume that an individual is more likely to be engaged in criminal conduct because of his state of residence, and thus any fact that would inculpate every resident of a state cannot support reasonable suspicion." *Vasquez* at 1138 (10th Cir. 2016).

Ex. 90 at OAG29212. See also, Ex. 901, at OAG28580 *et seq.*

However, even before the *Vasquez* decision was rendered, KHP troopers' training had established that the reasonable suspicion required to extend a traffic stop was not supported by (a) a driver's travel origin or destination alone; (b) a drivers' state citizenship or (c) nothing more than an out-of-state license plate.

26. Not at all contrary to this, troopers are trained that they may inquire about travel plans, either while multi-tasking during the course of a stop or in a consensual encounter. They are trained, depending upon the totality of the circumstances, the occupant(s)' travel plans—for example implausible travel plans; travel to or from a drug source when combined with other factors and evasiveness or dishonesty about travel in some instances—can produce objective, commonsense judgments and inferences that criminal conduct is present.

27. Troopers testified that the *Vasquez* decision did not alter their practices because they have not relied on the state of vehicle's registration (i.e., the state issuing the license plate) or the driver's state of residence in the reasonable suspicion calculus. KHP Lt. J. Doug Rules' email comment, which discussed a then recent Utah federal district court decision, explained:

> In my opinion the [Utah] trooper made a big mistake saying he was interested in the truck because it had California plates (***a license plate is never a factor for a traffic stop***) and failed to articulate any reasonable suspicion before calling for a dog.

> And the trooper made a big mistake when he testified to the fact the truck having California plates was what sparked his interest. Remember, ***we work an interstate highway which has cars coming from all over the county and we never do anything because of tag or race***.

Ex. 101 (emphasis supplied).

28. It is contrary to KHP policy and KHP training for KHP troopers to block a detained vehicle from safely re-entering traffic after a traffic stop has or should have ended. In the KHP's training, the so-called trooper "two step" maneuver does not block the detained vehicle from safely re-entering traffic or other coercion. Instead, it is described, in training, as the "Columbo Gambit" and a "[b]rief break in the conversation often signified by a re-engagement and a request to speak to said suspect." [Legal Issues in Car Stops 2020, at bate stamped OAG000241-44; Reasonableness is the touchstone of the Fourth Amendment (2018), at bate stamped OAG014239] The maneuver is to help establish any consent to additional conversation or extension of a stop or a search is consensual. Per the KHP training materials, the "trooper two step" is not prohibited, but "not necessary." [Reasonableness is the touchstone of the Fourth Amendment (2018), at bate stamped OAG014239]. The materials stress consent must be knowingly, intelligently, and

7

voluntarily made. ["Vehicle Stops – Legal Issues," Ganieany & Washburn (2021), at bate stamped OAG028924; Laws of Search & Seizure (2019), at bate stamped OAG001381]. They explain, "Consent must always be all of the following: — Knowing — Intelligent — Voluntary." ["Laws of Search & Seizure" (2021), at bate stamped OAG028672]. 2021 training at the KHP Academy explains:

Traffic Stops
- Voluntary encounters after a traffic stop get tricky.
  – You must have a sufficient break in time between the enforcement encounter and the consensual encounter.
  – Trooper Two Step is NOT ENOUGH by itself to purge the taint of the coercive nature of the traffic stop.

Traffic Stops
- Voluntary encounters after a traffic stop:
  – Factors that may render the contact non-consensual:
    • You did not return all the driver's documentation.
    • You have gone straight from the traffic stop to the consensual encounter without a sufficient break.
    • Your tone of voice is accusatory.
    • You are still in your patrol car.
    • You have made physical contact with the vehicle or subject.

Traffic Stops
- Whether a consensual encounter after a traffic stop is valid depends on whether a reasonable person would have felt free to leave.
- This is judged on the totality of the circumstances standard.

["Laws of Search & Seizure" (2021), at bate stamped OAG028756-58. Among the factors listed in the training that would show lack of consent is "an attempt to control the ability to flee" [Reasonableness is the touchstone of the Fourth Amendment (2018), at bate stamped OAG014238], "[p]hysical contact with the person by an officer" [Laws of Search & Seizure (2019), at bate stamped OAG001462], "[t]ouching, leaning on or into the vehicle" [Legal Issues in Car Stops 2020, at bate stamped OAG000243], "officer touching the vehicle when asking for consent" [2021 Advanced Interdiction, Troop N, at bate stamped OAG028445], "some physical touching by an officer" [2021 "4th Amendment Issues in Vehicle Stops," Luther Ganieany, at bate stamped OAG028608], "Physical contact with the person by an officer," [Laws of Search & Seizure" (2021) at bate stamped OAG028750].

Ex. 901 at the bates pages noted.

29. There is no evidence that KHP troopers fail to follow their training that consent must be knowingly, intelligently, and voluntarily made--in a "two-step" maneuver or otherwise.

30. Under KHP Policy ENF-07, entitled "CRIMINAL INTERDICTION TRAFFIC ENFORCEMENT":

KHP officers "are committed to the apprehension of criminals who use Kansas streets and highways in the furtherance of their criminal activity."

Interdiction processes are for "the pursuit, detection, and apprehension of persons engaged in criminal activity."

Ex. 905.

31. KHP interdiction is not the classic pretextual traffic stop. The purpose of the stop is to address a traffic infraction, but troopers are asked to "look past the traffic violation(s) for indications of criminal activity." In this sense, the Erich stop [discussed below] is the exception, where the trooper considered the older model RV's early morning travel something that he wanted to investigate if he observed a traffic infraction.

32. KHP trains its troopers that for them to be successful in interdiction that the troopers must "[b]e able to look past the traffic violation(s) for indications of criminal activity" and "[m]ust make high volume traffic stops." Ex. 901 at OAG28402.

33. This recognizes that generally traffic stops do not involve a motorist engaged in criminal activity. So, to increase the probability of detect and apprehend the criminals, more contacts with motorists is needed.

34. That said, the KHP troopers conducted approximately 1 million traffic stops between June 2016 and August 2021. The number of traffic stops was estimated as 200,000 or 300,000 annually. About 1000 canine sniffs were conducted in post-traffic stop detention in 6 years that Plaintiffs' expert reviewed. In sum, the best evidence is that canine sniffs during post-stop detentions account for less than ¼ of 1 percent of KHP traffic stops.

35. The KHP maintains a Professional Standards Unit ("PSU") which serves as an impartial fact-finding unit whose primary purpose is to safeguard and enhance the integrity of the agency. The unit receives and processes complaints against agency employees or procedures, ensuring employees are afforded due process, to ensure uniformity in their application, and identifying training and supervisory needs. Ex(s). 90 & 914a.

36. PSU's primary function is to investigate serious allegations of misconduct involving agency employees. PSU is also responsible for monitoring the progress of all agency complaint investigations to ensure the efficient and timely completion of reports. Ex. 90.

37. Any citizen or Patrol employee may present a complaint to PSU. Complaints may be made in person, in writing, by email, or by telephone. Information about to whom and how to make a complaint is publicly available through a general inquiry with KHP and on the KHP website at https://www.kansashighwaypatrol.org/233/Professional-Standards-Unit. However, all KHP employees are required to accept a complaint if a

supervisor is not immediately available to do so. All complaints then are forwarded to the PSU at General Headquarters in Topeka for appropriate action. Investigators contact the complainant (unless the complaint is anonymous), the accused employee, and witnesses; examine physical evidence; review reports and records; and document the facts surrounding the incident. The investigator's report is provided to the PSU commander, where it is reviewed for completeness and objectivity, and then forwarded to the assistant superintendent for review. The Superintendent ultimately reaches any conclusions about the accused employee's conduct and writes a letter to the complainant summarizing the results of the investigation. Disciplinary action is initiated when deemed appropriate, but is considered a confidential matter and is not to be disclosed to the complainant. Ex. 90.

38. Plaintiffs present evidence regarding six traffic stops where the motorists were detained for a canine sniff. The stops are

| Date | Stop/Detention | Passage of Time[1] |
|------|----------------|----------------|
| 12/20/2017 | Plaintiffs Blaine and Samuel Shaw | 5 years, 5 months, 6 days |
| 3/9/2018 | Plaintiffs Mark Erich and Shawna Maloney | 5 years, 2 months, 17 days |
| 2/10/2019 | Plaintiff Joshua Bosire | 4 years, 3 months, 16 days |
| 5/27/2020 | Daniel Kelly | 2 years, 11 months, 29 days |
| 2/5/2021 | Suzanne Dunn | 2 years, 3 months, 21 days |
| 9/5/2022 | Curtis Martinez | 8 months, 21 days |

39. Each of the Plaintiffs' stops/detentions predate Defendant Jones becoming the KHP's Superintendent, on April 3, 2019.

40. On December 20, 2017, KHP Master Trooper Doug Schulte stopped a minivan traveling 91 miles per hour in the 75 miles per hour zone westbound on I 70. B. Shaw was driving. Schulte issued a speeding citation; B. Shaw acknowledged he was speeding and paid the fine. Samuel Shaw was a passenger. After the traffic stop was complete, Schulte detained the Shaws for a canine sniff of the minivan.

41. Schulte asserted that he had reasonable suspicion to detain the Shaws for a canine sniff of their vehicle from the following:

(1) B. Shaw did not timely pull over.
(2) B. Shaw had a criminal history for felony intent to sell narcotics.
(3) The minivan was registered to someone other than B. and Samuel Shaw and was traveling on I 70, a known corridor to drug sources in Colorado.

---

[1] As of May 26, 2023.

(4) The minivan was crammed full of stuff, with a lived-in look, suggesting the hard travel characteristic of drug traffickers.

(5) Schulte found that Samuel Shaw was acting suspiciously because he refused to look at Schulte (looking forward only).

Ex. 4.

42. Schulte did not physically interfere with Plaintiffs' departure when B. Shaw consented to a very short conversation after Schulte handed to B. Shaw and explained a ticket for speeding, returned B. Shaw's license and proof of insurance, said "have a safe trip and drive safely." Schulte started walking back to toward his patrol vehicle, but returned to side of the vehicle after seeing B. Shaw had put the van into "drive." Before fully returning to stand before the driver side front window and while separated from the van by approximately 2 feet, Schulte asked if Shaw would answer some questions. Shaw readily agreed to answer the questions. However, when Schulte asked permission to search the van, Shaw refused the request.

43. On February 8, 2023, a jury found Schulte lacked the reasonable suspicion to detain the B. Shaw for a canine sniff and, as such, the detention violated B. Shaw's Fourth Amendment rights. It found B. Shaw suffered nominal damages of $1. Doc. 438.

44. On February 10, 2019, KHP Technical Trooper Brandon McMillan stopped Joshua Bosire for driving 82 miles per hour hour zone eastbound on I 70 about 5 miles west of Hays, Kansas. Bosire was driving a rented Nissan Altima. After the traffic stop was complete, McMillan detained Bosire for additional questioning and then for a canine sniff of the Altima.

45. McMillan asserted that he possessed reasonable suspicion from the following:

(1) McMillan and another trooper smelled a marijuana odor at a Love's Travel Shop in Ellis, which they believed might be associated with a rented Altima at the Travel Shop's gas pumps.

(2) The troopers saw the Altima had a mounted camera in the back; The Altima and vehicle that the trooper thought was a rental left Love's about the same time.

(3) Then about ten minutes later, after McMillan pulled over an Altima for speeding, he confirmed it was the Altima from Love's. McMillan did not smell the marijuana odor, but thought the Altima might be "caravanning" with the other vehicle seen leaving Love's.

(4) During the traffic stop, McMillan saw the two cameras mounted in the rental car and McMillan knew drug traffickers use surveillance cameras to facilitate caravanning, discourage a law enforcement stop, and confirm a "hired" driver appropriately transports drugs or narcotic cash.

(5) The Altima was a short-term rental. McMillan knew drug traffickers frequently use short-term rentals to transport drugs or narcotic funds.

(6) Bosire did not fully roll down his window and there was a partially covered notebook in the back of the rental car that appeared to be a ledger which drug transporters use.

(7) Bosire would only say he was traveling from the West going East, which McMillan found atypical and evasive.

(8) McMillan's suspicions were heightened in questioning immediately after the traffic stop should have concluded. McMillan believed that Bosire had not honestly answered his questions about the second man at Love's and the cameras in the rental car.

Ex. 9.

46. McMillan did not ask Bosire to enter into a consensual encounter. McMillan did ask Bosire if he would permit a search of the rental car, but Bosire refused the request.

47. On April 27, 2023, McMillan lacked the reasonable suspicion to detain the Bosire for a canine sniff and, as such, the detention violated his Fourth Amendment rights. It found that Bosire suffered compensatory damages of $20,163.70 and that punitive damages against McMillan were warranted in the amount of $20,000. Doc. 438.

48. On March 9, 2018, at 5:41 a.m., KHP Master Trooper Justin Rohr stopped an east bound Winnebago Chalet on I 70, at mile marker 226, for driving on and over the [shoulder's] fog line. Mark Erich ("Erich") was driving. Erich was given a warning citation. After the traffic stop was complete, Rohr detained Erich and his passenger for a canine sniff of the Winnebago. *Id.*

49. Rohr asserts a particularized and objective basis for suspecting legal wrongdoing from the following:

(1) Walking to the vehicle after it pulled over, Rohr smelled an odor of very recently applied fresh paint or bondo at the rear of the Winnebago where spare tires are frequently mounted and where it appeared that the vehicle had been painted over with white paint to potentially conceal a hidden compartment. Rohr's partner confirmed the presence of fresh white paint or bono by touching the RV and seeing a white substance on his hands from the RV.
(2) Erich said he had recently purchased the older model Winnebago Chalet. Rohr's training and experience was hidden compartments are frequently added by smugglers to older model, recently purchased, larger vehicles to transport illegal drugs.
(3) It was early in the morning and still dark. Rohr's training and experience is that people trafficking illegal narcotics will sometimes travel early morning or late night in an attempt to avoid law enforcement because the fewer law enforcement is out.

(4) After inquiring about the fresh paint/bondo smell, Rohr did not find credible the driver's and passenger's denial of knowledge of the obviously recently applied paint or bondo. In particular, Rohr saw white paint on Mr. Erich's hand suggesting he had done the painting and was not being honest.

(6) Erich and his passenger wife said that they were traveling from Colorado to Alabama, which added circumstances consistent with Rohr's suspicions because Rohr believed Colorado was a source state for illegal narcotics at the time. Although this, according to Rohr, was not the sole factor in his reasonable suspicions.

50. That the RV had a Colorado temporary plate was not one of the things that led to Rohr's suspicions to detain the Winnebago. The fact the RV was registered in Colorado was also not a factor in Rohr's reasonable suspicion calculus.

51. Rohr had the required reasonable suspicion for a canine sniff of the RV.

52. The canine alerted to the odor of narcotics. The RV was searched, but the source of the odor was not located.

53. On May 27, 2020, KHP Trooper James McCord stopped an east bound rented Nissan for following another vehicle too closely on I 70, near mile marker 192. Daniel Kelly ("Kelly") was driving. Only a warning citation was provided. After the traffic stop was complete, McCord detained Kelly for a canine sniff of the rented Nissan.

54. The dash cam video does not show Kelly's non-verbal response, but Kelly apparently agreed to answer a few questions posed by McCord. However, Kelly refused to give McCord consent to search of the Nissan.

55. McCord asserts a particularized and objective basis for suspecting legal wrongdoing from the following:

   (1) Kelly's extreme and persistent nervousness. Kelly's hands were trembling and he was bouncing his right leg. McCord described the expression on his face as a "nervous smile." These behaviors continued, before the detention, even after McCord told Kelly he was only receiving a warning.

   (2) Kelly's criminal history. Dispatch reported that Kelly's criminal history showed multiple entries for possession of narcotics with the intend to distribute and weapons violation for having a saw-off shotgun. Kelly was 32 years old at the time.

   (3) According to McCord, Kelly's explanation for his travel, in a rented vehicle, to Shawnee, Kansas from California, to transport his niece or nephew back to California, was implausible.[2]

---

[2] Kelly's travel plans were not implausible from in any objective sense. This "factor" is entitled to very little or no weight in the reasonable suspicion determination.

56. McCord had the required reasonable suspicion for a canine sniff of the Kelly's rented vehicle, exclusive of his subjective suspicion about Kelly's travel plans.

57. The canine alerted to the odor of narcotics. A search located marijuana vape pen, with a battery under the front passenger seat in the rented vehicle. Kelly said they were not his and agreed that the troopers could get rid of them.

58. On February 5, 2021, KHP Trooper Chandler Rule stopped a west bound rented Mercedes on I 70, near mile marker 340, for driving for speeding and failing to drive in right lane on 4-lane highway. Suzanne Dunn ("Dunn") was driving. Only warning citations were provided. After the traffic stop was complete, Dunn consented to a canine sniff of the rented vehicle at Rule's request.

59. Dunn knowingly, intelligently and voluntarily consented to the canine sniff. She thought she was being polite and respectful to law enforcement.

60. A canine alerted to the odor of narcotics. The rental was searched, but the source of the odor was not located.

61. Rule did not detain Dunn after the traffic stop had concluded from his suspicions. There is no evidence that he would or would not have detained her if she had refused the canine sniff. However, Rule articulated a particularized and objective basis for suspecting legal wrongdoing from the following:

    (1) Dunn's implausible travel plans. Dunn claimed to be driving across county (1,677 miles), to Denver, to pick up a van. Rule developed the one-way rental car expense was about $1,000, which he knew is substantially more than the cost to ship the van to Dunn's home in Arlington. Dunn claimed to be at high risk to Covid-19 as to why she did not fly to out to pick up the RV. However, paying for the RV's shipment would have avoided any Covid-19 exposure.
    (2) Traveling alone with inclement weather coming.
    (3) Traveling to known narcotics distribution hub (Denver).[3]

62. On September 5, 2022, KHP Lieutenant Scott Proffitt stopped an east bound Chevy which had been speeding on I 70 near mile marker 319. Curtis Martinez ("Martinez") was driving. After the traffic stop was complete, Proffitt detained Martinez for a canine sniff of the Chevy.

63. Proffitt had been west bound on I 70 when his radar indicated two east bound vehicles were speeding, the Chevy Cruze was going the fastest of the two. Proffitt could tell the driver of the Chevy saw Proffitt's patrol vehicle as did he U-turned in the median to pursue the speeding vehicles. The Chevy driven by Martinez

---

[3] It is not clear if Rule felt Dunn's level of nervousness was suspicion. But the nervousness he described and his reliance on Denver as a narcotic hub would have been entitled to little, if any, weight in the reasonable suspicion calculus.

immediately took an exit off I 70 to elude Proffitt, Exit 322. The Chevy travelled north (turning left) through a tunnel under I 70 immediately after taking the exit. This maneuver showed an intent to avoid the patrol car Martinez would have seen turning around on I 70 before Martinez took the exit. If Martinez was looking for place to relieve" himself, he would have turned south (turning right), relieved himself and traveled back onto the eastbound lanes to the highway.[4]

64. Exit 322 leads to Tall Grass road, which is a gravel, mostly one-lane road. There is no signage displaying an amenity at the exit. In fact, there are no buildings near the exit to the farming road. However, Proffitt knew a few miles to the west on I 70, where the Chevy had come from, there were several Junction City exits that had public restrooms. Proffitt also knew a sign on east bound I 70, located about a mile west of marker 319, reported a public rest stop was only a few more miles ahead after the Exit 322.

65. While up by the Chevy for the first time, after Proffitt told Martinez that the Exit 322 was not he was used to people taking, Martinez said he was looking for a bathroom. Proffitt, correctly so, believed Martinez's statement was not truthful. Martinez also denied he had been speeding. Proffitt knew Martinez was again being untruthful.

66. Also, while up by the Chevy for the first time, collecting information during the traffic stop, Martinez said the Chevy was his wife's. Martinez said his wife's name was Samantha. The insurance information Martinez showed Proffitt gave a different first and last name. Martinez said the insurance was in his mother-in-law's name. Martinez could not provide the current registration to the vehicle, he said they had just received new tags and the paperwork was at home. An old registration, Martinez provided Proffitt, showed that it was expired as of October 2021 and gave the owner's name as Samantha with a last name that was different from "Martinez." During this encounter, Proffitt saw Martinez's wallet had an image of "El Chapo," who is notorious drug cartel leader. During this first encounter, Proffitt felt that Martinez and his passenger were being aggressively argumentative and were attempting to bully or intimidate him into ending the stop.

67. Back at his patrol vehicle, Proffitt requested and received information about Martinez and the Chevy's registration. Martinez's criminal record was clear, but there was no new registration. Apparently Martinez had not been truthful about the renewal.

68. Returning to the Chevy, Proffitt returned paperwork, issued a warning for speeding and a citation for expired registration, explained the citation, and asked Martinez if he had any questions. Martinez did not have a question. Proffitt said "have a safe one," turned and walked back toward his patrol vehicle. But as Martinez started to pull away–the car moving forward a few feet–Proffitt walked back to the side of driver's side front window and, while standing a few feet away, asked "can I ask you

---

[4] Neither Martinez nor his passenger asked about relieving themselves during the detention for a dog sniff or during the search of the vehicle.

something." Martinez said yeah. Then after a few quick questions and Proffitt having stated "you guys turning off is overly suspicious," Proffitt requested consent to search the car. The consent was denied.

69. Proffitt asserts a particularized and objective basis for suspecting legal wrongdoing from the following:

(1) The Chevy immediately took an exit off I 70 to nowhere to elude Proffitt. Proffitt experience is such motorists have usually been doing something illegal.

(2) Martinez was untruthful about the reason he took the exit [there was nothing near the exit to that would lead a motorist to think there was a bathroom] and in his denial of speeding and about his speeding and the supposed new tag/registration. These untruths suggested that he was trying to hide illegal activity.

(3) Uncertainty, about Martinez's alleged relationship to the owner of the Chevy which could not be confirmed from the information provided to Proffitt. Drug traffickers frequently use non-owned vehicles.

(4) The El Chapo wallet. Proffitt's training and experience is drug traffickers will carry items showing affiliation or sympathy with notorious criminals like Joaquin "El Chapo" Guzmán.

(5) The behavior of Martinez and his passenger which was bullying and apparently intended to intimidate Proffitt suggesting they had something illegal in the vehicle and wanted to stop any investigation or his questioning that might lead him to find it.

70. A Sheriff county's canine alerted to the odor of narcotics. The Chevy was searched and a green vegetation residue in a cupholder was pin pointed as the probable source of the canine's alert.

71. In summary, the articulated suspicions for the canine sniffs presented in Plaintiffs' case are all very different.

| Articulated Suspicions | Stops |
|---|---|
|  |  |
| Bullying | Martinez |
| Criminal history regarding drugs | Martinez, Shaw |
| Early morning or overnight travel | Erich |
| El Chapo wallet | Martinez |
| Evasive answers regarding travel | Bosire |
| Extreme nervousness, even after told only a warning | Kelly |
| Failure to fully roll down car window | Bosire |
| Failure to promptly pullover | Shaw |
| Implausible travel | Dunn*, Kelly |
| Non-owned vehicle | Shaw |
| Older model RV | Rohr |
| Lived-in appearance | Dunn, Shaw |
| Passenger would not look at trooper and said nothing | Shaw |

| | |
|---|---|
| Possible caravanning | Bosire |
| Possible hidden compartment in area of new paint or bono | Erich |
| Possible drug ledger in vehicle | Bosire |
| Questionable relationship to vehicle owner | Martinez |
| Quick exit to elude law enforcement | Martinez |
| Smell of marijuana at rural convivence store where driver had been | Bosire |
| Surveillance cameras in rental | Bosire |
| Travel from Colorado and/or on drug corridor | Erich |
| Travel to Denver and/or on drug corridor | Dunn, Shaw |
| Unique rental | Bosire, Dunn |
| Untruthful or believed to be untruthful responses to questions | Bosire, Erich, Martinez |
| | |
| ***Colorado or other particular state license plate*** | ***NONE*** |
| ***Colorado or other particular state residency**** | ***NONE*** |

72. No evidence was presented any KHP trooper searched a vehicle from consent provided by the vehicle's driver after a "two-step" or similar encounter.

73. No evidence was presented of a court's suppression of evidence recovered in a road-side search of a vehicle by a KHP trooper, except in Lt. Greg Jirak's deposition testimony regarding *U.S. v. United States v. Jurado-Vallejo* [misspelled in the transcript *"Gerardo Vallejo"*] (Jirak Depo, p. 127). Jirak testified that the district court's suppression, ruling predicated on the validity of consent Jirak used incorrect Spanish words to secure the consent, was overruled by the appellate court.[5]

74. No evidence was presented of an incident where a KHP trooper asserted reasonable suspicion required to extend a traffic stop was supported by (a) a driver's travel origin or destination alone; (b) a driver's state citizenship or (c) nothing more than an out-of-state license plate.

75. No evidence was presented of an incident where a KHP trooper extended a traffic stop on the basis of (a) a driver's travel origin or destination alone; (b) a driver's state citizenship or (c) nothing more than an out-of-state license plate.

76. The only evidence of a complaint made to PSU about any traffic stop was a complaint by Bosire about the February 10, 2019 stop/detention described above. PSU comprehensively investigated the complaint. The investigation's findings and PSU's recommendations were presented to Defendant Jones. Jones found that McMillan had violated KHP policy by detaining Bosire for a canine sniff. McMillan was given an hour of one-on-one training by a KHP lawyer and was required to spend a ½ day

---

[5] *See United States v. Jurado-Vallejo*, 380 F.3d 1235, 1237 (10th Cir. 2004) (remanded for findings regarding probable cause for the search from evidence of a hidden compartment).

patrolling with a lieutenant. Jones felt this adequately assured that McMillan would not repeat his policy violation.

77. Major Mitchell Clark believes that KHP employees may be reluctant to present complaints about other employees to PSU. However, no evidence was presented that KHP employees are or were aware of incidents where KHP troopers have improperly or unconstitutionally detained motorists without their voluntary consent, required reasonable suspicion or probable cause.

78. Professor Jonathan Mummolo testified to opinions that a higher percentage of out-of-state motorists are stopped by KHP troopers relative to Kansas motorists and that out-of-state drivers are disproportionately searched (subject to a dog sniff). These opinions are all a comparison of a baseline or benchmark ratio of in-state to out-of-state drivers that Mummolo expected to have been traveling on I 70, based on mobile-phone data, against KHP's data pertaining stops/detentions on the highway. To establish his baseline, Mummolo used the mobile-phone data collected by a private vendor, SafeGraph. This data concerns phone usage at business within ¼ mile of I 70, whether the businesses are directly accessible to I 70 or not. The SafeGraph data is inadmissible hearsay. Mummolo acknowledged that he was not aware of anyone who had used the mobile-phone data to form expert opinions concerning the make-up of traffic on a highway near the businesses where the mobile-phone data supposed to have been collected. This data is not the kind that statistic experts use in forming opinions on the subject of the characteristic of drivers on highways. *Cf.* Fed. R. Evid. 703. Accordingly, Mummolo's opinions, which are based on the comparison of the mobile-phone data baseline, should not have been admitted and they are not considered by this Court.

79. Furthermore, Prof. Mummolo's opinions about higher percentage of out-of-state motorists stops and detentions are not relevant to whether troopers had the required reasonable suspicions to stop and detain motorists or to whether troopers violated motorists' Fourth Amendment rights. This case does not involve a denial of equal protection claim. Plaintiffs' claim that their right to travel is abridged has been dismissed, as without legal merit.

80. However, Prof. Mummolo also conducted an "outcome" analysis. This was his only opinion which did not rely on the SafeGraph data, relying instead on review of KHP reports and digiTicket citations. He claimed that the analysis could address whether troopers applied a different level of reasonable suspicion to out-of-state motorists when the trooper's detained motorists for canine dog sniff. He concluded there was no statistically significant difference among in-state and out-of-state drivers between the rates that drugs are discovered after a canine alert. He testified this disputed a claim that troopers apply lower standard for reasonable for reasonable suspicion to out-of-state drivers.

81. Hassan Aden testified:

- KHP does not effectively train its troopers on changes or developments in the relevant constitutional matters.
- KHP's policies addressing stops, searches, seizures and arrests are insufficient.
- KHP's unity command (supervisors working the same shift and areas as supervised troopers) is less than optimal and Jones lacks awareness of data that might inform him of problematic patterns and trends.
- KHP fails to hold troopers accountable to policies and laws pertaining to search and seizures carried out by KHP troopers.

82. Aden claims that his opinions were based upon "national police practices," but these alleged practices are not published and are really Aden's opinions on best practices. Aden acknowledged may, if not most, law enforcement agencies do not follow the practices he recommends.

83. Defendant objected to Aden's opinions on the basis that they are neither reliable, nor helpful. See Fed. R. Evid. 702. After considering the matter, the Court agrees. It has not accepted any of Aden's opinions in reaching the judgment in this case.

84. Moreover, the grounds for Aden's opinions all concern past, antidotal behaviors. They are not relevant to whether Jones is or will be violating motorist's Fourth Amendment rights or whether Jones is the cause of any hypothetical violation of motorist's Fourth Amendment rights by troopers.

85. Aden was not critical of the content of KHP's training regarding the Fourth Amendment issues in this case. Aden's limited training opinion concerned only a claimed failure to immediately provide updated training on the Tenth Circuits' *Vasquez v. Lewis* decision before Defendant Jones was KHP's Superintendent. No evidence was presented of a recent decision, after *Vasquez*, that required updated training. Aden does not criticize the current training on the *Vasquez* decision.

86. Aden's supervision opinions are mostly that Jones delegates too much supervision to frontline supervisors and KHP had not collected data regarding the ground for reasonable suspicion justifying a roadside detention for a canine sniff when there has been no arrest or forfeiture.

87. Plaintiffs presented no evidence of how Jones delegation causes or contributes to present or future Fourth Amendment violations by KHP troopers. Even for a historical perspective, there was not testimony that supported a different level of Jones' involvement in day-to-day supervision would have had any effect on the six detentions referenced in the testimony. The import of changed supervision is speculative, just as it is speculative that there will be future illegal detentions based upon the using state residency and innocent-travel indicia.

88. As of September 2022, KHP collects and analyzes the data that Aden asserted should have been collected before. Ex. 905. Troopers must complete a report that reports the basis of their reasonable suspicions to detain a motorist for a canine sniff. The report

is reviewed and analyzed for compliance with the policies requiring compliance with the Constitution's Fourth Amendment and other requirements by frontline supervision, PSU and Trooper N [the Interdiction troop].

89. However, Plaintiffs presented no evidence of how the earlier practice that did not require reports when there was no arrest or forfeiture caused or contributed Fourth Amendment violations by KHP troopers. There is no evidence of trend or practice that troopers are violating their training and KHP policies which the report might discover.

90. Aden's opinion that frontline supervisors fail to review, analyze and respond if issues are observed regarding the reports provided by their subordinates about roadside detentions is based on his misunderstanding of Lt. Rohr's testimony. Rohr testified that his canine deployment reports [which generally do not list the reasonable suspicions of other troopers] were generally reviewed by and given only grammatical correction by his former supervisor. This is no evidence that Rohr's supervisor did not also evaluate the substance of the report regarding Rohr's compliance with KHP policy and training. There is no evidence that any of Rohr's canine reports showed Rohr needed correction or discipline.

91. Aden's opinion on accountable is that McMillan should have received discipline, not just corrective training. There is no evidence that McMillan or any other trooper have filed or will fail to comply with KHP policy and training because of McMillan was not brought more to account for Bosire stop/detention. Only a few individuals with the KHP even knew about Jones' response to Bosire's complaint. There is no evidence, therefore, that the response to McMillan is viewed by troopers as insufficient so as to encourage and not deter other from similar misconduct.

92. There is no evidence that troopers fail to follow their training that consent must be knowingly, intelligently, and voluntarily made--in a "two-step" maneuver or otherwise.

Conclusions of Law

A. *Plaintiffs Lack Standing*

1.      Where a case proceeds to trial, standing is evaluated on basis of evidence in the record. At this stage, a plaintiff must do more than plead standing, the plaintiff must prove it. *Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 973 (10th Cir. 2020), *Glover River Org. v. U.S. Dep't of Interior*, 675 F.2d 251, 254 n. 3 (10th Cir. 1982).

2.     Abstract injury is not enough to confer standing: "(t)he injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). Thus, a plaintiff cannot sustain a claim for prospective injunctive relief that is based on "speculative future harm." *Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019). *See also Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 924 F.3d 375, 396 (7th Cir. 2019) ("Without a 'showing of any real or immediate threat that the plaintiff will be wronged again,' [ ], [plaintiff] lacked standing to request, and the district court lacked jurisdiction to award, the declaratory judgment and permanent injunction").

3.     Plaintiffs are unable to establish standing to pursue injunctive relief because they cannot show it is likely that they will have another encounter with a KHP trooper ***that results in an unconstitutional detention*** because of Jones' conduct.

4.     The reasoning in *Allee v. Medrano*, 416 U.S. 802, 815-16 (1974), *Rizzo v. Goode*, 423 U.S. 362 (1976), and *City of Los Angles v. Lyons*, 461 U.S. 95, 97-98 (1983), is controlling. Plaintiffs have abandoned their claims that Jones directs or requires constitutionally conducted post-traffic stop detentions. There is no evidence of widespread police misconduct, and certainly less than the pattern of misconduct that the Supreme Court found was required to provide standing in *Allee*, *Rizzo* and *Lyons*. Furthermore, there is no evidence of a prevailing and persistent pattern that troopers systematically detain people without reasonable suspicion or voluntary consent because of a policy or custom attributable to Jones.[6]

5.     In *Allee v. Medrano*, 416 U.S. 802, 815-16 (1974), the Supreme Court upheld a permanent injunction restraining further unconstitutional conduct by various Texas state law

---

[6] In fact, Plaintiffs now assert that the "policy or custom" analysis is inapplicable to their claim for equitable relief.

enforcement officials who had unlawfully threatened, detained, confined, and physically assaulted union leaders engaged in organizing efforts. *Id*. at 804-05. In affirming the district court's injunction, the Supreme Court found that the constitutional violations "were not a series of isolated incidents but a prevailing pattern" of police misconduct. *Id*. at 809. The Court also stated: Isolated incidents of police misconduct under valid statutes would not, of course, be cause for the exercise of a federal court's equitable powers. But …. [w]here, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate. *Id*., 416 U.S. at 815.

6.      *Rizzo v. Goode*, 423 U.S. 362 (1976), expanded upon the isolated incident/persistent pattern distinction. In *Rizzo*, equitable relief was granted by the district court in an effort to halt instances of police brutality directed at minority citizens. The injunction issued by the district court ordered police officials to submit for approval a comprehensive program for dealing with civilian complaints alleging police misconduct. *Id.* at 365. The Supreme Court held that 16 to 20 constitutional violations in a year's time, by only a small percentage of the police, did not warrant injunctive relief. *Id.* at 367-69. While not resting on its holding on lack of case or controversy, the Court's reasoning expressed doubt that a pattern existed for standing when the defendant was not directly "casually linked" to it, *i.e*., the officers engaged in the complained of police brutality, not the governmental executive defendants. *Id.* at 375. The same concerns are present in our case, which explains why 5 or 6 allegedly illegal detentions by troopers do not support Plaintiffs' standing to sue Jones.

7.      Plaintiffs' claims arise from three stops and detentions that happened between approximately 4 and 5 ½ years ago. [Shaw, 12/20/2017; Erich, 3/9/2018; Bosire, 2/10/2019]. Jones had no direct involvement with the stops. Jones was not even the KHP superintendent

22

when the three stops took place. There is no pattern in these cases. Rather, the articulated grounds for the alleged reasonable suspicion in each case was materially different.

8.      Additionally, Defendant disputes Plaintiffs' claim that the trooper in the Erich stop lacked the required reasonable suspicion to support a detain for a canine sniff. The Court agrees with the Defendant that there was reasonable suspicion of criminal activity.[7]

9.      Plaintiffs also presented testimony regard three other stops/detentions. The parties debate whether the Kelly and Martinez detentions were supported by reasonable suspicion. The Court finds the KHP troopers possessed the required reasonable suspicion to detain Kelly and

---

[7] The most persuasive facts are that the trooper was investigating the likelihood the RV had a hidden compartment from the age of the RV after smelling and actually locating fresh white paint or bondo on the back of the RV, where a hidden compartment would be located, and the driver had white paint on his hand, but denied painting the RV or knowledge of recent application of paint or bondo. *Cf., United States v. Toro-Pelaez*, 893 F. Supp. 963, 966 (D. Kan. 1995), *aff'd*, 107 F.3d 819 (10th Cir. 1997) (existence of a hidden compartment indicated the presence of drugs or drug-related currency providing probable cause for a search); *United States v. Stephenson,* 452 F.3d 1173, 1177-78 (10th Cir. 2006) (suspicion of hidden compartment supported reasonable suspicion).

Martinez for a canine sniff in each respective case.[8] However, the articulated grounds for the alleged reasonable suspicion in each case was materially different from each other and the Plaintiffs' stops. Dunn voluntarily consented to the detention for a canine sniff. Again, Jones had no direct involvement with the stop.

10.    Together, the Plaintiffs' detentions and the supposed additional 3 illegal detentions, each by different troopers, falls far short of the nineteen constitutional violations that *Rizzo* held was insufficient to support more than speculative future harm caused by Jones.

---

[8] Kelly is a close case. However, as a general rule courts must "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011) (*quoting United States v. Zubia–Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001). The trooper observed excessive nervousness, which persisted even after Kelly told he was only getting a warning, *e.g., United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir.2007) (excessive nervousness added to reasonable suspicion calculous); *United States v. Komsonekeo*, No. 20-6064, 2021 WL 4496465, at *3 (10th Cir. Oct. 1, 2021); *United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001) (same and the nervousness did not dissipate); and Kelly, at age 32, had multiple drug arrests/convictions for possession of narcotics with the intent to sell and a history of possessing an illegal sawed-off shotgun, *United States v. White*, 584 F.3d 935, 951 (10th Cir. 2009) (with other factors, criminal history contributes powerfully to the reasonable suspicion calculus).

Martinez is not a close case. Martinez attempted to evade the trooper, and lied about it. *See e.g., Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000) (flight allows officers to stop and investigate); *United States v. Ballance*, No. 20-3141, 2022 WL 108330, at *6 (10th Cir. Jan. 12, 2022), *cert. denied*, 213 L. Ed. 2d 1016, 142 S. Ct. 2778 (2022) (same); *United States v. Madrid*, 713 F.3d 1251, 1257 (10th Cir. 2013) (same). *See also United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996) (untruthful answer to question provided further articulable suspicion); *United States v. Carhee*, 27 F.3d 1493, 1497-98 (10th Cir.1994) (same); *United States v. Moore*, 22 F.3d 241, 243 (10th Cir.), *cert. denied*, 513 U.S. 891 (1994) (same); *United States v. Beltran*, No. 17-40105, 2018 WL 5720247, at *8 (D. Kan. Nov. 1, 2018) (same). His explanation for why he was driving some else's vehicle and aggressive behavior (including an unsupported denial that he had been speeding) just added to the trooper's reasonable suspicions that Martinez was involved in some illegal activity. Then, Martinez possessed a wallet that appeared to aggrandize drug smuggling, by the picture of a famous cartel kingpin. *See e.g., United States v. Lopez-Gutierrez*, 334 F. App'x 880, 881–82 (10th Cir. 2009) (contributing to reasonable suspicion, the officer recognized the images of Jesus Malverde, who is considered a patron saint by some drug traffickers, in a picture on the dashboard). Lt. Proffitt explained how these circumstances, together, were reasonable suspicions of illegal activity based on Proffitt's extensive experience.

11.     In summary, Plaintiffs have failed to show a real and immediate threat of future harm in their Fourth Amendment claim. As a result, the evidence in this case insufficient to avoid application of the rule in *Lyon*, which in turn follows the instructions provided in *Rizzo,* and Plaintiffs claim against Jones must be dismissed.[9]

*The Court Will Not Enter the Demanded Equitable Relief*

12.     Injunctive relief is not proper even assuming (a) Plaintiffs possess the required standing, (b) show their Fourth Amendment rights will be abridged in the future by a KHP trooper, and (c) Jones' actions or inactions culpably cause the future Fourth Amendment violation(s). First, the plaintiffs have adequate remedies at law so that their alleged harm is not irreparable absent an injunction. Second, the threatened injury from the demanded injunctive relief does not outweigh the harm that the injunction is likely to cause from adverse effects on public interest through interference with the principles and operations of federalism, risks from lack of comity afforded to other courts, and unbounded—or at least unreasonable—burdens in enforcement of the demanded injunctive relief. Third, Plaintiffs' injunction demands[10] are impermissibly vague under Rule 65's standards.

13.     There is no dispute that Federal district courts have the power to order injunctive relief when equity so requires. *See Signature Props. Int'l Ltd. P'ship v. City of Edmond*, 310 F.3d 1258, 1268 (10th Cir. 2002). Yet, guiding this discretion, the Supreme Court has stated that courts must apply the "traditional four-factor test" which governs the award of permanent injunctive relief. *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 394 (2006). Courts consider:

---

[9] It is worthy of note, according to the data that Plaintiffs' expert collected, in a similar approximately 5-year period of time more than a million citations were issued to motorists. Less than 2,000 stops resulted in canine sniffs during the period, according to the expert's data.

[10] Compare Pretrial Order, Doc. 290, at 46-48 (setting out Plaintiffs' demanded injunction relief) with Plaintiffs' response to Show Cause Order, Doc. 358, at 12.

"(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (*quoting Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir.2007)). "[A]ny modified test which relaxes one of the prongs ... and thus deviates from the standard test is impermissible." *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016). Moreover, "caution is especially appropriate" when "the type of injunction sought is mandatory rather than prohibitory." *Signature Properties Int'l Ltd. P'ship v. City of Edmond*, 310 F.3d 1258, 1269 (10th Cir. 2002).

14.     Furthermore, there are constrains against injunctive relief in Fed. R. Civ. P., Rule 65. That rule requires that an injunction is specific in "its terms" and "describe[d] in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required." *Id.* (d)(1) (bracket added). *See also Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004). *See e.g., Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 895 F.2d 659, 668 & n. 5 (10th Cir.1990) (cited and quoted in Monreal, 367 F.3d at 1236) ("[G]enerally, injunctions simply requiring the defendant to obey the law are too vague [to satisfy Rule 65]") (brackets original) (striking injunction prohibiting defendants "from discriminating on the basis of race, color or ethnicity in the operation of the school system" and directing defendants "to use their expertise and resources to comply with the constitutional requirement of equal education opportunity for all who are entitled to the benefits of public education in Denver, Colorado" was too vague).

15.     The Tenth Circuit does not deem harm "irreparable" unless a petitioner can show "a significant risk that he or she will experience harm that cannot be compensated after the fact

by money damages." *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (*quoting RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)).

16.    There is an adequate remedy at law for an illegal road side detention by a trooper under 42 U.S.C. § 1983, the Kansas Tort Claims Act, and Kansas common law.[11] Further, the exclusionary rule provides a remedy against illegal searches and seizures. The rule is fashioned specifically in the criminal law context to address asserted harm to the accused.

17.    Plaintiffs argue § 1983 does not provide an adequate remedy at law. They say that the Shaw verdict shows this. Just the opposite. The jury's verdict allowed nominal damages, the damages from the Fourth Amendment violation that Shaw proved. He received the remedy to which he is entitled. Plaintiffs assert that the rights of others may be violated and that these hypothetical other victims will not sue because they don't know that they have that remedy. This speculation does not make the legal remedy under §1983 any less available. Furthermore, the rights of "others" are not before the Court in Plaintiffs' demand for injunction. True, Plaintiffs want an injunction that would impact KHP's practices to extend beyond Plaintiffs. But their standing and this suit is limited to Plaintiffs' alleged right to an injunction. The Plaintiffs have pursued their own § 1983 claims.

18.    Plaintiffs also argue violation of any constitutional right inherently creates irreparable harm. This argument paints with too wide a brush. While some federal circuits have held irreparable injury should be presumed in constitutional cases, Prof. Anthony DiSarro shows such a blanket rule is poorly founded and contrary to modern Supreme Court jurisprudence on the subject. See Anthony DiSarro, "A Farewell to Harms: Against Presuming Irreparable Injury

---

[11] *See also Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010) (describing the elements of supervisory liability for damages under 42 U.S.C. § 1983).

in Constitutional Litigation," 35 *Harv. J.L. & Pub. Pol'y* 743, 772-74 (2012). *See also Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) ("The court must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm (unless such a 'departure from the long tradition of equity practice' was intended by Congress). *eBay*, 547 U.S. at 391, 393-94 [ ]. Instead, the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay*, 547 U.S. at 391 [ ]…") (parenthetical in quote).

19.     No authority has been presented that the Tenth Circuit has adopted a presumptive irreparable harm approach outside of the context of restraints on constitutionally protected speech. *See e.g., Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1235 (10th Cir. 2005) ("We therefore assume that plaintiffs have suffered irreparable injury when a government deprives plaintiffs of their commercial speech rights").[12]

20.     *Floyd v. U.S.*, 860 F.2d 999 (10th Cir. 1988), does offer insight onto our Circuit's view on whether violation of the Fourth Amendment is inherently irreparable. While addressing a claim for return of allegedly illegal seized property[13], the court overruled district court's holding that irreparable harm was not an element of the plaintiff's proof because it was presumed, and wrote:

> While we express no opinion regarding this issue on remand, we offer guidance
> on the proper characterization of irreparable harm. In rejecting irreparable harm as
> a required element of Rule 41(e) jurisdiction, the trial court cited a case indicating
> that "any deliberate violation of the fourth amendment is constitutionally

---

[12] Wright and Miller appears to distinguish between harm from violations the right to free speech or freedom of religion and other constitutional violations, citing eBay. *See* Wright & Miller, 11A *Fed. Prac. & Proc. Civ.* § 2948.1 (3d ed.)

[13] *See* Fed.R.Crim.P. 41(e).

irreparable." *Floyd*, 677 F.Supp. at 1087 (*citing In re Application of First United Fin. Corp.*, 620 F.Supp. 1450, 1452 (E.D.N.Y.1985)). We cannot approve of the application of this statement to the instant case.

*Id.* at 1005. The court reasoned: "it cannot be said that every individual whose fourth amendment rights are violated suffers irreparable harm such that Rule 41(e)'s remedial provisions are triggered." *Id.* at 1006.[14]

21.     *Bannister v. Bd of County Comm'rs.*, 829 F. Supp. 1249, 1252 (D. Kan. 1993), is the case that Plaintiffs cite from our Circuit that appears to hold irreparable harm is presumed by a violation of the Fourth Amendment. The decision is not controlling here and predates *eBay*.[15] Furthermore, the alleged employee drug testing policy presented a different kind of violation to the Fourth Amendment than that allegedly present here. The defendant's testing policy compelled its employees to forfeit rights or lose their jobs. It was not a case about a subordinate's violation of another's Fourth Amendment rights. The Hobson's choice in *Bannister* is arguably irreparable without resort to a presumption.

22.     Finally, it is very noteworthy that *O'Shea v. Littleton*, 414 U.S. 488, 490 (1974), involved claims of alleged patterns and practices of conduct in the administration of the criminal justice which were said to have deprived the plaintiffs of rights secured by the First, Sixth, Eighth, Thirteenth, and Fourteenth Amendments. Yet, *O'Shea* observed that injunctive relief is not granted where there "is adequate remedy at law and [the plaintiff] will not suffer irreparable

---

[14] *See also Tyler v. Russel*, 410 F.2d 490, 492 (10th Cir. 1969) (pre-Younger decision refusing to enjoin pending state criminal prosecution despite defendant's claim that prosecution violated Fourth Amendment, noting that "[n]o great and irreparable injury results to him which would not result to any other person charged with the same crime").

[15] In addition to applying a presumption of irreparable harm, the court applied a "none of the [four] factors, taken individually, is dispositive" test rejected in eBay.

injury if denied equitable relief." *Id.* at 499. There is no hint in the Court's discussion that the requirement was satisfied simply by the fact constitutional violations was asserted.

23.     In summary, the Court will not exercise its discretion to grant injunctive relief because Plaintiffs' claims do not establish irreparable harm unless the demanded injunction is issued.

24.     Moreover, it is not for the Court to author an injunction whole cloth. The harm and adverse effect of the demanded injunction must be measured by what Plaintiffs have submitted as their requested relief.

25.     As in *O'Shea v. Littleton*, Plaintiffs do not seek to strike down a single state statute, either on its face or as applied; nor do they seek to enjoin prosecutions that might be brought under a challenged criminal law. 414 U.S. at 501. Rather, they seek a multipart injunction supposedly aimed at controlling or preventing the occurrence of specific events involving any number of troopers that might take place in the course of future traffic stops.

26.     An injunction against acts which might occur in future, compliance and enforcement will be before the Court where there is a charge that the injunction has been disobeyed. When illegal contraband is found during one of these traffic stops, the injunction seems very much like "an ongoing federal audit" of state criminal proceedings, which would indirectly accomplish the kind of interference that *Younger v. Harris, supra*, and related cases sought to prevent," which *O'Shea* held was improper. *Id*. The injury is to federalism and impact from refused comity to other courts, which balances against entry of such an injunction.

27.     Even when criminal proceedings are not involved, the demanded injunction is too intrusive and is unworkable. For the most part, the originally demanded injunction leaves unstated exactly how Jones must train or supervise troopers. It has no objective boundary for

Jones to know that he has complied or failed to comply with the injunction, thereby imposing expense, risk and duties on the KHP's operations.

28.     The demanded injunction insists that the federal courts should direct the details of Jones' executive functions. Plaintiffs then demand continuous supervision by a court appointed "monitor" effectively to perform Jones' duties. Ultimately, the individual cases will come before the Court, for enforcement of its injunction, whenever a claim is made that an individual stop or detention lacked reasonable suspicion (by the "monitor" or otherwise). And then, the Court's judgment is placed potentially in conflict with the judgment of state or other federal courts regarding the illegality of the stop/detention. Moreover, the obvious burden on the Court's resources argues against entry of the demanded injunction in this case.

29.     *Rizzo v. Goode,* 423 U.S. 362 (1976), is against instructive, if not outright controlling. After raising, but not resting the holding on standing, the Court considered whether the district court could have granted an injunction that required the defendant city and its police executives to adopt a comprehensive program that revised policies and practices, including policies for investigating and resolving civilian complaints, in order to prevent or minimize future police brutality, which the district court found was likely to continue without the revised policies and practices. *Id.* at 368-69. The district court required the parties to jointly draft the changes and submit for its approval and order. *Id.* The district court found the changes that it approved and ordered were consistent with generally recognized law enforcement minimum standards. *Id.* at 370. However, the Supreme Court found injecting significantly revised police procedures was a limitation on the defendants' latitude in the dispatch of its internal affairs. *Id.* at 608. This, it concluded, impermissibly encroached on principles of federalism, reasoning Congress did not intend that § 1983 would allow an injunction by a federal court against an

executive of "state or local" government where there was no affirmative link between the

unconstitutional practices and the governmental executives. *Id.*

30.     Really, for the reasons stated in *Rizzo* and *O'Shea*, the demanded injunction is not

proper.[16] The Court will not grant the demanded injunction based on facts alleged.

31.     Plaintiffs appear to acknowledge that the injunction they demanded in the final

pretrial order is improper. They demand instead an injunction:

> •     KHP Superintendent is hereby enjoined from continuing his practice of permitting KHP troopers to prolong detentions of drivers without reasonable suspicion of criminal activity, in violation of the Fourth Amendment;
>
> •     KHP Superintendent is hereby enjoined from his practice of targeting out-of-state motorists for roadside detentions without adequate reasonable suspicion;
>
> •     The parties are ordered to confer regarding any additional operational changes that must be made to KHP practices to effectuate the two terms of the injunction listed above, and submit those proposals to the Court.

Doc. 358 at 12.

32.     Fed. R. Civ. Pro., Rule 65(d)(1) rule requires that an injunction be specific in "its

terms" and "describe in reasonable detail--and not by referring to the complaint or other

document--the act or acts restrained or required." None of Plaintiffs' bullet points come close to

---

[16] Plaintiffs claim that *Floyd v. City of New York*, 959 F. Supp. 2d 540, 658, 667 (S.D.N.Y. 2013), supports an injunction may be entered in this case despite the problems with entry of the equitable relief identified in *Rizzo* and *O'Shea.* There are many features about *Floyd* that make it unpersuasive and that distinguish it from this case. However, the most important to this discussion is that the district court understood that "[b]ecause vicarious liability is inconsistent with section 1983's causation requirement," "the 'official policy' requirement was intended to distinguish acts of the municipality from acts of municipal employees, and thereby make clear that municipal liability is limited to actions for which the municipality is actually responsible." *Floyd v. City of New York*, 813 F. Supp. 2d 417 (S.D.N.Y. 2011) (*quoting City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988)). Judge Shira Scheindlin found injunctive relief was appropriate only after finding unconstitutional municipal conduct. This starkly contrasts with the claimed basis of injunction in *Rizzo* and here that is premised on alleged failure to prevent employees allegedly continued unconstitutional conduct.

satisfying this basic requirement. The first two are just directing Jones to obey the law; thus, they are too vague. *See also Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004). The third is no injunction at all. Furthermore, the demanded amended injunction suffers from the same problems address above about the originally demanded injunction.

33.     The fate of Plaintiffs' request for declaratory relief should be no different than their claim for an injunction. In *Eccles v. Peoples Bank of Lakewood Village, Cal.*, 333 U.S. 426 (1948), the Supreme Court said "declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." *Id.* at 431. In that case, the Supreme Court required a showing of the equitable prerequisite irreparable harm in order to obtain Declaratory Judgment. *Id.* at 432-32. More specific to Jones, who is sued in his official capacity only, "[t]he *Ex parte Young* doctrine holds that the Eleventh Amendment generally does not stand as a bar to suits in which a party seeks only prospective equitable relief against a state official." *Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253, 1260 (2002) (emphasis added).

34.     In *Pub. Affs. Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962), the Court observed that "the Declaratory Judgment Act was an authorization, not a command." The act gives the federal courts competence to make a declaration of rights; it did not impose a duty to do so. *Id*.

35.     Any declaratory judgment must go to future conduct only.[17] Yet, Plaintiffs have offered no justification for a declaration that will tell Jones only to comply with the law. They have provided no support that a declaration would be appropriate given the available remedies at

---

[17] This incorporates the Eleventh Amendment's limitation on official capacity suits. *See Green v. Mansour*, 474 U.S. 64, 68-69 (1985).

law. Further, they do not explain how a declaratory judgment will not potentially interfere or possibly conflict with other courts' adjudications—and, if not, why a declaratory judgment is needed.

36.     For declaratory relief to be available to Plaintiffs, they must be entitled to appropriate prospective injunctive relief–which they are not. *See Robledo-Valdez v. Dick*, No. 16-CV-00192-MSK-KLM, 2017 WL 8942563, at *4 (D. Colo. Feb. 27, 2017), report and recommendation adopted in part, rejected in part, No. 16-CV-00192-MSK-KLM, 2017 WL 1190560 (D. Colo. Mar. 31, 2017). This is because the Eleventh Amendment bars federal court from ordering notice or declaratory relief in a suit against the state "unless it is ancillary to a judgment awarding prospective injunctive relief." *Johns v. Stewart*, 57 F.3d 1544, 1553 (10th Cir.1995) (*citing Green v. Mansour*, 474 U.S. 64, 70–74 (1985)). *Accord, Buchwald v. Univ. of New Mexico Sch. of Med.*, 159 F.3d 487, 495 (10th Cir. 1998).

37.     Therefore, even if Plaintiffs possessed the required standing, judgment is proper against Plaintiffs' injunction and declaratory claims.

*Plaintiffs have not proved Defendant is violating or is certain to violate their Fourth Amendment rights.*

38.     There are two overarching elements of a § 1983 claim. A deprivation of a federal right; and Defendant is a "person" who deprived the plaintiff of that right acting under color of state law. *West v. Atkins*, 487 U.S. 42, 49 (1988).

39.     Liability under §1983 does not exist in a vacuum. Plaintiffs must prove a present or imminent violation of federal law, here the Fourth Amendment of the Constitution. *Crowson v. Washington Cty. Utah*, 983 F.3d 1166, 1187 (10th Cir. 2020). For example, in an analogous situation, when a § 1983 plaintiff pursues a claim of supervisory liability, he must show the subordinate violated his constitutional rights—a supervisor cannot be liable if the subordinate did

34

not commit a violation. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 768 (10th Cir. 2013) (stating that the causation element of the affirmative-link test requires a plaintiff to show "that the defendant's alleged action(s) caused the constitutional violation" committed by a subordinate, suggesting that an underlying constitutional violation is required).

40.     Once again, *Rizzo* is instructive. In *Rizzo*, like here, the defendant government officials did not directly violate anyone's rights. Rather, the claim was that they permitted or did not prevent the police brutality. 423 U.S. at 371. This is very much like Plaintiffs' claim that Jones fails to ensure his troopers comply with the Fourth Amendment. Articulating how the plaintiffs had failed in their proof, *Rizzo* explained that to succeed the plaintiffs needed to show that the police misconduct flowed from a policy, plan, or a pervasive pattern. Further, this pattern, plan or policy had to be causally linked to the defendants named in the action. *Id.* at 371. More specifically, the Court stated that the statistics, which showed arguably 19 past incidents of unlawful conduct by police officers, and even the district court's finding that the conduct was not "rare" or "isolated incidents," *id*. at 368, failed to establish "common thread" "flowing from a deliberate plan" by government officials, *id*. at 375. Without this, the Court concluded there was no basis to grant an injunction against the government officials under § 1983.

41.     *Lewis v. Hyland*, 554 F.2d 93, 98 (3d Cir. 1977), summarized Rizzo ruling as follows:

> *Rizzo's* § 1983 discussion, like its "standing" discussion, was aimed at the failure of plaintiffs to prove the existence of an unconstitutional policy or plan adopted and enforced by the official defendants. Throughout, the Court emphasized the complete absence of any causal link between the individual police officers' conduct and the responsible authorities. Mere invocation of the words "pattern" or "plan" did not suffice without this causal link. Nor was it sufficient in *Rizzo* to have proved 16 to 20 incidents "of constitutional dimension" where the number of police-citizen contacts was many times greater.

*Rizzo's* focus was on the absence of any evidence (beyond what was dismissed as "(t)he District Court's unadorned finding of a statistical pattern") of participation by the named defendants in a plan or scheme to suppress constitutional rights. Such a plan, once proved, could be enjoined in federal court. *Allee v. Medrano*, 416 U.S. 802, 815-16 [ ] (1974); *Hague v. CIO*, 307 U.S. 496, [ ] (1939); *Lankford v. Gelston*, 364 F.2d 197, 202 (4th Cir. 1966) (*en banc*) (enjoining the "effectuation of a plan conceived by high ranking (police) officials").

The *Rizzo* Court refused to infer the existence of a plan of concerted action from the facts before it. A mere "failure to act (by responsible authorities) in the face of a statistical pattern" was found to provide no basis for injunctive relief.

42.     Then, regarding the deprivation of a federal right, to determine the elements of a constitutional claim under § 1983, courts must first look to the elements of the most analogous tort as of 1871 when § 1983 was enacted, so long as doing so is consistent with the values and purposes of the constitutional right at issue. *Thompson v. Clark*, 142 S. Ct. 1332, 1337 (2022).

43.     This official capacity suit against KHP Superintendent Jones is the equivalent to suing the state itself. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (suit against Pennsylvania Auditor General); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (suit against Commissioner of the Kentucky State Police). The state is not vicariously liable, under 42 U.S.C. § 1983, for the "unconstitutional conduct of [ ] subordinates." *Carr v. El Paso Cty., Colorado*, 757 F. App'x 651, 655 (10th Cir. 2018) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).[18]

44.     Plaintiffs say that they only need to show that a causal nexus between Jones's conduct—specifically his failure as the head of the agency to ensure his troopers are complying with the Constitution—and continuing constitutional violations occurring in the field under his watch, citing the Court's ruling regarding a motion in limine. *See* Doc. #466 at 3. The nexus

---

[18] "Based on the rules our precedents establish, respondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 675-76 (2009). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677.

language is a product of the requirement in *Ex parte Young*, 209 U.S. 123, 157 (1908), "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer *must have some connection*" with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." Our Circuit has called this "some connection" requirement a "nexus," *e.g., Peterson v. Martinez*, 707 F.3d 1197, 1206 (2013), where defendants are not required to have a "special connection," but only "some connection" to the unconstitutional act or conduct. "Rather, state officials must have a particular duty to 'enforce' the statute in question [or we contend here a challenged policy or custom] and a demonstrated willingness to exercise that duty." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (2007).

45.     This "nexus" requirement cannot be conflated to state the elements of a § 1983 claim against Defendant Jones. Back to § 1983, as there is no vicarious liability, the Court must find a required state-of-mind is established. Our Circuit's law shows the deliberate indifference state-of-mind is required to establish municipal liability for an employee's unconstitutional actions. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) ("[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences," *quoting Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)). There is no

logical reason that state officials should be held to a lesser or different state-of-mind.[19]

46.    Therefore, Plaintiffs must show both an ongoing denial of their Fourth Amendment rights and (1) "an official policy or custom, (2) causation, and (3) deliberate indifference" flowing from the fact that Jones office is not vicariously liability under § 1983. *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020). Important here, these "policy or custom" requirements apply to a demand for prospective relief, such as an injunction or a declaratory judgment. *Los Angeles Cty., Cal. v. Humphries*, 562 U.S. 29, 31 (2010).

47.    Plaintiffs argue KHP troopers are violating Fourth Amendment rights in two categories: (1) Troopers detain individuals "in part based on innocent travel plans," citing *Vasquez v. Lewis*,[20] Pl. Trial Brief, Doc. 484, at 2, and (2) employ a "Two-Step" maneuver, *id.* at 5.

48.    In neither category has Plaintiffs shown an on-going (or reasonably certain future) Fourth Amendment violation by Jones or anyone.

49.    "Reasonable suspicion" is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18

---

[19] The Supreme Court, in *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (a suit against the Pennsylvania Auditor General), stated: "In *Kentucky v. Graham*, [a suit against the Commissioner of the Kentucky State Police] … We emphasized that official-capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.*, at 165 [ ] (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 [ ] (1978)). Suits against state officials in their official capacity therefore should be treated as suits against the State. 473 U.S., at 166 [ ]. … ***Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, "the entity's 'policy or custom' must have played a part in the violation of federal law." Graham, supra, at 166, [ ] (quoting Monell, supra, 436 U.S., at 694)." Id. at*** 25 (emphasis supplied).

[20] Plaintiffs include an assertion that Trooper have asserted reasonable suspicion in part based out-of-state license plates and residence. Doc. 484, at 5.

(1981). The inquiry depends on "the totality of the circumstances." *Navarette v. California*, 572 U.S. 393, 397 (2014). The law requires looking at each nuance of an encounter as part of a larger mosaic to determine whether the "whole picture" suggests that criminal behavior may be afoot. *Cortez*, 449 U.S. at 418. The emphasis is on the "whole picture," rejects a "divide-and-conquer analysis" of a situation's relevant circumstances. *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (found reasonable suspicion in part by defendant's use of a "little-traveled route used by smugglers," *id.* at 277) "[B]ecause the mosaic which is analyzed for a reasonable-suspicion … is multi-faceted, 'one determination will seldom be a useful 'precedent' for another'"; the "exception" being when precedent is "so alike," without "any substantial basis for distinc[tion]," "remarkably similar." *Ornelas v. United States*, 517 U.S. 690, 698 (1996). Furthermore, the analysis is an objective one. An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed objectively, justify [the] action." *Brigham City v. Stuart*, 547 U.S. 398, 404-05 (2006). The officer's subjective motivation is irrelevant. *Id.; see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers").

50.     Reasonable suspicion does not require an officer to rule out the possibility of innocent conduct. *United States v. Deluca*, No. 20-8075, 2022 WL 3451394, at *3 (10th Cir. Aug. 18, 2022). "[R]easonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality." *Donahue v. Wihongi*, 948 F.3d 1177, 1188 (10th Cir. 2020).

51.     In *Arvizu*, 534 U.S. 266 (2002), the Supreme Court rejected the lower court's analysis that gave no weight to observations which were "readily susceptible to an innocent

explanation" and that attempted to "clearly delimit the extent to which certain factors may be considered by law enforcement officers in making stops." The Court approved: "that factors which by themselves were 'quite consistent with innocent travel' [may] collectively amount[ ] to reasonable suspicion." *Id.* at 274-75 (*citing United States v. Sokolow*, 490 U.S. 1, 9 (1989)).[21] The Court reasoned: "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at 273. Thus,

> When finally weighing the totality of the circumstances, we must be careful to "tak[e] into account an officer's reasonable inferences based on training, experience, and common sense," *Rice*, 483 F.3d at 1083 (emphasis added), and to that extent "we look at the objective facts, not the officer's state of mind" when "measuring the actions of a police officer under the Fourth Amendment," *United States v. Neff*, 300 F.3d 1217, 1222 (10th Cir.2002). In the end, reasonable suspicion must meet only a "minimum level of objective justification." *Garcia*, 751 F.3d at 1143 (*quoting* Rice, 483 F.3d at 1083) (internal quotation marks omitted). This level "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 [ ] (2002).

*United States v. Fager*, 811 F.3d 381, 386 (10th Cir. 2016).

52.     In *United States v. Zambrano*, 76 Fed.Appx. 848, 2003 WL 21694590 (10th Cir. 2003) (unpub.), the Circuit acknowledged sometimes motorists' behaviors, which are claimed suspicious when described broadly, seems contradictory. But the proper analysis is about whether the behaviors law enforcement sees and interprets combine, in the totality of the circumstances, to show reasonable suspicion. The Court said:

---

[21] Plaintiffs have incorrectly argued that $0 + 0 + 0$ does not equal reasonable suspicion. However, "[r]easonable suspicion may exist even if each of the factors alone is susceptible of innocent explanation." *United States v. Cervine*, 347 F.3d 865, 871 (10th Cir.2003). The *Vasquez* dissent accused the majority to using the "$0 + 0 + 0$ cannot = reasonable suspicion" to employ a "divide-and-conquer analysis" that is repudiated in *Arvizu. See Vasquez*, 834 F.3d at 1140. The majority did not dispute that the "$0 + 0 + 0$" approach was improper. Rather, it stated "[o]fficers [must] explain how these factors, taken together, indicate suspicious behavior." Id., 834 F.3d at 1137 n. 2.

Indeed, the behavior descriptions sometime appear contradictory from case to case. An officer's suspicion is aroused: when a subject looks at him carefully or refuses to look at him; when a subject drives exactly at the speed limit or drives too slowly; when a subject appears too nervous or too nonchalant. But we recognize the dynamic that well trained and experienced officers bring to the process, and hence, require that their suspicions be reasonable and articulable, not necessarily universal or profound.

76 Fed.Appx. at 851, n. 3.

53.     Therefore, because the Fourth Amendment concerns objective reasonableness under the totality of the circumstances, an officer's "[c]onsideration of [ ] unpersuasive factors does not negate the otherwise valid bases for his objectively reasonable suspicion." *United States v. Lopez*, No. 5:21-CR-40026-TC, 2021 WL 5279923, at *9 (D. Kan. Nov. 12, 2021). *E.g. United States v. Berg*, 956 F.3d 1213, 1219 (10th Cir.), *cert. denied sub nom. Berg v. United States*, 2020 WL 6037395 (U.S. Oct. 13, 2020) (finding reasonable suspicion, while noting traveling at night along a known drug corridor, using a slightly indirect route, was too innocuous to support reasonable suspicion under the fact of the case); *United States v. Santos*, 403 F.3d 1120, 1133 (10th Cir. 2005) (finding reasonable suspicion while concluding some offered factors were "pure makeweights").

54.     Moreover, circumstances involving the motorist's travel frequently plays a recognized factor in law enforcement's reasonable suspicions. The Circuit's cases where the motorist's travel combined with other circumstances to establish reasonable suspicion to detain a motorist after the traffic stop concluded are ubiquitous. *E.g., United States v. Mercado-Gracia*, 989 F.3d at 839; *United States v. Torres*, 786 Fed. Appx. 726 (10th Cir., Aug. 23, 2019) (unpublished); *United States v. Ma*, 254 F. Appx. 752, 756 (10th Cir. 2007) (unpublished); *United States v. Williams*, 271 F.3d 1262, 1270 (10th Cir. 2001) (place of departure or destination was factor). *See also United States v. Mendoza*, 817 F.3d 695, 700 (10th Cir. 2016);

*United States v. Karam*, 496 F.3d 1157, 1165-66 (10th Cir. 2007); *United States v. Pettit*, 785 F.3d 1374, 1381 (10th Cir. 2015); *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011); *United States v. Santos*, 403 F.3d 1120, 1130-32 (10th Cir. 2005); *United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir. 1995) (implausible travel plans were factors). *See also United States v. Orozco-Rivas*, 810 F. Appx. 660, 667 (10th Cir. 2020) (unpublished); *United States v. Torres*, 786 F. Appx. 726, 738 (10th Cir. 2019) (unpublished); *United States v. Sanchez-Valderuten*, 11 F.3d 985, 989 (10th Cir. 1993) (failure to disclose travel history or plans were factors); *United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir. 1997); *United States v. Soto*, 988 F.2d 1548, 1556 (10th Cir.1993) (vague travel plans were a factor). And, during the course of a traffic stop, an officer may inquire about the driver's travel plans and the identity of the individuals in the vehicle. *United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 1250 (2021) (*citing Pettit*, 785 F.3d at 1379).[22]

55.     While a particular motorist's route "is not entitled to much weight" in the reasonable suspicion calculus, *United States v. Mercado-Gracia,* 989 F.3d 829, 839 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1374 (2022)[23], courts have found it can add to the calculus. *See United States v. Farmer*, 215 F.3d 1338 (10th Cir. 2000) ("We have previously considered the fact that a car is traveling at night on a known drug corridor, from a known drug source city

---

[22] *Cortez*, 965 F.3d at 839 ("Such questioning is consistent with both the public's expectations regarding ordinary inquiries incidental to traffic stops and taking the least burdensome approach to ensuring officer safety"); *United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001) (*en banc*), *overturned on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005) (such inquiries are justified because "[t]ravel plans typically are related to the purpose of a traffic stop") *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (travel questions are permissible as the type of "negligibly burdensome" inquiries directed at ensuring officer safety).

[23] *Accord Vasquez v. Lewis*, 834 F.3d 1132, 1137 (10th Cir. 2016); *Shaw v. Schulte*, 36 F.4th 1006, 1015 (10th Cir. 2022).

when evaluating whether an officer had reasonable suspicion"); *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995) (considering in determination that officer had reasonable suspicion the fact that the car was traveling between Los Angeles and Detroit, two cities known for high drug usage). *See e.g., United States v. Barbee*, 968 F.2d 1026, 1029 (10th Cir.1992); *Mercado-Gracia*, 989 F.3d 829, 839; *United States v. Betances*, 650 F. App'x 615, 618 (10th Cir. 2016) (unpublished); *United States v. Westhoven*, 562 F. App'x 726, 728 (10th Cir. 2014) (unpublished); *United States v. Arjon*, 573 F. App'x 683, 688 (10th Cir. 2014) (unpublished) (driving slowly back and forth and stopping on a remote stretch of highway widely known as a drug-smuggling corridor only a few miles from the border provided reasonable suspicion); *United States v. Gutierrez*, 498 F. App'x 786, 793 (10th Cir. 2012) (unpublished); *United States v. Guerrero-Sanchez*, 412 F. App'x 133, 140 (10th Cir. 2011) (unpublished). *Cf. United States v. Cortez*, 965 F.3d 827, 835 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 1250, (2021) ("geography ["fifty miles from the Mexico border"] and context of the stop generated suspicion"). *See also, United States v. Arvizu*, 534 U.S. 266, 277 (2002) (border patrol agent had reasonable suspicion to believe illegal activity was occurring where vehicle was stopped during a patrol shift change on a "route used by smugglers to avoid [a] checkpoint").

56.     And factors that are typically "consistent with innocent travel" may contribute to reasonable suspicion depending on the circumstances. *United States v. Ahmed*, No. 18-4092, 2020 WL 5415813, at *2 (10th Cir. Sept. 10, 2020). *Accord, United States v. Pettit*, 785 F.3d 1374, 1379-80 (10th Cir. 2015).

57.     In sum, even if it is assumed that "innocent travel" cannot be a factor in the reasonable suspicion calculus, the consideration of such by troopers is not a constitutional

violation. Thus, the allegations regarding travel, even if true, do not establish the first element of a § 1983 suit, *i.e.,* a violation of federal law.

58.     The "Two-Step" is also not a violation of the Fourth Amendment. Stated another way, the procedure through which a trooper completes a traffic enforcement action and then reengages the driver to ask additional questions does not unconstitutionally prolong the stop.

59.     An officer may constitutionally prolong a stop after the traffic stop is or should be complete when the seized individual consents. *United States v. Cortez*, 965 F.3d 827, 833 (10th Cir. 2020). Thus, the procedure through which a trooper completes a traffic enforcement action and then reengages the driver to ask additional questions in a consensual encounter does not unconstitutionally prolong the stop. *See e.g.*, *Ohio v. Robinette*, 519 U.S. 33, 35 (1996). *See also United States v. Lopez*, No. 5:21-CR-40026, 2021 WL 5279923, at *10 (D. Kan. Nov. 12, 2021) (collecting some of the cases). This process has been referred to as the "two-step", *Lopez,* 2021 WL 5279923, at *10, or "Columbo Gambit," *State v. Thompson*, 284 Kan. 763, 778, 166 P.3d 1015 (2007), *as modified* (Oct. 17, 2007). And, in the application of the procedure, the Fourth Amendment issue becomes whether any consent granted for post-stop detention or a search was voluntary.

60.     "Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions" … If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed. *Florida v. Royer*, 460 U.S. 491, 497-98 (1983).

61.     The driver need not be explicitly told that he or she has the right to leave. *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996). Moreover, it is not necessary to read *Miranda* rights or even inform the driver of their right to not consent, *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

62.     The argument that the Two-Step, by itself, violates the Fourth Amendment has been rejected directly and indirectly in numerous decisions. If a motorist is willing to answer questions, the issue becomes whether any consent granted for post-stop detention or a search was voluntary and the Two-Step does not prevent this voluntary consent. *See e.g., United States v. Gomez-Arzate*, 981 F.3d 832, 842 (10th Cir. 2020) (found a consensual encounter permitted extended detention even after issuing the citation, the driver began walking back to his car when Deputy Mora turned around and yelled to him to ask if he would talk); *United States v. Martin*, No. 18-CR-40117, 2019 WL 6682990, at *1 (D. Kan. Dec. 6, 2019) (found consent was given after trooper issuing and explained a warning, told the defendant to have a safe trip, back towards his patrol car but then re-approached defendant and asked whether he could ask Defendant some questions; to which Defendant replied "sure" and then also said sure to a vehicle search); *United States v, Beltran*, No. 17-40105-01, 2018 WL 5720247 (D. Kan. Nov. 1, 2018) (found consent was granted after trooper "told Mr. Beltran that he was going to give him a warning and instructed him to watch his speed in construction zones… asked Mr. Beltran if he had any questions" then "told Mr. Beltran to 'have a safe trip" and "began to walk back to his patrol vehicle," but when the trooper reached the rear edge of Mr. Beltran's vehicle, he pivoted and started back in the direction of the driver's side window of Mr. Beltran's car" and "asked him, 'Hey, can I ask you a question, Juan?'"); *United States v. Delgado-Lopez*, No. 18-10095-01, 2018 WL 6200032 (D. Kan. Nov. 28, 2018) (found consent granted, responding "Defendant complains

that [Trooper] Parr asked for consent almost immediately after telling Defendant he was free to

go, without allowing him time to get out of the car.… But regardless of the timing, the

unequivocal message to Defendant that he was "free to go" was sufficient to convey to a

reasonable person that he was not required to stay and answer questions."); *United States v.*

*Ochoa*, No. 16-40028-01, 2017 WL 119628, at *5 (D. Kan. Jan. 12, 2017) (found consent to talk

and search, Ms. Ochoa gave permission after trooper told her to have a safe trip, she opened the

patrol vehicle, but before she exited the trooper asked her a few more questions and if he could

search her truck and trailer).

63.     Therefore, as with travel, use of the Two-Step is not a violation of the Fourth

Amendment.[24] Again, the first element of the § 1983 claim is not established.

64.     Largely, Plaintiffs' evidence and their expert's opinions focus on past detentions,

past training and past data collection. This is not legitimate fodder for entry of equitable relief

concerning current and future conduct.

> [I]njunctive relief can only be obtained for current or prospective injury and
> cannot be conditioned on a past injury that has already been remedied. *See Nova*
> *Health Sys. v. Gandy*, 416 F.3d 1149, 1155 n. 6 (10th Cir.2005) (*quoting San*
> *Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir.1996)
> ("Because plaintiffs seek declaratory and injunctive relief only ... it is insufficient
> for them to demonstrate only a past injury")). Further, to the extent that Plaintiff
> suggests that nothing would prevent Defendants from [engaging in the claimed
> illegal activity] in the future, generally, an injunction is only appropriate "to
> prevent existing or presently threatened injuries. One will not be granted against

---

[24] A few witnesses have testified that they did not think that they could safely leave after a
trooper turned to walk away from the vehicle because to trooper was too close. Their subjective
belief is not relevant to whether the traffic stop had concluded. Furthermore, the worry about the
trooper safety is at most a single factor in whether consent provided was voluntary. In the
examples provided, only Dunn consented to a canine sniff. She testified had been told by her
father to wait for the trooper to return to his vehicle before leaving. She testified, that she
consented to the dog sniff to be polite and respectful to police-that is, the consent was voluntary.
She also understood she did not need to consent, as she refused consent to a search of her
vehicle.

> something merely feared as liable to occur at some indefinite time in the future."
> *Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 75 L.Ed. 602
> (1931).

*Hale v. Ashcroft*, 683 F. Supp. 2d 1189, 1197–98 (D. Colo. 2009) (statement in bracket

supplied).[25]

65.     Plaintiff proffers no witness with knowledge in law enforcement or constitutional

standards to identify or explain how this incident could be viewed as a predictable result of the

City's alleged lack of training its officers to differentiate between persons with panic disorder

and intoxicated persons.

66.     Plaintiffs have failed to prove deliberate indifference and an unconstitutional

official custom or policy. Over the last 5 ½ years[26] there have been, according to Plaintiffs' six

detentions that are claimed to have been illegal. Each has a different set of facts, each a different

set of factors presented to support reasonable suspicion. Only the Shaw and Bosire detentions

have been found to violate the Fourth Amendment.

---

[25] Voluntary cessation of active illegal conduct can provide an exception to the mootness
doctrine. *See United Sch. Dist. No. 259, Sedgwick Cnty., Kan. v. Disability Rts. Ctr. of Kansas*,
491 F.3d 1143, 1150 (10th Cir. 2007). The exception is inapplicable here because no one says
Plaintiffs' claims are moot and there was no halted active illegal conduct. Certainly, training on
*Vasquez* and a new report policy are not cessation of illegal conduct. The exception to mootness
cannot be sued to circumvent that Plaintiffs may only obtain prospective equitable relief.
Necessarily, this focuses on Jones' present conduct and policies, including current training and
the new, but current, KHP report policy, even assuming these "changes" were after and, in some
measure, a response to Plaintiffs' claims in this lawsuit.
[26] See *supra*, n. 2.

67.     Defendant challenges that conclusion regarding the other four.[27] The evidence required to show a policy or custom and deliberate indifference simply is not present.[28]

68.     But given the questions about what proof Plaintiffs' must present to establish a required § 1983 state-of-mind and culpable conduct by Defendant Jones, the central problem with Plaintiffs' § 1983 claim against Jones is lack of causation. *Baker v. McCollan*, 443 U.S. 137, 142 (1979) ("a public official is liable under § 1983 only if he causes the plaintiff to be subjected to deprivation of his constitutional rights"). Plaintiffs do not challenge the substance of the training provided to troopers and the KHP policies that, if followed, proscribe unconstitutional detentions. Plaintiffs do not establish earlier training on *Vasquez*, old reporting requirements, current data collection and analysis, current ill-defined short comings in supervision, and a past singular failure require more punishment of Trooper McMillan, cause current or will cause future unconstitutional detentions. Plaintiffs have offered nothing but speculation on this point.

69.     Therefore, Plaintiffs fail to establish the second element of a § 1983 claim, *i.e.*, that Jones deprived the plaintiffs of the federal (here constitutional) right.

---

[27] There are multiple and different reasons that the troopers had reasonable suspicion to call for canine sniffs in the Erich stop [principally new white paint or bono smelled and located in area on van that suggested a hidden compartment combined with driver's denial of painting, but having white paint on his hand]; Kelly stop [principally extreme and unusual nerviness after being advised he was receiving a warning and a history of multiple drug crimes and possession of a sawed-off shotgun]; and Martinez stop [principally attempting to evade the trooper and by all reasonable appearances lying about his speeding, reason to leave (evade) the highway, and his bullying tactics.] The Dunn detention was consensual canine sniff. The validity or lack of the same of the trooper's suspicions in that case are not relevant.

[28] Proving "deliberate indifference" is not easy. The Tenth Circuit rejects the argument that § 1983 liability can attach where the defendant "should have known" of the unconstitutional behavior. *Gates v. Unified Sch. Dist. No. 449 of Leavenworth Cty., Kan.*, 996 F.2d 1035, 1042 (10th Cir. 1993). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal [here state] actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 70 (2011) (*quoting Bryan Cnty.*, 520 U.S. at 410).

*Conclusion.*

In summary, judgment is proper against Plaintiffs' claim under Fed. R. Civ. P. 52(c). Plaintiffs' lack standing. The Court should not grant the equitable relief demanded. Plaintiffs have not proved the required elements of a § 1983 claim in their official capacity suit against Defendant Jones.

Respectfully Submitted,

OFFICE OF KANSAS ATTORNEY GENERAL
KRIS KOBACH

/s/ Arthur S. Chalmers
Arthur S. Chalmers #11088
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Telephone: 785-368-6244
FAX: 785-291-3767
Email: art.chalmers@ag.ks.gov
*Attorneys for the Defendant Jones*

## CERTIFICATE OF SERVICE

This is to certify that on this 27th day of May, 2023, I electronically sent a copy of DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW to all counsel of record.

s/Arthur S. Chalmers
Arthur S. Chalmers