## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| BLAINE FRANKLIN SHAW et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 19-1343-KHV |
| | ) | |
| HERMAN JONES, in his official capacity as the Superintendent of the Kansas Highway Patrol, et al., | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| MARK ERICH et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 20-1067-KHV |
| | ) | |
| HERMAN JONES, in his official capacity as the Superintendent of the Kansas Highway Patrol, et al., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER
## AND ORDER TO SHOW CAUSE

To date, 23 states and the District of Columbia have legalized recreational marijuana.[1]  To

the west, Colorado legalized recreational marijuana in 2014.  To the east, Missouri legalized

recreational marijuana in 2022.[2] Meanwhile, in the name of drug interdiction, the Kansas Highway

---

[1]        Alaska, Arizona, California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, Washington and the District of Columbia have legalized recreational marijuana. Kansas is one of the only states that has not legalized any form of medical or recreational marijuana, along with Idaho, Nebraska, North Carolina, South Carolina and Wyoming.

[2]        Colorado legalized medical marijuana in 2000, and Missouri did so in 2016.

Patrol ("KHP") has waged war on motorists—especially out-of-state residents traveling between Colorado and Missouri on federal highway I-70 in Kansas.  As wars go, this one is relatively easy; it's simple and cheap, and for motorists, it's not a fair fight.  The war is basically a question of numbers: stop enough cars and you're bound to discover drugs.[3]  And what's the harm if a few constitutional rights are trampled along the way?

The Fourth Amendment to the United States Constitution protects citizens from "unreasonable searches and seizures," which is why KHP troopers must have reasonable suspicion to search an individual's person or property.[4]  The KHP has developed a work-around, however, which exploits fundamental precepts of the American legal system, along with the ignorance and timidity of the motoring public.  Kansas has hundreds or thousands of traffic laws on the books. These traffic laws give KHP troopers innumerable reasons to stop motorists for violations which may involve public safety, but the stops actually intended to investigate drug crimes for which they have little or no evidence.[5]  Once the vehicle is detained, the trooper can look inside the car for drugs

---

[3]      The KHP's goal in criminal interdiction is to reduce the flow of contraband into all areas of the United States, disrupt terrorist activities and reduce crimes associated with the drug trade.  Contraband can include drugs, drug money, weapons and other items, but trial testimony focused almost entirely on drugs.  When troopers intercept currency tied to drugs, the KHP keeps some of it to cover operational costs, even if the driver is not charged with or convicted of a crime. Kansas Standard Asset Seizure and Forfeiture Act, K.S.A. § 60-4101 et seq.

[4]      U.S. Const. amend. IV.  "Reasonable suspicion" requires a "particularized and objective basis" for suspecting that the particular person stopped has committed, is committing or is about to commit a crime.  Naverette v. California, 572 U.S. 393, 396 (2014).

[5]      In Whren v. United States, 517 U.S. 806, 815–19 (1996), the Supreme Court held that when officers witness traffic violations, they are authorized to make traffic stops even if the stops are pretextual, i.e., the motivation for the stop is not to enforce traffic laws but to investigate other possible crimes.  Since Whren, the state traffic codes have become "extremely powerful tools" in the war against drugs.  Shortly after Whren, one author noted as follows:

(continued . . .)

or other contraband in plain view.[6]  If no drugs or contraband are in plain view, the trooper cannot

search the vehicle without "reasonable suspicion" to believe that a crime has been, is being or is

about to be committed.

Typically, at the beginning of the initial traffic stop, a trooper does not have reasonable

---

[5]( . . . continued)

These codes regulate the details of driving in ways both big and small, obvious and arcane.  In the most literal sense, no driver can avoid violating *some* traffic law during a short drive, even with the most careful attention.  Fairly read, Wren says that any traffic violation can support a stop, no matter what the real reason for it is; this makes any citizen fair game for a stop, almost any time, anywhere, virtually at the whim of police . . . .

. . . .

. . . There is no detail of driving too small, no piece of equipment too insignificant, no item of automobile regulation too arcane to be made the subject of a traffic offense.  Police officers in some jurisdictions have a rule of thumb: the average driver cannot go three blocks without violating some traffic regulation.  Reading the codes, it is hard to disagree; the question is how anyone could get *as far as three blocks* without violating the law.

When we think of traffic offenses, we think of "moving violations"—exceeding the speed limit, crossing dividing lines, and the like.  But in fact traffic codes regulate many other aspects of driving-related activity, including some that seem almost wildly hypertechnical.  And some of these offenses have nothing to do with driving at all.  Rather, they are "equipment violations"—offenses in which driving with incorrect, outdated, or broken equipment constitutes the violation.  And then there are catch-all provisions: rules that allow police to stop drivers for conduct that complies with all rules on the books, but that officers consider "imprudent" or "unreasonable" under the circumstances, or that describe the offense in language so broad as to make a violation virtually coextensive with the officer's unreviewable personal judgment.

David A. Harris, "Driving While Black" And All Other Traffic Offenses: The Supreme Court And Pretextual Traffic Stops, 87 J. Crim. L. & Criminology 544, 545, 557–58 (Winter 1997).

[6]      Texas v. Brown, 460 U.S. 730, 737–44 (1983) (officer may seize contraband in plain view inside vehicle during lawful traffic stop).

suspicion to search the vehicle or the driver.  Therefore, his job is to "develop" reasonable suspicion to do so.[7]  A trooper without reasonable suspicion is a trooper engaged in a fishing expedition for evidence of drug crimes.  Fortunately for troopers, the law provides convenient, easy-to-use, virtually fool-proof tools to do so: (1) after the traffic stop is concluded, the trooper can try to keep the driver talking until he or she says something which a trooper considers suspicious; or (2) the trooper can elicit the driver's consent to a search.[8]  In terms of authority to search, consent is the gold standard.

So how do troopers elicit consent?  Sometimes—actually, in a surprising number of cases—the troopers need only ask.  Most drivers do not know that they have a right to deny consent, and troopers are more than happy to exploit their lack of knowledge of their legal rights.[9]  Even though the law requires that consent be knowing, intelligent and voluntary, troopers don't generally let such niceties stand in their way.  For drivers who are not initially forthcoming with consent, troopers are trained to conclude the traffic stop, somehow signal that the driver is free to go, then immediately re-engage the driver in friendly, casual conversation to keep the driver at the scene and

---

[7]     KHP troopers routinely describe their drug interdiction efforts as ones which involve "developing" reasonable suspicion.  Their word choice is telling.  "Developing" reasonable suspicion is not about evaluating whether the circumstances yield reasons to suspect unlawful behavior.  It is about extracting information from innocent motorists in hopes that they will make inconsistent statements which call their honesty into question, and that such statements, combined with body language, travel plans, nervousness, behavior of passengers, etc., will generate reasonable suspicion to search their vehicles for drugs.  Although "hundreds of traffic stops might occur with no arrests being made," the KHP trains its officers to "look past the traffic violation(s) for indicators of criminal activity" and cultivate an "ability to use the entire vehicle law book" to "make high volume traffic stops."  The KHP promises that drug interdiction not only gets criminals off the road but "puts excitement into routine patrol."

[8]     Schneckloth v. Bustamonte, 412 U.S. 218, 219, 222 (1973) (consent is exception to rule that officer must have warrant or reasonable suspicion to conduct search, and consent must be "voluntarily given").

[9]     Id. at 231–32 (police need not inform drivers of right to refuse search).

enable the trooper to develop reasonable suspicion or take another stab at getting consent—a maneuver colloquially known as the "Kansas Two-Step."[10]  If the driver persists in refusing to consent, the trooper has a fallback position: search the vehicle anyway and claim that he had reasonable suspicion all along.[11]

The KHP trains its troopers that when developing reasonable suspicion, they may consider the fact that a motorist is traveling to or from a "drug source" or "drug destination" state.  Before Missouri legalized recreational marijuana in 2022, travelers on federal highway I-70 automatically qualified as traveling either toward or away from a "drug source" state (Colorado).  Now that both states have legalized recreational marijuana, any traveler on I-70 between Colorado and Missouri—that is, anywhere on I-70 in Kansas, traveling in either direction—is by definition

---

[10]       Ordinary citizens are no match for a trooper who wants to talk his way into a search. The KHP trains its troopers to "Be nice!" because "the less robotic you are, the easier it will be for the innocent motoring public to relax."  One commentator noted as follows:

> Their goal, plain and simple, is to get people to agree to a search.  They are accomplished at the verbal judo necessary to subjugate their "opponents," they have the authority of their office behind them, and they make it their business to get what they want.  The officer starts with innocuous sounding questions . . . [t]hen the questions often get more personal.  They are designed to find contradictions that show the driver might have something to hide, and to put the driver in the frame of mind of responding to the officer's authority.  Police call it "sweet talk," and it almost always leads to a consensual search.  None of this is accidental; rather it is a well-honed, calculated psychological technique that police departments teach their officers.  And it works.

Harris, supra note 5, at 574.

[11]       The KHP has presented no evidence that its war on motorists is necessary for effective enforcement of drug laws, or even that such law enforcement tactics are effective: the record evidence is scarce, but it indicates that from 2016 to 2021, the KHP conducted between 124,387 and 211,531 traffic stops per year, and only recovered contraband in 0.16 per cent to 0.28 per cent of them.  Further, the KHP presented no evidence on the volume of innocent people who have been subjected to pretextual traffic stops or unlawful searches, or the percentage of traffic stops that were too pretextual to warrant a traffic warning, let alone a traffic citation.

traveling both to and from a "drug source" state.  And it doesn't stop there: according to KHP troopers, all major cities are also drug sources.[12]  As a result, all drivers on I-70 have moving targets on their backs.  Not surprisingly, even before Missouri legalized recreational marijuana, KHP troopers targeted out-of-state motorists for a disproportionate number of stops[13] and, once stopped, KHP troopers subjected them to a disproportionate number of canine sniffs and vehicle searches based on their out-of-state residences and their travel to and from "drug sources" and "drug destinations."

The overall strategy behind pretextual policing is legal—and that fact is not likely to change any time soon.[14]  In the meantime, the law has two primary checks on pretextual policing: (1) it limits the "tolerable duration" of a traffic stop and (2) if troopers do not have reasonable suspicion, it requires drivers' consent to extend the duration of the stop.  In Rodriguez v. United States, 575 U.S. 348 (2015), the Supreme Court made clear that the traffic stop may last no longer than necessary to effectuate its purpose: "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns . . . .  Because addressing the infraction is the purpose of the stop,

---

[12]     As a result, all motorists on I-35 between Kansas City and Wichita are also suspect.

[13]     For out-of-state motorists, it is more challenging to appear for court dates, to put up a legal fight to contest KHP actions and, because they cannot vote in Kansas elections, to effect political reform of KHP drug interdiction practices

[14]     For those who object to pretextual policing, the power to curb it lies with elected officials who set law enforcement policy and motorists who are empowered to assert their rights. One can scarcely fault the KHP for using all legally available tactics to achieve its mission. Pretextual policing only works, however, if drivers are ignorant of their rights or fail to assert them. KHP training materials acknowledge that pretextual policing strategies depend on ignorant, timid drivers, and joke that more informed and assertive drivers might identify themselves with bumper stickers that say, "WARNING! OCCUPANT KNOWS THEIR 4TH AMENDMENT RIGHTS."

it may 'last no longer than is necessary to effectuate th[at] purpose.'"  Id. at 354 (citations omitted); see also Bailey v. United States, 568 U.S. 186, 194 (2013) (citing Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion)) ("The scope of the detention must be carefully tailored to its underlying justification.").

Beyond that time, if the trooper lacks reasonable suspicion, he may extend the stop to ask questions unrelated to the stop, or to wait for other officers or a drug dog to arrive—but only with the driver's consent.[15]  If a driver merely submits to a trooper's show of authority, the driver has not given willing and voluntary consent and the trooper has committed a seizure for which he must have reasonable suspicion.  United States v. Mosley, 743 F.3d 1317, 1324–25 (10th Cir. 2014).  The encounter is not consensual unless a "reasonable person" would feel free to "disregard the police and go about his business."  Florida v. Bostick, 501 U.S. 429, 434 (1991) (citation omitted).

The KHP bears the burden of showing that reasonable suspicion justified any search and seizure.  United States v. Simpson, 609 F.3d 1140, 1156 (10th Cir. 2010).  The KHP also bears the burden of showing that in the totality of the circumstances, consent was freely and voluntarily given, and not the product of express or implied coercion.  Schneckloth, 412 U.S. at 222, 227.

"The touchstone of [the Court's] analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."  United States v. Morgan, 855 F.3d 1122, 1126 (10th Cir. 2017) (quoting Pennsylvania v. Mimms, 434 U.S. 106, 108–09 (1977)).  Reasonableness "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."  Mimms, 434 U.S. at 109 (quoting United States v. Brignoni-Ponce,

---

[15]     Because it extends a traffic stop, a trooper requires reasonable suspicion to conduct a canine sniff of a vehicle after the completion of a traffic stop.  Rodriguez, 575 U.S. at 354–57.

422 U.S. 873, 878 (1975)).  In this case, the Court endeavors to strike the appropriate balance and finds that the KHP does not routinely require or ensure that troopers follow the law with regard to reasonable suspicion and consent, and it has developed a practice of detaining motorists under circumstances which the Fourth Amendment forbids.  Stated otherwise, the KHP has not satisfied its burden of proving that its policies and practices satisfy the Fourth Amendment; troopers unlawfully detain motorists based on factors which do not satisfy the low bar of reasonable suspicion, and the KHP has not shown that such motorists give constitutionally valid consent to the prolonged periods of detention which they confront.[16]  Such policies and practices must be condemned as unlawful.  Furthermore, because traditional legal remedies are inadequate to ensure the KHP's compliance with its constitutional obligations, declaratory and injunctive relief must be awarded to plaintiffs.

## FINDINGS OF FACT

I.    **Introduction**

Plaintiffs bring suit under 42 U.S.C. § 1983 against Colonel Herman Jones in his official capacity as Superintendent of the KHP.  Plaintiffs allege that Jones maintains a policy and practice of detaining drivers in violation of the Fourth Amendment and seek injunctive and declaratory relief to remedy practices allegedly (but not exclusively) undertaken in the course of drug interdiction: (1) consideration of a driver's out-of-state residence, origin or destination as a factor contributing to reasonable suspicion to detain or search the vehicle, and (2) troopers' use of the  Kansas Two-Step to prolong roadside detentions under circumstances where reasonable drivers would not feel free to leave.

---

[16]    At most, the motorists in this case acquiesced to shows of official authority by armed KHP troopers.  Being ignorant of their rights, KHP troopers were able to effectively seize them without much fuss.

Plaintiffs are three drivers (Blaine Shaw, Joshua Bosire and Mark Erich) and two passengers (Samuel Shaw and Shawna Maloney) who were involved in three separate traffic stops by KHP troopers in 2017, 2018 and 2019.  In all three traffic stops: (1) plaintiff's vehicle had an out-of-state license plate; (2) plaintiff was traveling to or from Colorado; (3) the driver committed a traffic violation; (4) a KHP trooper witnessed the traffic violation, pulled the vehicle over and gave the driver a citation or warning; (5) the trooper further detained plaintiff for a canine sniff of the vehicle; and (6) the trooper did not discover drugs or other contraband.

In the Shaw and Erich/Maloney traffic stops, the trooper performed the Kansas Two-Step by saying goodbye to plaintiff after issuing the ticket or warning, taking a few steps away from the vehicle, immediately spinning around and returning to the vehicle, asking plaintiff if he could ask a few more questions, and seeking more information about plaintiff's travel plans, whether plaintiff had drugs in the vehicle, whether plaintiff consented to a search of the vehicle, etc.  In both stops, plaintiffs denied having contraband and refused consent to search, but the troopers continued to detain them to procure dogs for canine sniffs of the vehicles.  In the Bosire traffic stop, the trooper detained plaintiff for a canine sniff after the initial stop had concluded—without performing a Kansas Two-Step—in part because plaintiff declined to answer his questions about whether he was traveling from Colorado.

Plaintiffs bring suit against Jones as Superintendent and ultimate policymaker of the KHP.[17] Plaintiffs allege that as a state official acting in his official capacity, in violation of their Fourth Amendment rights, Jones maintains a policy and practice of detaining drivers based on state residency and innocent travel plans.  Specifically, plaintiffs allege that in violation of <u>Vasquez v. Lewis</u>, 834 F.3d

---

[17]     On July 1, 2023, Jones retired as Superintendent of the KHP.  On July 7, 2023, Kansas Governor Laura Kelly appointed Colonel Erik Smith to Superintendent of the KHP. Accordingly, the Court will order the parties to show cause why Smith should not be substituted as defendant in this case.

1132 (10th Cir. 2016), in developing reasonable suspicion to detain drivers, the KHP permits troopers to consider their state of residence and travel plans.  Plaintiffs further allege that in violation of their Fourth Amendment rights, the KHP allows troopers to use the Kansas Two-Step to unlawfully detain drivers to ask questions that will hopefully elicit incriminating information amounting to reasonable suspicion for a canine sniff, or to procure consent for such a search.[18]

Under 42 U.S.C. § 1983, Blaine Shaw, Samuel Shaw and Bosire brought damage claims against the individual troopers who conducted their traffic stops.  Samuel Shaw settled his damage claim against Trooper Douglas Schulte prior to trial.  Blaine Shaw and Bosire went to trial in February and April of 2023, and each received a jury verdict that the individual KHP trooper in question had violated his Fourth Amendment right to be free from unreasonable searches and seizures.  Prior to the bench trial against Jones, the parties stipulated that evidence from the Blaine Shaw and Bosire trials would be incorporated as part of the record in this case.

## II.    Disparities In KHP Traffic Stops

At least since 2014, when Colorado legalized the recreational cultivation, sale and possession of marijuana, KHP troopers have routinely considered a driver's travel plans (out-of-state travel origin and destination) as factors contributing to reasonable suspicion of drug possession or drug trafficking, and they have routinely detained out-of-state drivers for traffic stops and canine sniffs at disproportionately high rates compared to drivers who are Kansas residents.

Jonathan Mummolo is an assistant professor of politics and public affairs at Princeton University and co-owner of Knox & Mummolo LLC, which provides statistical consulting services

---

[18]    Even if they claim to already have reasonable suspicion for a search, troopers sometimes detain drivers to ask more questions to "further" develop reasonable suspicion or, because consensual searches are easier to handle than non-consensual searches, solicit consent for a search.

in lawsuits that involve law enforcement.  Mummolo conducted a quantitative analysis of KHP traffic enforcement policies to determine whether the KHP enforces traffic laws differently against Kansas motorists and out-of-state motorists.[19]  According to Mummolo, KHP troopers are far more likely to stop out-of-state drivers than Kansas drivers.  From January of 2018 to November of 2020, KHP troopers stopped 70 per cent more out-of-state drivers than would be expected if KHP troopers stopped in-state and out-of-state drivers at the same rate.  The 70 per cent discrepancy represents roughly 50,000 traffic stops.  This disparity is statistically significant, with a roughly one per cent likelihood that these results would arise under circumstances with no actual disparity in stop rates.  For this disparity to be explained by out-of-state drivers being more likely to speed, roughly 88 per cent of out-of-state drivers would have to speed at places and times where only 29 per cent of in-state drivers speed.  No evidence supports the existence of such a disparity in driving habits.

Once a motorist has been pulled over for a traffic stop, out-of-state motorists are much more likely than in-state motorists to be subjected to canine sniffs of their vehicles.  Mummolo analyzed 430 canine deployment reports and found that 399 (more than 90 per cent) were conducted on out-of-state motorists, even though out-of-state drivers represented only about 35 per cent of the drivers on the road at the measured times and locations.  Further, although out-of-state drivers represented more than 90 per cent of the analyzed canine sniffs, they represented only about 77 per

---

[19]       To conduct this analysis, Mummolo reviewed (1) a dataset created from KHP traffic enforcement records reflecting the reason for a given stop, the state identified on the vehicle's license plate, and the date, time and location of the stop; (2) Kansas Department of Transportation ("KDOT") records measuring traffic volume by hour of the day and the speed of that traffic volume; (3) a commercial dataset, purchased from the vendor SafeGraph, measuring the home locations of visitors to businesses in Kansas, which Mummolo used to determine the approximate composition of Kansas drivers versus out-of-state drivers on the road; (4) reports from KHP and other law enforcement agencies documenting canine sniffs conducted during KHP traffic stops; and (5) data from the Centers for Disease Control and Prevention regarding traffic fatalities by location in Kansas and Colorado.

cent of the total traffic stops at the times and places studied.[20]  In other words, even accounting for the disparity in initial traffic stops, out-of-state drivers are disproportionately subjected to canine sniffs once they are stopped.  Defendant presented no evidence which explains this disparity on grounds that are unrelated to out-of-state residency or travel plans.[21]

Aside from this statistical evidence, the Court heard conflicting evidence regarding whether and to what extent the KHP permits troopers to rely on a driver's out-of-state residence or license plates as factors in developing reasonable suspicion.  On paper, KHP policy does not permit troopers to rely *solely* on out-of-state license plates to justify a traffic stop or canine sniff, and the Court did not review any traffic stops where a trooper clearly relied solely on that factor.  The statistics, however, cannot be explained except by the inescapable inference that KHP troopers routinely consider out-of-state license plates, in combination with other factors, in developing reasonable suspicion.  Based on the significant statistical disparity between stops and searches of in-state versus out-of-state motorists, it is clear that KHP troopers target out-of-state drivers for traffic stops and canine sniffs.  As noted, Jones has not presented evidence which explains this disparity on grounds unrelated to drivers' out-of-state residency and/or travel plans.

## III.    Trooper Douglas Schulte's Traffic Stop Of Blaine And Samuel Shaw

On December 20, 2017, KHP Trooper Schulte stopped Blaine and Samuel Shaw on I-70, near Hays, for traveling 91 miles per hour in a 75 mile per hour zone.  Blaine Shaw was driving the vehicle, a 2010 Chrysler with Osage Nation license plates.  His brother Samuel was in the passenger

---

[20]    Further, Mummolo found that of the canine searches analyzed, barely half resulted in the discovery of illegal drugs, drug residue or drug paraphernalia.  This means that almost half of all KHP canine searches result in either (1) no canine alert or (2) a canine alert that is a "false positive," i.e., the troopers search the vehicle and do not recover drugs or other contraband.

[21]    Defendant objected to Mummolo's methodology and attacked his conclusions on various grounds, none of which are persuasive.

seat.  The Shaws were traveling from their residence in Oklahoma City, Oklahoma to visit family and friends in Colorado.

Schulte approached the vehicle, spoke to Blaine Shaw about speeding, took his driver's license and registration, and returned to the patrol vehicle to write a speeding citation.  Schulte gave Blaine Shaw the citation, license and registration and told him to have a safe trip.  Schulte then took three steps away from the vehicle, but pivoted within three and a half seconds and returned to the driver's window to ask, "Hey Blaine, can I ask you a question real quick?"  Blaine responded "yeah." He did not feel free to leave because Schulte was too close to his car to do so safely.  Schulte asked him more questions about his travel destination and whether any contraband was in the car.  Blaine denied having any contraband.  Schulte asked for permission to search the vehicle and Blaine Shaw refused.  Schulte nonetheless detained the Shaws for a canine sniff.  The canine allegedly alerted and Schulte searched the vehicle but did not recover any narcotics.[22]  The Shaws' initial traffic stop

---

[22]     The Supreme Court has held that where plaintiff does not challenge the canine's training or certification, a canine alert or indication can generally provide probable cause to search a vehicle.  Illinois v. Caballes, 543 U.S. 405, 409 (2005).  Here, however, plaintiffs did challenge canine training and reliability, and the record is woefully lacking on the extent to which canine deployment in drug interdiction is reliable under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

The record contains no evidence about the training, accuracy or track record of any canine involved in this case, or whether that training complied with established industry standards of dog training and utilization.  Only two canine handlers testified, and their testimony on this issue was cursory.  Trooper Justin Rohr, who handled the Erich/Maloney sniff, testified generically that the KHP has weekly training and certification requirements for canines, and conducts "several tests . . . to ensure that the dog is indicating or alerting to only drug odor . . . within the search area."  He added that his dog (Nico) was certified and had passed that sort of testing.  Trooper Chandler Rule, who handled the Dunn sniff, testified that the KHP has a ten-week dog training program, and that canine handlers train every week for at least eight hours.  He had no estimate of how often his dog (Cain) had alerted to a drug odor but the ensuing search revealed no contraband.  The record contains no further evidence on how any of the KHP canines were trained or certified, or on their actual performance records.  A dog's "alert" or "indication" only establishes probable cause if the dog is reliable, and since troopers discovered no contraband in any canine sniff in this case, the reliability of these particular canines is open to question.

(continued . . . )

- 13 -

(before Schulte performed the Two-Step) lasted 12 minutes, and Schulte detained the Shaws at least

28 minutes longer to perform a Two-Step, ask more questions, perform a canine sniff and search

their vehicle.[23]

Schulte testified that based on the following factors, he had reasonable suspicion to extend

the traffic stop: (1) Blaine Shaw took too long to pull over; (2) in 2009 (eight years earlier), Blaine

Shaw had a charge for possession of marijuana with intent to distribute; (3) the minivan was

registered to Blaine Shaw's father; (4) the Shaws were traveling on I-70, which was a "known drug

corridor;" (5) the Shaws were traveling to Denver, Colorado, which was a known drug source state;

(6) the Shaws were from Oklahoma, which was a known destination state for marijuana; (7) the

---

[22]( . . . continued)

Another problem: Rule testified that an "alert" is untrained behavior that a dog elicits when he is smelling a trained odor, but the "handler is typically the only one who would notice the alerting behavior." In other words, an alert may not be apparent from objectively observable facts. The KHP asks the Court to rely on the ipse dixit of the handler, whose credentials and expertise are themselves unaddressed by the evidence, and cross its fingers that the handler did not cue the allegedly alerting behavior.

What's more, the record contains little information about whether and to what extent canines alert or indicate to drug odors which are remote in time. Such information is critical in this case because all plaintiffs were driving rental cars, cars which belonged to other people or second-hand vehicles which they recently purchased. Rohr explained that canines are trained to alert on drug odors, not drugs, and according to Rohr, a dog can alert to a "very minimal" residual odor of marijuana; even where no drugs are present, the odor "could have been there at one time" (for example, "somebody could have drug odor on their hands and touch a door handle"). Therefore, when Nico reacted as he did in the Erich/Maloney sniff, it only meant that "there was drug odor present at one time." On these facts, canine behavior contributes little to nothing in the reasonable suspicion calculus.

Given the inadequate state of the record, this opinion should not be read to suggest that canine deployment is reliable or probative under Daubert. In fact, this Court joins District Judge Clark Waddoups in suggesting that the Tenth Circuit Court of Appeals revisit its "broad proclamations and comfort in canine sniffs and their certifiers." United States v. Esteban, 283 F. Supp. 3d 1115, 1134 (D. Utah 2017).

[23]     For unknown reasons, the dash camera footage of this traffic stop ends 40 minutes into the traffic stop. It is unclear exactly how long the Shaws' detention lasted in total.

vehicle was "crammed full of stuff" and had a "lived in look;" (8) Samuel Shaw did not look at or speak to Schulte; and (9) Blaine Shaw "claimed to be a criminal justice major at his age," but he refused to consent to a search.

On February 8, 2023, a jury found Schulte liable and awarded Blaine Shaw $1.00 in compensatory damages. The jury concluded that for the purpose of conducting a canine sniff, Schulte had extended Blaine Shaw's detention without reasonable suspicion.

In developing reasonable suspicion, Schulte relied in part on the Shaw brothers' plan to travel to Colorado, which he considered to be a drug source state, and their travel origin in Oklahoma, which he considered to be a drug destination state. The rest of the factors on which Schulte relied—Blaine Shaw's delay in pulling over, his marijuana charge in 2009, the vehicle being owned by the Shaws' father, the vehicle traveling on I-70, the "lived-in" appearance of the vehicle, Samuel Shaw's behavior and Blaine Shaw's criminal justice major—did not provide meaningful indicia of criminal activity. Further, when Schulte executed the Kansas Two-Step and returned to the vehicle, a reasonable driver in Blaine Shaw's position would not have felt free to leave. Less than four seconds elapsed between Schulte disengaging and re-engaging Blaine Shaw in conversation. This fact, combined with Schulte's proximity with the Shaws' vehicle, would have caused a reasonable driver to believe that he was still detained and was not free to leave.

Consistent with the jury verdict, the Court finds that (1) in developing reasonable suspicion, Schulte gave undue weight to the Shaws' out-of-state residence and travel plans, in violation of the Fourth Amendment; and (2) in an effort to procure consent for a search, elicit incriminating information and conduct a canine sniff, Schulte impermissibly extended the Shaws' detention by performing the Kansas Two-Step under circumstances where a reasonable driver would not have felt free to leave.

The KHP never disciplined Schulte for violating the Shaws' Fourth Amendment rights or instructed him to undergo corrective action such as re-training with legal counsel.  Although Blaine Shaw's encounter with Schulte makes him anxious about the prospect of being detained by the KHP, he continues to drive through Kansas to visit friends and family in Colorado.

**IV.**   **Trooper Justin Rohr's Traffic Stop Of Mark Erich And Shawna Maloney**

On March 9, 2018, at about 6:00 A.M., KHP Technical Trooper Justin Rohr was patrolling I-70 near Salina, Kansas, when he observed a white Mini Winnebago Chalet recreational vehicle ("RV") traveling eastbound.  Although the RV had not committed any traffic violations, Rohr decided to follow it because the time of day was suspicious, March was an uncommon time for camping and RVs are used to traffic narcotics.

Mark Erich was driving the RV and his wife Shawna Maloney was in the passenger seat. Two of their children, aged 10 and 13, were in the back.  The family lived in Colorado and was traveling to Alabama to visit family.

Erich was driving the RV in the right lane.  Rohr came up behind the RV in the left lane and drove less than one car-length behind it, virtually on its bumper, for about 15 seconds.  Rohr claimed that he drove in that position to "observe the tag, and observe the Winnebago," but the RV and its license plate were more visible from a position directly behind it in the other lane.  Rohr's headlights were blindingly bright in Erich's rear view mirror and distracted him.  When Rohr tailed him in that position for about 15 seconds, Erich became concerned that Rohr was a drunk or aggressive driver. To avoid Rohr's vehicle, Erich headed the RV toward the shoulder of the road.  In the process, the RV's right-side wheels crossed the fog line.  Rohr had seen that the RV had temporary tags from Colorado and a discolored spot on the back of the vehicle, and he immediately pulled directly behind

it, activated his lights and stopped the RV for crossing the fog line.[24]

Trooper [FNU] Gleason was in the patrol vehicle with Rohr.  As they approached the RV on foot, Rohr stated that he smelled bondo or paint and asked Gleason if he also smelled it.  Gleason stated that he did not.[25]  Rohr asked for Erich's driver's license and insurance and asked him whether the vehicle had just been painted, because "it smells like paint out here."  Erich said they had not painted the RV, that they had just bought it and that they didn't know if it had been recently painted.  Rohr noticed that Erich had a small amount of white paint on his hand, similar to the color of the RV.[26]  Rohr did not ask Erich about the paint on his hand, but because of the discolored spot on the back of the RV, the paint on Erich's hand and the alleged smell of paint, Rohr testified that he believed that the RV had a painted-over false compartment in the rear.  Rohr ran Erich's driver's license and learned that Erich had been arrested in 2004 (13 years earlier) for possession of drug paraphernalia.

Rohr returned to the RV, gave Erich a warning and told Erich and Maloney to "have a safe trip" and "drive careful."  Rohr took four steps away from the vehicle.  Four and a half seconds later, he returned to the driver's window and asked, "Hey sir, can I ask you some questions?"  Erich and

---

[24]    K.S.A. § 8-1522(a) ("A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.").  The Kansas Supreme Court has held, however, that a violation of this statute "requires more than an incidental and minimal lane breach."  State v. Marx, 289 Kan. 657, 674, 215 P.3d 601, 612 (2009).  In Marx, the court held that a single instance in which a vehicle crossed the fog line did not allow for a reasonable suspicion of a traffic violation.  Id. at 675–76, 215 P.3d at 612–13.  Rohr observed Erich cross the fog line only once, which under Marx is insufficient to establish a violation of § 8-1522(a).

[25]    Erich and Maloney never smelled bondo or paint in or around the vehicle.  Shawna Maloney was pregnant at the time and suffering from nausea and sensitivity to smells.  She testified that due to that sensitivity, she would have noticed any smell of bondo or paint in or around the RV.

[26]    Erich had painted trim at work the day earlier.

Maloney did not feel free to leave because Rohr was too close to the vehicle to do so.  Maloney also felt that because of Rohr's position of authority, she was obligated to stay and answer his questions.

Rohr and Erich had the following exchange:

Rohr: Hey sir, can I ask you some questions?  You said you guys are heading to Alabama?

Erich: Yeah.

Rohr: And how long are you guys gonna be out there?

Erich: Do I have to answer these questions?

Rohr: You don't have to.  Okay.

Erich: I'd prefer not to.

Rohr: Okay.  Can I talk to you any further, or…?

Erich: I'm free to go, right?

Rohr: You are free to go.

Erich: Okay.  I'd rather go.

Rohr: Okay.  Here's what I'm gonna do, okay.  I'm gonna detain you now, okay, because I think that you might have a false compartment in this vehicle.

Even before the Kansas Two-Step, Rohr had decided to extend the traffic stop based on the following factors: (1) drug traffickers sometimes travel in older-model RVs; (2) drug traffickers sometimes travel in the early morning or late at night; (3) he smelled paint or bondo; (4) Erich had paint on his hand; (5) the RV had a discolored spot, which suggested a false compartment; (6) because Erich had paint on his hand, Rohr believed that Erich and Maloney were dishonest about their travel plans and their knowledge whether the RV had been painted; and (7) the RV was traveling from Colorado, a known source state for drugs.

After Rohr informed Erich that he was detaining them, Rohr asked Erich if they had drugs in the car, which Erich denied.  Rohr asked why Erich had paint on his hand.  Erich told him "I'm a

construction worker" and "I painted today."  Rohr told the family to get out of the RV.  The weather

was "very, very cold," and the children were shivering on the side of the road, even with down

comforters around them.  Maloney was concerned for the safety of her children because of their

proximity to the highway at night.

Rohr was a canine handler.  His canine was in the back of the patrol vehicle, and he began a

canine sniff of the RV.  Rohr testified that when he started the sniff, he believed that the RV had a

false compartment where the discolored spot was.  Rohr began the canine sniff at the back of the RV

and pointed at the discolored spot.  The canine did not alert.  Rohr had the canine sniff around the

entire RV, returned to the back of the RV, and again pointed at the discolored spot.  This time, the

canine allegedly alerted.[27]

After the canine sniff, the troopers entered the RV and searched it for about 20 minutes.  Two

more troopers, Troopers Dylan Frantz and Phil Hendrickson, arrived.  In the dashcam footage, Rohr

can be heard asking one of the troopers if he can smell paint and the trooper replies "not yet."  Rohr

asked another trooper to "smell in here" and asked if he could smell anything; the trooper responded

in the affirmative but did not know what the smell was and could not identify it as paint.  The troopers

---

[27]     The dashcam video from Rohr's patrol vehicle does not show a visible alert, but Rohr testified that the canine started sniffing more intensely and "bracketing," i.e., changing the location of his head or nose from wider to narrower.  Rohr also testified that after alerting, the canine "indicated" by freezing at the back of the vehicle.  The dashcam video does not show visible alerting or freezing.  Where videotapes do not objectively and visibly confirm their testimony, the Court generally declines to afford meaningful weight to KHP trooper testimony about canine "bracketing," "freezing," "indicating" or "alerting" as reasonable grounds to detain a vehicle.  Neither side produced evidence that these behaviors are reliable indicia of contraband under Daubert.  Moreover, the record contains evidence that canine behavior which indicates drugs is not detectable except to officers who are conducting a given search.  Rohr and Trooper Chandler Rule, both canine handlers, testified that a canine's alerting behavior often is not noticeable to anyone except a canine handler who has trained with that specific canine.  Evidence of the canine behavior is problematic for these reasons and those stated above, in addition to the fact that the troopers did not eliminate cuing as an explanation for the dog's behavior.

found no narcotics or other contraband during the search.  After searching the vehicle, Rohr told

Erich and Maloney that they could get back in the RV.  As Erich approached the RV, Rohr stated,

"Hey sir, hold on just one second, all right?"  He detained the family once again, climbed the ladder

on the back of the RV, and searched the top of the vehicle.  After finding nothing, he again returned

and told the family that they were free to go.

The family's encounter with the KHP lasted about 40 minutes in total: about nine minutes

for the initial traffic stop (before Rohr performed the Two-Step), and an additional 31 minutes in

which Rohr performed the Two-Step, conducted a canine sniff and searched the RV.[28]  Because the

troopers had damaged the RV, the family could not camp in it as they had planned and instead had

to stay with family members.  On their trip back to Colorado, they drove through Texas instead of

Kansas because they did not want to risk getting pulled over again.

Maloney experienced so much anxiety from the traffic stop that she sought mental health

therapy, was unable to drive her personal vehicle for three months and dropped from full-time to

part-time work.  Erich was angry and felt violated and anxious as a result of the stop.  The family

did not take another vacation for three years because their children were too scared.  They ultimately

sold the RV.  Erich and Maloney now distrust law enforcement and have experienced multiple

situations, such as an attempted burglary, where they could have called the police but chose not to

because they feared the police.  Erich and Maloney have driven on I-70 through Kansas multiple

times since the traffic stop, but experience anxiety when doing so and avoid bringing their children

---

[28]    When Maloney re-entered the RV, she noticed that the troopers had disassembled
the radio, taken the dashboard apart, taken the domes off the light fixtures and smoke detectors
and broken some of them, gone through the refrigerator and the cupboards, dumped all of the
family's clothes out of their backpacks, moved the mattress and "messed up" equipment under the
bed, damaged the bathroom door to the point that it was hanging off the frame, broken the towel
rack, removed and broken the panel underneath the shower and broken the toilet.

when possible.

Rohr completed a KHP report which detailed the traffic stop and canine sniff.  The report did not detail all of Rohr's ostensible bases for reasonable suspicion.  In his report, Rohr claimed that he smelled a strong odor of paint or bondo, that the vehicle had a temporary tag and that the driver had white paint on his hand.  He also discussed the canine sniff and claimed that his canine "began to sniff intensely high on the back of the vehicle" and "froze with his feet on the rear bumper and starred [sic] at the rear of the vehicle," which was "his prescribed behavior when locating the source of an odor trained on."  In 2020, the KHP promoted Rohr to Lieutenant, a position where he supervises and evaluates other troopers.

During the traffic stop, Rohr unlawfully detained Erich and Maloney in violation of their Fourth Amendment rights.  Rohr decided to follow Erich and Maloney's RV because it was morning, March was an uncommon time for camping and RVs are commonly used to transport drugs.  He closed in and saw Colorado tags.  Rohr's patrol car was dangerously close to the RV, and his head lights blinded and distracted Erich because they reflected in the RV's rear-view mirrors.  For no legitimate law enforcement reason, Rohr followed so closely that he forced Erich to take evasive action and drive over the fog line.  A reasonable driver in Erich's position would have feared that Rohr was a dangerous driver who presented a high risk of causing a collision or road rage incident and would have steered away to create a safer distance.  In response, Rohr detained Erich for crossing the fog line.

The Court recognizes that a justified traffic stop, even when pretextual, does not violate a driver's Fourth Amendment rights.  United States v. Swan, No. 21-8071, 2022 WL 1763392, at *5 (10th Cir. June 1, 2022).  Whether a traffic stop is valid turns on whether the officer had a reasonable suspicion that the motorist violated a traffic law.  United States v. Vercher, 358 F.3d 1257, 1261

(10th Cir. 2004).  Here, Erich did not commit a traffic violation, and Rohr did not have an objectively reasonable belief that he had done so.  First, Kansas law requires a driver to stay "*as nearly as practicable* within a single lane." K.S.A. § 8-1522(a) (emphasis added).  Under these circumstances, with Rohr driving so closely behind and to the left of the RV, it was not practicable or reasonable for Erich to stay in the right lane.  By moving to the side of the road, Erich attempted to put a safe distance between himself and Rohr's vehicle, which he did not know was a KHP patrol vehicle, and which was dangerously close to him.  Second, even if Erich did not have such an obvious and justifiable reason for veering away from Rohr's vehicle, the Kansas Supreme Court has established that a single instance of a driver crossing the fog line does not amount to reasonable suspicion of a traffic violation because a violation of K.S.A. § 8-1522(a) "requires more than an incidental and minimal lane breach." Marx, 289 Kan. at 674, 215 P.3d at 612.  Third, KHP policy does not permit troopers to initiate traffic stops based on such a minimal lane breach.  In 2020, KHP training material stated that when a trooper evaluates whether to initiate a traffic stop based on a vehicle crossing the fog line, "a single tap on the fog line is not going to cut it."[29]  The stop was pretextual from its inception: Rohr followed an RV with Colorado tags in hopes of provoking a traffic violation, and his conduct caused the very traffic violation that he was hoping for.[30]

---

[29]    The record contains no evidence that the training material in 2020 reflects a different approach from training conducted in 2018, when this stop occurred.

[30]    Traffic stops for trivial traffic violations are a time-honored pretextual policing tradition.  As far back as 1967, a police officer explained: "You can always get a guy legitimately on a traffic violation if you tail him for a while, and then a search can be made."  Another officer stated: "You don't have to follow a driver very long before he will move to the other side of the yellow line and then you can arrest and search him for driving on the wrong side of the highway."  A third officer explained: "In the event that we see a suspicious automobile . . . [that we] wish to search . . . we will usually follow the vehicle until the driver makes a technical violation of a traffic law.  Then we have a means of making a legitimate search." Harris, supra note 5, at 559 (quoting Lawrence F. Tiffany et al., Detection of Crime 131 (1967)).

The Court finds that Rohr provoked the traffic violation and that the initial traffic stop cannot be deemed reasonable under that circumstance.  The Tenth Circuit has not squarely addressed whether, when the traffic violation that provides the basis for the stop is provoked by the officer's own conduct, the "minimum level of objective justification" for the stop falls away and the stop becomes unreasonable.  Two district courts in this Circuit have answered that question in the affirmative.  United States v. Ochoa, 4 F. Supp. 2d 1007, 1009 (D. Kan. 1998); Esteban, 283 F. Supp. 3d at 1127–30.  The Tenth Circuit has considered and distinguished Ochoa in later cases without disavowing its reasoning.  See United States v. Worthon, 520 F.3d 1173, 1180 (10th Cir. 2008); United States v. Rodriguez, 215 F.3d 1338, 2000 WL 639581, at *4; United States v. Ozbirn, 189 F.3d 1194, 1199 (10th Cir. 1999).  The Court agrees with the well-reasoned opinions of Judge Marten and Judge Waddoups and finds that because Rohr induced the traffic violation by Erich, the initial traffic stop was invalid.

If Rohr had not induced the traffic violation, Rohr's traffic stop might have been justified if Rohr had a reasonable but mistaken belief that Erich had committed a violation.  United States v. Walraven, 892 F.2d 972, 975–76 (10th Cir. 1989) (reasonable suspicion may be supported by "objectively reasonable" and "good faith belief" of traffic violation even if premised on factual error).  In the totality of the circumstances, however, Rohr could not have reasonably believed that Erich had violated K.S.A. § 8-1522(a) or any other traffic law.  Marx has been clearly established as the law in Kansas since 2009, and the Court assumes that Rohr received training consistent with Marx and with KHP policy that troopers may not initiate traffic stops based on a "single tap on the fog line."  Even disregarding Marx and KHP policy, a reasonable officer in Rohr's position would have known that driving so closely to another vehicle would cause a reasonable and prudent driver to move off the road to avoid a collision or road rage incident.  Kansas v. Glover, 140 S. Ct. 1183,

1190 (2020) (officer may not stop driver for conduct "no different from any other driver's"). "Like all seizures, 'the officer's action [in conducting a traffic stop] must be justified at its inception.'" Id. at 1191 (quoting Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty., 542 U.S. 177, 185 (2004)). Rohr's actions were not justified and he did not have reasonable suspicion to initiate the traffic stop. Id. (reasonable suspicion standard takes totality of circumstances into account and presence of additional facts might dispel reasonable suspicion).

If the original traffic stop had been valid, Rohr might have had reasonable suspicion to extend the detention for a canine sniff, based on the alleged smell of fresh paint, the discolored spot on the back of the RV and the fact that Erich had white paint on his hand. On the other hand, no one except Rohr ever claimed to smell paint. Rohr asked Gleason whether he smelled paint, and Gleason stated that he did not. After Rohr performed the canine sniff and began searching the RV, he repeatedly asked Frantz and/or Hendrickson if they smelled paint, and neither trooper did.[31] Erich and Maloney credibly testified that they never smelled bondo or paint, that Maloney's pregnancy made her hypersensitive to smells and that such a smell would have made her sick. Further, Erich explained to Rohr that he had paint on his hand because of his construction work. While Rohr was not required to accept this at face value, nothing in the circumstances indicated that Erich was being deceptive—or for that matter, that Rohr actually smelled paint or bondo.

The other factors that Rohr relied on in developing reasonable suspicion—Erich and

---

[31]     Troopers Gleason, Frantz and Hendrickson did not testify at trial and the record is not explicitly clear that they worked for the KHP. Based on the circumstances, the Court assumes that all three were KHP troopers and that their statements that they did not smell paint are admissible as statements, offered against defendant, that the troopers made in a representative capacity. Fed. R. Evid. 801(d)(2)(A). Furthermore, Trooper Gleason is audible on the dash camera footage stating that he detected wet paint on the discolored spot on the back of the RV. This statement, however, is offered against plaintiff, not defendant, and therefore is inadmissible hearsay under Rule 801(c) and Rule 802, Fed. R. Evid., rather than an admissible statement offered against an opposing party under Rule 801(d)(2)(A).

Maloney traveling from Colorado, in an RV, early in the morning, and Erich having a criminal history—can only contribute minimally, if at all, to reasonable suspicion.  Traveling from a state that has legalized marijuana "does little to add to the overall calculus of suspicion," and is "so broad as to be indicative of almost nothing."   Vasquez, 834 F.3d at 1137–38 (quoting United States v. Guerrero, 472 F.3d 784, 788, 787 (10th Cir. 2007)).   While the Court credits Rohr's testimony that drug traffickers sometimes travel early in the morning and in older-model RVs, these factors alone are not sufficient to establish reasonable suspicion; a vast number of innocent drivers also drive early in the morning and/or in older-model RVs.

Finally, the fact that Erich had an aged criminal charge for possession of drug paraphernalia could contribute only minimally to the reasonable suspicion calculus of a reasonable officer.  See Shaw v. Schulte, 36 F.4th 1006, 1016 (10th Cir. 2022) (passage of time since criminal arrest decreases weight as reasonable suspicion factor); United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005) ("Even people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches.").  In these circumstances, this factor could contribute minimally, if at all, to reasonable suspicion.

This is a closer case than the Shaw and Bosire traffic stops.  Based largely on the discolored spot on the back of the RV and the matching paint on Erich's hand, the Court concludes that if the original traffic stop had been valid—which, to reiterate, it was not—Rohr had reasonable suspicion to detain Erich and Maloney for a canine sniff.  The fact that the RV had a discolored spot in the location where some RVs in other model years had a spare tire, and the fact that the RV's paint color matched the paint on Erich's hand, provided marginally sufficient reasonable suspicion that the RV

had a hidden compartment and that Erich had recently painted over the compartment to conceal it.[32]

Finally, even if Rohr had reasonable suspicion for the original traffic stop *and* reasonable suspicion to extend the detention for a canine sniff, Rohr clearly did not have reasonable suspicion to *further* extend the detention—a second time—to climb the ladder on the back and search the roof of the RV. Rohr had exhaustively searched the interior of the RV and found no contraband or any indication of criminal activity. He confirmed with every other trooper on the scene (as well as Erich and Maloney) that no one smelled paint. He returned to Erich and Maloney and told them that they could get back in the RV, clearly indicating that the traffic stop was over, then immediately detained them for a third time to search the roof of the RV. At this moment, Rohr no longer had a shred of reasonable suspicion. The only significant factors that could have justified the canine sniff and original search of the RV were the painted-over spot on the back of the RV and the matching paint on Erich's hand. Rohr's hunch that this spot concealed a hidden compartment was disproved. The canine sniff resulted in a false positive. Rohr had no reason to detain Erich and Maloney to search the roof of an RV, an area completely unconnected to the discolored spot on the back of the RV, and he offered no justification for this further search. See United States v. Moore, 795 F.3d 1224, 1228 (10th Cir. 2015) (police detention must last no longer than necessary to effectuate purpose of stop). The fact that the final detention was brief is irrelevant. See United States v. Mayville, 955 F.3d 825, 830 (10th Cir. 2020); United States v. Cates, No. 22-8038, 2023 WL 4411853, at *7 (10th Cir. 2023)

---

[32]    If Rohr had developed sufficient reasonable suspicion to detain Erich and Maloney for a canine sniff before he performed the Two-Step, he did not need to initiate a consensual encounter. However, it is still important for the Court to note that Rohr performed the Two-Step in circumstances where a reasonable driver would not feel free to leave. Four and a half seconds elapsed between Rohr disengaging and re-engaging Erich in conversation. The short length of the "break" in contact and Rohr's proximity with the RV would have caused a reasonable driver to believe that he was still detained and was not free to leave.

(even de minimis delays violate Fourth Amendment).   After evaluating the totality of the circumstances, the Court finds that Rohr (1) violated Erich and Maloney's Fourth Amendment rights by initiating a traffic stop without reasonable suspicion, and (2) even if the traffic stop had been permissible, Rohr violated Erich and Maloney's Fourth Amendment rights by detaining them without reasonable suspicion to search the roof of their RV.

**V.      Trooper Brandon McMillan's Traffic Stop Of Joshua Bosire**

On February 10, 2019, Bosire drove eastbound on I-70 to his residence in Wichita, Kansas after visiting his daughter in Colorado.  Bosire stopped at a Love's gas station in Ellis, Kansas to get gas, and entered the gas station to ask an attendant for help with the gas pump.  KHP Troopers Brandon McMillan and Douglas Schulte were inside the gas station, along with gas station customers.  McMillan testified that as he walked toward the exit of the gas station, he smelled marijuana.

McMillan saw Bosire's vehicle by the gas pump.  Bosire was driving a rental car with Missouri license plates.[33]  McMillan saw a second rental vehicle at the gas station, a Dodge Charger, and concluded that the two vehicles were a caravan to deliver or acquire drugs.  McMillan saw Bosire at the pump with another person and concluded that the second person was the driver of the second car.

McMillan drove east on I-70 and parked on the median to wait for Bosire's vehicle.  When Bosire drove past, he was going seven miles over the speed limit, and McMillan detained him for speeding.  During the stop, McMillan asked Bosire where he was going.  Bosire said that he was coming from the west and heading east.  Bosire declined to answer McMillan's other questions, such as whether he was coming from Colorado.

---

[33]      Bosire was in a rental car because it was winter and his personal vehicle did not have all-wheel drive.

McMillan did not smell marijuana in the vehicle, but saw that Bosire only rolled the driver's side window down about one-third of the way, had cameras mounted on the dashboard and rear seat headrest and had a notebook partially covered by a blanket on the back seat. McMillan returned to his patrol vehicle to run Bosire's information. He also radioed for Schulte to join him. When Schulte arrived several minutes later, McMillan told him "I don't think I can hold him for a dog."

McMillan learned from dispatch that Bosire had no outstanding warrants. He returned to Bosire's driver-side window and gave him a warning for speeding. McMillan did not perform a Kansas Two-Step but told Bosire that he was suspicious and asked to search his vehicle. Bosire refused. McMillan then detained him and called a canine unit. The canine did not alert and McMillan allowed Bosire to depart. Bosire's detention lasted about 42 minutes in total.

McMillan testified that he had reasonable suspicion to extend the traffic stop for a canine sniff based on the following factors: (1) he smelled marijuana at the gas station; (2) Bosire was driving a rental vehicle and appeared to be part of a drug caravan; (3) at the gas pump, Bosire spoke to another man who McMillan believed was the driver of the second rental car; (5) Bosire had cameras mounted in his vehicle, which was suspicious in a rental vehicle; (6) Bosire refused to answer questions about his travel plans; (7) Bosire did not completely roll down his window; and (8) Bosire had a notebook on the back seat which could have been a drug ledger.

McMillan lacked reasonable suspicion to detain Bosire for a canine sniff. McMillan did not admit that Bosire's travel from Colorado contributed to his suspicion, but McMillan in fact relied upon his belief that Bosire was traveling from Colorado. One of the first questions McMillan asked Bosire was whether he was traveling from Colorado. McMillan clearly believed that Bosire was trafficking drugs from Colorado. Based on an absurd and tenuous combination of various factors—namely, the odor of marijuana inside the gas station, the presence of another rental vehicle

at the gas station and Bosire's interactions with a third party at the gas pump—McMillan concluded that Bosire was a drug trafficker. These factors, taken in context, did not give McMillan reasonable suspicion to extend Bosire's traffic stop for a canine sniff.

On April 27, 2023, a jury concluded that McMillan not only violated Bosire's Fourth Amendment rights, but did so with knowing or reckless disregard to Bosire's rights. The Court agrees and finds that McMillan did not have reasonable suspicion to detain Bosire for a canine sniff at the end of his traffic stop. The Court also finds that McMillan relied heavily on Bosire's out-of-state travel origin in developing reasonable suspicion, in violation of the Fourth Amendment. See Vasquez, 834 F.3d at 1137–38 (travel from state with legalized marijuana contributes only minimally to reasonable suspicion).

Bosire complained to the KHP and its Professional Standards Unit ("PSU") investigated his complaint. Brent Hogelin, Captain of Troop N,[34] reviewed the video and documents generated during the PSU investigation and concluded that McMillan had impermissibly extended Bosire's detention almost from its inception. Hogelin provided his opinion to Jones, who agreed that McMillan did not have a reason to detain Bosire for a canine sniff, and that McMillan had detained Bosire for longer than legally acceptable. The KHP reported these findings to Bosire and informed him that McMillan's failure would be handled in accordance with KHP policies and procedures. The

---

[34]     Troop N includes some 30 KHP troopers. Troop N specializes in criminal interdiction and troopers in Troop N focus on patrolling and performing interdiction work on highways. Troopers in Troop N are not the only troopers who perform interdiction work on highways, but they generally receive more interdiction training than troopers who are not in Troop N. The troopers who conducted the traffic stops involved in this case are in the following troops:

- Troop C: Trooper Scott Proffitt (Martinez traffic stop).
- Troop D: Trooper Douglas Schulte (Shaw traffic stop).
- Troop N: Trooper James McCord (Kelly traffic stop).
- Troop S: Trooper Justin Rohr (Erich/Maloney traffic stop) and Trooper Chandler Rule (Dunn traffic stop).
- Troop T: Trooper Brandon McMillan (Bosire traffic stop).

KHP ordered corrective action rather than discipline for McMillan, however, even though the KHP's policies state that corrective action is only supposed to be used for minor rule violations, and a constitutional violation is more significant than a minor rule violation.

McMillan's corrective action consisted of one hour of additional training with Sarah Washburn, former KHP legal counsel, and a ride-along with another trooper. Hogelin instructed McMillan to complete a ride-along with Trooper Greg Jirak, Lieutenant of Troop N. Jirak asked about the reason for the ride-along and Hogelin told him that "it should be business as usual." The ride-along lasted for about four hours. Jirak and McMillan did not discuss proper procedures for stops or searches, and McMillan did not learn anything from his additional training or ride-along.

The traffic stop damaged Bosire's trust in law enforcement and causes him significant fear and anxiety around police. He continues to regularly drive to Colorado to see his daughter.

## VI.   Trooper James McCord's Traffic Stop Of Daniel Kelly

At trial, the Court heard evidence of KHP traffic stops of non-parties Daniel Kelly, Suzanne Dunn and Curtis Martinez, over the last three years.

On May 27, 2020, KHP Trooper James McCord saw Daniel Kelly driving eastbound on I-70 in Russell County in a vehicle with California license plates. He followed Kelly for a short distance, then pulled him over—ostensibly for following too closely behind a pickup truck in violation of K.S.A. § 8-1523.[35] McCord approached the vehicle and asked Kelly about his travel plans. Kelly stated that he was traveling to Shawnee, Kansas to pick up his nephew. Kelly gave McCord his

---

[35]    The dashcam footage does not credibly substantiate McCord's claim that Kelly followed the pickup truck too closely. By the time Kelly's vehicle is visible in the footage, it is multiple car lengths behind the pickup truck. McCord testified that he observed Kelly following too closely behind the pickup truck when McCord was "approximately a quarter mile behind him." It is unclear how McCord could have observed this from so far behind Kelly's vehicle.

license and registration, and McCord learned that the vehicle was a rental.  McCord contacted dispatch to request information about Kelly's criminal history and learned that Kelly had prior charges for drug possession and a weapons charge for a sawed-off shotgun.[36]  McCord did not ask for or receive the dates of these prior charges.  McCord re-approached the vehicle, gave Kelly a warning for following too closely, waved goodbye and performed a Kansas Two-Step by taking two steps away from the vehicle, returning less than two seconds later, and saying "Oh, by the way sir, can I ask you just a few more questions?"

McCord testified that before he performed the Kansas Two-Step, he believed that he had reasonable suspicion to extend the traffic stop based on the following factors: (1) Kelly had California license plates; (2) Kelly was driving on I-70, a primary drug corridor; (3) Kelly was driving a rental vehicle; (4) Kelly had prior charges for drug possession and a weapons charge for a sawed-off shotgun; (5) Kelly appeared nervous; (6) Kelly stated that he was traveling from California to pick up his nephew in Shawnee, Kansas, which was suspicious to McCord because "I would not let my kids travel with their uncle;" (7) fingerprints were on the back lid of the car's trunk; (8) a bag or suitcase was on the passenger seat;[37] and (9) Kelly was driving instead of flying from California to Kansas.

McCord asked Kelly if he had any contraband in his vehicle, which Kelly denied.  McCord asked for consent to search and Kelly refused.  McCord then detained Kelly and called for a canine unit.  The canine trooper performed a sniff of the vehicle and informed McCord that the canine had

---

[36]   McCord testified that he does not request this information on every traffic stop, but did so in this case because he already believed that Kelly was a possible drug smuggler, based on Kelly driving on I-70 in a rental vehicle with California tags and intending to pick up his nephew.

[37]   McCord testified that when drug traffickers transport large quantities of drugs, they place their personal belongings on the passenger seat or back seat of the vehicle so that they do not have to open the trunk.

alerted.  The troopers searched the vehicle.  McCord recovered a vape pen that said "THC" on the cartridge but did not have it tested.  McCord did not recover any contraband.  Consistent with KHP policies at the time, McCord did not write a report about the traffic stop.

McCord lacked reasonable suspicion to detain Kelly for a canine sniff.  Like McMillan's detention of Bosire, McCord based his reasonable suspicion that Kelly had contraband in his vehicle on an absurd and tenuous combination of factors.  The majority of these factors—having California license plates, driving on I-70, driving a rental vehicle, seeming nervous while interacting with law enforcement, going on a trip with one's nephew, having fingerprints on the trunk lid, having a bag in the passenger seat and driving instead of flying—are so ordinary and benign that thousands of innocent drivers on Kansas highways every day likely share many or all of these factors.[38]  The Tenth Circuit forbids the KHP from basing reasonable suspicion on factors that "would justify the search and seizure of the citizens of more than half of the states in our country."  Vasquez, 834 F.3d at 1138 (referring to residency in state with legalized marijuana as reasonable suspicion factor).  By the same logic, it is inappropriate for KHP troopers to develop reasonable suspicion based on an amalgamation of overwhelmingly common and mundane factors.  None of these factors contribute more than minimally to reasonable suspicion, if at all.

The last factor, Kelly's criminal history, does not cure the defects in McCord's reasonable suspicion.  As stated above, this factor may contribute to reasonable suspicion.  "*In conjunction with*

---

[38]     See Vasquez, 834 F.3d at 1136–37 ("[KHP troopers] argue the following factors created reasonable suspicion: (1) Vasquez was driving alone late at night; (2) he was travelling on I-70, 'a known drug corridor'; (3) he was from Colorado and was driving from Aurora, Colorado, 'a drug source area'; (4) the back seat did not contain items the Officers expected to see in the car of someone moving across the country; (5) the items in his back seat were covered and obscured from view; (6) he had a blanket and pillow in his car; (7) he was driving an older car, despite having insurance for a newer one; (8) there were fresh fingerprints on his trunk; and (9) he seemed nervous. Such conduct, taken together, is hardly suspicious, nor is it particularly unusual.")

*other factors*," it may even contribute "powerfully" to the reasonable suspicion calculus.  Simpson, 609 F.3d at 1147 (emphasis added).  Here, however, Kelly did not base his reasonable suspicion calculus on other objectively reasonable factors.  Furthermore, he did not bother to ask dispatch about Kelly's past criminal charges or how recent they were, which indicates that he did not weigh this information heavily when developing reasonable suspicion.  See Shaw, 36 F.4th at 1016 (passage of time since criminal arrest decreases weight as reasonable suspicion factor).

After evaluating the totality of the circumstances, the Court finds that McCord did not have reasonable suspicion to detain Kelly for a canine sniff.  See United States v. Archuleta, 619 F. App'x 683, 690 (10th Cir. 2015) ("Having conducted a totality-of-the-circumstances analysis, we conclude that the government has failed to meet its burden of establishing reasonable suspicion.  The strongest piece of evidence in the government's favor (i.e., supporting reasonable suspicion) is [plaintiff's] criminal history.  But, neither standing alone, nor in combination with all of the other circumstances, is [plaintiff's] criminal history sufficient to provide the basis for reasonable suspicion here.").

Further, when McCord executed the Kansas Two-Step and returned to Kelly's vehicle, a reasonable driver in Kelly's position would not have felt free to leave.  Two seconds elapsed between McCord disengaging and re-engaging Kelly in conversation, and McCord took only two steps away.  The short length of the "break" in contact, and McCord's proximity with Kelly's vehicle, would have caused a reasonable driver to believe that he was still detained and was not free to leave.  The Court finds that McCord impermissibly extended Kelly's detention by performing the Kansas Two-Step under circumstances where a reasonable driver would not feel free to leave.

## VII.   Trooper Chandler Rule's Traffic Stop Of Suzanne Dunn

On February 5, 2021, KHP Trooper Chandler Rule saw Suzanne Dunn, who was driving a black Mercedes west on I-70, drive in the left lane, pass two trucks and continue to drive in the left

lane for about 50 seconds after passing the second truck.  He then stopped her for lingering in the left

lane in violation of K.S.A. § 8-1522(c), which provides that all vehicles "shall be driven in the right

lane except when . . . [o]vertaking and passing another vehicle."[39]  Rule ran Dunn's license plate and

learned that Dunn was driving a rental vehicle.  Rule approached Dunn's vehicle and told her that he

had pulled her over for driving in the left lane.  Rule also claimed that Dunn was driving too fast.[40]

Dunn told Rule that she was driving from her residence in Arlington, Virginia to Denver to

pick up a camper van that she had purchased on line.  Dunn told Rule that she was driving a rental

vehicle because she intended to drive the van back to Virginia.  Rule questioned why she would rent

such an expensive vehicle, and she explained that she had requested a different vehicle, but that the

rental company did not have any of those vehicles available.  Rule asked her why she was driving

rather than flying, and Dunn explained that she had an autoimmune disease, was not fully vaccinated

for COVID-19, and because of the pandemic, she did not feel safe flying.

Rule took Dunn's information and walked back to his patrol vehicle.  He returned, handed

her documents back and gave her a warning.  Rule told Dunn to have a safe trip, then took one step

away from the vehicle, re-approached it less than one second later, and asked, "Hey ma'am, do you

mind if I ask you a couple questions?"  Dunn responded "yeah," and Rule asked her more questions

---

[39]     During these 50 seconds, Rule's patrol vehicle passed Dunn in the right lane and then fell back behind her vehicle again, meaning that the right lane was not entirely clear for Dunn to merge back into the right lane.  For about 25 seconds within this period, Dunn could have merged into the right lane free and clear of Rule's patrol vehicle.  K.S.A. § 8-1522(c), however, did not explicitly require her to do so within 25 seconds.  The record is insufficient for the Court to definitively find that Dunn did or did not commit a traffic violation.  The Court will find, however, that Dunn's traffic stop was exceedingly pretextual.

[40]     Dunn disputes that she was speeding and testified that before Rule pulled her over, she had checked her speed and she was not speeding.

about where she bought the van, where she lived, the price of the van and what she did for a living.[41]

Dunn did not feel free to leave, in part because Rule had put his head and arms inside her vehicle

through the passenger-side window as he questioned her.

Rule asked Dunn if she had any contraband in the vehicle and she said no.  He asked if he

could search the trunk of her car, and she said no.  Rule asked why Dunn said no, and whether he

could run his canine around the outside of her vehicle.  Dunn consented because she thought that she

would remain inside the vehicle and that the canine would simply run around her vehicle.

Rule told Dunn to exit the rental car and deployed his canine around the vehicle for a drug

sniff.  During the sniff, the canine scratched the car and cracked one of the door handles.  Rule

testified that the canine alerted when he deviated from his "typical searching pattern," displayed

"deep nasal breathing" and "very frantic" behavior at the passenger door, and would not leave the

passenger door area as Rule attempted to lead him around the vehicle.[42]  Rule then searched the

---

[41]     With regard to interrogation of motorists, KHP training materials in 2020 instructed troopers: "DON'T OVERTHINK IT!!!  Highway interdiction is nothing more than asking questions until you have none."  The training continued as follows:

> We need to do a better job investigating all crimes during traffic stops . . . .  If we take the time to just ask a few questions during a stop, we can get a feel for who and what we are dealing with.  If all we are doing is writing tickets, is there really a need for Troopers?  Technology today is capable of mailing tickets.

[42]     The dash camera footage of this traffic stop shows more persuasively visible canine alerting than the footage in the Erich/Maloney traffic stop.  The footage does not clearly confirm Rule's testimony that the canine exhibited deep nasal breathing or unusually frantic behavior at the passenger door, as the canine appeared consistently high-energy before and throughout the traffic stop.  The footage also shows, however, that the canine suddenly stopped following Rule around the vehicle and returned to the right-side passenger door, in a clear deviation from his former behavior.  Nevertheless, the Court again notes that neither side produced evidence that these behaviors are reliable indicia of contraband under <u>Daubert</u>.  Moreover, Dunn's car—like the Shaws' car, Bosire's car, Kelly's car and Martinez's car—was a rental car or was owned by a third party.  The record is devoid of evidence regarding how long drug odors are detectable after drugs have been removed

(continued . . . )

vehicle, did not recover any contraband and permitted Dunn to leave.

Rule testified that he had reasonable suspicion to detain Dunn because (1) she was "traveling 1,677 miles to pick up a van," and it was "very odd that the only place she could find a van to camp in" was in Denver; (2) Arlington was a "known narcotics hub" and Denver was a "known narcotics distribution hub;"[43] (3) Dunn was nervous and hesitant; (4) Dunn was driving an expensive rental car; (4) it was "extremely suspicious" that Dunn chose to drive instead of fly during the COVID-19 pandemic; and (5) Dunn was 52 years old traveling halfway across the country by herself with inclement weather in the forecast.[44]

Dunn believed that Rule had given her paperwork to explain how to file a complaint with the KHP, but discovered that he had simply returned her driver's license and rental agreement.  Dunn made multiple calls to the KHP and eventually reached Trooper Justin Rohr, Rule's supervisor.  Rohr told Dunn that according to Rule, he had reasonable suspicion to detain her because (1) she was driving across the country and (2) referring to seaweed, carrots and water bottles, Dunn had "copious snacks" in her vehicle.

Rule completed a KHP report detailing the traffic stop and canine sniff.  In the report, Rule listed the factors that contributed to his suspicion, although KHP policies at the time did not require him to do so: (1) Dunn was traveling from Arlington, a known narcotics hub; (2) Dunn was traveling

---

[43]( . . . continued)

from a vehicle which is subject to a canine sniff.  Without such information, the Court has concerns about whether reasonable suspicion can be fairly attributed to particular drivers.  Those concerns are exacerbated because in all of these stops, the canines gave false positive results.

[43]     In Rule's opinion, any large metropolitan area is a narcotics hub.

[44]     Rule admitted that if Dunn were 25 years old, he still would have found her suspicious.

to Denver, a known narcotics distribution hub; (3) Dunn appeared nervous and hesitant; (4) Dunn's rental vehicle was expensive; (5) Dunn drove instead of flew; and (6) Dunn was a 52-year-old woman traveling halfway across the country by herself with inclement weather in the forecast.

Rule lacked reasonable suspicion to detain Dunn for a canine sniff.[45]  This thought process was based on an absurd and tenuous combination of innocent factors that were not objectively suspicious. These factors—traveling a long distance to pick up a new vehicle, traveling to and from "narcotics hubs" (i.e., any large metropolitan areas), nervousness when interacting with law enforcement, driving instead of flying during a pandemic, traveling a long distance even with possible inclement weather and taking "copious snacks" on a road trip—are so ordinary and benign that singly and in combination, they contribute only minimally, if at all, to the reasonable suspicion calculus.  Even if Dunn's travel plans were unusual, they were not unusual in a way which gave rise to a reasonable suspicion of criminal activity.  See United States v. Salzano, 158 F.3d 1107, 1112–13 (10th Cir. 1998) (though uneconomical, fact that defendant was driving across country in large motor home instead of flying or renting smaller vehicle did not support reasonable suspicion that large RV engaged in drug trafficking); United States v. Wood, 106 F.3d 942, 947 (10th Cir. 1997) (decision to take time and expense to drive, rather than fly or use other mode of transportation, cannot support reasonable suspicion, even where alternate form of travel would make more sense financially and defendant is not currently employed).

The last factor, Dunn's expensive rental vehicle, is not even remotely suspicious.  The proposition that a drug trafficker is especially likely to drive an unusually expensive (and more

---

[45]     Although Dunn ostensibly consented to the canine sniff,  Rule detained Dunn from the moment that he performed a Two-Step maneuver because, as explained below, he performed the Two-Step in circumstances where a reasonable driver would not have felt free to leave.

noticeable) rental vehicle is untested and illogical. In fact, Trooper Scott Proffitt testified that drivers who are engaged in criminal activity are more likely to drive *less* expensive vehicles. Jones provided no evidence that an expensive rental vehicle is more likely to contain contraband than other rental vehicles.[46] The fact that a driver or a vehicle is *unusual* or *uncommon* in some respect does not reasonably or necessarily mean that criminal activity has occurred, is occurring or is about to occur.

Further, when Rule executed the Kansas Two-Step and returned to Dunn's vehicle, a reasonable driver in her position would not have felt free to leave. Less than one second elapsed between Rule disengaging and re-engaging with Dunn. The extremely short length of the "break" in contact and Rule's proximity with Dunn's vehicle would have caused a reasonable driver to believe that she was still detained and not free to leave. In fact, Rule made physical contact with Dunn's vehicle by putting his head and arms through her passenger window as he talked to her. Even the KHP agrees that making physical contact with a vehicle "may render an encounter non-consensual."

In summary, (1) Rule performed the Kansas Two-Step under circumstances where a reasonable driver would not feel free to leave, and (2) Rule did not have reasonable suspicion to extend Dunn's detention when he performed the Two-Step.

## VIII.   Trooper Scott Proffitt's Traffic Stop Of Curtis Martinez

On September 5, 2022, KHP Lieutenant Scott Proffitt was patrolling I-70 near Fort Riley when his radar registered two vehicles speeding. He began to follow the vehicles and activated his

---

[46]     Jones actually produced no evidence that *any* factors which troopers routinely intone as grounds for reasonable suspicion are scientifically reliable, data-based or even consistent with generally accepted policing standards. On this record, it is hard to see how any particular stop or search could be justified by opinions that could pass muster under Daubert. Troopers routinely justify their behavior by invoking the mantra of their "training and experience" as law enforcement officials; yet, as this case demonstrates, they frequently lack specific, data-tested or even logical grounds for finding reasonable suspicion to detain or search a motorist.

lights.   One of the vehicles, driven by Curtis Martinez, took an off ramp.[47]   Proffitt followed Martinez's vehicle and saw it take a left turn at the end of the off ramp.   Proffitt followed, but when he caught up to the vehicle, it promptly stopped.   Proffitt testified that he was suspicious that the vehicle got off the highway when he activated his lights, which he believed was an evasive maneuver.[48]   Proffitt approached the vehicle, which had a Colorado license plate, and spoke to Martinez.   An unidentified passenger was also in the vehicle.   The occupants were playing loud music, and Proffitt asked them to turn it down.   Proffitt stated that this highway exit was not one that he was accustomed to seeing people take.   Martinez explained that he was looking for a restroom.

Proffitt asked Martinez for his driver's license and insurance and saw that he had a Colorado driver's license.   He also saw that the car was registered to a different name and that the registration had expired 11 months earlier.   Martinez told him that the car belonged to his wife and that his mother-in-law's name was on the insurance.   Martinez also stated that he was traveling to Missouri for work.   Proffitt asked the passenger for his name, which he declined to provide.

Proffitt requested the vehicle's registration paperwork.   Martinez informed Proffitt that they had just gotten new license plates, that he did not have the current registration for the car, and that they could call his wife, but she was at the pool with their son.

---

[47]     The record provides no information about the other speeding vehicle, or—aside from the inference that Martinez would be easier for Proffitt to catch and pull over because he took the off-ramp—why Proffitt chose to follow Martinez's vehicle instead of the other speeding vehicle.

[48]     The dash camera footage of Martinez's traffic stop does not substantiate Proffitt's belief that Martinez made an evasive maneuver.   When Proffitt activated his police lights and began to pursue Martinez, the two vehicles were a considerable distance away from each other, far enough that Martinez's vehicle is not visible in the footage, and multiple other vehicles on the road were closer to Proffitt than Martinez.   A reasonable driver in Martinez's position would not have immediately realized that Proffitt was pursuing him.   When it became clear that Proffitt was following him, i.e., when Proffitt followed him on the off ramp and through the left turn, Martinez immediately pulled over (within ten seconds).

Proffitt returned to his patrol vehicle and, although he does not normally do so, he requested information on Martinez's criminal and drug history.  The dispatcher informed Proffitt that Martinez had no criminal history.   Proffitt testified that at this point, he believed that he had reasonable suspicion to detain the vehicle based on the following factors: (1) Martinez had exited the highway in an evasive maneuver; (2) Martinez stated that he exited the highway because he was looking for a restroom, but Proffitt knew that there were no restrooms at that exit; (3) Martinez denied that he was speeding; (4) Martinez and his passenger acted defiant and argumentative; (5) Martinez was playing loud music, which was also defiant; (6) Martinez was driving a car that belonged to a third party (his wife) and was insured by another third party (his mother-in-law); (7) Martinez's registration was expired; (8) the passenger refused to identify himself; and (9) Proffitt believed that Martinez had an image of El Chapo or Jesus Malverde in Martinez's wallet.[49]  Proffitt also stated that he was concerned for his personal safety on the scene and that the vehicle occupants gave him an "officer safety vibe" because they were defiant and the passenger refused to identify himself.

Proffitt returned to the vehicle and gave Martinez a citation for having an expired registration in violation of K.S.A. § 8-142.  Proffitt told Martinez to "have a safe one," took two steps away, returned to the vehicle less than one second later and stated, "Can I ask you something?"  When Proffitt re-engaged, Martinez was already pulling his car away.  Martinez stopped his car and Proffitt told him that taking the highway exit was "overly suspicious."  He asked if Martinez had any contraband in the vehicle, which Martinez denied.  Proffitt asked for consent to search and Martinez refused.  Proffitt then detained the vehicle and called for a canine unit.

When calling for a canine unit, Proffitt explained to Officer [FNU] Childs, the canine

---

[49]     The Court takes judicial notice of the facts that El Chapo is a Mexican former drug cartel leader and Jesus Malverde is a Mexican folk hero who is celebrated by many drug traffickers.

handler, that the vehicle occupant had tattoos; the vehicle had Colorado tags; Martinez refused consent to search and had attempted to elude; the occupants were "wanting to put on a show and be bullies;" he was watching their hands; the vehicle was registered to Martinez's wife and insured by his mother-in-law; and he was unsure whether Martinez and his wife were legally married because "they're both Hispanic," they did not share a surname and "their lifestyle can be different."

Officer Childs arrived and performed a canine sniff. The canine allegedly alerted and Proffitt searched the vehicle. Proffitt did not recover any contraband. He did recover a "piece of vegetation" but did not test it, and permitted Martinez and his passenger to leave.

Proffitt had reasonable suspicion to detain Martinez for a canine sniff. Unlike the other traffic stops examined at trial, Proffitt had multiple, reasonable and significant factors that contributed to reasonable suspicion. Martinez denied that he was speeding when Proffitt had objective proof that he was speeding, giving Proffitt reasonable grounds to believe that Martinez was being deceptive. While Proffitt did not have objectively reasonable grounds to believe that Martinez took an "evasive maneuver," Martinez committed multiple traffic violations by both speeding and having an expired registration, and Proffitt credibly testified that drug traffickers commonly drive vehicles owned and/or insured by third parties. The fact that Martinez and his wife had different last names contributed to Proffitt's difficulty in determining whether Martinez was being truthful about his wife being the vehicle's owner. Proffitt saw an image in Martinez's wallet that he believed to be either El Chapo or Jesus Malverde, which—unlike factors such as "having an expensive rental vehicle" or "taking a road trip with one's nephew"—directly and logically contributes to the suspicion that a driver may be engaged in drug trafficking or other drug-related offenses. Finally, Martinez and his passenger acted agitated and defiant, a factor that may contribute to reasonable suspicion. United States v. McHugh, 639 F.3d 1250, 1258 (10th Cir. 2011). Furthermore—and crucially, for purposes

of this traffic stop's constitutionality—all of these factors were present before Proffitt performed the Kansas Two-Step, meaning that he had reasonable suspicion to detain Martinez for a canine sniff before he performed the Two-Step.  The fact that Proffitt had reasonable suspicion to detain Martinez for a canine sniff does not foreclose the possibility that Proffitt targeted Martinez for the initial traffic stop because of his out-of-state license plate.  Even so, plaintiffs have presented insufficient evidence for the Court to reach a finding in this regard.

Nevertheless, Proffitt performed the Kansas Two-Step in circumstances where a reasonable driver would not feel free to leave.  Less than one second elapsed between Proffitt disengaging and re-engaging Martinez in conversation.  The extremely short length of the "break" in contact and Proffitt's proximity with Martinez's vehicle would have caused a reasonable driver to believe that he was still detained and was not free to leave.  The fact that Martinez was obviously agitated and defiant throughout the entire detention further underscores the coercive nature of the Kansas Two-Steps examined at trial: Martinez could not have communicated more clearly that he did not want to engage with a KHP trooper and that he intended to leave at the earliest opportunity.  When Proffitt performed the Two-Step and stopped Martinez from leaving, Martinez was not "knowingly, intelligently and voluntarily" agreeing to keep speaking to Proffitt.

Because Proffitt had reasonable suspicion to extend Martinez's detention before he performed the Two-Step, however, his Two-Step maneuver did not render the extended detention unconstitutional.  Proffitt did not need to initiate a "consensual encounter" because he already had reasonable suspicion to further detain Martinez.  While it is important to note that this Two-Step maneuver—like the other Two-Steps examined at trial—would not have led a reasonable driver to feel that he was free to leave, Proffitt's encounter with Martinez was ultimately constitutional.

**IX.**    ***Vasquez* And KHP's Use Of Out-Of-State Travel As A Reasonable Suspicion Factor**

KHP troopers detain a disproportionate number of out-of-state motorists in part because the KHP trains and permits them to evaluate a driver's out-of-state residency and travel plans when developing reasonable suspicion.[50]  In other words, the KHP permits troopers to find that a driver is suspicious when the driver is an out-of-state resident or is traveling to or from a state that has legalized marijuana.[51]

In Vasquez, the Tenth Circuit tried to curtail the KHP's ability to detain motorists based on out-of-state residency and travel origin or destination.  The Tenth Circuit held that KHP troopers had impermissibly relied on Vasquez's status as a Colorado resident to justify a search of his vehicle. 834 F.3d at 1137–38.  The troopers listed nine factors that allegedly contributed to the reasonable suspicion calculus but relied "heavily" on plaintiff's state of residency because Colorado is known as a drug source state.  Id. at 1137.

The Tenth Circuit stated that the fact that a driver is traveling from a "drug source" city or state such as Colorado "does little to add to the overall calculus of suspicion," and is "so broad as to be indicative of almost nothing."  Id. at 1137–38 (quoting Guerrero, 472 F.3d at 787–88).  The Court stated that it is "time to stop the practice of detention of motorists for nothing more than an out-of-state license plate."  Id. at 1138.  Regarding out-of-state residency, the Tenth Circuit held that

---

[50]    Defendant strenuously claims that KHP troopers are not permitted to develop reasonable suspicion based on a driver's out-of-state residency.  The Court heard conflicting testimony regarding the KHP's policies and training on this point.  Regardless of the KHP's formal policies, however, evidence at trial indicates that in practice, KHP troopers frequently make traffic stops—with or without reasonable suspicion—based at least in part on out-of-state residency.

[51]    Because Missouri and Colorado have both legalized marijuana, they border Kansas on the east and west and I-70 is the major east-west traffic corridor through Kansas, all motorists on I-70 are traveling toward or away from known drug source states.  Under KHP logic, all motorists on I-70 can be reasonably suspected of drug trafficking activity.

it is "wholly improper to assume that an individual is more likely to be engaged in criminal conduct because of his state of residence" and "[a]bsent a demonstrated extraordinary circumstance, the continued use of state residency as a justification for the fact of or continuation of a stop is impermissible." Id.

In response to Vasquez, Randy Moon, Assistant Superintendent of the KHP, stated publicly that it would be unreasonable to expect troopers to ignore the fact that drivers are coming from a state such as Colorado that has legalized marijuana. The KHP did send an email informing troopers of Vasquez, but until 2020, when the KHP implemented policy changes in response to this litigation, it did not change any of its policies. Washburn, former legal counsel for the KHP, testified that she did not believe Vasquez constituted a substantive change in the law because it merely reiterated the principle that a driver's out-of-state residency, origin or destination cannot be the "sole" factor forming the basis of reasonable suspicion. The KHP trains its troopers consistent with this understanding but appears to permit them to consider a driver's out-of-state origin or destination as "a" factor which contributes to reasonable suspicion, in conjunction with other factors. Plaintiffs, however, argue that under Vasquez, a driver's out-of-state residence and travel plans cannot be considered even as "a" reasonable suspicion factor in conjunction with other factors.

In 2020, in response to this lawsuit, the KHP updated its trooper training materials on Vasquez. At that time, it revised its training material to include the following quotes from Vasquez:

- "'[T]hat the defendant was traveling from a drug source city—or a drug source state—does little to add to the overall calculus of suspicion.' The Court in Vasquez found that this factor was so 'broad as to be indicative of almost nothing.'"

- "'It is wholly improper to assume that an individual is more likely to be engaged in criminal conduct because of his state of residence, and thus any fact that would inculpate every resident of a state cannot support reasonable suspicion.'"

The KHP apparently continues to train its troopers that they may consider a driver's

out-of-state origin or destination as "a" reasonable suspicion factor in conjunction with other factors. Multiple KHP troopers testified that they continue to rely on a driver's state of origin or destination in developing reasonable suspicion. Trooper Ryan Wolting testified that the state on a license plate can be a factor in deciding who to pull over, and that the fact that a driver is traveling from Denver can contribute to reasonable suspicion because marijuana is legal in Denver. Lieutenant Jirak testified that a driver's state of origin is appropriate to consider in forming reasonable suspicion because drug production and distribution occur in states such as California, Colorado, Oklahoma and Missouri. Jirak acknowledged that all large population centers are drug source locations because drugs can come from anywhere. Lieutenant Rohr testified that a driver's state of origin indicates criminal activity because large amounts of drugs originate in states such as California and Colorado. Trooper Rule testified that he uses a driver's state of origin or destination as a factor in forming reasonable suspicion, and that the KHP has trained him to use travel on I-70 as a factor in forming reasonable suspicion because it is a primary drug corridor. No trooper testified that he does not use a driver's state of origin or destination as a factor in forming reasonable suspicion.

The KHP's current policies are as follows:

- Troopers may not conduct or direct a canine sniff of a vehicle based solely on the trooper's belief that the driver is traveling to or from Colorado.

- Troopers may not extend a vehicle stop or search a vehicle based only on a driver's travel origin or destination.

- Troopers may not include a driver's state citizenship as a factor contributing to reasonable suspicion.[52]

---

[52]     As noted above, it appears that KHP policy or training is inconsistent regarding whether troopers may use out-of-state residency as a factor contributing to reasonable suspicion. For example, Hogelin testified both that (1) KHP policy does not permit troopers to use a driver's out-of-state residency as *the sole* factor contributing to reasonable suspicion (suggesting that troopers may use that factor in conjunction with other factors), and (2) KHP policy does not permit troopers to use a driver's out-of-state residency as *a* factor contributing to reasonable suspicion (suggesting that troopers may not use that factor at all).

- Troopers may not detain motorists for nothing more than an out-of-state license plate.

## X.    KHP Data Collection Practices

Before September of 2022, the KHP did not train or require its troopers to list the bases for reasonable suspicion in post-detention reports unless the traffic stop involved an accident, arrest, seizure or canine deployment.  If a motorist filed a complaint or a lawsuit, and the trooper had not listed the bases for reasonable suspicion in a report, that trooper would document the traffic stop after the fact—sometimes long after the fact—and try to reconstruct the basis for reasonable suspicion.

Even before September of 2022, the KHP required canine troopers to fill out reports whenever they deployed a canine to sniff a vehicle, but did not require them to explain why they claimed reasonable suspicion to do so.  Further, while canine troopers often initiated their own traffic stops, they frequently performed canine sniffs at traffic stops initiated by other troopers.  The trooper who initiated the traffic stop often did not fully explain the basis for reasonable suspicion to the canine trooper, so the canine trooper could not provide a detailed basis for reasonable suspicion in his canine report.  Canine deployment reports frequently provided no detail about grounds for the canine sniff.  Trooper Ryan Wolting, a member of Troop N, testified about many traffic stops in which he called for a canine handler to perform a sniff of the vehicle.  In all of these stops, the canine handlers' canine deployment reports omitted identification of any reasonable suspicion for the sniff.  Wolting did not know of a way that anybody could find out what factors he relied on in developing reasonable suspicion during those stops.

Due in part to lack of documentation, supervising troopers and command staff at the KHP have rarely learned about traffic stops that do not result in recovery of narcotics.  Wolting's supervisors never talked with him about why he decided to call for a canine in stops that did not result in a drug seizure.  Jones never requested information about the number of canine sniffs conducted each month, or how many detentions for canine sniffs resulted in discovery of narcotics.

In 2022, after plaintiffs filed this lawsuit, Jones ordered command staff to change KHP policy and begin documenting detentions even when no arrest or seizure occurred. On September 19, 2022, in response to Jones' order, the KHP implemented Form HP-141. KHP troopers must fill out Form HP-141 to document traffic stops even when the stop does not result in an arrest or seizure. The first page of the new Form HP-141 provides a list of different indicators of criminal activity, with a checkbox for each indicator. The form also has fields at the top of the first page directing the trooper to list the driver's origin and destination. The form appears as follows:



As noted, the HP-141 form directs troopers to provide the vehicle's state of registration and the driver's origin and destination.  The form also provides checkboxes where troopers can list reasonable suspicion factors, such as unusually nervous behavior, a drug odor, masking odor, a newly registered vehicle, a third-party or one-way rental vehicle, conflicting stories, a lived-in appearance, a rental vehicle, vehicle alterations, etc.

HP-141 was the first time the KHP required troopers to document grounds for reasonable suspicion for roadside detentions that did not involve an arrest, seizure or accident.  Hogelin testified

that the purpose of HP-141 is to provide a record of events during detentions and allow KHP supervisors to monitor the legality of detentions, track their frequency, show training deficiencies and improve transparency.  Because Jones voluntarily initiated the form, he or his successor could rescind its use at any time.

Hogelin testified that a trooper's immediate supervisor must review each HP-141 for policy violations and training or equipment issues, and that the form ultimately comes to Troop N and to the PSU for review and historical filing.  Hogelin testified that by collecting HP-141 forms, the KHP gathers data from traffic stops, including (1) the trooper who made or participated in the detention, (2) the date, time and location, (3) vehicle information and (4) reasonable suspicion factors.  He testified that the KHP has internal databases which collect this data and that the KHP uses the database to look for trends, such as common tactics used by drug traffickers and new methods used to hide contraband.  The KHP does not use those databases to monitor the proportion of in-state versus out-of-state drivers that KHP troopers pull over for traffic stops; how many traffic stops lead to post-traffic stop detentions for vehicle searches; how many of these detentions do or do not result in contraband seizures; how frequently troopers perform the Kansas Two-Step; how often civilians lodge complaints against particular troopers arising out of traffic stops; or how often particular troopers violate the constitutional rights of drivers.

Because the KHP does not collect this data, it does not analyze its traffic enforcement practices to identify disparities and practices that need correction.  Jones does not require his executive staff, commanders or supervisors to collect data on KHP traffic enforcement policies or report those data trends to him.  Moreover, lack of data has made it difficult to determine the extent to which KHP practices have led to ongoing violations of drivers' Fourth Amendment rights, how frequently violations occur and whether those violations have factors in common.  Accordingly,

while defendant strenuously objects to Mummolo's conclusions and methodology, Mummolo's analysis is the best available evidence on the extent to which KHP troopers routinely consider a driver's out-of-state residence and travel plans in developing reasonable suspicion to prolong their traffic stops.  In preparation for trial, plaintiffs experienced considerable difficulties collecting relevant data, such as how many traffic stops and canine sniffs result in KHP troopers finding narcotics in a vehicle, what reasonable suspicion factors the troopers relied upon in those traffic stops, and how many in-state and out-of-state motorists are detained for traffic stops by the KHP in any given time period or location.

## XI.    Kansas Two-Step

KHP troopers intentionally use the Kansas Two-Step to pressure drivers to submit to extended detentions on the side of the road in order to develop reasonable suspicion and to develop "further" reasonable suspicion even if they claim it already exists.  The KHP maintains that all of these encounters are consensual, but the manner in which troopers perform the Two-Step creates highly coercive encounters in which reasonable drivers do not feel free to leave.

The KHP teaches its troopers how to perform the Two-Step, and many KHP troopers perform it at the conclusion of traffic stops.[53]  The Two-Step is a maneuver in which, at least nominally, a trooper ends the traffic stop by returning the driver's license and registration papers and saying "have a good day," "travel safe" or something similar; the trooper steps away from the vehicle; and the trooper quickly—here, between less than one second to five seconds later—re-engages with the

---

[53]      The KHP does not collect data on use of the Two-Step, and it is therefore impossible to ascertain exactly how frequent it is.  Troopers do not document or report instances in which they use the Two-Step and the KHP does not analyze or track the Two-Step's use among troopers, even after implementing HP-141.  The KHP also does not collect data on the number of traffic stops in which a trooper has performed the Two-Step and the driver has complained or filed a lawsuit against the KHP as a result of the traffic stop.

driver.  According to KHP training, if the driver re-engages after the Two-Step, it begins a new encounter which is consensual: the driver voluntarily stays to speak with the trooper, knowing (or believing) that he or she is free to leave.  Troopers are trained that two steps are not physically necessary to end the non-consensual phase of the encounter.  In fact, the KHP teaches that it is "[n]ot mandatory to disengage, as long as a reasonable person in the suspect's position would feel free to leave.  Even if they are not."

The KHP trains troopers on the Kansas Two-Step as part of pre-service training at the KHP Academy, and further trains on the Two-Step as part of its training on consensual encounters.  In 2021, the KHP Academy provided the following training to troopers:

- If a trooper uses the Two-Step to initiate a consensual encounter, consent must be knowingly, intelligently and voluntarily made.

- There must be a "sufficient break in time between the enforcement encounter and the consensual encounter."

- The Two-Step is not enough by itself to purge the taint of the coercive nature of the traffic stop.

- The following factors may render an encounter non-consensual:

  o The trooper did not return all the driver's documentation.

  o The trooper went straight from the traffic stop to the consensual encounter without a sufficient break.

  o The trooper's tone of voice was accusatory.

  o The trooper was still in his patrol car.

  o The trooper made physical contact with the vehicle or subject.

The KHP does not require troopers to perform the Two-Step, and not all troopers perform it. Jirak testified that instead of performing the Two-Step at the end of a traffic stop—i.e. instead of disengaging, stepping away from the vehicle and then re-engaging with the driver—he remains at the driver's window, waits until the driver makes a motion to put the car in gear or step on the brake,

and then asks the driver if he can "ask a few more questions before the driver leaves."

The KHP trains troopers not to inform a motorist that he or she is free to go. It trains them to conclude the traffic stop by using a different phrase like "Have a safe trip" or "Take care" or "Have a good day." In the traffic stops at issue, unless the motorist explicitly asked whether he was free to go, no KHP trooper informed the motorist that he was free to leave.

Troopers frequently perform the Two-Step to search for more information to develop reasonable suspicion for an extended detention, vehicle search or canine sniff. Other times, they do it even if they believe that they already possess reasonable suspicion, basically because it makes their lives easier: it is more convenient to perform a vehicle search if the trooper can obtain consent from the motorist.

Despite evidence that the break in time created by the Two-Step is extremely brief—five seconds or less—Jones and KHP troopers maintain that the Two-Step maneuvers in these cases terminated the coercive nature of the initial stop and created new, independent and consensual encounters that were knowing, voluntary and intelligent on the part of the motorists. In the Dunn and Martinez stops, Troopers Rule and Proffitt waited less than one second between disengaging and re-engaging with the driver; in the Kelly stop, McCord waited less than two seconds; in the Shaw traffic stop, Schulte waited three and a half seconds; and in the Erich and Maloney traffic stop, Rohr waited four and a half seconds. The troopers took between one and four steps from the vehicle before turning to re-engage with the drivers. While most troopers did not touch the vehicles after they re-engaged, Rule leaned through Dunn's passenger window, and Dunn did not feel free to leave because Rule's head and arms were inside her vehicle.

Based on this evidence, the Court finds that KHP troopers conduct the Kansas Two-Step under circumstances where reasonable drivers do not feel free to leave and do not knowingly,

voluntarily and intelligently consent to re-engage with the trooper.  In the traffic stops examined at trial, a reasonable driver would not believe that the coercive aspect of the original traffic stop had ceased.  See Schneckloth, 412 U.S. at 227 (consent must not be product of express or implied coercion); Mosley, 743 F.3d at 1324–25 (not willing and voluntary consent if driver submits to trooper's show of authority); Bostick, 501 U.S. at 434 (voluntary consent means reasonable person must feel free to "disregard the police and go about his business").

Troopers occupy a position of power and authority during a traffic stop, and when a trooper quickly reapproaches a driver after a traffic stop and continues to ask questions, the authority that a trooper wields—combined with the fact that most motorists do not know that they are free to leave and KHP troopers deliberately decline to tell them that they are free to leave—communicates a strong message that the driver is not free to leave.  A reasonable driver could not knowingly and intelligently believe otherwise.  In such circumstances, the theory that a driver who remains on the scene gives knowing and voluntary consent to further questioning is nothing but a convenient fiction; in the circumstances present in this case, troopers unlawfully detained drivers, without reasonable suspicion, for further questioning.

## XII.   **KHP Training And Supervision**

Jones relies on Lieutenant Colonel Jason DeVore, who functions as chief operating officer of the KHP, to relay information from Jones to other KHP staff, and vice versa.  Jones entrusts KHP legal counsel and commanders to ensure that troopers comply with legal requirements in traffic enforcement.

Troopers review legal updates in one of three ways: a software program called PowerDMS, emails and in-service training.[54]  Because KHP is a decentralized agency where KHP troopers have

---

[54]     Every year, KHP troopers are required to complete 40 hours of continuing law enforcement education or training, called in-service training.

flexibility in their work hours, in-person trainings are infrequent, and the KHP relies heavily on email and PowerDMS to communicate updates to troopers.

When KHP supervisors or command officers inform troopers of new Fourth Amendment court decisions through email, the KHP relies on troopers to read those emails and generally does not test or quiz them regarding the content. When the KHP implements a new policy or changes an existing policy, the policy is available on line to all troopers through PowerDMS. Troopers are required to access the new policy through PowerDMS and check a box to certify that they have read and reviewed the policy. Sometimes, albeit rarely, troopers must answer a few questions to confirm that they have read and understood the policy change.

Washburn testified that when she led legal training sessions with KHP troopers, her presentation would include "pop quizzes" to review the training materials with troopers immediately after presenting material to them. Outside of these pop quizzes, the KHP rarely if ever tests troopers to determine whether they understand Fourth Amendment law or KHP policies.

Hogelin testified that troopers have annual performance reviews with their supervising troopers. In those reviews, the KHP does not require supervising troopers to consider how many roadside detentions a trooper has performed that did not yield any contraband, or the number of times that courts have sustained motions to suppress involving that trooper. Hogelin requires supervisors in Troop N to perform random reviews of traffic stops and detentions on a quarterly basis. Troop N constitutes approximately five per cent of all KHP troopers, however, and Troop N appears to be the only troop in the KHP that performs that random review.

The KHP encourages troopers to search as many cars as possible, and the number of seizures a trooper performs is one metric that it uses to assess trooper performance. KHP training slides from an advanced interdiction training course state that a successful KHP trooper "must

make high volume traffic stops," and troopers must "STOP A LOT OF CARS!"

The PSU investigates allegations of misconduct by KHP troopers. The PSU is a fact-finding unit that receives and processes complaints against KHP employees. The commander of the PSU reports directly to Jones and sends the results of all PSU investigations to Jones to make a final decision about whether to impose discipline or corrective action. Jones may impose harsher or more lenient consequences than the PSU recommends. Jones is ultimately responsible for all KHP policies, disciplinary actions and patterns of misconduct. Jones relies on direct supervisors and commanders to review information on the frequency with which KHP troopers commit misconduct, such as detaining drivers without reasonable suspicion. Jones only receives that information, however, if it involves "aberrant behavior."

**CONCLUSIONS OF LAW**

**I.      42 U.S.C. § 1983**

Plaintiffs bring suit pursuant to 42 U.S.C. § 1983, which states in part as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Under this statute, plaintiffs sue Jones in his official capacity for declaratory and injunctive relief, alleging an ongoing practice of Fourth Amendment violations.

**II.     *Ex parte Young***

Under Ex parte Young, 209 U.S. 123 (1908), plaintiffs seek prospective relief against Jones in his official capacity. An official-capacity suit against a state officer is "not a suit against the

official but rather is a suit against the official's office," and as such, it is treated as a "suit against the State itself."  Hafer v. Melo, 502 U.S. 21, 26 (1991) (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).  While the Eleventh Amendment sovereign immunity doctrine deprives the federal courts of jurisdiction in most suits brought against states, Ex parte Young permits plaintiffs to sue state officials in their official capacities for prospective relief.  See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 102 (1984).

To fall within the Ex parte Young exception, plaintiffs must (1) establish an ongoing violation of federal law, (2) show that the named state official has "some connection" with the enforcement of the act, and (3) seek relief properly characterized as prospective.  Ex parte Young, 209 U.S. at 157; see Chilcoat v. San Juan Cnty., 41 F.4th 1196, 1214 (10th Cir. 2022).  The Ex parte Young test is a threshold analysis to determine whether sovereign immunity applies, before the Court reaches the merits of the underlying claim.  Whether state officials are actually violating federal law is a merits question.  17A Moore's Fed. Practice ¶ 123.40[3][A][iii], at 123-116.1 (3d ed. 2023).

Plaintiffs have satisfied the requirements of Ex parte Young.  For both of their claims, plaintiffs have established that KHP troopers are engaged in ongoing violations of federal law. Further, plaintiffs have established that Jones is a state official who is responsible for KHP practices and policies in that regard.  As the final authority in the KHP, Jones has the ultimate authority to authorize or prohibit any KHP practice.  Finally, plaintiffs seek relief which is properly characterized as prospective, i.e. injunctive and declaratory relief to enjoin the KHP's continuation of these practices.  Sovereign immunity does not bar plaintiffs' suit against Jones.

## III.  **Standing**

To bring suit against Jones, all plaintiffs must have standing.  To satisfy the standing requirements of Article III, plaintiffs must demonstrate that they have suffered an injury in fact, that

a causal connection exists between the injury and the conduct complained of, and it is likely that the injury will be redressed by a favorable decision.  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992).

Plaintiffs have demonstrated an injury in fact by establishing violations of their Fourth Amendment constitutional rights, and have shown a causal connection between their injuries and the complained-of conduct by Jones.  Jones argues, however, that KHP troopers present no appreciable risk of violating plaintiffs' constitutional rights in the future, so their injuries will not be redressed by a favorable decision and they therefore lack standing.  See Collins v. Daniels, 916 F.3d 1302, 1314–15 (10th Cir. 2019) (plaintiffs lack standing to seek injunctive relief where plaintiffs do not allege "appreciable risk" of future harm).

Jones presented evidence that the probability of a random motorist being stopped by a KHP trooper is about 0.41 per cent.  This estimate divides the total number of KHP traffic stops by the number of KDOT traffic sensor activations.[55]  This estimate ignores the substantial disparity in KHP troopers' traffic enforcement practices with regard to out-of-state drivers, however, and is further flawed because a single motorist often activates multiple KDOT sensors during a single trip, thus inflating the number of traffic sensor activations compared to the number of unique individual motorists.  According to Mummolo, the KHP estimate is likely miscalculated by several orders of magnitude.  The true likelihood that the KHP will stop a given driver is difficult to estimate, however, because the KHP does not collect or analyze that data.

All plaintiffs continue to travel through Kansas on Kansas highways, and they fear that they will be detained by KHP troopers in the future.  Although it is difficult to precisely determine the mathematical likelihood that KHP troopers will detain these plaintiffs in the future, it is clear that

---

[55]     KDOT traffic sensors are embedded in roadways and record data from passing cars.

KHP troopers stop out-of-state drivers at a highly disproportionate rate, and that once a trooper stops an out-of-state driver, a canine sniff (and its attendant delay) is disproportionately likely to ensue. See Ortega-Melendres v. Arpaio, 836 F. Supp. 2d 959, 979 (D. Ariz. 2011) (standing exists to challenge police stop even if likelihood that particular named plaintiff will again be stopped may not be high). It is also undisputed that Jones permits troopers to consider a driver's out-of-state residence and travel plans as—at the very least—"a" factor contributing to reasonable suspicion. See City of Los Angeles v. Lyons, 461 U.S. 95, 105–06 (1983) (plaintiff would have standing for prospective relief if he "allege[d] that he would have another encounter with the police" and "that the City ordered or authorized police officers to act in such a manner").

Regarding the likelihood that plaintiffs will again be subjected to unconstitutional Kansas Two-Steps, evidence at trial indicates that the Kansas Two-Step is a common practice within the KHP, so during any given traffic stop, a motorist (especially an out-of-state motorist) faces a meaningful likelihood that the trooper will perform a Two-Step maneuver. Due to lack of KHP data, the Court cannot determine exactly how prevalent the Two-Step is, or how frequently troopers perform it in circumstances where a reasonable driver would not feel free to leave. The record is clear, however, that troopers perform the Two-Step to create highly coercive circumstances and that they are very successful in pressuring motorists to remain after traffic stops without knowing, intelligent and voluntary consent. Because the Two-Step is so successful in pressuring motorists to remain on the scene to answer further questions, the Court has no doubt that KHP troopers regularly employ this tactic. In fact, Jones does not pretend that only a handful of rogue troopers abuse their power by engaging in the Two-Step. Plaintiffs have therefore established an appreciable risk that they will be subjected to an unconstitutional Kansas Two-Step in the future.

Further, an order from this Court which abrogates the KHP's ability to consider residency and

travel plans in developing reasonable suspicion and limits the circumstances in which troopers can perform the Kansas Two-Step would reduce plaintiffs' risk of future injury.  Plaintiffs therefore have standing to seek injunctive relief.  To establish standing for prospective relief, a future injury does not need to be certain; "even a small probability of injury is sufficient to create a case or controversy." Massachusetts v. EPA, 549 U.S. 497, 525 n.23 (2007) (quoting Village of Elk Grove v. Evans, 997 F.2d 328, 329 (7th Cir. 1993)).  Here, based on the evidence at trial, plaintiffs have demonstrated a sufficiently realistic threat that the KHP will violate their Fourth Amendment rights in the future. Plaintiffs therefore have standing.  See Tandy v. City of Wichita, 380 F.3d 1277, 1284 (10th Cir. 2004) (plaintiff has standing when she shows "realistic threat" of experiencing similar situation in future).

## IV.   Plaintiffs' Request For Injunctive Relief

For plaintiffs to obtain a permanent injunction, they must prove (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest.  Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 822 (10th Cir. 2007).  An injunction is a drastic and extraordinary remedy which should not be granted as a matter of course.  Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165 (2010).  A district court's decision to grant or deny permanent injunctive relief is discretionary.  Weinberger v. Romero-Barcelo, 456 U.S. 305, 319–20 (1982).

In the pretrial order, plaintiffs request the following injunctive relief:

- Requiring Defendant Jones to implement improved policies and programs with respect to training, supervision, monitoring, and discipline that will eliminate the policy, practice, pattern, and custom of suspicionless detentions and seizures. Including, but not limited to, the cessation of consideration of the following factors when forming reasonable suspicion:

  o  Out of state license plates;

  o  Travel origin or destination;

- Travel to or from so-called "drug source" locations or along so-called "drug source" corridors; and

- Any other factor the Tenth Circuit Court of Appeals or Kansas appellate courts have determined to be unreliable in forming reasonable suspicion.

- Requiring Defendant Jones to implement appropriate measures for supervision and discipline of KHP troopers who conduct detentions and seizures lacking reasonable suspicion or in violation of KHP policy;

- Requiring Defendant Jones to implement appropriate measures to ensure that KHP troopers document the following, and to do so in sufficient detail as to permit supervisory review for compliance with Article IV and the Fourth and Fourteenth Amendments:

  - all canine drug searches, including the location, the basis for each such search, the residency and demographics—including the state issuing the license plate on the vehicle—of each individual stopped, regardless of whether the encounter is followed by the use of force, consent search, citation, warning or arrest;

  - all detentions, including the location, the basis for each such detention, the residency and demographics—including the state issuing the license plate on the vehicle—of each individual stopped, regardless of whether the encounter is followed by the use of force, consent search, citation, warning or arrest; and

  - all citations and arrests, including the location, the basis for each such search, the residency and demographics—including the state issuing the license plate on the vehicle—of each individual stopped, issued and or conducted as a result of a canine drug search.

- Requiring Defendant Jones to implement appropriate measures to ensure that documentation of all roadside detentions and/or searches is retained in a single, searchable, up-to-date computerized database;

- Requiring Defendant Jones to make publicly available, on a semiannual basis, data on all roadside detentions and/or searches conducted by the KHP, including information on location, the basis for each detention and/or search, the license plate of the vehicle, and the residency and demographics of each individual stopped; [and]

- Requiring Defendant Jones and/or an independent, court-appointed neutral to monitor and audit canine drug search policies, practices, and customs, to ensure that such searches comport with constitutional and statutory requirements, including by, among other things, periodically reviewing forms documenting these searches and analyzing data on such searches.

Pretrial Order (Doc. #290) filed August 19, 2022 in D. Kan. No. 19-1343 at 47–48.

Caution in granting an injunction is especially warranted when the type of injunction sought is mandatory rather than prohibitory.  Signature Props. Int'l Ltd. P'ship v. City of Edmond, 310 F.3d 1258, 1269 (10th Cir. 2002).  Here, plaintiffs seek a mandatory injunction because the relief they seek would require Jones to affirmatively take action to amend policies, change trooper training and/or increase or alter his supervision over KHP troopers performing traffic stops.  See Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. At Thunderhead Ranch, 23 F.4th 1262, 1275 (10th Cir. 2022) (citing Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015) (characterizing order to remove content from YouTube as mandatory because order required party to take action)).

At a hearing on January 3, 2023, the Court expressed reservations about the feasibility of the injunctive relief which plaintiffs requested and ordered them to show cause why the Court should not enter judgment on the pleadings for defendant on plaintiffs' request for injunctive relief.  Minute Entry For Status Conference (Doc. #355) filed January 3, 2023 in D. Kan. No. 19-1343 at 1.  In response, plaintiffs modified their request for injunctive relief to include "any or all of the following:"

- Defendant "is hereby enjoined from continuing his practice of permitting KHP troopers to prolong detentions of drivers without reasonable suspicion of criminal activity, in violation of the Fourth Amendment;"

- Defendant "is hereby enjoined from his practice of targeting out-of-state motorists for roadside detentions without adequate reasonable suspicion;"

- "The parties are ordered to confer regarding any additional operational changes that must be made to KHP practices to effectuate the two terms of the injunction listed above, and submit those proposals to the Court."

- "If, after a bench trial, the Court finds that the KHP's use of the Two Step maneuver results in constitutional violations, the Court could include another term prohibiting the KHP from engaging in that practice."

Plaintiffs' Response To Court's Order To Show Cause Regarding Plaintiffs' Claim For Injunctive Relief (Doc. #358) filed January 7, 2023 in D. Kan. No. 19-1343 at 12–13.

### A.   Actual Success On The Merits

To obtain equitable relief against Jones, plaintiffs must prevail on the merits of their underlying claims that the KHP violated their constitutional rights, and that under Jones' supervision, the KHP is engaged in a pattern or practice of violating drivers' Fourth Amendment rights for reasons stated above.  Plaintiffs have done so.

### i.   Plaintiffs' First Claim: Innocent Travel Indicia

The KHP bears the burden of showing that troopers have reasonable suspicion to detain plaintiffs.  United States v. Carhee, 27 F.3d 1493, 1496–97 (10th Cir. 1994).  Plaintiffs argue that in violation of the Fourth Amendment, in developing reasonable suspicion, KHP troopers consider a driver's out-of-state residence, origin or destination.   Jones denies that KHP troopers consider residency and argues that Vasquez permits KHP troopers to consider out-of-state travel plans if they are implausible or contradictory or if they are not the sole factors cited to support reasonable suspicion.  The latter observation may be correct, but it is not relevant; this case does not involve any stop in which a trooper detained a motorist *solely* because the driver was an out-of-state resident, was traveling to or from another state, or offered travel plans that were implausible or contradictory.  Furthermore, contrary to Jones' argument, it is obvious that as a whole, troopers do consider residency in stopping disproportionate numbers of out-of-state motorists.

Under Vasquez, KHP troopers cannot consider a driver's out-of-state residency as a factor contributing to reasonable suspicion.  Vasquez, 834 F.3d at 1138 ("wholly improper to assume that an individual is more likely to be engaged in criminal conduct because of his state of residence").   KHP troopers may consider a driver's travel plans (out-of-state origins or destinations) as factors contributing to reasonable suspicion, but are required to give those factors very minimal weight.  Id. at 1137–38 (quoting Guerrero, 472 F.3d at 787–88) (travel from drug

source state "does little to add to the overall calculus of suspicion" and is "so broad as to be indicative of almost nothing").  On paper, KHP training appears to be consistent with Vasquez, but Mummolo's testimony proves that KHP troopers engage in a pattern or practice of impermissibly giving residency and travel plans significant weight when calculating reasonable suspicion; his data-based conclusions cannot be (or at least have not been) otherwise explained.

Jones correctly argues that Vasquez does not outright prohibit KHP troopers from considering travel plans in developing reasonable suspicion.  In Vasquez, the Tenth Circuit held that travel from a drug source city or state does "little" to add to reasonable suspicion and is "so broad as to be indicative of *almost* nothing."  Vasquez, 834 F.3d at 1137 (quoting Guerrero, 472 F.3d at 787–88) (emphasis added).  The Tenth Circuit made it clear, however, that such factors must be afforded minimal weight.  The evidence presented at trial shows that collectively, KHP troopers place far more than minimal weight on these factors.  For all practical purposes, Mummolo's statistical evidence is unrefuted, and it shows that KHP troopers target out-of-state drivers at a highly disproportionate rate.  Furthermore, the evidence regarding the individual traffic stops in this case shows that in their quest to "STOP A LOT OF CARS!", some troopers detain out-of-state drivers based on flimsy or contrived evidence of criminal activity.

Plaintiffs provided evidence of multiple instances where troopers detained motorists based in part on travel plans which were not inherently implausible, and the additional factors cited in support of reasonable suspicion would not lead a reasonable officer to suspect that the motorist had committed, was committing or was about to commit a crime.[56]  Notwithstanding its formal

---

[56]      In Dunn's traffic stop, two bases for Rule's reasonable suspicion were that Dunn was an older woman traveling alone and had "copious snacks" in her car.  Rule also testified that he found it "extremely suspicious" that Dunn would choose to drive rather than fly to pick up her

(continued . . . )

training and written policies, Mummolo's statistical evidence indicates that disregard of <u>Vasquez</u> is pervasive within the ranks of the KHP, and the KHP's deficient data collection regarding traffic enforcement and drug interdiction practices (1) makes it impossible to determine how pervasive this problem is, and (2) has likely enabled this disregard to escape the KHP's attention for many years.

The Court does not suggest that a trooper may not inquire about a driver's state of residency or travel plans during the course of a traffic stop.  Also, the Court does not suggest that implausible travel plans, or indicators of deceptiveness in a driver's answers, cannot contribute to reasonable suspicion.  In the traffic stops examined during trial, however, none of the motorists articulated travel plans that would have appeared implausible or suspicious to a reasonable officer.[57]  Simply because the trooper would not have chosen a particular route or mode of travel does not make those choices

---

[57]( . . . continued)

camper van, despite the fact that Dunn had explained that she was immunocompromised and unwilling to fly due to the COVID-19 pandemic.  Likewise, in Kelly's traffic stop, McCord found it "highly suspicious" that Kelly might travel to Kansas to pick up his nephew for a trip, because McCord personally would not let his son travel with his uncle.  In the Shaw traffic stop, Schulte testified that one basis for reasonable suspicion was that Blaine Shaw claimed to be a criminal justice major and yet would not consent to a search of his vehicle—implicating the clearly illegal position that troopers may base their reasonable suspicion upon a driver invoking his or her constitutional right to refuse consent for a search.  <u>See</u> <u>United States v. Santos</u>, 403 F.3d 1120, 1125–26 (10th Cir. 2005).  Likewise, in Bosire's traffic stop, a large part of McMillan's stated basis for reasonable suspicion was Bosire's reluctance to answer McMillan's questions about his travel plans, even though Bosire had a constitutional right to not answer McMillan's questions.  <u>Id.</u> at 1131–32.

[57]     Blaine Shaw informed Schulte that he and Samuel Shaw were traveling to Denver to visit family.  Bosire informed McMillan that he was coming from the west, and headed east.  (While Bosire was reluctant to answer McMillan's questions about his travel plans and McMillan perceived him to be "evasive," motorists are not required to disclose their travel plans during traffic stops, and a motorist's refusal to disclose such information cannot furnish a basis for reasonable suspicion.  <u>See</u> <u>Santos</u>, 403 F.3d at 1131–32.).  Erich and Maloney informed Rohr that they were traveling to Alabama.  Kelly informed McCord that he was traveling to Kansas to pick up his nephew.  Dunn informed Rule that she was traveling to Denver to pick up a purchased camper van.  Martinez informed Proffitt that he was traveling to Missouri for work.  None of these travel plans were implausible or indicative of deception.

indicative of criminal activity.  Salzano, 158 F.3d at 1112.  KHP troopers give disproportionate weight to out-of-state residency or travel plans, and this is obvious because the other factors articulated to demonstrate reasonable suspicion were entitled to little or no weight under any objective standard of plausibility.  Plaintiffs have prevailed on the merits of this claim.

### ii.        Plaintiffs' Second Claim: Kansas Two-Step

For a police officer to engage with a driver after a traffic stop ends, the trooper must either have reasonable suspicion to further detain the vehicle or must obtain the voluntary consent of the driver to remain and continue answering questions.  See United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005).  Jones and the KHP troopers who testified at trial maintain that as a matter of law, the Kansas Two-Step provides a sufficient break in contact for a reasonable driver to believe that he or she is free to leave.  Jones argues that if a driver remains after the trooper performs the Two-Step, the driver necessarily remains with intelligent, voluntary and knowing consent.  The KHP carries the burden of showing that in the totality of the circumstances, plaintiffs gave free and voluntary consent. See Schneckloth, 412 U.S. at 227.

As explained above, in videotapes of the Kansas Two-Steps that the Court reviewed during trial, viewed in light of the overall circumstances, the periods of disengagement were not sufficient for reasonable drivers to feel free to leave.  A one-second break in contract with a trooper, or even a three-second or five-second break, does not create a clear "end" to a traffic stop in the mind of a reasonable driver.  Further, the troopers who performed these maneuvers remained very close to the detained vehicles when they performed the Two-Step, taking four or fewer steps away.  When a trooper remains in close proximity to the vehicle without truly walking away from the driver, a

reasonable driver does not feel that he or she is free to leave.[58]

KHP troopers know that they are in positions of authority during traffic stops. They also know that when they fail to tell drivers that they are free to leave, consistent with KHP training, most drivers will feel coerced into remaining on the scene after troopers perform the Two-Step. Troopers insist that drivers give knowing, intelligent and voluntary consent. They do not. See Mosley, 743 F.3d at 1324–25 (not willing and voluntary consent if citizen submits to officer's show of authority). Faced with a KHP trooper who has performed the Two-Step, a reasonable person would not feel free to "disregard the police and go about his business." Bostick, 501 U.S. at 434.

Based on the evidence presented at trial, the Court finds that Jones failed to meet his burden of showing that plaintiffs gave free and voluntary consent. The KHP is engaged in a pattern or practice of prolonging traffic stops by using the Kansas Two-Step to coerce drivers into answering questions when the troopers do not have reasonable suspicion and the drivers do not feel free to leave. This practice violates the Fourth Amendment by extending traffic stops without reasonable suspicion and without the knowing, intelligent and voluntary consent of the drivers. Plaintiffs have succeeded on the merits of this claim.

### B.    Irreparable Harm Unless Injunction Is Granted

Irreparable injury and the inadequacy of legal remedies are the bases for federal injunctive relief. Weinberger, 456 U.S. at 312. Harm is "irreparable" if plaintiffs can show a "significant risk that he or she will experience harm that cannot be compensated after the fact by money damages."

---

[58]    Blaine Shaw, Erich, Maloney and Dunn testified that when the trooper reapproached the vehicle after performing the Two-Step, they did not feel free to leave because of the trooper's position of power, and because his close proximity made them feel that it would be dangerous to drive away.

Fish v. Kobach, 840 F.3d 710, 751 (10th Cir. 2016) (quoting RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1210 (10th Cir. 2009)).  Adequate legal remedies foreclose injunctive relief.  N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984).

The Tenth Circuit has stated that "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  Fish, 840 F.3d at 752 (quoting Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001)).  Accordingly, while the Court must engage in its traditional equitable inquiry as to the presence of irreparable harm in such a context, "the violation of a constitutional right must weigh heavily in that analysis."  Id.  Here, plaintiffs established that constitutional violations by KHP troopers caused them profound distress, humiliation, anger and other non-monetary damages.[59]  The risk that they will experience future harm cannot be compensated after the fact by money damages.  Drivers who experience illegal roadside detentions have some remedies at law, such as bringing suit under 42 U.S.C. § 1983 and through the Kansas Tort Claims Act, K.S.A. § 75-6101 et seq., but these remedies are not sufficient to abate the significant risk that plaintiffs will again experience irreparable harm.  Individual lawsuits against KHP troopers have not persuaded and evidently will not persuade the KHP to adopt permanent and comprehensive changes that are necessary to protect plaintiffs and similarly situated

---

[59]     All plaintiffs in this case provided credible testimony regarding how the constitutional violations impacted them.  All plaintiffs continue to travel through Kansas when necessary but experience significant anxiety and distress about the prospect of future encounters with the KHP.  Bosire is a naturalized United States citizen, and his traffic stop permanently damaged his views of law enforcement and the integrity of the Constitution.  As a result, he stopped participating in community volunteer work that required him to interact with law enforcement.  The Shaws, Erich, Maloney and Dunn felt angry, upset and violated.  The traffic stop distressed Maloney and her children so greatly that they refused to use their new RV and did not take vacations for several years.  It caused Maloney such anxiety that she had to seek therapy, stop driving her own vehicle and reduce her hours at work.

motorists from constitutional violations in the future.[60]

In summary, plaintiffs have succeeded in showing a significant risk that if the Court does not grant injunctive relief, they will experience harm that cannot be compensated after the fact by money damages.

### C.   **Balance Of Harms**

The third injunction factor requires the Court to balance the irreparable harms identified by plaintiffs against the harm that an injunction would cause.  Fish, 840 F.3d at 754.  Because plaintiffs seek a mandatory injunction, they seek a "disfavored" form of relief that the Court subjects to a heightened standard of scrutiny.  Awad v. Ziriax, 670 F.3d 1111, 1125 (10th Cir. 2012).  Under the heightened disfavored-injunction standard, plaintiffs must make a strong showing that the balance

---

[60]     Damage suits under Section 1983 are especially unavailing in most cases, thanks to the doctrine of qualified immunity.  Under this doctrine, as long as officers acted in good faith and believed that their actions were lawful, they can be shielded from liability under Section 1983 if they violated plaintiffs' constitutional rights.  See Pierson v. Ray, 386 U.S. 547, 555 (1967).  Since the inception of the doctrine, the Supreme Court has "evolved" the qualified immunity defense to spread its protection "to all but the plainly incompetent or those who knowingly violated the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  In part, qualified immunity is intended to protect law enforcement officers from personal liability and the "ordeal of litigation."  Apodaca v. Raemisch, 864 F.3d 1071, 1075 (10th Cir. 2017) (citing Plumhoff v. Rickard, 572 U.S. 765, 771–73 (2014)). Here, qualified immunity is not necessary to achieve that goal because the State defends and indemnifies KHP troopers—perhaps even as to punitive damages—so the qualified immunity defense inures to the benefit of the State and the threat of litigation for individual troopers is purely hypothetical.  It certainly does not initiate institutional reform.

The Supreme Court has also given qualified immunity "sweeping procedural advantages" by (1) allowing courts to grant qualified immunity at the summary judgment stage because "the law is not reasonably clear," even when the official "is not entitled to summary judgment on the merits;" (2) permitting courts to grant qualified immunity at the earliest possible procedural stage, especially before discovery has been taken "and necessarily before a plaintiff has obtained all the relevant facts;" and (3) allowing a court order denying qualified immunity to be immediately appealed.  Jamison v. McClendon, 476 F. Supp. 3d 386, 405 (S.D. Miss. 2020) (citing Mark R. Brown, The Fall and Rise of Qualified Immunity: From Hope to Harris, 9 Nev. L.J. 185, 195 (2008); Elder v. Holloway, 510 U.S. 510, 516 (1994)).  In short, drivers who have their Fourth Amendment rights violated by KHP troopers face a vanishingly small chance of finding an adequate legal remedy under Section 1983.

of harms tips in their favor.  Id. at 1131.  The Tenth Circuit holds that provisions of an injunction that do "no more than require [defendant] to obey the law" must be stricken.  Keyes v. Sch. Dist. No. 1, Denver, 895 F.2d 659, 668 & n.5 (10th Cir. 1990).

Plaintiffs argue that the balance of harms weighs in their favor because the threatened injury—deprivation of constitutional rights of those who travel across Kansas—outweighs the harm that an injunction may cause to the KHP.  Defendant argues that the balance of harms does not weigh in favor of plaintiffs because the proposed injunction would be unduly burdensome to defendant and would not comport with the principles of comity and equitable restraint articulated in O'Shea v. Littleton, 414 U.S. 488 (1974).

In O'Shea, residents of Cairo, Illinois brought a class action against a magistrate and a circuit court judge who allegedly engaged in illegal bond-setting, sentencing and jury-fee practices that discriminated against African-American and impoverished people, in violation of the Equal Protection Clause.  Plaintiffs sought an injunction, which the district court denied but the Seventh Circuit Court of Appeals directed the district court to grant.  Id. at 490–92.  The United States Supreme Court reversed, holding that the injunction "would require for its enforcement the continuous supervision by the federal court over the conduct of the petitioners in the course of future criminal trial proceedings involving any of the members of the respondents' broadly defined class."  Id. at 501.  It ruled that "a federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable."  Id. at 500.  It also noted that the injunction would empower any member of the plaintiff class who was a defendant in a case before the judges in question to bring suit in federal court to complain that the judge had violated the federal injunction.  Id.

While O'Shea largely concerns an issue of abstention under Younger v. Harris, 401 U.S. 37

(1971), the Supreme Court's concerns in O'Shea inform the balance of harms in this case.  The Court will not fashion injunctive relief that will require this Court to supervise in perpetuity every traffic stop that KHP troopers perform.  Further, the Court will not fashion relief that will permit every driver subjected to a KHP traffic stop to come directly to federal court and allege that the stop violated the injunction.  Such an injunction could force the Court to micromanage and second-guess all KHP traffic stops to determine whether the driver's out-of-state travel plans were sufficiently implausible or contradictory to contribute to reasonable suspicion, whether the trooper gave these indicia impermissible weight, whether each Kansas Two-Step stayed within permissible constitutional bounds and whether—in violation of the Court's injunction—any violations were fairly traceable to insufficient training, supervision or record-keeping by Jones.  Such relief would be unworkable for the Court and impermissibly intrusive upon the KHP.

Plaintiffs' amended request for injunctive relief raises additional concerns. The amended injunction is broad and lacking in detail, leaves unstated exactly how Jones should train or supervise troopers and has no objective boundaries for Jones to know that he has complied or failed to comply with the injunction.  By omitting this information, plaintiffs' proposed injunction would fall short of fulfilling the "two important functions performed by [Rule 65]: (1) to prevent confusion on the part of those faced with injunctive orders and (2) to aid the appellate court in defining the bounds of the injunctive relief."  New Mexico v. Trujillo, 813 F.3d 1308, 1319 n. 7 (10th Cir. 2016) (quoting Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., 84 F.3d 367, 371 (10th Cir. 1996)); see also Shook v. Board of Cnty Comm'rs of El Paso, 543 F.3d 597, 603, 605–06 (10th Cir. 2008) (affirming denial of injunction that would require jail to "provide sufficient numbers of mental health and custody staff, with adequate training" because court not equipped to determine what constitutes "adequate" training or "sufficient" number of employees).

Furthermore, three provisions of the amended request would merely enjoin Jones from violating the Constitution. Provisions of an injunction that do "no more than require [defendant] to obey the law," however, must be stricken. <u>Keyes</u>, 895 F.2d at 668 & n.5 (striking injunction prohibiting defendants "from discriminating on the basis of race" and directing defendants to "comply with the constitutional requirement of equal education opportunity for all" because injunctions simply requiring defendant to obey law are too vague to satisfy Rule 65).

Narrower and more specific injunctive relief could remedy unconstitutional practices within the KHP while tipping the balance of harms in favor of plaintiffs. Plaintiffs have a clear interest in preventing future violations of constitutional rights. Plaintiffs have also established particular KHP practices and deficiencies in KHP data collection that a well-tailored, narrow injunction could remedy and protect plaintiffs from future harm while not inflicting undue harm on KHP operations. Such an injunction would require the KHP to (1) improve its data collection practices to better track the disparities between traffic stops of in-state and out-of-state drivers, the reasonable suspicion factors that troopers rely upon and the frequency and manner with which troopers perform the Two-Step; (2) require troopers to transition from traffic stops to consensual encounters with motorists in a manner which ensures that further engagement is actually knowing, voluntary and intelligent, <u>i.e.</u> consensual in the letter and spirit of the law; (3) work with a court-appointed monitor to decrease the amount of weight that KHP troopers place upon innocent travel plans, in compliance with <u>Vasquez</u>; (4) amend trooper training materials and procedures consistent with the Court's findings; and (5) regularly report to either the Court or the court-appointed monitor to demonstrate its compliance with all of the requirements listed above.

### D.      Adverse Public Interest

The fourth injunction factor requires the Court to determine whether an injunction, if granted, would be adverse to the public interest.  It is "always in the public interest to prevent the violation of a party's constitutional rights."  <u>Free the Nipple-Fort Collins v. City of Fort Collins</u>, 916 F.3d 792, 807 (10th Cir. 2019) (citations omitted).

Throughout this case, plaintiffs have presented robust evidence that the KHP is engaged in an ongoing war against motorists in Kansas, which unconstitutionally subjects them to prolonged detentions without reasonable suspicion or consent.  Injunctive relief would serve a dual purpose in this case: requiring the KHP to better document its troopers' traffic enforcement practices and eradicating unconstitutional practices from Kansas highways.

The public has a "profound and long-term interest in upholding an individual's constitutional rights."  <u>Awad</u>, 670 F.3d at 1132 (citations omitted).  Injunctive relief in this case would protect the constitutional rights of all motorists who travel through Kansas.  The Court finds that injunctive relief would not be adverse to the public interest.

## V.      Declaratory Relief

In addition to injunctive relief, plaintiffs request declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  A declaratory judgment plaintiff must present the Court with a suit based on an "actual controversy," meaning that the Court must determine "whether the facts alleged, under all the circumstances, show that a substantial controversy exists, between parties having adverse legal interests, of sufficient

immediacy and reality to warrant the issuance of a declaratory judgment." Surefoot LC v. Sure Foot Corp., 531 F.3d 1236, 1244 (10th Cir. 2008) (quoting Md. Cas. Co. v. Pac. Coal & Oil, 312 U.S. 270, 273 (1941)).

Although a request for declaratory relief often accompanies a request for injunctive relief, they are separate remedies. Steffel v. Thompson, 415 U.S. 452, 467 (1974). A declaratory judgment lacks the enforcement mechanisms of an injunction but still binds the parties, and a public official who loses a declaratory judgment claim is expected to correct his or her unlawful conduct. Poe v. Gerstein, 417 U.S. 281, 282 (1974).

In determining whether to grant declaratory relief, the Court should inquire (1) whether a declaratory action would settle the controversy; (2) whether it would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fending" or "to provide an arena for a race to res judicata;" (4) whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether an alternative remedy would be better or more effective. Bell Helicopter Textron, Inc. v. Heliqwest Int'l., Ltd., 385 F.3d 1291, 1299 (10th Cir. 2004).

Plaintiffs seek a declaration that the KHP's practice of extending roadside detentions of motorists based in part on travel to and from "drug source states," and without reasonable suspicion, violates motorists' Fourth Amendment rights to be free from unreasonable searches and seizures, and renders the KHP liable for constitutional violations under 42 U.S.C. § 1983.[61]  Alternatively, plaintiffs seek a declaration that extending roadside detentions based in part on travel to and from drug source states is inconsistent with prevailing Tenth Circuit law and the Fourth Amendment.

---

[61]     Plaintiffs do not seek declaratory relief regarding their claim that KHP troopers are engaged in a practice of violating motorists' rights by performing coercive Kansas Two-Step maneuvers.

The Court declines to grant plaintiffs a declaratory judgment that extending roadside detentions "in part" on travel to and from drug source states is wholesale unconstitutional. This statement of the law is inconsistent with <u>Vasquez</u>, which permits officers to consider travel to and from drug source states as a factor which supports reasonable suspicion, as long as that factor is afforded minimal weight or the stated travel plans are implausible or contradictory. When the Tenth Circuit ruled on <u>Vasquez</u>, however, Kansas was not yet flanked on both sides by states that have legalized recreational marijuana. Now, *every* driver on I-70 in Kansas is traveling away from a "drug source" state and towards a "drug source" state. Accordingly, the fact that a driver is traveling on I-70 in Kansas gives KHP troopers no indication that a particular driver is engaged in illegal activity. In <u>Vasquez</u>, the Tenth Circuit held that KHP troopers cannot develop reasonable suspicion based on factors that "would justify the search and seizure of the citizens of more than half of the states in our country." 834 F.3d at 1138. That logic now dictates that when law enforcement officers in Kansas develop reasonable suspicion with regard to traffic on I-70, they must give no weight to the fact that a driver is traveling (1) away from a "drug source" state, (2) towards a "drug source" state, or (3) on a drug corridor; doing so would justify the search and seizure of every single driver traveling on I-70 in Kansas. The Court will grant declaratory relief to that effect.

The Court finds that granting declaratory relief would settle the controversy in this case. Under the first factor, while uncertainties remain regarding exactly how pervasive the KHP's unconstitutional practices are, this ruling definitively establishes that the practices challenged at trial amount to constitutional violations. Under the second factor, a declaratory judgment would serve a useful purpose in clarifying the legal relations at issue by establishing that KHP troopers violated plaintiffs' Fourth Amendment rights. Under the third factor, the Court has no reason to believe that plaintiffs are seeking declaratory relief merely for procedural fencing or as a race to res judicata.

Under the fourth factor, the requested declaratory judgment would not increase friction between federal and state courts or improperly encroach upon state jurisdiction, as the issues resolved in this case are federal and constitutional in nature.  Finally, under the fifth factor, an alternative remedy would not be better or more effective.  In conjunction with a narrowly tailored injunction, declaratory relief is a proper and effective remedy in this case.

**THE COURT THEREFORE ORDERS, ADJUDGES AND DECREES** that in violation of the Fourth Amendment and Vasquez v. Lewis, 834 F.3d 1132 (10th Cir. 2016), Jones is responsible for a policy or practice which unlawfully detains motorists in Kansas (especially out-of-state motorists) without reasonable suspicion or consent, based on out-of-state residency and—to more than a minimal extent—based on travel plans that are not implausible or inherently contradictory.  When KHP troopers develop reasonable suspicion with regard to motorists on I-70, they must give no weight to the fact that a motorist is traveling (1) toward a "drug source" or "drug destination" state, (2) away from a "drug source" or "drug destination" state, or (3) on a drug corridor.

**THE COURT FURTHER ORDERS, ADJUDGES AND DECREES** that in violation of the Fourth Amendment, Jones is responsible for a policy or practice of using the Kansas Two-Step to extend traffic stops of motorists in Kansas without reasonable suspicion and without the motorists' knowing, intelligent and voluntary consent.

**IT IS FURTHER ORDERED that all parties, no later than 5:00 p.m. on Monday, August 7, 2023, show cause in writing why the Court should not substitute Erik Smith, the current Superintendent of the KHP, as defendant in this case.**  See Hafer v. Melo, 502 U.S. 21, 25 (1991) (when official leaves office, successor automatically assumes his position in official capacity litigation).  **No later than 5:00 p.m. on August 14, 2023, each party may respond.**

**IT IS FURTHER ORDERED that all parties, no later than 5:00 p.m. on Monday, August 7, 2023, show cause in writing why the Court should not enter the following injunction. No later than 5:00 p.m. on August 14, 2023, each party may respond.**

Injunction

I.    Documentation

A.    In any reports which document investigatory stops, detentions, searches or consents, troopers shall use accurate and specific descriptive language and not rely on boilerplate or "pat" language or conclusory invocation of their training and experience as law enforcement officers and their consideration of all the relevant factors. Articulation of reasonable suspicion, along with consents, shall be clear and factually specific to particular individuals.

B.    Troopers shall document all investigatory stops and detentions, any searches (including canine sniffs) resulting from or proximate to the stop or detention, and any consents to search or to engage with troopers after the conclusion of a traffic stop. Within 60 days, the KHP shall develop an electronic report format to document all investigatory stops, searches and consent, whether or not they result in an arrest, issuance of a citation, search or discovery of contraband. The electronic documentation system shall allow for summarization, reports and searches, and shall be submitted for review and approval by the Court. The reporting format shall require troopers to document the following:

a.    the trooper's name and badge number;

b.    the date and time of the stop;

c.    the location of the stop;

d.    the duration of the stop;

e.    the identifying characteristics of the vehicle, including its make, model, year, color and the state that issued its license plate;

f.    the presence, names and number of any passengers;

g.    the reason for the stop, including a description of all facts on which the trooper relied in developing reasonable suspicion to justify the initial stop;

h.    whether the trooper asked any individual to consent to a search, whether the trooper advised the subject that he or she had a right to refuse or revoke consent at any time, whether such advice of rights has been independently documented, and whether consent to search was given;

- 76 -

    i.   whether a search (including a canine sniff) occurred and if so, a description of all facts on which the trooper relied in developing reasonable suspicion to search;

    j.   the nature and duration of the search and, if a canine was deployed, the length of any delay occasioned by the need to procure a canine unit;

    k.   whether the trooper seized any drugs or contraband, and the nature and disposition of any such drugs or contraband;

    l.   when and how the traffic stop concluded; and

    m.   after the traffic stop concluded, whether the trooper sought to engage in any conversation with the driver or occupants of the vehicle and if so, specific steps which the trooper took to communicate to the driver that the traffic stop was concluded and that the driver was free to go, the length of time from the conclusion of the traffic stop to the trooper's effort to re-engage and—if the driver re-engaged—the total length of the engagement after the end of the traffic stop.

C.    All documentation shall be submitted to the trooper's supervisor by the end of the shift.  Absent exceptional circumstances, supervisors shall review such reports within 12 hours of receiving them.  Supervisors shall report and shall document (1) those investigatory stops and detentions which appear unsupported by reasonable suspicion; (2) those searches which appear to be without legal justification; (3) stops, detentions or searches which appear to violate KHP training or policies; and (4) stops or searches that indicate a need for corrective action or review of KHP policy, strategy, tactics or training.

D.    The supervisor shall take appropriate action to address all violations or deficiencies in investigatory stops, detentions, searches and consents, including recommending corrective action for the involved officer and/or referring the incident for administrative or criminal investigation.  For each trooper, the supervisor shall track each violation or deficiency and any corrective action taken, to identify troopers who need repeated corrective action.

## II.    Searches and Continued Questioning

A.    Prior to conducting a search which is purportedly based on consent, a trooper shall notify a supervisor of the plan to conduct a consensual search, and receive approval from the supervisor before conducting it.  As part of the supervisory review, the supervisor shall document in an auditable format those requests that are legally unsupported, are in violation of KHP policy or this injunction, or that indicate a need for corrective action or review of any KHP policy, strategy, tactics or training. The supervisor shall take appropriate action to address violations or deficiencies, including recommending corrective action for the involved officer.

B.    When a trooper seeks consent for a search, the officer shall affirmatively inform

the subject of his or her right to refuse and to revoke consent at any time, and document the subject's consent on a written form which explains these rights.  The written form shall include separate signature lines for the trooper to certify that the trooper has read and explained these rights to the subject, and for the subject to affirm that he or she understands the right to refuse and to revoke consent to the search.

C.      When a trooper seeks to re-engage with a driver or occupant of the vehicle, after a traffic stop has concluded, the trooper shall affirmatively inform the subject of his or her right to refuse and to revoke consent at any time, and document the subject's consent on a written form which explains these rights.  The written form shall include separate signature lines for the trooper to certify that the trooper has read and explained these rights to the subject, and for the subject to affirm that he or she understands the right to refuse and to revoke consent to the search.

D.      The KHP shall maintain a log which lists each request for a search, the officer who requested the search, the supervisor who reviewed the request and the action taken on the request.

III.      The KHP shall develop a protocol for comprehensive analysis, no less frequently than every six months, of the foregoing data.  The report shall analyze the data, identify steps taken to correct problems and shall be publicly available, served on the parties in this case and filed with the Court.

IV.      No later than September 1, 2024, the KHP shall provide all officers with at least 24 hours of training, and at least ten hours thereafter on an annual basis, on facts and circumstances that may be considered in initiating, conducting, terminating and expanding an investigatory stop or detention; the difference between reasonable suspicion and mere speculation; and between knowing, voluntary and intelligent consent to engage with law enforcement, as opposed to seizure and/or mere acquiescence to police authority.

V.      KHP supervisors shall be held accountable for providing close and effective supervision necessary to direct and guide troopers in complying with constitutional requirements.  To this end, all troopers shall be assigned a single, consistent and clearly-identified supervisor.  Supervisors shall work the same days and hours as the troopers they are assigned to supervise.

VI.      The KHP will maintain and operate audio recording and video cameras in all marked and unmarked vehicles that are assigned to routine patrol duties and shall promptly repair or replace any non-functioning equipment.  Such recordings shall be maintained, reviewed by supervisors as appropriate and preserved for no less than three years for investigatory and audit purposes.  The KHP shall require

A.      activation of in-car cameras for all traffic stops or pursuits until the stop is concluded and the stopped vehicle departs, or until the officer's participation in the vehicle stop ends (whichever is later); and

B.      activation of in-car cameras or audio recording to record requests for consent to

search a vehicle, consent to deployment of drug-detection canines and consent to engage with a driver after the conclusion of a traffic stop, and all parts of the driver's response to said requests.

A trooper must immediately notify a supervisor when an event was not recorded, and provide a full explanation.  Supervisors shall refer for investigation any trooper who fails to properly make and preserve such recordings.

VII. The Court may appoint a special master to perform compliance reviews and audits and assess whether this injunction is effective in achieving constitutional policing.  The KHP shall be liable for all fees and expenses of the special master.  Within 90 days of his or appointment, the Special Master shall develop a plan for conducting outcome assessments and compliance reviews and audits, and shall submit said plan to the parties and the Court, for review and approval.  Two years after appointment, the Special Master shall conduct a comprehensive assessment to determine whether and to what extent the intent of the plan has been achieved.

VIII. This injunction will remain in effect for four years unless the KHP has achieved all objectives of the injunction by an earlier date, no sooner than two years, in which case the Court may dissolve it at an earlier date.  On the other hand, if the KHP has not obtained full and effective compliance, this injunction may be extended.

IX. The Court retains jurisdiction of this action for all purposes until the KHP has achieved full and effective compliance for no less than two years, and the Court so certifies.


**IT IS SO ORDERED.**

Dated this 21st day of July, 2023 at Kansas City, Kansas.



<u>/s Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge