**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| BLAINE FRANKLIN SHAW, *et al.*, | |
| *Plaintiffs,* | **Case No. 19-1343-KHV-GEB** |
| v. | |
| ERIK SMITH in his official capacity as the Superintendent of the Kansas Highway Patrol, *et al.*, | |
| *Defendants.* | |

| | |
|---|---|
| MARK ERICH, *et al.*, | |
| *Plaintiffs,* | |
| v. | **Case No. 20-1067-KHV-GEB** |
| ERIK SMITH, *KHP Superintendent,* | |
| *Defendant.* | |

**PLAINTIFFS' REPLY REGARDING THE ORDER TO SHOW CAUSE WHY THE COURT SHOULD NOT ENTER THE PROPOSED INJUNCTION**

Defendant Erik Smith raises two broad objections in response to the Court's order to show cause why it should not enter the Proposed Injunction. Def.'s Resp. to Order to Show Cause (Doc. #547). First, he incorrectly argues that the Court conflated Plaintiffs' non-monetary injuries with irreparable harm and failed to correctly formulate the irreparable harm test. To the contrary, the Court correctly found that Plaintiffs face a significant risk of future Fourth Amendment violations as a result of the KHP's unconstitutional interdiction practices, and that this exposure to future constitutional violations constitutes irreparable harm sufficient to justify injunctive relief. Smith does not identify any cases conflicting with the Court's conclusion.

Second, Smith erroneously contends that the Proposed Injunction is not narrowly tailored to address the constitutional violations identified in the Court's opinion and unduly interferes with the KHP's law enforcement functions. Smith's complaints about the burdens the Proposed Injunction impose are largely unsupported. In general, he mischaracterizes the Proposed Injunction's provisions, inaccurately suggesting that it would somehow require the Court or the special master to sit in review of every traffic stop performed by the KHP, despite the Court's express statements to the contrary in its Order. (Doc. #539). He also wrongly denies the Court's power to require the KHP to take remedial actions—such as informing drivers about their ability to revoke consent to a search or a voluntary discussion with a KHP trooper—that the Fourth Amendment does not independently require. Smith raises a number of other specific objections to the Proposed Injunction, and Plaintiffs responses are below.

Overall, however, Smith fails to articulate any persuasive, well-supported, and factually grounded reason not to enter the injunction the Court proposes. The injunction should issue with the corrections previously identified by Plaintiffs (Doc. #541), to which Smith did not object (Doc. #546).

## I.     THE COURT CORRECTLY DETERMINED THAT THE KHP'S PERVASIVE AND PERSISTENT DISREGARD OF FOURTH AMENDMENT REQUIREMENTS IMPOSES IRREPARABLE HARM.

This Court held that "[P]laintiffs have demonstrated a sufficiently realistic threat that the KHP will violate their Fourth Amendment rights in the future" to establish standing. (Doc. #539 at 59). As the Court recognized, the threatened violation of constitutional rights weighs heavily in the irreparable harm analysis, and in this case justifies the issuance of injunctive relief. *Id.* at 67 (quoting *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016)). Smith's objections to the Court's irreparable harm assessment are misplaced. The Court properly focused on Plaintiffs' risk of future

KC 20751499.1

constitutional deprivation, correctly concluded that Plaintiffs' ongoing exposure to the KHP's unconstitutional interdiction practices constitutes irreparable harm, and carefully crafted its injunction avoid undue interference with the KHP's legitimate law enforcement activities.

Numerous courts have held that systematic or pervasive Fourth Amendment violations give rise to irreparable harm sufficient to justify injunctive relief. *See, e.g.*, *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996); *Ortega-Melendres v. Arpaio* (*Melendres I*), 836 F. Supp. 2d 959, 979 (D. Ariz. 2011); *Floyd v. City of New York*, 959 F. Supp. 2d 668 671–72 (S.D.N.Y. 2013); *see also* Pls. Proposed Findings of Fact & Conclusions of Law at 154 –55 & nn. 919, 920, Doc. #529 (collecting cases). This case is no different. In *Vasquez v. Lewis*, the Tenth Circuit denied qualified immunity to KHP troopers who had unconstitutionally detained an out-of-state motorist, stating unequivocally that it is "time to stop the practice of detention of motorists for nothing more than an out-of-state license plate." 834 F.3d 1132, 1138 (10th Cir. 2016). And yet this Court found that Dr. "Mummolo's statistical evidence indicates that disregard of *Vasquez* is pervasive within the ranks of the KHP, and the KHP's deficient data collection regarding traffic enforcement and drug interdiction practices (1) makes it impossible to determine how pervasive this problem is, and (2) has likely enabled this disregard to escape the KHP's attention for many years." (Doc. #539 at 64). The Court further found that the "KHP is engaged in a pattern or practice of prolonging traffic stops by using the Kansas Two-Step to coerce drivers into answering questions when the troopers do not have reasonable suspicion and the drivers do not feel free to leave," in violation of basic Fourth Amendment principles. *Id.* at 66. Injunctive relief is appropriate to prevent further exposure to the KHP's unconstitutional interdiction practices.

KC 20751499.1

Attempting to avoid this straightforward conclusion, Smith accuses the Court of "equat[ing] non-monetary injuries with irreparable harm." (Doc. #547 at 3). Not so. The Court rested its irreparable harm analysis on the significant risk that Plaintiffs will again suffer Fourth Amendment violations if they continue to drive on interstate highways through Kansas, correctly noting that "[t]he risk that [Plaintiffs] will experience future harm cannot be compensated after the fact by money damages," even if "[d]rivers who experience illegal roadside detentions have some remedies at law." Order at 67 (Doc. #539) (emphasis added). The threatened or ongoing violation of constitutional rights routinely suffices to establish irreparable harm, even if a completed constitutional violation would give rise to discrete injuries that could be redressed through money damages. Thus, for example, a public employee who is fired for exercising their First Amendment rights may seek money damages for the unlawful termination, but a public employee who faces a continued threat of unconstitutional reprisal suffers irreparable harm without an adequate remedy at law. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("It is clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

The same principle applies here. The KHP's pervasive disregard of Fourth Amendment requirements and the attendant threat that Plaintiffs will be subjected to future unconstitutional detentions constitute irreparable harm sufficient to justify an injunction. Otherwise, the KHP would be able to openly flout the Fourth Amendment's requirements so long as it could afford to remunerate the rare plaintiff who files a successful damages claim. As the Court pointed out, "[i]ndividual lawsuits against KHP troopers have not persuaded and evidently will not persuade the KHP to adopt permanent and comprehensive changes that are necessary to protect plaintiffs

4

and similarly situated motorists from constitutional violations in the future." (Doc. #539 at 67-68); *see also id.* at 60 n.60 (noting that "[d]amage suits under Section 1983 are especially unavailing in most cases, thanks to the doctrine of qualified immunity"). The KHP's intransigence in the face of damages liability, including in *Vasquez* itself, supports the Court's conclusion that injunctive relief is warranted to rein in troopers' unconstitutional interdiction practices.

Smith alternatively argues that the Court's irreparable harm analysis was deficient because it does not specifically state that Plaintiffs face "an *immediate* risk of *great*, *irreparable* injury." (Doc. #547 at 4) (emphasis original) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983)). This argument is purely semantic. In *Lyons*, the Supreme Court held that Lyons lacked standing to pursue injunctive relief where he could not show an appreciable risk that he would again be subject to an unconstitutional chokehold. *Id.* at 105–07. The Court further stated that, even if Lyons' damages claims could somehow confer standing to pursue injunctive relief, his inability to establish a nonspeculative risk of future injury would likewise have precluded him from making the necessary irreparable harm showing. *Id.* at 111 ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]"). The Court acknowledged, however, that Lyons' fears would not have been speculative had he "allege[d] that he would have another encounter with the police" and "that the City ordered or authorized police officers to act in such a manner." *Id.* at 105–06.

This Court found that Plaintiffs confront just such a situation here, given the highly disproportionate rates at which the KHP stops and detains out-of-state drivers, based on inappropriate criteria, as well as the KHP's routine use of the Kansas Two-Step. (Doc. #539 at 57–58). That finding is sufficient to establish irreparable harm, as well as standing. *See Melendres I*,

KC 20751499.1

836 F. Supp. 2d at 979 ("The likelihood that any particular named Plaintiff will again be stopped in the same way may not be high. However, if MCSO detains people, as they claim a right to do, without reasonable suspicion that they have violated essential elements of a criminal law—either state or federal—exposure to that policy is both itself an ongoing harm and evidence that there is 'sufficient likelihood' that Plaintiffs' rights will be violated again." (citing *Lyons*, 461 U.S. at 111)), *aff'd sub nom. Melendres v. Arpaio* (*Melendres II*), 695 F.3d 990 (9th Cir. 2012). Contrary to Smith's suggestion, the Court fully accounted for comity and federalism principles in its balance of harms analysis, and it carefully tailored the proposed injunction to avoid undue interference with the KHP's legitimate law enforcement activities. (Doc. #539 at 68–71). Although Smith faults the Court for not using his preferred formulation of the irreparable harm test, the irreparable harm analysis does not turn on the use of magic words.[1]

## II.   THE PROPOSED INJUNCTION IS NARROWLY TAILORED TO ADDRESS THE FOURTH AMENDMENT VIOLATIONS IDENTIFIED IN THE COURT'S OPINION.

Smith's complaints about the proposed injunction's scope are equally unavailing. "Once a right and a violation [of the Constitution] have been shown," as in this case, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Cole v. City of Memphis*, 108 F. Supp. 3d 593, 608 (W.D. Tenn. 2015)

---

[1] Smith asserts that the risk of future harm to Plaintiffs is "certainly not immediate" because "Plaintiffs are from out of state and are not routinely traveling on Kansas highways." This statement is inaccurate—Plaintiff Joshua Bosire lives in Kansas, but frequently rents cars, which have out of state plates, to drive to Colorado to visit his daughter. (Doc. #539 at 27). The Court also found that, based on testimony at trial from each Plaintiff, "[a]ll plaintiffs continue to travel through Kansas on Kansas highways, and they fear that they will be detained by KHP troopers in the future." *Id.* at 57. It is also worth reminding Smith that this case began as a class action. Plaintiffs only stipulated to proceeding without a class because the Defendant at the time, Colonel Herman Jones, agreed that the relief issued in this case could benefit the entire proposed class, even if a class was not certified.

KC 20751499.1

(quoting *Swann v. Charlotte-Mecklenberg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). The Tenth Circuit "has directly applied to institutional reform litigation the vital principle that a federal court's equitable powers are inherently sufficiently broad to allow federal courts to fashion effective injunctive relief to cure federal constitutional violations." *Duran v. Carruthers*, 678 F. Supp. 839, 846-47 (D.N.M. 1988) (citing *Battle v. Anderson*, 708 F.2d 1523 (10th Cir. 1983)), *aff'd*, 885 F.2d 1492 (10th Cir. 1989); *see also Battle*, 708 F.2d at 1538 ("[T]he courts intervene, not simply to prevent isolated instances of misconduct, but rather to remove a threat to constitutional values posed by the manner of operation of the institution.").

Although courts "must be sensitive to the State's interest[s]," they "nevertheless must not shrink from their obligation to 'enforce the constitutional rights of all persons . . . [.]'" *Brown v. Plata*, 563 U.S. 493, 511 (2011) (quoting *Cruz v. Beto*, 405 U.S. 319, 321 (1972)); *see also Swann*, 402 U.S. at 15 (if state "authorities fail in their affirmative obligations [to uphold federal law] . . . judicial authority may be invoked"). Thus, courts have consistently held that when a state or local law enforcement agency suffers from a "persistent pattern of police misconduct, injunctive relief is appropriate." *Allee v. Medrano*, 416 U.S. 802, 815 (1974); *see also* Pls.' Reply Br. in Further Support of Their Proposed Finding of Fact & Conclusions of Law, at 17 n.70, Doc. #532 (collecting cases). "In this tailoring of remedies, of course, the preferred course is to preserve as much discretion for state administrators as possible. Yet, where constitutional rights have been violated, comity does not require, or even permit, a federal court to countenance those violations." *Duran*, 678 F. Supp. at 847.

The proposed injunction in this case strikes the appropriate balance between the duty to protect federal constitutional rights, on the one hand, and the need to respect principles of federalism and comity, on the other. Its provisions are broadly consistent with orders that have

KC 20751499.1

been implemented in similar cases. *See Melendres v. Arpaio* (*Melendres III*), No. CV-07-02513-PHX-GMS, 2013 WL 5498218, at *1 (D. Ariz. Oct. 2, 2013), *aff'd in relevant part, vacated in part*, (*Melendres IV*), 784 F.3d 1254 (9th Cir. 2015); *see also* 959 F. Supp. 2d at 675–88. *Cf. generally* U.S. Dep't of Justice, Police Reform Finder (database containing provisions from court-ordered police reform litigation handled by the federal government).[2]

### A.   Plaintiffs' Responses to Smith's Specific Objections

#### 1.   Section I.B.

Smith wrongly argues that the term "investigatory stop" is undefined and asserts that requiring the KHP to document all traffic stops would be unduly burdensome.

First, it is well-established that traffic stops are a form of investigatory stop. *See Arizona v. Johnson*, 555 U.S. 323, 327 (2009) ("[W]e hold that, in a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation.").

Second, the creation of a system for collecting comprehensive data on vehicle stops is necessary to ascertain whether KHP troopers are complying with this Court's Order and the Fourth Amendment. *See* Doc. #539 at 49 (stating that "lack of data has made it difficult to determine the extent to which KHP practices have led to ongoing violations of drivers' Fourth Amendment rights, how frequently violations occur and whether those violations have factors in common"). Smith does not cite any evidence or authority to support his bald assertion that requiring the KHP to document all investigatory stops, including traffic stops, would be unduly burdensome. To the contrary, a similar documentation requirement was imposed, and upheld on appeal, in *Melendres*. *See Melendres III*, 2013 WL 5498218, at *17–18; *Melendres IV*, 784 F.3d at 1266; *see also Nicacio*

---

[2] https://www.justice.gov/crt/page/file/922456/download.

KC 20751499.1

*v. INS*, 797 F.2d 700, 706 (9th Cir. 1985) (upholding injunction requiring INS to record particularized grounds for motorist stops in order to prevent future racial profiling), *overruled in part on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc). And Smith's predecessor himself changed KHP policy on September 19, 2022, stating that "KHP troopers must fill out Form HP-141 to document traffic stops even when the stop does not result in an arrest or seizure." (Doc. #539 at 47). This provision of the Proposed Injunction merely ensures that KHP troopers provide sufficient documentation to enable meaningful review of their interdiction practices and methodizes part of a procedure that the KHP has already determined was appropriate to adopt.

2.    Section I.C.

Smith is also wrong when he argues that the Proposed Injunction's documentation deadlines—requiring KHP troopers to submit documentation by the end of their shift, and requiring supervisors to review that documentation within 12 hours—are impractical, especially since the Proposed Injunction also requires supervisors to work the same shifts as the troopers they are assigned to supervise. He proposes instead that troopers should be required to submit their documentation within 48 hours after the end of their shifts, and that supervisors should have 72 hours to review the documentation.

Contemporaneous documentation and prompt supervisory review of KHP troopers' investigatory stops promotes accuracy and accountability *See* (Doc. #539 at 46) (noting that the absence of contemporaneous documentation of investigatory stops forced troopers to "try to reconstruct the basis for reasonable suspicion" when a motorist filed a complaint or lawsuit). Plaintiffs recognize that it would be difficult for a supervisor to review documentation submitted at the end of a trooper's shift within 12 hours, given that supervisors are required to work the same

KC 20751499.1

days and hours as the troopers they are assigned to supervise. In recognition of this, Plaintiffs respectfully propose a revision to accommodate Smith's concern:  supervisors should be required to review documentation submitted for a given shift by the end of the supervisor's following shift, and (absent exceptional circumstances) within 72 hours after the stop occurred. If a trooper's regular supervisor is unavailable for more than 72 hours after a stop occurs, Plaintiffs propose that the KHP should assign an available supervisor to review the documentation as soon as possible. A similar contemporaneous documentation and review requirement was imposed in *Melendres*. *Melendres III*, 2013 WL 5498218, at *26 ("MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information.").

3.      Section II.A.

Smith incorrectly argues that it would be impractical to require KHP troopers to receive approval from a supervisor prior to conducting a search that is purportedly based on consent, given that a trooper's supervisor may be unavailable at the time consent is requested. He asserts that this requirement will unduly lengthen the amount of time a driver is detained while awaiting supervisory approval for a search.

As the Court pointed out in its Order, "[m]ost drivers do not know that they have a right to deny consent [to a search], and troopers are more than happy to exploit their lack of knowledge of their legal rights. Even though the law requires that consent be knowing, intelligent and voluntary, troopers don't generally let such niceties stand in their way." (Doc. #539 at 4) (footnote omitted). The Court found that KHP troopers frequently use the Kansas Two-Step maneuver to obtain consent to a vehicle search under coercive circumstances, or to develop reasonable suspicion in

KC 20751499.1

the event consent is denied. *Id.* at 5, 52–53, 66. Plainly, evidence at trial demonstrated that troopers across ranks and geographic regions were unable to accurately ascertain whether a driver has knowingly, intelligently, and voluntarily consented to a vehicle search. Supervisory review *prior* to an ostensible consent search is essential to prevent further Fourth Amendment violations.

Although the KHP operates throughout Kansas, that should not prevent troopers from radioing their supervisors as needed to obtain approval for a search. And because the Court's Proposed Injunction would require supervisors to work the same shifts as the troopers under their command, a trooper's regular supervisor should ordinarily be available to review a request for approval to conduct a consent search. In the event a trooper's regular supervisor is unavailable when a trooper requests approval for a consent search, Plaintiffs propose that the KHP should assign an available patrol or interdiction supervisor to review the trooper's request.

4.      Section II.B.

Smith is wrong when he argues that requiring troopers to affirmatively inform motorists of their right to refuse or revoke consent to a search at any time, and to document this consent in writing, imposes a burden on KHP that is not required under the Fourth Amendment.

As discussed above, it is well-established that courts have broad remedial powers to address identified constitutional violations. *See, e.g.*, *Swann*, 402 U.S. at 15. "Once a constitutional violation is established, remedial decrees may require actions not independently required by the Constitution if those actions are, in the judgment of the court, necessary to correct the constitutional deficiencies." *Duran*, 678 F. Supp. at 847; *accord Melendres IV*, 784 F.3d at 1265. "Therefore, an injunction exceeds the scope of a district court's power only if it is 'aimed at eliminating a condition that does not violate the Constitution or does not flow from such a

11

violation.'" *Melendres IV*, 784 F.3d at 1265 (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)).

Although the Supreme Court has held that a law enforcement officer's failure to affirmatively disclose a person's right to refuse or revoke consent to a search does not automatically render the consent unknowing or involuntary, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 232–33 (1973), this Court found that KHP troopers routinely use the Kansas Two-Step in an attempt to extract such consent under circumstances that are deceptive and coercive. (Doc. #539 at 4–5, 52–53, 66). The Court affirmatively found that under these circumstances many motorists would not know that they could decline to answer additional questions from the officer or decline a search of their vehicle. *Id.* at 53. Requiring troopers to affirmatively disclose the right to refuse or revoke consent to a search—at least until the KHP has purged itself of the taint of the constitutional violations identified in the Court's Order—is consistent with this Court's broad remedial power and duty to root out the KHP's unconstitutional interdiction practices.[3]

        5.      Section II.C.

Smith suggests that the second sentence of this provision is duplicative of Section II.B. He recommends deleting the last three words ("to the search") to render it non-duplicative. And Smith is mistaken in his argument that requiring troopers to obtain consent to re-engage with a subject after a traffic stop has concluded, and to document that consent in writing, imposes a burden on KHP that is not required under the Fourth Amendment.

---

[3] The KHP already has a non-mandatory policy and related form for KHP troopers to document consent searches and obtain signature from the consenting motorist on a specific form. KHP could convert this policy into a mandatory policy and adopt the related form as part of the paperwork that troopers must complete during traffic stops. Regardless, Smith offers no compelling reason why converting a preexisting voluntary KHP policy into a mandatory policy would be overly onerous for KHP troopers.

KC 20751499.1

Plaintiffs agree that the last three words of the second sentence could be deleted. Alternatively, the second sentence could be modified to state: "The written form shall include separate signature lines for the trooper to certify that the trooper has read and explained these rights to the subject, and for the subject to affirm that he or she understands the right to refuse and to revoke consent **to further voluntary discussion with the trooper**."

Smith's broader objection is meritless. The Supreme Court has held that the Fourth Amendment does not "require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary." *See Ohio v. Robinette*, 519 U.S. 33, 39–40 (1996). However, as this Court correctly found, "KHP troopers conduct the Kansas Two-Step under circumstances where reasonable drivers do not feel free to leave and do not knowingly, voluntarily and intelligently consent to re-engage with the trooper. In the traffic stops examined at trial, a reasonable driver would not believe that the coercive aspect of the original traffic stop had ceased." (Doc. #539 at 52-53). In light of KHP troopers' abuse of the Kansas Two-Step in a manner that violates the Fourth Amendment, the Court properly exercises its broad remedial powers to prevent KHP troopers from initiating ostensibly "voluntary" encounters that are in fact deceptive or coercive.

6.    <u>Section V.</u>

Smith unreasonably argues that requiring supervisors to work the same days and hours as the troopers to whom they are assigned would be impractical, given the KHP's recruitment and funding constraints.

The evidence presented at trial indicates that the KHP's inadequate supervision of troopers contributes to the Fourth Amendment violations identified in the Court's Order. *See* (Doc. #539 at 53–55) (describing KHP's lax training and supervision practices, including with regard to Fourth

Amendment requirements). Plaintiffs' police practices expert, Chief Hassan Aden, testified concerning flaws in the KHP's practices that prevent supervisors from providing effective oversight, accountability, and support to KHP troopers in the performance of their duties. Courts can remedy such flawed practices through injunctive relief.  For example, the district court in *Melendres III* ordered the Maricopa County Sheriff's Office to require supervisors to work the same days and hours as the troopers assigned to their command in response to pervasive Fourth Amendment violations by that agency. *Melendres III*, 2013 WL 5498218, at *25 ("Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances."). Although Smith complains about the practicability of this remedy, he does not identify any alternative means to ensure that KHP troopers receive adequate supervision.

7.     Section VI.

Smith argues that the first paragraph of this provision, and subsections A and B, are unnecessary because the KHP already maintains audio and visual recordings for traffic stops and interactions with motorists. He also argues that the last sentence of this provision, stating that "[s]upervisors shall refer for investigation any trooper who fails to properly make and preserve such recordings," is vague, unnecessary, and unduly interferes with established procedures for ensuring compliance with KHP policy.

As already discussed, contemporaneous documentation of investigatory stops by KHP troopers is needed to enable meaningful review of their interdiction practices for compliance with this Court's Order and Fourth Amendment requirements. Similar audiovisual recording requirements have been ordered in analogous cases. *Melendres III*, 2013 WL 5498218, at *19; *Floyd*, 959 F. Supp. 2d at 684–85. Even if the KHP currently requires maintenance of audiovisual

recording, nothing prevents the agency from unilaterally rescinding this self-imposed policy at any time. Furthermore, it appears that this policy is imperfectly implemented. *See* Order at 14 n.23, Doc. #539 (noting that, "[f]or unknown reasons, the dash camera footage of this traffic stop ends 40 minutes into the traffic stop"). To the extent that this provision codifies current KHP practice, there is no reason not to include it in the injunction.

Plaintiffs propose that the last sentence of this provision should be amended to clarify that "[s]upervisors shall refer for investigation **by the Professional Standards Unit** any troopers who fail to properly make and preserve such recordings." Requiring the KHP's Professional Standards Unit to investigate violations of the Proposed Injunction would not unduly interfere with the KHP's internal procedures and practices. *See Melendres III*, 2013 WL 5498218, at *25 ("The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation."); *Floyd*, 959 F. Supp. 2d at 685 ("The Monitor will establish procedures for the review of stop recordings by supervisors and, as appropriate, more senior managers.").

8.     Section VII.

Smith argues that the appointment of a special master is unnecessary and unduly burdensome because it assumes that the KHP will not comply with any injunction issued by this Court. Smith further asserts that the evidentiary record does not support the conclusion "that KHP routinely engages in 'unconstitutional policing,'" (Doc. #547 at 9). He also objects that requiring the KHP to provide the "information and data demanded by the special master and to participate in various outcome assessments, compliance reviews and audits will place an undue burden on an already understaffed agency," and that "there is no evidence in the record indicating that KHP has

15

sufficient funds to pay all fees, costs and expenses of the special master without diverting said funds from other legitimate law enforcement purposes." *Id.* at 10.[4] Finally, Smith asserts that the "grant of such broad authority to the special master does not adequately account for the state's interests as a separate sovereign, conducting and directing its own law-enforcement activities." *Id.*

Smith's hyperbolic contention that the Proposed Injunction would place "the Court, acting through the special master, in the position of reviewing virtually every traffic stop made by KHP," *id.* at 5, is unfounded. To the contrary, the Court expressly declined to "fashion injunctive relief that will require this Court to supervise in perpetuity every traffic stop that KHP troopers perform," and further declined to "fashion relief that will permit every driver subjected to a KHP traffic stop to come directly to federal court and allege that the stop violated the injunction." (Doc. #539 at 70). Rightly so. Consistent with these statements, the Proposed Injunction does not assign the broad powers of which Smith complains. Instead, it states that the "Special Master shall develop a plan for conducting outcome assessments and compliance reviews and audits, and shall submit said plan to the parties and the Court, for review and approval. Two years after appointment, the Special Master shall conduct a comprehensive assessment to determine whether and to what extent the intent of the plan has been achieved." *Id.* at 79. Smith's objections to the scope of the special master's powers are therefore premature.

However, given Smith's concerns, Plaintiffs respectfully propose that the Court should designate a monitor, rather than a special master, to perform the assessment functions described in the Proposed Injunction. Although the terms are often used interchangeably, *Jackson v. Los Lunas Ctr. for Persons with Dev. Disabilities*, No. CV 87-0839 JP/KBM, 2012 WL 13076262, at *89

---

[4] Needless to say, Plaintiffs do not bear the burden of establishing the KHP's ability to cover the costs of compliance with the Court's remedial orders.

KC 20751499.1

(D.N.M. Oct. 12, 2012), special masters exercise broad quasi-judicial powers—including the authority to convene hearing, regulate proceedings, and make findings of fact and conclusions of law—while a monitor's "primary role is limited to ensuring or monitoring compliance with a court's orders," *id.* at 91.[5] Multiple remedial orders governing police reform across the country employ the use of a monitor to serve as the eyes and ears of the Court and ensure compliance with the Court's orders, without involving the Court itself in micromanagement of law enforcement operations—precisely the fear Smith articulates. A monitor is a commonplace, important component of ensuring that the Court's agreement is properly implemented and having its intendent effect.

Insofar as Smith argues that *any* review of the KHP's compliance with the Court's Order by a court-appointed neutral would be unjustified, however, he is plainly mistaken. First, the evidentiary record amply supports the Court's finding "that disregard of *Vasquez* is pervasive within the ranks of the KHP." (Doc. #539 at 64). In addition to the numerous individual detentions reviewed at trial, most of which lacked reasonable suspicion, Dr. Mummolo's statistical analysis found that out-of-state drivers are massively overrepresented in the KHP's traffic stops *and* canine sniffs. *Id.* at 11–12. As the Court noted, these disparities "cannot be explained except by the inescapable inference that KHP troopers routinely consider out-of-state license plates, in combination with other factors, in developing reasonable suspicion," and KHP did not present any evidence supporting an alternative explanation. *Id.* at 12. Testimony at trial made clear that KHP did not take *Vasquez* seriously, and many in leadership believed that the Tenth Circuit's ruling was incorrect and unworthy of troopers' attention. Short of a direct order to disregard *Vasquez*, it is hard to imagine how the evidence could be any clearer.

---

[5] Federal Rule of Civil Procedure 53 governs the appointment and duties of special masters.

KC 20751499.1

Second, the appointment of a monitor to assess a state or local law enforcement agency's compliance with a remedial injunction is well within the Court's discretion. *See Melendres IV*, 784 F.3d at 1266–67 ("[M]ost of the provisions dealing with the scope of the Monitor's assessment authority are aimed at eliminating the constitutional violations found by the district court and therefore do not constitute an abuse of discretion."); *Floyd*, 959 F. Supp. 2d at 676 (appointing independent monitor in police practices case). "Although states have argued that the appointment of a compliance administrator with broad powers unjustifiably interferes with a state's right to self-governance, courts have rejected that argument so long as the compliance administrator's powers 'are confined to implementation of the district court's remedial orders,' last no longer than necessary, and are the least intrusive effective remedy." *Jackson* 2012 WL 13076262, at *90 (collecting cases)). *Accord, e.g.*, *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir. 1994); *Kendrick v. Bland*, 740 F.2d 432, 438 (6th Cir. 1984). Moreover, KHP's pervasive disregard of *Vasquez* belies Smith's assertion that the agency can be trusted to implement judicial decisions without independent supervision.

Finally, it is only proper that the KHP should be liable for the special master's or monitor's fees and expenses. *See, e.g.*, *Melendres III*, 2013 WL 5498218, at *31 ("Defendants shall bear all reasonable fees and costs of the Monitor."); *Floyd*, 959 F. Supp. 2d at 678 ("The City will be responsible for the reasonable costs and fees of the Monitor, his staff, and any experts he retains."). The KHP's monetary liability in this case is a direct result of the agency's own misconduct, and the KHP therefore bears the burden of putting things right. If law enforcement agencies could evade compliance review merely by complaining about the associated expense, courts would have no effective means to ensure that their orders are being followed.

KC 20751499.1

**CONCLUSION**

For the foregoing reasons, none of Smith's arguments against the Proposed Injunction are persuasive. Plaintiffs therefore respectfully request that the Court enter its proposed relief, with the slight modifications discussed above and in prior submissions to the Court.

Respectfully submitted by,

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF KANSAS**
s/ Sharon Brett

| | |
|---|---|
| Sharon Brett | KS # 28696 |
| Kunyu Ching | *Pro hac vice* |

15601 Barkley St., Suite 500
Overland Park, KS 66212
Phone: (913) 490-4110
Fax: (913) 490-4119
sbrett@aclukansas.org
kching@aclukansas.org

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

| | |
|---|---|
| Brian Hauss | *Pro Hac Vice* |

125 Broad Street, Floor 18
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
bhauss@aclu.org

and

**SPENCER FANE LLP**
s/ Madison A. Perry

| | |
|---|---|
| Leslie A. Greathouse | KS # 18656 |
| Patrick McInerney | KS # 22561 |
| Madison A. Perry | KS # 27144 |
| Olawale O. Akinmoladun | KS # 25151 |

1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Phone: (816) 474-8100
Fax: (816) 474-3216
lgreathouse@spencerfane.com

KC 20751499.1

pmcinerney@spencerfane.com
mperry@spencerfane.com
wakinmoladun@spencerfane.com

***Attorneys for Plaintiffs***

KC 20751499.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of August 2023, a copy of the foregoing was filed and served via the Court's electronic filing system on all counsel of record.


s/ Madison A. Perry
Attorney for Plaintiffs

KC 20751499.1