# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BLAINE FRANKLIN SHAW, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ERIK SMITH in his official capacity as the Superintendent of the Kansas Highway Patrol, *et al.*, <br><br> *Defendants*. | **Case No. 19-1343-KHV-GEB** |
| MARK ERICH, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> ERIK SMITH, *KHP Superintendent,* <br><br> *Defendant.* | **Case No. 20-1067-KHV-GEB** |

### PLAINTIFFS' POSITION ON UNRESOLVED ISSUES
### OF THE PROPOSED INJUNCTION

On September 11, 2023, the Court held a hearing regarding unresolved issues pertaining to the Court's proposed injunctions. The Court raised two issues and requested additional briefing on each. The first concerns the appropriate scope of the injunction and the effect of prior discussions regarding class certification on the conduct that is to be enjoined. The second concerns a small number of discrete provisions in the injunction and the parties' proposed revisions. Plaintiffs address each of these issues below.

**I.     THE RELIEF THE COURT HAS PROPOSED ENJOINS THE KANSAS HIGHWAY PATROL AS A WHOLE AND INURES TO THE BENEFIT OF ALL MOTORISTS.**

All parties agree that all motorists and future motorists should benefit from the Court's injunction and all KHP troopers will be bound by it. For this reason, and as further detailed below, the Court's proposed injunction should apply as such.

The Court's Memorandum and Order (Doc. #539) finding that the Kansas Highway Patrol (KHP) engages is a broad pattern of unconstitutional detention practices merits the issuance of an injunction that stops these practices agency-wide, for all motorists traveling within and across Kansas. Proposed class definitions from a motion for class certification filed three years ago, and denied as moot 2.5 years ago, should have no impact on the Court's legal findings in this case.

In resolving the merits of Plaintiffs' claims and finding that Plaintiffs are entitled to an injunction, this Court held that "[P]laintiffs have demonstrated a sufficiently realistic threat that the KHP will violate their Fourth Amendment rights in the future" to establish standing. (Doc. #539 at 59). In part, the Court based this conclusion on evidence presented at trial that the pattern of constitutional violations complained of by Plaintiffs is widespread within the KHP, despite prior judicial admonitions, such as those offered in *Vasquez v. Lewis*. 834 F.3d 1132, 1138 (10th Cir. 2016). In particular, the Court found that Dr. "Mummolo's statistical evidence indicates that disregard of *Vasquez* is pervasive within the ranks of the KHP, and the KHP's deficient data collection regarding traffic enforcement and drug interdiction practices (1) makes it impossible to determine how pervasive this problem is, and (2) has likely enabled this disregard to escape the KHP's attention for many years." (Doc. #539 at 64). The Court further found that the "KHP is engaged in a pattern or practice of prolonging traffic stops by using the Kansas Two-Step to coerce

drivers into answering questions when the troopers do not have reasonable suspicion and the drivers do not feel free to leave," in violation of basic Fourth Amendment principles. *Id.* at 66.

Those findings are what must control the scope and impact of the ultimate injunction; not an outdated definition of a proposed class that was never entered and has never governed proceedings in this case. Years ago—before expert discovery, dispositive briefing, and other important developments in the case—the parties agreed that class certification was unnecessary because any injunction issued in this case would circumscribe the actions of all KHP employees going forward and therefore benefit *all* motorists, not just Plaintiffs. This was the exact practical reality KHP acknowledged during the briefing on class certification. For example, Defendant recognized that even without a class, "any declaratory or injunctive relief which has been demanded would run to all persons similarly situated" and "The persons bound by the Court's injunctive orders demanded by the plaintiffs include all Kansas Highway Patrol troopers." Doc. 166 at pp. 2-3; *see also* Doc. 88 pp. 5-6, Defendant's Opposition to Class Certification. Indeed, KHP realized that the "equitable relief that the named plaintiffs demand, if granted, would benefit the putative class members [in fact more, future motor vehicle drivers and passengers] without the certification of a class." Doc. 166 at p. 3. Plaintiffs agreed to not proceed as a class—and therefore, have no operative class definition governing the case—with that understanding in mind. *See* Doc. 165 at p. 2, Plaintiff's Response to the Court's Order to Show Cause ("as long as this Court's orders will operate across the [KHP] on all its troopers' interactions with travelers, class certification is unnecessary.").

Importantly, since the issuance of the Court's order overruling as moot Plaintiffs' motion for class certification (*see* Doc. 185), *neither* party has advanced a position that the previously proposed class definition would continue to control the proceedings, or the scope of an injunction

3

issued in this case. Rather, the parties have briefed unresolved issues and advanced through trial and post-trial briefing without any reference to this previously overruled motion and the class definition contained therein, in recognition of the fact that because it was overruled, that briefing would have no impact on the scope of relief to which Plaintiffs would be entitled if they prevailed. For example, neither party relied on the definition proposed in the overruled motion in the Pretrial Order, nor in their proposed findings of fact and conclusions of law.

This is because the parties agreed that the entirety of KHP would be bound by any injunction issued by this Court, and that such an injunction would benefit all motorists, not just Plaintiffs. That understanding remains today. Crucially, without that understanding, Plaintiffs would have vigorously pursued their motion for class certification, as their interest in pursuing a claim for injunctive relief was to ensure that these practices ceased and that no other motorists would experience what they went through during their stops and detentions by KHP troopers. *See, e.g.* Bench Trial Transcript Vol. 1 (May 1, 2023), Testimony of Shawna Maloney (describing that she brought the lawsuit because she wants to prevent KHP from doing to other families what happened to her and her family).

For the foregoing reasons, Plaintiffs respectfully submit that the previously suggested, yet overruled, class definition has no bearing on the scope of the injunction that should be issued in this case. Instead, the parties agreement governs: the entirety of the KHP will be bound by the ordered injunction, without regard for who they are stopping or where they are stopping them. In this way, the Court's injunction will account for the evidence presented at trial and the findings in the Court's prior Memorandum and Order—namely, that the KHP has been engaged in a widespread practice of constitutional violations—and the injunction should bind the KHP as a whole, to the benefit of all motorists traveling in and through Kansas.

II. **REMAINING UNRESOLVED ISSUES REGARDING THE COURT'S PROPOSED INJUNCTION.**

The Court also requested further discussion amongst the parties and briefing on remaining disputes regarding specific provisions of the proposed injunction. Plaintiffs state their position on each of these issues below.

    a. **Evidence Presented at Trial was Sufficient to Ensure the Scope of the Injunction Covers all Kansas Highway Patrol Troopers and across the State of Kansas.[1]**

Evidence at trial demonstrated that KHP's war on drivers is not limited to I-70. Its battle extends across the state. Plaintiffs put on ample evidence regarding KHP training, supervision practices, documentation, and troopers' understanding of basic constitutional law as relevant to the issues litigated in this case. *None* of this evidence demonstrated that the problems it revealed were limited in scope to I-70. Quite the contrary; the evidence demonstrated pervasive problems across troops, troopers, and troop leaders. The injunction should therefore account for the widespread nature of the evidence presented. There is no legal or factual justification to limit the reach of the injunction to only stops occurring on I-70, and doing so would create inequities for Plaintiffs that undermine the point of the injunction as a whole.

The evidence at trial showed that *all* KHP troopers engage in interdiction work. The KHP encourages *all* its troopers, by policy, to employ Criminal Interdiction Traffic Enforcement (CITE) procedures following traffic stops. KHP trains that to be a successful trooper, a trooper must be able to look past the traffic violations for indications of criminal activity. The evidence at trial showed that troopers use traffic laws and traffic stops to accomplish their goal of interdiction work throughout the state—not just on I-70.

---

[1] As noted above, all parties agree that all motorists and future motorists should benefit from the Court's injunction and all KHP troopers will be bound by it. For this reason, and as further detailed below, the Court's proposed injunction should apply as such.

5

KHP training explicitly directs troopers to engage in a large volume of traffic stops and detentions, without reference to I-70 or any other specific location. For example, slides from advanced interdiction training instructs troopers to "go beyond the traffic stop," and lists a variety of reasons why, including that doing so "puts excitement into routine patrol." The slides note that a successful KHP trooper "must make high volume traffic stops" and that troopers should "avoid becoming discouraged when things are slow," because "hundreds of traffic stops might occur with no arrests made." The slides emphasize that "the key is high volume traffic stops" and troopers must "STOP A LOT OF CARS!" The final note on one slide states: "2,782 activities 2,144 public contacts = 36 significant seizures," indicating the math behind KHP's volume practice. This training is in no way limited to I-70.

Trooper testimony likewise established that KHP troopers apply these principles beyond I-70. For example, Lt. Rohr testified that he considers travel on certain highways or roads as a factor in forming reasonable suspicion. Lt. Rohr has even relied on the mere fact of travel on K-10 and I-35, as well as I-70, as part of forming reasonable suspicion because, according to him, it is easy to travel on those roads and quicker than traveling on back roads, meaning drug traffickers might use those roads.

Similarly, troopers consider travel destinations or states of origin that are not directly linked to I-70 to be suspicious. For example, Lt. Rohr considered Plaintiff Erich and Plaintiff Maloney's travel destination, Alabama, to be suspicious. Lt. Rohr testified that state of origin can be indicative of criminal activity because large amounts of drug, narcotics, and criminal activity originate in California, Texas, Colorado, Arizona, Nevada, and Oregon. He said he considers states anywhere east as drug destinations, "even the state of Kansas." Trooper Schulte testified that the fact that Plaintiff Blaine Shaw was coming from Oklahoma was an indicator that added to Trooper

6

Schulte's suspicion because Oklahoma is a drug source state. Trooper Wolting testified that he commonly uses travel plans as a factor to form reasonable suspicion and that someone traveling to and from Oklahoma could be considered suspicious. He also testified that he considers a motorist's route suspicious if they are not taking the most direct route. Lt. Jirak testified he believes it is appropriate to consider the state of origin that someone is traveling from when he stops them. He claims it is appropriate because drug production or distribution are prevalent in certain areas such as Oklahoma; and he acknowledges there are no cities or states that he does not consider to be source locations for drugs because they could come from anywhere. In Lt. Jirak's experience, he considers every city and state to be a distribution hub. Trooper Chandler Rule testified he considers any large metropolitan area to be a known narcotics hub and travel to or from such a location can be suspicious.

Finally, evidence presented as part of Dr. Mummolo's analysis supported the conclusion that KHP's unconstitutional practices are not limited to I-70. His statistical analysis was not limited to I-70; it consisted of datapoints on I-35 and highways around Topeka.

Therefore, testimony at trial demonstrated that KHP's unconstitutional practices are in no way limited to I-70. In the face of this evidence, the requirement that an injunction be "narrowly tailored" does not require that the Court's proposed injunction be limited to I-70. "Once a right and a violation [of the Constitution] have been shown," as in this case, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Cole v. City of Memphis*, 108 F. Supp. 3d 593, 608 (W.D. Tenn. 2015) (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). The Tenth Circuit "has directly applied to institutional reform litigation the vital principle that a federal court's equitable powers are inherently sufficiently broad to allow federal courts to fashion effective

injunctive relief to cure federal constitutional violations." *Duran v. Carruthers*, 678 F. Supp. 839, 846-47 (D.N.M. 1988) (citing *Battle v. Anderson*, 708 F.2d 1523 (10th Cir. 1983)), *aff'd*, 885 F.2d 1492 (10th Cir. 1989); *see also Battle*, 708 F.2d at 1538 ("[T]he courts intervene, not simply to prevent isolated instances of misconduct, but rather to remove a threat to constitutional values posed by the manner of operation of the institution.").

This is especially important because, as a practical matter, KHP should not be permitted to engage in unconstitutional conduct on interstate highways but be prohibited from doing so only on I-70. The fact that the Plaintiffs were each stopped on I-70 has no legal significance for purposes of the scope of the injunction; they could just as easily have been stopped on I-35 or any number of other highways under the KHP's jurisdiction and subjected to the exact same misconduct. For example, Plaintiffs Shaw and Bosire testified to traveling multiple interstate highways to get to Colorado from their homes in Oklahoma and Wichita, respectively. Limiting the injunction to I-70 would mean that if a KHP trooper stopped Mr. Bosire on I-35 heading north to catch I-70 on one of his trips to see his daughter, the trooper could be subject Mr. Bosire to the exact same misconduct that Mr. Bosire experienced in the stop at issue in this lawsuit. That would be a fundamentally unjust result. The facts and evidence in this case do not mandate the issuance of an injunction where a motorist's rights are dependent on the travel route they take. Instead, the Court's injunction can and should cover the KHP's activities wherever they have jurisdiction to police.

**b. KHP should be Required to Continue Documenting all Stops during the Injunction Period (Section III.a.i.1 of the Proposed Injunction).**

Section III.a.i.1 of the proposed injunction requires troopers to document all investigatory stops and detentions, any searches (including canine sniffs) resulting from or proximate to the stop or detention, and any consents to search or to engage with troopers after the conclusion of the traffic stop. KHP has objected to the requirement for documenting all traffic stops as overly broad

and burdensome. These arguments are misplaced and unmoored from current KHP practices. They should be overruled and the provision should be entered as proposed. *See* Proposed Injunction (Doc. 522-1).

As a preliminary matter, Defendant incorrectly argues that all the issues in this case were related to the activities of KHP following the conclusion of the traffic stop and there was no evidence regarding the validity of underlying traffic violations. Testimony at trial showed that KHP recruits are taught at the academy to engage in pretextual stops (e.g., going six miles over the speed limit or drifting over the fog line or following too closely). Evidence and testimony at trial showed that, per their training, KHP troopers frequently engage in pretextual stops, then question motorists about their travel plans, destination, and origin. That questioning may be followed by the Two Step maneuver and additional questions to motorists. Although pretextual stops may be constitutional in many instances, when they are used to further unconstitutional practices such as those identified by the Court in its Memorandum and Order, (Doc. 539), they should be subjected to additional scrutiny.

By way of further example, the Court found the Erich and Maloney stop "was pretextual from its inception [and that] . . . Rohr provoked the traffic violation and that the initial traffic stop cannot be deemed reasonable under that circumstance." Memorandum and Order (Doc. 539) at 22-23. Other examples presented to the Court resulted in similar rulings. *Id.* at 30 (discussing the Kelly stop, "The dashcam footage does not credibly substantiate McCord's claim that Kelly followed the pickup too closely."), *id.* at 33 (discussing Dunn's stop, "The record is insufficient for the Court to definitively find that Dunn did or did not commit a traffic violation. The Court will find, however, that Dunn's traffic stop was exceedingly pretextual."). Therefore, Plaintiff's

disagree at the outset that documenting all traffic violations is beyond the scope of the issues in this case.

While Defendant has yet to provide a proposal to revise the reporting requirement to make it less burdensome, one inquiry posed at the hearing is whether the documentation requirements should be limited to out-of-state vehicles. They should not.

The Court found that "KHP permits troopers to find that a driver is suspicious when the driver is an out-of-state resident *or is traveling to or from a state that has legalized marijuana*." Memorandum and Order (Doc. 539) at 43 (emphasis added), *see also* Doc. 539 at 62-65. As the Court recognized, this was a practice that the Tenth Circuit previously tried to curtail in *Vasquez*. Memorandum and Order (Doc. 539) at 43 ("The Tenth Circuit stated that the fact that a driver is traveling from a 'drug source' city or state such as Colorado 'does little to add to the overall calculus of suspicion,' and is 'so broad as to be indicative of almost nothing.'"), *see also* Doc. 539 at 62-65. Because out-of-state travel plans do not necessarily correlate with out-of-state license plates, the proposed injunction should not be limited in this regard. Holding otherwise would allow unconstitutional detentions of motorists with Kansas license plates but out-of-state travel plans to escape review.

For these reasons, documentation from all stops, regardless of residency, is needed to ensure KHP is adhering to the Court's injunction which requires it to stop relying, as part of a reasonable suspicion calculus, on travel plans which are not implausible or deceptive.[2]

---

[2] For example, Trooper McMillan knew Plaintiff Bosire was from Kansas before deciding to detain him for a dog sniff and he did so in part based on the fact that he believed Plaintiff Bosire was traveling from Colorado. Despite the KHP's Professional Standards Unit finding that Trooper McMillan violated Plaintiff Bosire's constitutional rights, Trooper McMillan was not disciplined.

Moreover, the central issue in this case is why—and when—the KHP turns a routine traffic encounter into something more. Here, statistical evidence was critical to evaluating the KHP's practice and rebutting KHP's claim that it does not have a practice of impermissibly relying on a driver's residency or travel plans to or from a drug source state. To conduct that analysis, Dr. Mummolo needed to know the universe of stops and detentions that KHP engages in so that he could measure the number of stops and detentions that involved out of state motorists or "suspicious travel plans" against those that did not. For example, for the citation analysis, it would be more informative to compare citation outcomes among drivers who were stopped for the same reason. Disparate citation rates among those stopped for the same reasons strongly suggest disparate treatment. Without matching on stop reason, observed disparities could just be due to unobserved differences in the types of stops across the two groups of drivers (i.e. the groups are seen committing different types of offenses pre-stop). To make that comparison, some form of documentation from all stops is necessary. Put simply, the total number of stops and detentions is the denominator against which the numerator (the number of stops and detentions motivated by out-of-state residence or travel plans) must be measured and from which further disparate analyses can be conducted.

Defendant's continued objection that documentation of all stops is burdensome is unsupported and inaccurate. As noted at the September 11 hearing, KHP already documents all traffic stops through its digiticket system. *See e.g.* Exhibit 1, Erich Warning. In hopes of reaching an agreement, Counsel for the parties have met and conferred on this issue. Counsel for Plaintiff clarified that for stops that do not go beyond a ticket or warning, Plaintiff is not seeking additional documentation beyond a spreadsheet that could be produced from the digiticket system.[3] Those

---

[3] Spreadsheets auto-populated from digiticket fields were produced in discovery in this case.

spreadsheets will contain all the required information that is important for fulfilling this provision of the injunction and is already routinely completed by KHP troopers during traffic stops. In other words, for stops that do not result in any action by KHP beyond the issuance of a written warning or traffic ticket—i.e., no request for consent to search the vehicle or engage in additional questioning—the digiticket system already captures the required information, including the date, time, location of the stop; traffic infraction alleged; license plate state; drivers' license state of residency; and outcome (i.e. , warning or ticket). A spreadsheet of those data fields could be produced to comply with this provision of the proposed injunction.

In sum, Plaintiffs are satisfied if Defendant produces spreadsheets containing that already captured information (rather than the producing each and every digiticket written by KHP in a given reporting period). With that information that is already routinely documented in KHP's records and which can be exported to a spreadsheet, the request is not onerous. Counsel for Defendant informed that he is looking into possibilities for reporting from digiticket and believes that the parties may be able to come to a resolution on this. As of the due date of this submission, however, Counsel for Defendant has not responded on this point.

### c. Adequate Supervision – Training

Section III.f. of the proposed injunction addresses the need to ensure adequate supervision to prevent ongoing patterns of constitutional violations and how the KHP can focus on achieving and maintaining close and effective supervision. Defendant objected to a proposed provision in the injunction regarding supervisor shift assignments, arguing that complying with that provision would require hiring over 100 new supervisors. Plaintiffs agreed to confer regarding other options.

At the September 11 hearing, Defendant's counsel acknowledged close and effective supervision requires communicating standards and requirements to troopers, monitoring troopers'

actions, and holding troopers accountable when failing to adhere to standards and requirements. Plaintiffs agreed that in lieu of the abovementioned provision regarding supervisor shift schedules, additional provisions regarding supervisory training could be added to the proposed injunction to account for the deficiencies in supervision identified by the Court in the Court's Memorandum and Order.

Counsel for Defendant has indicated that Defendant is considering proposing 4 hours of initial training covering the terms of the injunction, supervisors' responsibilities as first line supervisors, and the forms, documents and procedures to be used. Thereafter, 2 hours of annual training covering any updated documents or procedures and any compliance issues observed during the preceding year.

The proposal Defendant is considering is insufficiently detailed, in that it does not require enough training hours or outline the appropriate topics for supervisory training. In addition, it does not provide any meaningful oversight regarding appropriate training or testing to ensure that supervisors understand and have learned from the training. Finally, it is inconsistent with the general training provisions previously drafted by the Court, in that it does not provide for curriculum approval.

Instead, Plaintiffs propose that the Court add a new provision to subsection III.e (training), as follows:

> Within 30 days of the effective date of this Injunction, the KHP shall create, and present to Plaintiffs for approval, a revised training curriculum and testing protocol for all supervisors at the rank of Sergeant and above. This curriculum shall address proper communication standards, how to monitor troopers' actions (including reviewing troopers' reports), addressing deficiencies in troopers' conduct in the field, and supervisors' obligations under this Agreement and the U.S. Constitution. The parties shall meet and confer regarding any objections to the proposed curriculum and submit an agreed upon curriculum to the Court for approval no later than 45 days from the effective date of this Injunction.

13

Within 60 days of the approval of the curriculum, KHP shall provide all supervisors with at least eight hours of training as described above. KHP supervisors shall receive at least 8 hours of annual in-service training on these topics.

The KHP shall institute a testing protocol which satisfies the Court that each supervisor has mastered the required subjects.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter its proposed relief, with the slight modifications discussed above and in prior submissions to the Court.

Respectfully submitted by,

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF KANSAS**
s/ Sharon Brett
Sharon Brett                    KS # 28696
Kunyu Ching                    *Pro hac vice*
15601 Barkley St., Suite 500
Overland Park, KS 66212
Phone: (913) 490-4110
Fax: (913) 490-4119
sbrett@aclukansas.org
kching@aclukansas.org

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
Brian Hauss                    *Pro Hac Vice*
125 Broad Street, Floor 18
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
bhauss@aclu.org

and

**SPENCER FANE LLP**
s/ Madison A. Perry
Leslie A. Greathouse            KS # 18656
Patrick McInerney               KS # 22561
Madison A. Perry                KS # 27144
Olawale O. Akinmoladun          KS # 25151

1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Phone: (816) 474-8100
Fax: (816) 474-3216
lgreathouse@spencerfane.com
pmcinerney@spencerfane.com
mperry@spencerfane.com
wakinmoladun@spencerfane.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

   I hereby certify that on the 21st day of September 2023, a copy of the foregoing was filed and served via the Court's electronic filing system on all counsel of record.

                s/ Madison A. Perry
                Attorney for Plaintiffs

KC 20846567.2